





















Case: 1:23-cv-00010-PAG Doc #: 3 Filed: 03/14/23 1 of 4. PageID #: 66

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Eddie Van Oliver, III, | ) | **CASE NO. 1:23 CV 10** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| v. | ) | |
| | ) | <u>**Memorandum of Opinion and Order**</u> |
| David Hoffman aka David Huffman, | ) | |
| *et al.*, | ) | |
| Defendants. | ) | |

     *Pro se* Plaintiff Eddie Van Oliver, III filed this action under 51 U.S.C. § 20137 against

David Hoffman aka David Huffman, Susan Fuhman, Robert Campbell, Kristina Rowe, Craig

Carpenter, Brin Saddler, and the Ohio Department of Mental Health. In the Complaint, Plaintiff

alleges he was admitted and discharged from multiple mental health treatment facilities in the

Columbus, Ohio area from April to September 2019. He objects to comments made about him,

David Hoffman aka David Huffman,
*et al.*,                                                     )
                    **Defendants.**                          )
                                                             )

      For the reasons stated in the Court's Memorandum of Opinion and Order, this action is

dismissed pursuant to 28 U.S.C. §1915(e). Further, the Court CERTIFIES pursuant to 28

U.S.C. §1915(a)(3) that an appeal from this decision could not be taken in good faith.


                              /s/ Patricia A. Gaughan
                              PATRICIA A. GAUGHAN
                              United States District Court
Dated:  3/14/23                  Chief Judge

and contends he suffered side effects from the medications given to him. He seeks unspecified damages.

Plaintiff also filed an Application to Proceed *In Forma Pauperis*. (Doc. 2). That Application is granted.

As an initial matter, this Court is not the proper venue for this action. A civil action may be brought only in: (1) a judicial district where any defendant resides, if all defendants reside in

Case: 1:23-cv-00010-PAG Doc #: 3 Filed: 03/14/23 2 of 4. PageID #: 67

the state in which the court is located, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or (3) if there is no district in which an action may otherwise be brought as provided by this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to the action brought. 28 U.S.C. § 1391(b). Plaintiff lists Columbus, Ohio addresses for all of the defendants. He further states that he was treated at the Twin Valley Behavioral Healthcare Hospital, the Columbus Springs East Hospital, and Riverside Methodist Hospital. All of these facilities are in Columbus, Ohio. Columbus is located within Ohio's southern judicial district. The Northern

District of Ohio is not the proper venue for this action.

An improperly venued action must be dismissed unless it is "in the interest of justice" that it be transferred to a district or division in which it could have been brought. 28 U.S.C. § 1406(a). For the reasons stated below, the Court finds that it would not be in the interest of justice to transfer this matter and this action is, therefore, dismissed.

Although *pro se* pleadings are liberally construed, *Boag v. MacDougall*, 454 U.S. 364, 365 (1982) (per curiam); *Haines v. Kerner*, 404 U.S. 519, 520 (1972), the Court is required to dismiss an *in forma pauperis* action under 28 U.S.C. §1915(e) if it fails to state a claim upon which relief can be granted, or if it lacks an arguable basis in law or fact. *Neitzke v. Williams*,

Case: 1:23-cv-00010-PAG  Doc #: 3  Filed: 03/14/23  3 of 4.  PageID #: 68

A cause of action fails to state a claim upon which relief may be granted when it lacks "plausibility in the Complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007). A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). The factual allegations in the pleading must be sufficient to raise the right to relief above the speculative level on the assumption that all the allegations in the complaint are true. *Bell Atl. Corp.*, 550 U.S. at 555. The Plaintiff is not required to include detailed factual allegations, but must provide more than "an unadorned, the-Defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A

pleading that offers legal conclusions or a simple recitation of the elements of a cause of action will not meet this pleading standard. *Id.* In reviewing a complaint, the Court must construe the pleading in the light most favorable to the Plaintiff. *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 561 (6th Cir.1998).

Plaintiff's Complaint does not meet the basic notice pleading requirements. It does not contain many facts. Plaintiff contends he was hospitalized at various times from April 2019 to September 2019. He states there was another hospitalization prior to April 2019, but he does not provide any information about it. He indicates he does not like some of the things that were said about him but does not indicate what was said or who said it. He states he is suffering

Case: 1:23-cv-00010-PAG Doc #: 3 Filed: 03/14/23 4 of 4. PageID #: 69

not allege facts to suggest that this statute applies to his case. No other federal cause of action is apparent on the face of the Complaint. Plaintiff fails to state a claim upon which relief may be granted.

Accordingly, Plaintiff's Application to Proceed *In Forma Pauperis* is granted and this action is dismissed pursuant to 28 U.S.C. §1915(e). The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
—————————————————————
PATRICIA A. GAUGHAN
United States District Court
Chief Judge

Dated: 3/14/23

Case: 1:23-cv-00010-PAG  Doc #: 4  Filed: 03/14/23  1 of 1.  PageID #: 70

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Eddie Van Oliver, III, | ) | **CASE NO. 1:23 CV 10** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| v. | ) | |
| | ) | **Judgment Entry** |

JURY,PRO SE,R/R

## U.S. District Court
## Southern District of Ohio (Columbus)
## CIVIL DOCKET FOR CASE #: 2:23-cv-04268-EAS-EPD

Van Oliver v. State of Ohio Housing Department et al
Assigned to: Judge Edmund A. Sargus
Referred to: Magistrate Judge Elizabeth Preston Deavers
Demand: $1,700,000
Cause: 28:1443(1) Rent, Lease & Ejectment

Date Filed: 12/28/2023
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Eddie Van Oliver, III**

represented by **Eddie Van Oliver, III**
2302 Middlehurst Dr.
Columbus, OH 43219
PRO SE

V.

**Defendant**

**State of Ohio Housing Department**

**Defendant**

**Harvest Woods Apartments**

**Defendant**

**Clintonville Common Apartments**

**Defendant**

**Bend at Broad Apartments**

**Defendant**

**Sherbrook Apartments**

Email All Attorneys

| Date Filed | # | Docket Text |
|---|---|---|
| 12/29/2023 | 2 | Notice of Deficiency re: Requires a filing fee or motion for leave to proceed in forma pauperis. Electronic filers can pay the fee online. Please scroll down to the *event* called, **Pay Fees Via Pay.gov** to pay the required fee. Related Document: 1 Complaint filed by Eddie Van Oliver, III. Deficiency Deadline by 1/29/2024. (sem)(This document has been sent by regular mail to the party(ies) listed in the NEF that did not receive electronic notification.) (Entered: 12/29/2023) |
| 01/02/2024 | 3 | Amended Notice of Deficiency re: Requires a filing fee or motion for leave to proceed in forma pauperis. Electronic filers can pay the fee online. Please scroll down to the *event* called, **Pay Fees Via Pay.gov** to pay the required fee. Related Document: 1 Complaint filed by Eddie Van Oliver, III (notice amended to reflect the correct filing fee amount effective 12/1/23). (sem)(This document has been sent by regular mail to the party(ies) listed in the NEF that did not receive electronic notification.) (Entered: 01/02/2024) |
| 02/26/2024 | 4 | OPINION & REPORT AND RECOMMENDATION re 1 Complaint. Plaintiff's request for leave to proceed in forma pauperis is GRANTED. Plaintiff shall be allowed to prosecute his action without prepayment of fees or costs and that judicial officers who render services in this action shall do so as if the costs had been prepaid. It is RECOMMENDED that Plaintiffs Complaint be DISMISSED in its entirety for lack of subject matter jurisdiction. It is FURTHER RECOMMENDED that the Court certify pursuant to 28 U.S.C. § 1915(a)(3) that for the foregoing reasons an Appeal of any Order adopting this Report and Recommendation would not be taken in good faith and therefore deny Plaintiff Leave to Appeal in forma pauperis. Objections to R&R due by 3/11/2024. Signed by Magistrate Judge Elizabeth Preston Deavers on 2/26/2024. (vb)(This document has been sent by regular mail to the party(ies) listed in the NEF that did not receive electronic notification). (Entered: 02/26/2024) |
| 02/26/2024 | | This entry is for statistical purposes only. See ECF 4 for the document. (Entered: 02/26/2024) |

| 02/26/2024 | 5 | COMPLAINT with JURY DEMAND against All Defendants, filed by Eddie Van Oliver, III. (vb) (Entered: 02/26/2024) |
| --- | --- | --- |

ᑌ

CLOSED,PRO SE

**U.S. District Court**
**Southern District of Ohio (Columbus)**
**CIVIL DOCKET FOR CASE #: 2:23-cv-04267-ALM-KAJ**

Van Oliver v. State of Virginia et al
Assigned to: Chief Judge Algenon L. Marbley
Referred to: Magistrate Judge Kimberly A. Jolson
Cause: 42:1983 Civil Rights Act

Date Filed: 12/28/2023
Date Terminated: 01/24/2024
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Eddie Van Oliver, III**
                                                   represented by  **Eddie Van Oliver, III**
2302 Middlehurst Dr.
Columbus, OH 43219
PRO SE

V.

**Defendant**

**State of Virginia**

**Defendant**

**Dominos Pizza Inc**

**Defendant**

**Kurt**

Email All Attorneys

| Date Filed | # | Docket Text |
|---|---|---|
| 12/28/2023 | 1 | MOTION for Leave to Proceed in forma pauperis by Plaintiff Eddie Van Oliver, III. (Attachments: # 1 complaint, # 2 service documents) (sem) (Entered: 12/29/2023) |
| 01/03/2024 | 2 | ORDER TO SHOW CAUSE: The Court DIRECTS plaintiff to show cause w/in fourteen (14) days why his claims should be adjudicated by this Court and not by a federal judge in the Eastern District of Virginia. Show Cause Response due by 1/17/2024. Signed by Magistrate Judge Kimberly A. Jolson on 1/3/2024. (kk2)(This document has been sent by regular mail to the party(ies) listed in the NEF that did not receive electronic notification) (Entered: 01/03/2024) |
| 01/24/2024 | 3 | ORDER TRANSFERRING this case to the United States District Court of the Eastern District of Virginia. Signed by Magistrate Judge Kimberly A. Jolson on 1/24/2024. (er)(This document has been sent by regular mail to the party(ies) listed in the NEF that did not receive electronic notification.) (Entered: 01/24/2024) |
| 01/24/2024 | | Case transferred to District of Eastern Virginia. Case file and docket sheet sent Electronically. (er) (Entered: 01/24/2024) |
| 01/30/2024 | | ***Notification of transfer of Civil Case from the Southern District of Ohio Case No. 2:23-cv-04267 to the Eastern District of Virginia as case number 1:24-cv-133. (er) (Entered: 01/30/2024) |



# City of Columbus

## Legislation Report

Office of City Clerk
90 West Broad Street
Columbus  OH  43215-9015
columbuscitycouncil.org

**File Number: 1821-2020**

---

**Emergency**

| | | |
|---|---|---|
| **File ID:** 1821-2020 | **Type:** Ordinance | **Status:** Council Office for Signature |
| **Version:** 2 | ***Committee:** Health & Human Services Committee | |
| **File Name:** | | **File Created:** 07/24/2020 |
| | | **Final Action:** |
| **Auditor Cert #:** | **Auditor:** When assigned an Auditor Certificate Number I , the City Auditor, hereby certify that there is in the treasury, or anticipate to come into the treasury, and not appropriated for any other purpose, the amount of money specified hereon, to pay the within Ordinance. | |

**Contact Name/No.:**

---

**Floor Action (Clerk's Office Only)**

---

**Mayor's Action**                          **Council Action**

_____     _____     _____     _____
Mayor                            Date                      Date Passed/ Adopted           President of Council

_____     _____                                      _____
Veto                             Date                                                               City Clerk

---

**Title:**  To require bars, night clubs, and restaurants in the City of Columbus to limit times of operation for onsite consumption of food, beer, wine and liquor to reduce and prevent the spread of Covid-19 through airborne and respiratory droplet transmissions; and to declare an emergency.

**Sponsors:**

**Attachments:**

---

| City of Columbus | Legislation Report | File Number: 1821-2020 |
|---|---|---|

## Approval History

| Version | Seq # | Action Date | Approver | Action | Due Date |
|---|---|---|---|---|---|

City of Columbus            Legislation Report            File Number: 1821-2020

**History of Legislative File**

| Ver. | Acting Body: | Date: | Action: | Sent To: | Due Date: | Return Date: | Result: |
|------|-------------|-------|---------|----------|-----------|-------------|---------|
| 1 | Columbus City Council | 07/27/2020 | Amended as submitted to the Clerk | | | | Pass |
| 1 | Columbus City Council | 07/27/2020 | Approved as Amended | | | | Pass |

**ODI:** Following the review and approval, when required, the Office of Diversity and Inclusion certifies compliance with Title 39 as of date listed.

**City Attorney:** Following review and approval, when required, this ordinance has been reviewed by the City Attorney's Office as to its form and legality only.

Explanation

Due to the ongoing and escalating health crisis and public health emergency and to reduce and prevent the spread of Covid-19 through airborne and respiratory droplet transmissions, there exists a need to reduce the hours of operation for onsite consumption of food, beer, wine and liquor of bars, night clubs, and restaurants in the City of Columbus.

Fiscal Impact: No funding is required for this legislation

Title

To require bars, night clubs, and restaurants in the City of Columbus to limit times of operation for onsite consumption of food, beer, wine and liquor to reduce and prevent the spread of Covid-19 through airborne and respiratory droplet transmissions; and to declare an emergency.

Body

WHEREAS, COVID-19 is a respiratory disease that can result in serious illness or death, caused by the SARS-CoV-2 virus, which is a new strain of coronavirus that had not been previously identified in humans and can easily spread from person to person. The virus is spread between individuals who are in close contact with each other (within about six feet) through respiratory droplets. It may be possible that individuals can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose or eyes; and

WHEREAS, on January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization declared the outbreak of COVID-19 a public health emergency of international concern; and

WHEREAS, on January 31, 2020, Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the United States to aid the nation's healthcare community in responding to COVID-19; and

WHEREAS, on March 9, 2020, Governor Mike DeWine signed an Executive Order declaring a State of Emergency for the entire State of Ohio in relation to COVID-19 pursuant to the Governor's authority vested in him by the Constitution, the laws of the State of Ohio and in accordance with Revised Code section 5502.22; and

WHEREAS, the Governor's Executive Order declaring a State of Emergency for the entire State of Ohio urged all citizens to heed to the advice of the Department of Health and other emergency officials regarding COVID-19 in order to protect their health and safety; and

WHEREAS, on March 12, 2020, Former Ohio Department of Health Director Amy Acton signed an order prohibiting mass gatherings in the state of Ohio; and

WHEREAS, on March 13, 2020, President Donald J. Trump declared a National Emergency, invoking the Stafford Act and allowing the Federal Emergency Management Agency to coordinate disaster response and aid state and local governments in addressing the COVID-19 pandemic; and

WHEREAS, on March 13, 2020, the Columbus Board of Health declared a Public Health Emergency due to this imminent threat of an acutely hazardous disease, posing a high probability of widespread exposure to an infectious agent that poses a significant risk of substantial harm to a large number of people, including a large number of serious or long-term disabilities or a large number of deaths; and

WHEREAS, the CDC reports that people are most contagious when they are most symptomatic (the sickest); however, some spread might be possible before people show symptoms; and

WHEREAS, on March 18, 2020, the Mayor, through Executive Order 2020-01, declared a State of Emergency in Columbus based on the COVID-19 pandemic; and

WHEREAS, on March 22, 2020, under direction of Ohio Governor Mike DeWine, Former Ohio Department of Health Director Amy Acton, M.D. issued an order requiring all Ohioans to stay in their homes to prevent the further spread of COVID-19 until April 6, 2020 and the order was extended until May 1, 2020 and was amended on April 30, May 20 and May 22, 2020 to allow businesses to open with the requirement that face coverings be worn by all employees except in certain circumstances; and

WHEREAS, in the City of Columbus and across Franklin County there is a current and ongoing threat of an acutely hazardous disease, illness, or health condition; specifically, COVID-19, that is believed to be caused by the appearance of a novel infectious agent and Franklin County, where Columbus is located, has been designated by the state Public Health Advisory System Risk Levels as Level 3, characterized by very high exposure and spread with a recommendation to limit activities as much as possible and to follow all current health orders; and

WHEREAS, on July 6, 2020, due to a Level 3 risk designation in Franklin County, characterized by very high exposure to and community spread of COVID-19, Columbus City Council passed Ordinance 1643-2020 requiring a face covering in public spaces in the City of Columbus; and

WHEREAS, on July 9, 2020, the World Health Organization (WHO) released new guidance indicating that COVID-19 may spread through airborne transmission, particularly in crowded indoor settings and/or those with poor ventilation, including restaurants; and

WHEREAS, on July 22, 2020, Governor DeWine announced a state-wide face covering mandate in response to the continuing spread of COVID-19; and

WHEREAS, a reduction of times of operation for onsite consumption of food, beer, wine and liquor for bars, nightclubs, and restaurants can limit exposure to and decrease the spread of COVID-19 through airborne and respiratory droplet transmission, especially because exemptions exist allowing patrons at these types of establishments to forgo face coverings for extended periods of time while seated at bars and tables and eating and drinking; and

WHEREAS, the 20-29 years of age demographic is presently the age group with the most confirmed and probable COVID-19 cases in Columbus, with many health order violations occurring in late night settings where many individuals in this age group tend to congregate; and

WHEREAS, after weighing the available information about the COVID-19 virus, consulting with Columbus Public Health, and considering the guidance from Orders issued by the Ohio Department of Health and Governor DeWine, Council concludes that the safety of the citizens of Columbus is best protected by implementing onsite consumption of food, beer, wine and liquor restrictions on bars, night clubs, and restaurants as limiting times of operation can limit exposure to and decrease the spread of COVID-19 through airborne and respiratory droplet transmission within populations; and

WHEREAS, the spread of COVID-19 continues to threaten the lives of the citizens of the City of Columbus and substantially impairs the ability to protect the lives and property of the citizens of the City of Columbus; NOW, THEREFORE,

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF COLUMBUS:

SECTION 1. For the purposes of this ordinance, "bar" means any place located in a permanent building that serves alcohol, intoxicating liquor, spirituous liquor, beer, wine, mixed beverages, and/or cider as defined in Ohio Revised Code §4301.01.

SECTION 2. For the purposes of this ordinance, "night club" means any place as defined in Ohio Revised Code §4301.01(B)(14) that is located in a permanent building, regardless of whether it is also considered a bar.

SECTION 3. For purposes of this ordinance, "restaurant" means a place located in a permanent building where, in consideration of the payment of money, food is prepared, sold, and served as the principal business of the place.

SECTION 4. All bars, night clubs, and restaurants within the City of Columbus shall not open for ~~business~~ the sale of food, beer, wine and liquor for onsite consumption earlier than 6:00 am and shall not remain open for ~~business~~ the sale of food, beer, wine and liquor for onsite consumption any later than ~~11:00~~10:00 pm. The premises of all bars, night clubs, and restaurants must be vacated by the general public no later than 60 minutes following closing except as necessary for carry out and delivery activities. ~~This~~These time ~~restriction~~ restrictions ~~applies~~ apply seven (7) days per week.

SECTION 5. Columbus Public Health shall have the authority to investigate and is directed to enforce the provisions of this ordinance.

SECTION 6. If Columbus Public Health observes violation(s) of a bar, night club, or restaurant failing to enforce the times of onsite consumption of food, beer, wine and liquor operation provisions of this ordinance, the following schedule of civil penalties shall be imposed on a place of business:

a. For a first violation, a warning of violation shall be issued; b. For a second violation, a fine of $500.00 shall be issued; c. For a third violation and for each subsequent violation, a fine of $1,000.00 shall be issued.

Any owner, manager, or person in charge of a bar, night club, or restaurant who fails or refuses to comply with this Ordinance may be in violation and cited.

SECTION 7. Violators have the right to appeal civil penalties pursuant to and in accordance with Columbus City Health Code Section 203.08.

SECTION 8. This ordinance is hereby declared to be an emergency measure and upon signature by the Mayor shall take full force and effect at 8:00am on Tuesday July 28, 2020 and shall remain in effect until such time as all governing public health orders associated with the COVID-19 pandemic expire.

**How large does a meeting or event need to be in order to be a "mass gathering"?**

Mass gathering (MG) events can range in size and profile. For example, high-profile international sporting events such as the Olympics or World Cup and international religious events such as the Hajj are all well-known mass gatherings. However, smaller events can also meet WHO's definition of a mass gathering. WHO defines mass gatherings as events characterized by the concentration of people at a specific location for a specific purpose over a set period of time and which has the potential to strain the planning and response resources of the country or community.

Any event can count as a mass gathering if the number of people it brings together can strain the planning and response resources of the health system in the community where it takes place. There is no defined threshold qualifying an event as a mass gathering based on the number of attendees alone. However, generally speaking, we can say that the risk associated with an event grows if, for example, the event takes place over several days,

<u>Tax Investigation-2B</u>
Franklin County
Public Lien Records

| Notice | LD470 |
|---|---|
| Notice date | 3/27/2025 |
| Lien number | 24S-329890 |
| To contact us | (800) 538-8953 |

Financial Accounting Innovations
2302 Middlehurst Dr
Columbus, OH 43219-1304

95-64-25351/2

Intent to seize your assets and property

# Amount due immediately: $494,176.80

This notice is to inform you that you may be the subject of investigation by The State Of Ohio. This investigation may involve alleged violations---including avoidance of the tax liability of $494,176.80 owed to The State Of Ohio.Unless payment is made to the State Of Ohio within seven (7) days of the date of this letter, further action may be taken to collect outstanding liability. To prevent action call (800) 538-8953 by 4/9/2025.

**Billing Summary**

| | |
|---|---|
| Amount you Owed | $411,814.00 |
| Additional failure-to-pay penalty | $32,945.12 |
| Additional interest charges | $49,417.68 |
| **Amount due immediately** | **$494,176.80** |

<u>Tax Investigation-2B</u>
Franklin County
Public Lien Records

Financial Accounting Innovations
2302 Middlehurst Dr
Columbus, OH 43219-1304

| Notice | LD470 |
|---|---|
| Notice date | 3/27/2025 |
| Lien number | 24S-329890 |

As required by law, you have been previously notified that The State Of Ohio has filed a lien in the name of Financial Accounting Innovations as of 12/2/2024 in Franklin county Recorder's Office

**Amount due immediately**

$494,176.80

**LP-470 24S-329890**

IV

118TH CONGRESS
1ST SESSION

# H. RES. 196

Memorializing those impacted by and lost to the COVID–19 pandemic.

_____

## IN THE HOUSE OF REPRESENTATIVES

MARCH 3, 2023

Mr. STANTON (for himself and Ms. LETLOW) submitted the following
resolution; which was referred to the Committee on Energy and Commerce

_____

# RESOLUTION

Memorializing those impacted by and lost to the COVID–
19 pandemic.

Whereas the first Monday in March is recognized as COVID–
19 Victims and Survivors Memorial Day;

Whereas SARS–CoV–2, a novel coronavirus that causes
COVID–19 disease (referred to in this preamble as
"COVID–19"), is a deadly illness that can transmit from
individual to individual;

Whereas, in late 2019, COVID–19 emerged and began to
spread throughout the world, creating a global pandemic
that has had a catastrophic impact on human life, com-
munities in the United States, and the economy of the
United States;

Whereas, in March 2020, communities in every State began
to experience increased death due to the COVID–19 pan-

2

demic, and families lost parents, siblings, children, friends, and neighbors to the virus;

Whereas, beginning in 2020, many across the United States were and continue to be personally impacted by COVID–19 including mourning their loved ones or suffering from the long-term health implications of the virus;

Whereas, by the end of February 2023, there had been more than 102,998,000 known cases of COVID–19 in the United States, and more than 1,113,000 people tragically lost their lives;

Whereas COVID–19 has had a disproportionate impact on low-income communities and communities of color, rural and tribal communities, individuals with disabilities, individuals with weakened immune systems, individuals experiencing homelessness, and individuals living in congregate settings, such as long-term care facilities and prisons;

Whereas COVID–19 has harmed the health and wellbeing of veterans, especially those struggling with post-traumatic stress disorder, by increasing social isolation and disrupting access to mental health services;

Whereas COVID–19 has harmed the health and wellbeing of children by reducing access to care and health services, disrupting schooling, increasing stress on caregivers, and tragically robbing millions of children of a parent or caregiver;

Whereas the symptoms and severity of COVID–19 can vary dramatically by individual, and million of survivors are experiencing long-term health implications of post-acute sequelae SARS–CoV–2 infection;

3

Whereas public servants, frontline and essential workers, and health care and public health professionals took selfless actions to protect their neighbors and communities, support struggling local economies, and find innovative ways to provide services;

Whereas local, State, Tribal, and Federal Government entities provided critical support to businesses, communities, and Americans in need; and

Whereas each life lost to COVID–19 and each sacrifice made shall never be forgotten: Now, therefore, be it

1    *Resolved,* That the House of Representatives—

2        (1) will memorialize those lost to the COVID–

3    19 pandemic;

4        (2) recognizes the suffering of those who con-

5    tracted the SARS–CoV–2 virus and those who con-

6    tinue to struggle with ongoing impacts of COVID–

7    19; and

8        (3) expresses support for the annual designa-

9    tion of "COVID–19 Victims and Survivors Memorial

10    Day".

○



This incident has been reported to the
Columbus Police Department
and is pending approval

Columbus Police Department
120 Marconi Blvd.
Columbus, OH 43215
614-645-4717

**General Information**

| | |
|---|---|
| Incident Type | Miscellaneous Incident |
| Tracking Number | T24003096 |
| Report Date | 02/13/2024 06:41 PM |

**Reporting Person Information**

| | |
|---|---|
| Name | Oliver III, Eddie |
| Home Address | 2302 Middlehurst Dr., Columbus, OH 43219, US |
| Home Phone | 614-953-4085 |
| Email | e.oliver@outlook.com |
| Work Phone | X |
| Race | Black |
| Sex | Male |
| DOB | 11/28/1989 |
| Driver License No | TM982114 |
| Licensing State | OH |

**Incident Information**

| | |
|---|---|
| Incident Location | 2302 Middlehurst Dr., Columbus, OH |
| Incident Time (start) | 02/13/2024 06:35 PM |
| Incident Time (end) | 02/13/2024 06:35 PM |
| Location Type | Other Location |

**Narrative**

Incident Description

Joshua Oliver who is my brother has been religiously hate crime. They have suggested that he was ADHD years ago and now he is married to a woman who has stolen his virginity. She was not a virgin at the wedding and wore an off white dress. The wedding occurred in 2020 against the city of Columbus legislation code. file number 1821-2020. No one was arrested for the continuation of the wedding. This is an city local high crime fraud. Please assist with the issue.

Print This Report







CDC Centers for Disease Control and Prevention

## COVID-19

COVID-19 Home



# Ending Isolation and Precautions for People with COVID-19: Interim Guidance

Updated Aug. 22, 2023

This page is **intended for use by healthcare professionals** who are caring for **people in the community setting** under isolation with COVID-19. For more information for the general population in the community, please see Isolation and Precautions for People with COVID-19.

These recommendations do not apply to healthcare personnel in the healthcare setting, and do not supersede state, local, tribal, or territorial laws, rules, and regulations. For healthcare settings, please see Managing Healthcare Personnel with SARS-CoV-2 Infection or Exposure to SARS-CoV-2 and Interim Infection Prevention and Control Recommendations for Healthcare Personnel. For more details, including details on certain non-healthcare settings, please review Setting-Specific Guidance.

## Summary of Recent Changes

Updates as of August 31, 2022                                                                ∧

- Updated guidance reflects new recommendations for isolation and precautions for people with COVID-19.
- Removed Assessment for Duration of Isolation and Key Findings From Transmission Literature sections so page provides most current information.

View Previous Updates

## Key Points

- People who are infected but asymptomatic or people with mild COVID-19 should isolate through at least day 5 (day 0 is the day symptoms appeared or the date the specimen was collected for the positive test for people who are asymptomatic). They should wear a mask through day 10. A test-based strategy may be used to remove a mask sooner.
- People with moderate  or severe COVID-19 should isolate through at least day 10. Those with severe COVID-19 may remain infectious beyond 10 days and may need to extend isolation for up to 20 days.
- People who are moderately or severely immunocompromised should isolate through at least day 20. Use of serial testing and consultation with an infectious disease specialist is recommended in these patients prior to ending isolation.

To **prevent SARS-CoV-2 transmission,** see CDC's recommended prevention strategies. For details on when to get tested for COVID-19, see Test for Current Infection.

## Recommendation for Ending Isolation

For people who are **mildly ill** with SARS-COV-2 infection and not moderately or severely immunocompromised:

Isolation can be discontinued at least 5 days after symptom onset (day 0 is the day symptoms appeared, and day 1 is the next full day thereafter) if fever has resolved for at least 24 hours (without taking fever-reducing medications) and other symptoms are improving.

Loss of taste and smell may persist for weeks or months after recovery and need not delay the end of isolation.

A high-quality mask should be worn around others at home and in public through day 10. A test-based strategy may be used to remove a mask sooner.

If symptoms recur or worsen, the isolation period should restart at day 0.

People who cannot wear a mask, including children < 2 years of age and people of any age with certain disabilities, should isolate for 10 days.

In certain high-risk congregate settings that have high risk of secondary transmission, CDC recommends a 10-day isolation period for residents. Isolation may be shortened to 7 days under certain conditions.

**More details:** Isolation and Precautions for People with COVID-19

**For people who test positive, are asymptomatic (never develop symptoms) and not moderately or severely immunocompromised:**

Isolation can be discontinued at least 5 days **after the first positive viral test** (day 0 is the date the specimen was collected for the positive test, and day 1 is the next full day thereafter).

A high-quality mask should be worn around others at home and in public through day 10. A test-based strategy may be used to remove a mask sooner.

If a person develops symptoms within 10 days of testing positive, their 5-day isolation period should start over (day 0 changes to the first day of symptoms).

People who cannot wear a mask, including children < 2 years of age and people of any age with certain disabilities, should isolate for 10 days.

In certain high-risk congregate settings that have high risk of secondary transmission, CDC recommends a 10-day isolation period for residents. Isolation may be shortened to 7 days under certain conditions.

**More details:** Isolation and Precautions for People with COVID-19

**For people who are moderately ill** ⬀ **and not moderately or severely immunocompromised:**

Isolation and precautions can be discontinued 10 days after symptom onset (day 0 is the day symptoms appeared, and day 1 is the next full day thereafter).

**For people who are severely ill** ⬀ **and not moderately or severely immunocompromised:**

Isolation should continue for at least 10 days after symptom onset (day 0 is the day symptoms appeared, and day 1 is the next full day thereafter).

Some people with severe illness (e.g., requiring hospitalization, intensive care, or ventilation support) may remain infectious beyond 10 days. This may warrant extending the duration of isolation and precautions for up to 20 days after symptom onset (with day 0 being the day symptoms appeared) and after resolution of fever for at least 24 hours (without the taking fever-reducing medications) and improvement of other symptoms.

Serial testing prior to ending isolation can be considered in consultation with infectious disease experts.

**For people who are moderately or severely immunocompromised (regardless of COVID-19 symptoms or severity):**

Moderately or severely immunocompromised patients may remain infectious beyond 20 days. For these people, CDC recommends an isolation period of at least 20 days, and ending isolation in conjunction with serial testing and consultation with an infectious disease specialist to determine the appropriate duration of isolation and precautions.

The criteria for serial testing to end isolation are:

Results are negative from at least two consecutive respiratory specimens collected ≥ 24 hours apart (total of two negative specimens) tested using an antigen test or nucleic acid amplification test.

Also, if a moderately or severely immunocompromised patient with COVID-19 was symptomatic, there should be resolution of fever for at least 24 hours (without the taking fever-reducing medication) and improvement of other

symptoms. Loss of taste and smell may persist for weeks or months after recovery and need not delay the end of isolation
.

Re-testing for SARS-CoV-2 infection is suggested if symptoms worsen or return after ending isolation and precautions.

If a patient has persistently positive nucleic acid amplification tests beyond 30 days, additional testing could include molecular studies (e.g., genomic sequencing) or viral culture, in consultation with an infectious disease specialist.

For the purposes of this guidance, moderate to severely immunocompromising conditions include, but might not be limited to, those defined in the interim clinical considerations for people with moderate to severe immunocompromise due to a medical condition or receipt of immunosuppressive medications or treatments.

Other factors, such as end-stage renal disease, likely pose a lower degree of immunocompromise, and there might not be a need to follow the recommendations for those with moderate to severe immunocompromise.

Ultimately, the degree of immunocompromise for the patient is determined by the treating provider, and preventive actions should be tailored to each patient and situation.

More details: Isolation and Precautions for People with COVID-19

# Previous Updates

Updates from Previous Content: Ending Isolation and Precautions Webpage 

**As of January 14, 2022**

- Updated guidance to reflect new recommendations for isolation for people with COVID-19.
- Added new recommendations for duration of isolation for people with COVID-19 who are moderately or severely immunocompromised.

**As of September 14, 2021**

- Combined guidance on ending isolation and precautions for adults with COVID-19 and ending home isolation webpages.
- Included evidence for expanding recommendations to include children.
- Edited to improve readability

**As of February 18, 2021**

- Some severely immunocompromised persons with COVID-19 may remain infectious beyond 20 days after their symptoms began and require additional SARS-CoV-2 testing and consultation with infectious diseases specialists and infection control experts.

**As of February 13, 2021**

- Added new evidence and recommendations for duration of isolation and precautions for severely immunocompromised adults.
- Added information on recent reports in adults of reinfection with SARS-CoV-2 variant viruses.

Updates from Previous Ending Home Isolation Webpage Content 

**As of February 18, 2021**

- Some severely immunocompromised persons with COVID-19 may remain infectious beyond 20 days after their symptoms began and require additional SARS-CoV-2 testing and consultation with infectious diseases specialists and infection control experts.

**Updates as of July 20, 2020**

A test-based strategy is no longer recommended to determine when to discontinue home isolation, except in certain circumstances.

Symptom-based criteria were modified as follows:

- Changed from "at least 72 hours" to "at least 24 hours" have passed *since last* fever without the use of fever-reducing medications.
- Changed from "improvement in respiratory symptoms" to "improvement in symptoms" to address expanding list of symptoms associated with COVID-19.

- For patients with severe illness, duration of isolation for up to 20 days after symptom onset may be warranted. Consider consultation with infection control experts.
- For persons who never develop symptoms, isolation and other precautions can be discontinued 10 days after the date of their first positive RT-PCR test for SARS-CoV-2 RNA.

**Updates as of July 17, 2020**

Symptom-based criteria were modified as follows:

- Changed from "at least 72 hours" to "at least 24 hours" have passed *since last* fever without the use of fever-reducing medications

Changed from "improvement in respiratory symptoms" to "improvement in symptoms" to address expanding list of symptoms associated with COVID-19

**Updates as of May 29, 2020**

Added information around the management of persons who may have prolonged viral shedding after recovery.

**Updates as of May 3, 2020**

Changed the name of the 'non-test-based strategy' to the 'symptom-based strategy' for those with symptoms. Added a 'time-based strategy' and named the 'test-based strategy' for asymptomatic persons with laboratory-confirmed COVID-19. Extended the home isolation period from 7 to 10 days *since symptoms first appeared* for the symptom-based strategy in persons with COVID-19 who have symptoms and from 7 to 10 days after the date of their first positive test for the time-based strategy in asymptomatic persons with laboratory-confirmed COVID-19. This update was made based on evidence suggesting a longer duration of viral shedding and will be revised as additional evidence becomes available. This time period will capture a greater proportion of contagious patients; however, it will not capture everyone.

Removed specifying use of nasopharyngeal swab collection for the test-based strategy and linked to the Interim Guidelines for Collecting, Handling, and Testing Clinical Specimens for Coronavirus Disease 2019 (COVID-19), so that the most current specimen collection strategies are recommended.

**Updates as of April 4, 2020**

- Revised title to include isolation in all settings other than health settings, not just home.

Last Reviewed Aug. 22, 2023
Last Updated Aug. 22, 2023

| Characteristic | No. (rate)† | |
| --- | --- | --- |
| | Total deaths | COVID-19 deaths§ |
| Sex | | |
| Female | 1,602,366 (689.2) | 172,689 (72.5) |
| Male | 1,756,448 (990.5) | 205,194 (115.0) |
| Race/Ethnicity | | |
| Hispanic | 304,488 (724.1) | 68,469 (164.3) |
| White, non-Hispanic | 2,467,419 (827.1) | 228,328 (72.5) |
| Black, non-Hispanic | 443,116 (1,105.3) | 59,871 (151.1) |
| Asian, non-Hispanic | 90,519 (457.9) | 13,334 (66.7) |
| American Indian or Alaska Native, non-Hispanic | 24,279 (1,024.0) | 4,504 (187.8) |
| Native Hawaiian or other Pacific Islander, non-Hispanic | 4,424 (828.4) | 679 (122.3) |
| Multiracial, non-Hispanic | 15,434 (378.8) | 1,125 (31.8) |
| Unknown | 9,135 (—) | 1,573 (—) |

* National Vital Statistics System provisional data are incomplete. Data from December are less complete due to reporting lags. These data exclude deaths that occurred in the United States among residents of U.S. territories and foreign countries.
† Deaths per 100,000 standard population. Age-adjusted death rates are provided by sex and race/ethnicity.
§ Deaths with confirmed or presumed COVID-19 as an underlying or contributing cause of death, with *International Classification of Diseases, Tenth Revision* code U07.1.

FIGURE 1. Provisional* number of COVID-19–related deaths† and other deaths, by week — National Vital Statistics System, United States, 2020



* National Vital Statistics System provisional data are incomplete. Data from December are less complete due to reporting lags. Deaths that occurred in the United States among residents of U.S. territories and foreign countries were excluded.

† Deaths with confirmed or presumed COVID-19 as an underlying or contributing cause of death, with *International*

2/10/2024, 2:25 PM



*Classification of Diseases, Tenth Revision* code U07.1.

FIGURE 2. Provisional* number of leading underlying causes of death[†] — National Vital Statistics System, United States, 2020

Top
Return



\* National Vital Statistics System provisional data are incomplete. Data from December are less complete due to reporting lags. Deaths that occurred in the United States among residents of U.S. territories and foreign countries were excluded.

[†] Deaths for which COVID-19 was a contributing, but not the underlying, cause of death are not included in this figure.

Top

**Suggested citation for this article:** Ahmad FB, Cisewski JA, Miniño A, Anderson RN. Provisional Mortality Data — United States, 2020. MMWR Morb Mortal Wkly Rep 2021;70:519–522. DOI: http://dx.doi.org/10.15585/mmwr.mm7014e1 ☑ .

*MMWR* and *Morbidity and Mortality Weekly Report* are service marks of the U.S. Department of Health and Human Services.

Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.

References to non-CDC sites on the Internet are provided as a service to *MMWR* readers and do not constitute or imply endorsement of these organizations or their programs by CDC or the U.S. Department of Health and Human Services. CDC is not responsible for the content of pages found at these sites. URL addresses listed in *MMWR* were current as of the date of publication.

All HTML versions of *MMWR* articles are generated from final proofs through an automated process. This conversion might result in character translation or format errors in the HTML version. Users are referred to the electronic PDF version (https://www.cdc.gov/mmwr) and/or the original *MMWR* paper copy for printable versions of official text, figures, and tables.

Questions or messages regarding errors in formatting should be addressed to mmwrq@cdc.gov.

Last Reviewed: March 7, 2023

www.nature.com/scientificreports

# scientific reports


Check for updates

OPEN

# Rapid and complete inactivation of SARS-CoV-2 by ultraviolet-C irradiation

Nadia Storm[1,4], Lindsay G. A. McKay[1,4], Sierra N. Downs[1], Rebecca I. Johnson[1], Dagnachew Birru[2], Marc de Samber[3], Walter Willaert[3], Giovanni Cennini[3] & Anthony Griffiths[1⊠]

The severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) pandemic has devastated global public health systems and economies, with over 52 million people infected, millions of jobs and businesses lost, and more than 1 million deaths recorded to date. Contact with surfaces contaminated with droplets generated by infected persons through exhaling, talking, coughing and sneezing is a major route of SARS-CoV-2 transmission, with the virus being able to survive on surfaces for extended periods of time. To interrupt these chains of transmission, there is an urgent need for devices that can be deployed to inactivate the virus on both recently and existing contaminated surfaces. Here, we describe the inactivation of SARS-CoV-2 in both wet and dry format using radiation generated by a commercially available Signify ultraviolet (UV)-C light source at 254 nm. We show that for contaminated surfaces, only seconds of exposure is required for complete inactivation, allowing for easy implementation in decontamination workflows.

Towards the end of 2019, an outbreak of life-threatening pneumonia caused by a novel betacoronavirus occurred in the Hubei Province of China[1]. The virus, named severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), has since spread across the world at an alarming rate to cause a debilitating and ongoing pandemic, with only a few islands not reporting any cases to date. While SARS-CoV-2 is thought to be of zoonotic origin[2], intense and extensive human-to-human transmission has mainly been driven by the inhalation of respiratory droplets and virus-bearing particles spread through the air[3], or by contact with surfaces contaminated with settled droplets[4]. Although academic institutions and pharmaceutical organizations worldwide have banded together to develop countermeasures against the virus, there are still no licensed vaccines or therapeutics available. The disruption of transmission chains is therefore crucial for managing the outbreak and preventing additional infections.

Ultraviolet (UV) irradiation is an extensively tested, widely used and effective no-contact method for inactivating viral pathogens[5–7]. There are three types of UV, including UV-A (315–400 nm), UV-B (280–315 nm) and UV-C (100–280 nm), of which UV-C is most commonly employed in germicidal applications. At a wavelength of 254 nm, viral inactivation can be attributed to direct UV-C light absorption and photochemical damage to nucleic acid, leading to the disruption of viral replication[8]. Despite its wide use, limited data exists on the effectiveness of UV-C on inactivating wet and dried SARS-CoV-2 on contaminated surfaces. In particular, the efficacy of UV-C for inactivating SARS-CoV-2 in fluids needs to be determined, as the UV absorbance characteristics of fluid constituents may influence the dose required to achieve complete viral inactivation.

In this paper, we describe the complete and rapid inactivation of SARS-CoV-2 in both wet and dried droplets using 254 nm UV-C irradiation. Our results suggest that UV-C is an affordable and effective tool for preventing SARS-CoV-2 contact transmission that can easily be deployed to manage the coronavirus disease outbreak.

## Results and discussion

**Estimation of viral decay time.** To examine the inactivation efficacy of UV-C on SARS-CoV-2, virus was applied to plastic tissue culture dishes and exposed to UV radiation as either wet or dried droplets for varying amounts of time ranging from 0.8 to 120 s. Under a UV-C irradiance of 0.849 mW/cm², partial inactivation

[1]National Emerging Infectious Diseases Laboratories, Boston University School of Medicine, 620 Albany Street, Boston, MA 02118, USA. [2]Signify Research, 1 Charles Park, 2nd Fl, Cambridge, MA 02142, USA. [3]Signify Research, High Tech Campus 7, 5656 AE Eindhoven, the Netherlands. [4]These authors contributed equally: Nadia Storm and Lindsay G. A. McKay. [⊠]email: ahgriff@bu.edu