



# FEDERAL REGISTER

Vol. 86          Wednesday,

No. 16          January 27, 2021

Pages 7225–7336

OFFICE OF THE FEDERAL REGISTER

II     **Federal Register** / Vol. 86, No. 16 / Wednesday, January 27, 2021



The **FEDERAL REGISTER** (ISSN 0097–6326) is published daily, Monday through Friday, except official holidays, by the Office of the Federal Register, National Archives and Records Administration, under the Federal Register Act (44 U.S.C. Ch. 15) and the regulations of the Administrative Committee of the Federal Register (1 CFR Ch. I). The Superintendent of Documents, U.S. Government Publishing Office, is the exclusive distributor of the official edition. Periodicals postage is paid at Washington, DC.

The **FEDERAL REGISTER** provides a uniform system for making available to the public regulations and legal notices issued by Federal agencies. These include Presidential proclamations and Executive Orders, Federal agency documents having general applicability and legal effect, documents required to be published by act of Congress, and other Federal agency documents of public interest.

Documents are on file for public inspection in the Office of the Federal Register the day before they are published, unless the issuing agency requests earlier filing. For a list of documents currently on file for public inspection, see *www.federalregister.gov.*

**The seal of the National Archives and Records Administration authenticates the Federal Register** as the official serial publication established under the Federal Register Act. Under 44 U.S.C. 1507, the contents of the **Federal Register** shall be judicially noticed.

The **Federal Register** is published in paper and on 24x microfiche. It is also available online at no charge at *www.govinfo.gov*, a service of the U.S. Government Publishing Office.

The online edition of the **Federal Register** is issued under the authority of the Administrative Committee of the Federal Register as the official legal equivalent of the paper and microfiche editions (44 U.S.C. 4101 and 1 CFR 5.10). It is updated by 6:00 a.m. each day the **Federal Register** is published and includes both text and graphics from Volume 1, 1 (March 14, 1936) forward. For more information, contact the GPO Customer Contact Center, U.S. Government Publishing Office. Phone 202-512-1800 or 866-512-1800 (toll free). E-mail, *gpocusthelp.com.*

The annual subscription price for the **Federal Register** paper edition is $860 plus postage, or $929, for a combined **Federal Register, Federal Register** Index and List of CFR Sections Affected (LSA) subscription; the microfiche edition of the **Federal Register** including the **Federal Register** Index and LSA is $330, plus postage. Six month subscriptions are available for one-half the annual rate. The prevailing postal rates will be applied to orders according to the delivery method requested. The price of a single copy of the daily **Federal Register,** including postage, is based on the number of pages: $11 for an issue containing less than 200 pages; $22 for an issue containing 200 to 400 pages; and $33 for an issue containing more than 400 pages. Single issues of the microfiche edition may be purchased for $3 per copy, including postage. Remit check or money order, made payable to the Superintendent of Documents, or charge to your GPO Deposit Account, VISA, MasterCard, American Express, or Discover. Mail to: U.S. Government Publishing Office—New Orders, P.O. Box 979050, St. Louis, MO 63197-9000; or call toll free 1-866-512-1800, DC area 202-512-1800; or go to the U.S. Government Online Bookstore site, see *bookstore.gpo.gov.*

There are no restrictions on the republication of material appearing in the **Federal Register.**

**How To Cite This Publication:** Use the volume number and the page number. Example: 85 FR 12345.

**Postmaster:** Send address changes to the Superintendent of Documents, Federal Register, U.S. Government Publishing Office, Washington, DC 20402, along with the entire mailing label from the last issue received.

## SUBSCRIPTIONS AND COPIES

**PUBLIC**

**Subscriptions:**

| | |
|---|---|
| Paper or fiche | 202–512–1800 |
| Assistance with public subscriptions | 202–512–1806 |

General online information   202–512–1530; 1–888–293–6498

**Single copies/back copies:**

| | |
|---|---|
| Paper or fiche | 202–512–1800 |
| Assistance with public single copies | 1–866–512–1800 |
| | (Toll-Free) |

**FEDERAL AGENCIES**

**Subscriptions:**

Assistance with Federal agency subscriptions:

| | |
|---|---|
| Email | *FRSubscriptions@nara.gov* |
| Phone | 202–741–6000 |

The Federal Register Printing Savings Act of 2017 (Pub. L. 115-120) placed restrictions on distribution of official printed copies of the daily **Federal Register** to members of Congress and Federal offices. Under this Act, the Director of the Government Publishing Office may not provide printed copies of the daily **Federal Register** unless a Member or other Federal office requests a specific issue or a subscription to the print edition. For more information on how to subscribe use the following website link: *https://www.gpo.gov/frsubs.*



Printed on recycled paper.

# Contents

Federal Register

Vol. 86, No. 16

Wednesday, January 27, 2021

**Agriculture Department**
*See* Office of Partnerships and Public Engagement
NOTICES
Agency Information Collection Activities; Proposals,
    Submissions, and Approvals, 7243–7246

**Bureau of Consumer Financial Protection**
NOTICES
Supervisory Highlights:
    Covid–19 Prioritized Assessments Special Edition, Issue
        23 (Winter 2021), 7271–7280

**Census Bureau**
NOTICES
Agency Information Collection Activities; Proposals,
    Submissions, and Approvals:
    State and Local Government Finance Collections, and
        Public Employment and Payroll Collections, 7247–
        7248

**Centers for Disease Control and Prevention**
NOTICES
Charter Renewal:
    Board of Scientific Counselors, National Center for Health
        Statistics, 7293
    Healthcare Infection Control Practices Advisory
        Committee, 7294
Meetings:
    Advisory Committee on Immunization Practices, 7293–
        7294
    National Center for Health Statistics, ICD–10
        Coordination and Maintenance Committee, 7294–
        7296

**Coast Guard**
RULES
Drawbridge Operations:
    Bayou Sara, Saraland, AL, 7241
    Mobile River, Hurricane, AL, 7238–7239
    Old Fort Bayou, MS, 7239–7240

**Commerce Department**
*See* Census Bureau
*See* Economic Development Administration
*See* Foreign-Trade Zones Board
*See* International Trade Administration
*See* National Oceanic and Atmospheric Administration

**Council of the Inspectors General on Integrity and
    Efficiency**
NOTICES
Privacy Act; Systems of Records, 7280–7283

**Economic Development Administration**
NOTICES
Trade Adjustment Assistance; Determinations, 7248–7249

**Energy Department**
*See* Federal Energy Regulatory Commission

**Farm Credit Administration**
RULES
Rules of Practice and Procedure:
    Adjusting Civil Money Penalties for Inflation, 7235–7237

**Federal Communications Commission**
NOTICES
Agency Information Collection Activities; Proposals,
    Submissions, and Approvals, 7290–7291

**Federal Energy Regulatory Commission**
NOTICES
Agency Information Collection Activities; Proposals,
    Submissions, and Approvals, 7289–7290
Application and Establishing Intervention Deadline:
    Breitburn Operating L.P., 7283–7284
Application:
    Northern States Power Co., WI, 7284–7285, 7288–7289
Combined Filings, 7285–7289
Request Under Blanket Authorization and Establishing
    Intervention and Protest Deadline:
    Gas Transmission Northwest, LLC, 7286–7287
Transfer of Exemption:
    Apple Inc., Monroe Hydro, LLC, 7287

**Federal Highway Administration**
NOTICES
Final Federal Agency Actions:
    Proposed Highway in Utah, 7333–7334

**Federal Maritime Commission**
NOTICES
Agreements Filed, 7291–7292

**Federal Reserve System**
NOTICES
Changes in Bank Control:
    Acquisitions of Shares of a Bank or Bank Holding
        Company, 7292–7293
Formations of, Acquisitions by, and Mergers of Bank
    Holding Companies, 7292

**Foreign-Trade Zones Board**
NOTICES
Proposed Production Activity:
    Rivian Automotive, LLC, Foreign-Trade Zone 114, Peoria,
        IL, 7249–7251

**Health and Human Services Department**
*See* Centers for Disease Control and Prevention
*See* National Institutes of Health

**Homeland Security Department**
*See* Coast Guard

**Housing and Urban Development Department**
NOTICES
Agency Information Collection Activities; Proposals,
    Submissions, and Approvals:
    Improving Customer Experience, 7302–7303

**Interior Department**
*See* National Indian Gaming Commission

**International Trade Administration**
RULES
Aluminum Import Monitoring and Analysis System;
Effective Date Delay, 7237
NOTICES
Agency Information Collection Activities; Proposals,
Submissions, and Approvals:
European Union-United States Privacy Shield; Invitation
for Applications for Inclusion on the List of
Arbitrators, 7255–7256
Antidumping or Countervailing Duty Investigations, Orders,
or Reviews:
Barium Chloride from the People's Republic of China,
7257–7258
Certain Uncoated Paper from Australia, 7256–7257
Certain Uncoated Paper from Brazil, 7254–7255, 7261–
7264
Certain Uncoated Paper from Indonesia, 7266–7269
Certain Uncoated Paper from Portugal, 7269–7270
Circular Welded Carbon Steel Pipes and Tubes from
Thailand, 7259–7261
Heavy Walled Rectangular Welded Carbon Steel Pipes
and Tubes from the Republic of Turkey, 7251–7252
Narrow Woven Ribbons with Woven Selvedge from the
People's Republic of China, 7264–7266
Passenger Vehicle and Light Truck Tires from the
People's Republic of China, 7258–7259
Application:
Cornell University, et al.; Duty-Free Entry of Scientific
Instruments, 7271
Determinations in Less-Than-Fair-Value Investigations:
Passenger Vehicle and Light Truck Tires from the
Republic of Korea, Taiwan, Thailand, and the
Socialist Republic of Vietnam, 7252–7254

**International Trade Commission**
NOTICES
Complaint:
Certain Cellular Signal Boosters, Repeaters, Bi-Directional
Amplifiers, and Components Thereof, 7304–7305
Investigations; Determinations, Modifications, and Rulings,
etc.:
Certain UMTS and LTE Cellular Communication Modules
and Products Containing the Same, 7305–7306

**Labor Department**
See Labor Statistics Bureau
RULES
Rescission of Rule on Guidance, 7237–7238

**Labor Statistics Bureau**
NOTICES
Agency Information Collection Activities; Proposals,
Submissions, and Approvals, 7306–7307

**Merit Systems Protection Board**
NOTICES
Privacy Act; Systems of Records, 7307–7309

**National Endowment for the Arts**
NOTICES
Meetings:
Arts Advisory Panel, 7309–7310

**National Endowment for the Humanities**
NOTICES
Agency Information Collection Activities; Proposals,
Submissions, and Approvals, 7310

**National Foundation on the Arts and the Humanities**
See National Endowment for the Arts
See National Endowment for the Humanities

**National Indian Gaming Commission**
NOTICES
Fee Rate and Fingerprint Fees, 7303–7304

**National Institutes of Health**
NOTICES
Meetings:
Center for Scientific Review, 7296–7298, 7301–7302
National Cancer Institute, 7296–7297
National Center for Complementary and Integrative
Health, 7300–7301
National Eye Institute, 7302
National Institute of Allergy and Infectious Diseases,
7299
National Institute of Dental and Craniofacial Research,
7298–7299
National Institute of Mental Health, 7299
National Institute of Neurological Disorders and Stroke,
7299–7300, 7302
National Institute of Nursing Research, 7300
National Institute on Drug Abuse, 7297, 7300

**National Oceanic and Atmospheric Administration**
PROPOSED RULES
Endangered and Threatened Species:
Designation of Critical Habitat for the Beringia Distinct
Population Segment of the Bearded Seal, 7242

**Nuclear Regulatory Commission**
NOTICES
License Transfer:
Palo Verde Nuclear Generating Station, Units 1, 2, and 3
Independent Spent Fuel Storage Installation, 7310–
7313
Order:
In the Matter of Tennessee Valley Authority Bellefonte
Nuclear Plant, Units 1 and 2, 7313–7316

**Office of Partnerships and Public Engagement**
NOTICES
Meetings:
Advisory Committee on Minority Farmers, 7246–7247

**Pension Benefit Guaranty Corporation**
NOTICES
Agency Information Collection Activities; Proposals,
Submissions, and Approvals:
Disclosure of Termination Information, 7316–7317

**Pipeline and Hazardous Materials Safety Administration**
NOTICES
Pipeline Safety: Request for Special Permit:
Natural Gas Pipeline Company of America, LLC, 7334–
7335

**Presidential Documents**
PROCLAMATIONS
U.S. Southern Border; Termination of Emergency and
Redirection of Funds Diverted to Border Wall
Construction (Proc. 10142), 7225–7227
EXECUTIVE ORDERS
COVID–19 Pandemic; Economic Relief (EO 14002), 7229–
7230

Government Agencies and Employees:
  Federal Workforce; Protection Efforts (EO 14003), 7231–
    7233

**Securities and Exchange Commission**
NOTICES
Agency Information Collection Activities; Proposals,
    Submissions, and Approvals, 7320–7321
Self-Regulatory Organizations; Proposed Rule Changes:
  Cboe BZX Exchange, Inc., 7327–7329
  Cboe EDGA Exchange, Inc., 7324–7327
  MIAX PEARL, LLC, 7317
  NYSE American LLC, 7321–7324
  The Options Clearing Corp., 7317–7320

**Small Business Administration**
NOTICES
Major Disaster Declaration:
  Alabama, 7330–7331
  Colorado, 7331
  Connecticut, 7329–7330
  Louisiana, 7330
  New Jersey, 7330
  North Carolina, 7331
  Oklahoma, 7329

**State Department**
NOTICES
Agency Information Collection Activities; Proposals,
    Submissions, and Approvals:
  Family Liaison Office Professional Development
    Fellowship Application, 7332–7333

Training/Internship Placement Plan, 7332
Designation as a Specially Designated Global Terrorist:
  Niamat Hama Rahim Hama Sharif, 7331–7332

**Transportation Department**
*See* Federal Highway Administration
*See* Pipeline and Hazardous Materials Safety
    Administration

**Treasury Department**
NOTICES
Agency Information Collection Activities; Proposals,
    Submissions, and Approvals:
  Return of Organization Exempt from Income Tax, 7335–
    7336
  Treasury Foreign Currency Forms, 7336

---

**Reader Aids**

Consult the Reader Aids section at the end of this issue for phone numbers, online resources, finding aids, and notice of recently enacted public laws.

To subscribe to the Federal Register Table of Contents electronic mailing list, go to https://public.govdelivery.com/accounts/USGPOOFR/subscriber/new, enter your e-mail address, then follow the instructions to join, leave, or manage your subscription.

VI     **Federal Register** / Vol. 86, No. 16 / Wednesday, January 27, 2021 / Contents

## CFR PARTS AFFECTED IN THIS ISSUE

A cumulative list of the parts affected this month can be found in the Reader Aids section at the end of this issue.

**3 CFR**

**Proclamations:**
10142...................................7225

**Executive Orders:**
13836 (revoked by
   14003)...........................7231
13837 (revoked by
   14003)...........................7231
13839 (revoked by
   14003)...........................7231
13857 (revoked by
   14003)...........................7231
14002...................................7229
14003...................................7231

**Administrative Orders:**
Memorandums:
Memorandum of
   October 11, 2019
   (revoked by EO
   14003)...........................7231

**12 CFR**
622.....................................7235

**19 CFR**
361.....................................7237

**29 CFR**
89......................................7237

**33 CFR**
117 (3 documents) ...........7238,
               7239, 7241

**50 CFR**

**Proposed Rules:**
223.....................................7242
226.....................................7242

**7225**

Federal Register

Vol. 86, No. 16

Wednesday, January 27, 2021

# Presidential Documents

Title 3—

The President

Proclamation 10142 of January 20, 2021

## Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction

### By the President of the United States of America

### A Proclamation

Like every nation, the United States has a right and a duty to secure its borders and protect its people against threats. But building a massive wall that spans the entire southern border is not a serious policy solution. It is a waste of money that diverts attention from genuine threats to our homeland security. My Administration is committed to ensuring that the United States has a comprehensive and humane immigration system that operates consistently with our Nation's values. In furtherance of that commitment, I have determined that the declaration of a national emergency at our southern border in Proclamation 9844 of February 15, 2019 (Declaring a National Emergency Concerning the Southern Border of the United States), was unwarranted. It shall be the policy of my Administration that no more American taxpayer dollars be diverted to construct a border wall. I am also directing a careful review of all resources appropriated or redirected to construct a southern border wall.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 202 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*), hereby declare that the national emergency declared by Proclamation 9844, and continued on February 13, 2020 (85 *Fed. Reg.* 8715), and January 15, 2021, is terminated and that the authorites invoked in that proclamation will no longer be used to construct a wall at southen border. I hereby futher direct as follows:

**Section 1.** *Pause in Construction and Obligation of Funds.* (a) The Secretary of Defense and the Secretary of Homeland Security, in consultation with the Director of the Office of Management and Budget, shall direct the appropriate officials within their respective departments to:

(i) pause work on each construction project on the southern border wall, to the extent permitted by law, as soon as possible but in no case later than seven days from the date of this proclamation, to permit:

(A) assessment of the legality of the funding and contracting methods used to construct the wall;

(B) assessment of the administrative and contractual consequences of ceasing each wall construction project; and

(C) completion and implementation of the plan developed in accordance with section 2 of this proclamation;

(ii) pause immediately the obligation of funds related to construction of the southern border wall, to the extent permitted by law; and

(iii) compile detailed information on all southern border wall construction contracts, the completion status of each wall construction project, and the funds used for wall construction since February 15, 2019, including directly appropriated funds and funds drawn from the Treasury Forfeiture Fund (31 U.S.C. 9705(g)(4)(B)), the Department of Defense Drug Interdiction and Counter-Drug Activities account (10 U.S.C. 284), and the Department

of Defense Military Construction account (pursuant to the emergency authorities in 10 U.S.C. 2808(a) and 33 U.S.C. 2293(a)).

(b) The pause directed in subsection (a)(i) of this section shall apply to wall projects funded by redirected funds as well as wall projects funded by direct appropriations. The Secretary of Defense and the Secretary of Homeland Security may make an exception to the pause, however, for urgent measures needed to avert immediate physical dangers or where an exception is required to ensure that funds appropriated by the Congress fulfill their intended purpose.

**Sec. 2.** *Plan for Redirecting Funding and Repurposing Contracts.* The Secretary of Defense and the Secretary of Homeland Security, in coordination with the Secretary of the Treasury, the Attorney General, the Director of the Office of Management and Budget, and the heads of any other appropriate executive departments and agencies, and in consultation with the Assistant to the President for National Security Affairs, shall develop a plan for the redirection of funds concerning the southern border wall, as appropriate and consistent with applicable law. The process of developing the plan shall include consideration of terminating or repurposing contracts with private contractors engaged in wall construction, while providing for the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose. The plan shall be developed within 60 days from the date of this proclamation. After the plan is developed, the Secretary of Defense and the Secretary of Homeland Security shall take all appropriate steps to resume, modify, or terminate projects and to otherwise implement the plan.

**Sec. 3.** *Definition.* Consistent with Executive Order 13767 of January 25, 2017 (Border Security and Immigration Enforcement Improvements), for the purposes of this proclamation, ''wall'' means a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier.

**Sec. 4.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twentieth day of January, in the year of our Lord two thousand twenty-one, and of the Independence of the United States of America the two hundred and forty-fifth.

[FR Doc. 2021–01922
Filed 1–26–21; 8:45 am]
Billing code 3295–F1–P

Federal Register / Vol. 86, No. 16 / Wednesday, January 27, 2021 / Presidential Documents  **7229**

## Presidential Documents

Executive Order 14002 of January 22, 2021

### Economic Relief Related to the COVID–19 Pandemic

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.** *Background.* The pandemic caused by the coronavirus disease 2019 (COVID–19) has led to an economic crisis marked by the closure of small businesses, job loss, food and housing insecurity, and increased challenges for working families balancing jobs and caregiving responsibilities. The current economic crisis has affected Americans throughout the Nation, but it is particularly dire in communities of color. The problems are exacerbated because State and local governments are being forced to consider steep cuts to critical programs to address revenue shortfalls the pandemic has caused. In addition, many individuals, families, and small businesses have had difficulties navigating relief programs with varying eligibility requirements, and some are not receiving the intended assistance. The economic crisis resulting from the pandemic must be met by the full resources of the Federal Government.

**Sec. 2.** *Providing Relief to Individuals, Families, and Small Businesses; and to State, Local, Tribal, and Territorial Governments.* (a) All executive departments and agencies (agencies) shall promptly identify actions they can take within existing authorities to address the current economic crisis resulting from the pandemic. Agencies should specifically consider actions that facilitate better use of data and other means to improve access to, reduce unnecessary barriers to, and improve coordination among programs funded in whole or in part by the Federal Government.

(b) Agencies should take the actions identified in subsection (a) of this section, as appropriate and consistent with applicable law, and in doing so should prioritize actions that provide the greatest relief to individuals, families, and small businesses; and to State, local, Tribal, and territorial governments.

(c) Independent agencies, as enumerated in 44 U.S.C. 3502(5), are strongly encouraged to comply with this section.

**Sec. 3.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 22, 2021.*

[FR Doc. 2021–01923
Filed 1–26–21; 8:45 am]
Billing code 3295–F1–P

Federal Register / Vol. 86, No. 16 / Wednesday, January 27, 2021 / Presidential Documents 7231

## Presidential Documents

Executive Order 14003 of January 22, 2021

## Protecting the Federal Workforce

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1**. *Policy.* Career civil servants are the backbone of the Federal workforce, providing the expertise and experience necessary for the critical functioning of the Federal Government. It is the policy of the United States to protect, empower, and rebuild the career Federal workforce. It is also the policy of the United States to encourage union organizing and collective bargaining. The Federal Government should serve as a model employer.

**Sec. 2**. *Revocation of Schedule F.* (a) The creation of a new Schedule F excepted service category in Executive Order 13957 of October 21, 2020 (Creating Schedule F in the Excepted Service), not only was unnecessary to the conditions of good administration, but also undermined the foundations of the civil service and its merit system principles, which were essential to the Pendleton Civil Service Reform Act of 1883's repudiation of the spoils system. Accordingly, to enhance the efficiency of the civil service and to promote good administration and systematic application of merit system principles, Executive Order 13957 is hereby revoked.

(b) The heads of all executive departments and agencies (agencies) shall, consistent with law, immediately suspend, revise, or rescind proposed actions, decisions, petitions, rules, regulations or other guidance pursuant to, or to effectuate, Executive Order 13957. The Director of the Office of Personnel Management (OPM) shall immediately cease processing or granting any petitions that seek to convert positions to Schedule F or to create new positions in Schedule F.

**Sec. 3**. *Revocation of Certain Presidential and Regulatory Actions.* (a) Executive Order 13836 of May 25, 2018 (Developing Efficient, Effective, and Cost-Reducing Approaches to Federal Sector Collective Bargaining), is hereby revoked. The Interagency Labor Relations Working Group is hereby disbanded and the Director of OPM shall withdraw all materials issued by this working group that are inconsistent with the policy set forth in section 1 of this order.

(b) Executive Order 13837 of May 25, 2018 (Ensuring Transparency, Accountability, and Efficiency in Taxpayer-Funded Union Time Use), is hereby revoked.

(c) Executive Order 13839 of May 25, 2018 (Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles), is hereby revoked.

(d) The Presidential Memorandum of October 11, 2019 (Executive Orders 13836, 13837, and 13839), is hereby revoked.

(e) The heads of agencies whose practices were covered by Executive Orders 13836, 13837, and 13839 (affected agencies) shall review and identify existing agency actions related to or arising from those orders. Such actions include:

(i) Actions related to the authorization of union time described in sections 4(b) and 5(b) of Executive Order 13837;

(ii) Actions related to the system for monitoring the use of union time described in section 5(c) of Executive Order 13837;

(iii) Guidance promulgated pursuant to section 7(d) of Executive Order 13837;

(iv) Actions taken pursuant to section 8 of Executive Order 13837;

(v) Revisions to discipline and unacceptable performance policies, including ones codified in bargaining agreements, issued pursuant to section 7(b) of Executive Order 13839; and

(vii) The final rule entitled "Probation on Initial Appointment to a Competitive Position, Performance-Based Reduction in Grade and Removal Actions and Adverse Actions," 85 *Fed. Reg.* 65940 (October 16, 2020).

(f) The heads of affected agencies shall, as soon as practicable, suspend, revise, or rescind, or publish for notice and comment proposed rules suspending, revising, or rescinding, the actions identified in the review described in subsection (e) of this section, as appropriate and consistent with applicable law and the policy set forth in section 1 of this order.

**Sec. 4.** *Ensuring the Right to Engage in Collective Bargaining.* The head of each agency subject to the provisions of chapter 71 of title 5, United States Code, shall elect to negotiate over the subjects set forth in 5 U.S.C. 7106(b)(1) and shall instruct subordinate officials to do the same.

**Sec. 5.** *Progress Toward a Living Wage for Federal Employees.* The Director of OPM shall provide a report to the President with recommendations to promote a $15/hour minimum wage for Federal employees.

**Sec. 6.** *Severability.* If any provision of this order, or the application of such provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of such provision to other persons or circumstances shall not be affected thereby.

**Sec. 7.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 22, 2021.*

[FR Doc. 2021–01924
Filed 1–26–21; 8:45 am]
Billing code 3295–F1–P

7235

# Rules and Regulations

**Federal Register**

Vol. 86, No. 16

Wednesday, January 27, 2021

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

## FARM CREDIT ADMINISTRATION

### 12 CFR Part 622

RIN 3052–AD45

### Rules of Practice and Procedure; Adjusting Civil Money Penalties for Inflation

**AGENCY:** Farm Credit Administration.

**ACTION:** Final rule.

**SUMMARY:** This regulation implements inflation adjustments to civil money penalties (CMPs) that the Farm Credit Administration (FCA) may impose or enforce pursuant to the Farm Credit Act of 1971, as amended (Farm Credit Act), and pursuant to the Flood Disaster Protection Act of 1973, as amended by the National Flood Insurance Reform Act of 1994, and further amended by the Biggert-Waters Flood Insurance Reform Act of 2012 (Biggert-Waters Act) (collectively FDPA, as amended).

**DATES:** This regulation is effective on January 27, 2021, and is applicable beginning January 15, 2021.

**FOR FURTHER INFORMATION CONTACT:**
Brian Camp, Accountant, Office of Regulatory Policy, Farm Credit Administration, (703) 254–3004, TTY (703) 883–4056, or Autumn R. Agans, Senior Counsel, Office of General Counsel, Farm Credit Administration, (703) 883–4082, TTY (703) 883–4056.

**SUPPLEMENTARY INFORMATION:**

## I. Objective

The objective of this regulation is to adjust the maximum CMPs for inflation through a final rulemaking to retain the deterrent effect of such penalties.

## II. Background

### A. Introduction

The Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996 (1996 Act) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (2015 Act)

(collectively, 1990 Act, as amended), requires all Federal agencies with the authority to enforce CMPs to evaluate and adjust, if necessary, those CMPs each year to ensure that they continue to maintain their deterrent value and promote compliance with the law. Section 3(2) of the 1990 Act, as amended, defines a civil monetary penalty [1] as any penalty, fine, or other sanction that: (1) Either is for a specific monetary amount as provided by Federal law or has a maximum amount provided for by Federal law; (2) is assessed or enforced by an agency pursuant to Federal law; and (3) is assessed or enforced pursuant to an administrative proceeding or a civil action in the Federal courts. [2]

The FCA imposes and enforces CMPs through the Farm Credit Act [3] and the FDPA, as amended. [4] FCA's regulations governing CMPs are found in 12 CFR parts 622 and 623. Part 622 establishes rules of practice and procedure applicable to formal and informal hearings held before the FCA, and to formal investigations conducted under the Farm Credit Act. Part 623 prescribes rules regarding persons who may practice before the FCA and the circumstances under which such persons may be suspended or debarred from practice before the FCA.

### B. CMPs Issued Under the Farm Credit Act

The Farm Credit Act provides that any Farm Credit System (System) institution or any officer, director, employee, agent, or other person participating in the conduct of the affairs of a System institution who violates the terms of a cease-and-desist order that has become final pursuant to section 5.25 or 5.26 of the Farm Credit Act must pay a maximum daily amount of $1,000, [5] for each day such violation

continues. This CMP maximum was set by the Farm Credit Amendments Act of 1985, which amended the Farm Credit Act. Orders issued by the FCA under section 5.25 or 5.26 of the Farm Credit Act include temporary and permanent cease-and-desist orders. In addition, section 5.32(h) of the Farm Credit Act provides that any directive issued under sections 4.3(b)(2), 4.3A(e), or 4.14A(i) of the Farm Credit Act "shall be treated" as a final order issued under section 5.25 of the Farm Credit Act for purposes of assessing a CMP.

Section 5.32(a) of the Farm Credit Act also states that "[a]ny such institution or person who violates any provision of the [Farm Credit] Act or any regulation issued under this Act shall forfeit and pay a civil penalty of not more than $500 [6] per day for each day during which such violation continues." This CMP maximum was set by the Agricultural Credit Act of 1987, which was enacted in 1988, and amends the Farm Credit Act. Current inflation-adjusted CMP maximums are set forth in existing § 622.61 of FCA regulations. [7]

The FCA also enforces the FDPA, as amended, which requires FCA to assess CMPs for a pattern or practice of committing certain specific actions in violation of the National Flood Insurance Program. The existing maximum CMP for a violation under the Flood Disaster Protection Act of 1973 is $2,000. [8] [9]

### C. Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015

#### 1. In General

The 2015 Act required all Federal agencies to adjust the CMPs yearly, starting January 15, 2017.

Under Section 4(b) of the 1990 Act, as amended, annual adjustments are to be made yearly no later than January 15 of

---

[1] *Note:* While the 1990 Act, as amended by 1996 and 2015 Acts, uses the term "civil monetary penalties" for these penalties or other sanctions, the Farm Credit Act and the FCA Regulations use the term "civil money penalties." Both terms have the same meaning. Accordingly, this rule uses the term civil money penalty, and both terms may be used interchangeably.

[2] *See* 28 U.S.C. 2461 *note.*

[3] Public Law 92–181, as amended.

[4] 42 U.S.C. 4012a and Public Law 103–325, title V, 108 Stat. 2160, 2255–87 (September 23, 1994).

[5] The inflation-adjusted CMP in effect on January 15, 2020, for a violation of a final order is $2,404 per day, as set forth in § 622.61(a)(1) of FCA

regulations. We discovered a transposition error, and note that the correct number for 2020 is $2,367.

[6] The inflation-adjusted CMP in effect on January 15, 2020, for a violation of the Farm Credit Act or a regulation issued under the Farm Credit Act is $1,071 per day, as set forth in § 622.61(a)(2) of FCA regulations.

[7] Prior adjustments were made under the 1990 Act and continue to be made each year.

[8] Public Law 112–141, 126 Stat. 405 (July 6, 2012).

[9] The inflation-adjusted CMP in effect on January 15, 2020, for a flood insurance violation is $2,226, as set forth in § 622.61(b) of FCA regulations.

each year.[10] Section 6 of the 1990 Act, as amended, states that any increase to a civil monetary penalty under this 1990 Act applies only to civil monetary penalties, including those whose associated violation predated such increase, which are assessed after the date the increase takes effect.

Section 5(b) of the 1990 Act, as amended, defines the term "cost-of-living adjustment" as the percentage (if any) for each civil monetary penalty by which (1) the Consumer Price Index (CPI) for the month of October of the calendar year preceding the adjustment, exceeds (2) the CPI for the month of October 1 year before the month of October referred to in (1) of the calendar year in which the amount of such civil monetary penalty was last set or adjusted pursuant to law.[11]

The increase for each CMP adjusted for inflation must be rounded using a method prescribed by section 5(a) of the 1990 Act, as amended, by the 2015 Act.[12]

### 2. Other Adjustments

If a civil monetary penalty is subject to a cost-of-living adjustment under the 1990 Act, as amended, but is adjusted to an amount greater than the amount of the adjustment required under the Act within the 12 months preceding a required cost-of-living adjustment, the agency is not required to make the cost-of-living adjustment to that CMP in that calendar year.[13]

## III. Yearly Adjustments

### A. Mathematical Calculations of 2021 Adjustments

The adjustment requirement affects two provisions of section 5.32(a) of the Farm Credit Act. For the 2021 yearly adjustments to the CMPs set forth by the Farm Credit Act, the calculation required by the 2020 White House Office of Management and Budget (OMB) guidance [14] is based on the percentage by which the CPI for October 2020 exceeds the CPIs for October 2019. The OMB set forth guidance, as required by the 2015 Act,[15] with a multiplier for

calculating the new CMP values.[16] The 2020 OMB multiplier for the 2021 CMPs is 1.01182.

The adjustment also affects the CMPs set by the Flood Disaster Protection Act of 1973, as amended. The adjustment multiplier is the same for all FCA enforced CMPs, set at 1.01182. The maximum CMPs for violations were created in 2012 by the Biggert-Waters Act, which amended the Flood Disaster Protection Act of 1973.

### 1. New Penalty Amount in § 622.61(a)(1)

The inflation-adjusted CMP currently in effect for violations of a final order occurring on or after January 15, 2020, is a maximum daily amount of $2,367.[17] Multiplying the $2,367 CMP by the 2020 OMB multiplier, 1.01182, yields a total of $2,394.98. When that number is rounded as required by section 5(a) of the 1990 Act, as amended, the inflation-adjusted maximum increases to $2,395. Thus, the new CMP maximum is $2,395, for violations that occur on or after January 15, 2021.

### 2. New Penalty Amount in § 622.61(a)(2)

The inflation-adjusted CMP currently in effect for violations of the Farm Credit Act or regulations issued under the Farm Credit Act occurring on or after January 15, 2020, is a maximum daily amount of $1,071.[18] Multiplying the $1,071 CMP maximum by the 2020 OMB multiplier, 1.01182, yields a total of $1,083.66. When that number is rounded as required by section 5(a) of the 1990 Act, as amended the inflation-adjusted maximum increases to $1,084. Thus, the new CMP maximum is $1,084, for violations that occur on or after January 15, 2021.

### 3. New Penalty Amounts for Flood Insurance Violations Under § 622.61(b)

The existing maximum CMP for a pattern or practice of flood insurance violations pursuant to 42 U.S.C. 4012a(f)(5) occurring on or after January 15, 2020, is $2,226. Multiplying $2,226 by the 2020 OMB multiplier, 1.01182, yields a total of $2,252.31. When that number is rounded as required by section 5(a) of the 1990 Act, as amended, the new maximum assessment of the CMP for violating 42 U.S.C. 4012a(f)(5) is $2,252. Thus, the

new CMP maximum is $2,252, for violations that occur on or after January 15, 2021.

## IV. Notice and Comment Not Required by Administrative Procedure Act

The 1990 Act, as amended, gives Federal agencies no discretion in the adjustment of CMPs for the rate of inflation. Further, these revisions are ministerial, technical, and noncontroversial. For these reasons, the FCA finds good cause to determine that public notice and an opportunity to comment are impracticable, unnecessary, and contrary to the public interest pursuant to the Administrative Procedure Act, 5 U.S.C. 553(b)(B), and adopts this rule in final form.

## V. Regulatory Flexibility Act

Pursuant to section 605(b) of the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), the FCA hereby certifies that this final rule will not have a significant economic impact on a substantial number of small entities. Each of the banks in the System, considered together with its affiliated associations, has assets and annual income in excess of the amounts that would qualify them as small entities. Therefore, System institutions are not "small entities" as defined in the Regulatory Flexibility Act.

## List of Subjects in 12 CFR Part 622

Administrative practice and procedure, Crime, Investigations, Penalties.

For the reasons stated in the preamble, part 622 of chapter VI, title 12 of the Code of Federal Regulations is amended as follows:

## PART 622—RULES OF PRACTICE AND PROCEDURE

■ 1. The authority citation for part 622 continues to read as follows:

**Authority:** Secs. 5.9, 5.10, 5.17, 5.25–5.37 of the Farm Credit Act (12 U.S.C. 2243, 2244, 2252, 2261–2273); 28 U.S.C. 2461 note; and 42 U.S.C. 4012a(f).

■ 2. Revise § 622.61 to read as follows:

### § 622.61 Adjustment of civil money penalties by the rate of inflation under the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended.

(a) The maximum amount of each civil money penalty within FCA's jurisdiction is adjusted in accordance with the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended (28 U.S.C. 2461 *note*), as follows:

(1) Amount of civil money penalty imposed under section 5.32 of the Act

---

[10] Public Law 114–74, sec. 701(b)(1).

[11] The CPI is published by the Department of Labor, Bureau of Statistics, and is available at its website: *https://www.bls.gov/cpi/*.

[12] Pursuant to section 5(a)(3) of the 2015 Act, any increase determined under the subsection shall be rounded to the nearest $1.

[13] Pursuant to section 4(d) of the 1990 Act, as amended.

[14] OMB Circular M–21–10, Implementation of Penalty Inflation Adjustments for 2021, Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

[15] 28 U.S.C. 2461 *note*, section 7(a).

[16] OMB Circular M–21–10, Implementation of Penalty Inflation Adjustments for 2021, Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

[17] 12 CFR 622.61(a)(1). As noted above, we discovered a transposition error, so the correct maximum daily amount for 2020 is $2,367. Accordingly, we use the corrected amount to compute the maximum amount for CMP violations that occur on or after January 15, 2021.

[18] 12 CFR 622.61(a)(2).

for violation of a final order issued under section 5.25 or 5.26 of the Act: The maximum daily amount is $2,395 for violations that occur on or after January 15, 2021.

(2) Amount of civil money penalty for violation of the Act or regulations: The maximum daily amount is $1,084 for each violation that occurs on or after January 15, 2021.

(b) The maximum civil money penalty amount assessed under 42 U.S.C. 4012a(f) is $2,252 for each violation that occurs on or after January 15, 2021, with no cap on the total amount of penalties that can be assessed against any single institution during any calendar year.

Dated: January 22, 2021.

**Dale Aultman,**

*Secretary, Farm Credit Administration Board.*

[FR Doc. 2021–01796 Filed 1–26–21; 8:45 am]

**BILLING CODE 6705–01–P**

## DEPARTMENT OF COMMERCE

**International Trade Administration**

**19 CFR Part 361**

**[Docket No. 210122–0011]**

**RIN 0625–AB18**

### Aluminum Import Monitoring and Analysis System: Delay of Effective Date

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**ACTION:** Final rule; delay of effective date; request for comments.

**SUMMARY:** The U.S. Department of Commerce (Commerce) is delaying the effective date of the final rule, entitled "Aluminum Import Monitoring and Analysis System," from January 25, 2021 until March 29, 2021. Commerce is also soliciting comments on the final rule.

**DATES:** The effective date of the rule amending 19 CFR part 361published at 85 FR 83804 (Dec. 23, 2020), is delayed from January 25, 2021, to March 29, 2021.

To be assured of consideration, written comments on the final rule must be received no later than February 26, 2021.

**ADDRESSES:** Submit comments only through the Federal eRulemaking Portal at *http://www.Regulations.gov*, Docket No. ITA–2021–0001.[1] Due to the

COVID–19 situation, Commerce is not able to accept comments submitted by mail or hand-delivery at this time. All comments submitted during the comment period permitted by this document will be a matter of public record and will generally be available on the Federal eRulemaking portal at *http://www.Regulations.gov*. Commerce will not accept response comments accompanied by a request that part or all of the material be treated confidentially because of its business proprietary nature or for any other reason. Therefore, do not submit confidential business information or otherwise sensitive or protected information.

Any questions concerning the process for submitting comments should be submitted to Enforcement & Compliance Communications office at (202) 482–0063 or *ECCommunications@trade.gov*.

The AIM system website is *https:// www.trade.gov/aluminum*.

**FOR FURTHER INFORMATION CONTACT:** Julie Al-Saadawi at (202) 482–1930 or Jessica Link at (202) 482–1411.

**SUPPLEMENTARY INFORMATION:** On December 23, 2020, Commerce published the final rule and accompanying regulations establishing the Aluminum Import Monitoring and Analysis (AIM) system.[2] The original effective date for the *Final Rule* was January 25, 2021. Commerce is now delaying the effective date until March 29, 2021.

This delay in effective date is necessary to allow the incoming Administration time to review the *Final Rule* and consider any additional comments before implementation. Unless otherwise announced, the majority of the final rule will be effective on March 29, 2021. The remaining portions of the final rule concerning an option to state "unknown" for certain fields on the aluminum license form will be effective on December 24, 2021, as originally stated in the final rule. For further background and information, see the *Final Rule*. Parties are invited to comment on all aspects of the *Final Rule* and the AIM system.

The AIM system website (*https:// www.trade.gov/aluminum*) continues to be operational. However, licenses will not be required for covered aluminum imports until on or after March 29, 2021. Further guidance on licenses already issued and the issuance of new

licenses during the intervening period prior to March 29, 2021 will be provided on the AIM system website.

Dated: January 22, 2021.

**Christian Marsh,**

*Acting Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2021–01804 Filed 1–22–21; 4:15 pm]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF LABOR

**Office of the Secretary**

**29 CFR Part 89**

**RIN 1290–AA41**

### Rescission of Department of Labor Rule on Guidance

**AGENCY:** Office of the Secretary, U.S. Department of Labor.

**ACTION:** Final rule; rescission of regulations.

**SUMMARY:** On August 28, 2020, the Department of Labor published a final rule on guidance implementing an Executive order entitled "Promoting the Rule of Law Through Improved Agency Guidance Documents," and providing policy and requirements for issuing, modifying, withdrawing, and using guidance; making guidance available to the public; a notice and comment process for significant guidance; and taking and responding to petitions about guidance. In accordance with the "Executive Order on Revocation of Certain Executive Orders Concerning Federal Regulation," issued by President Biden on January 20, 2021, this final rule rescinds the Department's rule on guidance.

**DATES:** This final rule is effective January 27, 2021.

**FOR FURTHER INFORMATION CONTACT:** Erin FitzGerald, Senior Policy Advisor, U.S. Department of Labor, Room S–2312, 200 Constitution Avenue NW, Washington, DC 20210; telephone: (202) 693–5076 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Discussion

On August 28, 2020, the Department of Labor published an internal final rule on guidance implementing E.O. 13891, "Promoting the Rule of Law Through Improved Agency Guidance Documents," signed by President Trump on October 9, 2019. As required by the E.O., the rule contained policy and requirements for issuing, modifying, withdrawing, and using guidance; making guidance available to the public; a notice and comment

---

[1] Comments on the previously issued proposed rule, *Aluminum Import Monitoring and Analysis System*, 85 FR 23748 (April 29, 2020) (*Proposed Rule*), can be found by searching for the *Proposed Rule* on the Federal eRulemaking portal at *http:// www.regulations.gov*.

[2] *Aluminum Import Monitoring and Analysis System*, 85 FR 83804 (Dec. 23, 2020) (*Final Rule*).

**7238** **Federal Register** / Vol. 86, No. 16 / Wednesday, January 27, 2021 / Rules and Regulations

process for significant guidance; and taking and responding to petitions about guidance (85 FR 53163).

On January 20, 2021, President Biden issued the "Executive Order on Revocation of Certain Executive Orders Concerning Federal Regulation" which, among other things, revoked E.O. 13891 and directed agencies to promptly take steps to rescind any orders, rules, regulations, guidelines, or policies, or portions thereof, implementing or enforcing the Executive orders. The January 20, 2021, E.O. states that it is the policy of the Administration "to use available tools to confront the urgent challenges facing the Nation, including the coronavirus disease 2019 (COVID–19) pandemic, economic recovery, racial justice, and climate change. To tackle these challenges effectively, executive departments and agencies (agencies) must be equipped with the flexibility to use robust regulatory action to address national priorities. This order revokes harmful policies and directives that threaten to frustrate the Federal Government's ability to confront these problems, and empowers agencies to use appropriate regulatory tools to achieve these goals."

After consideration and review, the Department has concluded that the internal rule on guidance deprives the Department and subordinate agencies of necessary flexibility in determining when and how best to issue public guidance based on particular facts and circumstances, and unduly restricts the Department's ability to provide timely guidance on which the public can confidently rely. Therefore, in accordance with President Biden's January 20, 2021, E.O., the Department is issuing this final rule, which rescinds the internal rule on guidance published at 85 FR 53163.

## II. Final Rule

The Department has determined that this rule is suitable for final rulemaking. The revisions to the Department's policies and requirements surrounding guidance are purely internal matters of agency management, as well as the agency's organization, procedure, and practice. Accordingly, as with the August 2020 final rule, the Department is not required to engage in a notice and comment process to issue them under either the Administrative Procedure Act. *See* 5 U.S.C. 553(a)(2), 553(b)(A). Furthermore, because this rule is procedural rather than substantive, the normal requirement of 5 U.S.C. 553(d) that a rule not be effective until at least 30 days after publication in the **Federal Register** is inapplicable. The Department also finds good cause to

provide an immediate effective date for this rule, because it imposes no obligations on parties outside the federal government and therefore no advance notice is required to enable employers or other private parties to come into compliance.

## List of Subjects in 29 CFR Part 89

Administrative practice and procedure, Labor.

## PART 89 [REMOVED]

■ For the reasons discussed in the preamble, and under the authority of 5 U.S.C. 301, the Department of Labor amends 29 CFR subtitle A by removing part 89.

Signed at Washington, DC.

**Stephanie Swirsky,**
*Deputy Assistant Secretary of Labor for Policy.*

[FR Doc. 2021–01746 Filed 1–22–21; 4:15 pm]

**BILLING CODE 4510–HL–P**

## DEPARTMENT OF HOMELAND SECURITY

### Coast Guard

### 33 CFR Part 117

**[Docket No. USCG–2019–0911]**

### Drawbridge Operation Regulation; Mobile River, Hurricane, AL

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of temporary deviation from regulations; request for comments.

**SUMMARY:** The Coast Guard has issued a temporary deviation from the operating schedule that governs the CSX Transportation Railroad drawbridge across the Mobile River, mile 13.3 near Hurricane, Mobile County, Alabama. This deviation will test a change to the drawbridge operation schedule to determine whether a permanent change to the schedule is needed. The Coast Guard is seeking comments from the public regarding these proposed changes.

**DATES:** This deviation is effective without actual notice from 7:01 a.m. January 27, 2021 through 7 a.m. July 8, 2021. For the purposes of enforcement, actual notice will be used from 7 a.m. January 8, 2021 through 7 a.m. January 27, 2021. Comments and related material must reach the Coast Guard on or before July 8, 2021.

**ADDRESSES:** You may submit comments identified by docket number USCG–2019–0911 using Federal eRulemaking Portal at *https://www.regulations.gov*.

See the "Public Participation and Request for Comments" portion of the **SUPPLEMENTARY INFORMATION** section below for instructions on submitting comments.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this test deviation, call or email Mr. Doug Blakemore. Eighth Coast Guard District Bridge Administration Branch Chief; telephone (504) 671–2128, email *Douglas.A.Blakemore@uscg.mil*.

**SUPPLEMENTARY INFORMATION:**

### I. Background, Purpose and Legal Basis

The CSX Transportation Railroad drawbridge has a vertical clearance of 5.5′ in the closed to navigation position and operates in accordance with 33 CFR 117.5. The CSX Railroad Company, the owner of the bridge requested to change operation of the bridge from a tended drawbridge to a remotely operated drawbridge.

CSX has completed installation of a remote operation system at the bridge and a remote control center, located in Mobile, AL. At the bridge, CSX has installed infrared cameras, closed circuit cameras and TVs, communication systems and information technology systems on the bridge that allow an operator from Mobile to monitor and control the bridge. They have also developed an operations manual that remote operators use to control each bridge.

The purpose of this test is to evaluate the impact to navigation safety and vessels reasonable ability to use the waterway while the drawbridge is operated from the CSX remote control center in Mobile, AL. The bridge's operation schedule and methods to contact the bridge to open will remain the same.

The waterway users include recreational vessels and commercial tows; which combined requires approximately six openings a day.

The Coast Guard will inform the users of the waterways through our Local and Broadcast Notices to Mariners of the change in operating schedule for the bridge so that vessel operators can arrange their transits to minimize any impact caused by the temporary deviation.

In accordance with 33 CFR 117.35(e), the drawbridge must return to its regular operating schedule immediately at the end of the effective period of this temporary deviation. This deviation from the operating regulations is authorized under 33 CFR 117.35.

## II. Public Participation and Request for Comments

We view public participation as essential to effective rulemaking, and will consider all comments and material received during the comment period. Your comment can help shape the outcome of this rulemaking. If you submit a comment, please include the docket number for this rulemaking, indicate the specific section of this document to which each comment applies, and provide a reason for each suggestion or recommendation.

We encourage you to submit comments through the Federal eRulemaking Portal at *https://www.regulations.gov.* If your material cannot be submitted using *https://www.regulations.gov,* contact the person in the **FOR FURTHER INFORMATION CONTACT** section of this document for alternate instructions.

We accept anonymous comments. All comments received will be posted without change to *https://www.regulations.gov* and will include any personal information you have provided. For more about privacy and submissions in response to this document, see DHS's eRulemaking System of Records notice (85 FR 14226, March 11, 2020).

Documents mentioned in this test deviation as being available in this docket and all public comments, will be in our online docket at *https://www.regulations.gov* and can be viewed by following that website's instructions. Additionally, if you go to the online docket and sign up for email alerts, you will be notified when comments are posted or a final rule is published.

Dated: January 11, 2021.

**Douglas Allen Blakemore, Sr.,**

*Chief, Bridge Administration Branch, Eighth Coast Guard District.*

[FR Doc. 2021–01104 Filed 1–26–21; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF HOMELAND SECURITY

### Coast Guard

### 33 CFR Part 117

**[Docket No. USCG–2018–0968]**

**RIN 1625–AA09**

### Drawbridge Operation Regulations; Old Fort Bayou, MS

**AGENCY:** Coast Guard, DHS.

**ACTION:** Final rule.

**SUMMARY:** The Coast Guard is changing the operating schedule that governs the State Road 609 highway bascule bridge across the Old Fort Bayou mile 1.6, Ocean Springs, Harrison County, Mississippi. This change was requested to address increased vehicular congestion, and allows Mississippi Department of Transportation to operate the bridge to meet vessel and traffic needs.

**DATES:** This rule is effective February 26, 2021.

**ADDRESSES:** To view documents mentioned in this preamble as being available in the docket, go to *https://www.regulations.gov.* Type USCG–2018–0968 in the ''SEARCH'' box and click ''SEARCH.'' Click on Open Docket Folder on the line associated with this rule.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this rule, call or email Mr. Doug Blakemore, Eighth Coast Guard District Bridge Administrator; telephone (504) 671–2128, email *Douglas.A.Blakemore@uscg.mil.*

**SUPPLEMENTARY INFORMATION:**

### I. Table of Abbreviations

CFR   Code of Federal Regulations
DHS   Department of Homeland Security
E.O.   Executive Order
FR   Federal Register
MDOT   Mississippi Department of Transportation
OMB   Office of Management and Budget
Pub. L.   Public Law
NPRM   Notice of proposed rulemaking
§   Section
SR   State Road
U.S.C.   United States Code

### II. Background, Purpose and Legal Basis

On July 20, 2020 the Coast Guard published a notice of proposed rulemaking entitled Drawbridge Operation Regulations; Old Fort Bayou, MS in the **Federal Register** (85 FR 43773), to seek public comments on whether the Coast Guard should consider modifying the current operating schedule to the Old Fort Bayou drawbridge. We received 0 comments.

### III. Discussion of Proposed Rule

The Coast Guard is issuing this rule under authority 33 U.S.C. 499.

The Mississippi Department of Transportation (MDOT) requested to change the operating requirements for the SR 609 drawbridge across Old Fort Bayou, mile 1.6, Ocean Springs, Harrison County, Mississippi. This bridge currently operates according to the schedule found in 33 CFR part 117. MDOT requested to close the bridge to vessels during peak vehicle traffic periods, from 6:30 a.m. to 8:00 a.m. and from 4 p.m. to 6 p.m. Monday through Friday, except federal holidays and to require a 12 hour notification to open the bridge during periods of very little vessel traffic activity on Thanksgiving Day, Christmas Day and New Year's Day.

This waterway is used by small tows and barges, commercial fisherman and recreational vessels. Closing the bridge to vessel traffic in the morning and evening commuting hours reduces vehicle queues and does not create vessel queues. The reduction in vehicle queues enhances safety by preventing vehicles from backing up on U.S. 90 highway. This bridge opens infrequently to vessels on Thanksgiving Day, Christmas Day and New Year's Day, therefore requiring a 12 hour notification provides vessels with a reasonable ability to use Old Fort Bayou.

Additionally the bridge is required to open for emergencies according to 33 CFR 117.31.

### IV. Discussion of Comments, Changes and the Final Rule

There were no comments on this rule change. The Coast Guard provided a comment period of 60 days. Based on the vessel data and bridge openings this rule provides vessels with a reasonable ability to use the waterway. We identified no impacts on marine navigation with this proposed rule.

### V. Regulatory Analyses

The Coast Guard developed this proposed rule after considering numerous statutes and Executive orders related to rulemaking. Below we summarize our analyses based on these statutes and Executive orders and we discuss First Amendment rights of protestors.

### A. Regulatory Planning and Review

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits. Executive Order 13771 directs agencies to control regulatory costs through a budgeting process. This NPRM has not been designated a ''significant regulatory action,'' under Executive Order 12866. Accordingly, the NPRM has not been reviewed by the Office of Management and Budget (OMB) and pursuant to OMB guidance it is exempt from the requirements of Executive Order 13771. This regulatory action determination is based on the ability that vessels can still open the draw and transit given advance notice. Those

**7240** **Federal Register** / Vol. 86, No. 16 / Wednesday, January 27, 2021 / Rules and Regulations

vessels with a vertical clearance requirement of less than 26 feet above mean high water may transit the bridge at any time. Additionally according to 33 CFR 117.31(b) the drawtender shall take all reasonable measures to have the draw opened, regardless of the operating schedule of the draw, for passage of certain vessels during emergency situations. We believe this proposed change to the drawbridge operation regulations at 33 CFR 117.675(a) will meet the reasonable needs of navigation.

*B. Impact on Small Entities*

The Regulatory Flexibility Act of 1980, 5 U.S.C. 601–612, as amended, requires Federal agencies to consider the potential impact of regulations on small entities during rulemaking. The term ''small entities'' comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. The Coast Guard certifies under 5 U.S.C. 605(b) that this proposed rule would not have a significant economic impact on a substantial number of small entities.

The bridge provides a 26 foot vertical clearance at mean high water that should accommodate most present vessel traffic and the bridge will continue to open on signal during most daylight hours for any vessel during the above federal holidays provided at least 12 hour notice is given. While some owners or operators of vessels intending to transit the bridge may be small entities, for the reasons stated in section IV.A above, this proposed rule would not have a significant economic impact on any vessel owner or operator.

Under section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104–121), we want to assist small entities in understanding this proposed rule. If the proposed rule would affect your small business, organization, or governmental jurisdiction and you have questions concerning its provisions or options for compliance, please contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section. The Coast Guard will not retaliate against small entities that question or complain about this proposed rule or any policy or action of the Coast Guard.

*C. Collection of Information*

This proposed rule would call for no new collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520).

*D. Federalism and Indian Tribal Government*

A rule has implications for federalism under Executive Order 13132, Federalism, if it has a substantial direct effect on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. We have analyzed this proposed rule under that Order and have determined that it is consistent with the fundamental federalism principles and preemption requirements described in Executive Order 13132.

Also, this proposed rule does not have tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes. If you believe this proposed rule has implications for federalism or Indian tribes, please contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section above.

*E. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) requires Federal agencies to assess the effects of their discretionary regulatory actions. In particular, the Act addresses actions that may result in the expenditure by a State, local, or tribal government, in the aggregate, or by the private sector of $100,000,000 (adjusted for inflation) or more in any one year. Though this proposed rule will not result in such expenditure, we do discuss the effects of this proposed rule elsewhere in this preamble.

*F. Environment*

We have analyzed this rule under Department of Homeland Security Management Directive 023–01 and U.S. Coast Guard Environmental Planning Policy COMDTINST 5090.1 (series) which guide the Coast Guard in complying with the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321–4370f). We have made a preliminary determination that this action is one of a category of

actions that do not individually or cumulatively have a significant effect on the human environment. This proposed rule promulgates the operating regulations or procedures for drawbridges. Normally this action is categorically excluded from further review, under paragraph L49, of Chapter 3, Table 3–1 of the U.S. Coast Guard Environmental Planning Implementation Procedures.

Neither a Record of Environmental Consideration nor a Memorandum for the Record are required for this rule.

*G. Protest Activities*

The Coast Guard respects the First Amendment rights of protesters. Protesters are asked to contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section to coordinate protest activities so that your message can be received without jeopardizing the safety or security of people, places or vessels.

**List of Subjects in 33 CFR Part 117**

Bridges.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR part 117 as follows:

**PART 117—DRAWBRIDGE OPERATION REGULATIONS**

■ 1. The authority citation for part 117 continues to read as follows:

**Authority:** 33 U.S.C. 499; 33 CFR 1.05–1; Department of Homeland Security Delegation No. 0170.1.

■ 2. Revise § 117.681 to read as follows:

**§ 117.681  Old Fort Bayou.**

The draw of the bridge, mile 1.6 at Ocean Springs, shall open on signal; except that, from 9 p.m. to 5 a.m., the draw shall open on signal if at least eight hour notice is given; on Thanksgiving Day, Christmas Day and New Year's Day the draw shall open on signal if at least 12 hour notice is given; and the draw need not open to vessels from 6:30 a.m. to 8 a.m. and from 4 p.m. to 6 p.m. Monday through Friday, except federal holidays. The draw shall open anytime at the direction of the District Commander.

Dated: December 16, 2020.

**John P. Nadeau,**

*Rear Admiral, U.S. Coast Guard, Commander, Eighth Coast Guard District.*

[FR Doc. 2020–28710 Filed 1–26–21; 8:45 am]

**BILLING CODE 9110–04–P**

# DEPARTMENT OF HOMELAND SECURITY

## Coast Guard

## 33 CFR Part 117

[Docket No. USCG–2019–0910]

## Drawbridge Operation Regulation; Bayou Sara, Saraland, AL

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of temporary deviation from regulations; request for comments.

**SUMMARY:** The Coast Guard has issued a temporary deviation from the operating schedule that governs the CSX Transportation Railroad drawbridge across Bayou Sara, mile 0.1 near Saraland, Mobile County, Alabama. This deviation will test a change to the drawbridge operation schedule to determine whether a permanent change to the schedule is needed. The Coast Guard is seeking comments from the public regarding these proposed changes.

**DATES:** This deviation is effective without actual notice from 7:01 a.m. January 27, 2021 through 7 a.m. July 8, 2021. For the purposes of enforcement, actual notice will be used from 7 a.m. January 8, 2021 through 7 a.m. January 27, 2021. Comments and related material must reach the Coast Guard on or before July 8, 2021.

**ADDRESSES:** You may submit comments identified by docket number USCG–2019–0910 using Federal eRulemaking Portal at *https://www.regulations.gov*.

See the ''Public Participation and Request for Comments'' portion of the **SUPPLEMENTARY INFORMATION** section below for instructions on submitting comments.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this test deviation, call or email Mr. Doug Blakemore, Eighth Coast Guard District, Bridge Administration Branch Chief; telephone (504) 671–2128, email *Douglas.A.Blakemore@uscg.mil*.

**SUPPLEMENTARY INFORMATION:**

## I. Background, Purpose and Legal Basis

The CSX Transportation Railroad drawbridge has a vertical clearance of 5′ in the closed to navigation position and operates in accordance with 33 CFR 117.105. The CSX Railroad Company, the owner of the bridge requested to change operation of the bridge from a tended drawbridge to a remotely operated drawbridge.

CSX has completed installation of a remote operation system at the bridge and a remote control center, located in Mobile, AL. At the bridge, CSX has installed infrared cameras, closed circuit cameras and TVs, communication systems and information technology systems on the bridge that allow an operator from Mobile to monitor and control the bridge. They have also developed an operations manual that remote operators use to control each bridge.

The purpose of this test is to evaluate the impact to navigation safety and vessels reasonable ability to use the waterway while the drawbridge is operated from the CSX remote control center in Mobile, AL. The bridge's operation schedule and methods to contact the bridge to open will remain the same.

The waterway users include recreational vessels and commercial tows; which combined requires approximately six openings a day.

The Coast Guard will inform the users of the waterways through our Local and Broadcast Notices to Mariners of the change in operating schedule for the bridge so that vessel operators can arrange their transits to minimize any impact caused by the temporary deviation.

In accordance with 33 CFR 117.35(e), the drawbridge must return to its regular operating schedule immediately at the end of the effective period of this temporary deviation. This deviation from the operating regulations is authorized under 33 CFR 117.35.

## II. Public Participation and Request for Comments

We view public participation as essential to effective rulemaking, and will consider all comments and material received during the comment period. Your comment can help shape the outcome of this rulemaking. If you submit a comment, please include the docket number for this rulemaking, indicate the specific section of this document to which each comment applies, and provide a reason for each suggestion or recommendation.

We encourage you to submit comments through the Federal eRulemaking Portal at *https:// www.regulations.gov*. If your material cannot be submitted using *https:// www.regulations.gov*, contact the person in the **FOR FURTHER INFORMATION CONTACT** section of this document for alternate instructions.

We accept anonymous comments. All comments received will be posted without change to *https:// www.regulations.gov* and will include any personal information you have provided. For more about privacy and submissions in response to this document, see DHS's eRulemaking System of Records notice (85 FR 14226, March 11, 2020).

Documents mentioned in this temporary deviation as being available in this docket and all public comments, will be in our online docket at *https:// www.regulations.gov* and can be viewed by following that website's instructions. Additionally, if you go to the online docket and sign up for email alerts, you will be notified when comments are posted or a final rule is published.

Dated: January 11, 2021

**Douglas Allen Blakemore, Sr.,**
*Chief, Bridge Administration Branch, Eighth Coast Guard District.*

[FR Doc. 2021–01103 Filed 1–26–21; 8:45 am]

**BILLING CODE 9110–04–P**

# Proposed Rules

**Federal Register**

Vol. 86, No. 16

Wednesday, January 27, 2021

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Parts 223 and 226**

**[Docket No.: 201228–0358]**

**RIN 0648–BJ65**

**Endangered and Threatened Species; Designation of Critical Habitat for the Beringia Distinct Population Segment of the Bearded Seal**

*Correction*

In notice document 2020–29006, appearing on pages 1433 through 1452 in the issue of Friday, January 8, 2021 make the following correction.

On page 1433, in the third column, on the eleventh line, "March 9, 2020" should read "March 9, 2021".

[FR Doc. C1–2020–29006 Filed 1–26–21; 8:45 am]

**BILLING CODE 1300–01–D**

# Notices

Federal Register

Vol. 86, No. 16

Wednesday, January 27, 2021

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

---

## DEPARTMENT OF AGRICULTURE

### Submission for OMB Review; Comment Request

January 22, 2021.

The Department of Agriculture has submitted the following information collection requirement(s) to OMB for review and clearance under the Paperwork Reduction Act of 1995, Public Law 104–13. Comments are requested regarding; whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; the accuracy of the agency's estimate of burden including the validity of the methodology and assumptions used; ways to enhance the quality, utility and clarity of the information to be collected; and ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

Comments regarding this information collection received by February 26, 2021 will be considered. Written comments and recommendations for the proposed information collection should be submitted within 30 days of the publication of this notice on the following website *www.reginfo.gov/public/do/PRAMain*. Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.

An agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB control number and the agency informs potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

#### Food and Nutrition Service

*Title:* School Meals Operations Study: State Agency COVID–19 Child Nutrition Waivers Evaluation.

*OMB Control Number:* 0584–0607.

*Summary of Collection:* This study was originally called the Child Nutrition Program Operations Study II. The Food and Nutrition Service (FNS) has changed the name of the study series to School Meals Operations (SMO) Study to better reflect the specific programs on which the study ordinarily collects data. The annual data collected from this study allows FNS to describe and assess program operations, provide input for legislation and regulations on the CN programs, and develop pertinent technical assistance and training for program staff at the State and local levels. This information is necessary for FNS to understand how recent and proposed legislation, regulations, policies, and initiatives change the child nutrition program operations. However, for the SY 2020–2021 data collection, FNS has repurposed the SMO Study to collect the data needed to meet the congressionally-mandated reporting requirements for the 21 COVID–19-related Child Nutrition waiver requests specified in section 2202 of the Families First Coronavirus Response Act (FFCRA) (Pub. L. 116–127). These nationwide waiver requests affected requirements in the National School Lunch Program (NSLP), the School Breakfast Program (SBP), the NSLP Seamless Summer Option (SSO), the School Food Service Program (SFSP), and the Child and Adult Care Food Program (CACFP).

*Need and Use of the Information:* This mandatory study will collect data from the State Child Nutrition directors through a web-survey and an administrative data collection. The survey portion of the study will collect information relevant to the implementation of the nationwide waivers, and the administrative data collection will collect disaggregated administrative data from the State agencies. This study will help the State agencies fulfill their congressionally-mandated reporting requirements by focusing on the use of COVID–19-related nationwide waivers and the administration of CN Programs that operated under nationwide waiver authority during March 2020 through September 2020. FNS will use the data to assess meal service levels to determine coverage within and across states, look for patterns and trends across site types, and assess how the waivers improved services to children since, in the absence of these waivers, meal service may not have been possible. The information will also inform FNS's planning, policy, and guidance related to state and local meal service operations during future emergency situations and unanticipated school closures.

*Description of Respondents:* State, Local, or Tribal Government.

*Number of Respondents:* 67.

*Frequency of Responses:* Reporting: Annually.

*Total Burden Hours:* 1,173.

Ruth Brown,
*Departmental Information Collection Clearance Officer.*

[FR Doc. 2021–01795 Filed 1–26–21; 8:45 am]

**BILLING CODE 3410–30–P**

---

## DEPARTMENT OF AGRICULTURE

### Submission for OMB Review; Comment Request

The Department of Agriculture has submitted the following information collection requirement(s) to OMB for review and clearance under the Paperwork Reduction Act of 1995, Public Law 104–13. Comments are requested regarding; whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; the accuracy of the agency's estimate of burden including the validity of the methodology and assumptions used; ways to enhance the quality, utility and clarity of the information to be collected; and ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

Comments regarding this information collection received by February 26, 2021 will be considered. Written comments and recommendations for the proposed information collection should be submitted within 30 days of the

publication of this notice on the following website *www.reginfo.gov/public/do/PRAMain*. Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.

An agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB control number and the agency informs potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

**Foreign Agricultural Service**

*Title:* CCC's Export Credit Guarantee Program (GSM–102).

*OMB Control Number:* 0551–0004.

*Summary of Collection:* The Export Credit Guarantee Program (GSM–102) is administered by the Commodity Credit Corporation (CCC) of the U.S. Department of Agriculture. This program provides guarantees to exporters in order to maintain and increase overseas importers ability to purchase U.S. agricultural goods. The Export Credit Guarantee Program underwrites credit extended by U.S. private banks to approved foreign banks using dollar-denominated, irrevocable letters of credit. The Foreign Agricultural Service (FAS) will collect information from the guarantee application submitted by the participants through an electronic system or in writing (via fax or email) or mail.

*Need and Use of the Information:* FAS will collect information from participating U.S. exporters in order to determine the exporter's eligibility for program benefits. The information collection is necessary to enable exporters, U.S. banks and foreign banks to receive the benefits of the program and to allow CCC to comply with the Federal Funding Accountability and Transparency Act, the Debt Collection Improvement Act, and non-procurement suspension and debarment regulations found at 2 CFR pars 180 and 417. If the information were not collected CCC would be unable to determine if export sales under the program would be eligible for coverage or, if coverage conformed to program requirements.

*Description of Respondents:* Business or other-for-profit.

*Number of Respondents:* 47.

*Frequency of Responses:* Record keeping, Reporting: On occasion.

*Total Burden Hours:* 1,130.

**Foreign Agricultural Service**

*Title:* Food Donation Programs (Food for Progress & Section 416(b) and McGovern-Dole International Food for Education and Child Nutrition Program).

*OMB Control Number:* 0551–0035.

*Summary of Collection:* The U.S. Department of Agriculture's Foreign Agricultural Service (FAS) provides U.S. agricultural commodities to feed millions of hungry people in needy countries through direct donations and concessional programs. USDA Food aid may be provided through three program authorities: Food for Progress authorized by the Food for Progress Act of 1985, Section 416(b); and the McGovern-Dole International Food for Education and Child Nutrition Program authorized by the Food, Conservation, and Energy Act of 2008 and Public Law 480.

*Need and Use of the Information:* FAS will collect information from recipients desiring to receive grants or cooperative agreements under the programs to determine their ability to carry out a food aid program, to establish the terms under which the commodities will be provided, to monitor the progress of commodity distribution (including how transportation is procured), to monitor the progress of expenditure of monetization funds, and to evaluate both the program's success and the participant's effectiveness in meeting the agreed upon goals. Information is also collected from ship owners/brokers shipping the commodity to its destination.

*Description of Respondents:* Not for-profit institutions; Business or other-for-profit.

*Number of Respondents:* 61.

*Frequency of Responses:* Recordkeeping; Reporting: Semi-annually; Quarterly; Monthly.

*Total Burden Hours:* 88,309.

**Foreign Agricultural Service**

*Title:* Pima Agriculture Cotton Trust Fund.

*OMB Control Number:* 0551–0044.

*Summary of Collection:* Section 12602 of the Agricultural Act of 2014 (Pub. L. 113–79) (The Act), as amended by the Agricultural Improvement Act of 2018 (Pub. L. 115–334), authorizes distributions out of the Pima Agriculture Cotton Trust Fund ("Pima Cotton Trust Fund") in each of calendar years 2018 through 2023, payable to qualifying claimants. Eligible claimants are directed to submit a notarized affidavit, following the statutory procedures specified in Section 12314(c) or (d) of the Act.

*Need and Use of the Information:* Distributions out of the Trust Fund is payable to (1) One or more nationally recognized associations established for the promotion of pima cotton for use in textile and apparel goods; (2) certain yarn spinners of pima cotton that produced ring spun cotton yarns in the United States from pima cotton during the prior calendar year; and (3) manufacturers who cut and sew cotton shirts in the United States who certify that they used imported cotton fabric during the prior calendar year. Eligible claimants for a distribution from the Pima Cotton Trust Fund are directed to submit a notarized affidavit. The Foreign Agriculture Service (FAS) will use the information provided in the affidavits to certify the claimants' eligibility and to authorize payment from the Pima Cotton Trust Fund. If eligible claimants do not submit an affidavit with the required information they will not be entitled to a distribution from the Pima Cotton Trust Fund.

*Description of Respondents:* Business or other-for-profit.

*Number of Respondents:* 9.

*Frequency of Responses:* Record keeping, Reporting: Annually.

*Total Burden Hours:* 9.

**Ruth Brown,**
*Departmental Information Collection Clearance Officer.*

[FR Doc. 2021–01750 Filed 1–26–21; 8:45 am]

**BILLING CODE 3410–10–P**

---

**DEPARTMENT OF AGRICULTURE**

**Submission for OMB Review; Comment Request**

January 22, 2021.

The Department of Agriculture has submitted the following information collection requirement(s) to OMB for review and clearance under the Paperwork Reduction Act of 1995, Public Law 104–13. Comments are requested regarding; whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; the accuracy of the agency's estimate of burden including the validity of the methodology and assumptions used; ways to enhance the quality, utility and clarity of the information to be collected; and ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological

collection techniques or other forms of information technology.

Comments regarding this information collection received by February 26, 2021 will be considered. Written comments and recommendations for the proposed information collection should be submitted within 30 days of the publication of this notice on the following website *www.reginfo.gov/ public/do/PRAMain*. Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.

An agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB control number and the agency informs potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

**Food and Nutrition Service**

*Title:* Child Nutrition Database.
*OMB Control Number:* 0584–0494.
*Summary of Collection:* The Child Nutrition Database (CNDB) is a necessary component and is required under 7 CFR 210.10(i)(2) and 7 CFR 220.8(i) to be part of the nutrient analysis software approved by the U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS) that is used in the nutrient analysis of the school meals served in the National School Lunch Program (NSLP) and the School Breakfast Program (SBP). 7 CFR 210.18 also requires State agencies to conduct a nutrient analysis of school lunches and breakfasts if non-compliance risk is determined as part of the administrative review to monitor compliance with the dietary specifications for calories, saturated fat, and sodium. When needed to determine compliance, the State agencies are required to use nutrient analysis software evaluated and approved by USDA. The USDA-approved nutrient analysis software must include the CNDB to provide agencies with the nutrient data of foods typically used in school recipes and menus, as well as for food products that are marketed to schools by food manufacturers. The CNDB provides the State agencies with the necessary nutrient information to assess compliance with the dietary specifications in 7 CFR 210.10 for the NSLP and 7 CFR 220.8 for the SBP. The CNDB is regularly maintained and updated to ensure that the information is accurate and current. Form FNS–710 CN Database Qualification Report,

which is an Excel spreadsheet, is used to collect the nutrient data from food manufacturers for commercially processed foods that are sold and marketed for use in school food service.

*Need and Use of the Information:* This is a voluntary information collection that is used to collect nutrient data from food manufacturers for their food products. Private software companies are required to use the CNDB in their nutrient analysis software programs approved by FNS for use in nutrient analyses required in the school meal programs. The State agencies and program operators use this nutrient information in the approved software programs for auditing and nutrient analysis review purposes. The CNDB contains nutrient composition data for: (1) Food items from the USDA National Nutrient Database for Standard Reference (SR); (2) standardized recipes for Child Nutrition Programs developed by FNS; (3) brand name commercially processed foods; and (4) USDA Foods.

*Description of Respondents:* Businesses or other for-profit.
*Number of Respondents:* 32.
*Frequency of Responses:* Reporting: Annually.
*Total Burden Hours:* 2,240.

**Ruth Brown,**

*Departmental Information Collection Clearance Officer.*

[FR Doc. 2021–01751 Filed 1–26–21; 8:45 am]

**BILLING CODE 3410–30–P**

---

**DEPARTMENT OF AGRICULTURE**

**Submission for OMB Review; Comment Request**

January 21, 2021.

The Department of Agriculture has submitted the following information collection requirement(s) to OMB for review and clearance under the Paperwork Reduction Act of 1995, Public Law 104–13. Comments are requested regarding: Whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; the accuracy of the agency's estimate of burden including the validity of the methodology and assumptions used; ways to enhance the quality, utility and clarity of the information to be collected; and ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques and other forms of information technology.

Comments regarding this information collection received by February 26, 2021 will be considered. Written comments and recommendations for the proposed information collection should be submitted within 30 days of the publication of this notice on the following website *www.reginfo.gov/ public/do/PRAMain*. Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.

An agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB control number and the agency informs potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

**Forest Service**

*Title:* Collaborative Forest Landscape Restoration Program.
*OMB Control Number:* 0596–0245.
*Summary of Collection:* The Collaborative Forest Landscape Restoration Program (CFLRP) is a USDA program started in 2010 to encourage collaborative groups of neighboring landowners, state, local and tribal government representatives, businesses, interest groups, and nonprofit organizations, to work with the Forest Service to find common ground pertaining to geographically extensive forest restoration. The Southwestern Crown Collaborative (SWCC) is one of 24 Collaborative Forest Landscape Restoration (CFLR) projects across the nation currently. In the CFLRP projects, collaborators and other partners work with the Forest Service to implement restoration work and multi-party monitoring of the restoration.

The Forest Landscape Restoration Act (FLRA) of 2009 (16 U.S.C. 7303), which enabled the CFLRP, requires monitoring "to assess the positive or negative ecological, social, and economic effects of projects implementing a selected proposal for not less than 15 years after project implementation commences." The proposed information collection will help meet the CFLRP projects' obligation for monitoring the social impacts on residents and stakeholders of activities conducted under the CFLRP. It is critical for managers to understand the social impacts of their decisions to allow for adaptive management and improve future outcomes. The scope of the survey includes residents of communities within and adjacent to CFLRP

landscapes and collaborative participants.

*Need and Use of the Information:* The information collection methods used will be:

1. *Mail and Electronic Monitoring Survey:* Respondents will be given the option of completing an online version of the monitoring instrument; those choosing not to respond online will be given the option of completing a paper version.

2. *Non-Response Checks:* Data will be analyzed for non-response bias and a small subset of respondents will be sampled via phone and asked a small number of monitoring questions (<5 minutes each).

This is an extension renewal without revisions of an information collection that will be conducted by the University of Montana's *Bureau of Business and Economic Research* (BBER) in conjunction with UM's *College of Forestry and Conservation.* The purpose is twofold: (1) To meet our obligations under the CFLRP to monitor social impacts, and (2) to provide feedback to Forest Service managers about the activities, including the decision making processes, conducted under the CFLRP. Through an adaptive management process recommended by the authors of the FLRA, this information can be used to improve processes and actions on future restoration projects. The results will be analyzed and published in a final report available for use by federal and state policy makers and by the general public.

*Description of Respondents:* Individuals or households.

*Estimated Number of Respondents:* 2,330.

*Frequency of Responses:* Reporting: Annually.

*Total Burden Hours:* 320 hours.

**Levi S. Harrell,**
*Departmental Information Collection Clearance Officer.*
[FR Doc. 2021–01735 Filed 1–26–21; 8:45 am]
**BILLING CODE 3411–15–P**

---

**DEPARTMENT OF AGRICULTURE**

**Submission for OMB Review; Comment Request**

January 22, 2021.

The Department of Agriculture has submitted the following information collection requirement(s) to OMB for review and clearance under the Paperwork Reduction Act of 1995, Public Law 104–13. Comments are requested regarding: Whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; the accuracy of the agency's estimate of burden including the validity of the methodology and assumptions used; ways to enhance the quality, utility and clarity of the information to be collected; and ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

Comments regarding this information collection received by February 26, 2021 will be considered. Written comments and recommendations for the proposed information collection should be submitted within 30 days of the publication of this notice on the following website *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function.

An agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB control number and the agency informs potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

**Risk Management Agency**

*Title:* General Administrative Regulations; Subpart V—Submission of Policies, Provisions of Policies, Rates of Premium, and Non-Reinsured Supplemental Policies.

*OMB Control Number:* 0563–0064.

*Summary of Collections:* The Federal Crop Insurance Corporation (FCIC) amends the procedures for the submission of policies, plans of insurance, or other rates or premium by insurance companies, entities or other persons. Public Law 96–365 provided for nationwide expansion of a comprehensive crop insurance program. The Federal Crop Insurance Act, as amended, expanded the role of the crop insurance to be the principal tool for risk management by producers of farm products and required that the crop insurance program operate on an actuarially sound basis. It provides for independent reviews of insurance products by persons experienced as actuaries and in underwriting. The Act was further amended in 2008 to provide the opportunity for the submission of a concept proposal to the FCIC Board of Directors (Board) for approval for advance payment of estimated research and development expenses.

*Need and Use of the Information:* An applicant has the option to submit a concept proposal or a submission package for a crop insurance product and have it presented to the Board. The Board will review an applicant's submissions to determine, if the interests of agricultural producers and taxpayers are protected; the submission is actuarially appropriate; appropriate insurance principles are followed; the requirements of the Act are met; and that sound, reasonable and appropriate underwriting principals are followed. If the information is incomplete, the submission will be disapproved.

*Description of Respondents:* Business or other-for-profit.

*Number of Respondents:* 190.

*Frequency of Responses:* Recordkeeping: Reporting; Other.

*Total Burden Hours:* 44,631.

**Ruth Brown,**
*Departmental Information Clearance Officer.*
[FR Doc. 2021–01760 Filed 1–26–21; 8:45 am]
**BILLING CODE 3410–08–P**

---

**DEPARTMENT OF AGRICULTURE**

**Office of Partnerships and Public Engagement**

**Advisory Committee on Minority Farmers**

**AGENCY:** Office of Partnerships and Public Engagement, USDA.

**ACTION:** Notice of conference call meeting.

---

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the Department of Agriculture and the Federal Advisory Committee Act (FACA), that a public teleconference of the Advisory Committee on Minority Farmers (ACMF) will be held to discuss USDA outreach, technical assistance, and capacity building for and with minority farmers; the implementation of the Socially Disadvantaged and Veteran Farmer and Rancher Grant Program (2501 Program); and methods of maximizing the participation of minority farmers and ranchers in the U.S. Department of Agriculture; and to plan mechanisms for best providing advice to the Secretary on the issues outlined above.

**DATES:** The conference call will be held Wednesday, February 10, 2021 at 1:00 p.m.–4:00 p.m. Central Standard Time (CST).

*Public Call-in Information:* Conference call-in number: Dial-in 888–251–2949 or 215–861–0694 Participant Access Code: 7792453#. Please be advised that before placing them into the conference call, the operator will ask callers to provide their names, their organizational affiliations (if any), and email addresses (so that callers may be notified of future meetings). Callers can expect to incur charges for calls they initiate over wireless lines, and the USDA will not refund any incurred charges. Callers will incur no charge for calls they initiate over land-line connections to the toll-free conference call-in number.

*Public Comments:* Written comments for the Committee's consideration may be submitted to email: *ACMF@usda.gov.* Written comments must be received by February 9, 2021.

*Availability of Materials for the Meeting:* General information about the ACMF as well as any updates concerning the meeting announced in this notice, may be found on the ACMF website at *https://www.usda.gov/ partnerships/advisory-committee-on- minority-farmers.*

*Accessibility:* USDA is committed to ensuring that all persons are included in our programs and events. If you are a person with a disability and require reasonable accommodations to participate in this meeting Please contact Eston Williams at *Eston.Williams@usda.gov* or (202) 596–0226.

Individuals who use telecommunication devices for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339 between 8:00 a.m. and 8:00 p.m., Eastern Standard Time, Monday through Friday.

**FOR FURTHER INFORMATION CONTACT:** General information about the committee can also be found at *https:// www.usda.gov/partnerships/advisory- committee-on-minority-farmers.* Any member of the public wishing to obtain information concerning this public meeting may contact Eston Williams, Designated Federal Officer (DFO), at *Eston.Williams@usda.gov* or at (202) 596–0226.

**SUPPLEMENTARY INFORMATION:** *Background:* The Committee was established in the U.S. Department of Agriculture pursuant to section 14008 of the Food Conservation and Energy Act of 2008, Public Law 110–246, 122 Stat. 1651, 2008 (7 U.S.C. 2279).

The Committee works in the interest of the public to ensure socially disadvantaged farmers have equal access to USDA programs. The Committee advises the Secretary on the implementation of section 2501 of the Food, Agriculture, Conservation, and Trade Act of 1990; methods of maximizing the participation of minority farmers and ranchers in U.S. Department of Agriculture programs; and civil rights activities within the Department, as such activities relate to participants in such programs.

**Cikena Reid,**

*USDA Committee Management Officer.*

[FR Doc. 2021–01752 Filed 1–26–21; 8:45 am]

**BILLING CODE 3412–88–P**

---

# DEPARTMENT OF COMMERCE

## Census Bureau

**Agency Information Collection Activities; Submission to the Office of Management and Budget (OMB) for Review and Approval; Comment Request; State and Local Government Finance Collections, and Public Employment and Payroll Collections**

**AGENCY:** U.S. Census Bureau, Commerce.

**ACTION:** Notice of information collection, request for comment.

**SUMMARY:** The Department of Commerce, in accordance with the Paperwork Reduction Act (PRA) of 1995, invites the general public and other Federal agencies to comment on proposed, and continuing information collections, which helps us assess the impact of our information collection requirements and minimize the public's reporting burden. The purpose of this notice is to allow for 60 days of public comment on the proposed revisions to the State and Local Government Finance Collections, and Public Employment and Payroll Collections, prior to the submission of the information collection request (ICR) to OMB for approval.

**DATES:** To ensure consideration, comments regarding this proposed information collection must be received on or before March 29, 2021.

**ADDRESSES:** Interested persons are invited to submit written comments by email to *Thomas.J.Smith@census.gov.* Please reference State and Local Government Finance Collections, and Public Employment and Payroll Collections in the subject line of your comments. You may also submit comments, identified by Docket Number USBC–2020–0034, to the Federal e-Rulemaking Portal: *http:// www.regulations.gov.* All comments received are part of the public record. No comments will be posted to *http://* *www.regulations.gov* for public viewing until after the comment period has closed. Comments will generally be posted without change. All Personally Identifiable Information (for example, name and address) voluntarily submitted by the commenter may be publicly accessible. Do not submit Confidential Business Information or otherwise sensitive or protected information. You may submit attachments to electronic comments in Microsoft Word, Excel, or Adobe PDF file formats.

**FOR FURTHER INFORMATION CONTACT:** Requests for additional information or specific questions related to collection activities should be directed to Raemeka Mayo, Assistant Division Chief, Economy-Wide Statistics Division, U.S. Census Bureau, Room 5K179, 4600 Silver Hill Road, Washington, DC 20233; phone (301) 763–4688; or by email *raemeka.m.mayo@census.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Abstract

The Census Bureau plans to revise the Annual Survey of State Tax Collections (F–5). This survey is collected as part of the larger State and Local Government Finance Collections, and Public Employment and Payroll Collections. We plan to add the collection of cannabis sales and license taxes, and sports betting sales taxes to the Annual Survey of State Tax Collections. Sports betting will include pari-mutuels, which were previously shown separately. This will modernize the survey's content to maintain the relevancy and sustainability of these data. Additionally, cognitive testing showed the addition and removal of questions did not impact overall response time.

The data are released as part of the State and Local Government Finance and Public Employment & Payroll statistical series. The collections also produce individual data products that focus on state governments, local governments, and public pensions in greater detail than the combined financial and employment series as a by-product of their collections for the combined data series. The Census Bureau provides these data to the Bureau of Economic Analysis to develop the public sector components of the National Income and Product Accounts and for constructing the functional payrolls in the public sector of the Gross Domestic Product, payroll being the single largest component of current operations. The Census Bureau also provides these data to the Federal Reserve Board for use in the Flow of Funds Accounts. Other Federal agencies

that make use of the data include the Council of Economic Advisers, the Agency for Healthcare Research and Quality, the Government Accountability Office, and the Department of Justice. State and local governments and related organizations, public policy groups, public interest groups, private research organizations, and private sector businesses also use these data.

## II. Method of Collection

These surveys use multiple modes for data collection including internet collection with a mailed invitation, telephone, and central collection. Other methods used to collect data and maximize response include collecting state and local government data through submitted financial audits, state financial reports, and comprehensive financial reports and via electronic or mailed files and/or records.

The Census Bureau developed central collection agreements with state and large local government officials to collect the data from their dependent agencies and report to the Census Bureau as a central respondent. These arrangements eliminate the need for a mail invitation for approximately 5,500 governmental units, approximately 3,716 state agencies and 158 school systems in a sample year and 36,000 during the year of the Census of Governments. The arrangements reduce burden by greatly decreasing the number of respondents who must complete an on-line form as the data are acquired from a centralized source instead of multiple sources. Currently, the Census Bureau has central collection arrangements to collect local government data with 27 states, four local school district governments and state government data from all 50 states. The Census Bureau continues to expand the conversion of paper submissions into electronic formats by collaborating with state and local governments regarding electronic reporting of central collection data and encouraging electronic responses from individual governments.

## III. Data

*OMB Control Number:* 0607–0585.

*Form Number(s):* F–5, F–11, F–12, F–13, F–28, F–29, F–32, E–1, E–2, E–3, E–4, E–5, E–6, E–7, E–8, E–9, E–10.

*Type of Review:* Regular submission, Request for a Revision of a Currently Approved Collection.

*Affected Public:* State and local governments.

*Estimated Number of Respondents:* For F-forms: 13,440, For E-forms: 16,872/sample year; For F-forms 59,259 For E-forms: 99,402/census year; Total: 30,312/sample year, 158,661/census year.

*Estimated Time per Response:* For F-forms: 3.03, For E-forms: .84 hours/sample year; For F-forms 3.00, For E-forms: .82 hours/census year; Total: 3.87 hours/sample year, 3.82 hours/census year.

*Estimated Total Annual Burden Hours:* For F-forms: 40,755, For E-forms: 14,164 hours/sample year; For F-forms: 177,826 hours, For E-forms: 81,299 hours/census year; Total: 54,919/sample year, 258,585/census year.

*Estimated Total Annual Cost to Public:* $0. (This is not the cost of respondents' time, but the indirect costs respondents may incur for such things as purchases of specialized software or hardware needed to report, or expenditures for accounting or records maintenance services required specifically by the collection.)

*Respondent's Obligation:* Voluntary.

*Legal Authority:* Title 13 U.S.C. Sections 161 and 182.

## IV. Request for Comments

We are soliciting public comments to permit the Department/Bureau to: (a) Evaluate whether the proposed information collection is necessary for the proper functions of the Department, including whether the information will have practical utility; (b) Evaluate the accuracy of our estimate of the time and cost burden for this proposed collection, including the validity of the methodology and assumptions used; (c) Evaluate ways to enhance the quality, utility, and clarity of the information to be collected; and (d) Minimize the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of information technology.

Comments that you submit in response to this notice are a matter of public record. We will include, or summarize, each comment in our request to OMB to approve this ICR. Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you may ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

**Sheleen Dumas,**
*Department PRA Clearance Officer, Office of the Chief Information Officer, Commerce Department.*

[FR Doc. 2021–01287 Filed 1–26–21; 8:45 am]
**BILLING CODE 3510–07–P**

## DEPARTMENT OF COMMERCE

### Economic Development Administration

### Notice of Petitions by Firms for Determination of Eligibility To Apply for Trade Adjustment Assistance

**AGENCY:** Economic Development Administration, U.S. Department of Commerce.

**ACTION:** Notice and opportunity for public comment.

**SUMMARY:** The Economic Development Administration (EDA) has received petitions for certification of eligibility to apply for Trade Adjustment Assistance from the firms listed below. Accordingly, EDA has initiated investigations to determine whether increased imports into the United States of articles like or directly competitive with those produced by each of the firms contributed importantly to the total or partial separation of the firms' workers, or threat thereof, and to a decrease in sales or production of each petitioning firm.

**SUPPLEMENTARY INFORMATION:**

**Federal Register** / Vol. 86, No. 16 / Wednesday, January 27, 2021 / Notices

LIST OF PETITIONS RECEIVED BY EDA FOR CERTIFICATION OF ELIGIBILITY TO APPLY FOR TRADE ADJUSTMENT ASSISTANCE

[1/11/2021 through 1/14/2021]

| Firm name | Firm address | Date accepted for investigation | Product(s) |
|---|---|---|---|
| Applied Composite Technology Aerospace, Inc., d/b/a ACT Aerospace, Inc. | 425 East 400 North, Gunnison, UT 84634. | 1/11/2021 | The firm manufactures aerospace parts and auxiliary equipment. |
| POET Holdings, LLC, d/b/a POET, LLC. | 4615 North Lewis Avenue, Sioux Falls, SD 57104. | 1/12/2021 | The firm manufactures bioethanol. |
| Printed Circuits Corporation. | 5295 Webb Parkway NW, Lilburn, GA 30047. | 1/13/2021 | The firm manufactures printed circuit board assemblies. |
| Palmer Drives Controls and Systems, Inc., d/b/a Palmer DCS. | 2810 South Raritan, Englewood, CO 80110. | 1/14/2021 | The firm manufactures electrical control panels. |

Any party having a substantial interest in these proceedings may request a public hearing on the matter. A written request for a hearing must be submitted to the Trade Adjustment Assistance Division, Room 71030, Economic Development Administration, U.S. Department of Commerce, Washington, DC 20230, no later than ten (10) calendar days following publication of this notice. These petitions are received pursuant to section 251 of the Trade Act of 1974, as amended.

Please follow the requirements set forth in EDA's regulations at 13 CFR 315.9 for procedures to request a public hearing. The Catalog of Federal Domestic Assistance official number and title for the program under which these petitions are submitted is 11.313, Trade Adjustment Assistance for Firms.

**Bryan Borlik,**
*Director.*

[FR Doc. 2021–01734 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–WH–P**

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

[B–02–2021]

### Foreign-Trade Zone (FTZ) 114—Peoria, Illinois; Notification of Proposed Production Activity; Rivian Automotive, LLC (Electric Vehicles and Components); Normal, Illinois

Rivian Automotive, LLC (Rivian) submitted a notification of proposed production activity to the FTZ Board for its facilities in Normal, Illinois. The notification conforming to the requirements of the regulations of the FTZ Board (15 CFR 400.22) was received on January 8, 2021.

The applicant indicates that it will be submitting a separate application for FTZ designation at the company's facility under FTZ 114. The facility will be used for the production of electric passenger and delivery vehicles, as well as vehicle components, subassemblies, chargers and charging stations. Pursuant to 15 CFR 400.14(b), FTZ activity would be limited to the specific foreign-status materials/components and specific finished products described in the submitted notification (as described below) and subsequently authorized by the FTZ Board.

Production under FTZ procedures could exempt Rivian from customs duty payments on the foreign-status materials/components used in export production. On its domestic sales, for the foreign-status materials/components noted below, Rivian would be able to choose the duty rates during customs entry procedures that apply to: Brackets, mountings and fittings (plastic; metal); inverters; lithium-ion electric battery packs; electric vehicles (passenger; delivery); vehicle bodies and body assemblies (passenger; delivery); assemblies (interior and exterior door; drivetrain; subframe); automotive body products (stampings); panels; pillars; crossmembers; reinforcements and supports); underbodies; automotive floors; automotive hoods; truck beds; tailgates and liftgates; roof headers, roofs, and roof assemblies; rails and rocker panels; automotive beams; wheelhouses and arches; cladding panels; electric vehicle "skateboard" chassis; drive unit; electric vehicle charging products (power cabinet; power cabinet module; dispenser (direct current fast charger)); slide out cargo tunnel track assemblies designed for vehicles; and, slide out camping kitchen assemblies designed for installation in cargo tunnel of pick-up trucks (duty rate ranges from duty-free to 25.0%). Rivian would be able to avoid duty on foreign-status components which become scrap/waste. Customs duties also could possibly be deferred or reduced on foreign-status production equipment.

The materials/components sourced from abroad include: General purpose automotive lubricants for gears; R1234YF hydrofluoroolefin (HFO) refrigerant; paint primer; clear coat paint; paint, e-coat resin and e-coat paste; washer fluid; automotive grease; resin cements and caulking components; brake fluid; coolant/antifreeze; high density polyethylene; polypropylene; electrocoating resin clear coat; rigid plastic tubing (ethylene; propylene; vinyl chloride); plastic components (tubes and hoses; tubes (having a minimum burst pressure of 27.6 MPa; not reinforced (with or without fittings); reinforced); fittings for hoses; bags; jugs; caps, plugs and closures; bezels, mountings, and fittings for vehicle interior; handles and handle inserts; brackets, mountings, fittings, fasteners, spacers, sliders, inserts and clips; straps and cable ties; all weather mats and floor mats); electrical and sealing tape; self-adhesive components (plastic (sheets; films; labels; strips); foam strips; labels); polyethylene separators; badges/emblems, trim and finishing closures (plastic; chrome); gaskets, washers and seals—including sealing tape (foam; plastic); rubber components (weatherstripping; profiles; hoses (not reinforced, with or without fittings; air and brake; reinforced without fittings); tubing (air and brake; for washer fluid and other liquids); floor and tray mats; gaskets; plugs; seals; O-rings; grommets; thermal pads; wiper blades); tires; ethylene propylene diene monomer (EPDM) rubber exterior door and body seals; natural rubber components (air springs; bumpers); synthetic rubber components (bushings; plugs and fillers; isolators); carrying/

storage cases of man-made fibers; seat belt components (webbing; retractors, pretensioners and assemblies; belt buckles, tongues and assemblies; belt adjusters and assemblies); camping tents for pick-up truck beds; high temperature mineral wool insulation; glass mirrors; steel components (tube fittings; stranded wire cables; self-tapping screws; screws; bolts; studs; socket screws; setscrews; nuts and lug nuts; locknuts; fasteners; plugs; studs; lock washers; washers; rivets; cotter pins; pins; snap rings; non-threaded fasteners; leaf springs and leaves; springs; eyelets; rings; clamps; caps; clips; retainer plates; magnetic steel cargo shelf assemblies; wheels; wheels with tire assemblies); components for pick-up truck slide out camping kitchen (stainless steel kitchenware; towel racks; induction cooktops and cooktop assemblies); aluminum components (spacers; fasteners; gaskets; plugs; wheels; wheels with tire assemblies); manual actuators for hoods, cargo boxes and doors; locks; key cylinders; keys; metal components (hinges; brackets; braces; mountings; fittings; drawer slides; levers and lever assemblies; seals); charging cabinet brackets and mountings; gas springs; welding studs; brake actuators; pumps (displacement; electric oil; centrifugal); vehicle thermal management system components (refrigerant compressors; refrigerant lines; refrigeration chillers); fans; air compressors; modules (air conditioning control; thermal cooling; radar; global positioning system (GPS) navigation; antenna; condenser radiator fan); heat exchangers; filters (oil; air); housings for components (air filters; inverter gate drive; controllers; junction boxes and connectors; mirrors (''scalps''); fuse box); windshield washer/wiper components (dispensers and assemblies; nozzles); windshield washer components (reservoirs; reservoir filler necks); jacking pucks; valves (pressure relief; solenoid and regulator); valve bodies, manifolds, and connectors; faucet sprayer head and sprayer assemblies; bearings (ball; tapered roller (including wheel hub units); cylindrical); bearing rings and cups; cross-axis joints; low voltage motors; alternating current (AC) electric motors exceeding 150kW; assemblies (drive unit; printed circuit board; insulated electrical connector; interior and exterior door; roof; seat belt; control arm; valve block; steering wheel and steering rack; slide out cargo tunnel track designed for vehicles; pull out camping kitchen designed for vehicles; winch); electric vehicle motors/drive units; stators and rotors; electric transformers; converters; drive inverters;

portable and onboard chargers; sintered neodymium-iron-boron non-flexible magnets; lead acid batteries; lithium ion batteries, modules, battery packs, and cells; battery components (carriers, separators and walls for cells and modules; control modules; pack and module enclosures (including top and bottom lids, covers and housings for modules, submodules and vehicle battery packs); shields and skid plates; adapters and connectors for connecting and sealing battery pack to the vehicle body; clamps); signaling equipment (lighting and visual; horns and sound); demisters; windshield wipers and defrosters; flashlights; charging cabinet radiators; cabin heaters; wireless transmission devices; hand-free microphones; sound system speakers mounted in enclosures (single; multiple); sound system speakers without enclosures; sound system amplifiers; speaker grills and covers; vehicle safety and navigational cameras; key fobs and remote control access cards; communication and navigation antennas; low noise amplifiers; radio receivers (AM/FM; satellite); circuits (printed; flexible printed); remote tuners; intrusion alarms; dashboard display panels; capacitors; sensors (multi-purpose; day/night solar; ride height; rangefinders and range detecting; temperature and thermal; pressure; multi-use; air quality and smoke detection; current); terminals and connectors; fuses; circuit breakers; power distribution units and electrical overload protectors; contactors; relays; electric switches and buttons; pack headers and connectors; busbars and busbar headers, jumpers, and trays; lugs; terminals; junction boxes; control modules and electronic control units (ECU); panel and distribution boards; programmable controllers; cabinets, consoles, and bases for electrical apparatus; printed circuit boards; sealed beam lamps for vehicles; microchips (programmable and data storage); electronic control units, modules and sensors; low voltage coaxial cables fitted with connector (<1,000 volts); wiring harnesses and wiring sets; insulated wiring harnesses; components for a voltage not exceeding 1,000V (insulated busbar fitted with connectors; insulated grounding wire fitted with connectors; cable; insulated grounding wire not fitted with connectors); electromagnetic interference (EMI) filters; bumpers; bumper components (moldings and trim; inserts and covers; beams and reinforcements); cross car reinforcement beams; body components (crossmembers; pillars and pedestals; reinforcements; side panels; stampings);

bulkheads; cant rails; consoles; console armrests and foam; corner nodes; cowls; crush boxes and crush cans; cupholders; ducts, vents and vent covers; interior panels and covers; fascias and cladding; fenders; floor carpet for vehicles; automotive floor panels; gear tunnels; glass run channels; belt cladding; moldings, trim and garnish; grilles; gussets; handles (with and without locks); headers; headliners (cut to shape/fitted); automotive hoods; hood liners (cut to shape/fitted); dashboard insulators; joinings and supports; leaf screens; rails and rocker panels; roofs; steering shafts; shock towers; spoilers; storage bins and compartments; door latches and door strikers; substrates; sun visors; sun visor covers, straps, and catches; tailgates and liftgates; wheel liners, tire blocks and spats; torque boxes; truck beds; underbodies; wheel houses and arches; windshields, roof and window glass; brake calipers, discs, rotors, pedals, lines, actuators, shafts and shields, plates, brackets, hubs, pads, shims, pistons, and dust boots; shields and housings for gears and motors; non-driving axles; wheel caps; shocks; struts; accumulators; control arms; dampers; damper modules, valve blocks, and dust boots; jounce bumpers, cups, and lines; suspension knuckles; suspension links, link assemblies, and link bushings; lines and line assemblies (includes hydraulic); manifolds; toe links; steering wheels, columns, boxes, racks, shafts and gears; steering spokes and steering spoke covers and inserts; airbags; accelerator pedals; baffles; brake hoses; closure caps; drive axles without differential; closure lids; spindles; cargo crossbars, mounts, and racks; degas bottles; latch cables; nylon latch webbing; protective lids/covers; accessory enclosure panels; service and roadside safety kits; shims; subframes; tow hooks; wheel hub units and assemblies; winches; liquid crystal displays; light detecting and ranging (LiDAR) units; tire pressure management systems (TPMS); coolant manifolds; instrument cluster meters and display elements; seats for motor vehicles; storage pouches and pockets for seats; seat cushions, backs, armrests and head rests; seat adjusters and handles; seat frames, supports, pedestals and reinforcements; protective plastic covers, shields and gap hiders for seats; and, coat hooks for seats (duty rate ranges from duty free to 17.6%, and $0.84/bbl). The request indicates that carrying/storage cases of man-made fibers, seat belt webbing, and camping tents for pick-up truck beds will be admitted to the zone in privileged foreign (PF) status (19 CFR 146.41),

thereby precluding inverted tariff benefits on such items. The request indicates that tires, tapered bearings, and steel wheels/assemblies are subject to an antidumping/countervailing duty (AD/CVD) order if imported from certain countries. The FTZ Board's regulations (15 CFR 400.14(e)) require that merchandise subject to AD/CVD orders, or items which would be otherwise subject to suspension of liquidation under AD/CVD procedures if they entered U.S. customs territory, be admitted to the zone in PF status. The request also indicates that certain materials/components are subject to duties under Section 232 of the Trade Expansion Act of 1962 (Section 232) or Section 301 of the Trade Act of 1974 (Section 301), depending on the country of origin. The applicable Section 232 and Section 301 decisions require subject merchandise to be admitted to FTZs in PF status.

Public comment is invited from interested parties. Submissions shall be addressed to the Board's Executive Secretary and sent to: *ftz@trade.gov.* The closing period for their receipt is March 8, 2021.

A copy of the notification will be available for public inspection in the "Reading Room" section of the Board's website, which is accessible via *www.trade.gov/ftz.*

For further information, contact Juanita Chen at *juanita.chen@trade.gov* or 202–482–1378.

Dated: January 21, 2021.

**Andrew McGilvray,**
*Executive Secretary.*

[FR Doc. 2021–01794 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[C–489–825]**

## Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review; 2018

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) is conducting an administrative review of the countervailing duty (CVD) order on heavy walled rectangular welded carbon steel pipes and tubes (HWR pipes and tubes) from the Republic of Turkey (Turkey) for the period January 1, 2018 through December 31, 2018. Commerce

preliminarily determines that Ozdemir Boru Profil San. Ve Tic. Ltd. Sti. (Ozdemir), the sole producer/exporter of HWR pipes and tubes from Turkey subject to this review, received *de minimis* countervailable subsidies.

**DATES:** Effective January 27, 2021.

**FOR FURTHER INFORMATION CONTACT:** Janae Martin or Jaron Moore, AD/CVD Operations, Office VIII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0238 or (202) 482–3640, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On November 12, 2019, Commerce published a notice of initiation of an administrative review of the CVD order on HWR pipes and tubes from Turkey.[1] On April 24, 2020, Commerce exercised its discretion to toll all deadlines in administrative reviews by 50 days.[2] On June 26, 2020, Commerce further extended the deadline for the preliminary results to November 18, 2020.[3] On July 21, 2020, Commerce tolled all deadlines in administrative reviews by an additional 60 days.[4] Accordingly, the deadline for the preliminary results in this administrative review was postponed to January 19, 2021.[5]

For a complete description of the events that followed the initiation of this review, *see* the Preliminary Decision Memorandum.[6] A list of topics discussed in the Preliminary Decision Memorandum is included as an Appendix to this notice. The Preliminary Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and

---

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 84 FR 61011 (November 12, 2019).

[2] *See* Memorandum, "Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews in Response to Operational Adjustments Due to COVID–19," dated April 24, 2020.

[3] *See* Memorandum, "Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Extension of Deadline for Preliminary Results of Antidumping Duty Administrative Review; 2017," dated June 26, 2019.

[4] *See* Memorandum, "Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews," dated July 21, 2020.

[5] *Id.* at 2.

[6] *See* Memorandum, "Decision Memorandum for the Preliminary Results: Administrative Review of the Countervailing Duty Order on Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey; 2018," dated concurrently with, and hereby adopted by, this notice (Preliminary Decision Memorandum).

Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov.* In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/.* The signed and electronic versions of the Preliminary Decision Memorandum are identical in content.

### Scope of the Order

The merchandise covered by the order is HWR pipes and tubes. For a complete description of the scope of the order, *see* the Preliminary Decision Memorandum.

### Methodology

Commerce is conducting this review in accordance with section 751(a)(1)(A) of the Tariff Act of 1930, as amended (the Act). For each of the subsidy programs found countervailable, we preliminarily determine that there is a subsidy, *i.e.,* a government financial contribution that gives rise to a benefit to the recipient, and that the subsidy is specific.[7] For a full description of the methodology underlying our conclusions, *see* the accompanying Preliminary Decision Memorandum.

### Preliminary Results of Review

Commerce preliminarily determines that the following countervailable subsidy rate exists for Ozdemir for the period January 1, 2018 through December 31, 2018:

| Company | Subsidy rate (percent) |
|---|---|
| Ozdemir Boru Profil San. Ve Tic. Ltd. Sti ........................ | * 0.39 |

\* *De minimis.*

### Assessment Rate

Consistent with section 751(a)(2)(C) of the Act, upon issuance of the final results, Commerce shall determine, and U.S. Customs and Border Protection (CBP) shall assess, countervailing duties on all appropriate entries covered by this review. If the assessment rate calculated in the final results is zero or *de minimis,* we will instruct CBP to liquidate all appropriate entries without regard to countervailing duties. Commerce intends to issue assessment instructions to CBP no earlier than 35 days after the date of publication of the final results of this review in the **Federal Register.** If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will

---

[7] *See* sections 771(5)(B) and (D) of the Act regarding financial contribution; section 771(5)(E) of the Act regarding benefit; and section 771(5A) of the Act regarding specificity.

direct CBP not to liquidate relevant entries until the time for parties to file a request for a statutory injunction has expired (*i.e.*, within 90 days of publication).

**Cash Deposit Rate**

Pursuant to section 751(a)(1) of the Act, Commerce intends to instruct CBP to collect cash deposits of estimated countervailing duties in the amount indicated for Ozdemir with regard to shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the date of publication of the final results of this review, except, where the rate calculated in the final results is zero or *de minimis,* no cash deposit will be required. For all non-reviewed firms, we will instruct CBP to continue to collect cash deposits of estimated countervailing duties at the most recent company-specific or all-others rate applicable to the company, as appropriate. These cash deposit instructions, when imposed, shall remain in effect until further notice.

**Disclosure and Public Comment**

We will disclose to parties to this proceeding the calculations performed in reaching the preliminary results within five days of the date of publication of these preliminary results.[8] Interested parties may submit written comments (case briefs) within 30 days of publication of the preliminary results and rebuttal comments (rebuttal briefs) within seven days after the time limit for filing case briefs.[9] Pursuant to 19 CFR 351.309(d)(2), rebuttal briefs must be limited to issues raised in the case briefs. Parties who submit arguments are requested to submit with the argument: (1) A statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.[10]

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing must do so within 30 days of publication of these preliminary results by submitting a written request to the Assistant Secretary for Enforcement and Compliance using Enforcement and Compliance's ACCESS system.[11] Requests should contain the party's name, address, and telephone number, the number of participants, whether any participant is a foreign national, and a list of the issues to be discussed. If a request for a hearing is made, Commerce will inform parties of the scheduled

date of the hearing which will be held at a time and date to be determined.[12] Issues addressed during the hearing will be limited to those raised in the briefs.[13] Parties should confirm the date and time of the hearing two days before the scheduled date.

Parties are reminded that all briefs and hearing requests must be filed electronically using ACCESS and received successfully in their entirety by 5 p.m. Eastern Time on the due date. Note that Commerce has temporarily modified certain of its requirements for serving documents containing business proprietary information, until further notice.[14]

Unless the deadline is extended pursuant to section 751(a)(3)(A) of the Act, Commerce intends to issue the final results of this administrative review, including the results of our analysis of the issues raised by the parties in their comments, within 120 days after publication of these preliminary results.

**Notification to Interested Parties**

This administrative review and notice are in accordance with sections 751(a)(1) and 777(i)(1) of the Act, and 19 CFR 351.221(b)(4).

Dated: January 19, 2021.

**Christian Marsh,**
*Deputy Assistant Secretary for Enforcement and Compliance.*

**Appendix—List of Topics Discussed in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Scope of the Order
IV. Subsidies Valuation Information
V. Benchmarks and Interest Rates
VI. Analysis of Programs
VII. Conclusion

[FR Doc. 2021–01791 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

[8] *See* 19 CFR 224(b).
[9] *See* 19 CFR 351.309(c)(1)(ii) and 351.309(d)(1).
[10] *See* 19 CFR 351.309(c)(2) and 351.309(d)(2).
[11] *See* 19 CFR 351.310(c).

[12] *See* 19 CFR 351.310.
[13] *See* 19 CFR 351.310(c).
[14] *See* 19 CFR 351.309; *see also* 19 CFR 351.303 (for general filing requirements); *Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19,* 85 FR 17006 (March 26, 2020); and *Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period,* 85 FR 41363 (July 10, 2020).

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–580–908, A–583–869, A–549–842, A–552–828]**

**Passenger Vehicle and Light Truck Tires From the Republic of Korea, Taiwan, Thailand, and the Socialist Republic of Vietnam: Notice of Correction to Preliminary Determinations in Less-Than-Fair-Value Investigations**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) is issuing this notice to correct an inadvertent typographical error in the ''Scope of the Investigation'' in Appendix I to the previously published **Federal Register** notices for the preliminary determinations in the less-than-fair-value investigations of passenger vehicle and light truck tires (passenger tires) from the Republic of Korea (Korea), Taiwan, Thailand, and the Socialist Republic of Vietnam (Vietnam).

**DATES:** Applicable January 6, 2021.

**FOR FURTHER INFORMATION CONTACT:** Leo Ayala at (202) 482–3945 (Korea and Thailand); Lauren Caserta at (202) 482–4737 (Taiwan); and Jasun Moy at (202) 482–8194 (Vietnam), AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

**Correction**

On January 6, 2021, Commerce published the *Preliminary Determinations* on passenger tires from Korea, Taiwan, Thailand, and Vietnam.[1]

---

[1] *See Passenger Vehicle and Light Truck Tires from the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 86 FR 501 (January 6, 2021); *Passenger Vehicle and Light Truck Tires from Taiwan: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 86 FR 508 (January 6, 2021); *Passenger Vehicle and Light Truck Tires from Thailand: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 86 FR 517 (January 6, 2021); and *Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 86 FR 504 (January 6, 2021) (collectively, *Preliminary Determinations*).

Due to a typographical error, the revised scope in Appendix I included a misspelling. Specifically, in Appendix I of the *Preliminary Determinations,* at paragraph (5)(a) of the exclusion language, it reads: ''The tires have a 265/70R17, 255/80R17, 265/70R16, 245/70R17, 245/75R17, *265/70R18,* or 265/70R18 size designation.'' The paragraph should have read: ''The tires have a 265/70R17, 255/80R17, 265/70R16, 245/70R17, 245/75R17, *245/70R18,* or 265/70R18 size designation'' (emphasis added).[2] We are hereby correcting the *Preliminary Determinations* to include the correct scope as described above and included in the Appendix to this notice.

This notice serves as a correction to the *Preliminary Determinations* and is published in accordance with section 777(i)(1) of the Tariff Act of 1930, as amended.

Dated: January 21, 2021.

**Christian Marsh,**

*Acting Assistant Secretary for Enforcement and Compliance.*

## Appendix—Scope of the Investigations

The scope of these investigations is passenger vehicle and light truck tires. Passenger vehicle and light truck tires are new pneumatic tires, of rubber, with a passenger vehicle or light truck size designation. Tires covered by these investigations may be tube-type, tubeless, radial, or non-radial, and they may be intended for sale to original equipment manufacturers or the replacement market.

Subject tires have, at the time of importation, the symbol ''DOT'' on the sidewall, certifying that the tire conforms to applicable motor vehicle safety standards. Subject tires may also have the following prefixes or suffix in their tire size designation, which also appears on the sidewall of the tire:

Prefix designations:

P—Identifies a tire intended primarily for service on passenger cars.

LT—Identifies a tire intended primarily for service on light trucks.

Suffix letter designations:

LT—Identifies light truck tires for service on trucks, buses, trailers, and multipurpose passenger vehicles used in nominal highway service.

All tires with a ''P'' or ''LT'' prefix, and all tires with an ''LT'' suffix in their sidewall markings are covered by these investigations regardless of their intended use.

In addition, all tires that lack a ''P'' or ''LT'' prefix or suffix in their sidewall markings, as well as all tires that include any other prefix or suffix in their sidewall markings, are included in the scope, regardless of their intended use, as long as the tire is of a size

that fits passenger cars or light trucks. Sizes that fit passenger cars and light trucks include, but are not limited to, the numerical size designations listed in the passenger car section or light truck section of the Tire and Rim Association Year Book, as updated annually. The scope includes all tires that are of a size that fits passenger cars or light trucks, unless the tire falls within one of the specific exclusions set out below.

Passenger vehicle and light truck tires, whether or not attached to wheels or rims, are included in the scope. However, if a subject tire is imported attached to a wheel or rim, only the tire is covered by the scope.

Specifically excluded from the scope are the following types of tires:

(1) Racing car tires; such tires do not bear the symbol ''DOT'' on the sidewall and may be marked with ''ZR'' in size designation;

(2) pneumatic tires, of rubber, that are not new, including recycled and retreaded tires;

(3) non-pneumatic tires, such as solid rubber tires;

(4) tires designed and marketed exclusively as temporary use spare tires for passenger vehicles which, in addition, exhibit each of the following physical characteristics:

(a) The size designation and load index combination molded on the tire's sidewall are listed in Table PCT–1R (''T'' Type Spare Tires for Temporary Use on Passenger Vehicles) or PCT–1B (''T'' Type Diagonal (Bias) Spare Tires for Temporary Use on Passenger Vehicles) of the Tire and Rim Association Year Book,

(b) the designation ''T'' is molded into the tire's sidewall as part of the size designation, and,

(c) the tire's speed rating is molded on the sidewall, indicating the rated speed in MPH or a letter rating as listed by Tire and Rim Association Year Book, and the rated speed is 81 MPH or a ''M'' rating;

(5) tires designed and marketed exclusively as temporary use spare tires for light trucks which, in addition, exhibit each of the following physical characteristics:

(a) The tires have a 265/70R17, 255/80R17, 265/70R16, 245/70R17, 245/75R17, 245/70R18, or 265/70R18 size designation;

(b) ''Temporary Use Only'' or ''Spare'' is molded into the tire's sidewall;

(c) the tread depth of the tire is no greater than 6.2 mm; and

(d) Uniform Tire Quality Grade Standards (''UTQG'') ratings are not molded into the tire's sidewall with the exception of 265/70R17 and 255/80R17 which may have UTGC molded on the tire sidewall;

(6) tires designed and marketed exclusively for specialty tire (ST) use which, in addition, exhibit each of the following conditions:

(a) The size designation molded on the tire's sidewall is listed in the ST sections of the Tire and Rim Association Year Book,

(b) the designation ''ST'' is molded into the tire's sidewall as part of the size designation,

(c) the tire incorporates a warning, prominently molded on the sidewall, that the tire is ''For Trailer Service Only'' or ''For Trailer Use Only'',

(d) the load index molded on the tire's sidewall meets or exceeds those load indexes listed in the Tire and Rim Association Year Book for the relevant ST tire size, and

(e) either

(i) the tire's speed rating is molded on the sidewall, indicating the rated speed in MPH or a letter rating as listed by Tire and Rim Association Year Book, and the rated speed does not exceed 81 MPH or an ''M'' rating; or

(ii) the tire's speed rating molded on the sidewall is 87 MPH or an ''N'' rating, and in either case the tire's maximum pressure and maximum load limit are molded on the sidewall and either

(1) both exceed the maximum pressure and maximum load limit for any tire of the same size designation in either the passenger car or light truck section of the Tire and Rim Association Year Book; or

(2) if the maximum cold inflation pressure molded on the tire is less than any cold inflation pressure listed for that size designation in either the passenger car or light truck section of the Tire and Rim Association Year Book, the maximum load limit molded on the tire is higher than the maximum load limit listed at that cold inflation pressure for that size designation in either the passenger car or light truck section of the Tire and Rim Association Year Book;

(7) tires designed and marketed exclusively for off-road use and which, in addition, exhibit each of the following physical characteristics:

(a) The size designation and load index combination molded on the tire's sidewall are listed in the off-the-road, agricultural, industrial or ATV section of the Tire and Rim Association Year Book,

(b) in addition to any size designation markings, the tire incorporates a warning, prominently molded on the sidewall, that the tire is ''Not For Highway Service'' or ''Not for Highway Use'',

(c) the tire's speed rating is molded on the sidewall, indicating the rated speed in MPH or a letter rating as listed by the Tire and Rim Association Year Book, and the rated speed does not exceed 55 MPH or a ''G'' rating, and

(d) the tire features a recognizable off-road tread design;

(8) Tires designed and marketed for off-road use as all-terrain-vehicle (ATV) tires or utility-terrain-vehicle (UTV) tires, and which, in addition, exhibit each of the following characteristics:

(a) The tire's speed rating is molded on the sidewall, indicating the rated speed in MPH or a letter rating as listed by the Tire and Rim Association Year Book, and the rated speed does not exceed 87 MPH or an ''N'' rating, and

(b) both of the following physical characteristics are satisfied:

(i) The size designation and load index combination molded on the tire's sidewall does not match any of those listed in the passenger car or light truck sections of the Tire and Rim Association Year Book, and

(ii) The size designation and load index combination molded on the tire's sidewall matches any of the following size designation (American standard or metric) and load index combinations:

| American standard size | Metric size | Load index |
|---|---|---|
| 26x10R12 ........ | 254/70R/12 ...... | 72 |

---

[2] *See* Memorandum, ''Passenger Vehicle and Light Truck Tires from the Republic of Korea, Taiwan, Thailand, and the Socialist Republic of Vietnam: Preliminary Scope Comments Decision Memorandum,'' dated December 29, 2020 at Attachment.

| American standard size | Metric size | Load index |
|---|---|---|
| 27x10R14 ...... | 254/65R/14 ...... | 73 |
| 28x10R14 ...... | 254/70R/14 ...... | 75 |
| 28x10R14 ...... | 254/70R/14 ...... | 86 |
| 30X10R14 ...... | 254/80R/14 ...... | 79 |
| 30x10R15 ...... | 254/75R/15 ...... | 78 |
| 30x10R14 ...... | 254/80R/14 ...... | 90 |
| 31x10R14 ...... | 254/85R/14 ...... | 81 |
| 32x10R14 ...... | 254/90R/14 ...... | 95 |
| 32x10R15 ...... | 254/85R/15 ...... | 83 |
| 32x10R15 ...... | 254/85R/15 ...... | 94 |
| 33x10R15 ...... | 254/90R/15 ...... | 86 |
| 33x10R15 ...... | 254/90R/15 ...... | 95 |
| 35x9.50R15 ...... | 241/105R/15 ...... | 82 |
| 35x10R15 ...... | 254/100R/15 ...... | 97 |

The products covered by these investigations are currently classified under the following Harmonized Tariff Schedule of the United States (HTSUS) subheadings: 4011.10.10.10, 4011.10.10.20, 4011.10.10.30, 4011.10.10.40, 4011.10.10.50, 4011.10.10.60, 4011.10.10.70, 4011.10.50.00, 4011.20.10.05, and 4011.20.50.10. Tires meeting the scope description may also enter under the following HTSUS subheadings: 4011.90.10.10, 4011.90.10.50, 4011.90.20.10, 4011.90.20.50, 4011.90.80.10, 4011.90.80.50, 8708.70.45.30, 8708.70.45.46, 8708.70.45.48, 8708.70.45.60, 8708.70.60.30, 8708.70.60.45, and 8708.70.60.60. While HTSUS subheadings are provided for convenience and for customs purposes, the written description of the subject merchandise is dispositive.

[FR Doc. 2021–01789 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

**International Trade Administration**

[A–351–842]

**Certain Uncoated Paper From Brazil: Final Results of Antidumping Duty Administrative Review; 2018–2019**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that certain uncoated paper (uncoated paper) from Brazil was sold in the United States at less than normal value during the period of review (POR), March 1, 2018 through February 28, 2019.

**DATES:** Applicable January 27, 2021.

**FOR FURTHER INFORMATION CONTACT:** Justin Neuman or Jerry Huang, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0486 and (202) 482–4047, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On April 2, 2020, Commerce published the *Preliminary Results*.[1] On April 24, 2020, Commerce tolled all deadlines in administrative reviews by 50 days.[2] On July 21, 2020, Commerce tolled all deadlines in administrative reviews by an additional 60 days.[3] Commerce extended the deadline for the final results further by 60 days on November 9, 2020.[4] The deadline for the final results of this review is now January 19, 2021. For a complete description of the events that occurred since the *Preliminary Results, see* the Issues and Decision Memorandum.[5]

### Scope of the Order

The products covered by this order are certain uncoated paper products from Brazil. For a full description of the scope, *see* the Issues and Decision Memorandum.

### Analysis of Comments Received

All issues raised in the case and rebuttal briefs are addressed in the Issues and Decision Memorandum. A list of the issues that parties raised and to which we responded in the Issues and Decision Memorandum is attached to this notice as an Appendix. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov*. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/index.html/*. The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

### Changes Since the Preliminary Results

Based on our review of the record and comments received from interested parties, we made the following changes to the *Preliminary Results*:

- We adjusted the programming language for Suzano Papel e Celulose S.A. (Suzano) using a corrected manufacturer code.[6]
- We included certain sales by International Paper do Brasil Ltda./ International Paper Exportadora Ltda. (collectively, International Paper) to a downstream customer located in a free trade zone in the margin calculation.[7]
- We adjusted the programming language for International Paper to eliminate the double counting of certain taxes deducted from home market gross unit price.[8]

### Final Results of Review

Commerce determines that the following weighted-average dumping margin exists for the period of March 1, 2018 through February 28, 2019:

| Exporter/producer | Weighted-average dumping margin (percent) |
|---|---|
| Suzano Papel e Celulose S.A ........................ | 32.31 |
| International Paper do Brasil Ltda. and International Paper Exportadora Ltda ........................ | 20.80 |

---

[1] *See Certain Uncoated Paper from Brazil: Preliminary Results of Administrative Review of the Antidumping Duty Order; 2018–2019*, 85 FR 18550 (April 2, 2020) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, ''Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews in Response to Operational Adjustments Due to COVID–19,'' dated April 24, 2020.

[3] *See* Memorandum, ''Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews,'' dated July 21, 2020.

[4] *See* Memorandum, ''Certain Uncoated Paper from Brazil: Extension of Deadline for Final Results of Antidumping Duty Administrative Review, 2018–2019,'' dated November 9, 2020.

[5] *See* Memorandum, ''Issues and Decision Memorandum for the Final Results of the 2018–2019 Administrative Review of the Antidumping Duty Order on Certain Uncoated Paper from Brazil,'' dated concurrently with and hereby adopted by, this notice (Issues and Decision Memorandum).

[6] *See* Issues and Decision Memorandum at Comment 2.

[7] *Id.* at Comment 3.

[8] *Id.* at Comment 4.

## Assessment Rates

Pursuant to section 751(a)(2)(A) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.212(b)(1), Commerce shall determine, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries covered by this review.

Because International Paper's and Suzano's weighted-average dumping margins are not zero or *de minimis* (*i.e.,* less than 0.5 percent), Commerce has calculated importer-specific antidumping duty assessment rates. International Paper did not report actual entered value for all of its U.S. sales; therefore, we calculated importer-specific per-unit duty assessment rates by aggregating the total amount of antidumping duties calculated for the examined sales and dividing this amount by the total quantity of those sales. Because Suzano reported the entered value of its U.S. sales, we calculated importer-specific *ad valorem* duty assessment rates based on the ratio of the total amount of dumping calculated for the examined sales to the total entered value of the sales. Where either the respondent's weighted-average dumping margin is zero or *de minimis* within the meaning of 19 CFR 351.106(c)(1), or an importer-specific assessment rate is zero or *de minimis*, we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties.

For entries of subject merchandise during the period of review produced by International Paper or Suzano for which they did not know their merchandise was destined for the United States, we will instruct CBP to liquidate unreviewed entries at the all-others rate if there is no rate for the intermediate company(ies) involved in the transaction.[9]

Consistent with its recent notice,[10] Commerce intends to issue assessment instructions to CBP no earlier than 35 days after the date of publication of the final results of this review in the **Federal Register**. If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will direct CBP not to liquidate relevant entries until the time for parties to file a request for a statutory injunction has expired (*i.e.,* within 90 days of publication).

## Cash Deposit Requirements

The following cash deposit requirements will be effective for all shipments of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date of the final results of this administrative review, as provided by section 751(a)(2)(C) of the Act: (1) The cash deposit rate for each specific company listed above will be that established in the final results of this review; (2) for merchandise exported by producers or exporters not covered in this administrative review but covered in a prior segment of the proceeding, the cash deposit rate will continue to be the company-specific rate published for the most recently completed segment of this proceeding; (3) if the exporter is not a firm covered in this review, a prior review, or the original less-than-fair-value (LTFV) investigation, but the producer is, the cash deposit rate will be the rate established for the most recently completed segment of this proceeding for the producer of the subject merchandise; and (4) the cash deposit rate for all other manufacturers or exporters will continue to be 26.95 percent, the all-others rate established in the LTFV investigation.[11] These deposit requirements, when imposed, shall remain in effect until further notice.

## Notification to Importers

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during the POR. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of double antidumping duties.

## Administrative Protective Order

This notice also serves as a final reminder to parties subject to administrative protective order (APO) of their responsibility concerning the return or destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3), which continues to govern business proprietary information in this segment of the proceeding. Timely written notification of the return/destruction of APO materials, or conversion to judicial protective order, is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

## Notification to Interested Parties

We are issuing and publishing this notice in accordance with sections 751(a)(1) and 777(i) of the Act.

Dated: January 19, 2021.

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance.*

## Appendix

### List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Scope of the Order
IV. Changes Since the *Preliminary Results*
V. Discussion of the Issues
    Comment 1: Calculation for Suzano's Financial Expenses
    Comment 2: Programming Issue in Suzano's Margin Calculation
    Comment 3: Treatment of International Paper's FTZ Sales
    Comment 4: Programming Issue in International Paper's Margin Calculation
VI. Recommendation

[FR Doc. 2021–01676 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

### Agency Information Collection Activities; Submission to the Office of Management and Budget (OMB) for Review and Approval; Comment Request; EU-U.S. Privacy Shield; Invitation for Applications for Inclusion on the List of Arbitrators

The Department of Commerce will submit the following information collection request to the Office of Management and Budget (OMB) for review and clearance in accordance with the Paperwork Reduction Act of 1995, on or after the date of publication of this notice. We invite the general public and other Federal agencies to comment on proposed, and continuing information collections, which helps us assess the impact of our information collection requirements and minimize the public's reporting burden. Public comments were previously requested via the **Federal Register** on November 24, 2020, during a 60-day comment period. This notice allows for an additional 30 days for public comments.

*Agency:* International Trade Administration.

---

[9] For a full discussion of this practice, *see Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties,* 68 FR 23954 (May 6, 2003).

[10] *See Notice of Discontinuation of Policy to Issue Liquidation Instructions After 15 Days in Applicable Antidumping and Countervailing Duty Administrative Proceedings,* 86 FR 3995 (January 15, 2021).

[11] *See Certain Uncoated Paper from Brazil: Final Determination of Sales at Less Than Fair Value,* 81 FR 3115 (January 20, 2016).

*Title:* EU-U.S. Privacy Shield; Invitation for Applications for Inclusion on the List of Arbitrators.

*OMB Control Number:* 0625–0277.

*Form Number(s):* None.

*Type of Request:* Regular submission, revision of a current information collection.

*Number of Respondents:* 40.

*Average Hours per Response:* 240 minutes.

*Burden Hours:* 160 hours.

*Needs and Uses:* As described in Annex I of the EU-U.S. Privacy Shield Framework, the Department of Commerce (the Department) and the European Commission (the Commission) committed to implement an arbitration mechanism to provide European individuals with the ability to invoke binding arbitration to determine, for residual claims, whether an organization has violated its obligations under the Privacy Shield. Organizations voluntarily self-certify to the EU-U.S. Privacy Shield Framework and, upon certification, the commitments the organization has made to comply with the EU-U.S. Privacy Shield Framework become legally enforceable under U.S. law. Organizations that self-certify to the EU-U.S. Privacy Shield Framework commit to binding arbitration of residual claims if a European individual chooses to exercise that option. Under the arbitration option, a Privacy Shield Panel (consisting of one or three arbitrators, as agreed by the parties) has the authority to impose individual-specific, non-monetary equitable relief (such as access, correction, deletion, or return of the European individual's data in question) necessary to remedy the violation of the EU-U.S. Privacy Shield Framework only with respect to the European individual. The Department and the Commission will seek to maintain a list of at least 20 arbitrators chosen based on independence, integrity, and expertise from which the parties will select the arbitrators. The arbitral mechanism outlined in Annex I of the EU-U.S. Privacy Shield Framework and Swiss-U.S. Privacy Shield Framework is a critical component of the Privacy Shield frameworks. Publishing this notice to collect information from individuals applying for inclusion on the list of arbitrators is a necessary step to maintain the arbitral mechanism. The Department previously requested and obtained approval of this information collection (OMB Control No. 0625–0277) and now seeks renewal of this information collection. Although the Department is not currently seeking additional applications, it may do so in the future as appropriate.

*Affected Public:* Private individuals.

*Frequency:* Recurrent, depending on the number of arbitrators required to retain an active list of 20 arbitrators.

*Respondent's Obligation:* Required to obtain or retain benefits.

*Legal Authority:* The Department's statutory authority to foster, promote, and develop international commerce (15 U.S.C. 1512).

This information collection request may be viewed at *www.reginfo.gov.* Follow the instructions to view the Department of Commerce collections currently under review by OMB.

Written comments and recommendations for the proposed information collection should be submitted within 30 days of the publication of this notice on the following website *www.reginfo.gov/ public/do/PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function and entering either the title of the collection or the OMB Control Number 0625–0277.

**Sheleen Dumas,**

*Department PRA Clearance Officer, Office of the Chief Information Officer, Commerce Department.*

[FR Doc. 2021–01803 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–602–807]**

### Certain Uncoated Paper From Australia: Negative Preliminary Determination of Circumvention of the Antidumping Duty Order for Uncoated Paper Rolls

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) preliminarily determines that imports of certain uncoated paper rolls from Australia were not completed by conversion into sheets of paper in the United States and, therefore, such imports are not circumventing the antidumping duty (AD) order on certain uncoated paper products from Australia, within the meaning of section 781(a) of the Tariff Act of 1930, as amended (the Act). We invite interested parties to comment on this preliminary determination.

**DATES:** Applicable January 27, 2021.

**FOR FURTHER INFORMATION CONTACT:** Genevieve Coen, AD/CVD Operations, Office V, Enforcement and Compliance,

International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–3251.

**SUPPLEMENTARY INFORMATION:**

### Background

On October 10, 2019, Commerce initiated an anti-circumvention inquiry to determine whether imports of certain uncoated paper rolls that are further processed into uncoated paper sheets in the United States [1] are circumventing the *Order* on certain uncoated paper from Australia.[2] Commerce issued a questionnaire soliciting data on the quantity and value (Q&V) of exports of uncoated paper rolls to Australian Paper Pty. Ltd. (Australian Paper) and received a timely response, in which Australian Paper notified Commerce that it had no shipments of inquiry merchandise during the period under consideration. Thereafter, Commerce selected Australian Paper as the sole mandatory respondent in this inquiry in order to examine its no shipment claim, and we issued an initial questionnaire and two supplemental questionnaires to this company. Australian Paper submitted timely responses to these questionnaires. For a complete description of the events that followed the initiation of this inquiry, *see* the Preliminary Decision Memorandum.[3]

### Scope of the Order

The merchandise subject to this *Order* includes uncoated paper in sheet form; weighing at least 40 grams per square meter but not more than 150 grams per square meter; that either is a white paper with a GE brightness level [4] of 85

---

[1] *See Certain Uncoated Paper Products from Australia, Brazil, the People's Republic of China, and Indonesia: Initiation of Anti-Circumvention Inquiry on the Antidumping and Countervailing Duty Orders,* 84 FR 55915 (October 18, 2019).

[2] *See Certain Uncoated Paper from Australia, Brazil, Indonesia, the People's Republic of China, and Portugal: Amended Final Affirmative Antidumping Determinations for Brazil and Indonesia and Antidumping Duty Orders,* 81 FR 11174 (March 3, 2016) (*Order*).

[3] *See* Memorandum, "Preliminary Decision Memorandum for the Anti-Circumvention Inquiry on the Antidumping Duty Order on Certain Uncoated Paper from Australia: Uncoated Paper Rolls," dated concurrently with, and hereby adopted by, this notice (Preliminary Decision Memorandum).

[4] One of the key measurements of any grade of paper is brightness. Generally speaking, the brighter the paper the better the contrast between the paper and the ink. Brightness is measured using a GE Reflectance Scale, which measures the reflection of light off a grade of paper. One is the lowest reflection, or what would be given to a totally black grade, and 100 is the brightest measured grade. "Colored paper" as used in this scope definition means a paper with a hue other than white that reflects one of the primary colors of magenta, yellow, and cyan (red, yellow, and blue) or a combination of such primary colors.

or higher or is a colored paper; whether or not surface-decorated, printed (except as described below), embossed, perforated, or punched; irrespective of the smoothness of the surface; and irrespective of dimensions (Certain Uncoated Paper). For a full description of the scope, *see* the Preliminary Decision Memorandum.

**Merchandise Subject to the Anti-Circumvention Inquiry**

This anti-circumvention inquiry covers certain uncoated paper rolls that are commonly, but not exclusively, known as ''sheeter rolls,'' from Australia that are further processed in the United States into individual sheets of uncoated paper that would otherwise be subject to the *Order* (*i.e.,* paper that weighs at least 40 grams per square meter but not more than 150 grams per square meter; and that either is a white paper with a GE brightness level of 83 +/−1% or higher or is a colored paper (as defined the ''Scope'' section of the Preliminary Decision Memorandum)), except as noted below. The uncoated paper rolls covered by this inquiry are able to be converted into sheets of uncoated paper using specialized cutting machinery prior to printing, and are typically, but not exclusively, between 52 and 103 inches wide and 50 inches in diameter. For clarity, we herein refer to ''subject-paper rolls'' when referencing the certain uncoated paper rolls that may be converted into subject merchandise. Subject-paper rolls are classified under Harmonized Tariff Schedule (HTS) code 4802.55.

**Methodology**

Commerce has made this preliminary negative circumvention determination in accordance with section 781(a) of the Act and 19 CFR 351.225(g). For a full description of the methodology underlying Commerce's preliminary determination, *see* the Preliminary Decision Memorandum. The Preliminary Decision Memorandum is a public document and is on file electronically *via* Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov*. In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/ frn/*. The signed and electronic versions of the Preliminary Decision Memorandum are identical in content. A list of the topics discussed in the Preliminary Decision Memorandum is attached at the Appendix to this notice.

**Preliminary Negative Determination of Circumvention**

As detailed in the Preliminary Decision Memorandum, we preliminarily determine there is no record evidence indicating that Australian subject-paper rolls are being completed by conversion into sheets of uncoated paper that would otherwise be subject to the *Order* in the United States. We, therefore, preliminarily determine that exports to the United States of subject-paper rolls from Australia are not circumventing the *Order.*

**Public Comment**

Case briefs or other written comments may be submitted to the Assistant Secretary for Enforcement and Compliance. Interested parties will be notified of the timeline for the submission of case briefs and written comments at a later date. Rebuttal briefs, limited to issues raised in case briefs, may be submitted no later than seven days after the deadline date for case briefs.[5] Pursuant to 19 CFR 351.309(c)(2) and (d)(2), parties who submit case briefs or rebuttal briefs in this investigation are encouraged to submit with each argument: (1) A statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing, limited to issues raised in the case and rebuttal briefs, must submit a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce, within 30 days after the date of publication of this notice. Requests should contain the party's name, address, and telephone number, the number of participants, whether any participant is a foreign national, and a list of the issues to be discussed. If a request for a hearing is made, Commerce intends to hold the hearing at a time and date to be determined. Parties should confirm by telephone the date, time, and location of the hearing two days before the scheduled date of the hearing.

Parties are reminded that briefs and hearing requests are to be filed electronically using ACCESS and that electronically filed documents must be received successfully in their entirety by 5 p.m. Eastern Time on the due date. Note that Commerce has temporarily modified certain of its requirements for serving documents containing business proprietary information until further notice.[6]

**Notification to Interested Parties**

This notice is published in accordance with sections 781(a) and 777(i) of the Act and 19 CFR 351.225(g).

Dated: January 19, 2021.

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance.*

**Appendix—List of Topics Discussed in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Scope of the *Order*
IV. Merchandise Subject to the Anti-Circumvention Inquiry
V. Period of Anti-Circumvention Inquiry
VI. Statutory Framework
VII. Anti-Circumvention Analysis
VIII. Country-Wide Determination
IX. Recommendation

[FR Doc. 2021–01784 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–570–007]**

**Barium Chloride From the People's Republic of China: Final Results of the Expedited Fifth Sunset Review of the Antidumping Duty Order**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) finds that revocation of the antidumping duty order on barium chloride from the People's Republic of China (China) would be likely to lead to continuation or recurrence of dumping at the levels indicated in the ''Final Results of Sunset Review'' section of this notice.

**DATES:** Applicable January 27, 2021.

**FOR FURTHER INFORMATION CONTACT:** Eliza Siordia, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–3878.

**SUPPLEMENTARY INFORMATION:**

**Background**

On October 17, 1984, Commerce issued the *Order* on barium chloride

---

[5] *See* 19 CFR 351.309; and 19 CFR 351.303 (for general filing requirements).

[6] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19,* 85 FR 17006 (March 26, 2020); and *Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period,* 85 FR 41363 (July 10, 2020).

from China.[1] On October 1, 2020, Commerce published the notice of initiation of the five-year sunset review of the *Order,* pursuant to section 751(c) of the Act of 1930, as amended (the Act).[2] On October 6, 2020, Commerce received a notice of intent to participate in this review from Chemical Products Corporation (CPC) within the deadline specified in 19 CFR 351.218(d)(1)(i).[3] CPC claimed interested party status under section 771(9)(C) of the Act as a manufacturer of a domestic like product in the United States. On October 30, 2020, CPC provided a complete substantive response for this review within the 30-day deadline specified in 19 CFR 351.218(d)(3)(i).[4] We received no substantive responses from any other interested parties, nor was a hearing requested. On November 20, 2020, Commerce notified the U.S. International Trade Commission (ITC) that it did not receive an adequate substantive response from respondent interested parties.[5] As a result, pursuant to section 751(c)(3)(B) of the Act and 19 CFR 351.218(e)(1)(ii)(C)(2), Commerce conducted an expedited (120-day) sunset review of the *Order.*

**Scope of the Order**

The merchandise covered by the order is barium chloride, a chemical compound having the formulas $BaCl2$ or $BaCl2$-$2H2O$, currently classifiable under subheading 2827.39.4500 of the Harmonized Tariff Schedule of the United States (HTSUS).[6] Although the HTSUS subheading is provided for convenience and customs purposes, the written description of the scope of this order is dispositive.

**Analysis of Comments Received**

All issues raised in this review, including the likelihood of continuation or recurrence of dumping in the event of revocation and the magnitude of the margins likely to prevail if the *Order* were revoked, are addressed in the accompanying Issues and Decision Memorandum.[7] A list of topics

---

[1] *See Antidumping Duty Order; Barium Chloride from the People's Republic of China,* 49 FR 40635 (October 17, 1984) (*Order*).

[2] *See Initiation of Five-Year (Sunset) Reviews,* 85 FR 61928 (October 1, 2020).

[3] *See* CPC's Letter, "Notice of Intent to Participate," dated October 6, 2020.

[4] *See* CPC's Letter, "Fifth Five-Year Review of Barium Chloride from China: Substantive Response to Notice of Initiation," dated October 30, 2020.

[5] *See* Commerce's Letter, "Sunset Reviews Initiated on October 1, 2020," dated November 20, 2020.

[6] The scope reflects the HTSUS subheading currently in effect.

[7] *See* Memorandum, "Issues and Decision Memorandum for the Final Results of the Expedited Fifth Sunset Review of the Antidumping Duty

discussed in the Issues and Decision Memorandum is included as an appendix to this notice. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly on the internet at *http://enforcement.trade.gov/frn/.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

**Final Results of Sunset Review**

Pursuant to sections 751(c)(1), and 752(c)(1) and (3) of the Act, Commerce determines that revocation of the antidumping duty order on barium chloride from China would likely lead to continuation or recurrence of dumping, and that the magnitude of the margin likely to prevail is up to 155.50 percent.[8]

**Administrative Protective Order (APO)**

This notice serves as the only reminder to interested parties subject to an APO of their responsibility concerning the return or destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305. Timely notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

**Notification to Interested Parties**

We are issuing and publishing these final results and notice in accordance with sections 751(c), 752(c), and 777(i)(1) of the Act, and 19 CFR 351.218 and 19 CFR 351.221(c)(5)(ii).

Dated: January 21, 2021.

**Christian Marsh,**

*Acting Assistant Secretary for Enforcement and Compliance.*

**Appendix**

**List of Topics Discussed in the Issues and Decision Memorandum**

I. Summary
II. Background
III. Scope of the Order
IV. History of the Order
V. Legal Framework
VI. Discussion of the Issues

---

Order on Barium Chloride from the People's Republic of China," dated concurrently with, and hereby adopted by, this notice.

[8] *Id.*

1. Likelihood of Continuation or Recurrence of Dumping
2. Magnitude of the Margins Likely To Prevail
VII. Final Results of Sunset Review
VIII. Recommendation

[FR Doc. 2021–01790 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–570–016]**

**Passenger Vehicle and Light Truck Tires From the People's Republic of China: Rescission, in Part, of Antidumping Duty Administrative Review; 2019–2020**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** On October 6, 2020, the Department of Commerce (Commerce) initiated an administrative review of the antidumping duty order on passenger vehicle and light truck tires (passenger tires) from the People's Republic of China (China) for 28 companies. Based on the timely withdrawal of requests for review, we are now rescinding this administrative review with respect to 21 of these companies.

**DATES:** Applicable January 27, 2021.

**FOR FURTHER INFORMATION CONTACT:** Peter Shaw or Toni Page, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0697 or (202) 482–1398, respectively.

**Background**

In August 2020, Commerce received multiple timely requests to conduct an administrative review of the antidumping duty order on passenger tires from China. Based upon these requests, on October 6, 2020, in accordance with section 751(a) of the Tariff Act of 1930, as amended (the Act), Commerce published a notice of initiation of an administrative review covering the period August 1, 2019 through July 31, 2020, with respect to 28 companies.[1] In October and December, 2020, the following companies withdrew their requests for an administrative review: Giti Radial Tire (Anhui) Company Ltd. (Giti Radial Anhui); Giti Tire (Fujian) Company Ltd.

---

[1] *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 85 FR 63081 (October 6, 2020) (*Initiation Notice*).

(Giti Fujian); Giti Tire (Hualin) Company Ltd. (Giti Hualin); Giti Tire Global Trading Pte. Ltd. (GTT); Haohua Orient International Trade Ltd. (Haohua Orient); Prinx Chengshan (Shandong) Tire Company Ltd. (PCT); Qingdao Lakesea Tyre Co., Ltd. (Lakesea); Qingdao Sentury Tire Co. Ltd. (Sentury); Riversun Industry Limited (Riversun); Safe & Well (HK) International Trading Limited (Safe & Well); Sailun Group (HongKong) Co., Limited (Sailun HK), formerly known as Sailun Jinyu Group (Hong Kong) Co., Limited (Sailun Jinyu HK); Sailun Group Co., Ltd. (Sailun Group), formerly known as Sailun Jinyu Group Co., Ltd. (Sailun Jinyu); Sailun Tire Americas Inc., formerly known as SJI North America Inc. (Sailun Americas); Sailun Tire International Corp. (Sailun International); Shandong Guofeng Rubber Plastics Co., Ltd. (Guofeng); Shandong Linglong Tyre Co., Ltd. (Linglong); Shandong New Continent Tire Co., Ltd. (New Continent); Shandong Province Sanli Tire Manufactured Co., Ltd. (Sanli);[2] Shandong Wanda Boto Tyre Co., Ltd. (Boto); Shouguang Firemax Tyre Co., Ltd. (Firemax); and Windforce Tyre Co., Limited (Windforce).[3]

**Partial Rescission**

Pursuant to 19 CFR 351.213(d)(1), Commerce will rescind an administrative review, in whole or in part, if a party who requested the review withdraws the request within 90 days of the date of publication of notice of initiation of the requested review. Giti Radial Anhui; Giti Fujian; Giti Hualin; GTT; Haohua Orient; PCT; Lakesea; Sentury; Riversun; Safe & Well; Sailun HK; Sailun Group; Sailun Americas; Sailun International; Linglong; New Continent; Sanli; Boto; Firemax; and Windforce timely withdrew their requests for an administrative review. No other party requested a review of these 20 companies. On August 31, 2020, ITG Voma Corporation (ITG Voma), a U.S. importer of passenger tires, requested a review of Guofeng.[4] On December 14, 2020, ITG Voma withdrew their request for an administrative review on Guofeng.[5] Accordingly, we are rescinding this review, in part, with respect to these 21 companies, pursuant to 19 CFR 351.213(d)(1).

The instant review will continue with respect to the following companies: Qingdao Fullrun Tyre Tech Corp., Ltd.; Qingdao Landwinner Tyre Co., Ltd.; Qingdao Nexen Tire Corporation; Shandong Qilun Rubber Co., Ltd., Sumitomo Rubber (Changshu) Co., Ltd.; Sumitomo Rubber (Hunan) Co., Ltd.; and Zhaoqing Junhong Co., Ltd.

**Assessment**

Commerce will instruct U.S. Customs and Border Protection (CBP) to assess antidumping duties on all appropriate entries. For the companies for which this review is rescinded, antidumping duties shall be assessed at rates equal to the cash deposit of estimated antidumping duties required at the time of entry, or withdrawal from warehouse, for consumption, in accordance with 19 CFR 351.212(c)(1)(i). Commerce intends to issue appropriate assessment instructions to CBP no earlier than 35 days after the publication of this notice in the **Federal Register**.

**Notification to Importers**

This notice serves as a reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping and/or countervailing duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the presumption that reimbursement of antidumping and/or countervailing duties occurred and the subsequent assessment of doubled antidumping duties.

**Notification Regarding Administrative Protective Orders**

This notice also serves as a reminder to parties subject to administrative protective order (APO) of their responsibility concerning the return or destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305, which continues to govern business proprietary information in this segment of the proceeding. Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

**Notification to Interested Parties**

This notice is issued and published in accordance with sections 751 and 777(i)(l) of the Act, and 19 CFR 351.213(d)(4).

Dated: January 21, 2021.

**James Maeder,**
*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*
[FR Doc. 2021–01798 Filed 1–26–21; 8:45 am]
**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

[A–549–502]

**Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments, In Part; 2018–2019**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) finds that circular welded carbon steel pipes and tubes (pipes and tubes) from Thailand are being, or are likely to be sold, at less than normal value during the period of review (POR), March 1, 2018 through February 28, 2019. We further determine that K Line Logistics had no shipments during the POR.

**DATES:** Applicable January 27, 2021.

**FOR FURTHER INFORMATION CONTACT:** Toni Page, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration,

---

[2] In the *Initiation Notice* this company was listed as Shandong Province Sanli Tire Manufacture Co., Ltd. Commerce later confirmed with counsel the correct spelling of the company's name. *See* Memorandum, "Antidumping Duty Administrative Review of Passenger Vehicle and Light Truck Tires from the People's Republic of China: Ex-parte Phone Call/Email with Shandong Sanli Tire Manufactured Co., Ltd.'s Counsel," dated October 20, 2020.

[3] *See* GTT's Letter, "*Passenger Vehicle and Light Truck Tires from the People's Republic of China:* Withdrawal of Request for Administrative Review," dated October 20, 2020; *see also* Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP's Letter, "Withdrawal of Request for the Administrative Review of Antidumping Duty Order on Passenger Vehicle and Light Truck Tires ("PVLT") from the People's Republic of China (A–570–016)," dated October 21, 2020; DeKieffer & Horgan, PLLC's Letter, "*Passenger Vehicle and Light Truck Tires from the People's Republic of China:* Partial Withdrawal of Request for Administrative Review," dated December 9, 2020; Boto's Letter, "*Passenger Vehicle and Light Truck Tires from the People's Republic of China:* Withdrawal of Request for Administrative Review," dated December 14, 2020; Guofeng's Letter, "*Passenger Vehicle and Light Truck Tires from People's Republic of China:* Withdrawal of Request for Administrative Review," dated December 14, 2020; Firemax's Letter, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China—Withdrawal of Request for Administrative Review," dated December 21, 2020; and PCT's Letter, "Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China—Withdrawal of Request for Administrative Review," dated December 22, 2020.

[4] *See* ITG Voma's Letter, "*Passenger Vehicle and Light Truck Tires from the People's Republic of China:* Request for Review—2019–2020 Review Period," dated August 31, 2020.

[5] *See* ITG Voma's Letter, "*Passenger Vehicle and Light Truck Tires from the People's Republic of China:* Withdrawal of Request for Administrative Review," dated December 14, 2020.

U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–1396.

**SUPPLEMENTARY INFORMATION:**

**Background**

On April 2, 2020, Commerce published the preliminary results of the administrative review of the antidumping duty order on pipes and tubes from Thailand.[1] The review covers 30 producers and/or exporters of the subject merchandise, including Saha Thai Steel Pipe Public Co., Ltd., also known as Saha Thai Steel Pipe (Public) Co., Ltd. (Saha Thai), which Commerce selected for individual examination. Further, Commerce found that K Line Logistics had no shipments during the POR. For a discussion of events since the *Preliminary Results* were published, *see* the Issues and Decision Memorandum.[2]

**Scope of the Order**

The products covered by this review are certain circular welded carbon steel pipes and tubes from Thailand. For a full description of the scope, *see* the Issues and Decision Memorandum.[3]

**Analysis of Comments Received**

All issues raised in the case and rebuttal briefs by parties to this administrative review are addressed in the Issues and Decision Memorandum.[4] A list of issues raised, and to which we responded, in the Issues and Decision Memorandum, is attached to this notice as an appendix. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov*. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly on the internet at *http://enforcement.trade.gov/frn/index.html*. The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

**Final Determination of No Shipments, In Part**

Commerce preliminarily found that K Line Logistics (K Line) had no shipments during the POR.[5] We received no further comments or information that refute this finding since the *Preliminary Results*. Thus, Commerce continues to find that K Line had no shipments during the POR.

**Changes Since the Preliminary Results**

Based on a review of the record and comments received from interested parties, we have made changes to the weighted-average dumping margins applied to Saha Thai and the remaining non-selected respondents. For further discussion, *see* the Issues and Decision Memorandum.

**Final Results of the Administrative Review**

Commerce preliminarily determines that the following weighted-average dumping margins exist for the period March 1, 2018 through February 28, 2019:

| Producer or exporter | Weighted-average dumping margin (percent) |
| --- | --- |
| Saha Thai Steel Pipe (Public) Company, Ltd | 37.55 |
| Apex International Logistics | 37.55 |
| Aquatec Maxcon Asia | 37.55 |
| Asian Unity Part Co., Ltd | 37.55 |
| Bis Pipe Fitting Industry Co., Ltd | 37.55 |
| Blue Pipe Steel Center | 37.55 |
| Blue Pipe Steel Center Co., Ltd | 37.55 |
| Chuhatsu (Thailand) Co., Ltd | 37.55 |
| CSE Technologies Co., Ltd | 37.55 |
| Expeditors International (Bangkok) | 37.55 |
| Expeditors Ltd | 37.55 |
| FS International (Thailand) Co., Ltd | 37.55 |
| Kerry-Apex (Thailand) Co., Ltd | 37.55 |
| Oil Steel Tube (Thailand) Co., Ltd | 37.55 |
| Otto Ender Steel Structure Co., Ltd | 37.55 |
| Pacific Pipe and Pump | 37.55 |
| Pacific Pipe Public Company Limited (also known as Pacific Pipe Company) | 37.55 |
| Panalpina World Transport Ltd | 37.55 |
| Polypipe Engineering Co., Ltd | 37.55 |
| Schlumberger Overseas S.A | 37.55 |
| Siam Fittings Co., Ltd | 37.55 |
| Siam Steel Pipe Co., Ltd | 37.55 |
| Sino Connections Logistics (Thailand) Co., Ltd | 37.55 |
| Thai Malleable Iron and Steel | 37.55 |
| Thai Oil Group | 37.55 |
| Thai Oil Pipe Co., Ltd | 37.55 |
| Thai Premium Pipe Co., Ltd | 37.55 |
| Vatana Phaisal Engineering Company | 37.55 |
| Visavakit Patana Corp., Ltd | 37.55 |

---

[1] *See Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018–2019*, 85 FR 18552 (April 2, 2020) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination, In Part; 2018–2019," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[3] *See* Issues and Decision Memorandum at "Scope of the Order."

[4] *Id.*

[5] *See Preliminary Results*, 85 FR at 18552.

**Assessment Rates**

Pursuant to section 751(a)(2)(C) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.212(b)(1), Commerce determined, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries of subject merchandise, in accordance with the final results of this review. For each of the companies identified in the ''Final Results of the Administrative Review'' above, Commerce will instruct CBP to assess antidumping duties at the *ad valorem* rate equal to each company's weighted-average dumping margin.

Consistent with its recent notice,[6] Commerce intends to issue assessment instructions to CBP no earlier than 35 days after the date of publication of the final results of this review in the **Federal Register**. If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will direct CBP not to liquidate relevant entries until the time for parties to file a request for a statutory injunction has expired (*i.e.,* within 90 days of publication).

**Cash Deposit Requirements**

The following cash deposit requirements will be effective for all shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the date of publication of the final results of this administrative review, as provided for by section 751(a)(2)(C) of the Act: (1) The cash deposit rate for the companies under review will be equal to the weighted-average dumping margin established in the final results of this review; (2) for previously reviewed or investigated companies not listed above in the ''Final Results of the Administrative Review'' above, including companies for which Commerce may determine to have had no shipments during the POR, the cash deposit rate will continue to be the company-specific rate published for the most recently completed segment of this proceeding; (3) if the exporter is not a firm covered in this review or another completed segment of this proceeding, but the producer is, then the cash deposit rate will be the rate established for the most recently completed segment of this proceeding for the producer of the merchandise; and (4) if neither the exporter nor the producer is a firm covered in this or any previously

completed segment of this proceeding, then the cash deposit rate will be the all-others rate of 15.67 percent established in the less-than-fair-value investigation.[7] These deposit requirements, when imposed, shall remain in effect until further notice.

**Notification to Importers**

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of doubled antidumping duties.

**Administrative Protective Order**

This notice also serves as a reminder to parties subject to administrative protective order (APO) of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

**Notification to Interested Parties**

We are issuing and publishing this notice in accordance with sections 751(a)(1) and 777(i) of the Act, and 19 CFR 351.221(b)(5).

Dated: January 19, 2021

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance.*

**Appendix—List of Topics Discussed in the Issues and Decision Memorandum**

I. Summary
II. Background
III. Scope of the Order
IV. Changes to the Preliminary Results
V. Discussion of Comments
    Comment 1: Dual-Stenciled Standard Pipe and Line Pipe
    Comment 2: Acceptance of Wheatland's New Factual Information (NFI) Submission
    Comment 3: Application of Total Adverse Facts Available (AFA) to Saha Thai
    Comment 4: Extension of the Deadlines To Reopen the Record of Review
    Comment 5: Adjustment of Hot-Rolled Coil (HRC) Costs to Account for a Particular Market Situation (PMS)

VI. Recommendation

[FR Doc. 2021–01793 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–351–842]**

**Certain Uncoated Paper From Brazil: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Uncoated Paper Rolls**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) preliminarily determines that imports of certain uncoated paper rolls from Brazil are circumventing the antidumping duty (AD) order on certain uncoated paper from Brazil. As a result, all imports of certain uncoated paper rolls from Brazil from Ahlstrom Brasil Ltd. (Ahlstrom) will be subject to suspension of liquidation on or after October 18, 2019. All remaining imports of certain uncoated paper rolls from Brazil will be subject to suspension of liquidation on or after the date of publication of this preliminary determination. Commerce is also imposing a certification requirement. We invite interested parties to comment on this preliminary determination.

**DATES:** Applicable January 27, 2021.

**FOR FURTHER INFORMATION CONTACT:** Jasun Moy, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–8194.

**SUPPLEMENTARY INFORMATION:**

**Background**

On October 18, 2019, Commerce initiated an anti-circumvention inquiry to determine whether imports of certain uncoated paper rolls that are further processed into uncoated paper sheets in the United States[1] are circumventing the *Order* on certain uncoated paper from Brazil.[2] Commerce issued questionnaires soliciting data on the

---

[6] *See Notice of Discontinuation of Policy to Issue Liquidation Instructions After 15 Days in Applicable Antidumping and Countervailing Duty Administrative Proceedings*, 86 FR 3995 (January 15, 2021).

[7] *See Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 FR 8341 (March 11, 1986).

[1] *See Certain Uncoated Paper Products from Australia, Brazil, the People's Republic of China, and Indonesia: Initiation of Anti-Circumvention Inquiry of Antidumping and Countervailing Duty Orders*, 84 FR 55915 (October 18, 2019) (*Initiation Notice*).

[2] *See Certain Uncoated Paper from Australia, Brazil, Indonesia, the People's Republic of China, and Portugal: Amended Final Affirmative Antidumping Determinations for Brazil and Indonesia and Antidumping Duty Orders*, 81 FR 11174 (March 3, 2016) (*Order*).

quantity and value (Q&V) of exports of uncoated paper rolls to various companies. We received responses to these questionnaires from all parties except Ahlstrom. One company, Carvajal Pulpa y Papel S.A. (Carvajal), a Colombian producer of paper rolls, reported no shipments of uncoated paper rolls produced in Brazil to the United States.[3]

Subsequently, Commerce selected two companies, International Paper do Brasil Ltda (IP)/International Paper Exportadora Ltda (IPEX) (collectively, IP),[4] and Suzano S.A. (Suzano), and required them to respond to a full questionnaire relating to their export activity with respect to uncoated paper rolls.[5] We received questionnaire and supplemental questionnaire responses from IP and Suzano, as well as responses from three U.S. companies. For a complete description of the events that followed the initiation of this inquiry, *see* the Preliminary Decision Memorandum.[6]

## Scope of the Order

The merchandise subject to this *Order* includes uncoated paper in sheet form; weighing at least 40 grams per square meter but not more than 150 grams per square meter; that either is a white paper with a GE brightness level of 85 or higher or is a colored paper; whether

or not surface-decorated, printed (except as described below), embossed, perforated, or punched; irrespective of the smoothness of the surface; and irrespective of dimensions (Certain Uncoated Paper). For a full description of the scope, *see* the Preliminary Decision Memorandum.

## Merchandise Subject to the Anti-Circumvention Inquiries

This anti-circumvention inquiry covers certain uncoated paper rolls that are commonly, but not exclusively, known as ''sheeter rolls,'' from Brazil that are further processed in the United States into individual sheets of uncoated paper that would be subject to the *Order* (*i.e.,* paper that weighs at least 40 grams per square meter but not more than 150 grams per square meter; and that either is a white paper with a GE brightness level of 83 +/− 1% or higher or is a colored paper (as defined in the ''Scope'' section of the Preliminary Decision Memorandum), except as noted below. The uncoated paper rolls covered by this inquiry are able to be converted into sheets of uncoated paper using specialized cutting machinery prior to printing, and are typically, but not exclusively, between 52 and 103 inches wide and 50 inches in diameter. For clarity, we herein refer to ''subject-paper rolls'' when referencing the certain uncoated paper rolls that may be converted into subject merchandise. Subject-paper rolls are classified under HTSUS category 4802.55.[7]

Certain importers of the subject-paper rolls that will not be converted into subject merchandise may certify that the rolls will not be further processed into subject merchandise covered by the scope of the *Order.* Failure to comply with the requisite certification requirement may result in the merchandise being found subject to AD duties.

## Methodology

Commerce made this preliminary finding of circumvention in accordance with section 781(a) of the Tariff Act of 1930, as amended (the Act) and 19 CFR 351.225(g). We relied on information placed on the record by the petitioners;[8] by IP and Suzano; and by Colonial Press International, Inc., Company B, and Perez Trading Company (collectively, U.S. companies). Further, because Ahlstrom did not cooperate by failing to

respond to the best of its ability to Commerce's requests for information, we have used adverse inferences when selecting from among the facts otherwise available on the record for certain aspects of this preliminary determination, pursuant to sections 776(a) and (b) of the Act.

For a full description of the methodology underlying our conclusions, *see* the Preliminary Decision Memorandum. The Preliminary Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov.* In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/ frn/.* The signed and electronic versions of the Preliminary Decision Memorandum are identical in content. A list of the topics discussed in the Preliminary Decision Memorandum is attached at Appendix I to this notice.

## Affirmative Preliminary Determination of Circumvention

Based on our analysis, as detailed in the Preliminary Decision Memorandum, we preliminarily find, pursuant to section 781(a) of the Act, that imports from Brazil of uncoated paper rolls that meet the description of inquiry merchandise above (*i.e.,* subject-paper rolls) that are further processed in the United States into subject merchandise are circumventing the *Order.*

We also preliminarily determine that Carvajal and IP did not export subject-paper rolls from Brazil to the United States during the period of inquiry.[9]

To administer this affirmative circumvention determination, Commerce is requiring that importers of certain paper rolls from Brazil that otherwise match the physical description of subject-paper rolls and will not be further processed into uncoated paper sheets subject to the *Order* certify that the merchandise will not be further processed into subject uncoated paper sheets. Importers of such merchandise will be required to certify and maintain their certifications and supporting documentation to

---

[3] In its Q&V questionnaire response, Carvajal reported that it exported rolls produced in Colombia through Brazil. *See* Carvajal's Letter, ''Anticircumvention Inquiry of the Antidumping Duty Orders on Uncoated Paper Sheets from Australia, Brazil, the People's Republic of China, and Indonesia, and the Countervailing Duty Orders on Uncoated Paper Sheets from the People's Republic of China and Indonesia: Quantity and Value Questionnaire,'' dated November 20, 2019 (Carvajal Q&V Response).

[4] In the less-than-fair-value investigation, we determined that IP and IPEX constituted a single entity. Because no interested party submitted comments on this issue, and in the absence of any new information regarding this finding, Commerce is continuing to find that IP and IPEX are affiliated, pursuant to sections 771(33)(E) and (F) of the Act and are a single entity, pursuant to 19 CFR 351.401(f). *See Certain Uncoated Paper from Brazil: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 80 FR 52029 (August 27, 2015), and accompanying Preliminary Decision Memorandum at ''Affiliation Determinations,'' unchanged in *Certain Uncoated Paper from Brazil: Final Determination of Sales at Less Than Fair Value,* 81 FR 3115 (January 20, 2016).

[5] *See* Memorandum, ''Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Uncoated Paper from Brazil: Respondent Selection,'' dated May 18, 2020. IP and Suzano are herein after also referred to as the ''mandatory respondents'' or the ''Brazilian producers and/or exporters.''

[6] *See* Memorandum, ''Preliminary Decision Memorandum for Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Uncoated Paper from Brazil: Uncoated Paper Rolls,'' dated concurrently, and hereby adopted, with this notice (Preliminary Decision Memorandum).

[7] *See Initiation Notice,* 84 FR at 55917.

[8] The petitioners are Domtar Corporation, Packaging Corporation of America, North Pacific Paper Company, Finch Paper LLC, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.

[9] The period for this inquiry examines the time period starting in the month the initiation of the underlying *Order* was published, and ending four years later, *i.e.,* February 1, 2015, through February 28, 2019. For Carvajal, *see* Carvajal Q&V Response. For IP, *see* Memorandum, ''Business Proprietary Memorandum for International Paper do Brasil Ltda and International Paper Exportadora Ltda,'' dated concurrently with this memorandum.

provide to U.S. Customs and Border Protection (CBP) and/or Commerce upon request.[10] Properly certified entries are not subject to AD duties under the *Order.* Exemption from AD duties under the *Order* is permitted only if the certification and documentation requirements specified in Appendices II and III are met.

Entries of subject-paper rolls produced and/or exported by Ahlstrom are not eligible for certification.

## Suspension of Liquidation

In accordance with 19 CFR 351.225(l)(2), for entries of subject-paper rolls that were produced and/or exported by Ahlstrom (*i.e.,* the non-responsive company), Commerce will instruct CBP to suspend liquidation of subject-paper rolls (as defined in the "Merchandise Subject to the Anti-Circumvention Inquiry" section above) from Brazil that are entered, or withdrawn from warehouse, for consumption on or after October 18, 2019, the date of publication of the initiation of this anti-circumvention inquiry in the **Federal Register**.[11] For all other entries of subject-paper rolls, Commerce will instruct CBP to suspend liquidation of the subject-paper rolls from Brazil that are entered, or withdrawn from warehouse, for consumption on or after the date of publication of this preliminary determination.[12]

CBP shall require cash deposits in accordance with those rates prevailing at the time of entry, unless the importer can certify to CBP that the subject-paper rolls will not be further processed into uncoated paper sheets subject to the *Order* in the United States.[13] In that latter instance, no cash deposit will be required. Subject-paper rolls meeting the physical characteristics described above, which are produced and/or exported by Ahlstrom, are not eligible for certification.

## Public Comment

Interested parties may submit case briefs to Commerce no later than 30 days after the date of publication of this notice. Rebuttal briefs, limited to issues raised in the case briefs, may be filed no later than seven days after the time limit for filing case briefs. Parties who submit case briefs or rebuttal briefs in this proceeding are encouraged to submit with each argument: (1) A statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.[14] Case and rebuttal briefs should be filed electronically via ACCESS.[15]

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing, limited to issues raised in the case and rebuttal briefs, must submit a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce, within 30 days after the date of publication of this notice.[16] Requests should contain the party's name, address, and telephone number, the number of participants, whether any participant is a foreign national, and a list of the issues to be discussed. If a request for a hearing is made, Commerce intends to hold the hearing at a time and date to be determined. Parties should confirm by telephone the date, time, and location of the hearing two days before the scheduled date.[17]

Note that Commerce has temporarily modified certain of its requirements for serving documents containing business proprietary information, until further notice.[18]

## Notification to the U.S. International Trade Commission (ITC)

Consistent with section 781(e) of the Act, Commerce is notifying the ITC of this affirmative preliminary determination to include the merchandise subject to this inquiry within the AD *Order* on uncoated paper from Brazil. Pursuant to section 781(e) of the Act, the ITC may request consultations concerning Commerce's proposed inclusion in the *Order* of the inquiry merchandise. These consultations must be concluded within 15 days after the date of the request. If, after consultations, the ITC believes that a significant injury issue is presented by the proposed inclusion, it will have 60

days to provide written advice to Commerce.

## Notification to Interested Parties

This notice is published in accordance with section 781(a) of the Act and 19 CFR 351.225(g).

Dated: January 19, 2021.

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance.*

## Appendix I—List of Topics Discussed in the Preliminary Decision Memorandum

I. Summary
II. Background
III. Scope of the Order
IV. Merchandise Subject to the Anti-Circumvention Inquiry
V. Period of Anti-Circumvention Inquiry
VI. Statutory Framework
VII. Use of Facts Available With An Adverse Inference
VIII. Anti-Circumvention Analysis
IX. Country-Wide Determination
X. Certification Requirement
XI. Recommendation

## Appendix II—Certification Requirements

If an importer imports subject-paper rolls from Brazil and claims that the subject-paper rolls will not be further processed into uncoated paper sheets covered by the *Order,* the importer is required to complete and maintain the importer certification attached hereto at Appendix III and all supporting documentation. Where the importer uses a broker to facilitate the entry process, it should obtain the entry summary number from the broker. Agents of the importer, such as brokers, however, are not permitted to make this certification on behalf of the importer.

All importers of subject-paper rolls from Brazil are eligible for the certification process detailed below, with the exception that entries of subject-paper rolls produced and/or exported by Ahlstrom Brasil Ltd. are ineligible for certification.

For entries of subject-paper rolls from Brazil entered, or withdrawn from warehouse, for consumption on or after the date this preliminary determination was signed for which the importer claims that the rolls will not be further processed into uncoated paper subject to the orders, the importer is required to meet the certification and documentation requirements detailed in the certifications in order for no suspension of liquidation and no cash deposit to be required for such entries. Among other requirements detailed below, importers are required to maintain a copy of any certifications, as well as sufficient documentation supporting the certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, mill certificates, production records, invoices, *etc.*) for the later of: (1) A period of five years from the date of entry; or (2) a period of three years after the conclusion of any litigation in the United States courts regarding such entries.

---

[10] The importer certification is provided at Appendix III.
[11] *See* Preliminary Decision Memorandum at "Use of Facts Available with an Adverse Inference"; *see also Anti-circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order,* 63 FR 18364, 18366 (April 15, 1998), unchanged in *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy: Affirmative Final Determination of Circumvention of the Antidumping Duty Order,* 63 FR 54672, 54675–6 (October 13, 1998).
[12] *See* Preliminary Decision Memorandum at "Use of Facts Available with an Adverse Inference.".
[13] *See* Appendix II for the certification requirements and Appendix III for the importer certification.

[14] *See* 19 CFR 351.309(c)(2) and (d)(2).
[15] *See* 19 CFR 351.303.
[16] *See* 19 CFR 351.310(c).
[17] *Id.*
[18] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period,* 85 FR 41363 (July 10, 2020).

For all such shipments and/or entries on or after the date of publication of this preliminary determination in the **Federal Register**, through 14 days after the date of publication of this preliminary determination in the **Federal Register**, for which certifications are required, importers should complete the required certifications no later than 14 days after the date of publication of this preliminary determination in the **Federal Register**.

Accordingly, where appropriate, the relevant bullet in the certification should be edited to reflect that the certification was completed within the time frame specified above. For example, the bullet in the importer certification that reads: "This certification was completed at or prior to the time of Entry Summary," could be edited as follows: "The imports referenced herein entered on {insert date}. This certification was completed on mm/dd/yyyy, within 14 days of the date of publication of the **Federal Register** notice of the preliminary determination of circumvention."

For all shipments and/or entries made later than the 14th day after the date of publication of this preliminary determination in the **Federal Register** for which certifications are required, importers should complete the required certification at or prior to the date of Entry Summary.

## Appendix III—Importer Certification

I hereby certify that:

(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY}.

(B) I have direct personal knowledge of the facts regarding the importation into the Customs territory of the United States of subject-paper rolls produced in Brazil that entered under entry summary number(s), identified below, and which are covered by this certification. Subject-paper rolls are defined as certain uncoated paper rolls commonly, but not exclusively, known as "sheeter rolls," (rolls with paper that weigh at least 40 grams per square meter but not more than 150 grams per square meter; and paper that either is a white paper with a GE brightness level of 83 +/− 1% or higher or is a colored paper) that may be converted into subject merchandise. The uncoated paper rolls are typically, but not exclusively, between 52 and 103 inches wide and 50 inches in diameter. Subject-paper rolls are classified under HTSUS category 4802.55. "Direct personal knowledge" refers to facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the importation of the product (e.g., the name of the exporter) in its records.

(C) *If the importer is acting on behalf of the first U.S. customer, complete this paragraph, if not put "NA" at the end of this paragraph:* The imported subject-paper rolls covered by this certification were imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

(D) The imported subject-paper rolls covered by this certification were shipped to {NAME OF PARTY TO WHOM MERCHANDISE WAS FIRST SHIPPED IN THE UNITED STATES}, located at {ADDRESS OF SHIPMENT}.

(E) Select appropriate statement below:

_____ I have direct personal knowledge of the facts regarding the end-use of the imported product because my company is the end-user of the imported product covered by this certification and I certify that the imported subject-paper rolls will not be used to produce subject merchandise. "Direct personal knowledge" includes information contained within my company's books and records.

_____ I have personal knowledge of the facts regarding the end-use of the imported product because my company is not the end-user of the imported product covered by this certification. However, I have been able to contact the end-user of the imported product and confirm that it will not use this product to produce subject merchandise. The end-user of the imported product is {COMPANY NAME} located at {ADDRESS}. "Personal knowledge" includes facts obtained from another party (e.g., correspondence received by the importer from the end-user of the product).

(F) The imported subject-paper rolls covered by this certification will not be further processed into uncoated paper sheets in the United States. (NOTE: For certifications related to entries made on or after the date of publication of the Preliminary Determination, and through 14 days after the date of publication of the Preliminary Determination, the importer should replace "will not be further processed" with "were not further processed" in the certification, as necessary).

(G) This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #:
Entry Summary Line Item #:
Foreign Seller:
Foreign Seller's Address:
Foreign Seller's Invoice #:
Foreign Seller's Invoice Line Item #:
Producer:
Producer's Address:

(H) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (i.e., documents maintained in the normal course of business, or documents obtained by the certifying party, for example, mill certificates, production records, invoices, etc.) for the later of: (1) A period of five years from the date of entry; or (2) a period of three years after the conclusion of any litigation in the United States courts regarding such entries.

(I) I understand that {NAME OF IMPORTING COMPANY} is required to provide this certification and supporting records to U.S. Customs and Border Protection (CBP) and/or the Department of Commerce (Commerce), upon request by the respective agency.

(J) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(K) I understand that failure to maintain the required certifications, and/or failure to substantiate the claims made herein, and/or failure to allow CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all entries to which this certification applies are within the scope of the antidumping duty order on certain uncoated paper from Brazil. I understand that such finding will result in:

(i) Suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the requirement that the importer post applicable antidumping duty cash deposits (as appropriate) equal to the rates determined by Commerce; and

(iii) the revocation of {NAME OF IMPORTING COMPANY}'s privilege to certify future imports of subject-paper rolls from Brazil as not being imported for purposes of further processing into the United States into uncoated paper sheets.

(L) I understand that agents of the importer, such as brokers, are not permitted to make this certification. Where a broker or other party was used to facilitate the entry process, {NAME OF IMPORTING COMPANY} obtained the entry summary number and date of entry summary from that party.

(M) This certification was completed at or prior to the date of entry summary.

(N) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. government.

Signature
{NAME OF COMPANY OFFICIAL}
{TITLE}

[FR Doc. 2021–01792 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

**International Trade Administration**

**[C–570–953]**

**Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review; 2018**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) preliminarily determines that countervailable subsidies have been provided to producers and exporters of narrow woven ribbons with woven selvedge (ribbons) from the People's Republic of China (China). The period of review (POR) is January 1, 2018 through December 31, 2018. Interested parties are invited to comment on these preliminary results.

**DATES:** Applicable January 27, 2021.

Federal Register / Vol. 86, No. 16 / Wednesday, January 27, 2021 / Notices

**7265**

**FOR FURTHER INFORMATION CONTACT:**
Terre Keaton Stefanova or Ian Hamilton, AD/CVD Operations, Office II, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–1280 or (202) 482–4798, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

Commerce published the notice of initiation of this administrative review on November 12, 2019.[1] Commerce extended the deadline for the preliminary results of this administrative review until September 29, 2020.[2] On April 24, 2020, Commerce tolled all deadlines in administrative reviews by 50 days.[3] On July 21, 2020, Commerce tolled all deadlines in administrative reviews by an additional 60 days.[4] Therefore, the deadline for the preliminary results of this review is January 19, 2021. For a complete description of the events that followed the initiation of this administrative review, *see* the Preliminary Decision Memorandum.[5]

**Scope of the Order**

The products covered by the order are narrow woven ribbons with woven selvedge from China. For a complete description of the scope of the order, *see* the Preliminary Decision Memorandum.[6]

**Methodology**

Commerce is conducting this countervailing duty (CVD) review in accordance with section 751(a)(1)(A) of the Tariff Act of 1930, as amended (the Act). For each of the subsidy programs found countervailable, Commerce preliminarily determines that there is a subsidy, *i.e.*, a financial contribution by

an "authority" that gives rise to a benefit to the recipient, and that the subsidy is specific.[7]

For a full description of the methodology underlying our preliminary conclusions, including our reliance, in part, on adverse facts available pursuant to sections 776(a) and (b) of the Act, *see* the Preliminary Decision Memorandum.[8] The Preliminary Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov*. In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *https://enforcement.trade.gov/frn/summary/prc/prc-fr.htm*. The signed and electronic versions of the Preliminary Decision Memorandum are identical in content.

**Preliminary Results of the Review**

As a result of this review, we preliminarily determine that the following estimated countervailable subsidy rate exists:

| Company | Subsidy rate (percent) |
|---|---|
| Yama Ribbons and Bows Co., Ltd .......................... | 42.20 |

**Disclosure**

Commerce intends to disclose the calculations and analysis performed in connection with the preliminary results to interested parties within five days of publication of this notice in the **Federal Register**.[9]

**Public Comment**

Case briefs or other written comments may be submitted to the Assistant Secretary for Enforcement and Compliance no later than 30 days after the publication of these preliminary results of review.[10] Rebuttal briefs, limited to issues raised in case briefs, may be submitted no later than seven days after the deadline for filing case briefs.[11] Parties who submit case briefs or rebuttal briefs in this administrative

review are encouraged to submit with each argument: (1) A statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.[12] Case and rebuttal briefs must be filed using ACCESS.[13] An electronically filed document must be received successfully in its entirety by ACCESS by 5:00 p.m. Eastern Time on the established deadline.[14] Note that Commerce has temporarily modified certain of its requirements for serving documents containing business proprietary information.[15]

Interested parties who wish to request a hearing, limited to issues raised in the case and rebuttal briefs, must do so within 30 days after the date of publication of these preliminary results by submitting a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce, using Enforcement and Compliance's ACCESS system.[16] Requests should contain the party's name, address, and telephone number, the number of participants, whether any participant is a foreign national, and a list of the issues to be discussed. If a request for a hearing is made, we will inform parties of the scheduled date for the hearing.[17]

Unless the deadline is extended pursuant to section 751(a)(3)(A) of the Act, we intend to issue the final results of this administrative review, including the results of our analysis of the issues raised by the parties in their case briefs, within 120 days after issuance of these preliminary results of this administrative review.

**Assessment Rates**

Consistent with section 751(a)(1) of the Act and 19 CFR 351.212(b)(2), upon issuance of the final results, Commerce shall determine, and U.S. Customs and Border Protection (CBP) shall assess, countervailing duties on all appropriate entries covered by this review. Commerce intends to issue assessment instructions to CBP no earlier than 35 days after the date of publication of the final results of this review in the **Federal Register**. If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will direct CBP not to liquidate relevant entries until the time for parties to file a request for a statutory injunction has

---

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 FR 61011 (November 12, 2019).

[2] *See* Memorandum, "Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China: Extension of Deadline for Preliminary Results of the 2018 Countervailing Duty Administrative Review," dated April 21, 2020.

[3] *See* Memorandum, "Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews in Response to Operational Adjustments Due to COVID–19," dated April 24, 2020.

[4] *See* Memorandum, "Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews," dated July 21, 2020.

[5] *See* Memorandum, "Decision Memorandum for the Preliminary Results of 2018 Countervailing Duty Administrative Review: Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China," (dated concurrently with, and hereby adopted by, this notice (Preliminary Decision Memorandum).

[6] *Id.*

[7] *See* sections 771(5)(B) and (D) of the Act regarding financial contribution; section 771(5)(E) of the Act regarding benefit; and section 771(5A) of the Act regarding specificity.

[8] A list of topics discussed in the Preliminary Decision Memorandum can be found in the appendix to this notice.

[9] *See* 19 CFR 351.224(b).

[10] *See* 19 CFR 351.309(c).

[11] *See* 19 CFR 351.309(d).

[12] *See* 19 CFR 351.309(c)(2) and (d)(2).

[13] *See* 19 CFR 351.303.

[14] *See* 19 CFR 351.303(b).

[15] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19*, 85 FR 41363 (July 10, 2020).

[16] *See* 19 CFR 351.310(c).

[17] *See* 19 CFR 351.310.

expired (*i.e.*, within 90 days of publication).

## Cash Deposit Requirements

Pursuant to section 751(a)(2)(C) of the Act, Commerce also intends to instruct CBP to collect cash deposits of estimated countervailing duties in the amount indicated above for Yama, on shipments of subject merchandise entered, or withdrawn from warehouse, for consumption, on or after the date of publication of the final results of review. For all non-reviewed firms, we will instruct CBP to collect cash deposits of estimated countervailing duties at the most recent company-specific or all-others rate applicable to the company, as appropriate. These cash deposit requirements, when imposed, shall remain in effect until further notice.

## Notification to Interested Parties

We are issuing and publishing these preliminary results in accordance with sections 751(a)(1) and 777(i)(1) of the Act, and 19 CFR 351.221(b)(4).

Dated: January 19, 2021.

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance.*

## Appendix

**List of Topics Discussed in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Scope of the Order
IV. Diversification of China's Economy
V. Use of Facts Otherwise Available and Adverse Inferences
VI. Subsidies Valuation
VII. Interest Rate Benchmarks, Discount Rates, Inputs, and Electricity Benchmarks
VIII. Analysis of Programs
IX. Recommendation

[FR Doc. 2021–01786 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–560–828, C–560–829]**

### Certain Uncoated Paper From Indonesia: Affirmative Preliminary Determinations of Circumvention of the Antidumping and Countervailing Duty Orders for Uncoated Paper Rolls

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) preliminarily determines that imports of certain uncoated paper rolls from Indonesia are circumventing

the antidumping duty (AD) and countervailing duty (CVD) orders on certain uncoated paper from Indonesia. As a result, all imports of certain uncoated paper rolls from Indonesia from certain non-responsive converters[1] will be subject to suspension of liquidation on or after October 18, 2019. All remaining imports of certain uncoated paper rolls from Indonesia will be subject to suspension of liquidation on or after the date of publication of this preliminary determination. Commerce is also imposing a certification requirement. We invite interested parties to comment on these preliminary determinations.

**DATES:** Applicable January 27, 2021.

**FOR FURTHER INFORMATION CONTACT:** Genevieve Coen, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–3251.

**SUPPLEMENTARY INFORMATION:**

### Background

On October 18, 2019, Commerce initiated anti-circumvention inquiries to determine whether imports of certain uncoated paper rolls that are further processed into uncoated paper sheets in the United States[2] are circumventing the *Orders*[3] on certain uncoated paper from Indonesia. Commerce issued questionnaires soliciting data on the quantity and value of exports of uncoated paper rolls to various companies. We received responses to these questionnaires from all parties except Midwest Converting and Mohawk Fine Papers Inc.

---

[1] The non-responsive converters are: Advanced Paper Enterprises, Inc.; Alliance Converting LLC; Case Paper Company Inc.; LinkMax Paper; Midwest Converting; Mohawk Fine Papers Inc.; and Northwoods Paper Converting (collectively, non-responsive converters). *See* Memorandum, "Preliminary Decision Memorandum for the Anti-Circumvention Inquiries on the Antidumping and Countervailing Duty Orders on Certain Uncoated Paper from Indonesia," dated concurrently with this notice (Preliminary Decision Memorandum) at "Use of Facts Available and Use of Facts Available with an Adverse Inference."

[2] *See Certain Uncoated Paper Products from Australia, Brazil, the People's Republic of China, and Indonesia: Initiation of Anti-Circumvention Inquiry on the Antidumping and Countervailing Duty Orders*, 84 FR 55915 (October 18, 2019) (*Initiation Notice*).

[3] *See Certain Uncoated Paper from Australia, Brazil, Indonesia, the People's Republic of China, and Portugal: Amended Final Affirmative Antidumping Determinations for Brazil and Indonesia and Antidumping Duty Orders*, 81 FR 11174 (March 3, 2016); *see also Certain Uncoated Paper from Indonesia and the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 81 FR 11187 (March 3, 2016) (collectively, *Orders*).

Subsequently, Commerce selected three Indonesian companies/company groups as mandatory respondents—APRIL Fine Paper Macao Offshore Limited/APRIL International Enterprise Pte. Ltd./A P Fine Paper Trading (Hong Kong) Limited/PT Anugrah Kertas Utama,/PT Riau Andalan Kertas (collectively, APRIL); Great Champ Trading Limited (Great Champ); and PT. Indah Kiat Pulp and Paper Tbk/PT. Pabrik Kertas Tjiwi Kimia Tbk/Pindo Deli Pulp and Paper (collectively, APP Indonesian Mills)—and required them to respond to a full questionnaire relating to their export activity with respect to uncoated paper rolls.[4] We additionally determined to examine merchandise imported by three U.S. companies and to obtain information related to their paper conversion operations from nine additional U.S. companies.[5] We received full questionnaire, supplemental questionnaire, and conversion questionnaire responses, as applicable from six of these companies and a partial response from a seventh company, CellMark Paper, Inc. (CellMark). Five companies (*i.e.*, Advanced Paper Enterprises, Inc.; Alliance Converting LLC; Case Paper Company Inc.; LinkMax; and Northwoods Paper Converting) failed to respond. For a complete description of the events that followed the initiation of these inquiries, *see* the Preliminary Decision Memorandum.

### Scope of the Orders

The merchandise subject to the *Orders* includes uncoated paper in sheet form; weighing at least 40 grams per square meter but not more than 150 grams per square meter; that either is a white paper with a GE brightness level of 85 or higher or is a colored paper; whether or not surface-decorated, printed (except as described below), embossed, perforated, or punched; irrespective of the smoothness of the surface; and irrespective of dimensions (Certain Uncoated Paper). For a full description of the scope, *see* the Preliminary Decision Memorandum.[6]

---

[4] *See* Memorandum, "Respondent Selection," dated May 18, 2020. As discussed in that document, we have previously found the various APRIL and APP Indonesian Mills companies as single entities in prior segments of this proceeding. In the absence of comments from any interested parties and any contrary information, we continue to treat these parties as single entities in this segment.

[5] *Id.*

[6] *See* Memorandum, "Preliminary Decision Memorandum for Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Uncoated Paper from Indonesia: Uncoated Paper Rolls," dated concurrently, and hereby adopted, with this notice (Preliminary Decision Memorandum).

## Merchandise Subject to the Anti-Circumvention Inquiries

These anti-circumvention inquiries cover certain uncoated paper rolls that are commonly, but not exclusively, known as "sheeter rolls," from Indonesia that are further processed in the United States into individual sheets of uncoated paper that would be subject to the *Orders* (*i.e.*, paper that weighs at least 40 grams per square meter but not more than 150 grams per square meter; and that either is a white paper with a GE brightness level of 83 +/− 1% or higher or is a colored paper (as defined in the "Scope" of the Preliminary Decision Memorandum)), except as noted below. The uncoated paper rolls covered by these inquiries are able to be converted into sheets of uncoated paper using specialized cutting machinery prior to printing, and are typically, but not exclusively, between 52 and 103 inches wide and 50 inches in diameter. For clarity, we herein refer to "subject-paper rolls" when referencing the certain uncoated paper rolls that may be converted into subject merchandise. Subject-paper rolls are classified under Harmonized Tariff Schedule category 4802.55.[7]

Certain importers of subject-paper rolls that will not be converted into subject merchandise may certify that the subject-paper rolls will not be further processed into subject merchandise covered by the scope of the *Orders.* Failure to comply with the requisite certification requirement may result in the merchandise being found subject to AD/CVD duties.

## Methodology

Commerce made these preliminary findings of circumvention in accordance with section 781(a) of the Tariff Act of 1930, as amended (the Act) and 19 CFR 351.225(g). We relied on information placed on the record by petitioners,[8] respondents, and other interested parties. Further, because CellMark and the non-responsive converters did not cooperate by failing to respond to the best of their abilities to Commerce's requests for information, we have used adverse inferences, either in whole or in part, when selecting from among the facts otherwise available on the record for certain aspects of these preliminary

determinations, pursuant to sections 776(a) and (b) of the Act.[9]

For a full description of the methodology underlying our conclusions, *see* the Preliminary Decision Memorandum. The Preliminary Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov.* In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/.* The signed and electronic versions of the Preliminary Decision Memorandum are identical in content. A list of the topics discussed in the Preliminary Decision Memorandum is attached at Appendix I to this notice.

## Affirmative Preliminary Determinations of Circumvention

Based on our analysis, as detailed in the Preliminary Decision Memorandum, we preliminarily find, pursuant to section 781(a) of the Act, that imports from Indonesia of uncoated paper rolls that meet the description of inquiry merchandise above (*i.e.,* subject-paper rolls) that are further processed in the United States into subject merchandise are circumventing the *Orders.*

To administer these affirmative circumvention determinations, Commerce is requiring that importers of certain paper rolls from Indonesia that otherwise match the physical description of subject-paper rolls and will not be further processed into uncoated paper sheets subject to the *Orders* certify that the merchandise will not be further processed into subject uncoated paper sheets. Importers of such merchandise will be required to certify and maintain their certifications and supporting documentation to provide to U.S. Customs and Border Protection (CBP) and/or Commerce upon request.[10] Properly certified entries are not subject to AD/CVD duties under the *Orders.* Exemption from AD/CVD duties under the *Orders* is permitted only if the certification and documentation requirements specified in Appendices II and III are met.

Entries of subject-paper rolls purchased by the non-responsive converters (*i.e.,* Advanced Paper Enterprises, Inc., Alliance Converting LLC, Case Paper Company Inc.,

LinkMax Paper, Midwest Converting, Mohawk Fine Papers Inc., and Northwoods Paper Converting) are not eligible for certification.

## Suspension of Liquidation

In accordance with 19 CFR 351.225(l)(2), for entries of subject-paper rolls that were imported or purchased by the non-responsive converters (*i.e.,* Advanced Paper Enterprises, Inc.; Alliance Converting LLC; Case Paper Company Inc.; LinkMax Paper; Midwest Converting; Mohawk Fine Papers Inc.; and Northwoods Paper Converting), Commerce will instruct CBP to suspend liquidation of subject-paper rolls (as defined in the "Merchandise Subject to the Anti-Circumvention Inquiries" section above) from Indonesia that are entered, or withdrawn from warehouse, for consumption on or after October 18, 2019, the date of publication of the initiation of these anti-circumvention inquiries in the **Federal Register**.[11] For all other entries of subject-paper rolls, Commerce will instruct CBP to suspend liquidation of the subject-paper rolls from Indonesia that are entered, or withdrawn from warehouse, for consumption on or after the date of publication of these preliminary determinations.

CBP shall require cash deposits in accordance with those rates prevailing at the time of entry, unless the importer can certify to CBP that the subject-paper rolls will not be further processed into uncoated paper sheets subject to the *Orders* in the United States, and that the purchaser and/or end user is not Advanced Paper Enterprises, Inc., Alliance Converting LLC, Case Paper Company Inc., LinkMax Paper, Midwest Converting, Mohawk Fine Papers Inc., or Northwoods Paper Converting.[12] In that latter instance, no cash deposit rate will be required. Subject-paper rolls meeting the physical characteristics described above, which are imported and/or purchased by the non-responsive converters (*i.e.,* Advanced Paper Enterprises, Inc., Alliance Converting LLC, Case Paper Company Inc., LinkMax Paper, Midwest Converting, Mohawk Fine Papers Inc., and

---

[7] *See Initiation Notice,* 84 FR at 55917.

[8] The petitioners are: Domtar Corporation; Packaging Corporation of America; North Pacific Paper Company; Finch Paper LLC; and the United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.

[9] *See* Preliminary Decision Memorandum at Section VII.

[10] The importer certification is provided at Appendix III.

[11] *See* Preliminary Decision Memorandum at "Use of Facts Available with an Adverse Inference"; *see also Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order,* 63 FR 18364, 18366 (April 15, 1998), unchanged in *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy: Affirmative Final Determination of Circumvention of the Antidumping Duty Order,* 63 FR 54672, 54675–76 (October 13, 1998).

[12] *See* Appendix II for the certification requirements and Appendix III for the importer certification.

Northwoods Paper Converting), are not eligible for certification.

**Public Comment**

Interested parties may submit case briefs to Commerce no later than 30 days after the date of publication of this notice. Rebuttal briefs, limited to issues raised in the case briefs, may be filed no later than seven days after the time limit for filing case briefs. Parties who submit case briefs or rebuttal briefs in this proceeding are encouraged to submit with each argument: (1) A statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.[13] Case and rebuttal briefs should be filed electronically via ACCESS.[14]

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing, limited to issues raised in the case and rebuttal briefs, must submit a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce, within 30 days after the date of publication of this notice.[15] Requests should contain the party's name, address, and telephone number, the number of participants, whether any participant is a foreign national, and a list of the issues to be discussed. If a request for a hearing is made, Commerce intends to hold the hearing at a time and date to be determined. Parties should confirm by telephone the date, time, and location of the hearing two days before the scheduled date.[16]

Note that Commerce has temporarily modified certain of its requirements for serving documents containing business proprietary information, until further notice.[17]

**Notification to the U.S. International Trade Commission (ITC)**

Consistent with section 781(e) of the Act, Commerce is notifying the ITC of these affirmative preliminary determinations to include the merchandise subject to these inquiries within the AD/CVD *Orders* on uncoated paper from Indonesia. Pursuant to section 781(e) of the Act, the ITC may request consultations concerning Commerce's proposed inclusion in the *Orders* of the inquiry merchandise. These consultations must be concluded within 15 days after the date of the request. If, after consultations, the ITC believes that a significant injury issue is

presented by the proposed inclusion, it will have 60 days to provide written advice to Commerce.

**Notification to Interested Parties**

This notice is published in accordance with section 781(a) of the Act and 19 CFR 351.225(g).

Dated: January 19, 2021.

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance.*

**Appendix I—List of Topics Discussed in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Scope of the Orders
IV. Merchandise Subject to the Anti-Circumvention Inquiries
V. Period of Anti-Circumvention Inquiries
VI. Statutory Framework
VII. Use of Facts Available With an Adverse Inference
VIII. Anti-Circumvention Analysis
IX. Country-Wide Determination
X. Certification Requirement
XI. Recommendation

**Appendix II—Certification Requirements**

If an importer imports subject-paper rolls from Indonesia and claims that the subject-paper rolls will not be further processed into uncoated paper sheets covered by the *Orders*, the importer is required to complete and maintain the importer certification attached hereto at Appendix III and all supporting documentation. Where the importer uses a broker to facilitate the entry process, it should obtain the entry summary number from the broker. Agents of the importer, such as brokers, however, are not permitted to make this certification on behalf of the importer.

All importers of subject-paper rolls from Indonesia are eligible for the certification process detailed below, with the exception that entries of subject-paper rolls imported and/or purchased by Advanced Paper Enterprises, Inc., Alliance Converting LLC, Case Paper Company Inc., LinkMax Paper, Midwest Converting, Mohawk Fine Papers Inc., or Northwoods Paper Converting, are ineligible for certification.

For entries of subject-paper rolls from Indonesia entered, or withdrawn from warehouse, for consumption on or after the date these preliminary determinations were signed for which the importer claims that the rolls will not be further processed into uncoated paper subject to the orders, the importer is required to meet the certification and documentation requirements detailed in the certifications in order for no suspension of liquidation and no cash deposit to be required for such entries. Among other requirements detailed below, importers are required to maintain a copy of any certifications, as well as sufficient documentation supporting the certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, mill

certificates, production records, invoices, *etc.*) for the later of: (1) A period of five years from the date of entry; or (2) a period of three years after the conclusion of any litigation in the United States courts regarding such entries.

For all such shipments and/or entries on or after the date of publication of these preliminary determinations in the **Federal Register**, through 14 days after the date of publication of these preliminary determinations in the **Federal Register**, for which certifications are required, importers should complete the required certifications no later than 14 days after the date of publication of these preliminary determinations in the **Federal Register**.

Accordingly, where appropriate, the relevant bullet in the certification should be edited to reflect that the certification was completed within the time frame specified above. For example, the bullet in the importer certification that reads: "This certification was completed at or prior to the time of Entry Summary," could be edited as follows: "The imports referenced herein entered on {insert date}. This certification was completed on mm/dd/yyyy, within 14 days of the publication date of the **Federal Register** notice of the preliminary determinations of circumvention."

For all shipments and/or entries made later than the 14th day after the date of publication of these preliminary determinations in the **Federal Register** for which certifications are required, importers should complete the required certification at or prior to the date of Entry Summary.

**Appendix III—Importer Certification**

I hereby certify that:
(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY}.
(B) I have direct personal knowledge of the facts regarding the importation into the Customs territory of the United States of subject-paper rolls produced in Indonesia that entered under the entry summary number(s), identified below, and which are covered by this certification. Subject-paper rolls are defined as certain uncoated paper rolls commonly, but not exclusively, known as "sheeter rolls," (rolls with paper that weigh at least 40 grams per square meter but not more than 150 grams per square meter; and paper that either is a white paper with a GE brightness level of 83 +/ − 1% or higher or is a colored paper) that may be converted into subject merchandise. The uncoated paper rolls are typically, but not exclusively, between 52 and 103 inches wide and 50 inches in diameter. Subject-paper rolls are classified under HTSUS category 4802.55. "Direct personal knowledge" refers to facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the importation of the product (*e.g.,* the name of the exporter) in its records.
(C) *If the importer is acting on behalf of the first U.S. customer, complete this paragraph, if not put "NA" at the end of this paragraph:* The imported subject-paper rolls covered by

---

[13] *See* 19 CFR 351.309(c)(2) and (d)(2).
[14] *See* 19 CFR 351.303.
[15] *See* 19 CFR 351.310(c).
[16] *Id.*
[17] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period,* 85 FR 41363 (July 10, 2020).

this certification were imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

(D) The imported subject-paper rolls covered by this certification were shipped to {NAME OF PARTY TO WHOM MERCHANDISE WAS FIRST SHIPPED IN THE UNITED STATES}, located at {ADDRESS OF SHIPMENT}.

(E) Select appropriate statement below:

__ I have direct personal knowledge of the facts regarding the end use of the imported product because my company is the end user of the imported product covered by this certification and I certify that the imported subject-paper rolls will not be used to produce subject merchandise. "Direct personal knowledge" includes information contained within my company's books and records.

__ I have personal knowledge of the facts regarding the end use of the imported product because my company is not the end user of the imported product covered by this certification. However, I have been able to contact the end user of the imported product and confirm that it will not use this product to produce subject merchandise. The end user of the imported product is {COMPANY NAME} located at {ADDRESS}. "Personal knowledge" includes facts obtained from another party (e.g., correspondence received by the importer from the end user of the product).

(F) The imported subject-paper rolls covered by this certification will not be further processed into uncoated paper sheets in the United States, and will not be sold to Advanced Paper Enterprises, Inc., Alliance Converting LLC, Case Paper Company Inc., LinkMax Paper, Midwest Converting, Mohawk Fine Papers Inc., or Northwoods Paper Converting. (Note: For certifications related to entries made on or after January 19, 2021, and through 14 days after the publication of the Preliminary Determinations, the importer should replace "will not be further processed" with "were not further processed" in the certification, as necessary).

(G) This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #:
Entry Summary Line Item #:
Foreign Seller:
Foreign Seller's Address:
Foreign Seller's Invoice #:
Foreign Seller's Invoice Line Item #:
Producer:
Producer's Address:

(H) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (i.e., documents maintained in the normal course of business, or documents obtained by the certifying party, for example, mill certificates, production records, invoices, etc.) for the later of: (1) A period of five years from the date of entry; or (2) a period of three years after the conclusion of any litigation in the United States courts regarding such entries.

(I) I understand that {NAME OF IMPORTING COMPANY} is required to

provide this certification and supporting records to U.S. Customs and Border Protection (CBP) and/or the Department of Commerce (Commerce), upon request by the respective agency.

(J) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(K) I understand that failure to maintain the required certifications, and/or failure to substantiate the claims made herein, and/or failure to allow CBP and/or Commerce to verify the claims made herein, may result in a de facto determination that all entries to which this certification applies are within the scope of the antidumping/countervailing duty orders on certain uncoated paper from Indonesia. I understand that such finding will result in:

(i) Suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the requirement that the importer post applicable antidumping and/or countervailing duty cash deposits (as appropriate) equal to the rates determined by Commerce; and

(iii) the revocation of {NAME OF IMPORTING COMPANY}'s privilege to certify future imports of subject-paper rolls from Indonesia as not being imported for purposes of further processing into the United States into uncoated paper sheets.

(L) I understand that agents of the importer, such as brokers, are not permitted to make this certification. Where a broker or other party was used to facilitate the entry process, {NAME OF IMPORTING COMPANY} obtained the entry summary number and date of entry summary from that party.

(M) This certification was completed at or prior to the date of entry summary.

(N) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. government.

*Signature*
{NAME OF COMPANY OFFICIAL}
{TITLE}

[FR Doc. 2021–01785 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510-DS-P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

### [A–471–807]

### Certain Uncoated Paper From Portugal: Final Results of Antidumping Duty Administrative Review; 2018–2019

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that certain uncoated paper (uncoated paper) from Portugal was sold in the United States

at less than normal value during the period of review (POR) March 1, 2018 through February 28, 2019.

**DATES:** Applicable January 27, 2021.

**FOR FURTHER INFORMATION CONTACT:** Robert Scully, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0572.

**SUPPLEMENTARY INFORMATION:**

### Background

On April 2, 2020, Commerce published the *Preliminary Results.*[1] On April 24, 2020, Commerce tolled all deadlines in administrative reviews by 50 days.[2] On July 21, 2020, Commerce tolled all deadlines in administrative reviews by an additional 60 days.[3] Commerce extended the deadline for the final results further by 60 days on October 23, 2020.[4] The deadline for the final results of this review is now January 19, 2021. For a complete description of the events that occurred since the *Preliminary Results, see* the Issues and Decision Memorandum.[5]

### Scope of the Order

The products covered by this order are certain uncoated paper products from Portugal. For a full description of the scope, *see* the Issues and Decision Memorandum.

### Analysis of Comments Received

All issues raised in the case and rebuttal briefs are addressed in the Issues and Decision Memorandum. A list of the issues that parties raised and to which we responded in the Issues and Decision Memorandum is attached to this notice as an Appendix. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and

[1] *See Certain Uncoated Paper from Portugal: Preliminary Results of the Administrative Review of the Antidumping Duty Order; 2018–2019,* 85 FR 18554 (April 2, 2020) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews in Response to Operational Adjustments Due to COVID–19," dated April 24, 2020.

[3] *See* Memorandum, "Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews," dated July 21, 2020.

[4] *See* Memorandum, "Certain Uncoated Paper from Portugal: Extension of Deadline for Final Results of Antidumping Duty Administrative Review, 2018–2019," dated October 23, 2020.

[5] *See* Memorandum, "Issues and Decision Memorandum for the Final Results of the 2018–2019 Administrative Review of the Antidumping Duty Order on Certain Uncoated Paper from Portugal," dated concurrently with and hereby adopted by, this notice (Issues and Decision Memorandum).

Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/index.html/.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

## Changes Since the Preliminary Results

Based on a review of the record and comments received from interested parties, we made the following changes to the *Preliminary Results:*

• We recalculated the amount of certain post-sale price adjustments reported for The Navigator Company, S.A.'s (Navigator's) home market sales.[6]

• We also recalculated certain adjustments to Navigator's costs.[7]

## Final Results of the Review

Commerce determines that the following weighted-average dumping margin exists for the period March 1, 2018 through February 28, 2019:

| Exporter/producer | Weighted-average dumping margin (percent) |
|---|---|
| The Navigator Company, S.A | 6.75 |

## Assessment Rate

Pursuant to section 751(a)(2)(A) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.212(b)(1), Commerce shall determine, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries covered by this review.

Because Navigator's weighted-average dumping margin is not zero or *de minimis* (*i.e.,* less than 0.5 percent), Commerce has calculated importer-specific antidumping duty assessment rates. We calculated importer-specific antidumping duty assessment rates by aggregating the total amount of dumping calculated for the examined sales of each importer and dividing each of these amounts by the total sales value associated with those sales. Where either the respondent's weighted-average dumping margin is zero or *de minimis* within the meaning of 19 CFR 351.106(c)(1), or an importer-specific assessment rate is zero or *de minimis,* we will instruct CBP to liquidate the

appropriate entries without regard to antidumping duties.

For entries of subject merchandise during the period of review produced by Navigator for which it did not know its merchandise was destined for the United States, we will instruct CBP to liquidate unreviewed entries at the all-others rate if there is no rate for the intermediate company(ies) involved in the transaction.[8]

Consistent with its recent notice,[9] Commerce intends to issue assessment instructions to CBP no earlier than 35 days after the date of publication of the final results of this review in the **Federal Register**. If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will direct CBP not to liquidate relevant entries until the time for parties to file a request for a statutory injunction has expired (*i.e.,* within 90 days of publication).

## Cash Deposit Requirements

The following cash deposit requirements will be effective for all shipments of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date of the final results of this administrative review, as provided by section 751(a)(2)(C) of the Act: (1) The cash deposit rate for Navigator will be the rate established in the final results of this administrative review; (2) for merchandise exported by producers or exporters not covered in this administrative review but covered in a prior segment of the proceeding, the cash deposit rate will continue to be the company-specific rate published for the most recently completed segment of this proceeding; (3) if the exporter is not a firm covered in this review, a prior review, or the original less-than-fair-value (LTFV) investigation, but the producer is, the cash deposit rate will be the rate established for the most recently completed segment of this proceeding for the producer of the subject merchandise; and (4) the cash deposit rate for all other manufacturers or exporters will continue to be 7.80 percent, the all-others rate established in the LTFV investigation.[10] These cash

deposit requirements, when imposed, shall remain in effect until further notice.

## Notification to Importers

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this POR. Failure to comply with this requirement could result in the Commerce's presumption that reimbursement of antidumping duties has occurred and the subsequent assessment of double antidumping duties.

## Administrative Protective Order

This notice also serves as a final reminder to parties subject to administrative protective order (APO) of their responsibility concerning the return or destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3), which continues to govern business proprietary information in this segment of the proceeding. Timely written notification of the return/destruction of APO materials, or conversion to judicial protective order, is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

## Notification to Interested Parties

We are issuing and publishing this notice in accordance with sections 751(a)(1) and 777(i)(1) of the Act, and 19 CFR 351.221(b)(5) and 19 CFR 351.213(h)(1).

Dated: January 19, 2021.

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance.*

## Appendix

### List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Scope of the Order
IV. Changes Since the *Preliminary Results*
V. Discussion of the Issues
    Comment 1: Whether Commerce Should Use an Alternative Market Price for Calculating the Cost of Pulp
    Comment 2: Whether and How To Cap "Bonus" Rebates
    Comment 3: Whether Commerce Should Grant Navigator a Constructed Export Price (CEP) Offset
    Comment 4: Whether Commerce Made Ministerial Errors Affecting the Reclassification of Certain Costs
VI. Recommendation

[FR Doc. 2021–01677 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

[6] *See* Issues and Decision Memorandum at Comment 2.

[7] *Id.* at Comment 4.

[8] For a full discussion of this practice, *see Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties,* 68 FR 23954 (May 6, 2003).

[9] *See Notice of Discontinuation of Policy to Issue Liquidation Instructions After 15 Days in Applicable Antidumping and Countervailing Duty Administrative Proceedings,* 86 FR 3995 (January 15, 2021).

[10] *See Certain Uncoated Paper from Portugal: Final Determination of Sales at Less than Fair Value and Final Negative Determination of Critical Circumstances,* 81 FR 3105 (January 20, 2016).

*Federal Register* / Vol. 86, No. 16 / Wednesday, January 27, 2021 / Notices

## DEPARTMENT OF COMMERCE

### International Trade Administration

### Cornell University, et al.; Application(s) for Duty-Free Entry of Scientific Instruments

Pursuant to Section 6(c) of the Educational, Scientific and Cultural Materials Importation Act of 1966 (Pub. L. 89–651, as amended by Pub. L. 106– 36; 80 Stat. 897; 15 CFR part 301), we invite comments on the question of whether instruments of equivalent scientific value, for the purposes for which the instruments shown below are intended to be used, are being manufactured in the United States.

Comments must comply with 15 CFR 301.5(a)(3) and (4) of the regulations and be postmarked on or before February 16, 2021. Address written comments to Statutory Import Programs Staff, Room 3720, U.S. Department of Commerce, Washington, DC 20230. Please also email an identical copy of any written comments to *Dianne.Hanshaw@ trade.gov*. Similarly, requests by the public to examine applications should be emailed to *Dianne.Hanshaw@ trade.gov*.

*Docket Number: 20–010.* Applicant: Cornell University, Department of Materials Science and Engineering, Carpenter Hall, 313 Campus Road, Ithaca, NY 14853. Instrument: Six-axes sample manipulator for ample resolved photoemission. Manufacturer: Fermi Instruments, China. Intended Use: According to the applicant, the instrument will be used to fabricate on site new material and to study their electronic properties with several experimental techniques. Angle resolved photoemission (ARPES) will be the main one, as it conveys directly most information needed on the electronic structure of the material, *e.g.*, whether it is conducting/insulating/ superconducting anisotropic, close to an electronic instability, likely to undergo an electronic transition, etc. According to the applicant, this is of great importance for fundamental physics, but in a longer-term perspective, also in order to identify the potential of materials for applications, in particular, in energy production, conversion and storage. The ARPES set up, as well as, the molecular beam epitaxy station for materials fabrication, will be used as a facility for internal and external users, which will have to submit proposals and apply for time to perform their experiments. Justification for Duty-Free Entry: According to the applicant, there are no instruments of the same general category manufactured in the United

States. Application accepted by Commissioner of Customs: August 6, 2020.

*Docket Number: 12–011.* Applicant: Cornell University, Department of Materials Science and Engineering, Carpenter Hall, 313 Campus Road, Ithaca, NY 14853. Instrument: Multi-gas lamp for angle-resolved photoemission. Manufacturer: Fermi, China. Intended Use: According to the applicant, the instrument will be used to fabricate on site new material and to study their electronic properties with several experimental techniques. Angle resolved photoemission (ARPES) will be the main one, as it conveys directly most information needed on the electronic structure of the material, *e.g.*, whether it is conducting/insulating/ superconducting anisotropic, close to an electronic instability, likely to undergo an electronic transition, etc. According to the applicant, this is of great importance for fundamental physics, but in a longer-term perspective, also in order to identify the potential of materials for applications, in particular, in energy production, conversion and storage. The excitation source is a key element of any photoemission setup. It provides a beam of light which is directed to the sample and causes the emission of the electrons, object of the measurement. For angle-resolved photoemission, the standard excitation source is a helium (He) gas discharge lamp, which excites He atoms and emits light caused by the de-excitation process. It is widely used in many laboratories and sold by a few companies in the world. Justification for Duty-Free Entry: According to the applicant, there are no instruments of the same general category manufactured in the United States. Application accepted by Commissioner of Customs: August 10, 2020.

*Docket Number: 20–012.* Applicant: University of Minnesota, Department of Chemical Engineering and Materials Science, 421 Washington Avenue SE, Minneapolis, MN 55455. Instrument: Spark Plasma Sintering Systems. Manufacturer: SUGA Co., Ltd., Japan. Intended Use: According to the applicant, the instrument will be used to study a variety of structural ceramic and metal materials including refractory alloys (*e.g.*, containing combinations of Nb, Ta, W, Mo, Zr, Hf, etc.,), oxide ceramics such as $Gd_2Zr_2O_7$), $(Y_5Al_3O_{12})$, and $Y_2Si_2O_7$, and non-oxide ceramics such as $SiC$ and $Si_3N_4$. The instrument will also be used to study the sintering or consolidation behavior of these materials and will be used to prepare dense specimens to be analyzed using other instruments. The research focuses

on the development or materials with improved performance in extreme environments. The instrument will be used to generate dense specimens of the materials described above, which will subsequently be tested using other methods to determine their performance in oxidizing or corrosive environments. A key aspect of the investigations involved rapid consolidation in order to achieve high density while limiting grain growth associated with longer exposures to high temperature used in other sintering techniques. Justification for Duty-Free Entry: According to the applicant, there are no instruments of the same general category manufactured in the United States. Application accepted by Commissioner of Customs: August 11, 2020.

Dated: January 21, 2021.

**Richard Herring,**
*Director, Subsidies Enforcement, Enforcement and Compliance.*

[FR Doc. 2021–01788 Filed 1–26–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## BUREAU OF CONSUMER FINANCIAL PROTECTION

### Supervisory Highlights, Covid–19 Prioritized Assessments Special Edition, Issue 23 (Winter 2021)

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Supervisory Highlights.

---

**SUMMARY:** The Bureau of Consumer Financial Protection (Bureau) is issuing its twenty-third edition of Supervisory Highlights. This is a special edition of *Supervisory Highlights* that details the Bureau's Prioritized Assessment (PA) work. PA observations are described in the areas of mortgage, auto and student loan servicing, credit card account management, consumer reporting- furnishing, debt collection, deposits, prepaid cards, and small business lending. The report does not impose any new or different legal requirements, and all observations described in the report are based only on those specific facts and circumstances noted during those PAs.

**DATES:** The Bureau released this edition of the Supervisory Highlights on its website on January 19, 2021.

**FOR FURTHER INFORMATION CONTACT:** Jaclyn Sellers, Counsel, at (202) 435– 7449. If you require this document in an alternative electronic format, please contact *CFPB_Accessibility@cfpb.gov*.

**SUPPLEMENTARY INFORMATION:**

## 1. Introduction

The Bureau is publishing this Special Edition of Supervisory Highlights to inform the public of observations in its prioritized assessment (PA) supervisory work conducted last year after the sudden onset of the COVID–19 pandemic. PAs focused on assessing risks to consumers resulting from the pandemic.

### 1.1 Background

The COVID–19 pandemic had immediate and broad implications for Bureau-supervised entities. In a very short period of time, entities needed to adapt to a number of operational challenges, which included State stay-at-home orders, staffing shortages, transition to partial or total remote work, and business closures.

COVID–19 also deeply impacted consumers. Within three months of the pandemic's start, the unemployment rate jumped to over 11 percent [1] and a significant number of consumers sought unemployment benefits. With large income losses, many households struggled to meet their credit obligations. In the early days of the pandemic, consumer requests for accommodations skyrocketed.

On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act),[2] which included a temporary small business lending program known as the Paycheck Protection Program (PPP). It also amended certain provisions of the Fair Credit Reporting Act (FCRA) and established protections for consumers including homeowners and student loan borrowers. Institutions had to quickly implement the applicable CARES Act provisions.

The Bureau recognized the challenges posed by the pandemic and encouraged supervised entities to focus on assisting consumers. The Bureau issued a number of statements that provided entities with temporary regulatory relief. The Bureau also announced that, in certain instances, the Bureau would take a flexible supervisory and enforcement approach during the pandemic. For more information about these statements please visit the Bureau's website at *https://www.consumer finance.gov/compliance/supervisory-guidance/.*

[1] U.S. Department of Labor. July 17, 2020. Economics News Release: Employment Situation Summary, available at: *https://www.bls.gov/news.release/archives/laus_07172020.pdf.*

[2] Coronavirus Aid, Relief, and Economic Security Act, Public Law 116–136, 134 stat. 281 (March 27, 2020).

### 1.2 Prioritized Assessments

In May of 2020, the Bureau rescheduled about half of its planned examination work and instead conducted PAs in response to the pandemic. PAs were higher-level inquiries than traditional examinations. They were designed to obtain real-time information from a broad group of supervised entities that operate in markets posing elevated risk of consumer harm due to pandemic-related issues.

The Bureau, through its supervision program, analyzed pandemic-related market developments to determine where issues were most likely to pose risk to consumers. The Bureau also prioritized markets where Congress provided special provisions in the CARES Act to help consumers.

The Bureau sent targeted information requests to a significant number of entities to obtain information necessary to assess risk of consumer harm and violation of Federal consumer financial law. Each targeted information request was specific to the product market, that market's attendant risks to consumers, and the institution. The targeted information requests focused on a short period of time, generally from early May 2020 through September 2020.

Typically, targeted information requests sought, as applicable:

• Information on how the institution was assisting consumers;

• challenges the institution was facing as a result of the COVID–19 pandemic;

• changes the institution made to its compliance management system (CMS) in response to the pandemic;

• information about the institution's relevant communications with consumers;

• basic data regarding the institution's response to the COVID–19 pandemic; and

• information about service providers.

PAs were not designed to identify violations of Federal consumer financial law, but rather to spot and assess risks and communicate these risks to supervised entities so that they could be addressed to prevent consumer harm. The Bureau sent close-out letters to entities that detailed any observed risks and contained supervisory recommendations, if applicable. The Bureau will be following up on risks identified while conducting PAs in the normal course of the Bureau's supervisory work.

## 2. General Observations

Many entities offered accommodations to consumers that experienced pandemic-related hardships. The CARES Act mandated forbearance options on federally backed mortgages and placed most student loans owned by the Department of Education into forbearance, and mandated zero interest accrual for all federally owned student loans. Even where not legally required, many entities also offered accommodations, including expanded payment assistance programs and fee waivers. For example, many auto servicers offered six-month payment deferrals to any consumer with a COVID–19 hardship, and many credit card issuers also offered deferrals that ranged from one to six months.

Some Bureau-supervised entities struggled to adjust to the rapid changes brought on by the pandemic. Many institutions experienced increased call volumes from consumers requesting relief or disputing charges, with corresponding increases in hold times for many consumers. For some entities, the combination of rapid program implementation and operational challenges resulted in elevated risk of consumer harm. For example, several entities experienced a backlog of accommodation requests or provided inaccurate information to consumers about the accommodations they offered.

Other risks observed by Bureau examiners ranged from inaccurate credit reporting to failure to send out timely disclosures. In many cases, staffing shortages or inaccurate training materials led to these issues.

Many institutions created COVID–19 response teams to identify and address consumer and industry challenges caused by the pandemic. Many entities engaged in robust monitoring of key processes, leading them to self-identify issues and implement corrective actions where needed. Other entities made changes in response to risks that Bureau examiners observed. Commonly seen changes made by institutions included:

• Providing consumer remediation;

• reversing fees;

• updating scripts to provide accurate information to consumers;

• transitioning from manual to automated processes;

• correcting inaccurate credit reporting; and

• correcting account histories.

Some entities also increased staffing to clear backlogs and to address increased demand for accommodations.

## 3. Supervisory Observations

Specific PA observations are described in this report in the areas of mortgage, auto and student loan servicing, credit card account management, consumer reporting-

furnishing, debt collection, deposits, prepaid cards, and small business lending.[3]

### 3.1 Mortgage Servicing

**Market Response to Consumers & Industry Challenges**

The CARES Act established certain protections for homeowners. For example, for borrowers with federally backed mortgages, borrowers have the right to request and obtain forbearance for up to 180 days and to request and obtain an extension for another 180 days (for a total of 360 days). Since March 2020, millions of borrowers have sought payment relief options and enrolled in CARES Act forbearances.[4]

Servicers faced a number of significant challenges. Beginning in March 2020, they had to quickly implement the CARES Act and make other operational changes in light of evolving investor guidance. Servicers reported taking a variety of steps to address issues related to the pandemic and enroll borrowers into CARES Act forbearances. Many servicers reported operational constraints, resource burdens, and service interruptions. Many servicers also moved employees from other duties to respond to forbearance requests. Some servicers reported disruptions to normal CMS and monitoring processes.

**Consumer Risk**

Examiners' review of mortgage servicers' PA responses indicated several issues that raise the risk of consumer harm. Some categories of issues are described below.

**Providing Incomplete or Inaccurate Information to Consumers About Forbearance**

Several servicers provided incomplete or inaccurate information to consumers regarding CARES Act forbearances. These issues present a range of potential risks of consumer harm, such as dissuading borrowers from requesting a forbearance and causing borrowers to pursue other options that may be less favorable to them than forbearance. Examiners observed instances of the following:

• Customer service representatives provided inaccurate information regarding forbearances, including the available period for CARES Act forbearances and the interest accrued or amounts owed. Servicers told some borrowers that "lump sum" payment of all missed monthly payments would be required at the end of the forbearance period, when in fact that was not correct.

• Representatives indicated that only delinquent borrowers could qualify for a forbearance, contrary to the CARES Act.[5] As a result, representatives instructed some current borrowers to call back to request forbearance only after they had failed to make an on-time monthly payment.

• Written materials, such as forbearance approval letters and customer service websites, included inaccurate or potentially misleading information regarding CARES Act forbearance. For example, one servicer suggested that consumers had to pay a fee to receive a forbearance and another provided incorrect due dates for the borrower's next payment.

• A servicer sent borrowers requesting CARES Act forbearances written agreements purporting to require a signature as a condition of enrollment and stating that payments would be due later that month, when in fact they would not be due for 90 or 180 days. The CARES Act requires only that borrowers request a forbearance and attest to a financial hardship due to the pandemic to qualify.

**Sending Collections and Default Notices, Assessing Late Fees, and Initiating Foreclosures for Borrowers Enrolled in Forbearance**

Several servicers took actions on borrowers' accounts that were erroneous or inconsistent with the fact that borrowers were enrolled in CARES Act forbearances. These issues present risks of direct financial harm and significant confusion for borrowers who were enrolled in forbearances. For example, some servicers sent automated collection notices to borrowers in CARES Act forbearances indicating that their accounts were past due, and that negative reporting and late fees could result. While collection notices may be required for FHA loans by regulation under some circumstances, they are not required for other loans and may result in confusion for consumers enrolled in CARES Act forbearances. In other cases, system issues resulted in erroneous late fees and default notices for borrowers enrolled in forbearances. Examiners also identified one servicer that erroneously initiated foreclosure actions in violation of the CARES Act's moratorium on foreclosures and assessed related fees on borrowers in the early weeks of the pandemic.[6]

**Cancelling or Providing Inaccurate Information About Borrowers' Preauthorized Electronic Funds Transfers**

Several servicers provided inaccurate information or took actions concerning borrowers' preauthorized electronic funds transfers without their knowledge or consent. These issues can result in inadvertent missed payments and other negative consequences for consumers.

Due to manual data entry errors, representatives at one servicer cancelled borrowers' preauthorized electronic funds transfers when they inquired about forbearance options over the phone. In addition, at other servicers, representatives provided inaccurate information to borrowers by stating that they did not need to take steps to cancel their preauthorized electronic fund transfers when they enrolled in forbearance, when in fact they did.

**Failing To Timely Process Forbearance Requests**

Many servicers experienced delays in processing forbearance requests in the early months of the pandemic. These delays were generally brief. However, a few servicers experienced more serious delays or failed to process forbearance requests. As a result, this issue presents a risk to consumers who do not timely receive the benefit of a requested forbearance and experience negative consequences, such as missed payments and negative credit reporting. For example, representatives processing borrower requests for forbearance incorrectly used a code indicating only that the borrowers inquired about forbearance, and no forbearance was processed.

**Enrolling Borrowers in Automatic or Unwanted Forbearances**

Many servicers enrolled borrowers in automatic or unwanted forbearances. Examiners observed the following:

• Certain servicers did not effectively communicate to borrowers that they were applying for a forbearance. In some cases, borrowers believed that they were

---

[3] This document does not impose any new or different legal requirements. In addition, the risks described in this issue of *Supervisory Highlights* are based on the particular facts and circumstances reviewed by the Bureau as part of its PA work. A conclusion that elevated risk to consumers exists is based on the facts and circumstances described here and may not lead to such a finding under different facts and circumstances.

[4] According to the Mortgage Bankers Association, an estimated 2.7 million borrowers were in forbearance plans as of December 2020. Mortgage Bankers Association. December 21, 2020. *MBA: Share of Mortgage Loans in Forbearance Increases to 5.49 Percent*, available at: *https://www.mba.org/2020-press-releases/december/share-of-mortgage-loans-in-forbearance-increases-to-549-percent.*

[5] The CARES Act states that borrowers may request forbearance "regardless of delinquency status." *See* CARES Act, section 4022(b)(1).

[6] The CARES Act placed a moratorium on certain foreclosures. *See* CARES Act, section 4022.

simply reviewing information regarding forbearance on the servicers' website or discussing a financial hardship with representatives on the phone. Those borrowers did not understand that they had applied for, or that the servicer would process, a forbearance.

• Certain representatives used incorrect system codes that placed borrowers' accounts into forbearances that they did not request.

• Certain servicers automatically placed borrowers' accounts into forbearance without their knowledge or approval. When borrowers with multiple loan accounts applied for forbearance on one account, some servicers automatically applied the forbearance to some or all of the borrowers' other accounts. One servicer automatically converted in-process loan modification applications into forbearances without borrowers' consent.[7]

• Several servicers acknowledged that, when accounts were placed in forbearance without borrowers' request or approval, the servicers then furnished information to consumer reporting companies (CRCs)[8] indicating that the accounts had been placed in forbearance.

Loss Mitigation Process Deficiencies

Some servicers did not take appropriate steps relating to loss mitigation for borrowers in CARES Act forbearances. The risks to consumers from these issues include missed opportunities to pursue and enroll in appropriate repayment options or plans. Issues observed include:

• One servicer enrolled borrowers who submitted incomplete loss mitigation applications in CARES Act forbearances and appropriately sent acknowledgement letters to these borrowers but failed to include a statement that the consumer will be evaluated for all options upon submitting a completed loss mitigation application, as required by Regulation X,

• One servicer had no process in place to evaluate whether borrowers who submitted complete loss mitigation

applications qualified for CARES Act forbearances because they were experiencing a pandemic-related hardship. Some borrowers were instead enrolled in forbearances that lacked CARES Act protections—such as a term up to 360 days and credit reporting protections. The servicer received complaints from borrowers who missed payments while in a loss mitigation process, when they likely could have been offered the protections of the CARES Act.

### 3.2 Auto Servicing

Market Response to Consumers & Industry Challenges

Auto servicers reported large numbers of pandemic-related payment assistance requests beginning in early March 2020. Many servicers expanded existing payment assistance programs to help borrowers who were having trouble making payments. The changes included waiving late fees, permitting non-delinquent as well as delinquent borrower enrollments, and providing longer payment deferrals.

The payment assistance programs generally offered loan payment deferment on a case-by-case basis, with most borrowers receiving a payment deferral period of three or more months. In the majority of cases, the payment deferments extended the loan term by the same number of months. Most servicers continued to charge interest during the deferral period.

Servicers generally suspended repossessions between mid-March and early-May 2020, because State stay-at-home orders halted repossession efforts. While some states may have imposed repossession moratoria, there was no Federal moratorium.

Consumer Risk

Examiners' review of auto loan servicers' PA responses indicated several issues that present risk of consumer harm, including the following:

Many servicers provided information to consumers about the impact of interest accrual during deferment periods on the final loan payment amount that might not have been sufficiently precise for consumers to understand how much their payments would increase. For example, consumers who would face final payments that were more than double their regular payments may not have reasonably anticipated this result when servicers described the final payment as "substantially larger than your regular monthly payment." More specific information about the final payment

may allow consumers to budget and plan for future large payments and mitigate the risks that consumer could not make that payment. Servicers have various options to better disclose the long-term payment obligations, such as estimating final payment amounts.

Some servicers continued to withdraw funds for monthly payments after servicers had agreed to deferments. And some servicers failed to process certain payment assistance requests.

One servicer sent borrowers notices warning them of possible repossession when, in fact, the servicers had suspended repossession operations during the relevant time period. This practice likely affected whether some borrowers, threatened by repossession, spent discretionary money on their car payments instead of other financial necessities during the pandemic.

### 3.3 Student Loan Servicing

Market Response to Consumers & Industry Challenges

The CARES Act provided certain student loan borrowers with a range of protections. It temporarily reduced interest rates to zero for all federal loans owned by the U.S. Department of Education (ED) and suspended monthly payments for most of these loans. To facilitate the suspension, servicers placed most loans in repayment status into an administrative forbearance. In addition, the suspended monthly payments are considered eligible payments toward the total number of qualifying payments necessary for forgiveness under the Public Service Loan Forgiveness program and various income-driven repayment plans. Servicers reported that between March and May 2020 the number of delinquent accounts in the William D. Ford Federal Direct Loan Program (Direct loans) decreased from 1.9 million to fewer than 150 accounts.

Many loan holders of commercial Federal Family Education Loan Program (FFELP) loans directed servicers to use the natural disaster forbearance provisions to provide payment relief for consumers impacted by the pandemic. These provisions did not provide the forgiveness or interest rate features of the CARES Act relief afforded to borrowers with Direct loans and ED-held FFELP loans.

Private student loan holders and lenders managed the early response to the pandemic with a variety of different payment relief options. Certain private student loan holders relied on options provided in the terms of the original note like economic hardship or natural disaster forbearances. Still others

---

[7] One servicer informed examiners that automatic forbearances were intended to allow borrowers to avoid the need to separately request forbearance on other loan accounts. However, examiners observed that a significant number of consumers enrolled in automatic forbearances called or submitted complaints seeking removal from forbearance.

[8] The term "consumer reporting company" means the same as "consumer reporting agency," as defined in the Fair Credit Reporting Act, 15 U.S.C. 1681a(f), including nationwide consumer reporting agencies as defined in 15 U.S.C. 1681a(p) and nationwide specialty consumer reporting agencies as defined in 15 U.S.C. 1681a(x).

created new short-term payment relief options for consumers. Private loan forbearance options and implementation of FFELP disaster forbearance programs often evolved as the extent of the economic impacts from the pandemic became more apparent. In general, servicers did not require any documentation to enroll borrowers into COVID–19 related forbearances. Between March and May 2020, servicers reported that the number of delinquent commercial FFELP and private student loans across all servicers reviewed fell from 270,000 to 146,000.

Servicers faced a number of significant challenges. In March and April 2020, they quickly implemented the CARES Act for federally owned loans, identified and made available a variety of private and commercial FFELP payment relief options, and complied with local shelter-in-place or stay-at-home orders. Many servicers reported operational constraints and service interruptions, consistent with other servicing sectors. Finally, examiners observed that a large percentage of calls from commercial FFELP and private student loan borrowers related to the CARES Act even though they were not eligible for the benefits. For example, consumers often expressed confusion and frustration after receiving bills when they believed their loans should have been automatically placed into CARES Act forbearances. Other consumers inquired about how to enroll in the forbearances they heard about in the news.

Consumer Risk

Examiners' review of student loan servicers' PA responses, which related to federal and private student loans, indicated several issues that raise the risk of consumer harm, described below.

One servicer provided incorrect or incomplete information about available payment relief options in written communications to numerous consumers. For example, some borrowers received inaccurate notices indicating that interest would capitalize at the conclusion of the natural disaster forbearances when, in fact, it would not. In another instance, private student loan borrowers received notices suggesting that they were eligible for natural disaster forbearances with certain terms when, in fact, the borrowers receiving these notices were ineligible. In both of these situations the servicer sent written communications informing affected borrowers of the error.

Multiple servicers failed to routinely discuss all available repayment options with borrowers requesting payment

assistance. While borrowers were eligible to enroll in various forbearances in the wake of the COVID–19 pandemic, they have other options as well. For example, commercial FFELP borrowers are eligible for income-based repayment, which may be a better option for many borrowers. Additionally, private loan borrowers may also be eligible for non-standard repayment plans that can provide long-term payment relief. In these cases, consumers were never informed about alternative repayment options when they requested payment assistance.

Operational challenges resulted in one servicer failing to maintain regular call center hours. While operational disruptions were common across the industry, during this period most call centers stayed open at least part of the time. The complete or partial closure of call centers created a range of problems for consumers who were unable to talk with representatives, particularly in connection with payment relief-specific guidance.

One private loan holder was not responding to consumers' forbearance extension requests. Many loan holders authorize servicers to grant initial forbearances for consumers that call to request payment assistance. However, some loan holders require that servicers seek their approval for any forbearance extension. Examiners observed that thousands of extension requests were delayed and ultimately denied because the loan holder never responded. This challenge needlessly hinders consumers' abilities to make broader financial decisions and may cause certain consumers to believe the loan holder will evaluate the applications and that extensions are likely.

One servicer provided inaccurate information related to the number of payments eligible for repayment, rehabilitation, or forgiveness programs. Unlike under most forbearances, months that federally owned loans are enrolled in the forbearance authorized by the CARES Act are considered eligible under a variety of programs. However, when providing information to consumers about the total number of eligible payments, one servicer failed to include these months in the count.

Examiners observed some payment allocation errors when servicers applied voluntary payments to accounts enrolled in CARES Act forbearances. The servicers allow consumers to direct payments to individual loans within their accounts through individual instructions or standing orders. Many consumers use standing orders to establish a payment methodology that directs payments to loans with the

highest interest rates. When consumers do not provide allocation instructions, servicers use their own default methodologies. Some servicers' default methodologies allocate payments based on the interest rates of the loans. The CARES Act stopped all interest accrual on loans owned by ED, and in these loans, some servicers failed to comply with allocation methodologies or instructions that relied on loan-level interest rates. In one situation, a servicer did not comply with consumers' standing payment instructions to allocate payments towards the highest interest rate loan first. Rather, representatives incorrectly used the CARES Act temporary interest rates and split payments evenly across the consumers' loans despite underlying differences in interest rates. While the error was not systematic in that case, if uncorrected, consumers' highest interest rate loans will not be paid down as much as they would be if servicers applied payments based on the permanent interest rate, so when payments and interest accrual resume, these borrowers would end up paying more over time.

Some servicers failed to prevent preauthorized electronic funds transfers following forbearance approval for loans that are not federally owned. For example, due to manual errors, one servicer failed to timely enroll consumers in forbearances that they approved over phone calls and failed to cancel the relevant preauthorized fund transfers as well. In other examples, servicers failed to cancel preauthorized electronic funds transfers when consumers requested and were granted forbearances that halted all required payments.

One servicer provided inaccurate information to consumers regarding the information required to evaluate forbearance applications for loans that are not federally owned. The servicer advised consumers that providing the date range related to the COVID–19 impact was acceptable. In fact, the servicer denied forbearance requests for consumers who provided date ranges rather than precise dates of COVID–19 impact.

Certain servicers allow commercial FFELP consumers to enroll in natural disaster forbearances through their websites or automated phone systems. Examiners observed that one servicer failed to prevent certain ineligible borrowers in technical default (more than 270 days delinquent) from enrolling in forbearances. This resulted in the servicer confirming enrollment in forbearances that were not actually provided to consumers. Consumers may

have believed that they did not need to take any actions until the forbearance periods ended. However, these consumers in fact needed to make payments or, at a minimum, talk with representatives to resolve the issues.

### 3.4 Credit Card Account Management

#### Market Response to Consumers & Industry Challenges

Credit card issuers generally provided some form of relief to consumers experiencing hardships as a result of the COVID–19 pandemic. The most common relief was allowing consumers to skip a payment or to defer payments for one to six months. While some issuers waived interest along with payment deferrals, interest continued to accrue on accounts at most issuers. Other relief options included lowered interest rates, waivers of annual and other fees, and extended deferred interest periods for credit card accounts that already had deferred interest on certain purchases. A few issuers made changes to manage credit risk. Some issuers tightened underwriting standards, stopped proactive score-based credit limit increases, reduced credit limits, or closed some accounts. Some issuers also halted marketing campaigns to acquire new accounts and paused direct marketing campaigns due to uncertainty in the market.

Issuers generally experienced some operational challenges as a result of the COVID–19 pandemic, such as increased call volume. The compliance-related challenges included:

• Difficulty in meeting written disclosure timing requirements; or obtaining necessary consumer consent for electronic disclosures (*e.g.,* for change-in-terms letters and statement messaging);

• Meeting regulatory requirements to address customer disputes, sometimes resulting from business partner and merchant closures; and

• Adjustments in regular monitoring and testing schedules for credit card operations.

In responding to challenges, some issuers deployed their existing disaster preparedness and business continuity management plans to address some of the operational challenges related to the COVID–19 pandemic. However, several issuers had to modify existing programs and business line processes, and revise policies and procedures to respond to the unique operational challenges posed by the COVID–19 pandemic.

#### Consumer Risk

Examiners' review of issuers' PA responses indicated several issues that raise the risk of consumer harm. These issues are described below.

#### Implementation and System Deficiencies

Certain issuers reported problems implementing relief programs, and these problems may have caused consumer harm. These issuers relied on manual processes to handle high volumes of requests for relief and did not provide adequate employee training about relief programs.

Some issuers that used manual processes to handle the high volumes of requests for relief reported significant backlogs in processing such requests. Due to these backlogs, accounts became delinquent between the time of consumers' requests for relief and the actual processing of requests, exposing consumers' accounts to potential negative credit reporting, charge-offs, or account closures.

In some instances, consumers who requested relief were erroneously told that they would receive immediate relief as of the date of their request. In fact, these consumers would not receive relief until the consumer's request was manually entered into the issuer's system, which occurred days, or even weeks, later. In some cases, consumers were never manually enrolled in relief programs. Consequently, fees and interest that were supposed to be waived, along with the payment deferrals, were not waived.

Some issuers also reported that employees provided inaccurate information to consumers in order to collect payments from them. For instance, representatives told consumers that they had to pay their past due amount to enroll in the payment deferment program when in fact, paying the past due amount was not a requirement for enrollment.

#### Auto Pay Process Deficiencies

Several issuers advised consumers who requested to skip or defer credit card payments pursuant to a pandemic relief program that they must adjust or separately cancel any preauthorized credit card payments (including preauthorized transfers from an external financial institution) that were set up to make their periodic credit card payments. Examiners observed that the instructions given to consumers in certain cases, including going through additional steps to cancel or defer payments after completing the pandemic relief request process, posed a risk of consumer harm.

Some issuers did not immediately suspend preauthorized transfers upon enrolling consumers in pandemic relief programs, despite making representations to consumers that payments would be suspended as of the date the consumer enrolled. Rather, the issuers' systems were programmed to suspend preauthorized transfers as of the date that the consumer's request for relief was manually processed by the issuer. Because of processing backlogs, suspension of transfers did not occur until several days or weeks after the consumer's oral request. Due to these processing backlogs, examiners observed that several consumers' accounts were debited in error.

#### Timing of Delivery of Disclosures

At several issuers, some consumers who had not previously opted to receive electronic disclosures requested COVID–19 relief telephonically. For these consumers, the issuers had no practical way to provide written disclosures without delaying relief or obtaining the consumer's consent to electronic disclosure. Rather than delay relief, the issuers provided immediate relief to cardholders and delivered written disclosures by letter or statement notice.[9]

#### Billing Disputes

Some issuers reported that they failed to resolve billing disputes by the regulatory deadline. This failure was attributed to the increased volume of error notices and merchant closures which increased the amount of time to investigate and resolve such errors.

### 3.5 Consumer Reporting and Furnishing

Consumer reporting plays a critical role in consumers' financial lives. CRCs assemble or evaluate consumer information for the purpose of furnishing consumer reports to third parties. Such consumer reports can determine a consumer's eligibility for credit cards, car loans, and home mortgage loans—and they often affect how much a consumer is going to pay for that loan. Furnishers of information provide information to CRCs and thus play a crucial role in the accuracy and integrity of consumer reports. Inaccurate information on consumer reports can lead to market harm. For example, inaccurate information on a consumer report can impact a consumer's ability to obtain credit or open a new deposit or savings account. Moreover, furnishers have an important role when consumers dispute the accuracy of information in

---

[9] CFPB. May 13, 2020. *Open-End (not Home-Secured) Rules FAQs related to the Covid–19 Pandemic, available at: https://files.consumer finance.gov/f/documents/cfpb_faqs_open-end-rules-covid-19_2020-05.pdf.*

their consumer reports. Consumers may dispute information that appears on their consumer report directly with furnishers ("direct disputes") or indirectly through CRCs ("indirect disputes"). When CRCs and furnishers receive disputes, they are required to investigate the disputes to verify the accuracy of the information furnished.[10] A timely and responsive reply to a consumer dispute may reduce the impact that inaccurate negative information in a consumer report may have on the consumer.

Market Response to Consumers & Industry Challenges

The CARES Act amended Section 623(a)(1) of the FCRA (CARES Act FCRA amendment). This amendment applies if a furnisher makes an accommodation with respect to one or more payments on a credit obligation or account of a consumer, and the consumer makes the payments or is not required to make one or more payments pursuant to the accommodation. For accounts where the CARES Act FCRA amendment applies, if the credit obligation or account was current before the accommodation, during the accommodation the furnisher must continue to report the credit obligation or account as current. If the credit obligation or account was delinquent before the accommodation, during the accommodation the furnisher cannot advance the delinquent status.[11] For more examples regarding the applicability of the CARES Act FCRA amendment, the Bureau has published detailed FAQs.[12]

Furnishers and CRCs faced challenges in responding to the pandemic and the new requirements of the CARES Act FCRA amendment. Several furnishers and CRCs reported temporary staffing challenges that affected the entities' ability to complete reasonable dispute investigations within the time periods specified in the FCRA and Regulation V. Many furnishers also adapted to consumer need by offering new or expanded payment accommodations to consumers, which required changes in staffing to handle request volume. In light of the new statutory requirements for furnishing under the CARES Act FCRA amendment, these new or

expanded accommodations also required that furnishers make changes in procedures to appropriately code accounts so that they would be furnished correctly according to the statute's new requirements. Notwithstanding these challenges, most CRCs and furnishers provided information indicating that they have adapted to meet their FCRA and Regulation V obligations. This is consistent with the findings of the CFPB's Office of Research that, in several credit markets including mortgage loans, auto loans, and student loans, the reported rate of new delinquencies, as well as the reported share of existing delinquencies that became more delinquent, decreased between March and June 2020.[13]

Consumer Risk

Examiners' review of furnishers' and CRCs' PA responses indicated several issues that present risk of consumer harm.

Inaccurate Reporting of Accommodations

Some entities furnished new and/or advancing delinquency information to CRCs after making an accommodation. As noted above, if a furnisher makes an accommodation, the furnisher must under certain conditions report the credit obligation or account as current, or if the credit obligation or account was delinquent before the accommodation, not advance the delinquent status during the period of the accommodation.[14] Certain furnishers made accommodations, and communicated to the consumer that the accommodation had been made immediately after the consumer submitted the application. These furnishers then delayed processing accommodations due to backlogs created by the volume of accommodation requests. This resulted in: (i) Reporting some consumers who were current as delinquent, and then improperly advancing and reporting their incorrect delinquency status, or (ii) improperly advancing the delinquency status of other consumers who were delinquent at the time of the accommodation.

Insufficient Furnishing Policies and Procedures

Examiners observed that insufficient furnishing policies and procedures caused an entity to furnish inaccurate account information to CRCs related to the practice of home pickups of leased vehicles.

Furnishers are required to "establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the information relating to consumers that it furnishes to a consumer reporting agency. The policies and procedures must be appropriate to the nature, size, complexity, and scope of each furnisher's activities."[15]

An auto furnisher failed to update furnishing policies and procedures to address the furnisher's changed leased vehicle return practices. This caused the furnisher to erroneously report consumers as delinquent for leased vehicles that had, in fact, been returned. As a result of the pandemic, many auto dealerships were closed, so vehicles were picked up from consumers' homes. This created delays or errors in the processing of lease termination, causing auto furnishers to report accounts as delinquent even though consumers had returned their vehicles on time.

After making changes to accommodation programs offered to consumers during the pandemic, a number of furnishers did not update their written policies and procedures regarding the accuracy and integrity of the information related to consumers that they furnish to CRCs. Accommodation programs offered by furnishers may affect how the furnishers report information about its accounts to CRCs. Accordingly, there is a risk of furnishing inconsistent with the CARES Act FCRA Amendment if furnishers have made changes to accommodation programs without updating related furnishing policies and procedures.

Untimely Dispute Investigations

CRCs and furnishers are required to conduct an investigation with respect to the disputed information, review all relevant information provided by the consumers with the dispute, and respond with the results of the dispute investigation.[16]

In the second quarter of 2020, staffing challenges due to the pandemic impacted dispute investigation capacity at one or more furnishers and CRCs. As a result of these staffing challenges, some furnishers and CRCs were unable to timely conduct investigations of

---

[10] 15 U.S.C. 1681i(a), 15 U.S.C. 1681s–2(a)(8), 15 U.S.C. 1681s–2(b); 12 CFR 1022.43.

[11] CARES Act, Public Law 116–136, sec. 4201 (2020) (amending section 623(a)(1) of the FCRA subject to certain exceptions).

[12] CFPB. June 16, 2020. *Consumer Reporting FAQs Related to the CARES Act and COVID–19 Pandemic, available at https://files.consumer finance.gov/f/documents/cfpb_fcra_consumer-reporting-faqs-covid-19_2020-06.pdf.*

[13] CFPB. August 31, 2020. *The Early Effects of the COVID–19 Pandemic on Consumer Credit, available at https://files.consumerfinance.gov/f/documents/cfpb_early-effects-covid-19-consumer-credit_issue-brief.pdf.*

[14] CARES Act, Public Law 116–136, sec. 4201 (2020) (amending section 623(a)(1) of the FCRA).

[15] Regulation V, 12 CFR 1022.42(a).

[16] 15 U.S.C. 1681i(a), 15 U.S.C. 1681s–2(b)(1).

disputed tradelines in the months of April and May. However, examiners observed data indicating that, by the end of June 2020, the average time to resolve disputes by furnishers had returned to the average time from prior years.

Some CRCs and furnishers that experienced this problem in the Spring 2020 took steps to reduce the risk of inaccurate consumer information caused by these staffing challenges. Specifically, these CRCs and furnishers continued to investigate the disputes and subsequently furnished updated or corrected information about such disputed items after completing their dispute investigations. CFPB Supervision is continuing to monitor dispute timeliness at CRCs and furnishers.

### 3.6 Debt Collection

**Market Response to Consumers & Industry Challenges**

During the review period, some participants in the debt collection industry reported an increase in consumer contacts and payments, which several attributed to more consumers being at home, reduced spending, and the resources provided by pandemic assistance programs.

Debt collectors altered their work practices in response to the pandemic to comply with State orders and reduce their employees' risk of infection. In general, collectors responding to the PAs indicated that they transitioned partially or entirely to remote work during the review period. Other workplace changes were reported, including the implementation of remote call-monitoring tools and modifications to telework policies.

Some states instituted pandemic measures that impacted the debt collection industry and consumers. These measures include prohibitions on new wage garnishments or bank attachments, and a requirement that consumers be offered the option to defer scheduled payments.

**Consumer Risk**

Examiners' review of debt collectors' PA responses indicated several issues that raise the risk of consumer harm, discussed below.

In certain instances, there were delays in processing suspensions of administrative wage garnishments (AWG), followed by attempts by collectors to rectify the effects of those delays. Several servicers of commercially owned Federal student loans voluntarily suspended AWG collections. However, some employers

did not promptly suspend garnishment of consumer wages. As a result, collectors made additional efforts to contact the employers and to provide refunds for wages garnished after the suspension.

Examiners reviewed the potential for FDCPA compliance risks associated with new restrictions on wage garnishment and bank attachments. FDCPA violations can occur independent of whether State law has been violated. Nonetheless, when evaluating whether an action taken to enforce a judgment violates FDCPA section 808's prohibition of "unfair or unconscionable" debt collection practices, one fact the Bureau may consider is whether applicable law permits resort to garnishment or attachment of a consumer's assets in a particular set of circumstances. Several State laws or regulations promulgated during the review period appear to prohibit debt collectors from imposing new attachments on bank accounts or new wage garnishments on employers. Of the examined debt collectors that engage in litigation and judgment enforcement activities, several voluntarily stopped imposing new bank attachments and/or wage garnishments during the review period. Due to significant complexities and a rapidly shifting landscape of State restrictions, continued litigation and judgment enforcement during the pandemic could still pose compliance risks and, as a result, risks to consumers.

There were payment processing delays for some entities caused by the transition to remote work. Certain collectors experienced delays in processing payments that were sent by mail and received at a physical location which was temporarily inaccessible due to the pandemic. In those instances, examiners generally observed the entity retroactively posting payments effective on the date payment was delivered.

### 3.7 Deposits

**Market Response to Consumers & Industry Challenges**

As part of the CARES Act, Congress authorized direct monetary payments, known as Economic Impact Payments (EIPs), to many consumers. The CARES Act also increased the amount of State unemployment insurance consumers might receive. Direct deposit was the primary method of distribution for EIPs. Direct deposit was and is a significant distribution method for State unemployment insurance benefits. Due to the economic hardship caused by the pandemic, consumers' ability to access these benefits was critical.

Depository institutions responded to the challenges posed by the pandemic in several ways. Many institutions closed physical branch locations to protect the health of both their staff and customers. A number of institutions transitioned staff to remote work, increased call center staffing in order to deal with the influx of customer questions, and increased ATM deposit and withdrawal limits to maintain consumers' access to their funds.

In response to the pandemic, a number of institutions activated their existing disaster relief programs. Numerous institutions made temporary changes to existing policies and procedures and documented those changes in informal documents, including job aids, playbooks, and FAQs issued to employees. A few institutions also made changes to formal policies and procedures. Whether through existing disaster relief programs, temporary changes, or formal policy and procedure updates, many institutions reported taking actions to reach out to consumers to offer assistance and provide resources in connection with pandemic-related hardships.

**Consumer Risk**

Examiners' review of institutions' PA responses found several issues that elevate the risk of harm to consumers. The most commonly observed risks arose from the failure of institutions to fully implement the protections states put in place to protect consumers' access to the full amount of their government benefits, specifically EIPs and unemployment insurance benefits. Some states prohibited institutions from using EIPs or unemployment insurance benefits to cover charged-off loan obligations, fees owed to the institutions, or overdrawn account balances. Other states limited actions to garnish government benefits to satisfy judgments, attachments, or levies for third-party creditors.[17] These State actions took a number of different forms, including executive orders, emergency legislation, court orders, and State attorney general guidance.

Many institutions sought to identify, analyze, and, as appropriate, ensure compliance with State measures that imposed legal obligations on the institutions. But based on the limited information obtained through the PAs, examiners could not determine that all the institutions identified and/or

---

[17] The Coronavirus Response and Relief Supplemental Appropriation Act of 2021 provides many consumers with a second Economic Impact Payment. The legislation authorizing the payments directs financial institutions to treat these EIPs as exempt from garnishment orders.

analyzed compliance obligations under State laws with respect to exercising setoff rights and/or garnishing government benefits. Failure to properly identify, analyze, and, as applicable, comply with State actions poses a risk that consumers might be deprived of the full use of government benefits. Such a failure could, in turn, under certain circumstances, constitute an act or practice that violates Federal consumer financial law.

For those institutions that did waive setoff rights in response to State actions discussed above or on their own initiative, other consumer risks were identified. Institutions used a variety of methods to waive setoff rights. These methods included refunding fees that contributed to a consumer's account being overdrawn, permanently forgiving overdrawn account balances, and issuing checks to consumers with overdrawn accounts for the full amount of their EIPs or protected unemployment insurance benefits. Institutions most frequently waived setoff rights through the issuance of provisional credits in the amount of the overdrawn account balances. These credits would then be revoked at a later date, potentially leaving some consumers with a negative account balance.

Waiver of setoff rights allowed consumers access to the full amount of government benefits. At several institutions, examiners found risk when the institutions failed to clearly communicate to consumers how and when provisional credits would be revoked. This risk was exacerbated if the institutions lacked a clear policy preventing assessment of an overdraft fee when the revocation of provisional credit resulted in a negative account balance. Consumer complaints indicated confusion about the use and revocation of provisional credits. Examiners also observed a risk with respect to policies and procedures around the waiver or refund of account fees. In response to COVID–19, some institutions expanded existing account fee waiver or refund policies either through a blanket waiver or upon consumer request. These institutions informed consumers of the changes on their websites or via press releases. However, examiners observed a risk when the institutions failed to implement policies and procedures that clearly and consistently operationalized account fee waivers and refunds.

## 3.8 Prepaid Accounts

### Market Response to Consumers & Industry Challenges

Pandemic-related business closures led to millions of consumers receiving State unemployment insurance benefits. For a period of time, the CARES Act enhanced the amount of unemployment insurance benefits that consumers received. Many States issue prepaid cards as a method for disbursing unemployment insurance benefits. Aside from unemployment insurance benefits, some consumers received EIPs on prepaid cards. As a result, prepaid accounts experienced an unexpected spike in demand.

This rapid growth caused issues related to transaction and maintenance fees, service availability, and continuity. The industry encountered difficulty in fully staffing call centers to quickly answer questions and resolve conflicts relating to the significant increase in volume and number of prepaid accounts. Although depository institutions issue prepaid accounts, they often contract with third-party service providers to assist in managing the accounts. The compliance infrastructure at these third parties is generally less mature, which exacerbates the potential for consumer harm caused by unforeseen changes in the prepaid marketplace.

### Consumer Risk

Prepaid account issuers generally made changes to address staffing challenges and operational difficulties caused by the COVID–19 pandemic and the significant rise in volume and number of accounts. Nonetheless, examiners highlighted a few key COVID–19 related risks with respect to issuers of unemployment insurance benefit prepaid accounts.

Due to surge in demand, one institution lacked sufficient supply of the required disclosures and privacy notices and, rather than delay account access, mailed the prepaid account information to consumers without the required disclosures and privacy notices. To mitigate the lack of paper written disclosure, the institution included the address of a website where consumers could review the information online. The lack of paper disclosures presented a risk of harm as these consumers did not receive disclosures that included the terms of use and privacy notices as required by law.[18] These required disclosures cover,

among other things, the fee schedule and error resolution rights associated with the prepaid accounts. The institution addressed this issue by subsequently mailing the required disclosures and privacy notices to impacted consumers.

### 3.9 Small Business Lending

The Bureau has supervisory authority over large insured depository institutions and insured credit unions, many of which have originated PPP loans. Consistent with its authority to ensure compliance with the Equal Credit Opportunity Act (ECOA), the Bureau conducted PAs to assess potential fair lending risks attendant to the institutions' participation in the program. Below are the supervisory observations resulting from these PAs.

### Market Response to Consumers & Industry Challenges

The COVID–19 pandemic had a swift and dramatic impact on small businesses. Many small businesses were forced to shut down temporarily or reduce operations in response to mandatory State and local stay-at-home orders issued to reduce exposure to, and transmission of, COVID–19. Small businesses also experienced a significant drop in demand for goods and services and disruptions in their supply chains. Because of these impacts, many small businesses experienced a sharp drop in revenue and increased economic stress.

To address this problem, section 1102 of the CARES Act amended section 7(a) of the Small Business Act, 15 U.S.C. 636(a), to create a temporary small business lending program known as the PPP. Under the PPP, small businesses could receive loans from private lender to cover eligible payroll, costs, business mortgage payments and interest, rent, and utilities for either an 8- or 24-week period after disbursement. Each loan is fully guaranteed by the Small Business Administration (SBA), which administers the PPP; small business borrowers do not have to make any payments during the first six months of the loan term and may receive a deferral up to one year; and small businesses may receive complete or partial forgiveness of their loans if they use their loans to cover certain expenses and meet other requirements. A wide range of financial institutions were eligible to participate as lenders in the PPP, including institutions that normally do not participate in the SBA's

---

[18] Electronic Fund Transfer Act, 12 U.S.C. 1693 *et seq.*; Regulation E, 12 CFR 1005.15(c)(1); Regulation P, 12 CFR part 1016.

7(a) lending program.[19] This includes federally insured depository institutions, credit unions, and nonbanks.[20]

When the PPP opened on April 3, 2020, demand for PPP loans far exceeded the initial $349 billion of funding for PPP loans and those funds were exhausted in less than two weeks. Congress subsequently provided another $310 billion (including $60 billion specifically to be lent by smaller banks and credit unions), bringing the total funding for the PPP to $659 billion. The second round of funding became available on April 27, 2020 and was not exhausted. When the PPP closed on August 8, 2020, $133 billion remained available.

While the PPP was active, Congress made additional funds available, changed the term for new PPP loans, and revised other program requirements. The SBA also issued numerous interim final rules related to the program and lenders. PPP lenders were responsible for ensuring that their participation in the PPP complied not only with the CARES Act and SBA rules, but also with other applicable laws, including ECOA.

Fair Lending Risk

Examiners' review of small business lenders' PA responses identified certain issues that may pose fair lending risks.

In implementing the PPP, multiple lenders adopted a policy that restricted access to PPP loans beyond the eligibility requirements of the CARES Act and rules and orders issued by the SBA (an "overlay"). Specifically, several small business lenders restricted access by limiting eligibility for PPP loans to existing customers (an "existing customer overlay"). The Bureau's PA work in this area revealed that the existing customer overlay fell into two general categories:

(1) Restrictive policies that allowed only small businesses with a pre-existing relationship (or certain type of pre-existing relationship) with the institution the opportunity to apply for a PPP loan; and

(2) less restrictive policies that required small businesses without a pre-existing relationship to first become customers of the financial institution (usually by opening a business deposit account) and then apply for a PPP loan.

Examiners determined that an overlay restricting access to PPP loans for small businesses that do not have an existing relationship with the institution, while neutral on its face, may have a disproportionate negative impact on a prohibited basis and run a risk of violating the ECOA and Regulation B. The small business lenders provided business justifications for their use of existing customer overlays, with the majority of institutions noting that they adopted such overlays because of Know Your Customer legal requirements, the prevention of fraud, or both. Several institutions also offered other, operational reasons for adopting this overlay, including managing extreme demand and enabling the institution to process as many applications as possible before funds were depleted. Examiners noted the challenges faced by small business lenders in implementing the PPP during a nationwide emergency and found that the institutions' stated reasons for adopting their overlays reflected legitimate business needs during part or all of the review period. Examiners did not, however, conduct a full analysis of any institution's overlay, and did not make any determination about whether an institution's use of the overlay complies with ECOA or Regulation B. Examiners encouraged the small business lenders to consider the fair lending risks associated with participation in the PPP, in further implementation of the PPP, and in any new lending program and to evaluate and address any risks.

**4. Conclusion**

The Bureau is committed to being as transparent as possible about its supervisory findings and will continue to publish *Supervisory Highlights* to aid Bureau-supervised entities in their efforts to comply with Federal consumer financial law. While the Bureau's PA reviews are substantially complete, in some instances, examiners identified issues that require follow up. The Bureau will follow-up on risks identified during PAs in the course of its regular supervisory work and findings may be shared in future editions of *Supervisory Highlights*.

**5. Signing Authority**

The Director of the Bureau, Kathleen L. Kraninger, having reviewed and approved this document, is delegating the authority to electronically sign this document to Grace Feola, a Bureau Federal Register Liaison, for purposes of publication in the **Federal Register**.

Dated: January 19, 2021.

**Grace Feola,**
*Federal Register Liaison, Bureau of Consumer Financial Protection.*

[FR Doc. 2021–01601 Filed 1–26–21; 8:45 am]

**BILLING CODE 4810–AM–P**

## COUNCIL OF THE INSPECTORS GENERAL ON INTEGRITY AND EFFICIENCY

### Privacy Act of 1974; System of Records

**AGENCY:** Council of the Inspectors General on Integrity and Efficiency (CIGIE).

**ACTION:** Notice of a new system of records.

**SUMMARY:** CIGIE proposes to establish a system of records that is subject to the Privacy Act of 1974. Pursuant to Public Law 116–136, CIGIE proposes this system of records in furtherance of the statutory mandate of CIGIE's Pandemic Response Accountability Committee (PRAC) to promote transparency and conduct oversight of the funds disseminated per the Coronavirus Aid, Relief, and Economic Security Act (CARES Act); the Coronavirus Preparedness and Response Supplemental Appropriations Act of 2020; the Families First Coronavirus Response Act; and any other act primarily making appropriations for Coronavirus response and related activities.

**DATES:** This proposal will be effective without further notice on February 26, 2021 unless comments are received that would result in a contrary determination.

**ADDRESSES:** Submit comments identified by "CIGIE–5" by any of the following methods:

1. *Federal Rulemaking Portal: http://www.regulations.gov.*

Submit comments via the Federal eRulemaking portal by searching for CIGIE–5. Select the link "Comment Now" that corresponds with "CIGIE–5." Follow the instructions provided on the screen. Please include your name, company name (if any), and "CIGIE–5" on your attached document.

2. *Mail:* Council of Inspectors General on Integrity and Efficiency, 1717 H Street NW, Suite 825, Washington, DC 20006. ATTN: Virginia Grebasch/CIGIE–5, Notice of New System of Records.

3. *Email: comments@cigie.gov.*

**FOR FURTHER INFORMATION CONTACT:** Virginia Grebasch, Senior Counsel, Pandemic Response Accountability Committee, Council of the Inspectors

---

[19] The 7(a) loan program is the SBA's primary program for providing financial assistance to small businesses. The program's name comes from section 7(a) of the Small Business Act, 15 U.S.C. 636(a). The SBA offers several different types of loans through the program.

[20] Institutions that were not SBA-certified did have to apply to the SBA and receive delegated authority to process PPP loan applications.