NASA

**UNIDENTIFIED ANOMALOUS PHENOMENA**

Independent Study Team Report

## Members of the NASA Unidentified Anomalous Phenomena Independent Study Team

Chair
**Dr. David Spergel**
Simons Foundation

Panelists

**Dr. Anamaria Berea**
George Mason University

**Dr. Federica Bianco**
University of Delaware

**Dr. Reggie Brothers**
AE Industrial Partners

**Dr. Paula Bontempi**
University of Rhode Island

**Dr. Jennifer Buss**
Potomac Institute of Policy Studies

**Dr. Nadia Drake**
Science Journalist

**Mr. Mike Gold**
Redwire Space

**Dr. David Grinspoon**
Planetary Science Institute

Designated Federal Official
**Dr. Daniel Evans**
NASA Headquarters

**Capt. Scott Kelly, USN, Ret.**
NASA Astronaut, Ret.

**Dr. Matt Mountain**
Association of Universities
for Research and Astronomy

**Mr. Warren Randolph**
Federal Aviation Administration

**Dr. Walter Scott**
Maxar Technologies

**Dr. Joshua Semeter**
Boston University

**Dr. Karlin Toner**
Federal Aviation Administration

**Dr. Shelley Wright**
University of California, San Diego

*Front and back cover photos: views of the earth as photographed
from the Earth-orbital Apollo 4 unmanned space mission.*
*All photos are from NASA unless otherwise indicated.*

# TABLE OF CONTENTS

3    EXECUTIVE SUMMARY

7    FOREWORD

9    INTRODUCTION

11    RESPONSES TO STATEMENT OF TASK

21    OVERALL CONCLUSIONS AND RECOMMENDATIONS

23    ACKNOWLEDGEMENTS

24    WORK PRODUCTS: DISCUSSION



*Group Photo: Members of the NASA Unidentified Anomalous Phenomena Independent Study Team.*



This is a type of lightning known as a red sprite — a phenomenon that has rarely been photographed in this amount of detail. Some thunderstorms produce sprites, but most do not. Photo credit: Stephane Vetter (TWAN)

# EXECUTIVE SUMMARY

The study of Unidentified Anomalous Phenomena (UAP) presents a unique scientific opportunity that demands a rigorous, evidence-based approach. Addressing this challenge will require new and robust data acquisition methods, advanced analysis techniques, a systematic reporting framework and reducing reporting stigma. NASA – with its extensive expertise in these domains and global reputation for scientific openness – is in an excellent position to contribute to UAP studies within the broader whole-of-government framework led by the All-domain Anomaly Resolution Office (AARO).

> NASA is in an excellent position to contribute to UAP studies within the broader whole-of-government framework.

NASA has a variety of existing and planned Earth- and space-observing assets, together with an extensive archive of historic and current data sets, which should be directly leveraged to understand UAP. Although NASA's fleet of Earth-observing satellites typically lack the spatial resolution to detect relatively small objects such as UAP, their state-of-the-art sensors can be directly utilized to probe the state of the local earth, oceanic, and atmospheric conditions that are spatially and temporally coincident with UAPs initially detected via other methods. Thus, NASA's assets can play a vital role by directly determining whether specific environmental factors are associated with certain reported UAP behaviors or occurrences.

Next, the U.S. commercial remote-sensing industry offers a potent mix of Earth-observing satellites that offer imagery at sub- to several-meter spatial resolution, which is well-matched to the typical spatial scales of known UAP. Although every point on Earth does not have constant high-resolution coverage, the panel finds nonetheless that such commercial constellations could offer a powerful complement to the detection and study of UAP when coincident collection occurs.

At present, analysis of UAP data is hampered by poor sensor calibration, the lack of multiple measurements, the lack of sensor metadata, and the lack of baseline data. Making a concerted effort to improve all aspects is vital, and NASA's expertise should be comprehensively leveraged as part of a robust and systematic data acquisition strategy within the whole-of-government framework.

Moving forward, NASA should contribute to a comprehensive, government-wide approach to collecting future data. The importance of detecting UAP with multiple, well-calibrated sensors is paramount, and NASA could potentially leverage its considerable expertise in this domain to utilize multispectral or hyperspectral data as part of a rigorous data acquisition campaign.

The panel finds that artificial intelligence (AI) and machine learning (ML) are essential tools for identifying rare occurrences, potentially including UAP, within vast datasets. However, these powerful techniques will only work on well-characterized data gathered with respect to strong standards. NASA's extensive experience in the application of state-of-the-art computational and

data-analysis techniques should therefore be leveraged to provide critical assistance. Once again, appropriate data collection, curation, and distribution are paramount; NASA, with its world-leading experience in these aspects is well-positioned to play a leading role.

Engaging the public is also a critical aspect of understanding UAP. The panel sees several advantages to augmenting data collection efforts using modern crowdsourcing techniques, including open-source smartphone-based apps that simultaneously gather imaging data and other smartphone sensor metadata from multiple citizen observers worldwide. NASA should therefore explore the viability of developing or acquiring such a crowdsourcing system as part of its strategy. In turn, the panel finds that there is currently no standardized system for making civilian UAP reports, resulting in sparse and incomplete data devoid of curation or vetting protocols. NASA should play a vital role by assisting AARO in its development of this Federal system.

The negative perception surrounding the reporting of UAP poses an obstacle to collecting data on these phenomena. NASA's very involvement in UAP will play a vital role in reducing stigma associated with UAP reporting, which almost certainly leads to data attrition at present. NASA's long-standing public trust, which is essential for communicating findings about these phenomena to citizens, is crucial for destigmatizing UAP reporting. The scientific processes used by NASA encourage critical thinking; NASA can model for the public how to best approach the study of UAP, by utilizing transparent reporting, rigorous analysis, and public engagement.

Finally, the threat to U.S. airspace safety posed by UAP is self-evident. The panel finds that a particularly promising avenue for deeper integration within a systematic, evidenced-based framework for UAP is the Aviation Safety Reporting System (ASRS), which NASA administers for the FAA. This confidential and voluntary reporting system for pilots, air traffic controllers, and other professional aviation staff, receives approximately 100,000 reports per year. Although not initially designed for UAP collection, better harnessing it for commercial pilot UAP reporting would provide a critical database that would be valuable for the whole-of-government effort to understand UAP. In turn, NASA's long history of partnership with the FAA should be leveraged to investigate how advanced, real-time analysis techniques could be applied to future generations of air traffic management (ATM) systems.

## FRAMEWORK OF RECOMMENDATIONS

Although AARO leads the whole-of-government response to UAP, the panel recommends that NASA play an essential role within that framework. NASA should leverage its core capabilities and expertise to determine whether it should take a leading or supporting role in implementing a given recommendation.

## ORGANIZATION OF THIS REPORT

This report is organized as follows. We present a systematic response to the eight charge elements that formed the Terms of Reference that NASA provided to the Independent Study Team, followed by a detailed set of conclusions and recommendations. These responses stemmed from a series of sub-panel reports that the entire team deliberated in full at the public meeting held on May 31, 2023, all of which are included as work products toward the end of this report for full public transparency.

*An orbital sunrise photographed by an Expedition 40 crew member on the International Space Station.*



The spectacular aurora borealis, or the "northern lights," over Canada is sighted from the space station near the highest point of its orbital path.

# FOREWORD

Unidentified Anomalous Phenomena (UAP) are one of our planet's greatest mysteries. Observations of objects in our skies that cannot be identified as balloons, aircraft, or natural known phenomena have been spotted worldwide, yet there are limited high-quality observations. The nature of science is to explore the unknown, and data is the language scientists use to discover our universe's secrets. Despite numerous accounts and visuals, the absence of consistent, detailed, and curated observations means we do not presently have the body of data needed to make definitive, scientific conclusions about UAP.

At NASA, we use data and the tools of science to explore the unknown in the atmosphere and space. In June 2022, NASA established an external independent study team to find a way we can use our open-source data and resources to help shed light on the nature of future UAP. Much like a team of peer reviewers, NASA commissions independent study teams as a formal part of NASA's scientific process, and such teams provide the agency external counsel and an increased network of perspectives from esteemed scientific experts.

NASA's UAP Independent Study Team is made up of 16 experts from diverse backgrounds in science, technology, data, artificial intelligence, space exploration, aerospace safety, media and commercial innovation. They were assigned to pinpoint the data available around UAP and produce a report that outlines a roadmap for how NASA can use its tools of science to obtain usable data to evaluate and categorize the nature of UAP going forward. This is not a review of previous UAP incidents.

We thank the UAP Independent Study Team members for their service on the study and for their contributions towards the advancement of our nation's understanding of UAP. While we are still evaluating the report and assessing the team's findings and recommendations, NASA's Science Mission Directorate and the Agency are committed to keeping a clear and open pipeline for communication and resources with the Department of Defense's All-Domain Anomaly Resolution Office (AARO) to support its whole-of-government approach towards understanding and resolving UAP cases. NASA is appointing a Director of UAP Research to centralize communications and leverage NASA's extensive resources and expertise to actively engage in the whole-of-government UAP initiative. This individual will also ensure that the agency's vast analytical capabilities, including its proficiency in data management, machine learning and artificial intelligence, are contributed to the government's unified UAP effort.

At NASA, we are committed to openness, transparency, and scientific integrity and they are a central part of our operations. By setting up this independent study team, NASA gained important external perspectives from leading experts in our nation for how we can use our resources to advance the study of UAP data and explore the unknown in air and space for the benefit of all.

**Dr. Nicola Fox, Associate Administrator, Science Mission Directorate**



*A meteor streaks across the sky during the annual Perseid meteor shower*

# INTRODUCTION

Recently, many credible witnesses, often military aviators, have reported seeing objects they did not recognize over U.S. airspace. Most of these events have since been explained, but a small handful cannot be immediately identified as known human-made or natural phenomena. These events are now collectively referred to as Unidentified Anomalous Phenomena, or UAP[1].

A vital part of NASA's mission is exploring the unknown using the rigorous process of the scientific method. This means scrutinizing our assumptions and intuition; transparently and diligently collecting data; reproducing results; seeking independent evaluation; and finally, reaching a scientific consensus about the nature of an occurrence. The scientific method challenges us to solve problems by impartially evaluating our own ideas, by being willing to be wrong, and by following the data.

It is increasingly clear that the majority of UAP observations can be attributed to known phenomena or occurences. When it comes to studying such phenomena, our overarching challenge is that the data needed to explain these anomalous sightings often do not exist; this includes eyewitness reports, which on their own can be interesting and compelling, but are not reproducible and usually lack the information needed to make any definitive conclusions about a UAP's provenance. Thus, to understand UAP, a rigorous, evidence-based, data-driven scientific framework is essential.

This report offers a vision of how NASA could contribute to understanding the phenomena and how the agency's approach will complement the whole-of-government effort to understand UAP.

---

1 At the time that this study was initiated, Congress defined UAP as Unidentified Aerial Phenomena. After this study began, the term UAP was redefined as Unidentified Anomalous Phenomena.



A weather balloon sails into the sky after release from the Cape Canaveral weather station in Florida.

# RESPONSES TO STATEMENT OF TASK

**1** What types of scientific data currently collected and archived by NASA or other civilian government entities should be synthesized and analyzed to potentially shed light on the nature and origins of Unidentified Anomalous Phenomena (UAP)?

**FINDING**

NASA'S fleet of earth-observing satellites should play a powerful supporting role to determine the environmental conditions that coincide with UAP.

NASA has a variety of existing and planned Earth- and space-observing assets, together with an extensive archive of historic and current data sets, which should be used to address the challenges of detecting and/or understanding UAP. NASA's fleet of Earth-observing satellites collect the most data within the Earth system, yet they typically lack the spatial resolution to detect relatively small objects such as UAP. However, they still should play a powerful supporting role to determine the environmental conditions that coincide with UAP. For example, the advanced sensors on the Terra and Aqua missions should be directly utilized to retroactively probe the state of the local earth, ocean, and atmospheric conditions that are spatially and temporally coincident with UAP initially detected via other methods. Thus, NASA can help determine whether specific environmental factors are associated with reported UAP properties or occurrences.

There are other promising civilian capabilities that can be employed to scrutinize UAP. Assets such as the NEXRAD Doppler radar network (160 weather radars jointly operated by the FAA, U.S. Air Force, and National Weather Service) or the Geostationary Operational Environmental Satellites will be essential for distinguishing interesting objects from airborne clutter. Furthermore, forthcoming large-sky surveys enabled by ground-based telescopes such as the Vera C. Rubin Observatory will offer powerful complements in the search for anomalous objects beyond the Earth's atmosphere.

**FINDING**

It is essential to note the pivotal role that structured data curation plays in a rigorous and evidence-based framework to better understand UAP.

NASA also has substantial experience in Synthetic Aperture Radar (SAR), which can provide much higher angular resolution images of Earth, as well as confirm surface motion and change. The panel sees particular promise in future SAR-based Earth-observing satellites such as NISAR (NASA-ISRO Synthetic Aperture Radar) mission, a partnership with the Indian Space Research Organization. The excellent resolution of NISAR will provide valuable radar data that will potentially be critical for examining UAP directly, in addition to their environmental context. SAR systems will also provide critical validation of any truly anomalous properties, such as rapid acceleration or high-G maneuvers through the Doppler signatures they produce.

Irrespective of the source of the observation, it is essential to note the pivotal role that structured data curation plays in a rigorous and evidence-based framework to better understand UAP. To date, UAP data often consist of observations initially acquired for other purposes, which often lack adequate

11

metadata and are not optimized for systematic scientific analysis. Here, NASA – with its world-leading expertise in curation, archiving, and distribution of large volumes of data – can play a key role. NASA's adherence to FAIR (Findability, Accessibility, Interoperability and Reusability) data principles when generating curated data repositories enables both scientists and citizen scientists to conduct data-mining and meaningful analysis. In addition, due to the absence of a comprehensive system for gathering civilian UAP reports, there are inconsistencies in how data is collected, processed, and curated. The application of NASA's rigor to UAP data protocols will ultimately be essential for a detailed understanding of these phenomena.



**South Asian Object** (Image 1)
Footage taken by an MQ-9 of an unidentified object in South Asia with an apparent atmospheric wake or cavitation, later assessed as a likely commercial aircraft by the All-domain Anomaly Resolution Office. The cavitation is likely a sensor artifact resulting from video compression.

*The appearance of U.S. Department of Defense (DoD) visual information does not imply or constitute DoD endorsement.*

**②** What types of scientific data currently collected and held by non-profits and companies should be synthesized and analyzed to potentially shed light on the nature and origins of UAP?

The U.S. commercial remote-sensing industry offers a potent mix of Earth-observing sensors that have the collective potential to directly resolve UAP events. For instance, commercial satellite constellations provide imagery at sub- to several-meter spatial resolution, which is well-matched to the typical spatial scales of known UAP. In addition, the high temporal cadence offered by commercial remote-sensing networks can substantially increase the likelihood of providing retroactive coverage of UAP events that are initially observed via other means. The limitation on this data is that at any given time most of the Earth's surface is not covered by commercial satellites at high resolution — for a particular UAP event, we will need to be fortunate to obtain high-resolution observations from space.

Beyond this, the panel applauds the efforts undertaken in the private sector and U.S. academic community to employ one or more inexpensive ground-based sensors that are capable of surveying large areas of the sky. Such sensors, which could potentially be rapidly deployed to areas of known UAP activity may play a key role in establishing so-called "pattern-of-activity" trends, as well as potentially the physical characteristics of UAP themselves.

**FINDING**
The U.S. commercial remote-sensing industry offers a potent mix of Earth-observing sensors that have the collective potential to directly resolve UAP events.

**FINDING**

The standardization of collected information via well-crafted calibration will make it possible to carry out a rigorous scientific investigation into UAP. NASA's experience in this area will be vital.

Once more, however, robust data calibration is vital, and here NASA again can play an important advisory role. The calibration process ensures that information gathered from sensors and instruments is precise, dependable and devoid of any systematic errors or biases. In the case of UAP studies, where data often originates from instruments not specifically designed for detecting such objects, proper calibration becomes even more crucial. In turn, metadata, which provides contextual information such as sensor type, manufacturer details, noise characteristics and time of acquisition, must simultaneously be present for an accurate characterization of both a potential UAP as well as the sensor itself. Indeed, several apparent UAP have been demonstrated to be sensor artifacts once appropriate calibration and metadata scrutiny were applied. Although a substantial investment, the standardization of collected information via well-crafted calibration will make it possible to carry out a rigorous scientific investigation into UAP. NASA's experience in this area will be essential.

**3** What other types of scientific data should be collected by NASA to enhance the potential for developing an understanding of the nature and origins of UAP?

To improve our understanding of UAP, NASA should contribute to a comprehensive approach to collecting data within the broader whole-of-government framework to understand UAP. The importance of detecting UAP with multiple, well-calibrated sensors is paramount, and NASA should leverage its considerable expertise in this domain to potentially utilize multispectral or hyperspectral data as part of a rigorous campaign to acquire additional data on future UAP. In addition, forthcoming large-sky surveys enabled by Federal ground-based assets including the Vera C. Rubin Observatory will collect vast quantities of data, which can be directly used to search for anomalous objects beyond the Earth's atmosphere.

**FINDING**

NASA should leverage its considerable expertise in this domain to potentially utilize multispectral or hyperspectral data as part of a rigorous campaign.

Data signatures are vast, and theories that predict novel signatures help guide our searches. It is imperative to set clear evidence thresholds to avoid errors, especially with automated methods. Furthermore, purpose-built future sensors for UAP detection should be designed to adjust on millisecond timescales to aid better detection. In lockstep, alert systems should detect and share transient information quickly and uniformly.

The panel notes that, at present, gathering data on UAP is hampered by sensor calibration challenges and a lack of sensor metadata. In short, calibration ensures that future data gathered are reliable and accurate, while gathering metadata – such as the time, location, and sensor observing modes – ensures that the contextual and environmental factors of a recorded UAP event are well

known. Both, in turn, allow for systematic analyses of UAP events, and critically will enable the elimination of false positives due to sensor artifacts. Making a concerted effort to improve both aspects will be vital when gathering future data, and here NASA's expertise should be comprehensively leveraged as part of a robust and systematic data strategy within the whole-of-government framework.

The panel also sees several advantages to augmenting potential data collection efforts using modern crowdsourcing techniques, including open-source smartphone-based apps that simultaneously gather imaging data and other smartphone sensor data from multiple citizen observers. NASA should therefore explore the viability of developing or acquiring such a crowdsourcing system as part of a future data strategy.

**FINDING**

NASA's expertise should be comprehensively leveraged as part of a robust and systematic data strategy within the whole-of-government framework.

As stated above, NASA's fleet of Earth-observing satellites must also play a key role in collecting future data on environmental conditions coinciding with UAP sightings. Despite the mismatch in spatial resolution between the present generation of satellites and typical UAP events, by gathering and analyzing future satellite data, we will undoubtedly gain insights into the typical environmental factors associated with UAP. Future missions, such as the NOAA/NASA Geostationary Extended Observations (GeoXO) satellite system, will provide even more robust data that will prove important in UAP analysis. NASA should also leverage sensors that expand its observational reach, such as penetrating deeper into the ocean or at the air/sea interfaces.

Next, collection efforts from radio and optical astronomy that are designed for technosignature searches should be expanded from the Earth's atmosphere to the whole solar system. Additionally, near-Earth objects (NEO) programs also have significant data collections about phenomena close to Earth's atmosphere, which constitutes an untapped repository of data both for characterizing natural phenomena and anomalies. NASA should consider integrating these elements as part of a robust future-data strategy.

Finally, NASA's very involvement in gathering future data will play an important role in reducing stigma associated with UAP reporting, which very likely leads to data attrition at present. NASA's long-standing public trust, which is essential for communicating findings about these phenomena to citizens, is crucial for destigmatizing UAP reporting and scientific research. The scientific processes used by NASA encourage critical thinking; NASA can model for the public how to approach a topic, such as UAP, by applying transparent reporting and rigorous analyses when acquiring future data.

**Middle East Object**

Footage taken by an MQ-9 of an apparent silver, orb-like object in the Middle East. Due to limited data, the object remains unidentified.

*The appearance of U.S. Department of Defense (DoD) visual information does not imply or constitute DoD endorsement.*





④ Which scientific analysis techniques currently in production could be employed to assess the nature and origins of UAP? Which types of analysis techniques should be developed?

Artificial intelligence (AI) and machine learning (ML) have proven to be essential tools for identifying rare occurrences within vast datasets. These methodologies, combined with NASA's extensive experience and expertise, should be utilized to investigate the nature and origins of UAP by examining data from sources such as satellites and radar systems. However, the effectiveness of AI and ML in studying UAP depends critically upon the quality of the data used to train the AI and in subsequent analysis. At present, UAP analysis is more limited by the quality of data than by the availability of techniques. As a consequence, it is a higher priority to obtain better quality data than it is to develop new analysis techniques.

**FINDING**

AI and ML, combined with NASA's extensive expertise, should be utilized to investigate the nature and origins of UAP.

Once AARO and other agencies, including NASA, accumulate an extensive and well-curated catalog of baseline data, these can be used to train neural networks so that they can characterize deviations from normal. The panel finds that standard techniques that are routinely applied in astronomy, particle physics, and other areas of science can be adapted for these analyses.

When it comes to detecting anomalies – such as UAP – within datasets, there are two approaches. The first approach involves constructing a model that represents the expected signal characteristics then searching for any matches against this model. The second approach involves using a model of the background properties and searching for anything that deviates from that model. The panel notes that the first approach is difficult as we do not possess a consistent description of the physical characteristics of UAP. The second

15

approach, on the other hand, requires an understanding of what is considered normal and known in a given search area, which can then be distinguished from what is unusual and unknown. AARO has already begun this task by studying what "normal" phenomena such as solar glint or balloons look like to military sensors. The program of systematically calibrating observations of "normal" is an essential step before starting to search for the abnormal.

A third potential avenue for scientific analysis is to cross-correlate NASA's extensive databases with the locations and times of reported UAP events. Once an extensive list of UAP reports is made available, the panel regards this as a promising method for future analysis. Again, NASA's expertise in AI and ML will allow it to make a prominent contribution.

For any scientific analysis purposes, including UAP analysis, it is essential that the data used for AI and ML are collected according to rigorous standards. The data must be collected using calibrated instruments tailored to their respective use cases accompanied by metadata to facilitate calibration and contextual comprehension. Proper curation and integration of data are also critical for enabling scientific analysis. To establish a baseline understanding, an examination of known events with precisely calibrated instruments is also necessary. NASA, with its expertise in data calibration, management, and advanced analysis is well-positioned to take a central role in these efforts within the whole-of-government framework to assess UAP.

**FINDING**

NASA, with its expertise in data calibration, management, and advanced analysis is well-positioned to take a central role in these efforts.

**⑤ In considering the factors above, what basic physical constraints can be placed on the nature and origins of UAP?**

Observations of UAP to date are inconsistent and do not adhere to similar characteristics. As a consequence, it is difficult to put physical constraints on them at present, which provides a strong motivation for the rigorous, evidence-based framework articulated in this report. The strongest physical constraints are not on the anomalous events but on the conventional events: we know the range of velocities and accelerations that can be achieved by state-of-the art platforms, drones, balloons and planes. Deviations from this behavior, such as any well-characterized observation of velocities and accelerations outside of that range, are scientifically interesting for UAP assessment and analysis. The panel emphasizes that clearly determining distances is key to understanding and corroborating any claimed anomalous high-velocity and high-acceleration events, a fact borne out by AARO's findings that the vast majority of UAP have prosaic explanations.

**FINDING**

The panel regards placing physical constraints on UAP, together with the suite of plausible natures and origins, as being within reach.

If the whole-of-government framework to understanding UAP – with NASA playing a crucial role – were to implement the preponderance of steps prescribed above, then the panel regards placing physical constraints on UAP, together with the suite of plausible natures and origins, as being within reach. If all unidentified events move at conventional speeds and accelerations, this likely points towards a conventional explanation for these events. Convincing evidence of verified anomalous accelerations and velocity would point towards potentially novel explanations for UAP.

⑥ What civilian airspace data related to UAPs have been collected by government agencies and are available for analysis to a) inform efforts to better understand the nature and origins of UAPs, and b) determine the risk of UAPs to the National Air Space (NAS)?

Government agencies, including the FAA, gather civilian airspace data that can be analyzed to probe for UAP. These data include information obtained from air traffic control towers and radar systems. However it is essential to note that such data are not always optimized or suitable for rigorous scientific analysis of UAP. The observations almost always happen incidentally using instruments not specifically designed for detecting objects; furthermore, crucial contextual information in the form of metadata is often missing. Although civilian airspace data has been used by AARO to assist with the analysis of isolated UAP cases, the broad corpus of such data is unlikely to yield a global understanding of the size, movement, or nature of UAP.

**FINDING**

With its world-leading expertise in data curation and organization, NASA is well-positioned to advise on the best methodologies for establishing repositories of civilian airspace data.

Furthermore, at present, there is no standardized Federal system for making civilian UAP reports. While AARO is establishing a systematic mechanism for military and intelligence community UAP reports, current FAA guidelines instruct citizens wanting to report UAP to contact local law enforcement or one or more non-governmental organizations. As a result, the collection of data is sparse, unsystematic, and lacks any curation or vetting protocols.

Here, once more, NASA can provide important assistance to the whole-of-government effort to understand UAP. With its world-leading expertise in data curation and organization, NASA is well-positioned to advise on the best methodologies for establishing repositories of civilian airspace data.

17

**FINDING**

Leveraging the Aviation Safety Reporting System for commercial pilot UAP reporting would provide a critical database.

⑦ What current reporting protocols and air traffic management (ATM) data acquisition systems can be modified to acquire additional data on past and future UAPs?

It is clear to the panel that establishing a more robust and systematic framework and data repository for UAP reporting is essential. This particularly applies to civilian reporting of UAP: current FAA guidelines suggest that citizens wanting to report UAP contact their local law enforcement or one or more non-governmental organizations, which is inadequate for drawing scientific inferences. Although such eyewitness reports are often interesting and compelling, they are insufficient on their own for making definitive conclusions about UAP. Thus, their effective corroboration within a robust reporting and follow-up framework based on systematically gathered data (including the ATM system) can provide a useful tool for understanding UAP.

A particularly promising avenue for deeper integration within a systematic, evidenced-based framework for is the NASA's Aviation Safety Reporting System (ASRS), which NASA administers for the FAA. This system is a confidential, voluntary, non-punitive reporting system that receives safety reports from pilots, air traffic controllers, dispatchers, cabin crew, ground operators, maintenance technicians, and UAS operators that provides a unique data source for emerging UAS safety issues. ASRS receives reports describing close-calls, hazards, violations, and safety-related incidents. With 47 years of confidential safety reporting, ASRS has received more than 1,940,000 reports, averaging approximately 100,000 per year. Reports are received from all aspects of aviation operations. Although the system resides at NASA Ames and involves NASA employees, the ASRS program is solely funded by FAA and it is not part of NASA's Aeronautics activity. Although not initially designed for UAP collection, leveraging this system for commercial pilot UAP reporting would provide a critical database that would be valuable for the whole-of-government effort to understand UAP, and here NASA should provide technical assistance.

**South Asian Object** (Image 2)
Footage taken by an MQ-9 of an unidentified object in South Asia with an apparent atmospheric wake or cavitation, later assessed as a likely commercial aircraft by the All-domain Anomaly Resolution Office. The cavitation is likely a sensor artifact resulting from video compression.
*The appearance of U.S. Department of Defense (DoD) visual information does not imply or constitute DoD endorsement.*



**(8)** What potential enhancements to future ATM development efforts can be recommended to acquire data concerning future reported UAPs to assist in the effort to better understand the nature and origin of the UAPs?

NASA's deep experience in researching and developing air traffic management tools, together with its strong partnership with the FAA, will be pivotal to designing future ATM systems to acquire UAP data. At present, surveillance instruments are not designed to detect anomalous objects, and associated metadata are often absent. NASA should begin by developing new concepts and ideas for ATM systems, which enable these systems to assist in the effort to better understand UAP.

NASA should leverage its expertise by reviewing and demonstrating passive sensing techniques. NASA should also consider platforms that include new types of data such as imaging data and even multispectral or hyperspectral data. In turn, NASA could conduct research to see whether machine learning algorithms could be incorporated into future ATM systems to detect and analyze UAP in real-time. This research would represent a complex undertaking whose outcome could allow for substantial and systematic gathering UAP data as well as a robust characterization of the background. Once again, NASA's experience and expertise in these areas would allow it to provide critical assistance in identifying and evaluating new safety systems.

**FINDING**

NASA's strong partnership with the FAA will be pivotal to designing future air traffic management systems to acquire UAP data.



This NASA Space Shuttle STS-100 image captures naturally occuring von Karman vortices forming in clouds near Rishiri-to island in Japan, caused by a stable, low-cloud atmosphere flowing over a tall obstacle.

# OVERALL CONCLUSIONS AND RECOMMENDATIONS

We recommend that NASA play a prominent role in the whole-of-government effort to understand UAP by leveraging its extensive expertise to contribute to a comprehensive, evidence-based approach that is rooted in the scientific method. We specifically recommend that NASA utilize its existing and planned Earth-observing assets to probe the local environmental conditions associated with UAP that are initially detected by other means. In so doing, NASA can directly probe whether certain environmental factors are coincident with known UAP. We further recommend that NASA explore enhancing collaborations with the U.S. commercial remote-sensing industry, which offer powerful constellations of high-resolution Earth-observing satellites.

At present, the detection of UAP is often serendipitous, captured by sensors that were not designed or calibrated for this purpose, and which lack comprehensive metadata. Coupled with incomplete data archiving and curation, this means that the origin of numerous UAP remain uncertain. The importance of detecting UAP with multiple, well-calibrated sensors is thus paramount, and accordingly we recommend that NASA leverage its considerable expertise in this domain to potentially utilize multispectral or hyperspectral data as part of a rigorous data acquisition campaign.

In turn, the panel finds that sophisticated data analysis techniques, including artificial intelligence and machine learning, must be used in a comprehensive UAP detection campaign when coupled with systematic data gathering and robust curation. Here, we recommend that NASA's expertise in these key areas be contributed to the whole-of-government UAP effort.

The panel finds that public engagement in the effort to better understand UAP will be vital. NASA, by lending its name to UAP studies, is already helping to reduce stigma associated with reporting. Beyond this, we recommend that NASA explore the viability of developing or acquiring a crowdsourcing system, such as open-source smartphone-based apps, to gather imaging data and other smartphone sensor data from multiple citizen observers as part of a wider effort to more systematically gather public UAP reports.

Lastly, we recommend that the Aviation Safety Reporting System (ASRS) for commercial pilot UAP reporting be better leveraged, providing a critical database for the whole-of-government effort to understand UAP. The agency's long history of partnership with the FAA should also be capitalized to investigate how advanced, real-time analysis techniques could be applied to future generations of air traffic management (ATM) systems.

In conclusion, NASA is uniquely positioned to contribute to a robust and systematic approach to studying UAP, furthering its mission of advancing scientific knowledge, technical expertise, and exploration. When considering the above recommendations, and according to budget priorities, NASA should leverage its core capabilities and expertise to determine whether it should take a leading or supporting role in implementing a given recommendation. The positioning of NASA's role should further be situated within the context of the broader whole-of-government approach to understanding UAP.



*Sunset over the Indian Ocean, photographed by an Expedition 23 crew member on the International Space Station.*

# ACKNOWLEDGEMENTS

The compilation of this report has been a significant task, made possible only through the collective efforts of a dedicated team of professionals. We would like to take a moment to acknowledge and express our gratitude to those who have been instrumental in this endeavor.

At the forefront, our profound appreciation goes to NASA for their unwavering support and commitment. We are deeply grateful to NASA Administrator Sen. Bill Nelson for his visionary approach, recognizing the importance of NASA's involvement in this initiative. Dr. Daniel Evans, our Designated Federal Official, has provided exceptional leadership and guidance throughout this study. Our gratitude extends to Science Mission Directorate Associate Administrator Dr. Nicky Fox and her predecessor, Dr. Thomas Zurbuchen, for their invaluable advice. Additionally, a special mention must be made of NASA's Earth Science Division for graciously hosting this activity under the Earth Science Advisory Committee.

Handling media inquiries with finesse and professionalism, Katherine Rohloff, NASA's UAP Press Secretary, has been an essential pillar in our communication strategy. Her dedication to ensuring accurate and effective communication of our findings to the public has been commendable.

Our sincere thanks go to Dr. Sean Kirkpatrick, the Director of AARO. His expertise and collaboration have been invaluable, enriching our understanding and providing a solid foundation for our committee's work.

Last, but certainly not least, the staff of NASA Research and Education Support Services (NRESS) have been the unsung heroes behind the scenes, ensuring that every logistical detail was meticulously addressed. We would like to extend our heartfelt gratitude to Renee Atkins and Sharon Smallwood for their dedication and unwavering support.

To all mentioned and the countless others who have contributed behind the scenes, we extend our deepest gratitude. Your commitment, expertise, and passion have been the driving force behind this report, and we are profoundly thankful for your contributions.

## WORK PRODUCTS: DISCUSSION

The panel's responses to the eight charge elements in the Terms of Reference, as well as the panel's overall recommendations and conclusions, all stemmed from a series of sub-panel reports that the entire team deliberated in full at the public meeting held on May 31, 2023. The reports are included in this section for full public transparency.

### UAP in a Scientific Context

On June 9, 2022, NASA announced an independent study of unidentified anomalous phenomena (UAP), with a focus on identifying how the Agency could address the question scientifically. Recently, many credible witnesses, often military aviators, have reported seeing objects they did not recognize over U.S. airspace. Most of these events have since been explained, but a small handful cannot be immediately identified as known humanmade or natural phenomena. These events are now collectively referred to as UAP. But are these objects real or are they sensor artifacts? Are they a threat to aerospace safety? Are they a threat to U.S. national security? Are they unknown natural phenomena? What else could they be?

This report outlines several approaches NASA could take if the Agency chooses to address the question of UAP.

A vital part of NASA's mission is to explore the unknown. Often, the most exciting aspect of exploration is discovering unexplained phenomena. After discovery, the next step in charting the unknown requires applying rigorous scientific approaches to understand an observation. This means scrutinizing our assumptions and intuition; transparently and diligently collecting data; reproducing results; seeking independent evaluation; and finally, reaching a scientific consensus about the nature of an occurrence. It was Thomas Jefferson who, in an 1808 letter, wrote: "A thousand phenomena present themselves daily which we cannot explain, but where facts are suggested, bearing no analogy with the laws of nature as yet known to us, their verity needs proofs proportioned to their difficulty."

Today, we summarize Jefferson's conclusion as "extraordinary claims require extraordinary evidence." This is especially true when it comes to claims that could profoundly change how we view our place in the cosmos. Over millennia, we've developed ever more powerful instruments to study the universe and each time we've looked at the sky—or our planet—in a different way, we've observed surprising and perplexing phenomena that at first defied explanation.

For example, in 1967, astrophysics graduate student Jocelyn Bell-Burnell discovered a pulsing cosmic radio source. Its pulses were so regular—just like a ticking clock—that it at first seemed artificial in origin. But she eventually discovered that her confoundingly periodic cosmic object was a rapidly rotating neutron star: a pulsar. Today, scientists know of thousands of pulsars, and they can harness their clock-like rotation to probe everything from nuclear physics to gravitational waves produced by colliding supermassive black holes. In the 1960s, satellites also detected mysterious gamma-ray bursts. These initially looked like evidence for covert Cold War-era nuclear tests. Now, astronomers know that these tremendously energetic explosions are caused when massive stars cataclysmically collapse and die, and when stellar corpses violently collide.

Science has also solved mysteries that originated much closer to home, including the mechanisms behind bioluminescence and glittering atmospheric "sprites"—beautiful orange-red flashes of light that were reported for more than a hundred years but only scientifically explained recently. The crucial steps in understanding these events were the systematic collection of data, the rigorous testing of hypotheses, the development of new observational techniques to study unknowns, and an open and transparent scientific discussion.

The scientific method challenges us to solve problems by stringently evaluating our own ideas, by being willing to be wrong, and by following the data into unknown territory—wherever it may lead us. As Carl Sagan wrote in *The Demon-Haunted World*, "science carries us toward an understanding of how the world is, rather than how we would wish it to be."

Science is a process that reveals reality rather than sculpts it—no matter how unsatisfying or confusing that reality might be.

That includes the question of whether UAP have an extraterrestrial origin. There is an intellectual continuum between hypothesizing that faraway extraterrestrial civilizations might produce detectable technologies, and looking for those technologies closer to home. But in the search for life beyond Earth, extraterrestrial life itself must be the hypothesis of last resort—the answer we turn to only after ruling out all other possibilities. As Sherlock Holmes said, "Once you eliminate the impossible, whatever remains, no matter how improbable, must be the truth."

To date, in the peer-reviewed scientific literature, there is no conclusive evidence suggesting an extraterrestrial origin for UAP. When it comes to UAP, the challenge we have is that the data needed to explain these anomalous sightings often do not exist; this includes eyewitness reports, which on their own can be interesting and compelling, but aren't reproducible and usually lack the information needed to make any definitive conclusions about a phenomenon's provenance.

This report offers a vision of how NASA could contribute to understanding the phenomena and how the agency's approach might complement efforts by other federal entities. Congress has made the Department of Defense's All-domain Anomaly Resolution Office (AARO) the lead Federal organization for resolving these anomalies. With its emphasis on open scientific inquiry, NASA can complement AARO's work.

The following sections highlight the information provided to the panel, and our conclusions, over seven months of fact-finding.

### What is NASA's Role?

NASA is a science-driven agency committed to exploring and understanding air and space. That mission includes tackling unknown phenomena, whether in the farthest reaches of the universe or closer to home, as well as here on Earth. For more than 60 years, the Agency has focused on astronomy, astrophysics and aeronautics; it also uses space-based assets to study our home world's aquatic, atmospheric, cryospheric, and terrestrial systems.

As a result of NASA's long and storied history of space (and space-based) research, the Agency has amassed a robust and rigorous scientific arsenal for investigating unexplained observations, which will be crucial for studying UAP. The Agency has a variety of existing and planned assets—plus a trove of historic and current data sets—that could be used to address the challenges of detecting and/or understanding UAP. NASA research also employs a wide range of observation and analytical methods, using calibrated sensors, advanced data analysis, modeling, and cutting-edge computational and data visualization tools. As such, NASA's missions, data, and technical expertise in science and engineering could help to investigate and understand reported UAP.

The panel considered how existing and/or planned NASA missions, data, experience, or studies might contribute to the understanding of UAP using global satellite and suborbital observations. Chiefly, NASA's scientific discoveries, results, and databases are public. Already, an extensive data archive from NASA satellites and foreign partner space agencies is openly available, ensuring transparency as well as the opportunity for citizen scientist participation.

In Earth science, NASA's core mission is to understand and protect our home planet. Passive radiometric Earth-observing missions, such as NASA's Terra and Aqua satellites, currently employ a range of sensors that collect information about Earth's land, ocean, atmosphere, and other components. These data sets could help to identify weather, ocean, and other environmental characteristics coincident with UAP observations. New Earth-observing missions, such as NISAR (NASA-ISRO Synthetic Aperture Radar), a partnership with the Indian Space Research Organization, will provide valuable radar data that could be helpful for examining UAP directly, in addition to their environmental context.

These newer observations live within a historical context. For more than 50 years, global time series data gathered by NASA (with partners including the National Oceanic and Atmospheric Administration [NOAA]) have allowed researchers to examine trends within and across components of Earth's systems. Such long-term data sets help scientists better understand the evolving Earth, while also identifying natural and anthropogenic variability in the Earth system. Knowing that baseline allows researchers to detect and examine Earth's environment for anomalies. Examples of naturally occurring anomalies include events such as harmful algal blooms, hurricanes and typhoons, changes in the jet stream, drought and fire conditions, and bioluminescence in the ocean. Understanding the origins of such large-scale phenomena is at the heart of NASA's Earth science mission.

NASA has a long and successful record of partnering with other Federal agencies. In the study of UAP, the establishment of a NASA/AARO liaison will be an important step towards enabling interagency cooperation.

In addition to the Agency's Earth science research programs, NASA also supports programs in astrobiology. Some of these programs investigate life in extreme environments on Earth—with the hypothesis that such organisms and conditions could be analogs for habitable environments elsewhere in the universe. Other programs investigate the possibility that extraterrestrial life exists.

In astrophysics and space sciences, NASA is focused on understanding the universe. Looking for anomalies in both air and space will likely lead to novel discoveries; some might reveal entirely new physics, while others will be interesting and important even if their explanations lie in conventional physics. In time-domain astrophysics, researchers are increasingly interested in identifying unusual, transient events. At radio wavelengths, this includes the recent discovery of fast radio bursts, which astronomers are still struggling to understand. Recently, most innovation has been accomplished by combining information from multiple observatories that operate at different electromagnetic wavelengths, from radio and optical telescopes on the ground to ultraviolet and gamma-ray telescopes in space, and even with different messengers: neutrinos and gravitational waves. Observatories with extensive sky coverage and dense time coverage are ideal for spotting near-Earth objects with large proper motions and phenomena with anomalous time evolution. For example, the NASA Planetary Defense Coordination program is dedicated to leveraging NASA and partner astrophysical research assets to identify and classify near-Earth objects—such as asteroids—that move rapidly across the sky.

In addition to its extensive Federal and international partnerships, NASA is also uniquely capable of leveraging public and private partnerships—for example, working with commercial partners in Earth-observing satellite data. These collaborations could result in new technologies that may be useful in observing and understanding UAP. Partners, including other Federal agencies such as NOAA and the Federal Aviation Administration (FAA), may collect data that could help to understand UAP. Moreover, NASA has a strong record of international collaboration, which could be beneficial, as the study of these phenomena would benefit from global cooperation and data sharing. Given NASA's experience with long-term scientific projects and missions, the Agency is well equipped to handle the extensive and ongoing study that UAP investigation likely requires.

Many scientists and aviators consider the study of UAP to be "fringe" at best. The panel heard a first-hand account of the type of stigma that may come from reporting UAP, which almost certainly leads to attrition in reporting.

Recently, the DoD began encouraging military aviators to disclose anomalies they encountered, which resulted in a significant increase in UAP reports: Between March 5, 2021, and August 30, 2022, DoD received a total of 247 new UAP reports, according to an analysis published by the Office of the Director of National Intelligence (ODNI) in 2022. In contrast, 263 reports had been filed in the 17 years prior to March 2021. Dr. Sean Kirkpatrick reported at this panel's public meeting that AARO has now collected more than 800 reported events. This includes the addition of data from the FAA. AARO and ODNI assess that the observed increase in the reporting rate is partially due to a

better understanding of the possible threats that UAP may represent—either as flight safety hazards or as potential adversary collection platforms. This is partially due to reduced stigma surrounding UAP reporting.

The negative stigma that impacts reporting rates in turn impacts the study of UAP. In testimony before the Senate Commerce, Science and Technology Committee on February 15, 2023, the Acting FAA Administrator was asked about the process for civilian reporting of balloons. The Administrator, who is also a pilot, indicated that the protocols and reporting of balloons may be spotty. Thus, even as such reports are being encouraged, there are still barriers to reporting observations. For example, how or where should someone make a report? Will the reporter be believed or shamed? Will any action be taken to understand the event?

NASA could play an important role in destigmatizing the UAP reporting process. NASA's long-standing public trust, which is essential for communicating findings about these phenomena to the public, is also crucial for destigmatizing UAP reporting. The scientific processes used by NASA encourage critical thinking and skepticism; within this framework, there should be no credulous acceptance of unlikely reports with unlikely explanations. NASA can model for the public how to approach a topic, such as UAP, by applying transparent reporting and rigorous analyses.

Further, the NASA brand is trusted, global, and positive, representing science, curiosity, and technological achievement in the face of adversity. NASA serves as an example of professionalism and leadership in technological advancement. The NASA logo is enough to generate interest and credibility; studies of things that were previously fringe moved into the mainstream when NASA became involved. Prominent examples of NASA's involvement in public life include slogans like "NASA is with you when you fly," which promote aviation safety. In turn, every U.S. commercial aircraft and every U.S. air traffic control tower has NASA-supported technology on board.

NASA's public announcement of its UAP Independent Study Team membership was met with interest and spurred both positive and negative feedback. At least one scientist serving on the study team reported receiving negative (hate) mail from colleagues due to their membership. Others were ridiculed and criticized on social media. Study Team members also noted firsthand knowledge of colleagues who were warned to stay away from research in areas like extraterrestrial technosignatures, which could damage their scientific credibility and promotion potential. These experiences further confirm the negative stigma associated with studying unusual or unexplained phenomena. Such criticism, either by detractors or by proponents of the extraterrestrial hypothesis, are anathema to the scientific method, which NASA always has and will continue to promote in an objective and open-minded fashion.

As a Federal agency, NASA can make it safer for researchers to explore data within the civilian aerospace domain by starting that work within the Agency itself. NASA can look at how civil data is shared, study how reporting can be incentivized, and help to engage the community. For example, NASA can rally the civil space community through requests for information, by convening conferences, by offering grand challenges, and other activities.

Many Federal, state, local, private, and other domestic and international partners collect data and observations that could be relevant for understanding UAP. As an example, NASA's potential to study the universe is enhanced through partnerships with other agencies, such as the National Science Foundation (NSF) and the Department of Energy (DoE), which are currently building facilities such as the Vera C. Rubin Observatory that will generate data that may be useful for understanding UAP in space. NASA's ability to study Earth is enhanced through partnerships with NSF, which supports Antarctic research. The Antarctic is a superb environment for collecting meteorites. With its low level of human activity, it is a low "clutter" environment for identifying anomalies. Such sparsely occupied airspaces may offer a low background environment for UAP searches; however, it is unclear as to whether or not constraining the search geographically would exclude their presence, or whether environmental phenomena could also be a significant, location-dependent source of noise.

The Federal partnership between AARO and NASA already provides a foundation for a collaborative examination of UAP events. In addition, NASA and AARO should engage other agencies, as appropriate and as needed.

27

A well-known UAP event is the "GoFast" video, recorded by navy aviators from the USS Theodore Roosevelt. A still frame from this video is shown in the Figure below, where the infrared camera has locked onto a small object in the center. The video gives an impression of an object skimming above the ocean at a great velocity. But analysis of the numerical information on the display reveals a less extraordinary interpretation.




The circled numbers in the image provide the information needed to estimate the object's altitude and velocity. This information includes (1) elevation angle of the camera (negative = downward), (2) azimuth angle of the camera, (3) target range in nautical miles, (4) the aircraft's altitude in feet, (5) time reference in seconds, and (6) indicated air speed in knots. Using items 1, 3, and 4, plus a bit of trigonometry, we calculate that the object is at an altitude of 13,000 feet, and 4.2 miles from the ocean behind it (see middle panel). Given that the aircraft's groundspeed is about 435 mph, we may conclude that the impression of rapid motion is at least partly due to the high velocity of the sensor, coupled with the parallax effect.

We can use other information from the display to place some limits on the true velocity of the object. This analysis is summarized in the right-hand panel, which depicts an overhead view of the encounter during a 22-second interval. The jet was banking left at about 15° during this time, which corresponds to an approximate turning radius of 16 kilometers. We know the range and bearing of the object at the start (t=0s) and end (t=22s) times. Using the calculated true air speed (TAS) and a bit more trigonometry, we find the object moved about 390 meters during this 22-second interval, which corresponds to an average speed of 40 mph. This is a typical wind speed at 13,000 feet.

Our calculation has neglected wind effects on the aircraft, and thus there is uncertainty in this result. But the analysis reveals that the object need not be moving at an extraordinary velocity. Note also that the object appears bright against a dark ocean for these display settings. This indicates that the object is colder than the ocean. There is thus no evidence of heat produced by a propulsion system. This further supports the conjecture that the object is most likely drifting with the wind. The availability of additional data would enable a more firm conclusion about the nature of this object.

Original GoFast video, released by the Department of Defense:
*https://www.navair.navy.mil/foia/documents*

28

U.S. Federal agencies that could support the effort to understand UAP include the DoD, Department of State, the FAA, the Department of Commerce (DoC) and major agencies within DoC including NOAA, the National Institute of Standards and Technology, and the Bureau of Ocean Energy Management, plus the DoE and NSF.

## Data on UAP

*Status of Existing Data*

NASA collects an enormous amount of data using highly-calibrated, validated equipment from a variety of environments and domains across the entire Earth. Could NASA bring this same approach of rigorous science to UAP?

Before we can apply the scientific method to understanding an unusual phenomenon, the relevant data must first meet standards for data-driven approaches. Many such standards have been codified over time, including the FAIR data principle—an acronym for Findability, Accessibility, Interoperability, and Reusability[2]. We followed these and other similar principles when reviewing the current status of data on UAP, and that analysis led to the findings and recommendations in this report.

UAP data are rarely, if ever, collected in a concerted effort to understand the phenomenon; they are usually coincidental observations. Often, observations of UAP are made using instruments or sensors that have not been designed or calibrated to detect anomalous objects, and to constrain their movement parameters. Metadata (meaning sensor type, manufacturer, noise characteristics, time of acquisition, instrument sensitivity, information about the data storage such as bit-depth, location of the sensor, conditions of the sensor such as temperature, exposure characteristics, and so on) are often absent, making calibration and a thorough understanding of context difficult. So, there is correspondingly limited information associated with many of the unresolved UAP reports—even if several reports are accompanied by photographic or videographic evidence.

As a result, existing observations are neither optimized for studying UAP nor are they suited for a systematic scientific analysis.

In addition, much of the data collected by military sensors or intelligence satellites are classified—often because of what the imagery could reveal about U.S. technical capabilities to our adversaries, and not because of what is actually in the images. While essential for security, these classified observations enhance the sense of mystery and conspiracy surrounding UAP, and they present an obstacle to scientific inquiry.

For many events, the data and metadata did not enable a conclusive characterization of the size, motion, or nature of the UAP. Yet, where it did, such as in the "GoFast" UAP video, the apparent anomalous behavior of the UAP can often be explained by the motion of the sensor platform[3].

In contrast, NASA observations are made using well-calibrated instruments that have been designed for their specific use cases. This is how NASA can scientifically approach the study of Earth- and space-based phenomena.

In science, data need to be reproducible, and hypotheses falsifiable—the scientific method works by systematically analyzing data with the intent to falsify a hypothesis.

As a general principle, the data should support measurement that can rule out specific explanations or interpretations, leaving us with no choice but to embrace its opposite. In the case of UAP, the hypothesis we seek to reject (or "null hypothesis") is that the UAP have phenomenology consistent with known natural or technological causes. Eyewitness reports should be considered along with corroborating sensor data in the study of UAP as reports may reveal patterns (for example, clusters in time or location). Yet, without calibrated sensor data to accompany it, no report can provide conclusive evidence on the nature of UAP or enable a study into the details of what was witnessed. While witnesses may be inherently credible, reports are not repeatable by others, and they do not allow a complete investigation into possible cognitive biases and errors (such as accuracy in perception, or misperception caused by environmental factors, errors in the recording device, judgment or misjudgment of distance or speed, for

2 *https://www.nature.com/articles/sdata201618*
3 Dr. Sean Kirkpatrick's presentation to this committee, May 31, 2023

example). Therefore, the reports do not alone constitute data that can support a repeatable, reproducible analysis, and the hypothesis that what was witnessed was a manifestation of known natural or technological phenomena cannot be falsified.

*Collecting New Data*
The instrumental characteristics of the equipment that can potentially capture UAP data are important information that should be available for researchers studying the observations. This is essential for a data-driven study of UAP. These characteristics may include lab-measured (rather than field-reported) error rates of sensors that are routinely used by both civilian and military aircraft; modeling of optical "ghosting" in the images due to scattering of solar and lunar glints within the camera system; solar or bright star glints from oceans' surfaces; and noise sources intrinsic to the sensors themselves.

Multisensor platforms are important for providing a complete picture of a UAP event. An object's motion should be recorded, as well as its shape (imaging data), color (multispectra or hyperspectral data) and any sounds and other characteristics. Crowd-sourced observations that are standardized can also offer important metadata information that can be used to filter and classify events.

The panel sees an advantage to augmenting potential data collection efforts using modern crowd-sourcing techniques, including open-source smartphone-based apps. Using open-source software is consistent with NASA's commitment to transparency. From multiple near-simultaneous observations with smartphones, imaging and sound data could be collated, and metadata used to triangulate an object's location and estimate its velocity and size.

Such a database could be developed through a partnership involving AARO, NASA, and commercial partners. The collected data would need to meet the standards described above, so platform developers would need to focus on constructing a data architecture that would support such collection. NASA can use its experience in citizen science projects to help minimize data noise, systematic errors, and cognitive biases related to human observed events (as opposed to sensors).

Once an anomalous signal is identified, new discovery infrastructure may be needed to characterize it in full. Collecting additional data on a rapidly evolving phenomenon of interest has become a common practice in astrophysics, but collection of what in astrophysics is referred to as "follow-up data" requires a high level of automation in the collection, reduction, (real time) analysis of the discovery data, and robotization of follow-up facilities. While NASA has historically paved the way for this mode of observing by developing and supporting the General Coordinates Network (GCN) that enables rapid coordination of observations from ground and space assets, consideration of developing such an infrastructure should follow after careful planning of the discovery data as outlined above as such a plan is significantly resource-intensive. If systematic studies of these events continue to reveal anomalies, then future studies may consider optimizing such a system of follow-up observations.

*Data Curation and Integration*
There is no standardized Federal system for making civilian UAP reports. While the DoD is establishing a systematic mechanism for military UAP reports, current FAA guidelines instruct persons wanting to report UAP to contact local law enforcement or a non-governmental organization such as the National UFO Reporting Center[4]. This results in inhomogeneously collected, processed, and curated data.

Integrating NASA's open, civilian dataset with DoD's more focused, restricted information would take some effort. Additionally, data integration opportunities exist with NOAA. Assets such as the NEXRAD Doppler radar network (160 weather radars jointly operated by the FAA, U.S. Air Force, and National Weather Service) or the Geostationary Operational Environmental Satellites may be very useful for distinguishing interesting objects from airborne (wind-borne) clutter.

---

4 https://www.faa.gov/air_traffic/publications/atpubs/atc_html/chap9_section_8.html

Commercial remote sensing systems could be another source of high-quality UAP-relevant data, as high-resolution, high-cadence imagery captured by dense satellite constellations could resolve UAP events. For instance, commercial constellations provide daily (or more frequent) cadence imagery, at sub- to several- meter spatial resolution. However, integrating anomalous events across platforms, including radar data and commercial downward looking satellites, is an expensive exercise.

In addition to integration, data curation is also an important part of the scientific approach. Currently, studying even a single UAP event requires a heavy lift in retrieving data (and metadata, when available), which at the moment is entirely manual. It cannot be automated due to the poor organization and curation of the data. Organized data repositories are needed to facilitate automation in retrieving UAP data—and therefore, to facilitate the systematic, scientific approach to studying UAP. NASA's extensive experience in data calibration, cleaning, curation, management, and distribution, and its practice of making all of its data accessible to the public, could be leveraged to set up curated data repositories for the study of UAP. These repositories could include data from NASA assets that are suitable for the study of UAP, as well as crowd-sourced data from NASA-related platforms.

Curated public repositories of UAP data would facilitate data mining (or knowledge discovery from data) by scientists and citizen scientists. Several platforms built for analyzing scientific data have led to historical scientific discoveries. For example, the *Galaxy Zoo,* a platform that collects astrophysical data and enables citizen-scientist projects, led to the discovery of Boyajian's Star—a star with unique and peculiar fluctuations in brightness that at one point was considered a potential signature of alien technology. Years later, the star's behavior was understood to be the work of a disk of disrupted comets.

A strategy that encourages citizen analysis of UAP data would bring an element of transparency to the field that could help combat biases, preconceived skepticism, and mistrust of authorities. Opening the analysis to a large audience would also improve robustness: Multiple competing but independent teams, working on solving science's biggest questions, provide an additional layer of verification. As an example, the unexpected finding that the universe is expanding at an accelerating rate (because of the mysterious force that we now call "dark energy") is a good example of how that might work. In the 1990s, two independent teams simultaneously found evidence for the accelerating cosmos using data that had been collected and analyzed independently.

### Analyzing UAP Data

When searching for a signal in data, scientists often have to separate and extract it from a complex background of signals produced by unrelated phenomena—commonly referred to as simply "background," noise, or clutter. Therefore, when looking for rare and unusual events, a common strategy is to search where there is little background noise. For example, neutrino experiments are often conducted underground (e.g. the Gran Sasso National Laboratory in Italy, IceCUBE in Antarctica); most particles cannot reach those depths because they are absorbed by the Earth. Meteorite hunters are often most successful in Antarctica—any rock found on top of a glacier is an interesting object.

In contrast, the airspace near many military sites is a challenging place to search for UAP: human aircrafts, drones, balloons, and other objects, are all significant sources of background.

Geographically, sparsely occupied airspaces—such above the South Pole—may offer a low background environment for UAP searches. But UAP are poorly understood, and it's not clear whether limiting the search geographically would exclude their presence, or whether environmental phenomena could also be a significant, location-dependent source of noise. Another background-limiting strategy would be to examine astronomical plates for satellites prior to 1959, when Sputnik, the first artificial satellite of Earth[5] launched. (Although, if something unusual were to be found in historical astronomical plates, it would be difficult to verify its nature with additional data, as historical records may be incomplete, lost, intractable, not reproducible, and at best laborious to cross-reference.)

---

[5] https://www.sciencedirect.com/science/article/pii/S0094576522000480

Fortunately, modern analytical techniques have improved our ability to find extremely rare signals within a sea of clutter, whether that is one Higgs event in $10^{10}$ collisions with the Large Hadron Collider, or a small number of photons from an exoplanet hiding in a billion stellar background photons. If the background cannot be minimized, it has to be characterized in detail and completely; detailed knowledge of the signatures (morphological, spectroscopic, kinematic) of all known airborne events need to be incorporated to eliminate spurious detections of known phenomena. This requires an extensive study of known events with accurately calibrated instruments.

There are numerous balloons and drones in the air at any moment. Observers may report some of these conventional objects as anomalies. The DoD already has the responsibility of alert response to unexplained aircraft in U.S. airspace. NASA could be a partner in the search for aerospatial events by enabling cross-identification with anomalies in the Earth-space environment. Since NASA data are already public and offered to the world in well-curated repositories accessible programmatically, the Agency's portfolio is set up to enable cross-referencing with NASA data and contribute to this characterization.

A database that supports the characterization of background signals should include information about the launch rate of balloons (weather, scientific, commercial, hobbyist, and military—where allowed by national security considerations); number of aircraft in the sky across the United States and the globe; daily drone launch rate within U.S. airspace; as well as characteristics of the appearance and motion capabilities of these items.

There are two approaches to detecting anomalies in large datasets. If you are looking for a needle in a haystack, one approach is to have a detailed model of the properties of needles and look for anything that looks like a needle. The other approach is to have an accurate model of the properties of hay and look for anything that looks different from hay.

In the first approach, if one knows the signal to expect, a model (or simulations) can be developed to look for that signal in large datasets. While we may be able to anticipate the sorts of signals produced by physical systems that adhere to known laws of physics, we cannot comprehensively envision all possible signals that could explain UAP, or that come from new technology or new physics (were it adversarial, extraterrestrial, or a naturally occurring but as-of-yet unknown phenomena).

The alternative approach to detecting anomalies requires a deep and thorough knowledge of what is normal and known, which can subsequently be separated from what is anomalous and unknown.

Machine learning has emerged as a powerful tool for the search for rare events, such as the creation of a Higgs Boson at an accelerator, the detection of rare cancer types, or the detection of fraudulent credit card charges to intrusions in cyber infrastructure. Machine learning and AI can play a role in the study of UAP, but not until the data both meet the standards described above and enable an extensive characterization of known and anomalous signals.

A recommendation about which methodologies specifically should be applied to this problem cannot be given at this time, as that selection depends on the nature of the data to be analyzed. Thus this question should be asked after (or ideally together with) the questions pertaining to UAP observing platforms and curated repositories for UAP data. Once the nature of the data is established, selecting algorithms for their analysis can be completed.

However, in the broad and lively domain of anomaly detection it is likely that methodologies for studying UAP already exist or can be adapted from analytical methods developed in other fields. Developing entirely new methodologies will likely be unnecessary and even a waste of resources, though adapting existing methods will still require some amount of dedicated effort. NASA could leverage its name, broad reach, and popularity to encourage and support an extensive review of existing methods for anomaly detection in the context of multidisciplinary conferences, workshops, and data challenges with mock datasets.

### Observations Beyond Earth's Atmosphere

Even if all of the UAP events have conventional origins, the search for signs of life beyond Earth is a compelling scientific quest. For many years, researchers in astrobiology and SETI, the Search for Extraterrestrial Intelligence, have focused on developing the techniques and methods needed to spot life's signatures in the cosmos. To do that, they must first identify an anomalous signature—perhaps something suggestive of life—and then determine if that signature has an explanation based on known phenomena or if it reveals previously undetected biological or even technological activity.

These NASA-supported scientific communities have relevant experience in first determining and then communicating whether observations that might at first appear extraordinary actually justify making extraordinary claims[6,7].

Many of NASA's science missions are, at least in part, focused on answering the question of whether life exists beyond Earth. Those investigations include missions looking for biosignatures, perhaps on Mars or the icy moons orbiting Jupiter and Saturn—as well as farther afield, in the ratios of molecules present in exoplanet atmospheres.

Searching for signs of alien technology is a natural extension of those investigations. In 2017, Jill Tarter, one of the pioneers in the scientific search for extraterrestrial intelligence, coined the term "technosignatures" to capture the breadth of technologies that might be detectable. Today, we consider technosignatures to be the fingerprints of an advanced civilization in the same way that we consider metabolic byproducts, or ratios of atmospheric gases, to be the fingerprints of biology.

NASA funded short-lived searches for radio technosignatures decades ago. More recently, the agency funded a study of potential atmospheric technosignatures on exoplanets; it also supported a survey for the waste heat generated by Dyson spheres in existing infrared data. Such surveys provide useful astrophysical data even in the absence of a technosignature discovery. In addition, solar system exploration offers multiple possibilities for technosignature searches at modest additional costs. These studies could provide scientifically useful results whether or not they identify technosignatures.

NASA is the lead agency for solar system exploration. It already has an active program of detecting objects in our solar neighborhood using both ground-based and space-based facilities, and it could leverage those capabilities to search for objects in space with anomalous motion or trajectories. For example, we are capable of launching spacecraft that can escape Earth's orbit—and even escape the Sun's gravity. A more advanced civilization could be capable of building crafts that can travel much faster than the 45 km/s escape velocity from Earth's orbit, or even the 600 km/s escape velocity from our Galaxy. Interstellar travel would likely require such speeds and may entail travel at relativistic velocities. Searching for high velocity objects moving through our solar system is an example of a high risk of failure/high value of return study. In addition to looking for anomalous velocities in new or existing datasets, search programs could target objects with unusual light curves, acceleration, spectral signatures, or other relevant anomalies.

Currently planned or existing NASA missions can widen their scope to include searching for extraterrestrial technosignatures in planetary atmospheres, on planetary surfaces, or in near-Earth space. These searches generally wouldn't require changes in hardware or data acquisition, but may simply require new directions in data analysis. For example, high sensitivity studies of the stable Earth-Moon Lagrange points might conceivably find technosignatures but would likely have a high scientific payoff, such as possibly finding remnants of the collision that formed our Moon.

At this point there is no reason to conclude that existing UAP reports have an extraterrestrial source. However, if we acknowledge that as one possibility, then those objects must have traveled through our solar system to get here. Just as the galaxy does not stop at the outskirts of the solar system, the solar system also includes Earth and its environs. Thus, there is an intellectual continuum between extrasolar technosignatures, solar system SETI, and potential unknown alien technology operating in Earth's atmosphere. If we recognize the plausibility of any of these, then we should recognize that all are at least plausible.

---

6 Community Report From the Biosignatures Standards of Evidence Workshop - *https://arxiv.org/abs/2210.14293*
7 National Academies Independent Review of the Community Report from the Biosignature Standards of Evidence Workshop: Report Series Committee on Astrobiology and Planetary Sciences (2022) - *https://nap.nationalacademies.org/catalog/26621/independent-review-of-the-community-report-from-the-biosignature-standards-of-evidence-workshop*





No. 12-1436
STATE OF WEST VIRGINIA SUPREME COURT OF APPEALS

# State v. Webster

Decided Oct 18, 2013

No. 12-1436

2013-10-18

State of West Virginia, Plaintiff, Respondent v. Ricky D. Webster, Defendant, Petitioner

Brent D. Benjamin

(Berkeley County 11-F-199)

## MEMORANDUM DECISION

Petitioner Ricky D. Webster, by counsel Sherman L. Lambert Sr., appeals the Circuit Court of Berkeley County's order entered on November 1, 2012, that denied his motion for a new trial, and sentenced him to the statutory term of not less than ten nor more than twenty-five years for the offense of sexual assault in the second degree, and to the statutory term of not less than two nor more than ten years for the offense of assault during the commission of a felony, with sentences to run concurrently. Petitioner was further sentenced to twenty years of supervised release. The State, by counsel Cheryl K. Saville, filed a response.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

On July 23, 2011, petitioner raped K.H.[1] in the area of Commerce Street, just off North Queen Street, in Martinsburg, West Virginia. Petitioner and the victim were acquaintances. K.H. was drinking with some friends at the Moose Lodge that evening. She called petitioner on her cell phone to talk. He invited her to a party nearby. K.H. left the Moose Lodge around 11:30, and met petitioner to go to the party for some drinks. On the way to the party, petitioner grabbed K.H. by her neck, dragged her by the hair across a gravel road to a remote location, and brutally raped her. Afterward, K.H. called 911, and she was treated for her injuries at an area hospital.

[1] In view of the sensitive nature of this case, this Court will refer to the victim by her initials. *Clifford K. v. Paul S.*, 217 W.Va. 625, 630 n.1, 619 S.E.2d 138, 143 n.1 (2005).

In October of 2011, a grand jury indicted petitioner on charges of two felony counts of sexual assault in the second degree and one felony count of assault during the commission of a felony. After a three-day trial in July of 2012, a jury returned a verdict convicting petitioner of Count Two, sexual assault in the second degree, and Count Three, assault during the commission of a felony. The jury acquitted petitioner on Count One, a separate charge of sexual assault in the *2 second degree.

On October 15, 2012, the matter came before the court for a hearing on post-trial motions and for sentencing. The circuit court denied petitioner's

State v. Webster    No. 12-1436 (W. Va. Oct. 18, 2013)

motion for a new trial, and sentenced him as set forth above. The final order was entered on November 1, 2012, and this appeal followed.

Petitioner raises two assignments of error in this appeal, including an ineffective assistance of counsel claim. Petitioner also contends that the circuit court erred by imposing strict time limitations on closing summation. For the reasons set forth below, we affirm the order of the circuit court.

Petitioner raises an ineffective assistance of counsel claim as his first assignment of error. Traditionally, an ineffective assistance of counsel claim is not cognizable on direct appeal.

> We have urged counsel repeatedly to think of the consequences of raising this issue on direct appeal. Claims that an attorney was ineffective involve inquiries into motivation behind an attorney's trial strategies. *See State v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (1995). Without such facts trial counsel's alleged lapses or errors will be presumed tactical moves, flawed only in hindsight. What is more, in the event a defendant pursues his claim on direct appeal and it is rejected, our decision will be binding on the circuit court through the law of the case doctrine, 'leaving [defendant] with the unenviable task of convincing the [circuit court] judge that he should disregard our previous ruling.' *U.S. v. South,* 28 F.3d 619, 629 (7th Cir.1994). That is why in *Miller* we suggested that a defendant who presents an ineffective assistance claim on direct appeal has little to gain and everything to lose.

*State ex rel. Daniel v. Legursky,* 195 W.Va. 314, 317 n.1, 465 S.E.2d 416, 419 n.1 (1995).

We decline to address this issue on direct appeal because the record is insufficient. The claim of ineffective assistance of counsel would more appropriately be addressed pursuant to a petition for writ of habeas corpus. If he desires, petitioner may pursue a petition for writ of post-conviction habeas corpus. We express no opinion on the merits of this issue or of any habeas petition.

Petitioner's remaining assignment of error is that the circuit court erred by not providing notice to counsel, and then imposing a thirty-minute time limitation on closing summation. He argues that the purpose of West Virginia Trial Court Rule 42.04(b) is to provide an opportunity for counsel to give a closing summation to the jury without the circuit court intermittently interrupting with a "stop watch" approach to the remaining time left.

To resolve this issue, this Court employs the standard of review articulated in Syllabus Point 3 of *State v. Vance,* 207 W.Va. 640, 535 S.E.2d 484 (2000): *3

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

We also note that "a trial court has broad discretion in controlling argument before the jury and that counsel should be afforded wide latitude in presenting a case." *Dawson v. Casey,* 178 W.Va. 717, 721, 364 S.E.2d 43, 47 (1987).

The West Virginia Trial Court Rules state, in pertinent part, that "[t]he time of [closing] argument in any case may be determined and regulated by the court, but the convenience of counsel will be consulted." T.C.R. 42.04(b). Additionally, the United States Supreme Court has found that the

3

State v. Webster    No. 12-1436 (W. Va. Oct. 18, 2013)

judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He [or she] may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. [The judge] may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects [the judge] must have broad discretion.

*Herring v. New York,* 422 U.S. 853, 862 (1975). *Herring* was quoted with approval by this Court in *State v. Webster,* 218 W.Va. 173, 176, 624 S.E.2d 520, 523 (2005).

In the instant proceeding, the circuit court afforded petitioner's counsel the opportunity to make a closing summation. The circuit court gave cues to petitioner's counsel during his closing summation indicating how much time he had remaining. Petitioner's counsel even stopped to ask how much time he had left during one exchange.

Furthermore, the record reflects that petitioner's counsel was provided some additional latitude when the circuit court gave him a final warning to take a minute to wrap up since he was "already over time."

We find no indication from a plain reading of the record that petitioner was prejudiced in any way or that counsel's argument suffered due to the circuit court's time limitation on closing summation. Therefore, this Court does not conclude that the circuit court abused its discretion or deprived petitioner of a fair trial.

For the foregoing reasons, we affirm the order of the Circuit Court of Berkeley County, entered on November 1, 2012.

4    Affirmed. *4

## CONCURRED IN BY:

Chief Justice Brent D. Benjamin
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II

casetext
Part of Thomson Reuters

No. 95
Supreme Court of North Carolina

# State v. Fletcher

301 N.C. 515 (N.C. 1980)  ·  271 S.E.2d 913
Decided Dec 1, 1980

No. 95

Filed 2 December 1980

Homicide 21.7 — second degree murder — sufficiency of evidence

> Evidence was sufficient for the jury in a second degree murder prosecution where it tended to show that defendant and the victim were passengers in an automobile; the two were having a discussion; defendant shot the victim in the back of the head; the driver proceeded down a dirt road for 70 to 75 yards whereupon defendant dragged the victim's body into the woods and shot it six or seven more times; defendant took a wallet and approximately $50 off the victim and returned to the car; and defendant returned to the site of the crime approximately six weeks later and moved the body elsewhere.

DEFENDANT appeals from judgment of Fountain, J., 24 March 1980 Criminal Session, ONSLOW Superior Court.

Rufus L. Edmisten, Attorney General, by Elisha H. Bunting, Jr., Assistant Attorney General, for the State.

Richard S. James, attorney for defendant appellant. *517

517

Justice BROCK took no part in the consideration or decision of this case.

In a bill of indictment, proper in form, defendant was charged with the murder of Jimmy Leroy Dulaney on 23 May 1979 in *516 Onslow County. For reasons not disclosed by the record, he was placed on trial for murder in the second degree only.

516

Benjamin Duval testified that on and prior to 23 May 1979 he and defendant were both members of the United States Marine Corps and were stationed at Camp LeJeune in Onslow County. At defendant's request, he drove defendant and a man named Jimmy Leroy Dulaney away from the base during the lunch hour on 23 May 1979. Defendant said they wanted to go to "another guy's house," and Duvall followed the directions given by defendant. Defendant rode in the back seat and Dulaney in the front seat beside the driver. They drove along Highway 24 toward Swansboro. Defendant and Dulaney were discussing something about hash. Shortly before reaching Swansboro, they turned down the road to Belgrade and proceeded two or more miles. At that point, defendant shot Dulaney in the back of the head and told Duval to keep driving. Defendant put a pair of old blue jeans over Dulaney's head and told Duval to drive down a dirt road, which he did for about seventy to seventy-five yards and stopped. Defendant dragged Dulaney's body into the woods, a distance of fifty to sixty feet, and then shot the body six or seven more times. Defendant took a wallet and approximately fifty dollars off the victim, returned to the car and told Duval to remain silent because he was an accomplice now. They returned to the base at Camp LeJeune.

casetext
Part of Thomson Reuters

State v. Fletcher 271 S.E.2d 913 (N.C. 1980)

On 4 July 1979, Duval and defendant returned to the site of the crime and moved the body elsewhere. Parts of the body were found on 1 August 1979 at both locations. Duval's testimony was corroborated in many respects by other witnesses. Incriminating letters written by defendant were also introduced in evidence.

Duval further testified he had entered a plea of guilty in this case and faced a sentence of twenty years in prison.

Defendant offered no evidence.

The jury convicted defendant of murder in the second degree and he was sentenced to life imprisonment. He appealed to this Court urging errors noted in the opinion.

HUSKINS, Justice.

Defendant contends the State's evidence was insufficient to repel his motion for judgment of nonsuit made at the close of the State's evidence. Denial of that motion constitutes his first assignment of error.

It is elementary that a motion to nonsuit requires the trial court to consider the evidence in its light most favorable to the State, take it as true, and give the State the benefit of every reasonable inference to be drawn therefrom. State v. Cook, 273 N.C. 377 160 S.E.2d 49 (1968). Whether the evidence is direct, circumstantial, or both, if there is evidence from which a jury could find that the offense charged had been committed and that defendant committed it, the motion to nonsuit should be overruled. State v. Goines, 273 N.C. 509, 160 S.E.2d 469 (1968). When so considered, the evidence in this case is sufficient to support a conviction for murder in the first degree. There is substantial evidence of every material element of first degree murder, including premeditation and deliberation as well as felony murder, i.e., a murder committed in the perpetration of a felony. Defendant's guilt or innocence of second degree murder was therefore a question for the jury. The record contains abundant evidence of an unlawful killing done with malice. Defendant cannot complain that a benevolent State saw fit to spare his life. The motion for compulsory nonsuit was properly denied.

Defendant's motion to set aside the verdict is merely formal and requires no discussion. Such motion is addressed to the discretion of the trial court, and refusal to grant it is not reviewable absent abuse of discretion. State v. Downey, 253 N.C. 348, 117 S.E.2d 39 (1960); State v. Reddick, 222 N.C. 520, 23 S.E.2d 909 (1943). No abuse of discretion is shown, and the motion was properly denied. State v. McNeil, 280 N.C. 159, 185 S.E.2d 156 (1971).

Notwithstanding the overwhelming evidence of defendant's guilt, we have examined the entire record and find no prejudicial error. The judgment must therefore be sustained.

No error.

Justice BROCK took no part in the consideration or decision of this case. *518

casetext
Part of Thomson Reuters

2



# Yarborough v. Yarborough, 290 U.S. 202 (1933)

Overview    Opinions

**Syllabus**

## U.S. Supreme Court

**Yarborough v. Yarborough, 290 U.S. 202 (1933)**

**Yarborough v. Yarborough**

**No. 14**

**Argued October 12, 13, 1933**

**Decided December 4, 1933**

**290 U.S. 202**

*Syllabus*

1. A decree of a state court fixing the obligation of a divorced father for the support and education of his minor daughter *held* binding, under the full faith and credit clause of the Constitution, on the

Page 290 U. S. 203

courts of another state to which the daughter and the divorced mother had removed and in which it was sought to force additional contributions from the father by attachment of his local property. P. 290 U. S. 208 *et seq.*

2. By the law of Georgia, a decree in a divorce suit fixing the permanent alimony that the husband must pay for the support and education of his minor child may be entered by consent of the husband and wife before the rendition of the two concurring verdicts which the law makes necessary for the granting of total divorce; it becomes unalterable after the expiration of the term at which the total divorce was granted. P. 290 U. S. 209.

3. The provision which the Georgia law makes for permanent alimony for the child does not vest a property right in him, but is an incident of the divorce proceeding. Jurisdiction of the parents in that suit confers jurisdiction over the minor's custody and support. P. 290 U. S. 210.

4. Hence, by the Georgia law, a consent (or other) decree in a divorce suit fixing permanent alimony for a minor child is binding upon him, although the child was not served with process, was not made a formal party to the suit, and was not represented by guardian *ad litem*. P. 290 U. S. 210.

5. Appearance of both parents in the divorce proceeding in Georgia, the domicile of the father, gave the Georgia court complete jurisdiction of the marriage status and, as an incident, power to finally determine the extent of the father's obligation to support the child, though the child was residing in another state when the judgment was entered. P. 290 U. S. 211.

6. The fact that the child became a resident of the other state did not enable that state to impose additional duties on the father, who continued to be domiciled in Georgia. P. 290 U. S. 212.

168 S.C. 46, 166 S.E. 877, reversed.



# Webster v. Reproductive Health Services, 492 U.S. 490 (1989)

Overview    Opinions    Materials

**Argued:**          **Decided:**
April 26, 1989       July 3, 1989

**Syllabus**

## U.S. Supreme Court

**Webster v. Reproductive Health Svcs., 492 U.S. 490 (1989)**

**Webster v. Reproductive Health Services**

**No. 88-605**

**Argued April 26, 1989**

**Decided July 3, 1989**

**492 U.S. 490**

*Syllabus*

Appellees, state-employed health professionals and private nonprofit corporations providing abortion services, brought suit in the District Court for declaratory and injunctive relief challenging the constitutionality of a Missouri statute regulating the performance of abortions. The statute, *inter alia:* (1) sets forth "findings" in its preamble that "[t]he life of each human being begins at conception," and that "unborn children have protectable interests in life, health, and wellbeing," §§ 1.205.1(1), (2), and requires that all state laws be interpreted to provide unborn children with the same rights enjoyed by other persons, subject to the Federal Constitution and this Court's precedents, § 1.205.2; (2) specifies that a physician, prior to performing an abortion on any woman whom he has reason to believe is 20 or more weeks pregnant, must ascertain whether the fetus is "viable" by performing "such medical examinations and tests as are necessary to make a finding of [the fetus'] gestational age, weight, and lung maturity," § 188.029; (3) prohibits the use of public employees and facilities to perform or assist abortions not necessary to save the mother's life, §§ 188.210, 188.215; and (4) makes it unlawful to use public funds, employees, or facilities for the purpose of "encouraging or counseling" a woman to have an abortion not necessary to save her life, §§ 188.205, 188.210, 188.215. The District Court struck down each of the above provisions, among others, and enjoined their enforcement. The Court of Appeals affirmed, ruling that the provisions in question violated this Court's decisions in *Roe v. Wade,* 410 U. S. 113, and subsequent cases.

*Held:* The judgment is reversed.

851 F.2d 1071, reversed.

THE CHIEF JUSTICE delivered the opinion of the Court with respect to Parts I, II-A, II-B, and II-C, concluding that:

1. This Court need not pass on the constitutionality of the Missouri statute's preamble. In invalidating the preamble, the Court of Appeals misconceived the meaning of the dictum in *Akron v. Akron Center for*



**Drug Enforcement Administration**

———————

**Andrew Lawton, Acting**
Special Agent in Charge - Detroit
@DEADetroitDiv

# Agents In Ohio Seize 44 Pounds Of Heroin And 142 Pounds Of

# Methamphetamine From A Mexican Source Of Supply

———

April 03, 2018
**For Immediate Release**

**Contact:** Brian McNeal

**Phone Number:** (571) 362-1498

**CLEVELAND, Ohio.** - Two Mexican nationals and a Cleveland man were charged in federal court after law enforcement agents seized more than 140 pounds of methamphetamine in Hudson, believed to be the largest seizure of meth in Ohio history.

Tyrone Rogers, 36, Hector Manuel Ramos-Nevarez, 26, and Gilbert Treviso-Garcia, 24, are charged with conspiracy to possess with intent to distribute methamphetamine.

They were arrested after DEA agents seized approximately 82 pounds of crystal methamphetamine from 7592 Olde Eight Road in Hudson. They also seized an additional 60 pounds of liquid meth from the same warehouse.

The seizure of crystal methamphetamine came the same week another Mexican national was arrested with approximately 44 (20 kilograms) of heroin on State Route 8 in Akron. Octavio Barragan-Manzo was indicted Tuesday on one count of possession with intent to distribute heroin.

"Although we in Northeast Ohio are far from the border, these cases demonstrate that the threat posed by Mexican criminal organizations to our region is very real," U.S. Attorney Justin E. Herdman said. "International drug trafficking organizations are active right here in our backyard and they seek to profit from the misery of our friends and neighbors struggling with addiction. The destruction caused by heroin and fentanyl is well documented, and now we are seeing an influx of crystal methamphetamine and cocaine. Law enforcement will work vigilantly to choke off the supply of these deadly drugs here in Ohio, and we need to come together as a community to reduce the demand."

"These seizures are yet another example of the prevalence of drugs and the demand for drugs in the Cleveland area and surrounding communities," said DEA Special Agent in Charge Timothy Plancon. "The DEA continues our efforts to target drug traffickers especially those contributing to the opioid epidemic in America."

Akron Police Chief Kenneth Ball said: "This case represents a win for law enforcement and our citizens.  It reflects the dedication of our investigators and strength of partnering organizations that join with us to make our communities safer.  Unfortunately, it also represents that the threat of illegal drug activities remain formidable.  I look forward to a sentencing that will properly protect us from these drug trafficking predators."

"Law enforcement in Ohio is working every day to stop those bringing these deadly drugs into our state," said Ohio Attorney General Mike DeWine. "Task forces operating as part of my office's Ohio Organized Crime Investigations Commission will continue to work in partnership with state, local, and federal authorities to intercept drugs before they can be abused."

Rogers traveled from Cleveland to the La Quinta Inn in Macedonia last month, where he picked up two men later identified as Ramos-Nevarez and Treviso-Garcia. Together, they traveled to a residence at 226 Barrington Place East in Aurora. Rogers drove the two men between Barrington Place East and the location on Olde Eight Road several times, according to court documents.

Investigators executed a delayed-notice search warrant at 7592 Olde Eight Road on March 24, where they seized approximately 82 pounds of crystal methamphetamine. The location appeared to be a crystal methamphetamine processing facility used to make, package and distribute the drug, according to court documents.

Since it was a delayed-notice warrant, no notification was left at Olde Eight Road. Investigators listened to several conversations about who had "broken into" the location. Rogers and others believed it was an inside person who robbed them, according to court documents.

Investigators intercepted telephone calls in which Rogers got the "green light" (believed to be from his Mexican supplier) to kill the

person Rogers believed stole his drugs. Rogers said people were going to "knock his head in," according to court documents.

Investigators arrested Rogers, Ramos-Nevarez and Treviso-Garcia on March 24, believing they were going to kill the person they incorrectly believed took the 82 pounds of crystal methamphetamine from 7592 Olde Eight Road. Investigators found an additional 60 pounds of liquid meth during another search of that location. Another search of other locations associated with Rogers resulted in the seizure of four firearms, according to court documents.

In the heroin case, Barragan-Manzo was arrested on March 21 after he was found with 20 kilogram-sized packages containing

heroin. Barragan-Manzo was stopped driving on State Route 8 in Akron, according to court documents.

An Ohio State Highway Patrol canine positively alerted to the presence of drugs. Law enforcement officers then located 20 brick-shaped objects which later tested positive for heroin. A subsequent search of a location in Akron resulted in the seizure of three pistols, a rifle and a shotgun, according to court documents.

The Barragan-Manzo case was investigated by the DEA, Akron Police Department, Ohio State Highway Patrol, Summit County Sheriff's Office and the Ohio Organized Crime Investigations Commission. It is being prosecuted by Assistant U.S. Attorney Henry F. DeBaggis.

The methamphetamine case is being investigated by the Cleveland DEA Task Force, which includes representatives from the Lake County Narcotics Agency, Cuyahoga County Sheriff's Office, Euclid Police Department, Aurora Police Department, Summit County Sheriff's Office, Boston Heights Police Department, Cleveland Heights Police Department, Cleveland Division of Police, Ashtabula County Sheriff's Office, Ohio State Highway Patrol, Ohio BCI and U.S. Border Patrol. It is being prosecuted by Assistant U.S. Attorney Marisa T. Darden.

If convicted, the defendant's sentence will be determined by the Court after review of factors unique to this case, including the defendant's prior criminal record, if any, the defendant's role in the offense and the

characteristics of the violations.  In all cases, the sentence will not exceed the statutory maximum and, in most cases, it will be less than the maximum.

An indictment is a charge and is not evidence of guilt. A defendant is entitled to a fair trial in which it will be the government's burden to prove guilt beyond a reasonable doubt.

###



**Drug Enforcement Administration**

**Orville O. Greene**
Special Agent in Charge - Detroit
@DEADetroitDiv

# Seventeen People Indicted In Federal Court For Conspiracy

# To Manufacture And Sell Crack Cocaine In Ohio

September 06, 2017
**For Immediate Release**

**Contact:** Brian McNeal

**Phone Number:** (571) 362-1498

**17 kilos of cocaine and over $500,000 in cash seized in investigation; 12 additional people charged in state court**

**COLUMBUS, Ohio** - Seventeen people were indicted in federal court for their role in a conspiracy to purchase large amounts of powder cocaine, cook the drug into crack

cocaine and then sell it in and around Medina County, law enforcement officials said.

Indicted in federal court are: Troy Bankhead, 47, of Cleveland; Dona Battle, 44, of Cleveland; William Battle, 45, of Cleveland; Aaron Watson, 31, of Medina; Anthony Patterson, 50, of Columbia Station; Carlos Tripp, 44, of Medina; Dale Lind, 58, of Medina; Douglas Cameron, 48, of Medina; Erica Latten, 29, of Cleveland; Fannie Tripp, 60, of Medina; Felicia Finowski, 49, Columbia Station; Jennifer Cayce, 38, of Medina; Jermaine Tripp, 36, of Medina; John Spickler, 38, of Brunswick; John Wise, 53, of Medina; Michael Powell, 52, of Medina, and Raymel King, 30, of Cleveland.

Twelve other people have been charged in Ohio state court.

According to the six-count indictment unsealed today:

Bankhead sold large amounts of powder cocaine to Dona Battle between August 2016 and February 2017. Battle then cooked the cocaine into crack cocaine at 26799 Royalton Road, Columbia (the residence of Patterson and Finowski), 5651 Columbia Road, (the residence of Cameron and Cayce) and 1406 West 75th Street, Apartment 3, (the residence of Latten).

Dona Battle then sold the crack cocaine to several other dealers, including Watson, Lind, Carlos Tripp, William Battle, Raymel King and Jermaine Tripp, who then sold it to drug users.

Dona Battle used 417 Bronson Street, Apartment A, (the residence of Fannie Tripp) and 997 Substation Road, (the residence of Spickler) as drug houses from which he could sell crack and powder cocaine. Spickler, Latten, Wise, Patterson and Finowski also provided transportation for Battle to obtain crack and powder cocaine for further distribution.

These cases are the result on an 18-month investigation, which was a cooperative effort between the U.S. Drug Enforcement (DEA), Ohio Bureau of Criminal Investigation and the Medina County Drug Task Force. The investigation consisted of undercover purchases of drugs, the execution of search warrants, and other investigative techniques. This investigation resulted in several significant seizures including more than 37

pounds of cocaine, $516,975 in cash, a tractor-trailer, five other vehicles and five firearms.

DEA Special Agent in Charge Timothy J. Plancon said: "Putting a stop to this criminal conspiracy is significant. The seizure of 37 pounds of cocaine and over half a million dollars of drug-dealing proceeds indicates that this group was connected with drug traffickers at the highest levels. Halting their activities makes everyone in the region safer. The efforts of the Medina County Drug Task Force and the Ohio Bureau of Criminal Investigation have been particularly integral to this investigation's success."

 "This organization used homes and apartments to cook crack cocaine, which it sold in and around Medina," U.S. Attorney Justin E. Herdman said. "It was a spoke in a

larger organization that trafficked a lot of cocaine. These defendants will now be held accountable for their actions."

"I created a specialized unit at the Ohio Bureau of Criminal Investigation to focus on large-scale drug trafficking operations, and we are pleased that we were able to work with local and federal authorities to help bring down this drug trafficking organization," said Ohio Attorney General DeWine. "These drugs have no place on our streets, and our agents will continue to work diligently to investigate those who are pushing drugs in Ohio."

"This investigation was initiated by agents from the Medina County Drug Task Force and Cleveland office of the Drug Enforcement Administration," said Gary

Hubbard, director of the Medina County Drug Task Force. "The intent was to address local drug trafficking issues in the city of Medina with a focus on repeat drug trafficking offenders. The hard work and commitment by all of the agents involved resulted in one of the largest drug trafficking investigations and narcotics seizures in Medina County history. This investigation lead to the seizure of the 17 kilos of cocaine, six ounces of heroin and over $500,000 in U.S. currency that was first reported in February 2017. The success of this case was made possible by the longstanding partnerships between the Medina County Drug Task Force, DEA, Ohio Bureau of Criminal Investigation and the many other law enforcement agencies involved."

This case was investigated by the DEA, Ohio Attorney General's Bureau of Criminal Investigation, Medina County Drug Task Force, Medina County Sheriff's Office, Medina Police Department, National Guard Intelligence, Ohio State Highway Patrol, Cleveland Division of Police, Cleveland Heights Police Department, Cuyahoga County Sheriff's Department, Lorain County Drug Task Force, Lake County Narcotics, Akron Police Department, Summit County Drug Unit, Ashtabula County Sheriff's Office, U.S. Border Patrol and Suburban Police Anti-Crime Network Drug Enforcement Unit, with assistance from the Medina County Prosecutor's Office. It is being prosecuted by Assistant U.S. Attorney Henry F. DeBaggis.

###

Case: 2:25-cv-00748-SDM-EPD Doc #: 1-8 Filed: 07/07/25 Page: 64 of 147 PAGEID #: 571

1/31/25, 10:51 AM     Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak – The White …

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.



**PROCLAMATIONS**
—

# Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak

Issued on: **March 13, 2020**

★ ★ ★

In December 2019, a novel (new) coronavirus known as SARS-CoV-2 ("the virus") was first detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the coronavirus disease COVID-19 that has now spread globally.  The Secretary of Health and Human Services (HHS) declared a public health emergency on January 31, 2020, under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID-19.  I have taken sweeping action to control the spread of the virus in the United States, including by suspending entry of foreign nationals seeking entry who had been physically present within the prior 14 days in certain jurisdictions where COVID-19 outbreaks have occurred, including the People's Republic of China, the Islamic Republic of Iran, and the Schengen Area of Europe.  The Federal Government, along with State and local governments, has taken preventive and proactive measures to slow the spread of the virus and treat those affected, including by instituting Federal quarantines for individuals evacuated from foreign nations, issuing a declaration pursuant to section 319F-3 of the Public Health Service Act (42 U.S.C. 247d-6d), and releasing policies to accelerate the acquisition of personal protective equipment and streamline

bringing new diagnostic capabilities to laboratories. On March 11, 2020, the World Health Organization announced that the COVID-19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States.

The spread of COVID-19 within our Nation's communities threatens to strain our Nation's healthcare systems. As of March 12, 2020, 1,645 people from 47 States have been infected with the virus that causes COVID-19. It is incumbent on hospitals and medical facilities throughout the country to assess their preparedness posture and be prepared to surge capacity and capability. Additional measures, however, are needed to successfully contain and combat the virus in the United States.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq*.) and consistent with section 1135 of the Social Security Act (SSA), as amended (42 U.S.C. 1320b-5), do hereby find and proclaim that the COVID-19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020. Pursuant to this declaration, I direct as follows:

Section 1. Emergency Authority. The Secretary of HHS may exercise the authority under section 1135 of the SSA to temporarily waive or modify certain requirements of the Medicare, Medicaid, and State Children's Health Insurance programs and of the Health Insurance Portability and Accountability Act Privacy Rule throughout the duration of the public health emergency declared in response to the COVID-19 outbreak.

Sec. 2. Certification and Notice. In exercising this authority, the Secretary of HHS shall provide certification and advance written notice to the Congress as required by section 1135(d) of the SSA (42 U.S.C. 1320b-5(d)).

Sec. 3. General Provisions. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

Case: 2:25-cv-00748-SDM-EPD Doc #: 1-8 Filed: 07/07/25 Page: 66 of 147 PAGEID #: 573

1/31/25, 10:51 AM          Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak – The White …

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this thirteenth day of March, in the year of our Lord two thousand twenty, and of the Independence of the United States of America the two hundred and forty-fourth.

DONALD J. TRUMP

The White House

  

| | |
|---|---|
| President Donald J. Trump | News |
| Vice President Mike Pence | Remarks |
| First Lady Melania Trump | Articles |
| Mrs. Karen Pence | Presidential Actions |
| The Cabinet | Briefings & Statements |
| Administration Accomplishments | About The White House |
| Economy & Jobs | Council of Economic Advisers |

Case: 2:25-cv-00748-SDM-EPD Doc #: 1-8 Filed: 07/07/25 Page: 67 of 147 PAGEID #: 574

1/31/25, 10:51 AM          Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak – The White …

Budget & Spending

Education

Immigration

National Security & Defense

Healthcare

Council of Environmental Quality

National Security Council

Office of Management and Budget

Office of National Drug Control Policy

Office of Science and Technology Policy

Copyright    Privacy Policy



[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14819
Non-Argument Calendar

_____

| FILED |
| U.S. COURT OF APPEALS |
| ELEVENTH CIRCUIT |
| May 27, 2009 |
| THOMAS K. KAHN |
| CLERK |

D. C. Docket No. 92-00170-CR-BH-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDDIE OLIVER, JR.,
a.k.a. Bo Diddley,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(May 27, 2009)

Before BLACK, MARCUS and PRYOR, Circuit Judges.

PER CURIAM:

    Eddie Oliver, Jr, proceeding pro se, appeals from the district court's denial

of his 18 U.S.C. § 3582(c)(2) motion for reduction of sentence based on

Amendments 439, 505, and 706 to the Sentencing Guidelines. On appeal, Oliver argues that the district court abused its discretion in denying his motion because Amendments 439, 505 and 706 should have been applied to his sentence. After thorough review, we affirm.

"We review a district court's decision not to reduce a sentence pursuant to § 3582(c)(2) for abuse of discretion." United States v. Moreno, 421 F.3d 1217, 1219 (11th Cir. 2005), cert. denied, 547 U.S. 1050 (2006). A district court may abuse its discretion by making an error of law. United States v. Brown, 332 F.3d 1341, 1343 (11th Cir. 2003) (citation omitted). If the district court errs in applying the guidelines, we must nevertheless ignore the errors if they were harmless. United States v. Foley, 508 F.3d 627, 634 (11th Cir. 2007). "[R]emand is required only if the sentence was imposed as a result of an incorrect application of the Guidelines." Williams v. United States, 503 U.S. 193, 202-03 (1992) (quotations and emphasis omitted).

Section 3582(c)(2) gives retroactive effect to particular amendments to the Sentencing Guidelines that subsequently lower the sentencing range upon which an earlier sentence was based. United States v. Pringle, 350 F.3d 1172, 1176 (11th Cir. 2003). The relevant policy statement on retroactive reduction of sentences provides that a sentence reduction is authorized under § 3582(c)(2) only where the

2

applicable amendment to the Guidelines Manual is enumerated in § 1B1.10(c). See

U.S.S.G. § 1B1.10(a); United States v. Pelaez, 196 F.3d 1203, 1205 n.3 (11th Cir.

1999) (holding that only the amendments listed in § 1B1.10(c) may be applied

retroactively using a § 3582(c)(2) motion). Even if an amendment applies

retroactively, however, a reduction in the term of imprisonment is not authorized if

the amendment does not have the effect of lowering the applicable guideline range.

U.S.S.G. § 1B1.10(a)(2)(B); U.S.S.G. § 1B1.10 comment (n.1).

Amendment 505 amended U.S.S.G. § 2D1.1(c), by, inter alia, setting the

base offense level for 1.5 kilograms or more of cocaine base at 38, where,

previously, the level was as high as 42. U.S.S.G. app. C, amend. 505 (2006). The

Sentencing Commission's policy statement on retroactive reduction of sentences,

U.S.S.G. § 1B1.10, indicates that Amendment 505 is retroactively applicable.

U.S.S.G. § 1B1.10(c). Amendment 505 became effective after Oliver was

sentenced.

Amendment 706, which also became effective after Oliver was sentenced

and applies retroactively, provides for a two-level reduction in the base offense

level assigned to certain levels of crack cocaine listed in the Drug Quantity Table

in U.S.S.G. § 2D1.1. U.S.S.G. App. C., Amend. 706; U.S.S.G. § 1B1.10(c).

Before Amendment 706 took effect, a defendant received a base offense level of 38

under § 2D1.1(c)(1) if he was held accountable for 1.5 kilograms or more of crack cocaine; under the amended version of § 2D1.1(c)(1), however, a defendant receives a base offense level of 38 if he is held accountable for 4.5 kilograms or more of crack cocaine. See U.S.S.G. App. C, Amend. 706 (2007).

On the record here, we are not persuaded by Oliver's argument that the district court abused its discretion in denying his § 3582 motion. As an initial matter, Amendment 439 is not listed in the Sentencing Commission's policy statement on the retroactive reduction in sentences. See U.S.S.G. § 1B1.10(c). Therefore, Amendment 439 may not be applied retroactively through a § 3582(c)(2) motion, see Pelaez, 196 F.3d at 1205 n.3, and, therefore, any error of the district court in failing to consider Amendment 439 was harmless.

We likewise reject Oliver's claim regarding Amendment 505. As the record shows, Oliver's total offense level was calculated to be 45, but because U.S.S.G. § 5A n.2 stated that an offense level of more than 43 was to be treated as an offense level of 43, Oliver's total offense level was set at 43. Based on a total offense level of 43, and a criminal history category of III, the guideline range was life imprisonment. Even with a reduction of Oliver's base offense level to 38, with the enhancements applied at sentencing in 1993, Oliver's offense level would be 43. With an offense level of 43, and a criminal history category of III, Oliver's

4

sentencing range remains life imprisonment. See U.S.S.G. Chapter 5, Part A (1993). Thus, any error by the district court in denying Oliver eligibility for relief under Amendment 505 was harmless.

Nor would Amendment 706 affect his sentence. In Oliver's § 3582 motion, he conceded that he was held accountable for 11.23 kilograms of cocaine base. Therefore, Oliver's base offense level would remain unchanged even after Amendment 706 revised § 2D1.1(c)(1) because he was held responsible for more than 4.5 kilograms of crack cocaine. In short, Oliver's sentence was not based on a range subsequently lowered by Amendment 706 and the district court lacked authority to grant him a sentencing reduction under § 3582(c)(2) based on Amendment 706. See U.S.S.G. § 1B1.10(a)(2)(B); see also United States v. Moore, 541 F.3d 1323, 1330 (11th Cir. 2008) (holding that the district court lacked authority under § 3582(c)(2) to grant a sentencing reduction to defendants who were career offenders sentenced under U.S.S.G. § 4B1.1 because Amendment 706 would not ultimately affect their guideline ranges), cert. denied, McFadden v. United States, 129 S. Ct. 965 (2009), and cert. denied, __ S. Ct. __ (U.S. Mar. 9, 2009) (No. 08-8554); United States v. Walker, 301 F. App'x 844 (11th Cir. 2008) (unpublished opinion) (holding that the district court lacked authority under

§ 3582(c)(2) to grant a sentencing reduction to a defendant who was held accountable for more than 4.5 kilograms of crack cocaine).

Accordingly, we affirm.

**AFFIRMED.**

# House Committee Begins Hearings on Bill to Combat Drug and Human Trafficking in Ohio

October 4, 2023

Republican Newsroom



COLUMBUS –State Reps. Cindy Abrams (R-Harrison) and D.J. Swearingen (R-Huron) today provided sponsor testimony on House Bill 230 during a House Homeland Security Committee meeting.

In response to the staggering increase in drug overdoses, specifically fentanyl poisoning, in Ohio and throughout the United States, this legislation will directly combat the drug and human trafficking crises in Ohio.

"We are looking forward to continuing to work with our law enforcement and prosecutors, as well as this committee on this important legislation to keep our communities safe," said Abrams during sponsor testimony. "It is crucial that we take steps to protect our children and greater communities from the current drug and human trafficking epidemics."

Raises the charge for human trafficking to an F1 with its expansion of the definition of human trafficking; and

Adds a specification that if someone is found or pleads guilty to a fentanyl-related death, there is a mandatory prison term of five years.

"This bill will ensure that the appropriate individuals face consequences for their horrific actions," said Swearingen. "It is our responsibility to support law enforcement and protect all Ohioans."

House Bill 230 will continue to receive hearings in the House Homeland Security Committee.

 

Disclaimer  Support  Directory  About
© 2024 Ohio House of Representatives.
All Rights Reserved.





# State v. Burgess

**480 S.E.2d 638 (1997)**

STATE of North Carolina, v. Larry Patrick BURGESS, Jr.

No. 294A96.

**Supreme Court of North Carolina.**

February 10, 1997.

*639 Michael F. Easley, Attorney General by R. Kendrick Cleveland, Associate Attorney General, for the State.

Malcolm Ray Hunter, Jr., Appellate Defender by Charlesena Walker, Assistant Appellate Defender, for defendant-appellant.

FRYE, Justice.

Upon proper indictments, defendant was tried and convicted of murder in the first degree of Juanita Michelle Jones (Jones), murder in the first degree of Christie Nicole Smith (Smith), and first-degree arson of the home of Juanita Michelle Jones and her three small children. As to each murder victim, the jury found defendant guilty of murder in the first degree on the basis of malice, premeditation, and deliberation as well as under the felony murder rule. At the capital sentencing proceeding, the jury recommended a sentence of life imprisonment for each murder. On 17 November 1995, Judge Ragan entered judgments imposing sentences of life imprisonment for each of the first-degree murder convictions and life imprisonment for the first-degree arson conviction.

On appeal to this Court, defendant makes eight arguments. After reviewing the record, transcript, and briefs in this case, we conclude that defendant received a fair trial, free of

prejudicial error.

The State's evidence presented at trial tended to show the following facts and circumstances: *640 On 20 May 1994, defendant borrowed a friend's automobile and drove to the apartment of Juanita Michelle Jones, whom he had dated in the past. Brittany Jones, Jones' four-year-old daughter, let defendant into the house. After arguing with Jones, defendant returned to the automobile, obtained a .38-caliber pistol from under the seat of the automobile, and reentered the apartment. Defendant displayed the pistol and told Brittany to go upstairs. Brittany went upstairs and told Jones, who was ironing at the time, that defendant had a gun. Defendant refused to allow Jones to leave the room. Brittany ran to the bathroom where her younger brothers and Christie Nicole Smith, Jones' cousin, were. Jones ran into the bathroom and locked the door. Defendant burst through the door and killed Jones and Smith. He choked Brittany and her two brothers and threw them to the floor. Defendant set a fire in Jones' closet and then left the apartment.

Mary Cox, Jones' aunt, telephoned Jones' apartment on 20 May 1994. Brittany answered the telephone and said, "Aunt Helen, come. [Defendant] killed my momma and Chris. Come. We are going to burn up." Cox immediately left work and went to Jones' apartment. When Cox arrived, she noticed black smoke coming out the back door. Cox opened the door and was met by Jones' children. As the children grabbed her and ran from the apartment, Cox noticed blood "everywhere" on their clothes.

Defendant testified at trial that he was twenty-one years old in May 1994 and that he had been in the United States Marine Corps for about one year. Defendant further testified that he met Jones in January 1992 in a Jacksonville shopping mall and that Jones had lied to him about not having children, about being in school, about having a job, and about not having dated a serviceman before. They continued to date for a while, even after he discovered these untruths. In the summer of 1992, Jones told defendant that she was marrying a corporal and that she would be moving with him to California. Defendant testified that he was happy for her.

Defendant further testified that in January 1993, Jones tried twice to reach defendant at his office, but defendant was meeting with a superior officer each time she called and could not come to the telephone. During one call, someone grabbed the telephone from Jones and told the sergeant who answered the telephone that if defendant was too busy to talk to Jones, he could talk to her in court. Jones did not leave her name either time she called, and defendant was dumbfounded by the message. In February 1993, defendant learned that a civil summons had been issued to him for nonsupport. It was defendant's first knowledge of the lawsuit. At court, Jones admitted that she was not sure whether her third

child was defendant's but that she had to bring the suit because her mother was "on her case about having kids and having deadbeat dads for them." Shortly thereafter, Jones told the district attorney that she wanted to drop the suit.

Defendant further testified that Jones stopped by his barracks at Camp Lejeune in Jacksonville between 5:30 and 6:00 one morning in June 1993 and stated that she was at the camp visiting a friend and just wanted to see how he was doing. He told her that he had a busy morning ahead of him and needed to get some rest. Shortly thereafter, there was another knock at the door of defendant's barracks, and defendant found a baby at the door and saw Jones driving away. Defendant drove around, found Jones at her friend's house in Greenville, and returned the baby. Jones had told defendant that if he did not have time for her, he would have to make time. Defendant returned to the barracks too late for a class required to maintain his security clearance. As a result of being late for class, defendant was dismissed from the class, and his top-secret security clearance was nullified.

Defendant testified that in August 1993, he was deployed overseas to Bosnia and Somalia. While he was away, Jones called Camp Lejeune looking for him and "fussed out" several high-ranking officers. Upon returning to Camp Lejeune, defendant was informed of these calls and was advised to get blood tests performed to determine paternity. Pursuant to this advice, defendant and *641 Jones scheduled blood testing at the Department of Social Services (DSS) in Greenville. Defendant missed the first appointment and his rescheduled appointment because he was performing field operations. Defendant called DSS to report that he would not be able to make the appointments. The DSS worker who answered the telephone told defendant that if he could not make his appointment, they would see him in court. The court date was set for 13 May 1994. At court, the judge declined making a decision on the nonsupport action and ordered defendant to appear for blood testing on 20 May 1994.

Defendant also testified that on 20 May 1994, he borrowed a friend's automobile and went to Jones' apartment to drive her to the health department for the blood testing. Jones, however, just wanted him to sign papers acknowledging that he was the father. He asked her why she had not told him during her pregnancy that she was pregnant and suspected that he was the father. Defendant also asked Jones about the sergeant she was purportedly dating during her pregnancy. An argument ensued, and Jones grabbed a knife from the kitchen and asked defendant to leave. Defendant went out to the automobile to leave but changed his mind because he did not want to be degraded at the health department without first getting some answers from Jones. At that point, defendant reached under the seat and grabbed a .38-caliber pistol that he knew the owner of the automobile kept under the seat.

Defendant testified that he then reentered Jones' apartment and proceeded upstairs where Jones and Smith were talking. When Jones saw that defendant had a gun, she asked if that was supposed to mean anything. After defendant told her that he just wanted to talk, Jones stated that she did not need him for anything and that defendant had better pray that the child was not his because she was going to make the rest of his life miserable. Jones threatened to "put a curse" on defendant. The argument escalated, and defendant fired the pistol. Defendant testified that he did not remember how many times he fired the weapon but that he did remember shooting the victims. Defendant then testified that he was "really nervous" and that he set fire to his clothes in Jones' closet because he thought that Jones had used them to put a curse on him. Defendant denied that he tried to harm the children.

Defendant's motions to dismiss made at the close of the State's evidence and again at the close of all the evidence were denied.

In his first argument, defendant contends that the trial court committed plain error in instructing the jury about premeditated and deliberate murder and felony murder and by informing the jury that it could convict defendant of first-degree murder under either or both theories. Defendant argues that the trial court should have specifically informed the jury that it had to be unanimous on the theory of first-degree murder upon which its verdict was rendered. Defendant contends that the jury could have interpreted the instructions to allow a conviction on a theory of first-degree murder not found by all the jurors beyond a reasonable doubt, in violation of his constitutional right to a unanimous jury. Defendant contends that it is impossible to determine whether the jury unanimously found that he actually committed either premeditated and deliberate murder or felony murder or if different jurors convicted him on the basis of different theories. Notwithstanding the failure to object to the instructions at trial, defendant argues that this Court should grant a new trial under the plain error rule because of a perceived lack of evidence that defendant formed the intent to kill while in a cool state of blood. In light of the actual instructions given to the jury, the verdict sheet returned by the jury, and the jury poll, we are satisfied that the jury was not misled by the instructions.

We rejected a similar challenge in State v. Alford, 339 N.C. 562, 453 S.E.2d 512 (1995). In Alford, we noted:

The actual instructions given by the trial court made it clear to the jury that it had to be unanimous on both the verdict and the basis for that verdict. After informing the jury that it could "find the defendant guilty of first degree murder on either or both of two theories[,] [t]hat is, on the *642 basis of malice, premeditation and deliberation, or under the felonyfirst-degree felony murder rule," the trial court charged the jury on first-degree

murder by premeditation and deliberation and then instructed on the elements of felony murder.

Id. at 575, 453 S.E.2d at 519.

As in Alford, the actual instructions given by the trial court in the instant case made it clear to the jury that it had to be unanimous on both the verdict and the basis for that verdict. After informing the jury that it could find "defendant guilty of first degree murder on either or both of two theories, that is, on the basis of malice, premeditation and deliberation, or under the first-degree felony murder rule," the trial court charged the jury on first-degree murder on the basis of malice, premeditation, and deliberation and then instructed on the elements of first-degree murder under the felony murder rule. The court in the instant case then charged the jury as follows:

So I charge that if you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant intentionally killed the victim with a deadly weapon and that this proximately caused the victim's death, and that the defendant intended to kill the victim, and that he acted with malice after premeditation and with deliberation, it would be your duty to return a verdict of guilty of first-degree murder on the basis of malice, premeditation, and deliberation. However, if you do not so find or have a reasonable doubt as to one or more of these things, you would not run [sic] a verdict of guilty of first-degree murder on the basis of malice, premeditation, and deliberation. Whether or not you find the defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation, you will also consider whether he is guilty of first-degree murder under the first-degree felony murder rule.

We note that this instruction is essentially identical to the instruction given in Alford.

In Alford, we noted that "[t]he court then gave the final mandate on felony murder and finally instructed the jurors, `You and each of you, that is, all 12 of you, must unanimously agree upon any verdict which you return.'" Id. at 576, 453 S.E.2d at 519. In the instant case, after instructing the jurors on felony murder, the court continued to instruct the jury on other crimes for which defendant could be found guilty. The court then told the jury: "Now, I instruct you that a verdict is not a verdict until all twelve jurors agree unanimously as to what your decision shall be. You may not render a verdict by majority vote." After admonishing the jurors as to their "duty to consult with one another and to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment," the court instructed the jurors, "Now, when you have reached a unanimous verdict you will

have your foreperson mark yourmark the ballot (sic) appropriately and knock on the door to announce your verdict."

We further note that in Alford, we said:

[T]he verdict sheet actually returned by the jury and the jury poll conducted after the verdict was returned indicate that the jurors did not construe the disjunctive instructions to allow the jury to convict defendant of first-degree murder on a basis that was not unanimously found beyond a reasonable doubt. The verdict sheet clearly indicates that the jury found defendant guilty of both premeditated and deliberate murder and felony murder. When polled, each juror reiterated that he or she found defendant guilty of first-degree murder based on both theories.

Id. at 575, 453 S.E.2d at 519. In the instant case, the verdict sheet actually returned by the jury and the jury poll conducted after the verdict was returned indicate that the jurors did not construe the court's instructions in a manner allowing the jury to convict defendant of first-degree murder on a basis that was not unanimously found beyond a reasonable doubt. The verdict sheet indicates that the jury found defendant guilty of both premeditated and deliberate murder and felony murder. Further, the record shows that when polled, no juror expressed that he or she had not found defendant guilty of first-degree murder based on both theories. Accordingly, as in Alford, we conclude that *643 defendant's contentions are without merit, and we reject defendant's first argument.

In his second argument, defendant contends that the trial court committed reversible error when it imposed judgment upon defendant for the arson conviction when defendant had already been convicted and sentenced for his convictions of first-degree murder based upon the felony murder rule with arson as one of the underlying felonies. Defendant argues that because arson was used as one of the underlying felonies to support his first-degree murder convictions under the felony murder rule, defendant could not be sentenced for both arson and murder.

In State v. Lewis, 321 N.C. 42, 361 S.E.2d 728 (1987), we said:

When the evidence so warrants, a trial judge may submit a special verdict form to the jury that allows the jurors to indicate whether they find the defendant guilty of first degree murder based upon premeditation and deliberation or first degree murder based on a felony murder theory. State v. Silhan, 302 N.C. 223, 275 S.E.2d 450 (1981). However, if both theories are submitted to the jury and the jury finds the defendant guilty under both theories the underlying felony need not merge with the murder. State v. Rook, 304 N.C.

201, 283 S.E.2d 732 (1981)[, cert. denied, 455 U.S. 1038, 102 S. Ct. 1741, 72 L. Ed. 2d 155 (1982) ].

Lewis, 321 N.C. at 50, 361 S.E.2d at 733. In the instant case, defendant was convicted of the first-degree murders based upon theories of premeditation and deliberation and felony murder. Thus, the underlying felony of arson need not merge with the murder convictions, and it was not error to sentence defendant separately for each of the murders and for the underlying felony.

In his third argument, defendant contends that the trial court erred when it imposed separate judgments for each of the two first-degree murder convictions since the convictions were based upon the felony murder rule and each homicide was used as the underlying felony for the other. Again we note that defendant was convicted of the first-degree murders based on theories of premeditation and deliberation and felony murder. Defendant was sentenced only once for the murder of Jones and once for the murder of Smith. Since there was no merger of either murder conviction by its use as an underlying felony for the other murder, see id., the trial court did not err by sentencing defendant separately for each murder.

In his fourth argument, defendant contends that the trial court improperly used his contemporaneous murder convictions as a nonstatutory aggravating factor for the arson conviction when it found that "the arson was committed during a course of conduct in which other crimes endangered the lives of others." We disagree.

In State v. Taylor, 322 N.C. 280, 367 S.E.2d 664 (1988), we said:

Pursuant to the Fair Sentencing Act, the trial court is not confined to consideration of statutory factors only, but may consider nonstatutory factors to the extent they are (1) related to the purposes of sentencing and (2) supported by the evidence in the case. N.C.G.S. § 15A-1340.4(a) (1983). Amongst the purposes of sentencing explicitly identified in N.C.G.S. § 15A-1340.3 are "to protect the public by restraining offenders" and "to provide a general deterrent to criminal behavior."

Taylor, 322 N.C. at 287, 367 S.E.2d at 668. Additionally, the Fair Sentencing Act[1] and our cases interpreting it establish that a conviction may not be aggravated by (1) prior convictions of other crimes which could have been joined for trial, (2) contemporaneous convictions of crimes actually joined, or (3) acts which form the gravamen of these prior or contemporaneous convictions. N.C.G.S. § 15A-1340.4(a)(1)o (1983); State v. Hayes, 323

N.C. 306, 372 S.E.2d 704 (1988); State v. Westmoreland, 314 N.C. 442, 334 S.E.2d 223 (1985); State v. Lattimore, 310 N.C. 295, 311 S.E.2d 876 (1984).

*644 In the case before us, the trial court aggravated defendant's sentence on the basis of defendant's committing the arson "during a course of conduct in which other crimes endangered the lives of others." Contrary to defendant's contention that the "other crimes" referred to in this nonstatutory aggravating factor include the murders of Jones and Smith for which defendant was contemporaneously convicted, we conclude that the other crimes involved the assaults on Jones' three small children. It is certainly reasonable to conclude that this is the type of behavior from which the public should be protected and from which possible future offenders should be deterred. Thus, the trial court's finding of the nonstatutory aggravating factor in question was clearly related to the purposes of sentencing.

Moreover, the trial court's finding was amply supported by the evidence. The State's evidence in the proceeding below indicated that when defendant pulled his gun, he saw Brittany run into the bathroom where Smith and the other two children were. The shell casings found in the bedroom show that defendant fired two bullets into the locked bathroom while he was standing on the outside of the door in the master bedroom. Further, the State's evidence shows that defendant choked the three children and threw them to the floor. This evidence is sufficient for the trial judge to find the aggravating factor that the arson was committed during a course of conduct, that is, the assaults on the children, that endangered the lives of others. These crimes are separate and distinct from the murders for which defendant was convicted. Thus, the aggravating factor did not run afoul of the statute.

In his fifth argument, defendant contends that the trial court improperly used evidence of the offenses joined for trial when it found as an aggravating factor for the arson conviction that "defendant was armed with a deadly weapon at the time of the crime." In the instant case, defendant was convicted of two counts of first-degree murder and one count of first-degree arson. The trial court found as an aggravating factor that defendant was armed with a deadly weapon at the time he started the fire that constituted the criminal act supporting the arson conviction. We have held that acts which could have been, but were not, the basis for other joinable criminal convictions may be used to aggravate the conviction for which a defendant is being sentenced. State v. Abee, 308 N.C. 379, 302 S.E.2d 230 (1983). Because the act of carrying the deadly weapon could have been, but was not, the basis for other joinable criminal convictions, it may be used to aggravate the conviction for which

defendant is being sentenced. Accordingly, we find no error in the trial court's use of this aggravating factor.

In his sixth argument, defendant contends that the trial court committed reversible error when it refused to instruct the jury on the lack of mental capacity according to defendant's requested written instruction. Defendant requested the following instruction:

You may find that there is evidence which tends to show that the defendant lacked mental capacity at the time of the alleged events in this case. However, if you find that the defendant lacked mental capacity, you should consider whether this condition affected whether or not he deliberated prior to his killing which is required for the conviction of first-degree murder. In order for you to find the defendant guilty of first-degree murder, you must find beyond a reasonable doubt that he killed the deceased with malice, and in the execution of an actual specific intent to kill formed after premeditation and deliberation. If as a result of lack of mental capacity, the defendant did not deliberate prior to killing the deceased, he is not guilty of first-degree murder. Therefore, I charge that if upon considering the evidence with respect to the defendant's lack of mental capacity you have a reasonable doubt as to whether the defendant formulated the specific intent required for the conviction of first-degree murder, you will not return a verdict of guilty of first-degree murder.

The State offered North Carolina criminal pattern jury instruction 305.11. After considering both parties' proposed jury instructions, the trial court consolidated the two *645 instructions and instructed the jury as follows:

Now, you may find that there is evidence which tends to show that the defendant lacked mental capacity at the time of the acts alleged in this case. If you find that the defendant lacked mental capacity, you couldyou should consider whether this condition affected his ability to formulate the specific intent which is required for conviction of first-degree murder on the basis of malice, premeditation, and deliberation, or whether this condition affected his ability to premeditate or deliberate. In order for you to find the defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation, you must find beyond a reasonable doubt that he killed the deceased with malice and [in] the execution of an actual specific intent to kill formed after premeditation [ ] and deliberation. If as a result of a lack of mental capacity, the defendant did not have the specific intent to kill the deceased formed after premeditation [ ] and deliberation, he is not guilty of first-degree murder on the basis of malice, premeditation, and deliberation. If as a result of a lack of mental capacity, the defendant did not have the ability to premeditate or deliberate, he is not guilty of first-degree murder on the basis of malice, premeditation, and

deliberation. Therefore, I charge that ifupon considering the evidence with respect to the defendant's lack of mental capacity you have a reasonable doubt as to whether the defendant formulated the specific intent required for the conviction of first-degree murder or lacked the mental capacity to premeditate or deliberate, you will not return a verdict of guilty of first-degree murder on the basis of malice, premeditation, and deliberation.

In State v. Brown, 335 N.C. 477, 439 S.E.2d 589 (1994), we said:

With regard to a defendant's request for jury instructions, this Court has consistently held that a trial court is not required to repeat verbatim a requested, specific instruction that is correct and supported by the evidence, but that it is sufficient if the court gives the instruction in substantial conformity with the request.

Id. at 490, 439 S.E.2d at 597. In the instant case, the trial court instructed the jury in substantial conformity with the specific instruction requested by defendant. Therefore, we reject defendant's sixth argument.

In his seventh argument, defendant contends that the trial court committed reversible error in denying his motion to dismiss the charges of first-degree murder based upon the theory of premeditation and deliberation. Defendant argues that the State's evidence failed to prove beyond a reasonable doubt that defendant formed the intent to kill the victims while in a cool state of blood.

In ruling on a motion to dismiss, the trial court must examine the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference that can be drawn therefrom. State v. Powell, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). "The defendant's evidence, unless favorable to the State, is not to be taken into consideration." State v. Jones, 280 N.C. 60, 66, 184 S.E.2d 862, 866 (1971). The determination of the witnesses' credibility is for the jury. See State v. Locklear, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988).

In State v. Saunders, 317 N.C. 308, 345 S.E.2d 212 (1986), we said:

"Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation." State v. Calloway, 305 N.C. 747, 751, 291 S.E.2d 622, 625 (1982). Premeditation is defined as "thought beforehand for some length of time no matter how short." Id. Deliberation means an "intention to kill executed by the defendant in a `cool state of blood' in furtherance of a `fixed design to gratify a feeling of revenge, or, to accomplish some unlawful purpose.'" Id. "`Cool state of blood' as used in connection with premeditation and deliberation does not mean absence of passion and emotion but means

that an unlawful killing is deliberate and premeditated if executed with a fixed design to kill notwithstanding defendant was angry or in an emotional state at *646 the time." State v. Ruof, 296 N.C. 623, 636, 252 S.E.2d 720, 728 (1979).

Saunders, 317 N.C. at 312, 345 S.E.2d at 215.

In the instant case, there was substantial evidence to support a finding that defendant killed the victims in a cool state of blood. Viewing the evidence in the light most favorable to the State, as we must, the evidence shows that defendant entered Jones' apartment without a pistol and, after leaving the apartment after an argument with Jones, returned with a pistol, argued with Jones again, and then shot his way into the bathroom where Jones, Smith, and the three small children had locked themselves away from defendant's reach. Once inside the bathroom, defendant, a Marine experienced with firearms, took aim and fired a bullet into Jones' neck and placed the muzzle of the gun next to the hand Smith had raised to defend herself and shot her in the head. Notwithstanding that defendant may have been angry or in an emotional state at the time he shot the victims, the evidence was sufficient for a jury to find that defendant executed his specific intent to kill in a cool state of blood. Therefore, the trial court did not err in denying defendant's motion to dismiss for insufficiency of the evidence.

In his eighth and final argument, defendant contends that the trial court committed reversible error by sustaining the prosecutor's objections to a portion of the direct testimony of Dr. John Warren, a forensic psychologist, relating to defendant's state of mind at the time of the killings.

On direct examination, defense counsel asked Dr. Warren whether he had an opinion concerning whether the killings of the victims in this case were "committed in a cool state of blood." After he stated that he had an opinion, defense counsel asked Dr. Warren to state his opinion, at which time the State objected. Outside the presence of the jury, the trial court sustained the State's objection as to the use of a precise legal term. Defense counsel then offered to rephrase the question. On voir dire, defense counsel rephrased the question concerning defendant's mental state to ask whether "around the time of the killings of [the victims,]... [defendant] had snapped." The trial court sustained the State's objection to the use of the term "snapped." On voir dire, Dr. Warren stated that he had an opinion as to whether defendant had "snapped" and testified as follows:

Recognizing the imprecise nature of the termslang term snapped, as I said in my report, I believe that the defendant had an inability to think things through calmly and clearly, to

weigh options or consider alternatives at the moment of the shootings. And this combined with his report of snapping, would indicate that yes, he snapped.

Defendant argues that the testimony of Dr. Warren that defendant "snapped" tended to show that defendant was not in a cool state of blood when he shot the victims and, thus, was relevant since it tended to show that defendant did not premeditate and deliberate the killings. We agree. See State v. Shank, 322 N.C. 243, 367 S.E.2d 639 (1988) (expert witness may testify concerning defendant's ability to make and carry out plans, and jury may consider such evidence when determining if defendant had the ability to form a specific intent).

Nevertheless, a determination of relevancy under Rule 401 does not necessarily end the inquiry as to whether a trial court erred in sustaining an objection to proffered expert witness testimony. As we said in State v. Jackson, 340 N.C. 301, 457 S.E.2d 862 (1995):

The admissibility of evidence is first governed by Rule 401 of the Rules of Evidence, which defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Rule 702 sets the standard for the admissibility of expert opinion testimony, specifying that a witness qualified as an expert may testify as to scientific, technical or other specialized knowledge if such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." N.C.G.S. § 8C-1, Rule 702 (1992).

Jackson, 340 N.C. at 310, 457 S.E.2d at 868.

As an expert witness in the field of psychology, Dr. Warren was, by education and *647 training, in a better position than the jury to evaluate whether defendant could formulate a specific plan or intent to kill. See State v. Wilkerson, 295 N.C. 559, 247 S.E.2d 905 (1978). An expert witness' opinion to the effect that the defendant's capacity to calmly function and plan was severely impaired is evidence which arguably would tend to show that the defendant acted without premeditation and deliberation and could not form the specific intent to kill.

Assuming arguendo that Dr. Warren's opinion that defendant "snapped" could have "assist[ed] the trier of fact to understand the evidence or to determine a fact in issue," N.C.G.S. § 8C-1, Rule 702, and that the trial court erred by not admitting it, we nevertheless conclude that the error in this instance was not prejudicial. Dr. Warren was allowed to testify about defendant's mental state at the time of the murders, testimony which

indicated that defendant did not form the specific intent to kill. We are convinced that even if Dr. Warren had given his opinion that defendant "snapped," the jury verdicts in this case would not have been different. See N.C.G.S. § 15A-1443(a) (1988). Accordingly, we reject defendant's final argument. Defendant received a fair trial, free of prejudicial error.

NO ERROR.

NOTES

[1] The Fair Sentencing Act, N.C.G.S. § 15A-1340.1 to -1340.7 (1988), was repealed effective 1 October 1994, when the Structured Sentencing Act became effective for offenses occurring on or after that date.

Some case metadata and case summaries were written with the help of AI, which can produce inaccuracies. You should read the full case before relying on it for legal research purposes.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.



# State v. Smith

**400 S.E.2d 405 (1991)**

**328 N.C. 161**

STATE of North Carolina v. Carlton James SMITH.

No. 130PA89.

**Supreme Court of North Carolina.**

February 7, 1991.

*406 Lacy H. Thornburg, Atty. Gen. by Robert J. Blum, Associate Atty. Gen., and G. Lawrence Reeves, Jr., Asst. Atty. Gen., Raleigh, for State.

Charles H. Henry, Jr., Jacksonville, and Richard L. Cannon, III, Greenville, for defendant-appellant.

WEBB, Justice.

This case brings to the Court the question of whether the Superior Court, Onslow County has jurisdiction to try a person as an adult for crimes he allegedly committed as a juvenile on the Camp Lejeune military reservation. There are constitutional and statutory provisions that affect this question. Article I, § 8 of the Constitution of the United States provides in part:

The congress shall have power.... .... [17.] To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the

Case: 2:25-cv-00748-SDM-EPD Doc #: 1-8 Filed: 07/07/25 Page: 90 of 147 PAGEID #: 597

12/20/24, 11:27 AM                State v. Smith :: 1991 :: North Carolina Supreme Court Decisions :: North Carolina Case Law :: North Carolina Law :: US Law :: J…

legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings[.]

N.C.G.S. § 104-7 provides in part:

The consent of the State is hereby given, in accordance with the seventeenth clause, eighth section, of the first article of the Constitution of the United States, to the acquisition by the United States, by purchase, condemnation, or otherwise, of any land in the State required for the sites for customhouses, courthouses, post offices, arsenals, or other public buildings whatever, or for any other purposes of the government. Exclusive jurisdiction in and over any land so acquired by the United States shall be and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and *407 criminal process of the courts of this State; but the jurisdiction so ceded shall continue no longer than the said United States shall own such lands. The jurisdiction ceded shall not vest until the United States shall have acquired title to said lands by purchase, condemnation, or otherwise.

40 U.S.C. § 255 provides in part:

Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted.

In interpreting article I, § 8 of the Constitution of the United States and the statutory provisions, it has been held that if several steps are taken the federal government acquires jurisdiction over lands it owns. The government must acquire the land by condemnation or otherwise. If the state in which the land is situated cedes jurisdiction to the federal government, and if the government accepts jurisdiction, the state no longer has jurisdiction over this territory. Paul v. United States, 371 U.S. 245, 83 S. Ct. 426, 9 L. Ed. 2d 292 (1963).

Whether the United States has acquired jurisdiction is a federal question. Silas Mason Co. v. Tax Com., 302 U.S. 186, 58 S. Ct. 233, 82 L. Ed. 187 (1937).

In this case all parties agree that the murders allegedly occurred on the Camp Lejeune military reservation and that the State has ceded and the federal government has accepted jurisdiction over this territory. The State contends the government's jurisdiction is not exclusive and the State has jurisdiction to try the defendant.

In criminal cases dealing with this problem the federal courts have said the jurisdiction of the United States is exclusive. In United States v. Unzeuta, 281 U.S. 138, 50 S. Ct. 284, 74 L. Ed. 761 (1930), the defendant assigned error for being tried in federal court for a murder committed on the Fort Robinson military reservation in Nebraska. In overruling this assignment of error the United States Supreme Court said, "[w]hen the United States acquires title to lands, which are purchased by the consent of the legislature of the state within which they are situated `for the Erection of Forts, Magazines, Arsenals, Dock-yards and other needful Buildings' (Const. art. I, § 8) the Federal jurisdiction is exclusive of all state authority." Id. at 142, 50 S. Ct. at 285, 74 L. Ed. at 773. In Bowen v. Johnston, 306 U.S. 19, 59 S. Ct. 442, 83 L. Ed. 455 (1939), the defendant was convicted of a murder committed in the Chickamauga and Chattanooga National Park. The United States Supreme Court said the federal district court had exclusive jurisdiction to try the defendant for crimes committed in this territory. See also Benson v. United States, 146 U.S. 325, 13 S. Ct. 60, 36 L. Ed. 991 (1892).

In United States v. Daye, 696 F.2d 1305 (11th Cir.1983), the Court of Appeals for the Eleventh Circuit, in overruling the defendant's assignment of error to his being tried in federal court said, "because the Everglades National Park remains in the exclusive jurisdiction of the federal government, Florida has not and cannot extend its jurisdiction to cover Indian lands located within the Park." In State v. DeBerry, 224 N.C. 834, 32 S.E.2d 617 (1945) this Court, relying on federal cases, held it was *408 error not to abate a criminal action for assault on a female which occurred on the premises of a post office. We said that at the time the United States acquired the land for the post office, "the Legislature had given its unqualified consent to the acquisition of lands within the State by the United States for the purpose of erecting thereon any post office, courthouse, etc., and the Federal jurisdiction therefore became exclusive." Id. at 837, 32 S.E.2d at 619. It appears from these cases that the Superior Court, Onslow County does not have jurisdiction to try the defendant.

The State argues that the federal government has not exercised exclusive jurisdiction over juvenile delinquency offenses which occur on the Camp Lejeune military reservation. It

bases this argument on Paul v. United States, 371 U.S. 245, 83 S. Ct. 426, 9 L. Ed. 2d 292; Howard v. Commissioners of Sinking Fund of City of Louisville et al., 344 U.S. 624, 73 S. Ct. 465, 97 L. Ed. 617 (1953); Stewart v. Sadrakula, 309 U.S. 94, 60 S. Ct. 431, 84 L. Ed. 596 (1940); and Chicago R.I. & P. Ry. Co. v. McGlinn, 114 U.S. 542, 5 S. Ct. 1005, 29 L. Ed. 270 (1885). These decisions have developed the doctrine that in civil cases the state laws in existence on federal enclaves at the time of the cession of the territory continue in effect until abrogated by the federal authority. This assures that no area, however small, will be left without a developed legal system for private rights. The State argues that the areas of interest to both sovereigns may co-exist within the enclave so long as there is no interference with the federal function.

The State argues that the federal government has not abrogated State jurisdiction over juvenile offenders on the Camp Lejeune military reservation and the State has concurrent jurisdiction. It relies on 18 U.S.C. § 5032 which says in part:

A juvenile alleged to have committed an act of juvenile delinquency, other than a violation of law committed within the special maritime and territorial jurisdiction of the United States for which the maximum authorized term of imprisonment does not exceed six months, shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles.... If the Attorney General does not so certify, such juvenile shall be surrendered to the appropriate legal authorities of such State.

The State contends that this statute and other legislative action show it was and is the position of Congress that states are better able to deal with the juvenile delinquency problems than federal authorities. The State concedes that it normally would not have jurisdiction over criminal matters but says in this case that a juvenile delinquency hearing is a civil matter. Once the state court obtained jurisdiction it did not lose it when the defendant became an adult. The State contends it has concurrent jurisdiction because the federal government has never accepted jurisdiction over juvenile matters on the Camp Lejeune reservation. It argues that 40 U.S.C. § 255 allows the federal government only the jurisdiction it requires.

The difficulty for the State in relying on 18 U.S.C. § 5032 to argue that the federal government recognizes that states are better able to deal with juvenile delinquency problems than the federal government is that the United States Attorney certified to the

United States District Court pursuant to 18 U.S.C. § 5032 that the courts of North Carolina did not have jurisdiction over the defendant with respect to the acts committed on the Camp Lejeune military reservation. In United States v. Vancier, 515 F.2d 1378 (2nd Cir.), cert. denied, 423 U.S. 857, 96 S. Ct. 107, 46 L. Ed. 2d 82 (1975), a juvenile was charged in the United States District Court for the Southern District of New York with an act of juvenile delinquency. He was also charged with a criminal act in a court in the State of New York. *409 The United States Attorney certified to the federal district court that a juvenile or other appropriate court did not have jurisdiction over the defendant with respect to the alleged acts of juvenile delinquency. The state court dismissed the charges and the defendant was held in federal court to be a juvenile delinquent. On appeal he contended he should not have been tried in federal court because the state court had jurisdiction. The Second Circuit Court of Appeals held that the United States Attorney's certification, in the absence of a showing of bad faith, had to be accepted by the Court as final. It held the federal district court had exclusive jurisdiction. Because we are dealing with a federal question we must look to the federal courts for guidance. If we must accept the United States Attorney's certification as final that the courts of this state do not have jurisdiction, then 18 U.S.C. § 5032 is not helpful to the State.

As to the State's argument that the federal government never accepted jurisdiction of juvenile delinquency matters on the Camp Lejeune reservation, the acceptance of Acting Secretary of the Navy Forrestal said that jurisdiction was "accepted on behalf of the United States in the manner and form provided by an act of 1907, Ch. 25, N.C.Code 1927, Sec. 8059" (N.C.G.S. § 104-7). N.C.G.S. § 104-7 says, "[e]xclusive jurisdiction ... shall be and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this State." It appears that the State ceded all jurisdiction that it could except for the service of process and this is what the United States accepted.

The State says that Acting Secretary Forrestal could not have accepted jurisdiction of persons charged with acts of juvenile delinquency because he did not know "the many complexities of jurisdictional law that would arise in the future." Whatever the Acting Secretary could foresee, we believe he accepted exclusive jurisdiction as completely as he could. The state and federal governments had laws in effect governing matters of juvenile delinquency at the time jurisdiction was ceded. There is nothing in either of the two opinions of the Court of Appeals for the Fourth Circuit dealing with this defendant that would indicate the district court did not have jurisdiction to conduct an adjudication of delinquency for this defendant.

As to the State's contention that a juvenile delinquency hearing is a civil matter in both federal and state courts and for that reason the state and federal governments have concurrent jurisdiction, it is true that in Kent v. United States, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966), the United States Supreme Court said juvenile delinquency proceedings are designated civil and not criminal. Subchapter XI of Chapter 7A of the General Statutes, which contains the North Carolina Juvenile Code, does not classify a juvenile hearing as civil or criminal. We cannot find a case in this state which says a juvenile proceeding is a civil case. In regard to juvenile proceedings this Court has held that "[w]hatever may be their proper classification, they certainly are not `criminal prosecutions'" which require a jury trial or a trial at which the public must be admitted. In re Burrus, 275 N.C. 517, 529, 169 S.E.2d 879, 886 (1969). There are certain constitutional rights which a juvenile has at such a hearing which are not required in civil trials, such as the right to counsel if there is a possibility of commitment and the privilege against self incrimination. This would suggest a juvenile hearing is not a civil case. We do not believe we have to decide whether a juvenile hearing is civil or criminal. In this case the proceedings against the defendant in the Superior Court, Onslow County are criminal proceedings. His case was transferred to superior court for trial on three charges of murder.

Bound as we are by the federal court's interpretation of this federal question, we must hold that the Superior Court, Onslow County does not have jurisdiction to try the defendant. If we were to hold otherwise we would have to overrule State v. DeBerry, 224 N.C. 834, 32 S.E.2d 617. As Chief Justice Stacy said in DeBerry, "[t]his may lead to an undesirable result. Nevertheless, *410 we can only declare the law as we find it." Id. at 837, 32 S.E.2d at 619.

We reverse the order of the superior court and remand for the dismissal of the three charges against the defendant.

REVERSED AND REMANDED.

MARTIN, Justice, concurring.

I concur in the result reached by the majority but for different reasons.

A review of the history of this appeal is helpful to an understanding of the issues involved.

1. On 24 August 1981 Connie Smith, Tyler Dash, and Sharon Sager were found murdered in a residence located at 6080-A Kentucky Court in the Watkins Village housing area of the Camp Lejeune Marine Corps base. The victims were the defendant's aunt, his twelve year old sister, and his cousin.

2. On 24 August 1981 this defendant was fifteen years of age and resided with his mother and two sisters on the Marine Corps base at Camp Lejeune.

3. The defendant was immediately a suspect in the case. However, federal authorities evidently concluded that they did not have sufficient evidence to proceed, and by 1983 they had lost track of this defendant altogether.

4. Sometime after the murders, defendant Smith moved with the remainder of his family to Oregon.

5. In 1986 defendant wanted to join the Oregon National Guard. That organization contacted Camp Lejeune for copies of defendant's medical records. Upon receipt of the records which included psychiatric reports, defendant was turned down for the National Guard. Defendant's mother contacted Camp Lejeune and asked that the investigation concerning defendant be closed so that he could "get on with his life." Agents from the Naval Investigative Service contacted defendant and conducted a number of interviews with him. At one of those interviews, defendant made incriminating statements concerning the murders and was arrested on 30 June 1986.

6. On 7 July 1986 Samuel T. Currin, United States Attorney, through his assistant, M.F. Bogdanos, filed a certificate with the Federal Court for the Eastern District of North Carolina certifying "no Juvenile Court or other appropriate court of any state including the General Court of Justice of the State of North Carolina has jurisdiction over said juvenile with respect to the acts of juvenile delinquency alleged in this case, such acts having occurred on Marine Corps base at Camp Lejeune, North Carolina, a military reservation acquired for the use of the United States and under exclusive jurisdiction thereof."

7. On 8 July 1986 the federal government filed a "juvenile information" charging defendant with these three murders, and a magistrate found probable cause to believe that "the juvenile committed the offenses alleged."

8. On 22 July 1986 the U.S. District Judge entered an order upon motion of the government transferring this case to the District Court for trial of the defendant as an adult. This order was appealed to the United States Court of Appeals, Fourth Circuit.

9. On 26 May 1987 the United States Court of Appeals, Fourth Circuit, entered a decision reversing the order of the trial court transferring this defendant's case for trial as an adult. The court held that at the time of the commission of these alleged crimes (24 August 1981) there was no provision in the Federal Juvenile Delinquency Act which would permit the transfer of a juvenile's case to the District Court for trial as an adult. Although the statute in

effect in 1981 was amended in 1984 to allow such transfer, the amendment could not be applied to this defendant for these alleged crimes as that would constitute a violation of the ex post facto clause of the United States Constitution. United States v. Juvenile Male, 819 F.2d 468 (4th Cir. 1987).

10. On 6 July 1987 the United States District Judge entered an order granting leave to the government to dismiss the juvenile information, and this dismissal was taken by the government.

*411 11. On 7 July 1987 the United States government procured a true bill of indictment from the grand jury charging this defendant with three counts of murder in the first degree involving these alleged killings and a fourth count of escape.

12. On 8 July 1987 the defendant made a motion to dismiss the bills of indictment which was denied by the Federal Court on 3 December 1987. Notice of Appeal was taken to the United States Court of Appeals, Fourth Circuit.

13. The Court of Appeals on 12 July 1988 reversed the District Court Judge ordering that the three murder charges should have been dismissed.

14. On 14 December 1988 the United States District Judge entered an order pursuant to the Fourth Circuit opinion dismissing the three murder charges against this defendant. The theory of the Fourth Circuit decision was that the initiation of the juvenile proceedings against this defendant, which the government had previously dismissed, prevented the government from later prosecuting him as an adult by way of a bill of indictment.

15. Thereafter, on 12 January 1989 the government dismissed the escape charge with the consent of the Federal Court.

16. On 13 December 1988 the Onslow County grand jury returned indictments charging defendant with the 24 August 1981 murders of his aunt, cousin, and sister.

17. Defendant entered pleas of not guilty at his arraignment on 25 January 1989.

18. On 13 February 1989 defendant filed two motions to dismiss for lack of jurisdiction.

19. On 23 February 1989 Judge Strickland denied these motions. Whereupon the case was appealed to this Court.

At the outset, the validity of State v. DeBerry, 224 N.C. 834, 32 S.E.2d 617 (1945), is not necessary to a resolution of this appeal. This Court in DeBerry only held that N.C.G.S. §

104-1 and 104-7 did not apply to property acquired by the United States in 1899, years before the statutes were adopted. The case at bar is not concerned with the retroactivity of the statutes. The "unqualified consent" by the state to the federal acquisition of the post office property in DeBerry was based upon legislation adopted in 1887, not N.C.G.S. § 104-7. DeBerry is not relevant to the issue before the Court at this time.

The legal issue involved in this case is not the guilt or innocence of the defendant of the murders in question. The defendant has made a judicial stipulation that on 24 August 1981 the three victims were found murdered in a residence on the Marine Corps base at Camp Lejeune. The only question remaining as to guilt or innocence is whether this defendant was the perpetrator of the three murders, or any one or more of them. Defendant has made incriminating statements to Naval Investigative Service agents from which a jury could conclude that defendant was the person who perpetrated the crimes.

The issue before this Court is whether the Superior Court of Onslow County had jurisdiction to try this defendant upon the bills of indictment returned against him for the murders. The resolution of this issue depends upon this Court's interpretation of the United States Constitution, state and federal statutes, and the acts of the state and federal governments with respect to the acquisition of the land by the United States government upon which Camp Lejeune is now situated and within which the murders in this case occurred.

At the time of the murders in question there was no provision in the Federal Juvenile Delinquency Act for the trial of a juvenile as an adult when charged with such serious offenses as murder. The most that the federal government could do under the Federal Juvenile Delinquency Act at that time was to have a juvenile delinquency adjudication proceeding.

The United States government in 1981, at the time of these crimes, had no provision to try as an adult a juvenile who had committed three murders. Under the law of North Carolina in 1981, the defendant could be tried as an adult for the offense of *412 murder. Where there is a gap in jurisdiction of the United States, upon the ceding of territorial jurisdiction by the state to the United States, the state retains its underlying territorial jurisdiction over the area in question insofar as the exercise of such jurisdiction by the state does not interfere with the activities of the federal government in carrying out its duties upon the federal enclave. However, the Federal Assimilative Crimes Act cures this gap in the federal jurisdiction. This act reads:

Laws of States adopted for areas within Federal jurisdiction Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title [18 USC § 7], is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or ommitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13 (1948).

The provisions of this Act have been in effect since 1825. The purpose of this statute is to provide for punishment in the federal courts, as an offense against the United States, of offenses committed within federal enclaves, but only in the way and to the extent that the offense in question would have been punishable if committed within the jurisdiction of the state. United States v. Press Publishing Co., 219 U.S. 1, 31 S. Ct. 212, 55 L. Ed. 65 (1910). It provides criminal laws for federal enclaves by use of the state law to fill gaps in federal criminal law. United States v. Brown, 608 F.2d 551 (5th Cir.1979). Where Congress has failed to pass specific criminal legislation, the Act is used to fill the gaps in criminal law in federal enclaves. United States v. Fulkerson, 631 F. Supp. 319 (D.Haw.1986).

In 1981, the federal law failed to provide for the trial of a juvenile for the crime of murder committed within a federal enclave. The juvenile could only be proceeded against under the Federal Juvenile Delinquency Act. Such proceedings are civil rather than criminal. Kent v. United States, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966). The juvenile court basically is determining the needs of the child and society rather than adjudicating criminal conduct or fixing criminal responsibility, guilt, or punishment. Id. Thus in 1981, the federal laws failed to provide for the trial of this defendant, a juvenile, on criminal charges of murder.

To the contrary, North Carolina in 1981 did provide for the trial of a juvenile for the crime of murder. The statute, passed in 1979, reads:

The court after notice, hearing, and a finding of probable cause may transfer jurisdiction over a juvenile 14 years of age or older to superior court if the juvenile was 14 years of age or older at the time he allegedly committed an offense which would be a felony if committed by an adult. If the alleged felony constitutes a capital offense and the judge finds probable cause, the judge shall transfer the case to the superior court for trial as in the case of adults.

Case: 2:25-cv-00748-SDM-EPD Doc #: 1-8 Filed: 07/07/25 Page: 99 of 147 PAGEID #: 606

12/20/24, 11:27 AM          State v. Smith :: 1991 :: North Carolina Supreme Court Decisions :: North Carolina Case Law :: North Carolina Law :: US Law :: J…

N.C.G.S. § 7A-608 (1989).

Therefore, by applying the Federal Assimilative Crimes Act, thereby incorporating N.C.G.S. § 7A-608 as a part of the federal criminal law, the United States had jurisdiction to try this defendant for the capital charges of murder. Because the federal government thereby had jurisdiction to try this defendant on the murder charges, the state lacked jurisdiction to do so.

Inexplicably, counsel and the court failed to recognize and apply the Federal Assimilative Crimes Act in deciding and reviewing the issue of whether this defendant could be tried as an adult in the federal court for these three murders. See United States v. Juvenile Male, 819 F.2d 468 (4th Cir.1987). Had the federal court done so, these murder cases could have been adjudicated in 1987. Nevertheless, the actions of the federal court cannot serve to expand the jurisdiction of the courts of this state.

For these reasons, I concur in the result.

Some case metadata and case summaries were written with the help of AI, which can produce inaccuracies. You should read the full case before relying on it for legal research purposes.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

*Reproductive Health, Inc.,* 462 U. S. 416, 462 U. S. 444, that "a State may not adopt one theory of when life begins to justify its regulation of abortions."

Page 492 U. S. 491

That statement means only that a State could not "justify" any abortion regulation otherwise invalid under *Roe v. Wade* on the ground that it embodied the State's view about when life begins. The preamble does not, by its terms, regulate abortions or any other aspect of appellees' medical practice, and § 1.205.2 can be interpreted to do no more than offer protections to unborn children in tort and probate law, which is permissible under *Roe v. Wade, supra,* at 410 U. S. 161-162. This Court has emphasized that *Roe* implies no limitation on a State's authority to make a value judgment favoring childbirth over abortion, *Maher v. Roe,* 432 U. S. 464, 432 U. S. 474, and the preamble can be read simply to express that sort of value judgment. The extent to which the preamble's language might be used to interpret other state statutes or regulations is something that only the state courts can definitively decide, and, until those courts have applied the preamble to restrict appellees' activities in some concrete way, it is inappropriate for federal courts to address its meaning. *Alabama State Federation of Labor v. McAdory,* 325 U. S. 450, 325 U. S. 460. Pp. 492 U. S. 504-507.

2. The restrictions in §§ 188.210 and 188.215 of the Missouri statute on the use of public employees and facilities for the performance or assistance of nontherapeutic abortions do not contravene this Court's abortion decisions. The Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government may not deprive the individual. *DeShaney v. Winnebago County Dept. of Social Services,* 489 U. S. 189, 489 U. S. 196. Thus, in *Maher v. Roe, supra; Poelker v. Doe,* 432 U. S. 519; and *Harris v. McRae,* 448 U. S. 297, this Court upheld governmental regulations withholding public funds for nontherapeutic abortions but allowing payments for medical services related to childbirth, recognizing that a government's decision to favor childbirth over abortion through the allocation of public funds does not violate *Roe v. Wade.* A State may implement that same value judgment through the allocation of other public resources, such as hospitals and medical staff. There is no merit to the claim that *Maher, Poelker,* and *McRae* must be distinguished on the grounds that preventing access to a public facility narrows or forecloses the availability of abortion. Just as in those cases, Missouri's decision to use public facilities and employees to encourage childbirth over abortion places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy, but leaves her with the same choices as if the State had decided not to operate any hospitals at all. The challenged provisions restrict her ability to obtain an abortion only to the extent that she chooses to use a physician affiliated with a public hospital. Also without merit is the assertion that

Page 492 U. S. 492

*Maher, Poelker,* and *McRae* must be distinguished on the ground that, since the evidence shows that all of a public facility's costs in providing abortion services are recouped when the patient pays, such that no public funds are expended, the Missouri statute goes beyond expressing a preference for childbirth over abortion by creating an obstacle to the right to choose abortion that cannot stand absent a compelling state interest. Nothing in the Constitution requires States to enter or remain in the abortion business or entitles private physicians and their patients access to public facilities for the performance of abortions. Indeed, if the State does recoup all of its costs in performing abortions and no state subsidy, direct or indirect, is available, it is difficult to see how any procreational choice is burdened by the State's ban on the use of its facilities or employees for performing abortions. The cases in question all support the view that the State need not commit any resources to performing abortions, even if it can turn a profit by doing so. Pp. 492 U. S. 507-511.

3. The controversy over § 188.205's prohibition on the use of public funds to encourage or counsel a woman to have a nontherapeutic abortion is moot. The Court of Appeals did not consider § 188.205 separately from §§ 188.210 and 188.215 -- which respectively prohibit the use of public employees and facilities for such counseling -- in holding all three sections unconstitutionally vague and violative of a woman's right to choose an abortion. Missouri has appealed only the invalidation of § 188.205. In light of the State's claim, which this Court accepts for purposes of decision, that § 188.205 is not directed at the primary conduct of physicians or health care providers, but is simply an instruction to the State's fiscal officers not to allocate public funds for abortion counseling, appellees contend that they are not "adversely" affected by the section, and therefore that there is no longer a case or controversy before the Court on this question. Since plaintiffs are masters of their complaints even at the appellate stage, and since appellees no longer seek equitable relief on their § 188.205 claim, the Court of Appeals

is directed to vacate the District Court's judgment with instructions to dismiss the relevant part of the complaint with prejudice. *Deakins v. Monaghan,* 484 U. S. 193, 484 U. S. 200. Pp. 492 U. S. 511-513.

THE CHIEF JUSTICE, joined by JUSTICE WHITE and JUSTICE KENNEDY, concluded in Parts II-D and III that:

1. Section 188.029 of the Missouri statute -- which specifies, in its first sentence, that a physician, before performing an abortion on a woman he has reason to believe is carrying an unborn child of 20 or more weeks gestational age, shall first determine if the unborn child is viable by using that degree of care, skill, and proficiency that is commonly exercised by practitioners in the field; but which then provides, in its second sentence, that, in making the viability determination, the physician shall

Page 492 U. S. 493

perform such medical examinations and tests as are necessary to make a finding of the unborn child's gestational age, weight, and lung maturity -- is constitutional, since it permissibly furthers the State's interest in protecting potential human life. Pp. 492 U. S. 513-521.

(a) The Court of Appeals committed plain error in reading § 188.029 as requiring that, after 20 weeks, the specified tests *must* be performed. That section makes sense only if its second sentence is read to require only those tests that are useful in making subsidiary viability findings. Reading the sentence to require the tests *in all circumstances,* including when the physician's reasonable professional judgment indicates that they would be irrelevant to determining viability or even dangerous to the mother and the fetus, would conflict with the first sentence's *requirement* that the physician apply his reasonable professional skill and judgment. It would also be incongruous to read the provision, especially the word "necessary," to require tests irrelevant to the expressed statutory purpose of determining viability. Pp. 492 U. S. 514-515.

(b) Section 188.029 is reasonably designed to ensure that abortions are not performed where the fetus is viable. The section's tests are intended to determine viability, the State having chosen viability as the point at which its interest in potential human life must be safeguarded. The section creates what is essentially a presumption of viability at 20 weeks, which the physician, prior to performing an abortion, must rebut with tests -- including, if feasible, those for gestational age, fetal weight, and lung capacity -- indicating that the fetus is not viable. While the District Court found that uncontradicted medical evidence established that a 20-week fetus is *not* viable, and that 23 1/2 to 24 weeks' gestation is the earliest point at which a reasonable possibility of viability exists, it also found that there may be a 4-week error in estimating gestational age, which supports testing at 20 weeks. Pp. 492 U. S. 515-516.

(c) Section 188.029 conflicts with *Roe v. Wade* and cases following it. Since the section's tests will undoubtedly show in many cases that the fetus is not viable, the tests will have been performed for what were, in fact, second-trimester abortions. While *Roe,* 410 U. S. at 410 U. S. 162, recognized the State's interest in protecting potential human life as "important and legitimate," it also limited state involvement in second-trimester abortions to protecting maternal health, *id.* at 410 U. S. 164, and allowed States to regulate or proscribe abortions to protect the unborn child only after viability, *id.* at 410 U. S. 165. Since the tests in question regulate the physician's discretion in determining the viability of the fetus, § 188.029 conflicts with language in *Colautti v. Franklin,* 439 U. S. 379, 439 U. S. 388-389, stating that the viability determination is, and must be, a matter for the responsible attending physician's judgment. And, in light of District Court findings that the tests increase the expenses of abortion, their validity

Page 492 U. S. 494

may also be questioned under *Akron,* 462 U.S. at 462 U. S. 434-435, which held that a requirement that second-trimester abortions be performed in hospitals was invalid because it substantially increased the expenses of those procedures. Pp. 492 U. S. 516-517.

(d) The doubt cast on the Missouri statute by these cases is not so much a flaw in the statute as it is a reflection of the fact that *Roe's* rigid trimester analysis has proved to be unsound in principle and unworkable in practice. In such circumstances, this Court does not refrain from reconsidering prior constitutional rulings, notwithstanding *stare decisis. E.g., Garcia v. San Antonio Metropolitan Transit Authority,* 469 U. S. 528. The *Roe* framework is hardly consistent with the notion of a Constitution like ours that is cast in general terms and usually speaks in

general principles. The framework's key elements -- trimesters and viability -- are not found in the Constitution's text, and, since the bounds of the inquiry are essentially indeterminate, the result has been a web of legal rules that have become increasingly intricate, resembling a code of regulations, rather than a body of constitutional doctrine. There is also no reason why the State's compelling interest in protecting potential human life should not extend throughout pregnancy, rather than coming into existence only at the point of viability. Thus, the *Roe* trimester framework should be abandoned. Pp. 492 U. S. 517-520.

(e) There is no merit to JUSTICE BLACKMUN's contention that the Court should join in a "great issues" debate as to whether the Constitution includes an "unenumerated" general right to privacy as recognized in cases such as *Griswold v. Connecticut,* 381 U. S. 479. Unlike *Roe, Griswold* did not purport to adopt a whole framework, complete with detailed rules and distinctions, to govern the cases in which the asserted liberty interest would apply. The *Roe* framework sought to deal with areas of medical practice traditionally left to the States, and to balance once and for all, by reference only to the calendar, the State's interest in protecting potential human life against the claims of a pregnant woman to decide whether or not to abort. The Court's experience in applying *Roe* in later cases suggests that there is wisdom in not necessarily attempting to elaborate the differences between a "fundamental right" to an abortion, *Akron, supra,* at 462 U. S. 420, n. 1, a "limited fundamental constitutional right," *post* at 492 U. S. 555, or a liberty interest protected by the Due Process Clause. Moreover, although this decision will undoubtedly allow more governmental regulation of abortion than was permissible before, the goal of constitutional adjudication is not to remove inexorably "politically devisive" issues from the ambit of the legislative process, but is, rather, to hold true the balance between that which the Constitution puts beyond the reach of the democratic process and that which it does not. Furthermore, the suggestion that legislative bodies, in a Nation

Page 492 U. S. 495

where more than half the population is female, will treat this decision as an invitation to enact abortion laws reminiscent of the dark ages misreads the decision and does scant justice to those who serve in such bodies and the people who elect them. Pp. 492 U. S. 520-521.

2. This case affords no occasion to disturb *Roe's* holding that a Texas statute which criminalized *all* nontherapeutic abortions unconstitutionally infringed the right to an abortion derived from the Due Process Clause. *Roe* is distinguishable on its facts, since Missouri has determined that viability is the point at which its interest in potential human life must be safeguarded. P. 492 U. S. 521.

JUSTICE O'CONNOR, agreeing that it was plain error for the Court of Appeals to interpret the second sentence of § 188.029 as meaning that doctors must perform tests to find gestational age, fetal weight, and lung maturity, concluded that the section was constitutional as properly interpreted by the plurality, and that the plurality should therefore not have proceeded to reconsider *Roe v. Wade.* This Court refrains from deciding constitutional questions where there is no need to do so, and generally does not formulate a constitutional rule broader than the precise facts to which it is to be applied. *Ashwander v. TVA,* 297 U. S. 288, 297 U. S. 346, 297 U. S. 347. Since appellees did not appeal the District Court's ruling that the first sentence of § 188.029 is constitutional, there is no dispute between the parties over the presumption of viability at 20 weeks created by that first sentence. Moreover, as properly interpreted by the plurality, the section's second sentence does nothing more than delineate means by which the unchallenged 20-week presumption may be overcome if those means are useful in determining viability and can be prudently employed. As so interpreted, the viability testing requirements do not conflict with any of the Court's abortion decisions. As the plurality recognizes, under its interpretation of § 188.029's second sentence, the viability testing requirements promote the State's interest in potential life. This Court has recognized that a State may promote that interest when viability is possible. *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U. S. 747, 476 U. S. 770-771. Similarly, the basis for reliance by the lower courts on *Colautti v. Franklin,* 439 U. S. 379, 439 U. S. 388-389, disappears when § 188.029 is properly interpreted to require only subsidiary viability findings, since the State has not attempted to substitute its judgment for the physician's ascertainment of viability, which therefore remains "the critical point." Nor does the marginal increase in the cost of an abortion created by § 188.029's viability testing provision, as interpreted, conflict with *Akron v. Akron Center for Reproductive Health,* 462 U. S. 416, 462 U. S. 434-439, since, here, such costs do not place a "heavy, and unnecessary burden" on a woman's abortion decision, whereas the statutory requirement in *Akron,* which related to

Page 492 U. S. 496

previablity abortions, more than doubled a woman's costs. Moreover, the statutory requirement in *Akron* involved second-trimester abortions generally; § 188.029 concerns only tests and examinations to determine viability when viability is possible. The State's compelling interest in potential life postviability renders its interest in determining the critical point of viability equally compelling. *Thornburgh, supra,* at 476 U. S. 770-771. When the constitutional invalidity of a State's abortion statute actually turns upon the constitutional validity of *Roe,* there will be time enough to reexamine *Roe,* and to do so carefully. Pp. 492 U. S. 525-531.

JUSTICE SCALIA would reconsider and explicitly overrule *Roe v. Wade.* Avoiding the *Roe* question by deciding this case in as narrow a manner as possible is not required by precedent and not justified by policy. To do so is needlessly to prolong this Court's involvement in a field where the answers to the central questions are political, rather than juridical, and thus to make the Court the object of the sort of organized pressure that political institutions in a democracy ought to receive. It is particularly perverse to decide this case as narrowly as possible in order to avoid reading the inexpressibly "broader than was required by the precise facts" structure established by *Roe v. Wade.* The question of *Roe's* validity is presented here, inasmuch as § 188.029 constitutes a legislative imposition on the judgment of the physician concerning the point of viability and increases the cost of an abortion. It does palpable harm, if the States can and would eliminate largely unrestricted abortion, skillfully to refrain from telling them so. Pp. 492 U. S. 532-537.

REHNQUIST, C.J., announced the judgment of the Court and delivered the opinion for a unanimous Court with respect to Part II-C, the opinion of the Court with respect to Parts I, II-A, and II-B, in which WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined, and an opinion with respect to Parts II-D and III, in which WHITE and KENNEDY, JJ., joined. O'CONNOR, J., *post,* p. 492 U. S. 522, and SCALIA, J., *post,* p. 492 U. S. 532, filed opinions concurring in part and concurring in the judgment. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 492 U. S. 537. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post,* p. 492 U. S. 560.

Page 492 U. S. 498

**Read More**

---

## Opinions

**Opinions & Dissents**

# U.S. Supreme Court

**Webster v. Reproductive Health Svcs., 492 U.S. 490 (1989)**
**Webster v. Reproductive Health Services**

**No. 88-605**

**Argued April 26, 1989**

**Decided July 3, 1989**

**492 U.S. 490**

*APPEAL FROM THE UNITED STATES COURT OF APPEALS FOR*

*THE EIGHTH CIRCUIT*

*Syllabus*

Appellees, state-employed health professionals and private nonprofit corporations providing abortion services, brought suit in the District Court for declaratory and injunctive relief challenging the constitutionality of a Missouri statute regulating the performance of abortions. The statute, *inter alia:* (1) sets forth "findings" in its preamble that "[t]he life of each human being begins at conception," and that "unborn children have protectable interests in life, health, and wellbeing," §§ 1.205.1(1), (2), and requires that all state laws be interpreted to provide unborn children with the same rights enjoyed by other persons, subject to the Federal Constitution and this Court's precedents, § 1.205.2; (2) specifies that a physician, prior to performing an abortion on any woman whom he has reason to believe is 20 or more weeks pregnant, must ascertain whether the fetus is "viable" by performing "such medical examinations and tests as are necessary to make a finding of [the fetus'] gestational age, weight, and lung maturity," § 188.029; (3) prohibits the use of public employees and facilities to perform or assist abortions not necessary to save the mother's life, §§ 188.210, 188.215; and (4) makes it unlawful to use public funds, employees, or facilities for the purpose of "encouraging or counseling" a woman to have an abortion not necessary to save her life, §§ 188.205, 188.210, 188.215. The District Court struck down each of the above provisions, among others, and enjoined their enforcement. The Court of Appeals affirmed, ruling that the provisions in question violated this Court's decisions in *Roe v. Wade,* 410 U. S. 113, and subsequent cases.

*Held:* The judgment is reversed.

851 F.2d 1071, reversed.

THE CHIEF JUSTICE delivered the opinion of the Court with respect to Parts I, II-A, II-B, and II-C, concluding that:

1. This Court need not pass on the constitutionality of the Missouri statute's preamble. In invalidating the preamble, the Court of Appeals misconceived the meaning of the dictum in *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U. S. 416, 462 U. S. 444, that "a State may not adopt one theory of when life begins to justify its regulation of abortions."

Page 492 U. S. 491

That statement means only that a State could not "justify" any abortion regulation otherwise invalid under *Roe v. Wade* on the ground that it embodied the State's view about when life begins. The preamble does not, by its terms, regulate abortions or any other aspect of appellees' medical practice, and § 1.205.2 can be interpreted to do no more than offer protections to unborn children in tort and probate law, which is permissible under *Roe v. Wade, supra,* at 410 U. S. 161-162. This Court has emphasized that *Roe* implies no limitation on a State's authority to make a value judgment favoring childbirth over abortion, *Maher v. Roe,* 432 U. S. 464, 432 U. S. 474, and the preamble can be read simply to express that sort of value judgment. The extent to which the preamble's language might be used to interpret other state statutes or regulations is something that only the state courts can definitively decide, and, until those courts have applied the preamble to restrict appellees' activities in some concrete way, it is inappropriate for federal courts to address its meaning. *Alabama State Federation of Labor v. McAdory,* 325 U. S. 450, 325 U. S. 460. Pp. 492 U. S. 504-507.

2. The restrictions in §§ 188.210 and 188.215 of the Missouri statute on the use of public employees and facilities for the performance or assistance of nontherapeutic abortions do not contravene this Court's abortion decisions. The Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government may not deprive the individual. *DeShaney v. Winnebago County Dept. of Social Services,* 489 U. S. 189, 489 U. S. 196. Thus, in *Maher v. Roe, supra; Poelker v. Doe,* 432 U. S. 519; and *Harris v. McRae,* 448 U. S. 297, this Court upheld governmental regulations withholding public funds for nontherapeutic abortions but allowing payments for medical services related to childbirth, recognizing that a government's decision to favor childbirth over abortion through the allocation of public funds does not violate *Roe v. Wade.* A State may implement that same value judgment through the allocation of other public resources, such as hospitals and medical staff. There is no merit to the claim that *Maher, Poelker,* and *McRae* must be distinguished on the grounds that preventing access to a public facility narrows or forecloses the availability of abortion. Just as in those cases, Missouri's decision to use public facilities and employees to encourage childbirth over abortion places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy, but leaves her with the same choices as if the State had decided not to operate any hospitals at all. The challenged provisions restrict her ability to obtain an abortion only to the extent that she chooses to use a physician affiliated with a public hospital. Also without merit is the assertion that

Page 492 U. S. 492

*Maher, Poelker,* and *McRae* must be distinguished on the ground that, since the evidence shows that all of a public facility's costs in providing abortion services are recouped when the patient pays, such that no public funds are expended, the Missouri statute goes beyond expressing a preference for childbirth over abortion by creating an obstacle to the right to choose abortion that cannot stand absent a compelling state interest. Nothing in the Constitution requires States to enter or remain in the abortion business or entitles private physicians and their patients access to public facilities for the performance of abortions. Indeed, if the State does recoup all of its costs in performing abortions and no state subsidy, direct or indirect, is available, it is difficult to see how any procreational choice is burdened by the State's ban on the use of its facilities or employees for performing abortions. The cases in question all support the view that the State need not commit any resources to performing abortions, even if it can turn a profit by doing so. Pp. 492 U. S. 507-511.

3. The controversy over § 188.205's prohibition on the use of public funds to encourage or counsel a woman to have a nontherapeutic abortion is moot. The Court of Appeals did not consider § 188.205 separately from §§ 188.210 and 188.215 -- which respectively prohibit the use of public employees and facilities for such counseling -- in holding all three sections unconstitutionally vague and violative of a woman's right to choose an abortion. Missouri has appealed only the invalidation of § 188.205. In light of the State's claim, which this Court accepts for purposes of decision, that § 188.205 is not directed at the primary conduct of physicians or health care providers, but is simply an instruction to the State's fiscal officers not to allocate public funds for abortion counseling, appellees contend that they are not "adversely" affected by the section, and therefore that there is no longer a case or controversy before the Court on this question. Since plaintiffs are masters of their complaints even at the appellate stage, and since appellees no longer seek equitable relief on their § 188.205 claim, the Court of Appeals is directed to vacate the District Court's judgment with instructions to dismiss the relevant part of the complaint with prejudice. *Deakins v. Monaghan,* 484 U. S. 193, 484 U. S. 200. Pp. 492 U. S. 511-513.

THE CHIEF JUSTICE, joined by JUSTICE WHITE and JUSTICE KENNEDY, concluded in Parts II-D and III that:

1. Section 188.029 of the Missouri statute -- which specifies, in its first sentence, that a physician, before performing an abortion on a woman he has reason to believe is carrying an unborn child of 20 or more weeks gestational age, shall first determine if the unborn child is viable by using that degree of care, skill, and proficiency that is commonly exercised by practitioners in the field; but which then provides, in its second sentence, that, in making the viability determination, the physician shall

Page 492 U. S. 493

perform such medical examinations and tests as are necessary to make a finding of the unborn child's gestational age, weight, and lung maturity -- is constitutional, since it permissibly furthers the State's interest in protecting potential human life. Pp. 492 U. S. 513-521.

(a) The Court of Appeals committed plain error in reading § 188.029 as requiring that, after 20 weeks, the specified tests *must* be performed. That section makes sense only if its second sentence is read to require only those tests that are useful in making subsidiary viability findings. Reading the sentence to require the tests *in all circumstances,* including when the physician's reasonable professional judgment indicates that they would be irrelevant to determining viability or even dangerous to the mother and the fetus, would conflict with the first sentence's *requirement* that the physician apply his reasonable professional skill and judgment. It would also be incongruous to read the provision, especially the word "necessary," to require tests irrelevant to the expressed statutory purpose of determining viability. Pp. 492 U. S. 514-515.

(b) Section 188.029 is reasonably designed to ensure that abortions are not performed where the fetus is viable. The section's tests are intended to determine viability, the State having chosen viability as the point at which its interest in potential human life must be safeguarded. The section creates what is essentially a presumption of viability at 20 weeks, which the physician, prior to performing an abortion, must rebut with tests -- including, if feasible, those for gestational age, fetal weight, and lung capacity -- indicating that the fetus is not viable. While the District Court found that uncontradicted medical evidence established that a 20-week fetus is *not* viable, and that 23 1/2 to 24 weeks' gestation is the earliest point at which a reasonable possibility of viability exists, it also found that there may be a 4-week error in estimating gestational age, which supports testing at 20 weeks. Pp. 492 U. S. 515-516.

(c) Section 188.029 conflicts with *Roe v. Wade* and cases following it. Since the section's tests will undoubtedly show in many cases that the fetus is not viable, the tests will have been performed for what were, in fact, second-trimester abortions. While *Roe,* 410 U.S. at 410 U. S. 162, recognized the State's interest in protecting potential human life as "important and legitimate," it also limited state involvement in second-trimester abortions to protecting maternal health, *id.* at 410 U. S. 164, and allowed States to regulate or proscribe abortions to protect the unborn child only after viability, *id.* at 410 U. S. 165. Since the tests in question regulate the physician's discretion in determining the viability of the fetus, § 188.029 conflicts with language in *Colautti v. Franklin,* 439 U. S. 379, 439 U. S. 388-389, stating that the viability determination is, and must be, a matter for the responsible attending physician's judgment. And, in light of District Court findings that the tests increase the expenses of abortion, their validity

Page 492 U. S. 494

may also be questioned under *Akron,* 462 U.S. at 462 U. S. 434-435, which held that a requirement that second-trimester abortions be performed in hospitals was invalid because it substantially increased the expenses of those procedures. Pp. 492 U. S. 516-517.

(d) The doubt cast on the Missouri statute by these cases is not so much a flaw in the statute as it is a reflection of the fact that *Roe's* rigid trimester analysis has proved to be unsound in principle and unworkable in practice. In such circumstances, this Court does not refrain from reconsidering prior constitutional rulings, notwithstanding *stare decisis. E.g., Garcia v. San Antonio Metropolitan Transit Authority,* 469 U. S. 528. The *Roe* framework is hardly consistent with the notion of a Constitution like ours that is cast in general terms and usually speaks in general principles. The framework's key elements -- trimesters and viability -- are not found in the Constitution's text, and, since the bounds of the inquiry are essentially indeterminate, the result has been a web of legal rules that have become increasingly intricate, resembling a code of regulations, rather than a body of constitutional doctrine. There is also no reason why the State's compelling interest in protecting potential human life should not extend throughout pregnancy, rather than coming into existence only at the point of viability. Thus, the *Roe* trimester framework should be abandoned. Pp. 492 U. S. 517-520.

(e) There is no merit to JUSTICE BLACKMUN's contention that the Court should join in a "great issues" debate as to whether the Constitution includes an "unenumerated" general right to privacy as recognized in cases such as *Griswold v. Connecticut,* 381 U. S. 479. Unlike *Roe, Griswold* did not purport to adopt a whole framework, complete with detailed rules and distinctions, to govern the cases in which the asserted liberty interest would apply. The *Roe* framework sought to deal with areas of medical practice traditionally left to the States, and to balance once and for all, by reference only to the calendar, the State's interest in protecting potential human life against the claims of a pregnant woman to decide whether or not to abort. The Court's experience in applying *Roe* in later cases suggests that there is wisdom in not necessarily attempting to elaborate the differences between a "fundamental right" to an abortion, *Akron, supra,* at 462 U. S. 420, n. 1, a "limited fundamental constitutional right," *post* at 492 U. S. 555, or a liberty interest protected by the Due Process Clause. Moreover, although this decision will undoubtedly allow more governmental regulation of abortion than was permissible before, the goal

of constitutional adjudication is not to remove inexorably "politically devisive" issues from the ambit of the legislative process, but is, rather, to hold true the balance between that which the Constitution puts beyond the reach of the democratic process and that which it does not. Furthermore, the suggestion that legislative bodies, in a Nation

Page 492 U. S. 495

where more than half the population is female, will treat this decision as an invitation to enact abortion laws reminiscent of the dark ages misreads the decision and does scant justice to those who serve in such bodies and the people who elect them. Pp. 492 U. S. 520-521.

2. This case affords no occasion to disturb *Roe*'s holding that a Texas statute which criminalized *all* nontherapeutic abortions unconstitutionally infringed the right to an abortion derived from the Due Process Clause. *Roe* is distinguishable on its facts, since Missouri has determined that viability is the point at which its interest in potential human life must be safeguarded. P. 492 U. S. 521.

JUSTICE O'CONNOR, agreeing that it was plain error for the Court of Appeals to interpret the second sentence of § 188.029 as meaning that doctors must perform tests to find gestational age, fetal weight, and lung maturity, concluded that the section was constitutional as properly interpreted by the plurality, and that the plurality should therefore not have proceeded to reconsider *Roe v. Wade*. This Court refrains from deciding constitutional questions where there is no need to do so, and generally does not formulate a constitutional rule broader than the precise facts to which it is to be applied. *Ashwander v. TVA,* 297 U. S. 288, 297 U. S. 346, 297 U. S. 347. Since appellees did not appeal the District Court's ruling that the first sentence of § 188.029 is constitutional, there is no dispute between the parties over the presumption of viability at 20 weeks created by that first sentence. Moreover, as properly interpreted by the plurality, the section's second sentence does nothing more than delineate means by which the unchallenged 20-week presumption may be overcome if those means are useful in determining viability and can be prudently employed. As so interpreted, the viability testing requirements do not conflict with any of the Court's abortion decisions. As the plurality recognizes, under its interpretation of § 188.029's second sentence, the viability testing requirements promote the State's interest in potential life. This Court has recognized that a State may promote that interest when viability is possible. *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U. S. 747, 476 U. S. 770-771. Similarly, the basis for reliance by the lower courts on *Colautti v. Franklin,* 439 U. S. 379, 439 U. S. 388-389, disappears when § 188.029 is properly interpreted to require only subsidiary viability findings, since the State has not attempted to substitute its judgment for the physician's ascertainment of viability, which therefore remains "the critical point." Nor does the marginal increase in the cost of an abortion created by § 188.029's viability testing provision, as interpreted, conflict with *Akron v. Akron Center for Reproductive Health,* 462 U. S. 416, 462 U. S. 434-439, since, here, such costs do not place a "heavy, and unnecessary burden" on a woman's abortion decision, whereas the statutory requirement in *Akron,* which related to

Page 492 U. S. 496

previablity abortions, more than doubled a woman's costs. Moreover, the statutory requirement in *Akron* involved second-trimester abortions generally; § 188.029 concerns only tests and examinations to determine viability when viability is possible. The State's compelling interest in potential life postviability renders its interest in determining the critical point of viability equally compelling. *Thornburgh, supra,* at 476 U. S. 770-771. When the constitutional invalidity of a State's abortion statute actually turns upon the constitutional validity of *Roe,* there will be time enough to reexamine *Roe,* and to do so carefully. Pp. 492 U. S. 525-531.

JUSTICE SCALIA would reconsider and explicitly overrule *Roe v. Wade.* Avoiding the *Roe* question by deciding this case in as narrow a manner as possible is not required by precedent and not justified by policy. To do so is needlessly to prolong this Court's involvement in a field where the answers to the central questions are political, rather than juridical, and thus to make the Court the object of the sort of organized pressure that political institutions in a democracy ought to receive. It is particularly perverse to decide this case as narrowly as possible in order to avoid reading the inexpressibly "broader than was required by the precise facts" structure established by *Roe v. Wade.* The question of *Roe*'s validity is presented here, inasmuch as § 188.029 constitutes a legislative imposition on the judgment of the physician concerning the point of viability and increases the cost of an abortion. It does palpable harm, if the States can and would eliminate largely unrestricted abortion, skillfully to refrain from telling them so. Pp. 492 U. S. 532-537.

REHNQUIST, C.J., announced the judgment of the Court and delivered the opinion for a unanimous Court with respect to Part II-C, the opinion of the Court with respect to Parts I, II-A, and II-B, in which WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined, and an opinion with respect to Parts II-D and III, in which WHITE and KENNEDY, JJ., joined. O'CONNOR, J., *post*, p. 492 U. S. 522, and SCALIA, J., *post*, p. 492 U. S. 532, filed opinions concurring in part and concurring in the judgment. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 492 U. S. 537. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 492 U. S. 560.

Page 492 U. S. 498

CHIEF JUSTICE REHNQUIST announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II-A, II-B, and II-C, and an opinion with respect

Page 492 U. S. 499

to Parts II-D and III, in which JUSTICE WHITE and JUSTICE KENNEDY join.

This appeal concerns the constitutionality of a Missouri statute regulating the performance of abortions. The United States Court of Appeals for the Eighth Circuit struck down several provisions of the statute on the ground that they violated this Court's decision in *Roe v. Wade*, 410 U. S. 113 (1973), and cases following it. We noted probable jurisdiction, 488 U.S. 1003 (1989), and now reverse.

Page 492 U. S. 500

I

In June, 1986, the Governor of Missouri signed into law Missouri Senate Committee Substitute for House Bill No. 1596 (hereinafter Act or statute), which amended existing state law concerning unborn children and abortions. [Footnote 1]

Page 492 U. S. 501

The Act consisted of 20 provisions, 5 of which are now before the Court. The first provision, or preamble, contains "findings" by the state legislature that "[t]he life of each human being begins at conception," and that "unborn children have protectable interests in life, health, and wellbeing." Mo.Rev.Stat. §§ 1.205.1(1), (2) (1986). The Act further requires that all Missouri laws be interpreted to provide unborn children with the same rights enjoyed by other persons, subject to the Federal Constitution and this Court's precedents. § 1.205.2. Among its other provisions, the Act requires that, prior to performing an abortion on any woman whom a physician has reason to believe is 20 or more weeks pregnant, the physician ascertain whether the fetus is viable by performing

"such medical examinations and tests as are necessary to make a finding of the gestational age, weight, and lung maturity of the unborn child."

§ 188. 029. The Act also prohibits the use of public employees and facilities to perform or assist abortions not necessary to save the mother's life, and it prohibits the use of public funds, employees, or facilities for the purpose of "encouraging or counseling" a woman to have an abortion not necessary to save her life. §§ 188.205, 188.210, 188.215.

In July, 1986, five health professionals employed by the State and two nonprofit corporations brought this class action in the United States District Court for the Western District of Missouri to challenge the constitutionality of the Missouri statute. Plaintiffs, appellees in this Court, sought declaratory and injunctive relief on the ground that certain statutory provisions violated the First, Fourth, Ninth, and Fourteenth Amendments to the Federal Constitution. App. A9. They asserted violations of various rights, including the "privacy

Page 492 U. S. 502

rights of pregnant women seeking abortions"; the "woman's right to an abortion"; the "righ[t] to privacy in the physician-patient relationship"; the physician's "righ[t] to practice medicine"; the pregnant woman's "right to life due to inherent risks involved in childbirth"; and the woman's right to "receive . . . adequate medical advice and treatment" concerning abortions. *Id.* at A17-A19.

Plaintiffs filed this suit

"on their own behalf and on behalf of the entire class consisting of facilities and Missouri licensed physicians or other health care professionals offering abortion services or pregnancy counseling and on behalf of the entire class of pregnant females seeking abortion services or pregnancy counseling within the State of Missouri."

*Id.* at A13. The two nonprofit corporations are Reproductive Health Services, which offers family planning and gynecological services to the public, including abortion services up to 22 weeks "gestational age," [Footnote 2] and Planned Parenthood of Kansas City, which provides abortion services up to 14 weeks gestational age. *Id.* at A9-A10. The individual plaintiffs are three physicians, one nurse, and a social worker. All are "public employees" at "public facilities" in Missouri, and they are paid for their services with "public funds," as those terms are defined by § 188.200. The individual plaintiffs, within the scope of their public employment, encourage and counsel pregnant women to have nontherapeutic abortions. To of the physicians perform abortions. App. A54-A55.

Several weeks after the complaint was filed, the District Court temporarily restrained enforcement of several provisions of the Act. Following a 3-day trial in December, 1986, the District Court declared seven provisions of the Act unconstitutional and enjoined their enforcement. 662 F. Supp. 407 (WD Mo.1987). These provisions included the preamble, § 1.205; the "informed consent" provision, which required

Page 492 U. S. 503

physicians to inform the pregnant woman of certain facts before performing an abortion, § 188.039; the requirement that post-16-week abortions be performed only in hospitals, § 188.025; the mandated tests to determine viability, § 188.029; and the prohibition on the use of public funds, employees, and facilities to perform or assist nontherapeutic abortions, and the restrictions on the use of public funds, employees, and facilities to encourage or counsel women to have such abortions, §§ 188.205, 188.210, 188.215. *Id.* at 430.

The Court of Appeals for the Eighth Circuit affirmed, with one exception not relevant to this appeal. 851 F.2d 1071 (1988). The Court of Appeals determined that Missouri's declaration that life begins at conception was "simply an impermissible state adoption of a theory of when life begins to justify its abortion regulations." *Id.* at 1076. Relying on *Colautti v. Franklin,* 439 U. S. 379, 439 U. S. 388-389 (1979), it further held that the requirement that physicians perform viability tests was an unconstitutional legislative intrusion on a matter of medical skill and judgment. 851 F.2d at 1074-1075. The Court of Appeals invalidated Missouri's prohibition on the use of public facilities and employees to perform or assist abortions not necessary to save the mother's life. *Id.* at 1081-1083. It distinguished our decisions in *Harris v. McRae,* 448 U. S. 297 (1980), and *Maher v. Roe,* 432 U. S. 464 (1977), on the ground that

"'[t]here is a fundamental difference between providing direct funding to effect the abortion decision and allowing staff physicians to perform abortions at an existing publicly owned hospital.'"

851 F.2d at 1081, quoting *Nyberg v. City of Virginia,* 667 F.2d 754, 758 (CA8 1982), *appeal dism'd,* 462 U.S. 1125 (1983). The Court of Appeals struck down the provision prohibiting the use of public funds for "encouraging or counseling" women to have nontherapeutic abortions, for the reason that this provision was both overly vague and inconsistent with the right to an abortion enunciated in *Roe v. Wade.* 851 F.2d at 1077-1080. The court also invalidated the hospitalization

Page 492 U. S. 504

requirement for 16-week abortions, *id.* at 1073-1074, and the prohibition on the use of public employees and facilities for abortion counseling, *id.* at 1077-1080, but the State has not appealed those parts of the judgment below. *See* Juris. Statement I-II. [Footnote 3]

## II

Decision of this case requires us to address four sections of the Missouri Act: (a) the preamble; (b) the prohibition on the use of public facilities or employees to perform abortions; (c) the prohibition on public funding of abortion counseling; and (d) the requirement that physicians conduct viability tests prior to performing abortions. We address these *seriatim.*

*A*

The Act's preamble, as noted, sets forth "findings" by the Missouri legislature that "[t]he life of each human being begins at conception," and that "[u]nborn children have protectable interests in life, health, and wellbeing."

Mo.Rev.Stat. §§ 1.205.1(1), (2) (1986). The Act then mandates that state laws be interpreted to provide unborn children with "all the rights, privileges, and immunities available to other persons, citizens, and residents of this state," subject to the Constitution and this Court's precedents. § 1.205.2. [Footnote 4] In invalidating

Page 492 U. S. 505

the preamble, the Court of Appeals relied on this Court's dictum that "*a State may not adopt one theory of when life begins to justify its regulation of abortions.*'" 851 F.2d at 1075-1076, *quoting Akron v. Akron Center for Reproductive Health, Inc., 462 U. S. 416, 462 U. S. 444 (1983), in turn citing Roe v. Wade, 410 U.S. at 410 U. S. 159-162. It rejected Missouri's claim that the preamble was "abortion-neutral," and "merely determine[d] when life begins in a nonabortion context, a traditional state prerogative." 851 F.2d at 1076. The court thought that " [t]he only plausible inference" from the fact that "every remaining section of the bill save one regulates the performance of abortions" was that "the state intended its abortion regulations to be understood against the backdrop of its theory of life." Ibid. [Footnote 5]*

The State contends that the preamble itself is precatory, and imposes no substantive restrictions on abortions, and that appellees therefore do not have standing to challenge it. Brief for Appellants 21-24. Appellees, on the other hand, insist that the preamble is an operative part of the Act intended to guide the interpretation of other provisions of the Act. Brief for Appellees 19-23. They maintain, for example, that the preamble's definition of life may prevent physicians

Page 492 U. S. 506

in public hospitals from dispensing certain forms of contraceptives, such as the intrauterine device. *Id.* at 22.

In our view, the Court of Appeals misconceived the meaning of the *Akron* dictum, which was only that a State could not "justify" an abortion regulation otherwise invalid under *Roe v. Wade* on the ground that it embodied the State's view about when life begins. Certainly the preamble does not, by its terms, regulate abortion or any other aspect of appellees' medical practice. The Court has emphasized that *Roe v. Wade* "implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion." *Maher v. Roe,* 432 U.S. at 432 U. S. 474. The preamble can be read simply to express that sort of value judgment.

We think the extent to which the preamble's language might be used to interpret other state statutes or regulations is something that only the courts of Missouri can definitively decide. State law has offered protections to unborn children in tort and probate law, *see Roe v. Wade, supra,* at 410 U. S. 161-162, and § 1.205.2 can be interpreted to do no more than that. What we have, then, is much the same situation that the Court confronted in *Alabama State Federation of Labor v. McAdory,* 325 U. S. 450 (1945). As in that case:

"We are thus invited to pass upon the constitutional validity of a state statute which has not yet been applied or threatened to be applied by the state courts to petitioners or others in the manner anticipated. Lacking any authoritative construction of the statute by the state courts, without which no constitutional question arises, and lacking the authority to give such a controlling construction ourselves, and with a record which presents no concrete set of facts to which the statute is to be applied, the case is plainly not one to be disposed of by the declaratory judgment procedure."

*Id.* at 325 U. S. 460. It will be time enough for federal courts to address the meaning of the preamble should it be applied to restrict the activities of appellees in some concrete way. Until then, this

Page 492 U. S. 507

Court

"is not empowered to decide . . . abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result a to the thing in issue in the case before it."

*Tyler v. Judges of Court of Registration,* 179 U. S. 405, 179 U. S. 409 (1900). *See also Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U. S. 464, 454 U. S. 473 (1982). [Footnote 6] We therefore need not pass on the constitutionality of the Act's preamble.

*B*

Section 188.210 provides that

Section 188.210 provides that

"[i]t shall be unlawful for any public employee within the scope of his employment to perform or assist an abortion, not necessary to save the life of the mother,"

while § 188.215 makes it

"unlawful for any public facility to be used for the purpose of performing or assisting an abortion not necessary to save the life of the mother. [Footnote 7]"

The Court of Appeals held that these provisions contravened this Court's abortion decisions. 851 F.2d at 1082-1083. We take the contrary view.

As we said earlier this Term in *DeShaney v. Winnebago County Dept. of Social Services*, 489 U. S. 189, 489 U. S. 196 (1989):

"[O]ur cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."

In *Maher v. Roe, supra*, the Court upheld a Connecticut welfare regulation under which Medicaid recipients received payments for medical services related

Page 492 U. S. 508

to childbirth, but not for nontherapeutic abortions. The Court rejected the claim that this unequal subsidization of childbirth and abortion was impermissible under *Roe v. Wade*. As the Court put it:

"The Connecticut regulation before us is different in kind from the laws invalidated in our previous abortion decisions. The Connecticut regulation places no obstacles -- absolute or otherwise -- in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult -- and in some cases, perhaps, impossible -- for some women to have abortions is neither created nor in any way affected by the Connecticut regulation."

432 U.S. at 432 U. S. 474. Relying on *Maher*, the Court in *Poelker v. Doe*, 432 U. S. 519, 432 U. S. 521 (1977), held that the city of St. Louis committed

"no constitutional violation . . . in electing, as a policy choice, to provide publicly financed hospital services for childbirth without providing corresponding services for nontherapeutic abortions."

More recently, in *Harris v. McRae*, 448 U. S. 297 (1980), the Court upheld "the most restrictive version of the Hyde Amendment," *id.* at 448 U. S. 325, n. 27, which withheld from States federal funds under the Medicaid program to reimburse the costs of abortions, "*except where the life of the mother would be endangered if the fetus were carried to term.*'" *Ibid.* (quoting Pub.L. 94-439, § 209, 90 Stat. 1434). *As in Maher and Poelker, the Court required only a showing that Congress' authorization of "reimbursement for medically necessary services generally, but not for certain medically necessary*

Page 492 U. S. 509

abortions" was rationally related to the legitimate governmental goal of encouraging childbirth. 448 U.S. at 448 U. S. 325.

The Court of Appeals distinguished these cases on the ground that

"[t]o prevent access to a public facility does more than demonstrate a political choice in favor of childbirth; it clearly narrows, and in some cases forecloses, the availability of abortion to women."

851 F.2d at 1081. The court reasoned that the ban on the use of public facilities

"could prevent a woman's chosen doctor from performing an abortion because of his unprivileged status at other

hospitals or because a private hospital adopted a similar anti-abortion stance."

*Ibid.* It also thought that "[s]uch a rule could increase the cost of obtaining an abortion and delay the timing of it as well." *Ibid.*

We think that this analysis is much like that which we rejected in *Maher, Poelker,* and *McRae.* As in those cases, the State's decision here to use public facilities and staff to encourage childbirth over abortion "places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy." *McRae,* 448 U.S. at 448 U. S. 315. Just as Congress' refusal to fund abortions in *McRae* left

"an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all,"

*id.* at 448 U. S. 317, Missouri's refusal to allow public employees to perform abortions in public hospitals leaves a pregnant woman with the same choices as if the State had chosen not to operate any public hospitals at all. The challenged provisions only restrict a woman's ability to obtain an abortion to the extent that she chooses to use a physician affiliated with a public hospital. This circumstance is more easily remedied, and thus considerably less burdensome, than indigency, which "may make it difficult -- and in some cases, perhaps, impossible -- for some women to have abortions" without public funding. *Maher,* 432 U.S. at 432 U. S. 474. Having held that the State's refusal to fund abortions does not violate *Roe v. Wade,* it strains logic to reach a contrary result for the use

Page 492 U. S. 510

of public facilities and employees. If the State may "make a value judgment favoring childbirth over abortion and . . . implement that judgment by the allocation of public funds," *Maher, supra,* at 432 U. S. 474, surely it may do so through the allocation of other public resources, such as hospitals and medical staff.

The Court of Appeals sought to distinguish our cases on the additional ground that "[t]he evidence here showed that all of the public facility's costs in providing abortion services are recouped when the patient pays." 851 F.2d at 1083. Absent any expenditure of public funds, the court thought that Missouri was "expressing" more than "its preference for childbirth over abortions," but rather was creating an "obstacle to exercise of the right to choose an abortion [that could not] stand absent a compelling state interest." *Ibid.* We disagree.

"Constitutional concerns are greatest," we said in *Maher, supra,* at 432 U. S. 476,

"when the State attempts to impose its will by the force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader."

Nothing in the Constitution requires States to enter or remain in the business of performing abortions. Nor, as appellees suggest, do private physicians and their patients have some kind of constitutional right of access to public facilities for the performance of abortions. Brief for Appellees 46-47. Indeed, if the State does recoup all of its costs in performing abortions, and no state subsidy, direct or indirect, is available, it is difficult to see how any procreational choice is burdened by the State's ban on the use of its facilities or employees for performing abortions. [Footnote 8]

Page 492 U. S. 511

*Maher, Poelker,* and *McRae* all support the view that the State need not commit any resources to facilitating abortions, even if it can turn a profit by doing so. In *Poelker,* the suit was filed by an indigent who could not afford to pay for an abortion, but the ban on the performance of nontherapeutic abortions in city-owned hospitals applied whether or not the pregnant woman could pay. 432 U.S. at 432 U. S. 520; *id.* at 432 U. S. 524 (BRENNAN, J., dissenting). [Footnote 9] The Court emphasized that the mayor's decision to prohibit abortions in city hospitals was "subject to public debate and approval or disapproval at the polls," and that

"the Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth, as St. Louis has done."

*Id.* at 432 U. S. 521. Thus we uphold the Act's restrictions on the use of public employees and facilities for the performance or assistance of nontherapeutic abortions.

*C*

The Missouri Act contains three provisions relating to "encouraging or counseling a woman to have an abortion not necessary to save her life." Section 188.205 states that no public funds can be used for this purpose; § 188.210 states that public employees cannot, within the scope of their employment, engage in such speech; and § 188.215 forbids such speech in public facilities. The Court of Appeals did not consider § 188.205 separately from §§ 188.210 and 188.215. It held that all three of these provisions were unconstitutionally vague, and that

"the ban on using public funds, employees, and facilities to encourage or counsel a woman to have an abortion is an unacceptable infringement of the woman's fourteenth amendment right to choose an abortion after receiving

Page 492 U. S. 512

the medical information necessary to exercise the right knowingly and intelligently."

851 F.2d at 1079. [Footnote 10]

Missouri has chosen only to appeal the Court of Appeals' invalidation of the public funding provision, § 188.205. *See* Juris. Statement I-II. A threshold question is whether this provision reaches primary conduct, or whether it is simply an instruction to the State's fiscal officers not to allocate funds for abortion counseling. We accept, for purposes of decision, the State's claim that § 188.205 "is not directed at the conduct of any physician or health care provider, private or public," but "is directed solely at those persons responsible for expending public funds." Brief for Appellants 43. [Footnote 11]

Appellees contend that they are not "adversely" affected under the State's interpretation of § 188.205, and therefore that there is no longer a case or controversy before us on this question. Brief for Appellees 31-32. Plaintiffs are masters of their complaints, and remain so at the appellate stage of a litigation. *See Caterpillar Inc. v. Williams,* 482 U. S. 386, 482 U. S. 398-399 (1987). A majority of the Court agrees with appellees that the controversy over § 188.205 is now moot, because appellees' argument amounts to a decision to no longer seek a declaratory judgment that § 188.205 is unconstitutional and accompanying declarative relief. *See Deakins v. Monaghan,* 484 U. S. 193, 484 U. S. 199-201 (1988); *United States v. Munsingwear, Inc.,* 340 U. S. 36, 340 U. S. 39-40 (1950). We accordingly direct the Court of Appeals to vacate the judgment of the District Court

Page 492 U. S. 513

with instructions to dismiss the relevant part of the complaint. *Deakins,* 484 U.S. at 484 U. S. 200.

"Because this [dispute] was rendered moot in part by [appellees'] willingness permanently to withdraw their equitable claims from their federal action, a dismissal with prejudice is indicated."

*Ibid.*

*D*

Section 188.029 of the Missouri Act provides:

"Before a physician performs an abortion on a woman he has reason to believe is carrying an unborn child of twenty or more weeks gestational age, the physician shall first determine if the unborn child is viable by using and exercising that degree of care, skill, and proficiency commonly exercised by the ordinarily skillful, careful, and prudent physician engaged in similar practice under the same or similar conditions. In making this determination of viability, the physician shall perform or cause to be performed such medical examinations and tests as are necessary to make a finding of the gestational age, weight, and lung maturity of the unborn child and shall enter such findings and determination of viability in the medical record of the mother. [Footnote 12]"

As with the preamble, the parties disagree over the meaning of this statutory provision. The State emphasizes the language of the first sentence, which speaks in terms of the physician's determination of viability being made by the standards of ordinary skill in the medical profession. Brief for Appellants 32-35. Appellees stress the language of the second sentence, which prescribes such "tests as are necessary" to make a finding of gestational age, fetal weight, and lung maturity. Brief for Appellees 26-30.

Page 492 U. S. 514

The Court of Appeals read § 188.029 as requiring that, after 20 weeks, "doctors *must* perform tests to find gestational age, fetal weight and lung maturity." 851 F.2d at 1075, n. 5. The court indicated that the tests needed to

determine fetal weight at 20 weeks are "unreliable and inaccurate," and would add $125 to $250 to the cost of an abortion. *Ibid.* It also stated that

"amniocentesis, the only method available to determine lung maturity, is contrary to accepted medical practice until 28-30 weeks of gestation, expensive, and imposes significant health risks for both the pregnant woman and the fetus."

*Ibid.*

We must first determine the meaning of § 188.029 under Missouri law. Our usual practice is to defer to the lower court's construction of a state statute, but we believe the Court of Appeals has "fallen into plain error" in this case. *Frisby v. Schultz,* 487 U. S. 474, 487 U. S. 483 (1988); *see Brockett v. Spokane Arcades, Inc.,* 472 U. S. 491, 472 U. S. 500, n. 9 (1985).

"'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'"

*Philbrook v. Glodgett,* 421 U. S. 707, 421 U. S. 713 (1975), quoting *United States v. Heirs of Boisdore,* 8 How. 113, 49 U. S. 122 (1849). *See Chemehuevi Tribe of Indians v. FPC,* 420 U. S. 395, 420 U. S. 402-403 (1975); *Kokoszka v. Belford,* 417 U. S. 642, 417 U. S. 650 (1974). The Court of Appeals' interpretation also runs "afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties." *Frisby, supra,* at 487 U. S. 483.

We think the viability testing provision makes sense only if the second sentence is read to require only those tests that are useful to making subsidiary findings as to viability. If we construe this provision to require a physician to perform those tests needed to make the three specified findings *in all circumstances,* including when the physician's reasonable professional judgment indicates that the tests would be irrelevant to determining viability or even dangerous to the mother and the fetus, the second sentence of § 188.029 would

Page 492 U. S. 515

conflict with the first sentence's *requirement* that a physician apply his reasonable professional skill and judgment. It would also be incongruous to read this provision, especially the word "necessary," [Footnote 13] to require the performance of tests irrelevant to the expressed statutory purpose of determining viability. It thus seems clear to us that the Court of Appeals' construction of § 188.029 violates well-accepted canons of statutory interpretation used in the Missouri courts, *see State ex rel. Stern Brothers & Co. v. Stilley,* 337 S.W.2d 934, 939 (Mo.1960) ("The basic rule of statutory construction is to first seek the legislative intention, and to effectuate it if possible, and the law favors constructions which harmonize with reason, and which tend to avoid unjust, absurd, unreasonable or confiscatory results, or oppression"); *Bell v. Mid-Century Ins. Co.,* 750 S.W.2d 708, 710 (Mo.App.1988) ("Interpreting the phrase literally would produce an absurd result, which the Legislature is strongly presumed not to have intended"), which JUSTICE BLACKMUN ignores. *Post* at 492 U. S. 545-546.

The viability testing provision of the Missouri Act is concerned with promoting the State's interest in potential human life, rather than in maternal health. Section 188.029 creates what is essentially a presumption of viability at 20 weeks, which the physician must rebut with tests indicating that the fetus is not viable prior to performing an abortion. It also directs the physician's determination as to viability by specifying consideration, if feasible, of gestational age, fetal weight, and lung capacity. The District Court found that "the medical evidence is uncontradicted that a 20-week fetus is *not* viable," and that "23 1/2 to 24 weeks gestation is the earliest point in pregnancy where a reasonable possibility of viability

Page 492 U. S. 516

exists." 662 F. Supp. at 420. But it also found that there may be a 4-week error in estimating gestational age, *id.* at 421, which supports testing at 20 weeks.

In *Roe v. Wade,* the Court recognized that the State has "important and legitimate" interests in protecting maternal health and in the potentiality of human life. 410 U.S. at 410 U. S. 162. During the second trimester, the State "may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health." *Id.* at 410 U. S. 164. After viability, when the State's interest in potential human life was held to become compelling, the State

"may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother."

*Id.* at 165. [Footnote 14]

In *Colautti v. Franklin,* 439 U. S. 379 (1979), upon which appellees rely, the Court held that a Pennsylvania statute regulating the standard of care to be used by a physician performing an abortion of a possibly viable fetus was void for vagueness. *Id.* at 439 U. S. 390-401. But in the course of reaching that conclusion, the Court reaffirmed its earlier statement in *Planned Parenthood of Central Mo. v. Danforth,* 428 U. S. 52, 428 U. S. 64 (1976), that

"'the determination of whether a particular

Page 492 U. S. 517

fetus is viable is, and must be, a matter for the judgment of the responsible attending physician.'"

439 U.S. at 439 U. S. 396. JUSTICE BLACKMUN, *post* at 492 U. S. 545, n. 6, ignores he statement in *Colautti* that

"neither the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability -- be it weeks of gestation or fetal weight or any other single factor -- as the determinant of when the State has a compelling interest in the life or health of the fetus."

439 U.S. at 439 U. S. 388-389. To the extent that § 188.029 regulates the method for determining viability, it undoubtedly does superimpose state regulation on the medical determination whether a particular fetus is viable. The Court of Appeals and the District Court thought it unconstitutional for this reason. 851 F.2d at 1074-1075; 662 F. Supp. at 423. To the extent that the viability tests increase the cost of what are in fact second-trimester abortions, their validity may also be questioned under *Akron,* 462 U.S. at 462 U. S. 434-435, where the Court held that a requirement that second-trimester abortions must be performed in hospitals was invalid because it substantially increased the expense of those procedures.

We think that the doubt cast upon the Missouri statute by these cases is not so much a flaw in the statute as it is a reflection of the fact that the rigid trimester analysis of the course of a pregnancy enunciated in *Roe* has resulted in subsequent cases like *Colautti* and *Akron* making constitutional law in this area a virtual Procrustean bed. Statutes specifying elements of informed consent to be provided abortion patients, for example, were invalidated if they were thought to "structur[e] . . . the dialogue between the woman and her physician." *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U. S. 747, 476 U. S. 763 (1986). As the dissenters in *Thornburgh* pointed out, such a statute would have been sustained under any traditional standard of judicial review, *id.* at 476 U. S. 802 (WHITE, J., dissenting), or for any other surgical procedure except abortion. *Id.* at 476 U. S. 783 (Burger, C.J., dissenting).

Page 492 U. S. 518

*Stare decisis* is a cornerstone of our legal system, but it has less power in constitutional cases, where, save for constitutional amendments, this Court is the only body able to make needed changes. *See United States v. Scott,* 437 U. S. 82, 437 U. S. 101 (1978). We have not refrained from reconsideration of a prior construction of the Constitution that has proved "unsound in principle and unworkable in practice." *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U. S. 528, 469 U. S. 546 (1985); *see Solorio v. United States,* 483 U. S. 435, 483 U. S. 448-450 (1987); *Erie R. Co. v. Tompkins,* 304 U. S. 64, 304 U. S. 74-78 (1938). We think the *Roe* trimester framework falls into that category.

In the first place, the rigid *Roe* framework is hardly consistent with the notion of a Constitution cast in general terms, as ours is, and usually speaking in general principles, as ours does. The key elements of the *Roe* framework -- trimesters and viability -- are not found in the text of the Constitution, or in any place else one would expect to find a constitutional principle. Since the bounds of the inquiry are essentially indeterminate, the result has been a web of legal rules that have become increasingly intricate, resembling a code of regulations rather than a body of constitutional doctrine. [Footnote 15] AS JUSTICE WHITE has put it, the trimester framework

Page 492 U. S. 519

has left this Court to serve as the country's "*ex officio* medical board with powers to approve or disapprove

medical and operative practices and standards throughout the United States." *Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. at 428 U. S. 99 (opinion concurring in part and dissenting in part). *Cf. Garcia, supra,* at 469 U. S. 547.

In the second place, we do not see why the State's interest in protecting potential human life should come into existence only at the point of viability, and that there should therefore be a rigid line allowing state regulation after viability but prohibiting it before viability. The dissenters in *Thornburgh,* writing in the context of the *Roe* trimester analysis, would have recognized this fact by positing against the "fundamental right" recognized in *Roe* the State's "compelling interest" in protecting potential human life throughout pregnancy. "[T]he State's interest, if compelling after viability, is equally compelling before viability." *Thornburgh,* 476 U.S. at 476 U. S. 795 (WHITE, J., dissenting); *see id.* at 476 U. S. 828 (O'CONNOR, J., dissenting) ("State has compelling interests in ensuring maternal health and in protecting potential human life, and these interests exist *throughout pregnancy'*) (citation omitted).

The tests that § 188.029 requires the physician to perform are designed to determine viability. The State here has chosen viability as the point at which its interest in potential human life must be safeguarded. *See* Mo.Rev.Stat. § 188.030 (1986) ("No abortion of a viable unborn child shall be performed unless necessary to preserve the life or health of the woman"). It is true that the tests in question increase the expense of abortion, and regulate the discretion of the physician in determining the viability of the fetus. Since the tests will undoubtedly show in many cases that the fetus is not viable, the tests will have been performed for what were, in fact, second-trimester abortions. But we are satisfied that the requirement of these tests permissibly furthers

Page 492 U. S. 520

the State's interest in protecting potential human life, and we therefore believe § 188.029 to be constitutional.

JUSTICE BLACKMUN takes us to task for our failure to join in a "great issues" debate as to whether the Constitution includes an "unenumerated" general right to privacy as recognized in cases such as *Griswold v. Connecticut,* 381 U. S. 479 (1965), and *Roe.* But *Griswold v. Connecticut,* unlike *Roe,* did not purport to adopt a whole framework, complete with detailed rules and distinctions, to govern the cases in which the asserted liberty interest would apply. As such, it was far different from the opinion, if not the holding, of *Roe v. Wade,* which sought to establish a constitutional framework for judging state regulation of abortion during the entire term of pregnancy. That framework sought to deal with areas of medical practice traditionally subject to state regulation, and it sought to balance once and for all by reference only to the calendar the claims of the State to protect the fetus as a form of human life against the claims of a woman to decide for herself whether or not to abort a fetus she was carrying. The experience of the Court in applying *Roe v. Wade* in later cases, *see supra* at 492 U. S. 518, n. 15, suggests to us that there is wisdom in not unnecessarily attempting to elaborate the abstract differences between a "fundamental right" to abortion, as the Court described it in *Akron,* 462 U.S. at 462 U. S. 420, n. 1, a "limited fundamental constitutional right," which JUSTICE BLACKMUN today treats *Roe* as having established, *post* at 492 U. S. 555, or a liberty interest protected by the Due Process Clause, which we believe it to be. The Missouri testing requirement here is reasonably designed to ensure that abortions are not performed where the fetus is viable -- an end which all concede is legitimate -- and that is sufficient to sustain its constitutionality.

JUSTICE BLACKMUN also accuses us, *inter alia,* of cowardice and illegitimacy in dealing with "the most politically divisive domestic legal issue of our time." *Post* at 492 U. S. 559. There is

Page 492 U. S. 521

no doubt that our holding today will allow some governmental regulation of abortion that would have been prohibited under the language of cases such as *Colautti v. Franklin,* 439 U. S. 379 (1979), and *Akron v. Akron Center for Reproductive Health, Inc., supra.* But the goal of constitutional adjudication is surely not to remove inexorably "politically divisive" issues from the ambit of the legislative process, whereby the people through their elected representatives deal with matters of concern to them. The goal of constitutional adjudication is to hold true the balance between that which the Constitution puts beyond the reach of the democratic process and that which it does not. We think we have done that today. JUSTICE BLACKMUN's suggestion, *post* at 492 U. S. 538, 492 U. S. 557-558, that legislative bodies, in a Nation where more than half of our population is women, will treat our decision today as an invitation to enact abortion regulation reminiscent of the dark ages not only misreads our views but does scant justice to those who serve in such bodies and the people who elect them.

---

111

Both appellants and the United States as *Amicus Curiae* have urged that we overrule our decision in *Roe v. Wade*. Brief for Appellants 12-18; Brief for United States as *Amicus Curiae* 8-24. The facts of the present case, however, differ from those at issue in *Roe*. Here, Missouri has determined that viability is the point at which its interest in potential human life must be safeguarded. In *Roe*, on the other hand, the Texas statute criminalized the performance of *all* abortions, except when the mother's life was at stake. 410 U.S. at 410 U. S. 117-118. This case therefore affords us no occasion to revisit the holding of *Roe*, which was that the Texas statute unconstitutionally infringed the right to an abortion derived from the Due Process Clause, *id.* at 410 U. S. 164, and we leave it undisturbed. To the extent indicated in our opinion, we would modify and narrow *Roe* and succeeding cases.

Page 492 U. S. 522

Because none of the challenged provisions of the Missouri Act properly before us conflict with the Constitution, the judgment of the Court of Appeals is

*Reversed.*

[Footnote 1]

After *Roe v. Wade*, the State of Missouri's then-existing abortion regulations, *see* Mo.Rev.Stat. §§ 559.100, 542.380, and 563.300 (1969), were declared unconstitutional by a three-judge federal court. This Court summarily affirmed that judgment. *Danforth v. Rodgers*, 414 U.S. 1035 (1973). Those statutes, like the Texas statute at issue in *Roe*, made it a crime to perform an abortion except when the mother's life was at stake. 410 U.S. at 410 U. S. 117-118, and n. 2.

In June, 1974, the State enacted House Committee Substitute for House Bill No. 1211, which imposed new regulations on abortions during all stages of pregnancy. Among other things, the 1974 Act defined "viability," § 2(2); required the written consent of the woman prior to an abortion during the first 12 weeks of pregnancy, § 3(2); required the written consent of the woman's spouse prior to an elective abortion during the first 12 weeks of pregnancy, § 3(3); required the written consent of one parent if the woman was under 18 and unmarried prior to an elective abortion during the first 12 weeks of pregnancy, § 3(4); required a physician performing an abortion to exercise professional care to "preserve the life and health of the fetus" regardless of the stage of pregnancy and, if he should fail that duty, deemed him guilty of manslaughter and made him liable for damages, § 6(1); prohibited the use of saline amniocentesis, as a method of abortion, after the first 12 weeks of pregnancy, § 9; and required certain recordkeeping for health facilities and physicians performing abortions, §§ 10, 11. In *Planned Parenthood of Central Mo. v. Danforth*, 428 U. S. 52 (1976), the Court upheld the definition of viability, *id.* at 428 U. S. 63-65, the consent provision in § 3(2), *id.* at 428 U. S. 65-67, and the recordkeeping requirements. *Id.* at 428 U. S. 79-81. It struck down the spousal consent provision, *id.* at 428 U. S. 67-72, the parental consent provision, *id.* at 428 U. S. 72-75, the prohibition on abortions by amniocentesis, *id.* at 428 U. S. 75-79, and the requirement that physicians exercise professional care to preserve the life of the fetus regardless of the stage of pregnancy. *Id.* at 428 U. S. 81-84.

In 1979, Missouri passed legislation that, *inter alia*, required abortions after 12 weeks to be performed in a hospital, Mo.Rev.Stat. § 188.025 (Supp.1979); required a pathology report for each abortion performed, § 188.047; required the presence of a second physician during abortions performed after viability, § 188.030.3; and required minors to secure parental consent or consent from the juvenile court for an abortion, § 188.028. In *Planned Parenthood Assn. of Kansas City, Mo., Inc. v. Ascroft*, 462 U. S. 476 (1983), the Court struck down the second-trimester hospitalization requirement, *id.* at 462 U. S. 481-482, but upheld the other provisions described above. *Id.* at 462 U. S. 494.

[Footnote 2]

The Act defines "gestational age" as the "length of pregnancy as measured from the first day of the woman's last menstrual period." Mo.Rev.Stat. § 188.015(4) (1986).

[Footnote 3]

The State did not appeal the District Court's invalidation of the Act's "informed consent" provision to the Court of Appeals, 851 F.2d at 1073, n. 2, and it is not before us.

[Footnote 4]

Section 1.205 provides in full:

"1. The general assembly of this state finds that:"

"(1) The life of each human being begins at conception;"

"(2) Unborn children have protectable interests in life, health, and wellbeing;"

"(3) The natural parents of unborn children have protectable interests in the life, health, and wellbeing of their unborn child."

"2. Effective January 1, 1988, the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state, subject only to the Constitution of the United States, and decisional interpretations thereof by the United States Supreme Court and specific provisions to the contrary in the statutes and constitution of this state."

"3. As used in this section, the term 'unborn children' or 'unborn child' shall include all unborn child [*sic*] or children or the offspring of human beings from the moment of conception until birth at every stage of biological development."

"4. Nothing in this section shall be interpreted as creating a cause of action against a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care."

[Footnote 5]

Judge Arnold dissented from this part of the Court of Appeals' decision, arguing that Missouri's declaration of when life begins should be upheld "insofar as it relates to subjects other than abortion," such as "creating causes of action against persons other than the mother" for wrongful death or extending the protection of the criminal law to fetuses. 851 F.2d at 1085 (opinion concurring in part and dissenting in part).

[Footnote 6]

Appellees also claim that the legislature's preamble violates the Missouri Constitution. Brief for Appellees 23-26. But the considerations discussed in the text make it equally inappropriate for a federal court to pass upon this claim before the state courts have interpreted the statute.

[Footnote 7]

The statute defines "public employee" to mean "any person employed by this state or any agency or political subdivision thereof." Mo.Rev.Stat. § 188.200(1) (1986). "Public facility" is defined as

"any public institution, public facility, public equipment, or any physical asset owned, leased, or controlled by this state or any agency or political subdivisions thereof."

§ 188.200(2).

[Footnote 8]

A different analysis might apply if a particular State had socialized medicine and all of its hospitals and physicians were publicly funded. This case might also be different if the State barred doctors who performed abortions in private facilities from the use of public facilities for any purpose. *See Harris v. McRae,* 448 U. S. 297, 448 U. S. 317, n.19 (1980).

[Footnote 9]

The suit in *Poelker* was brought by the plaintiff

"on her own behalf and on behalf of the entire class of pregnant women residents of the City of St. Louis, Missouri, desiring to utilize the personnel, facilities and services of the general public hospitals within the City of St. Louis for the termination of pregnancies."

*Doe v. Poelker,* 497 F.2d 1063, 1065 (CA8 1974).

[Footnote 10]

In a separate opinion, Judge Arnold argued that Missouri's prohibition violated the First Amendment because it

"sharply discriminate[s] between kinds of speech on the basis of their viewpoint: a physician, for example, could discourage an abortion, or counsel against it, while in a public facility, but he or she could not encourage or counsel in favor of it."

851 F.2d at 1085.

[Footnote 11]

While the Court of Appeals did not address this issue, the District Court thought that the definition of "public funds" in Mo.Rev.Stat. § 188.200 (1986) "certainly is broad enough to make *encouraging or counseling' unlawful for anyone who is paid from" public funds as defined in § 188.200. 662 F. Supp. 407, 426 (WD Mo.1987).*

[Footnote 12]

The Act's penalty provision provides that

"[a]ny person who contrary to the provisions of sections 188.010 to 188.085 knowingly performs . . . any abortion or knowingly fails to perform any action required by [these] sections . . . shall be guilty of a class A misdemeanor."

Mo.Rev.Stat. § 188.075 (1986).

[Footnote 13]

*See* Black's Law Dictionary 928 (5th ed.1979) ("Necessary. This word must be considered in the connection in which it is used, as it is a word susceptible of various meanings. It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought").

[Footnote 14]

The Court's subsequent cases have reflected this understanding. *See Colautti v. Franklin,* 439 U. S. 379, 439 U. S. 386 (1979) (emphasis added) ("For both logical and biological reasons, we indicated in [in *Roe*] that the State's interest in the potential life of the fetus reaches the compelling point at the stage of viability. Hence, *prior to viability, the State may not seek to further this interest by directly restricting a woman's decision whether or not to terminate her pregnancy*"); *id.* at 439 U. S. 389 ("Viability is the critical point. And we have recognized no attempt to stretch the point of viability one way or the other"); *accord, Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. at 428 U. S. 61 (State regulation designed to protect potential human life limited to period "subsequent to viability"); *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U. S. 416, 462 U. S. 428 (1983), quoting *Roe v. Wade,* 410 U.S. at 410 U. S. 163 (emphasis added) (State's interest in protecting potential human life "becomes compelling *only* at viability, the point at which the fetus *has the capability of meaningful life outside the mother's womb'"*).

[Footnote 15]

For example, the Court has held that a State may require that certain information be given to a woman by a physician or his assistant, *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. at 462 U. S. 448, but that it may not require that such information be furnished to her only by the physician himself. *Id.* at 462 U. S. 449. Likewise, a State may require that abortions in the second trimester be performed in clinics, *Simopoulos v. Virginia,* 462 U. S. 506 (1983), but it may not require that such abortions be performed only in hospitals. *Akron, supra,* at 462 U. S. 437-439. We do not think these distinctions are of any constitutional import in view of our abandonment of the trimester framework. JUSTICE BLACKMUN's claim, *post* at 492 U. S. 539-541, n. 1, that the State goes too far, even under *Maher v. Roe,* 432 U. S. 464 (1977); *Poelker v. Doe,* 432 U. S. 519 (1977); and *Harris v. McRae,* 448 U. S. 297 (1980), by refusing to permit the use of public facilities, as defined in Mo.Rev.Stat. § 188.200 (1986), for the performance of abortions is another example of the fine distinctions endemic in the *Roe* framework.

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

I concur in Parts I, II-A, II-B, and II-C of the Court's opinion.

**I**

Nothing in the record before us or the opinions below indicates that subsections 1(1) and 1(2) of the preamble to Missouri's abortion regulation statute will affect a woman's decision to have an abortion. JUSTICE STEVENS, following appellees, *see* Brief for Appellees 22, suggests that the preamble may also "interfer[e] with contraceptive choices," *post* at 492 U. S. 564, because certain contraceptive devices act on a female ovum after it has been fertilized by a male sperm. The Missouri Act defines "conception" as "the fertilization of the ovum of a female by a sperm of a male," Mo.Rev.Stat. § 188.015(3) (1986), and invests "unborn children" with "protectable interests in life, health, and wellbeing," § 1.205.1(2), from "the moment of conception. . . . " § 1.205.3. JUSTICE STEVENS asserts that any possible interference with a woman's right to use postfertilization contraceptive devices would be unconstitutional under *Griswold v. Connecticut,* 381 U. S. 479 (1965), and our subsequent contraception cases. *Post* at 492 U. S. 564-566. Similarly, certain *amici* suggest that the Missouri Act's preamble may prohibit the developing technology of *in vitro* fertilization, a technique used to aid couples otherwise unable to bear children in which a number of ova are removed from the woman and fertilized by male sperm. This process often produces excess fertilized ova ("unborn children" under the Missouri Act's definition) that are discarded, rather than reinserted into the woman's uterus. Brief for Association of Reproductive Health Professionals

Page 492 U. S. 523

*et al.* as *Amici Curiae* 38. It may be correct that the use of post-fertilization contraceptive devices is constitutionally protected by *Griswold* and its progeny, but, as with a woman's abortion decision, nothing in the record or the opinions below indicates that the preamble will affect a woman's decision to practice contraception. For that matter, nothing in appellees' original complaint, App. 8-21, or their motion *in limine* to limit testimony and evidence on their challenge to the preamble, *id.* at 57-59, indicates that appellees sought to enjoin potential violations of *Griswold*. Neither is there any indication of the possibility that the preamble might be applied to prohibit the performance of *in vitro* fertilization. I agree with the Court, therefore, that all of these intimations of unconstitutionality are simply too hypothetical to support the use of declaratory judgment procedures and injunctive remedies in this case.

Similarly, it seems to me to follow directly from our previous decisions concerning state or federal funding of abortions, *Harris v. McRae,* 448 U. S. 297 (1980), *Maher v. Roe,* 432 U. S. 464 (1977), and *Poelker v. Doe,* 432 U. S. 519 (1977), that appellees' facial challenge to the constitutionality of Missouri's ban on the utilization of public facilities and the participation of public employees in the performance of abortions not necessary to save the life of the mother, Mo.Rev.Stat. §§ 188.210, 188.215 (1986), cannot succeed. Given Missouri's definition of "public facility" as

"any public institution, public facility, public equipment, or any physical asset owned, leased, or controlled by this state or any agency or political subdivisions thereof,"

§ 188.200(2), there may be conceivable applications of the ban on the use of public facilities that would be unconstitutional. Appellees and *amici* suggest that the State could try to enforce the ban against private hospitals using public water and sewage lines, or against private hospitals leasing state-owned equipment or state land. *See* Brief for Appellees 49-50; Brief for National Association of Public Hospitals as *Amicus Curiae*

Page 492 U. S. 524

9-12. Whether some or all of these or other applications of § 188.215 would be constitutional need not be decided here. *Maher, Poelker,* and *McRae* stand for the proposition that some quite straightforward applications of the Missouri ban on the use of public facilities for performing abortions would be constitutional, and that is enough to defeat appellees' assertion that the ban is facially unconstitutional.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the [relevant statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."

First Amendment.

*United States v. Salerno,* 481 U. S. 739, 481 U. S. 745 (1987).

I also agree with the Court that, under the interpretation of § 188.205 urged by the State and adopted by the Court, there is no longer a case or controversy before us over the constitutionality of that provision. I would note, however, that this interpretation of § 188.205 is not binding on the Supreme Court of Missouri which has the final word on the meaning of that State's statutes. *Virginia v. American Booksellers Assn., Inc.,* 484 U. S. 383, 484 U. S. 395 (1988); *O'Brien v. Skinner,* 414 U. S. 524, 414 U. S. 531 (1974). Should it happen that § 188.205, as ultimately interpreted by the Missouri Supreme Court, does prohibit publicly employed health professionals from giving specific medical advice to pregnant women,

"the vacation and dismissal of the complaint that has become moot 'clears the path for future relitigation of the issues between the parties,' should subsequent events rekindle their controversy."

*Deakins v. Monaghan,* 484 U. S. 193, 484 U. S. 201, n. 5 (1988), quoting *United States v. Munsingwear, Inc.,* 340 U. S. 36, 340 U. S. 40 (1950). Unless such events make their appearance and give rise to relitigation, I agree that we and all federal

Page 492 U. S. 525

courts are without jurisdiction to hear the merits of this moot dispute.

**II**

In its interpretation of Missouri's "determination of viability" provision, Mo.Rev.Stat. § 188.029 (1986), *see ante* at 492 U. S. 513-521, the plurality has proceeded in a manner unnecessary to deciding the question at hand. I agree with the plurality that it was plain error for the Court of Appeals to interpret the second sentence of § 188.029 as meaning that "doctors *must* perform tests to find gestational age, fetal weight and lung maturity." 851 F.2d at 1075, n. 5 (emphasis in original). When read together with the first sentence of § 188.029 -- which requires a physician to

"determine if the unborn child is viable by using and exercising that degree of care, skill, and proficiency commonly exercised by the ordinary skillful, careful, and prudent physician engaged in similar practice under the same or similar conditions"

-- it would be contradictory nonsense to read the second sentence as requiring a physician to perform viability examinations and tests in situations where it would be careless and imprudent to do so. The plurality is quite correct:

"the viability testing provision makes sense only if the second sentence is read to require only those tests that are useful to making subsidiary findings as to viability,"

*ante* at 492 U. S. 514, and, I would add, only those examinations and tests that it would not be imprudent or careless to perform in the particular medical situation before the physician.

Unlike the plurality, I do not understand these viability testing requirements to conflict with any of the Court's past decisions concerning state regulation of abortion. Therefore, there is no necessity to accept the State's invitation to reexamine the constitutional validity of *Roe v. Wade,* 410 U. S. 113 (1973). Where there is no need to decide a constitutional question, it is a venerable principle of this Court's adjudicatory processes not to do so, for " [t]he Court will not 'anticipate a question of constitutional law in advance of the

Page 492 U. S. 526

necessity of deciding it.'" *Ashwander v. TVA,* 297 U. S. 288, 297 U. S. 346 (1936) (Brandeis, J., concurring), quoting *Liverpool, New York and Philadelphia S. S. Co. v. Commissioners of Emigration,* 113 U. S. 33, 113 U. S. 39 (1885). Neither will it generally "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." 297 U.S. at 297 U. S. 347. Quite simply, "[i]t is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton v. United States,* 196 U. S. 283, 196 U. S. 295 (1905). The Court today has accepted the State's every interpretation of its abortion statute, and has upheld, under our existing precedents, every provision of that statute which is properly before us. Precisely for this reason, reconsideration of *Roe* falls not into any "good-cause exception" to this "fundamental rule of judicial restraint . . . ." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold*

fundamental rule of judicial restraint...." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P. C.,* 467 U. S. 138, 467 U. S. 157 (1984). *See post* at 492 U. S. 532-533 (SCALIA, J., concurring in part and concurring in judgment). When the constitutional invalidity of a State's abortion statute actually turns on the constitutional validity of *Roe v. Wade,* there will be time enough to reexamine *Roe.* And to do so carefully.

In assessing § 188.029, it is especially important to recognize that appellees did not appeal the District Court's ruling that the first sentence of § 188.029 is constitutional. 662 F. Supp. at 420-422. There is, accordingly, no dispute between the parties before us over the constitutionality of the "presumption of viability at 20 weeks," *ante* at 492 U. S. 515, created by the first sentence of § 188.029. If anything might arguably conflict with the Court's previous decisions concerning the determination of viability, I would think it is the introduction of this presumption. The plurality, *see ante* at 492 U. S. 515, refers to a passage from *Planned Parenthood of Central Mo. v. Danforth,* 428 U. S. 52, 428 U. S. 64 (1976):

"The time when viability is achieved may vary with each pregnancy, and the determination of whether a particular fetus is viable is, and must

Page 492 U. S. 527

be, a matter for the judgment of the responsible attending physician."

The 20-week presumption of viability in the first sentence of § 188.029, it could be argued (though, I would think, unsuccessfully), restricts "the judgment of the responsible attending physician," by imposing on that physician the burden of overcoming the presumption. This presumption may be a "superimpos[ition] [of] state regulation on the medical determination whether a particular fetus is viable," *ante* at 492 U. S. 517, but, if so, it is a restriction on the physician's judgment that is not before us. As the plurality properly interprets the second sentence of § 188.029, it does nothing more than delineate means by which the unchallenged 20-week presumption of viability may be overcome if those means are useful in doing so and can be prudently employed. Contrary to the plurality's suggestion, *see ante* at 492 U. S. 517, the District Court did not think the second sentence of § 188.029 unconstitutional for this reason. Rather, both the District Court and the Court of Appeals thought the second sentence to be unconstitutional precisely because they interpreted that sentence to impose state regulation on the determination of viability that it does not impose.

Appellees suggest that the interpretation of § 188. 029 urged by the State may "virtually eliminat[e] the constitutional issue in this case." Brief for Appellees 30. Appellees therefore propose that we should abstain from deciding that provision's constitutionality "in order to allow the state courts to render the saving construction the State has proposed." *Ibid.* Where the lower court has so clearly fallen into error, I do not think abstention is necessary or prudent. Accordingly, I consider the constitutionality of the second sentence of § 188.029, as interpreted by the State, to determine whether the constitutional issue is actually eliminated.

I do not think the second sentence of § 188.029, as interpreted by the Court, imposes a degree of state regulation on the medical determination of viability that in any way conflicts with prior decisions of this Court. As the plurality

Page 492 U. S. 528

recognizes, the requirement that, where not imprudent, physicians perform examinations and tests useful to making subsidiary findings to determine viability "promot[es] the State's interest in potential human life, rather than in maternal health." *Ante* at 492 U. S. 515. No decision of this Court has held that the State may not directly promote its interest in potential life when viability is possible. Quite the contrary. In *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U. S. 747 (1986), the Court considered a constitutional challenge to a Pennsylvania statute requiring that a second physician be present during an abortion performed "when viability is possible." *Id.* at 476 U. S. 769-770. For guidance, the Court looked to the earlier decision in *Planned Parenthood Assn. of Kansas City, Mo., Inc. v. Ashcroft,* 462 U. S. 476 (1983), upholding a Missouri statute requiring the presence of a second physician during an abortion performed after viability. *Id.* at 462 U. S. 482-486 (opinion of Powell, J.); *id.* at 462 U. S. 505 (O'CONNOR, J., concurring in judgment in part and dissenting in part). The *Thornburgh* majority struck down the Pennsylvania statute merely because the statute had no exception for emergency situations, and not because it found a constitutional difference between the State's promotion of its interest in potential life when viability is possible and when viability is certain. 476 U.S. at 476 U. S. 770-771. Despite the clear recognition by the *Thornburgh* majority that the Pennsylvania and Missouri statutes differed in this respect, there is no hint in the opinion of the *Thornburgh* Court that the State's interest in

potential life differs depending on whether it seeks to further that interest postviability or when viability is possible. Thus, all nine Members of the *Thornburgh* Court appear to have agreed that it is not constitutionally impermissible for the State to enact regulations designed to protect the State's interest in potential life when viability is possible. *See id.* at 476 U. S. 811 (WHITE, J., dissenting); *id.* at 476 U. S. 832 (O'CONNOR, J., dissenting). That is exactly what Missouri has done in § 188.029.

Page 492 U. S. 529

Similarly, the basis for reliance by the District Court and the Court of Appeals below on *Colautti v. Franklin,* 439 U. S. 379 (1979), disappears when § 188.029 is properly interpreted. In *Colautti,* the Court observed:

"Because this point [of viability] may differ with each pregnancy, neither the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability -- be it weeks of gestation or fetal weight or any other single factor -- as the determinant of when the State has a compelling interest in the life or health of the fetus. Viability is the critical point."

*Id.* at 439 U. S. 388-389. The courts below, on the interpretation of § 188.029 rejected here, found the second sentence of that provision at odds with this passage from *Colautti. See* 851 F.2d at 1074; 662 F. Supp. at 423. On this Court's interpretation of § 188.029, it is clear that Missouri has not substituted any of the "elements entering into the ascertainment of viability" as "the determinant of when the State has a compelling interest in the life or health of the fetus." All the second sentence of § 188.029 does is to require, when not imprudent, the performance of "those tests that are useful to making *subsidiary* findings as to viability." *Ante* at 492 U. S. 514 (emphasis added). Thus, consistent with *Colautti,* viability remains the "critical point" under § 188.029.

Finally, and rather half-heartedly, the plurality suggests that the marginal increase in the cost of an abortion created by Missouri's viability testing provision may make § 188.029, even as interpreted, suspect under this Court's decision in *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U. S. 416, 462 U. S. 434-439 (1983), striking down a second-trimester hospitalization requirement. *See ante* at 492 U. S. 517. I dissented from the Court's opinion in *Akron* because it was my view that, even apart from *Roe*'s trimester framework, which I continue to consider problematic, *see Thornburgh, supra,* at

Page 492 U. S. 530

476 U. S. 828 (dissenting opinion), the *Akron* majority had distorted and misapplied its own standard for evaluating state regulation of abortion which the Court had applied with fair consistency in the past: that, previability, "a regulation imposed on a lawful abortion is not unconstitutional unless it unduly burdens the right to seek an abortion." *Akron, supra,* at 462 U. S. 453 (dissenting opinion) (internal quotations omitted).

It is clear to me that requiring the performance of examinations and tests useful to determining whether a fetus is viable, when viability is possible, and when it would not be medically imprudent to do so, does not impose an undue burden on a woman's abortion decision. On this ground alone, I would reject the suggestion that § 188.029 as interpreted is unconstitutional. More to the point, however, just as I see no conflict between § 188.029 and *Colautti* or any decision of this Court concerning a State's ability to give effect to its interest in potential life, I see no conflict between § 188.029 and the Court's opinion in *Akron.* The second-trimester hospitalization requirement struck down in *Akron* imposed, in the majority's view, "a heavy, and unnecessary, burden," 462 U.S. at 462 U. S. 438, more than doubling the cost of "women's access to a relatively inexpensive, otherwise accessible, and safe abortion procedure." *Ibid.; see also id.* at 462 U. S. 434. By contrast, the cost of examinations and tests that could usefully and prudently be performed when a woman is 20-24 weeks pregnant to determine whether the fetus is viable would only marginally, if at all, increase the cost of an abortion. *See* Brief for American Association of Prolife Obstetricians and Gynecologists *et al.* as *Amici Curiae* 3 ("At twenty weeks gestation, an ultrasound examination to determine gestational age is standard medical practice. It is routinely provided by the plaintiff clinics. An ultrasound examination can effectively provide all three designated findings of sec. 188.029"); *id.* at 22 ("A finding of fetal weight can be obtained from the same ultrasound test used to determine gestational age"); *id.* at 25 ("There are a number of different

Page 492 U. S. 531

methods in standard medical practice to determine fetal lung maturity at twenty or more weeks gestation. The most simple and most obvious is by inference. It is well known that fetal lungs do not mature until 33-34 weeks gestation. . . . If an assessment of the gestational age indicates that the child is less than thirty-three weeks, a

general finding can be made that the fetal lungs are not mature. This finding can then be used by the physician in making his determination of viability under section 188.029"); *cf.* Brief for American Medical Association *et al.* as *Amici Curiae* 42 (no suggestion that fetal weight and gestational age cannot be determined from the same sonogram); *id.* at 43 (another clinical test for gestational age and, by inference, fetal weight and lung maturity, is an accurate report of the last menstrual period), citing Smith, Frey, & Johnson, Assessing Gestational Age, 33 Am.Fam.Physician 215, 219-220 (1986).

Moreover, the examinations and tests required by § 188.029 are to be performed when viability is possible. This feature of § 188.029 distinguishes it from the second-trimester hospitalization requirement struck down by the *Akron* majority. As the Court recognized in *Thornburgh,* the State's compelling interest in potential life postviability renders its interest in determining the critical point of viability equally compelling. *See supra* at 492 U. S. 527-528. Under the Court's precedents, the same cannot be said for the *Akron* second-trimester hospitalization requirement. As I understand the Court's opinion in *Akron,* therefore, the plurality's suggestion today that *Akron* casts doubt on the validity of § 188.029, even as the Court has interpreted it, is without foundation, and cannot provide a basis for reevaluating *Roe.* Accordingly, because the Court of Appeals misinterpreted § 188.029, and because, properly interpreted, § 188.029 is not inconsistent with any of this Court's prior precedents, I would reverse the decision of the Court of Appeals.

In sum, I concur in Parts I, II-A, II-B, and II-C of the Court's opinion and concur in the judgment as to Part II-D.

Page 492 U. S. 532

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I join Parts I, II-A, II-B, and II-C of the opinion of the Court. As to Part II-D, I share JUSTICE BLACKMUN's view, *post* at 492 U. S. 556, that it effectively would overrule *Roe v. Wade,* 410 U. S. 113 (1973). I think that should be done, but would do it more explicitly. Since today we contrive to avoid doing it, and indeed to avoid almost any decision of national import, I need not set forth my reasons, some of which have been well recited in dissents of my colleagues in other cases. *See, e.g., Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U. S. 747, 476 U. S. 786-797 (1986) (WHITE, J., dissenting); *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U. S. 416, 462 U. S. 453-459 (1983) (O'CONNOR, J., dissenting); *Roe v. Wade, supra,* at 410 U. S. 172-178 (REHNQUIST, J., dissenting); *Doe v. Bolton,* 410 U. S. 179, 410 U. S. 221-223 (1973) (WHITE, J., dissenting).

The outcome of today's case will doubtless be heralded as a triumph of judicial statesmanship. It is not that, unless it is statesmanlike needlessly to prolong this Court's self-awarded sovereignty over a field where it has little proper business, since the answers to most of the cruel questions posed are political, and not juridical -- a sovereignty which therefore quite properly, but to the great damage of the Court, makes it the object of the sort of organized public pressure that political institutions in a democracy ought to receive.

JUSTICE O'CONNOR's assertion, *ante* at 492 U. S. 526, that a *"fundamental rule of judicial restraint'" requires us to avoid reconsidering Roe, cannot be taken seriously. By finessing Roe we do not, as she suggests, ante at 492 U. S. 526, adhere to the strict and venerable rule that we should avoid " `decid[ing] questions of a constitutional nature.'" We have not disposed of this case on some statutory or procedural ground, but have decided, and could not avoid deciding, whether the Missouri statute meets the requirements of the United States Constitution.*

Page 492 U. S. 533

The only choice available is whether, in deciding that constitutional question, we should use *Roe v. Wade* as the benchmark, or something else. What is involved, therefore, is not the rule of avoiding constitutional issues where possible, but the quite separate principle that we will not " ` formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Ante* at 492 U. S. 526. The latter is a sound general principle, but one often departed from when good reason exists. Just this Term, for example, in an opinion authored by JUSTICE O'CONNOR, despite the fact that we had already held a racially based set-aside unconstitutional because unsupported by evidence of identified discrimination, which was all that was needed to decide the case, we went on to outline the criteria for properly tailoring race-based remedies in cases where such evidence is present. *Richmond v. J. A. Croson Co.,* 488 U. S. 469, 488 U. S. 506-508 (1989). Also this Term, in an opinion joined by JUSTICE O'CONNOR, we announced the constitutional rule that deprivation of the right to confer with counsel during trial violates the Sixth Amendment even if no prejudice can be shown, despite our finding that there had been no such deprivation on the facts before us -- which was all that was needed to decide

finding that there had been no such deprivation on the facts before us -- which was all that was needed to decide that case. *Perry v. Leeke,* 488 U. S. 272, 488 U. S. 278-280 (1989); *see id.* at 488 U. S. 285 (KENNEDY, J., concurring in part). I have not identified with certainty the first instance of our deciding a case on broader constitutional grounds than absolutely necessary, but it is assuredly no later than *Marbury v. Madison,* 1 Cranch 137 (1803), where we held that mandamus could constitutionally issue against the Secretary of State, although that was unnecessary given our holding that the law authorizing issuance of the mandamus by this Court was unconstitutional.

The Court has often spoken more broadly than needed in precisely the fashion at issue here, announcing a new rule of constitutional law when it could have reached the identical result by applying the rule thereby displaced. To describe

Page 492 U. S. 534

two recent opinions that JUSTICE O'CONNOR joined: In *Daniels v. Williams,* 474 U. S. 327 (1986), we overruled our prior holding that a "deprivation" of liberty or property could occur through negligent governmental acts, ignoring the availability of the alternative constitutional ground that, even if a deprivation had occurred, the State's postdeprivation remedies satisfied due process, *see id.* at 474 U. S. 340-343 (STEVENS, J., concurring in judgment). In *Illinois v. Gates,* 462 U. S. 213 (1983), we replaced the preexisting "two-pronged" constitutional test for probable cause with a totality-of-the-circumstances approach, ignoring the concurrence's argument that the same outcome could have been reached under the old test, *see id.* at 462 U. S. 267-272 (WHITE, J., concurring in judgment). It is rare, of course, that the Court goes out of its way to *acknowledge* that its judgment could have been reached under the old constitutional rule, making its adoption of the new one unnecessary to the decision, but even such explicit acknowledgment is not unheard of. *See Commonwealth Edison Co. v. Montana,* 453 U. S. 609 (1981); *Perez v. Campbell,* 402 U. S. 637 (1971). For a sampling of other cases where the availability of a narrower, well-established ground is simply ignored in the Court's opinion adopting a new constitutional rule, though pointed out in separate opinions of some Justices, *see Michelin Tire Corp. v. Wages,* 423 U. S. 276 (1976); *Pointer v. Texas,* 380 U. S. 400 (1965); and *Mapp v. Ohio,* 367 U. S. 643 (1961). It would be wrong, in any decision, to ignore the reality that our policy not to "formulate a rule of constitutional law broader than is required by the precise facts" has a frequently applied good-cause exception. But it seems particularly perverse to convert the policy into an absolute in the present case, in order to place beyond reach the inexpressibly "broader than was required by the precise facts" structure established by *Roe v. Wade.* The real question, then, is whether there are valid reasons to go beyond the most stingy possible holding today. It seems to me there are not only valid but compelling ones.

Page 492 U. S. 535

Ordinarily, speaking no more broadly than is absolutely required avoids throwing settled law into confusion; doing so today preserves a chaos that is evident to anyone who can read and count. Alone sufficient to justify a broad holding is the fact that our retaining control, through *Roe,* of what I believe to be, and many of our citizens recognize to be, a political issue, continuously distorts the public perception of the role of this Court. We can now look forward to at least another Term with carts full of mail from the public, and streets full of demonstrators, urging us -- their unelected and life-tenured judges who have been awarded those extraordinary, undemocratic characteristics precisely in order that we might follow the law despite the popular will -- to follow the popular will. Indeed, I expect we can look forward to even more of that than before, given our indecisive decision today. And if these reasons for taking the unexceptional course of reaching a broader holding are not enough, then consider the nature of the constitutional question we avoid: in most cases, we do no harm by not speaking more broadly than the decision requires. Anyone affected by the conduct that the avoided holding would have prohibited will be able to challenge it himself and have his day in court to make the argument. Not so with respect to the harm that many States believed, pre-*Roe,* and many may continue to believe, is caused by largely unrestricted abortion. That will continue to occur if the States have the constitutional power to prohibit it, and would do so, but we skillfully avoid telling them so. Perhaps those abortions cannot constitutionally be proscribed. That is surely an arguable question, the question that reconsideration of *Roe v. Wade* entails. But what is not at all arguable, it seems to me, is that we should decide now, and not insist that we be run into a corner before we grudgingly yield up our judgment. The only sound reason for the latter course is to prevent a change in the law -- but to think that desirable begs the question to be decided.

Page 492 U. S. 536

It was an arguable question today whether § 188.029 of the Missouri law contravened this Court's understanding

It was an arguable question today whether § 188.029 of the Missouri law contravened this Court's understanding of *Roe v. Wade,* * and I would have examined *Roe* rather than

Page 492 U. S. 537

examining the contravention. Given the Court's newly contracted abstemiousness, what will it take, one must wonder, to permit us to reach that fundamental question? The result of our vote today is that we will not reconsider that prior opinion, even if most of the Justices think it is wrong, unless we have before us a statute that in fact contradicts it -- and even then (under our newly discovered "no broader than necessary" requirement) only minor problematical aspects of *Roe* will be reconsidered, unless one expects state legislatures to adopt provisions whose compliance with *Roe* cannot even be argued with a straight face. It thus appears that the mansion of constitutionalized abortion law, constructed overnight in *Roe v. Wade,* must be disassembled doorjamb by doorjamb, and never entirely brought down, no matter how wrong it may be.

Of the four courses we might have chosen today -- to reaffirm *Roe,* to overrule it explicitly, to overrule it *sub silentio,* or to avoid the question -- the last is the least responsible. On the question of the constitutionality of § 188.029, I concur in the judgment of the Court and strongly dissent from the manner in which it has been reached.

* That question, compared with the question whether we should reconsider and reverse *Roe,* is hardly worth a footnote, but I think JUSTICE O'CONNOR answers that incorrectly as well. In *Roe v. Wade,* 410 U. S. 113, 410 U. S. 165-166 (1973), we said that

"the physician [has the right] to administer medical treatment according to his professional judgment up to the points where important state interests provide compelling justifications for intervention."

We have subsequently made clear that it is also a matter of medical judgment when viability (one of those points) is reached.

"The time when viability is achieved may vary with each pregnancy, and the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician."

*Planned Parenthood of Central Mo. v. Danforth,* 428 U. S. 52, 428 U. S. 64 (1976). Section 188.029 conflicts with the purpose, and hence the fair import, of this principle, because it will sometimes require a physician to perform tests that he would not otherwise have performed to determine whether a fetus is viable. It is therefore a legislative imposition on the judgment of the physician, and one that increases the cost of an abortion.

JUSTICE O'CONNOR would nevertheless uphold the law because it "does not impose an undue burden on a woman's abortion decision." *Ante* at 492 U. S. 530. This conclusion is supported by the observation that the required tests impose only a marginal cost on the abortion procedure, far less of an increase than the cost-doubling hospitalization requirement invalidated in *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U. S. 416 (1983). *See ante* at 492 U. S. 530-531. The fact that the challenged regulation is less costly than what we struck down in *Akron* tells us only that we cannot decide the present case on the basis of that earlier decision. It does not tell us whether the present requirement is an "undue burden," and I know of no basis for determining that this particular burden (or any other for that matter) is "due." One could with equal justification conclude that it is not. To avoid the question of *Roe v. Wade's* validity, with the attendant costs that this will have for the Court and for the principles of self-governance, on the basis of a standard that offers "no guide but the Court's own discretion," *Baldwin v. Missouri,* 281 U. S. 586, 281 U. S. 595 (1930) (Holmes, J., dissenting), merely adds to the irrationality of what we do today.

Similarly irrational is the new concept that JUSTICE O'CONNOR introduces into the law in order to achieve her result, the notion of a State's "interest in potential life when viability is possible." *Ante* at 492 U. S. 528. Since "viability" means the mere *possibility* (not the certainty) of survivability outside the womb, "possible viability" must mean the possibility of a possibility of survivability outside the womb. Perhaps our next opinion will expand the third trimester into the second even further, by approving state action designed to take account of "the chance of possible viability."

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in part and dissenting in part.

Today, *Roe v. Wade,* 410 U. S. 113 (1973), and the fundamental constitutional right of women to decide whether to

terminate a pregnancy, survive, but are not secure. Although the Court extricates itself from this case without making a single, even incremental, change in the law of abortion, the plurality and JUSTICE SCALIA would overrule *Roe* (the first silently, the other explicitly) and would return to the States

Page 492 U. S. 538

virtually unfettered authority to control the quintessentially intimate, personal, and life-directing decision whether to carry a fetus to term. Although today, no less than yesterday, the Constitution and the decisions of this Court prohibit a State from enacting laws that inhibit women from the meaningful exercise of that right, a plurality of this Court implicitly invites every state legislature to enact more and more restrictive abortion regulations in order to provoke more and more test cases, in the hope that, sometime down the line, the Court will return the law of procreative freedom to the severe limitations that generally prevailed in this country before January 22, 1973. Never in my memory has a plurality announced a judgment of this Court that so foments disregard for the law and for our standing decisions.

Nor in my memory has a plurality gone about its business in such a deceptive fashion. At every level of its review, from its effort to read the real meaning out of the Missouri statute to its intended evisceration of precedents and its deafening silence about the constitutional protections that it would jettison, the plurality obscures the portent of its analysis. With feigned restraint, the plurality announces that its analysis leaves *Roe* "undisturbed," albeit "modif[ied] and narrow[ed]." *Ante* at 492 U. S. 521. But this disclaimer is totally meaningless. The plurality opinion is filled with winks, and nods, and knowing glances to those who would do away with *Roe* explicitly, but turns a stone face to anyone in search of what the plurality conceives as the scope of a woman's right under the Due Process Clause to terminate a pregnancy free from the coercive and brooding influence of the State. The simple truth is that *Roe* would not survive the plurality's analysis, and that the plurality provides no substitute for *Roe*'s protective umbrella.

I fear for the future. I fear for the liberty and equality of the millions of women who have lived and come of age in the 16 years since *Roe* was decided. I fear for the integrity of, and public esteem for, this Court.

I dissent.

Page 492 U. S. 539

**I**

THE CHIEF JUSTICE parades through the four challenged sections of the Missouri statute *seriatim*. I shall not do this, but shall relegate most of my comments as to those sections to the margin. [Footnote 2/1] Although I disagree with the Court's consideration

Page 492 U. S. 540

of §§ 1.205, 188.210, and 188.215, and am especially disturbed by its misapplication of our past decisions in upholding Missouri's ban on the performance of abortions at

Page 492 U. S. 541

"public facilities," its discussion of these provisions is merely prologue to the plurality's consideration of the statute's viability testing requirement, § 188.029 -- the only section of the Missouri statute that the plurality construes as implicating *Roe* itself. There, tucked away at the end of its opinion, the plurality suggests a radical reversal of the law of abortion; and there, primarily, I direct my attention.

In the plurality's view, the viability testing provision imposes a burden on second-trimester abortions as a way of furthering the State's interest in protecting the potential life of the fetus. Since, under the *Roe* framework, the State may not fully regulate abortion in the interest of potential life (as opposed to maternal health) until the third trimester, the plurality finds it necessary, in order to save the Missouri testing provision, to throw out *Roe's* trimester framework. *Ante* at 492 U. S. 518-520. In flat contradiction to *Roe,* 410 U.S. at 410 U. S. 163, the plurality concludes that the State's interest in potential life is compelling before viability, and upholds the testing provision

Page 492 U. S. 542

because it "permissibly furthers" that state interest. *Ante* at 492 U. S. 519.

*A*

At the outset, I note that, in its haste to limit abortion rights, the plurality compounds the errors of its analysis by needlessly reaching out to address constitutional questions that are not actually presented. The conflict between § 188.029 and *Roe's* trimester framework, which purportedly drives the plurality to reconsider our past decisions, is a contrived conflict: the product of an aggressive misreading of the viability testing requirement and a needlessly wooden application of the *Roe* framework.

The plurality's reading of § 188.029 is irreconcilable with the plain language of the statute, and is in derogation of this Court's settled view that "*district courts and courts of appeals are better schooled in and more able to interpret the laws of their respective States.*" *Frisby v. Schultz*, 487 U. S. 474, 487 U. S. 482 (1988), quoting *Brockett v. Spokane Arcades, Inc.*, 472 U. S. 491, 472 U. S. 499-500 (1985). *Abruptly setting aside the construction of § 188.029 adopted by both the District Court and Court of Appeals as "plain error," the plurality reads the viability testing provision as requiring only that, before a physician may perform an abortion on a woman whom he believes to be carrying a fetus of 20 or more weeks gestational age, the doctor must determine whether the fetus is viable and, as part of that exercise, must, to the extent feasible and consistent with sound medical practice, conduct tests necessary to make findings of gestational age, weight, and lung maturity. Ante at 492 U. S. 514-517. But the plurality's reading of the provision, according to which the statute requires the physician to perform tests only in order to determine viability, ignores the statutory language explicitly directing that*

"the physician *shall* perform or cause to be performed such medical examinations and tests as are *necessary to make a finding of the gestational age, weight, and lung maturity* of the unborn child and *shall* enter such findings"

in the mother's medical record. § 188.029 (emphasis added). The

Page 492 U. S. 543

statute's plain language requires the physician to undertake whatever tests are necessary to determine gestational age, weight, and lung maturity, regardless of whether these tests are necessary to a finding of viability, and regardless of whether the tests subject the pregnant woman or the fetus to additional health risks or add substantially to the cost of an abortion. [Footnote 2/2]

Had the plurality read the statute as written, it would have had no cause to reconsider the *Roe* framework. As properly construed, the viability testing provision does not pass constitutional muster under even a rational basis standard, the least restrictive level of review applied by this Court. *See Williamson v. Lee Optical Co.*, 348 U. S. 483 (1955). By mandating tests to determine fetal weight and lung maturity for every fetus thought to be more than 20 weeks gestational age, the statute requires physicians to undertake procedures, such as amniocentesis, that, in the situation presented, have no medical justification, impose significant additional health risks on both the pregnant woman and the fetus, and bear no rational relation to the State's interest in protecting fetal life. [Footnote 2/3] As written, § 188.029 is an arbitrary imposition of discomfort, risk, and expense, furthering no discernible interest except to make the procurement of an abortion as arduous and difficult as possible. Thus, were it not for

Page 492 U. S. 544

the plurality's tortured effort to avoid the plain import of § 188.029, it could have struck down the testing provision as patently irrational irrespective of the *Roe* framework. [Footnote 2/4]

The plurality eschews this straightforward resolution in the hope of precipitating a constitutional crisis. Far from avoiding constitutional difficulty, the plurality attempts to engineer a dramatic retrenchment in our jurisprudence by exaggerating the conflict between its untenable construction of § 188.029 and the *Roe* trimester framework.

No one contests that, under the *Roe* framework, the State, in order to promote its interest in potential human life, may regulate and even proscribe nontherapeutic abortions once the fetus becomes viable. *Roe*, 410 U.S. at 410 U. S. 164-165. If, as the plurality appears to hold, the testing provision simply requires a physician to use appropriate and medically sound tests to determine whether the fetus is actually viable when the estimated gestational age is greater than 20 weeks (and therefore within what the District Court found to be the margin of error for viability,

*ante* at 492 U. S. 515-516), then I see little or no conflict with *Roe.* [Footnote 2/5] Nothing in *Roe,* or any of its progeny, holds that a State may not effectuate its compelling interest in the potential life of a viable fetus by seeking to ensure that no viable fetus is mistakenly aborted because of the inherent lack of precision in estimates of gestational age. A requirement that a physician make a finding of viability, one way or

Page 492 U. S. 545

the other, for every fetus that falls within the range of possible viability does no more than preserve the State's recognized authority. Although, as the plurality correctly points out, such a testing requirement would have the effect of imposing additional costs on second-trimester abortions where the tests indicated that the fetus was not viable, these costs would be merely incidental to, and a necessary accommodation of, the State's unquestioned right to prohibit nontherapeutic abortions after the point of viability. In short, the testing provision, as construed by the plurality, is consistent with the *Roe* framework, and could be upheld effortlessly under current doctrine. [Footnote 2/6]

How ironic it is, then, and disingenuous, that the plurality scolds the Court of Appeals for adopting a construction of the statute that fails to avoid constitutional difficulties. *Ante* at

Page 492 U. S. 546

492 U. S. 514, 492 U. S. 515. By distorting the statute, the plurality manages to avoid invalidating the testing provision on what should have been noncontroversial constitutional grounds; having done so, however, the plurality rushes headlong into a much deeper constitutional thicket, brushing past an obvious basis for upholding § 188.029 in search of a pretext for scuttling the trimester framework. Evidently, from the plurality's perspective, the real problem with the Court of Appeals' construction of § 188.029 is not that it raised a constitutional difficulty, but that it raised the wrong constitutional difficulty -- one not implicating *Roe.* The plurality has remedied that, traditional canons of construction and judicial forbearance notwithstanding.

*B*

Having set up the conflict between § 188.029 and the *Roe* trimester framework, the plurality summarily discards *Roe's* analytic core as "*unsound in principle and unworkable in practice.*'" *Ante at 492 U. S. 518, quoting Garcia v. San Antonio Metropolitan Transit Authority, 469 U. S. 528, 469 U. S. 546 (1985). This is so, the plurality claims, because the key elements of the framework do not appear in the text of the Constitution, because the framework more closely resembles a regulatory code than a body of constitutional doctrine, and because, under the framework, the State's interest in potential human life is considered compelling only after viability, when, in fact, that interest is equally compelling throughout pregnancy. Ante at 492 U. S. 519-520. The plurality does not bother to explain these alleged flaws in Roe. Bald assertion masquerades as reasoning. The object, quite clearly, is not to persuade, but to prevail.*

*1*

The plurality opinion is far more remarkable for the arguments that it does not advance than for those that it does. The plurality does not even mention, much less join, the true jurisprudential debate underlying this case: whether the Constitution includes an "unenumerated" general right to

Page 492 U. S. 547

privacy as recognized in many of our decisions, most notably *Griswold v. Connecticut,* 381 U. S. 479 (1965), and *Roe,* and, more specifically, whether, and to what extent, such a right to privacy extends to matters of childbearing and family life, including abortion. *See, e.g., Eisenstadt v. Baird,* 405 U. S. 438 (1972) (contraception); *Loving v. Virginia,* 388 U. S. 1 (1967) (marriage); *Skinner v. Oklahoma ex rel. Williamson,* 316 U. S. 535 (1942) (procreation); *Pierce v. Society of Sisters,* 268 U. S. 510 (1925) (childrearing). [Footnote 2/7] These are questions of unsurpassed significance in this Court's interpretation of the Constitution, and mark the battleground upon which this case was fought by the parties, by the Solicitor General as *amicus* on behalf of petitioners, and by an unprecedented number of *amici.* On these grounds, abandoned by the plurality, the Court should decide this case.

But rather than arguing that the text of the Constitution makes no mention of the right to privacy, the plurality complains that the critical elements of the *Roe* framework -- trimesters

Page 492 U. S. 548

and viability -- do not appear in the Constitution, and are, therefore, somehow inconsistent with a Constitution cast in general terms. *Ante* at 492 U. S. 518-519. Were this a true concern, we would have to abandon most of our constitutional jurisprudence. As the plurality well knows, or should know, the "critical elements" of countless constitutional doctrines nowhere appear in the Constitution's text. The Constitution makes no mention, for example, of the First Amendment's "actual malice" standard for proving certain libels, *see New York Times Co. v. Sullivan,* 376 U. S. 254 (1964), or of the standard for determining when speech is obscene. *See Miller v. California,* 413 U. S. 15 (1973). Similarly, the Constitution makes no mention of the rational basis test, or the specific verbal formulations of intermediate and strict scrutiny by which this Court evaluates claims under the Equal Protection Clause. The reason is simple. Like the *Roe* framework, these tests or standards are not, and do not purport to be, rights protected by the Constitution. Rather, they are judge-made methods for evaluating and measuring the strength and scope of constitutional rights or for balancing the constitutional rights of individuals against the competing interests of government.

With respect to the *Roe* framework, the general constitutional principle, indeed the fundamental constitutional right, for which it was developed is the right to privacy, *see, e.g., Griswold v. Connecticut,* 381 U. S. 479 (1965), a species of "liberty" protected by the Due Process Clause, which under our past decisions safeguards the right of women to exercise some control over their own role in procreation. As we recently reaffirmed in *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U. S. 747 (1986), few decisions are "more basic to individual dignity and autonomy" or more appropriate to that "certain private sphere of individual liberty" that the Constitution reserves from the intrusive reach of government than the right to make the uniquely personal, intimate, and self-defining decision whether to end

Page 492 U. S. 549

a pregnancy. *Id.* at 476 U. S. 772. It is this general principle, the "*moral fact that a person belongs to himself and not others nor to society as a whole,*'" *id.* at 476 U. S. 777, n. 5 (STEVENS, J., concurring), quoting Fried, Correspondence, 6 Phil. & Pub.Aff. 288-289 (1977), that is found in the Constitution. See Roe, 410 U.S. at 410 U. S. 152-153. The trimester framework simply defines and limits that right to privacy in the abortion context to accommodate, not destroy, a State's legitimate interest in protecting the health of pregnant women and in preserving potential human life. Id. at 410 U. S. 154-162. Fashioning such accommodations between individual rights and the legitimate interests of government, establishing benchmarks and standards with which to evaluate the competing claims of individuals and government, lies at the very heart of constitutional adjudication. To the extent that the trimester framework is useful in this enterprise, it is not only consistent with constitutional interpretation, but necessary to the wise and just exercise of this Court's paramount authority to define the scope of constitutional rights.*

The plurality next alleges that the result of the trimester framework has "been a web of legal rules that have become increasingly intricate, resembling a code of regulations, rather than a body of constitutional doctrine." *Ante* at 492 U. S. 518. Again, if this were a true and genuine concern, we would have to abandon vast areas of our constitutional jurisprudence. The plurality complains that, under the trimester framework, the Court has distinguished between a city ordinance requiring that second-trimester abortions be performed in clinics and a state law requiring that these abortions be performed in hospitals, or between laws requiring that certain information be furnished to a woman by a physician or his assistant and those requiring that such information be furnished by the physician exclusively. *Ante* at 492 U. S. 518, n. 15, citing *Simopoulos v. Virginia,* 462 U. S. 506 (1983),

Page 492 U. S. 550

and *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U. S. 416 (1983). Are these distinctions any finer, or more "regulatory," than the distinctions we have often drawn in our First Amendment jurisprudence, where, for example, we have held that a "release time" program permitting public school students to leave school grounds during school hours to receive religious instruction does not violate the Establishment Clause, even though a release time program permitting religious instruction on school grounds does violate the Clause? *Compare Zorach v. Clauson,* 343 U. S. 306 (1952), *with Illinois ex rel. McCollum v. Board of Education of School Dist. No. 71, Champaign County,* 333 U. S. 203 (1948). Our Fourth Amendment jurisprudence recognizes factual distinctions no less intricate. Just this Term, for example, we held that, while an aerial observation from a helicopter hovering at 400 feet does not violate any reasonable expectation of privacy, such an expectation of privacy would be violated by a helicopter observation from an unusually low altitude. *Florida v. Riley,* 488 U. S.

445, 488 U. S. 451 (1989) (O'CONNOR, J., concurring in judgment). Similarly, in a Sixth Amendment case, the Court held that, although an overnight ban on attorney-client communication violated the constitutionally guaranteed right to counsel, *Geders v. United States,* 425 U. S. 80 (1976), that right was not violated when a trial judge separated a defendant from his lawyer during a 15-minute recess after the defendant's direct testimony. *Perry v. Leeke,* 488 U. S. 272 (1989).

That numerous constitutional doctrines result in narrow differentiations between similar circumstances does not mean that this Court has abandoned adjudication in favor of regulation. Rather, these careful distinctions reflect the process of constitutional adjudication itself, which is often highly fact-specific, requiring such determinations as whether state laws are "unduly burdensome" or "reasonable" or bear a "rational" or "necessary" relation to asserted state interests. In a recent due process case, THE CHIEF JUSTICE wrote for the

Page 492 U. S. 551

Court:

"[M]any branches of the law abound in nice distinctions that may be troublesome but have been thought nonetheless necessary:"

"I do not think we need trouble ourselves with the thought that my view depends upon differences of degree. The whole law does so as soon as it is civilized."

*Daniels v. Williams,* 474 U. S. 327, 474 U. S. 334 (1986), quoting *LeRoy Fibre Co. v. Chicago, M. & St. P. R. Co.,* 232 U. S. 340, 232 U. S. 354 (1914) (Holmes, J., partially concurring).

These "differences of degree" fully account for our holdings in *Simopoulos, supra,* and *Akron, supra.* Those decisions rest on this Court's reasoned and accurate judgment that hospitalization and doctor counseling requirements unduly burdened the right of women to terminate a pregnancy, and were not rationally related to the State's asserted interest in the health of pregnant women, while Virginia's substantially less restrictive regulations were not unduly burdensome and did rationally serve the State's interest. [Footnote 2/8] That the Court exercised its best judgment in evaluating these markedly different statutory schemes no more established the Court as an *"ex officio medical board,"' ante* at 492 U. S. 519, quoting *Planned Parenthood of Central Mo. v. Danforth, 428 U. S. 52, 428 U. S. 99 (1976) (opinion of WHITE, J., concurring in part and dissenting in part), than our decisions involving religion in the public schools establish the Court as a national school board, or our decisions concerning prison regulations establish the Court as*

Page 492 U. S. 552

a bureau of prisons. *See Thornburgh v. Abbott,* 490 U. S. 401 (1989) (adopting different standard of First Amendment review for incoming, as opposed to outgoing, prison mail). If, in delicate and complicated areas of constitutional law, our legal judgments "have become increasingly intricate," *ante* at 492 U. S. 518, it is not, as the plurality contends, because we have overstepped our judicial role. Quite the opposite: the rules are intricate because we have remained conscientious in our duty to do justice carefully, especially when fundamental rights rise or fall with our decisions.

3

Finally, the plurality asserts that the trimester framework cannot stand because the State's interest in potential life is compelling throughout pregnancy, not merely after viability. *Ante* at 492 U. S. 519. The opinion contains not one word of rationale for its view of the State's interest. This "it is so because we say so" jurisprudence constitutes nothing other than an attempted exercise of brute force; reason, much less persuasion, has no place.

In answering the plurality's claim that the State's interest in the fetus is uniform and compelling throughout pregnancy, I cannot improve upon what JUSTICE STEVENS has written:

"I should think it obvious that the State's interest in the protection of an embryo -- even if that interest is defined as 'protecting those who will be citizens' . . . -- increases progressively and dramatically as the organism's capacity to feel pain, to experience pleasure, to survive, and to react to its surroundings increases day by day. The development of a fetus -- and pregnancy itself -- are not static conditions, and the assertion that the government's interest is static simply ignores this reality. . . . [U]nless the religious view that a fetus is a 'person' is adopted . . . there is a fundamental and well-recognized difference between a fetus and a human being; indeed, if

Page 492 U. S. 553

there is not such a difference, the permissibility of terminating the life of a fetus could scarcely be left to the will of the state legislatures. And if distinctions may be drawn between a fetus and a human being in terms of the state interest in their protection -- even though the fetus represents one of 'those who will be citizens' -- it seems to me quite odd to argue that distinctions may not also be drawn between the state interest in protecting the freshly fertilized egg and the state interest in protecting the 9-month-gestated, fully sentient fetus on the eve of birth. Recognition of this distinction is supported not only by logic, but also by history and by our shared experiences."

*Thornburgh,* 476 U.S. at 476 U. S. 778-779 (footnote omitted). *See also Roe,* 410 U.S. at 410 U. S. 129-147.

For my own part, I remain convinced, as six other Members of this Court 16 years ago were convinced, that the *Roe* framework, and the viability standard in particular, fairly, sensibly, and effectively functions to safeguard the constitutional liberties of pregnant women while recognizing and accommodating the State's interest in potential human life. The viability line reflects the biological facts and truths of fetal development; it marks that threshold moment prior to which a fetus cannot survive separate from the woman and cannot reasonably and objectively be regarded as a subject of rights or interests distinct from, or paramount to, those of the pregnant woman. At the same time, the viability standard takes account of the undeniable fact that, as the fetus evolves into its postnatal form, and as it loses its dependence on the uterine environment, the State's interest in the fetus' potential human life, and in fostering a regard for human life in general, becomes compelling. As a practical matter, because viability follows "quickening" -- the point at which a woman feels movement in her womb -- and because viability occurs no earlier than 23 weeks gestational age, it establishes an easily applicable standard for regulating abortion while

Page 492 U. S. 554

providing a pregnant woman ample time to exercise her fundamental right with her responsible physician to terminate her pregnancy. [Footnote 2/9] Although I have stated previously for a majority of this Court that " [c]onstitutional rights do not always have easily ascertainable boundaries," to seek and establish those boundaries remains the special responsibility of this Court. *Thornburgh,* 476 U.S. at 476 U. S. 771. In *Roe,* we discharged that responsibility as logic and science compelled. The plurality today advances not one reasonable argument as to why our judgment in that case was wrong and should be abandoned.

*C*

Having contrived an opportunity to reconsider the *Roe* framework, and then having discarded that framework, the plurality finds the testing provision unobjectionable because it "permissibly furthers the State's interest in protecting potential human life." *Ante* at 492 U. S. 519-520. This newly minted

Page 492 U. S. 555

standard is circular, and totally meaningless. Whether a challenged abortion regulation "permissibly furthers" a legitimate state interest is the question that courts must answer in abortion cases, not the standard for courts to apply. In keeping with the rest of its opinion, the plurality makes no attempt to explain or to justify its new standard, either in the abstract or as applied in this case. Nor could it. The "permissibly furthers" standard has no independent meaning, and consists of nothing other than what a majority of this Court may believe at any given moment in any given case. The plurality's novel test appears to be nothing more than a dressed-up version of rational basis review, this Court's most lenient level of scrutiny. One thing is clear, however: were the plurality's "permissibly furthers" standard adopted by the Court, for all practical purposes, *Roe* would be overruled. [Footnote 2/10]

The "permissibly furthers" standard completely disregards the irreducible minimum of *Roe:* the Court's recognition that a woman has a limited fundamental constitutional right to decide whether to terminate a pregnancy. That right receives no meaningful recognition in the plurality's written opinion. Since, in the plurality's view, the State's interest in potential life is compelling as of the moment of conception, and is therefore served only if abortion is abolished, every hindrance to a woman's ability to obtain an abortion must be "permissible." Indeed, the more severe the hindrance, the more effectively (and permissibly) the State's interest would be furthered. A tax on abortions or a criminal prohibition would both satisfy the plurality's standard. So, for that

Page 492 U. S. 556

matter, would a requirement that a pregnant woman memorize and recite today's plurality opinion before seeking an abortion.

The plurality pretends that *Roe* survives, explaining that the facts of this case differ from those in *Roe:* here, Missouri has chosen to assert its interest in potential life only at the point of viability, whereas, in *Roe,* Texas had asserted that interest from the point of conception, criminalizing all abortions except where the life of the mother was at stake. *Ante* at 492 U. S. 521. This, of course, is a distinction without a difference. The plurality repudiates every principle for which *Roe* stands; in good conscience, it cannot possibly believe that *Roe* lies "undisturbed" merely because this case does not call upon the Court to reconsider the Texas statute or one like it. If the Constitution permits a State to enact any statute that reasonably furthers its interest in potential life, and if that interest arises as of conception, why would the Texas statute fail to pass muster? One suspects that the plurality agrees It is impossible to read the plurality opinion, and especially its final paragraph, without recognizing its implicit invitation to every State to enact more and more restrictive abortion laws, and to assert their interest in potential life as of the moment of conception. All these laws will satisfy the plurality's nonscrutiny until, sometime, a new regime of old dissenters and new appointees will declare what the plurality intends: that *Roe* is no longer good law. [Footnote 2/11]

Page 492 U. S. 557

D

Thus, "not with a bang, but a whimper," the plurality discards a landmark case of the last generation and casts into darkness the hopes and visions of every woman in this country who had come to believe that the Constitution guaranteed her the right to exercise some control over her unique ability to bear children. The plurality does so either oblivious or insensitive to the fact that millions of women, and their families, have ordered their lives around the right to reproductive choice, and that this right has become vital to the full participation of women in the economic and political walks of American life. The plurality would clear the way once again for government to force upon women the physical labor and specific and direct medical and psychological harms that may accompany carrying a fetus to term. The plurality would clear the way again for the State to conscript a woman's body and to force upon her a "distressful life and future." *Roe,* 410 U.S. at 410 U. S. 153.

The result, as we know from experience, *see* Cates & Rochat, Illegal Abortions in the United States: 1972-1974, 8 Family Planning Perspectives 86, 92 (1976), would be that, every year, hundreds of thousands of women, in desperation, would defy the law and place their health and safety in the unclean and unsympathetic hands of back-alley abortionists, or they would attempt to perform abortions upon themselves,

Page 492 U. S. 558

with disastrous results. Every year, many women, especially poor and minority women, would die or suffer debilitating physical trauma, all in the name of enforced morality or religious dictates or lack of compassion, as it may be.

Of the aspirations and settled understandings of American women, of the inevitable and brutal consequences of what it is doing, the tough-approach plurality utters not a word. This silence is callous. It is also profoundly destructive of this Court as an institution. To overturn a constitutional decision is a rare and grave undertaking. To overturn a constitutional decision that secured a fundamental personal liberty to millions of persons would be unprecedented in our 200 years of constitutional history. Although the doctrine of *stare decisis* applies with somewhat diminished force in constitutional cases generally, *ante* at 492 U. S. 518, even in ordinary constitutional cases, "any departure from . . . *stare decisis* demands special justification." *Arizona v. Rumsey,* 467 U. S. 203, 467 U. S. 212 (1984). *See also Vasquez v. Hillery,* 474 U. S. 254, 474 U. S. 266 (1986) ("[T]he careful observer will discern that any detours from the straight path of *stare decisis* in our past have occurred for articulable reasons, and only when the Court has felt obliged *to bring its opinions into agreement with experience and with facts newly ascertained,*'" quoting *Burnet v. Coronado Oil & Gas Co.,* 285 U. S. 393, 285 U. S. 412 (1932) (Brandeis, J., dissenting)). *This requirement of justification applies with unique force where, as here, the Court's abrogation of precedent would destroy people's firm belief, based on past decisions of this Court, that they possess an unabridgeable right to undertake certain conduct. [Footnote 2/12]*

Page 492 U. S. 559

Page 492 U. S. 559

As discussed at perhaps too great length above, the plurality makes no serious attempt to carry "the heavy burden of persuading . . . that changes in society or in the law dictate" the abandonment of *Roe* and its numerous progeny, *Vasquez,* 474 U.S. at 474 U. S. 266, much less the greater burden of explaining the abrogation of a fundamental personal freedom. Instead, the plurality pretends that it leaves *Roe* standing, and refuses even to discuss the real issue underlying this case: whether the Constitution includes an unenumerated right to privacy that encompasses a woman's right to decide whether to terminate a pregnancy. To the extent that the plurality does criticize the *Roe* framework, these criticisms are pure *ipse dixit.*

This comes at a cost. The doctrine of *stare decisis*

"permits society to presume that bedrock principles are founded in the law, rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact."

474 U.S. at 474 U. S. 265-266. Today's decision involves the most politically divisive domestic legal issue of our time. By refusing to explain or to justify its proposed revolutionary revision in the law of abortion, and by refusing to abide not only by our precedents, but also by our canons for reconsidering those precedents, the plurality invites charges of cowardice and

Page 492 U. S. 560

illegitimacy to our door. I cannot say that these would be undeserved.

## II

For today, at least, the law of abortion stands undisturbed. For today, the women of this Nation still retain the liberty to control their destinies. But the signs are evident and very ominous, and a chill wind blows.

[Footnote 2/1]

Contrary to the Court, I do not see how the preamble, § 1.205, realistically may be construed as "abortion-neutral." It declares that "[t]he life of each human being begins at conception" and that "[u]nborn children have protectable interests in life, health, and wellbeing." Mo.Rev.Stat. §§ 1.205.1(1) and (2) (1986). By the preamble's specific terms, these declarations apply to all of Missouri's laws which, in turn, are to be interpreted to protect the rights of the unborn to the fullest extent possible under the Constitution of the United States and the decisions of this Court. § 1.205.2. As the Court of Appeals concluded, the Missouri Legislature "intended its abortion regulations to be understood against the backdrop of its theory of life." 851 F.2d 1071, 1076 (CA8 1988). I note the Solicitor General's acknowledgment that this backdrop places

"a burden of uncertain scope on the performance of abortions by supplying a general principle that would fill in whatever interstices may be present in existing abortion precedents."

Brief for United States as *Amicus Curiae* on behalf of appellants 8-9, n. 5.

In my view, a State may not expand indefinitely the scope of its abortion regulations by creating interests in fetal life that are limited solely by reference to the decisional law of this Court. Such a statutory scheme, whose scope is dependent on the uncertain and disputed limits of our holdings, will have the unconstitutional effect of chilling the exercise of a woman's right to terminate a pregnancy and of burdening the freedom of health professionals to provide abortion services. In this case, moreover, because the preamble defines fetal life as beginning upon "the fertilization of the ovum of a female by a sperm of a male," § 188.015(3), the provision also unconstitutionally burdens the use of contraceptive devices, such as the IUD and the "morning after" pill, which may operate to prevent pregnancy only after conception as defined in the statute. *See* Brief for Association of Reproductive Health Professionals *et al.* as *Amici Curiae* 30-39.

The Court upholds §§ 188.210 and 188.215 on the ground that the constitutionality of these provisions follows from our holdings in *Maher v. Roe,* 432 U. S. 464 (1977), *Poelker v. Doe,* 432 U. S. 519 (1977), and *Harris v. McRae,* 448 U. S. 297 (1980). There were strong dissents in all those cases.

Whatever one may think of *Maher, Poelker,* and *Harris,* however, they most certainly do not control this case, where the State not only has withdrawn from the business of abortion, but has taken affirmative steps to assure

that abortions are not performed by private physicians in private institutions. Specifically, by defining "public facility" as

"any public institution, public facility, public equipment, or any physical asset owned, leased, or controlled by this state or any agency or political subdivisions thereof,"

§ 188.200, the Missouri statute prohibits the performance of abortions in institutions that, in all pertinent respects, are private, yet are located on property owned, leased, or controlled by the government. Thus, under the statute, no abortion may be performed at Truman Medical Center in Kansas City -- where, in 1985, 97 percent of all Missouri hospital abortions at 16 weeks or later were performed -- even though the Center is a private hospital, staffed primarily by private doctors, and administered by a private corporation: the Center is located on ground leased from a political subdivision of the State.

The sweeping scope of Missouri's "public facility" provision sharply distinguishes this case from *Maher, Poelker,* and *Harris.* In one of those cases, it was said:

"The State may have made childbirth a more attractive alternative . . . but it . . . imposed no restriction on access to abortions that was not already there."

*Maher,* 432 U.S. at 432 U. S. 474. Missouri's public facility ban, by contrast, goes far beyond merely offering incentives in favor of childbirth (as in *Maher* and *Harris*), or a straightforward disassociation of state-owned institutions and personnel from abortion services (as in *Poelker*). Here, by defining as "public" every health care institution with some connection to the State, no matter how attenuated, Missouri has brought to bear the full force of its economic power and control over essential facilities to discourage its citizens from exercising their constitutional rights, even where the State itself could never be understood as authorizing, supporting, or having any other positive association with the performance of an abortion. *See* R. Dworkin, The Great Abortion Case, New York Review of Books, June 29, 1989, p. 49.

The difference is critical. Even if the State may decline to subsidize or to participate in the exercise of a woman's right to terminate a pregnancy, and even if a State may pursue its own abortion policies in distributing public benefits, it may not affirmatively constrict the availability of abortions by defining as "public" that which in all meaningful respects is private. With the certain knowledge that a substantial percentage of private health care providers will fall under the public facility ban, *see* Brief for National Association of Public Hospitals as *Amicus Curiae* 10-11, Missouri does not "leav[e] a pregnant woman with the same choices as if the State had chosen not to operate any public hospitals at all," *ante* at 492 U. S. 509; rather, the public facility ban leaves the pregnant woman with far fewer choices, or, for those too sick or too poor to travel, perhaps no choice at all. This aggressive and shameful infringement on the right of women to obtain abortions in consultation with their chosen physicians, unsupported by any state interest, much less a compelling one, violates the command of *Roe.*

Indeed, JUSTICE O'CONNOR appears to recognize the constitutional difficulties presented by Missouri's "public facilities" ban, and rejects respondents' "facial" challenge to the provisions on the ground that a facial challenge cannot succeed where, as here, at least some applications of the challenged law are constitutional. *Ante* at 492 U. S. 523-524. While I disagree with this approach, JUSTICE O'CONNOR's writing explicitly leaves open the possibility that some applications of the "public facilities" ban may be unconstitutional, regardless of *Maher, Poelker,* and *Harris.*

I concur in 492 U. S. holding that respondents' challenge to § 188.205 is moot, although I note that the constitutionality of this provision might become the subject of relitigation between these parties should the Supreme Court of Missouri adopt an interpretation of the provision that differs from the one accepted here. *See Deakins v. Monaghan,* 484 U. S. 193, 484 U. S. 201, n. 5 (1988).

[Footnote 2/2]

I consider irrefutable JUSTICE STEVENS' discussion of this interpretive point. *See post* at 492 U. S. 560-563.

[Footnote 2/3]

The District Court found that "the only method to evaluate [fetal] lung maturity is by amniocentesis," a procedure that "imposes additional significant health risks for both the pregnant woman and the fetus. 662 F. Supp. 407, 422 (WD Mo.1987). Yet the medical literature establishes that to require amniocentesis for all abortions after 20 weeks would be contrary to sound medical practice and, moreover, would be useless for the purpose of

determining lung maturity until no earlier than between 28 and 30 weeks gestational age. *Ibid.; see also* Brief for American Medical Association *et al.* as *Amici Curiae* 41. Thus, were § 188.029 read to require a finding of lung maturity, it would require physicians to perform a highly intrusive procedure of risk that would yield no result relevant to the question of viability.

[Footnote 2/4]

I also agree with the Court of Appeals, 851 F.2d at 1074-1075, that, as written, § 188.029 is contrary to this Court's decision in *Colautti v. Franklin,* 439 U. S. 379, 439 U. S. 388-389 (1979).

[Footnote 2/5]

The plurality never states precisely its construction of § 188.029. I base my synopsis of the plurality's views mainly on its assertion that the entire provision must be read in light of its requirement that the physician act only in accordance with reasonable professional judgment, and that the provision imposes no requirement that a physician perform irrelevant or dangerous tests. *Ante* at 492 U. S. 514-515. To the extent that the plurality may be reading the provision to require tests other than those that a doctor, exercising reasonable professional judgment, would deem necessary to a finding of viability, the provision bears no rational relation to a legitimate governmental interest, and cannot stand.

[Footnote 2/6]

As convincingly demonstrated by JUSTICE O'CONNOR, *ante* at 492 U. S. 527-531, the cases cited by the plurality are not to the contrary. As noted by the plurality, in both *Colautti v. Franklin,* 439 U.S. at 388-389, and *Planned Parenthood of Central Mo. v. Danforth,* 428 U. S. 52 (1976), we stressed that the determination of viability is a matter for the judgment of the responsible attending physician. But § 188.029, at least as construed by the plurality, is consistent with this requirement. The provision does nothing to remove the determination of viability from the purview of the attending physician; it merely instructs the physician to make a finding of viability using tests to determine gestational age, weight, and lung maturity when such tests are feasible and medically appropriate.

I also see no conflict with the Court's holding in *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U. S. 416 (1983), that the State may not impose "a heavy, *and unnecessary,* burden on women's access to a relatively inexpensive, otherwise accessible, and safe abortion procedure." *Id.* at 462 U. S. 438 (emphasis added). In *Akron,* we invalidated a city ordinance requiring that all second-trimester abortions be performed in acute-care hospitals on the ground that such a requirement was not medically necessary, and would double the cost of abortions. *Id.* at 462 U. S. 434-439. By contrast, the viability determination at issue in this case (as read by the plurality), is necessary to the effectuation of the State's compelling interest in the potential human life of viable fetuses, and applies not to all second-trimester abortions, but instead only to that small percentage of abortions performed on fetuses estimated to be of more than 20 weeks gestational age.

[Footnote 2/7]

The plurality, ignoring all of the aforementioned cases except *Griswold,* responds that this case does not require consideration of the "great issues" underlying this case because *Griswold,* "unlike *Roe,* did not purport to adopt a whole framework . . . to govern the cases in which the asserted liberty interest would apply." *Ante* at 492 U. S. 520. This distinction is highly ironic. The Court in *Roe* adopted the framework of which the plurality complains as a mechanism necessary to give effect both to the constitutional rights of the pregnant woman and to the State's significant interests in maternal health and potential life. Concededly, *Griswold* does not adopt a framework for determining the permissible scope of state regulation of contraception. The reason is simple: in *Griswold* (and *Eisenstadt*), the Court held that the challenged statute, regulating the use of medically safe contraception, did not properly serve *any* significant state interest. Accordingly, the Court had no occasion to fashion a framework to accommodate a State's interests in regulating contraception. Surely the plurality is not suggesting that it would find *Roe* unobjectionable if the Court had forgone the framework and, as in the contraception decisions, had left the State with little or no regulatory authority. The plurality's focus on the framework is merely an excuse for avoiding the real issues embedded in this case, and a mask for its hostility to the constitutional rights that *Roe* recognized.

[Footnote 2/8]

The difference in the *Akron* and *Simopoulos* regulatory regimes is stark. The Court noted in *Akron* that the city ordinance requiring that all second-trimester abortions be performed in acute care hospitals undoubtedly would have made the procurement of legal abortions difficult and often prohibitively expensive, thereby driving the performance of abortions back underground where they would not be subject to effective regulation. Such a requirement obviously did not further the city's asserted interest in maternal health. 462 U.S. at 462 U. S. 420, n. 1. On the other hand, the Virginia law at issue in *Simopoulos,* by permitting the performance of abortions in licensed outpatient clinics as well as hospitals, did not similarly constrict the availability of legal abortions, and therefore did not undermine its own stated purpose of protecting maternal health.

[Footnote 2/9]

Notably, neither the plurality nor JUSTICE O'CONNOR advances the now-familiar catch-phrase criticism of the *Roe* framework that, because the point of viability will recede with advances in medical technology, *Roe* "is clearly on a collision course with itself." *See Akron,* 462 U.S. at 462 U. S. 458 (dissenting opinion). This critique has no medical foundation. As the medical literature and the *amicus* briefs filed in this case conclusively demonstrate, "there is an *anatomic threshold' for fetal viability of about 23-24 weeks of gestation." Brief for American Medical Association et al. as Amici Curiae 7. See also Brief for 167 Distinguished Scientists and Physicians, including 11 Nobel Laureates, as Amici Curiae 8-14. Prior to that time, the crucial organs are not sufficiently mature to provide the mutually sustaining functions that are prerequisite to extrauterine survival, or viability. Moreover, "no technology exists to bridge the development gap between the three-day embryo culture and the 24th week of gestation." Fetal Extrauterine Survivability, Report to the New York State Task Force on Life and the Law 3 (1988). Nor does the medical community believe that the development of any such technology is possible in the foreseeable future. Id. at 12. In other words, the threshold of fetal viability is, and will remain, no different from what it was at the time Roe was decided. Predictions to the contrary are pure science fiction. See Brief for A Group of American Law Professors as Amicus Curiae 23-25.*

[Footnote 2/10]

Writing for the Court in *Akron,* Justice Powell observed the same phenomenon, though in hypothetical response to the dissent in that case:

"In sum, it appears that the dissent would uphold virtually any abortion regulation under a rational basis test. It also appears that even where heightened scrutiny is deemed appropriate, the dissent would uphold virtually any abortion-inhibiting regulation because of the State's interest in preserving potential human life. . . . This analysis is wholly incompatible with the existence of the fundamental right recognized in *Roe v. Wade.*"

462 U.S. at 462 U. S. 420-421, n. 1.

[Footnote 2/11]

The plurality claims that its treatment of *Roe,* and a woman's right to decide whether to terminate a pregnancy, "hold[s] true the balance between that which the Constitution puts beyond the reach of the democratic process and that which it does not." *Ante* at 492 U. S. 521. This is unadulterated nonsense. The plurality's balance matches a lead weight (the State's allegedly compelling interest in fetal life as of the moment of conception) against a feather (a "liberty interest" of the pregnant woman that the plurality barely mentions, much less describes). The plurality's balance -- no balance at all -- places nothing, or virtually nothing, beyond the reach of the democratic process.

JUSTICE SCALIA candidly argues that this is all for the best. *Ante* at 492 U. S. 532. I cannot agree.

"The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property . . . may not be submitted to vote; they depend on the outcome of no elections."

*West Virginia Board of Education v. Barnette,* 319 U. S. 624, 319 U. S. 638 (1943). In a Nation that cherishes liberty, the ability of a woman to control the biological operation of her body and to determine with her responsible physician whether or not to carry a fetus to term must fall within that limited sphere of individual autonomy that lies beyond the will or the power of any transient majority. This Court stands as the ultimate guarantor of that zone of privacy, regardless of the bitter disputes to which our decisions may give rise. In *Roe,*

and our numerous cases reaffirming *Roe,* we did no more than discharge our constitutional duty.

[Footnote 2/12]

*Cf. South Carolina v. Gathers,* 490 U. S. 805, 490 U. S. 824 (1989) (SCALIA, J., dissenting) ("[T]he respect accorded prior decisions increases, rather than decreases, with their antiquity, as the society adjusts itself to their existence and the surrounding law becomes premised on their validity").

Moreover, as Justice Powell wrote for the Court in *Akron:*

"There are especially compelling reasons for adhering to *stare decisis* in applying the principles of *Roe v. Wade.* That case was considered with special care. It was first argued during the 1971 Term, and reargued -- with extensive briefing -- the following Term. The decision was joined by THE CHIEF JUSTICE and six other Justices. Since *Roe* was decided in January, 1973, the Court repeatedly and consistently has accepted and applied the basic principle that a woman has a fundamental right to make the highly personal choice whether or not to terminate her pregnancy."

462 U.S. at 462 U. S. 420, n. 1. *See, e.g., Planned Parenthood of Central Mo. v. Danforth,* 428 U. S. 52 (1976); *Bellotti v. Baird,* 428 U. S. 132 (1976); *Beal v. Doe,* 432 U. S. 438 (1977); *Maher v. Roe,* 432 U. S. 464 (1977); *Colautti v. Franklin,* 439 U. S. 379 (1979); *Bellotti v. Baird,* 443 U. S. 622 (1979); *Harris v. McRae,* 448 U. S. 297 (1980); *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U. S. 416 (1983); *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U. S. 747 (1986).

JUSTICE STEVENS, concurring in part and dissenting in part.

Having joined Part 492 U. S. I shall not comment on § 188.205 of the Missouri statute. With respect to the challenged portions of §§ 188.210 and 188.215, I agree with JUSTICE BLACKMUN, *ante* at 492 U. S. 539-541, n. 1 (concurring in part and dissenting in part), that the record identifies a sufficient number of unconstitutional applications to support the Court of Appeals' judgment invalidating those provisions. The reasons why I would also affirm that court's invalidation of § 188.029, the viability testing provision, and §§ 1.205.1(1), (2) of the preamble, [Footnote 3/1] require separate explanation.

I

It seems to me that in 492 U. S. the plurality strains to place a construction on § 188.029 [Footnote 3/2] that enables

Page 492 U. S. 561

it to conclude: "[W]e would modify and narrow *Roe* and succeeding cases," *ante* at 492 U. S. 521. That statement is ill-advised, because there is no need to modify even slightly the holdings of prior cases in order to uphold § 188.029. For the most plausible nonliteral construction, as both JUSTICE BLACKMUN, *ante* at 492 U. S. 542-544 (concurring in part and dissenting in part), and JUSTICE O'CONNOR, *ante* at 492 U. S. 525-531 (concurring in part and concurring in judgment), have demonstrated, is constitutional and entirely consistent with our precedents.

I am unable to accept JUSTICE O'CONNOR's construction of the second sentence in § 188.029, however, because I believe it is foreclosed by two controlling principles of statutory interpretation. First, it is our settled practice to accept

"the interpretation of state law in which the District Court and the Court of Appeals have concurred even if an examination of the state law issue without such guidance might have justified a different conclusion."

*Bishop v. Wood,* 426 U. S. 341, 426 U. S. 346 (1976). [Footnote 3/3] Second,

"[t]he fact that a particular application of the clear terms of a statute might be unconstitutional does not provide us with a justification for ignoring the plain meaning of the statute."

*Public Citizen v. Department of Justice,* 491 U. S. 440, 491 U. S. 481 (1989) (KENNEDY, J., concurring

Page 492 U. S. 562

in judgment). [Footnote 3/4] In this case, I agree with the Court of Appeals, 851 F.2d 1071, 1074-1075 (CA8 1988),

and the District Court, 662 F. Supp. 407, 423 (WD Mo.1987), that the meaning of the second sentence of § 188.029 is too plain to be ignored. The sentence twice uses the mandatory term "shall," and contains no qualifying language. If it is implicitly limited to tests that are useful in determining viability, it adds nothing to the requirement imposed by the preceding sentence.

My interpretation of the plain language is supported by the structure of the statute as a whole, particularly the preamble, which "finds" that life "begins at conception" and further commands that state laws shall be construed to provide the maximum protection to "the unborn child at every stage of development." Mo.Rev.Stat. §§ 1.205.1(1), 1.205.2 (1986). I agree with the District Court that "[o]bviously, the purpose of this law is to protect the potential life of the fetus, rather than to safeguard maternal health." 662 F. Supp. at 420. A literal reading of the statute tends to accomplish that goal. Thus it is not "incongruous," *ante* at 492 U. S. 515, to assume that the Missouri Legislature was trying to protect the potential human life of nonviable fetuses by making the abortion decision more costly. [Footnote 3/5] On the contrary, I am satisfied that the Court of Appeals, as well as the District Court, correctly concluded that the Missouri Legislature meant exactly what it said in the second sentence of § 188.029. I am also satisfied,

Page 492 U. S. 563

for the reasons stated by JUSTICE BLACKMUN, that the testing provision is manifestly unconstitutional under *Williamson v. Lee Optical Co.,* 348 U. S. 483 (1955),"'irrespective of the *Roe [v. Wade,* 410 U. S. 113 (1973),] framework." *Ante* at 492 U. S. 544 (concurring in part and dissenting in part).

## II

The Missouri statute defines "conception" as "the fertilization of the ovum of a female by a sperm of a male," Mo.Rev.Stat. § 188.015(3) (1986), even though standard medical texts equate "conception" with implantation in the uterus, occurring about six days after fertilization. [Footnote 3/6] Missouri's declaration therefore implies regulation not only of previability abortions, but also of common forms of contraception such as the IUD and the morning-after pill. [Footnote 3/7] Because the preamble, read in context, threatens serious encroachments upon the liberty of the pregnant woman and the health professional, I am persuaded that these plaintiffs, appellees before us, have

Page 492 U. S. 564

standing to challenge its constitutionality. *Accord,* 851 F.2d at 1075-1076.

To the extent that the Missouri statute interferes with contraceptive choices, I have no doubt that it is unconstitutional under the Court's holdings in *Griswold v. Connecticut,* 381 U. S. 479 (1965); *Eisenstadt v. Baird,* 405 U. S. 438 (1972); and *Carey v. Population Services International,* 431 U. S. 678 (1977). The place of *Griswold* in the mosaic of decisions defining a woman's liberty interest was accurately stated by Justice Stewart in his concurring opinion in *Roe v. Wade,* 410 U. S. 113, 410 U. S. 167-170 (1973):

"[I]n *Griswold v. Connecticut,* 381 U. S. 479, the Court held a Connecticut birth control law unconstitutional. In view of what had been so recently said in \[*Ferguson v.\] Skrupa,* [372 U.S. 726 (1963),] the Court's opinion in *Griswold* understandably did its best to avoid reliance on the Due Process Clause of the Fourteenth Amendment as the ground for decision. Yet the Connecticut law did not violate any provision of the Bill of Rights, nor any other specific provision of the Constitution. So it was clear to me then, and it is equally clear to me now, that the *Griswold* decision can be rationally understood only as a holding that the Connecticut statute substantively invaded the 'liberty' that is protected by the Due Process Clause of the Fourteenth Amendment. As so understood, *Griswold* stands as one in a long line of pre-*Skrupa* cases decided under the doctrine of substantive due process, and I now accept it as such."

"* * * *"

"Several decisions of this Court make clear that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment. *Loving v. Virginia,* 388 U. S. 1, 388 U. S. 12 [(1967)]; *Griswold v. Connecticut, supra; 268 U. S. Society of Sisters,* [268 U.S. 510 (1925)]; *Meyer v. Nebraska,* [262 U.S. 390 (1923)]. *See also*

Page 492 U. S. 565

*Prince v. Massachusetts,* 321 U. S. 158, 321 U. S. 166 [(1944)]; *Skinner v. Oklahoma,* 316 U. S. 535, 316 U. S. 541

*Prince v. Massachusetts,* 321 U. S. 158, 321 U. S. 166 [(1944)]; *Skinner v. Oklahoma,* 316 U. S. 535, 316 U. S. 541 [(1942)]. As recently as last Term, in *Eisenstadt v. Baird,* 405 U. S. 438, 405 U. S. 453, we recognized"

"the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."

"That right necessarily includes the right of a woman to decide whether or not to terminate her pregnancy."

"Certainly the interests of a woman in giving of her physical and emotional self during pregnancy and the interests that will be affected throughout her life by the birth and raising of a child are of a far greater degree of significance and personal intimacy than the right to send a child to private school protected in *Pierce v. Society of Sisters,* 268 U. S. 510 (1925), or the right to teach a foreign language protected in *Meyer v. Nebraska,* 262 U. S. 390 (1923)."

"*Abele v. Markle,* 351 F. Supp. 224, 227 (Conn.1972)."

"Clearly, therefore, the Court today is correct in holding that the right asserted by Jane Roe is embraced within the personal liberty protected by the Due Process Clause of the Fourteenth Amendment."

(Emphasis in original; footnotes omitted.) [Footnote 3/8]

One might argue that the *Griswold* holding applies to devices "preventing conception," 381 U.S. at 381 U. S. 480 -- that is, fertilization -- but not to those preventing implantation, and therefore, that *Griswold* does not protect a woman's choice to use an IUD or take a morning-after pill. There is unquestionably

Page 492 U. S. 566

a theological basis for such an argument, [Footnote 3/9] just as there was unquestionably a theological basis for the Connecticut statute that the Court invalidated in *Griswold.* Our jurisprudence, however, has consistently required a secular basis for valid legislation. *See, e.g., Stone v. Graham,* 449 U. S. 39, 449 U. S. 40 (1980) (per curiam). [Footnote 3/10] Because I am not aware of any secular basis for differentiating between contraceptive procedures that are effective immediately before and those that are effective immediately after fertilization, I believe it inescapably follows that the preamble to the Missouri statute is invalid under *Griswold* and its progeny.

Indeed, I am persuaded that the absence of any secular purpose for the legislative declarations that life begins at conception and that conception occurs at fertilization makes the relevant portion of the preamble invalid under the Establishment Clause of the First Amendment to the Federal Constitution. This conclusion does not, and could not, rest on the fact that the statement happens to coincide with the tenets of certain religions, *see McGowan v. Maryland,* 366 U. S. 420, 366 U. S. 442 (1961); *Harris v. McRae,* 448 U. S. 297, 448 U. S. 319-320 (1980), or on the fact that the legislators who voted to enact it may have been motivated by religious considerations, *see Washington v. Davis,* 426 U. S. 229, 426 U. S. 253 (1976) (STEVENS, J., concurring). Rather, it rests on the fact that the preamble, an unequivocal endorsement of a religious tenet of some, but by no means all, Christian faiths, [Footnote 3/11] serves no identifiable

Page 492 U. S. 567

secular purpose. That fact alone compels a conclusion that the statute violates the Establishment Clause. [Footnote 3/12] *Wallace v. Jaffree,* 472 U. S. 38, 472 U. S. 56 (1985).

My concern can best be explained by reference to the position on this issue that was widely accepted by the leaders of the Roman Catholic Church for many years. The position is summarized in a report, entitled "Catholic Teaching On Abortion," prepared by the Congressional Research Service of the Library of Congress. It states in part:

"The disagreement over the status of the unformed as against the formed fetus was crucial for Christian teaching on the soul. It was widely held that the soul was not present until the formation of the fetus 40 or 80 days after conception, for males and females respectively. Thus, abortion of the 'unformed' or 'inanimate' fetus (from *anima,* soul) was something less than true homicide, rather a form of anticipatory or quasi-homicide. This view received its definitive treatment in St. Thomas Aquinas, and became for a time the dominant interpretation m the Latin Church."

"* * * *"

"For St. Thomas, as for mediaeval Christendom generally, there is a lapse of time -- approximately 40 to 80 days

"For St. Thomas, as for mediaeval Christendom generally, there is a lapse of time -- approximately 40 to 80 days -- after conception and before the soul's infusion. . . ."

"For St. Thomas, 'seed and what is not seed is determined by sensation and movement.' What is destroyed in abortion of the unformed fetus is seed, not man. This distinction received its most careful analysis in St. Thomas. It was the general belief of Christendom, reflected,

Page 492 U. S. 568

for example, in the Council of Trent (1545-1563), which restricted penalties for homicide to abortion of an animated fetus only."

C. Whittier, Catholic Teaching on Abortion: Its Origin and Later Development (1981), reprinted in Brief for Americans United for Separation of Church and State as *Amicus Curiae* 13a, 17a (quoting *In octo libros politicorum* 7.12, attributed to St. Thomas Aquinas). If the views of St. Thomas were held as widely today as they were in the Middle Ages, and if a state legislature were to enact a statute prefaced with a "finding" that female life begins 80 days after conception and male life begins 40 days after conception, I have no doubt that this Court would promptly conclude that such an endorsement of a particular religious tenet is violative of the Establishment Clause.

In my opinion the difference between that hypothetical statute and Missouri's preamble reflects nothing more than a difference in theological doctrine. The preamble to the Missouri statute endorses the theological position that there is the same secular interest in preserving the life of a fetus during the first 40 or 80 days of pregnancy as there is after viability -- indeed, after the time when the fetus has become a "person" with legal rights protected by the Constitution. [Footnote 3/13] To sustain that position as a matter of law, I believe Missouri has the burden of identifying the secular interests that differentiate the first 40 days of pregnancy from the period immediately

Page 492 U. S. 569

before or after fertilization when, as *Griswold* and related cases establish, the Constitution allows the use of contraceptive procedures to prevent potential life from developing into full personhood. Focusing our attention on the first several weeks of pregnancy is especially appropriate, because that is the period when the vast majority of abortions are actually performed.

As a secular matter, there is an obvious difference between the state interest in protecting the freshly fertilized egg and the state interest in protecting a 9-month-gestated, fully sentient fetus on the eve of birth. There can be no interest in protecting the newly fertilized egg from physical pain or mental anguish, because the capacity for such suffering does not yet exist; respecting a developed fetus, however, that interest is valid. In fact, if one prescinds the theological concept of ensoulment -- or one accepts St. Thomas Aquinas' view that ensoulment does not occur for at least 40 days -- a State has no greater secular interest in protecting the potential life of an embryo that is still "seed" than in protecting the potential life of a sperm or an unfertilized ovum.

There have been times in history when military and economic interests would have been served by an increase in population. No one argues today, however, that Missouri can assert a societal interest in increasing its population as its secular reason for fostering potential life. Indeed, our national policy, as reflected in legislation the Court upheld last Term, is to prevent the potential life that is produced by "pregnancy and childbirth among unmarried adolescents." *Bowen v. Kendrick,* 487 U. S. 589, 487 U. S. 593 (1988); *accord, id.* at 487 U. S. 602. If the secular analysis were based on a strict balancing of fiscal costs and benefits, the economic costs of unlimited childbearing would outweigh those of abortion. There is, of course, an important and unquestionably valid secular interest in "protecting a young pregnant woman from the consequences of an incorrect decision," *Planned Parenthood of Central Mo. v. Danforth,* 428 U. S. 52, 428 U. S. 102 (1976)

Page 492 U. S. 570

(STEVENS, J., concurring in part and dissenting in part). Although that interest is served by a requirement that the woman receive medical and, in appropriate circumstances, parental, advice, [Footnote 3/14] it does not justify the state legislature's official endorsement of the theological tenet embodied in §§ 1.205.1(1), (2).

The State's suggestion that the "finding" in the preamble to its abortion statute is, in effect, an amendment to its tort, property, and criminal laws is not persuasive. The Court of Appeals concluded that the preamble "is simply an impermissible state adoption of a theory of when life begins to justify its abortion regulations." 851 F.2d at

1076. Supporting that construction is the state constitutional prohibition against legislative enactments pertaining to more than one subject matter. Mo.Const., Art. 3, § 23. *See In re Ray,* 83 B.R. 670 (Bkrtcy Ct., ED Mo.1988); *Berry v. Majestic Milling Co.,* 223 S.W. 738 (Mo.1920). Moreover, none of the tort, property, or criminal law cases cited by the State was either based on or buttressed by a theological answer to the question of when life begins. Rather, the Missouri courts, as well as a number of other state courts, had already concluded that a "fetus is a *person,*' `minor,' or `minor child' within the meaning of their particular wrongful death statutes."

*Page 492 U. S. 571*

*O'Grady v. Brown,* 654 S.W.2d 904, 910 (Mo.1983) (en banc). *[Footnote 3/15]*

Bolstering my conclusion that the preamble violates the First Amendment is the fact that the intensely divisive character of much of the national debate over the abortion issue reflects the deeply held religious convictions of many participants in the debate. *[Footnote 3/16]* The Missouri Legislature may not inject its endorsement of a particular religious tradition into this debate, for "[t]he Establishment Clause does not allow public bodies to foment such disagreement." *See County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, post* at 492 U. S. 651 (STEVENS, J., concurring in part and dissenting in part).

In my opinion, the preamble to the Missouri statute is unconstitutional for two reasons. To the extent that it has substantive impact on the freedom to use contraceptive procedures, it is inconsistent with the central holding in *Griswold.* To the extent that it merely makes "legislative findings without operative effect," as the State argues, Brief for Appellants 22, it violates the Establishment Clause of the First

Page 492 U. S. 572

Amendment. Contrary to the theological "finding" of the Missouri Legislature, a woman's constitutionally protected liberty encompasses the right to act on her own belief that -- to paraphrase St. Thomas Aquinas -- until a seed has acquired the powers of sensation and movement, the life of a human being has not yet begun. *[Footnote 3/17]*

*[Footnote 3/1]*

The State prefers to refer to subsections (1) and (2) of § 1.205.1 as "prefatory statements with no substantive effect." Brief for Appellants 9; *see id.* at 21; *see also* 851 F.2d 1071, 1076 (CA8 1988). It is true that § 1.205 is codified in Chapter 1, Laws in Force and Construction of Statutes, of Title I, Laws and Statutes, of the Missouri Revised Statutes, while all other provisions at issue are codified in Chapter 188, Regulation of Abortions, of Title XII, Public Health and Welfare. But because § 1.205 appeared at the beginning of House Bill No. 1596, *see ante* at 492 U. S. 500-501, it is entirely appropriate to consider it as a preamble relevant to those regulations.

*[Footnote 3/2]*

The testing provision states:

"188.029. Physician, determination of viability, duties"

"Before a physician performs an abortion on a woman he has reason to believe is carrying an unborn child of twenty or more weeks gestational age, the physician shall first determine if the unborn child is viable by using and exercising that degree of care, skill, and proficiency commonly exercised by the ordinarily skillful, careful, and prudent physician engaged in similar practice under the same or similar conditions. In making this determination of viability, the physician shall perform or cause to be performed such medical examinations and tests as are necessary to make a finding of the gestational age, weight, and lung maturity of the unborn child and shall enter such findings and determination of viability in the medical record of the mother."

Mo.Rev.Stat. § 188.029 (1986).

*[Footnote 3/3]*

*See also United States v. Durham Lumber Co.,* 363 U. S. 522, 363 U. S. 526-527 (1960); *Propper v. Clark,* 337 U. S. 472, 337 U. S. 486-487 (1949); *Hillsborough v. Cromwell,* 326 U. S. 620, 326 U. S. 630 (1946); *Huddleston v. Dwyer,* 322 U. S. 232, 322 U. S. 237 (1944); *MacGregor v. State Mutual Life Ins. Co.,* 315 U. S. 280, 315 U. S. 281 (1942) (per curiam).

[Footnote 3/4]

We have stated that we will interpret a federal statute to avoid serious constitutional problems if "a reasonable alternative interpretation poses no constitutional question," *Gomez v. United States,* 490 U. S. 858, 490 U. S. 864 (1989), or if "it is fairly possible to interpret the statute in a manner that renders it constitutionally valid," *Communications Workers v. Beck,* 487 U. S. 735, 487 U. S. 762 (1988), or "unless such construction is plainly contrary to the intent of Congress," *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council,* 485 U. S. 568, 485 U. S. 575 (1988).

[Footnote 3/5]

As with the testing provision, the plurality opts for a construction of this statute that conflicts with those of the Court of Appeals, 851 F.2d at 1076-1077, and the District Court, 662 F. Supp. 407, 413 (WD Mo.1987).

[Footnote 3/6]

The fertilized egg remains in the woman's Fallopian tube for 72 hours, then travels to the uterus' cavity, where cell division continues for another 72 hours before implantation in the uterine wall. D. Mishell & V. Davajan, Infertility, Contraception and Reproductive Endocrinology 109-110 (2d ed.1986); *see also* Brief for Association of Reproductive Health Professionals *et al.* as *Amici Curiae* 31-32 (ARHP Brief) (citing, *inter alia,* J. Pritchard, P. MacDonald, & N. Gant, Williams Obstetrics 88-91 (17th ed.1985)). "[O]nly 50 per cent of fertilized ova ultimately become implanted." ARHP Brief 32, n. 25 (citing Post Coital Contraception, The Lancet 856 (Apr. 16, 1983)).

[Footnote 3/7]

An intrauterine device, commonly called an IUD, "works primarily by preventing a fertilized egg from implanting." Burnhill, Intrauterine Contraception, in Fertility Control 271, 280 (S. Corson, R. Derman, & L. Tyrer eds.1985). *See also* 21 CFR § 801.427, p. 32 (1988); ARHP Brief 34-35. Other contraceptive methods that may prevent implantation include "morning-after pills," high-dose estrogen pills taken after intercourse, particularly in cases of rape, ARHP Brief 33, and the French RU 486, a pill that works "during the indeterminate period between contraception and abortion," *id.* at 37. Low-1evel estrogen "combined" pills -- a version of the ordinary, daily ingested birth control pill -- also may prevent the fertilized egg from reaching the uterine wall and implanting. *Id.* at 35-36.

[Footnote 3/8]

The contrast between Justice Stewart's careful explication that our abortion precedent flowed naturally from a stream of substantive due process cases and JUSTICE SCALIA's notion that our abortion law was "constructed overnight in *Roe v. Wade,*" *ante* at 492 U. S. 537 (concurring in part and concurring in judgment) is remarkable.

[Footnote 3/9]

Several *amici* state that the "sanctity of human life from conception and opposition to abortion are, in fact, sincere and deeply held religious beliefs," Brief for Lutheran Church-Missouri Synod *et al.* as *Amici Curiae* 20 (on behalf of 49 "church denominations"); *see* Brief for Holy Orthodox Church as *Amicus Curiae* 12-14.

[Footnote 3/10]

The dissent in *Stone* did not dispute this proposition; rather, it argued that posting the Ten Commandments on schoolroom walls has a secular purpose. 449 U.S. at 449 U. S. 43-46 (REHNQUIST, J., dissenting).

[Footnote 3/11]

*See, e.g.,* Brief for Catholics for a Free Choice *et al.* as *Amici Curiae* 5 ("There is no constant teaching in Catholic theology on the commencement of personhood").

[Footnote 3/12]

Pointing to the lack of consensus about life's onset among experts in medicine, philosophy, and theology, the Court in *Roe v. Wade,* 410 U. S. 113, 410 U. S. 158, 410 U. S. 162 (1973), established that the Constitution does not permit a State to adopt a theory of life that overrides a pregnant woman's rights. *Accord, Akron v. Akron Center for Reproductive Health, Inc.,* 462 U. S. 416, 462 U. S. 444 (1983). The constitutional violation is doubly grave if,

as here, the only basis for the State's "finding" is nonsecular.

[Footnote 3/13]

No Member of this Court has ever questioned the holding in *Roe,* 410 U.S. at 410 U. S. 156-159, that a fetus is not a "person" within the meaning of the Fourteenth Amendment. Even the dissenters in *Roe* implicitly endorsed that holding by arguing that state legislatures should decide whether to prohibit or to authorize abortions. *See id.* at 410 U. S. 177 (REHNQUIST, J., dissenting) (arguing that the Fourteenth Amendment did not "withdraw from the States the power to legislate with respect to this matter"); *Doe v. Bolton,* 410 U. S. 179, 410 U. S. 222 (1973) (WHITE, J., dissenting jointly in *Doe* and *Roe*). By characterizing the basic question as "a political issue," *see ante* at 492 U. S. 535 (concurring in part and concurring in judgment), JUSTICE SCALIA likewise implicitly accepts this holding.

[Footnote 3/14]

"The Court recognizes that the State may insist that the decision not be made without the benefit of medical advice. But since the most significant consequences of the decision are not medical in character, it would seem to me that the State may, with equal legitimacy, insist that the decision be made only after other appropriate counsel has been had as well. Whatever choice a pregnant young woman makes -- to marry, to abort, to bear her child out of wedlock -- the consequences of her decision may have a profound impact on her entire future life. A legislative determination that such a choice will be made more wisely in most cases if the advice and moral support of a parent play a part in the decisionmaking process is surely not irrational. Moreover, it is perfectly clear that the parental consent requirement will necessarily involve a parent in the decisional process."

*Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. at 428 U. S. 103 (STEVENS, J., concurring in part and dissenting in part).

[Footnote 3/15]

The other examples cited by the State are statutes providing that unborn children are to be treated as though born within the lifetime of the decedent, *see* Uniform Probate Code § 2-108 (1969), and statutes imposing criminal sanctions in the nature of manslaughter for the killing of a viable fetus or unborn quick child, *see, e.g.,* Ark.Stat.Ann. § 41-2223 (1947). None of the cited statutes included any "finding" on the theological question of when life begins.

[Footnote 3/16]

No fewer than 67 religious organizations submitted their views as *amici curiae* on either side of this case. *Amici* briefs on both sides, moreover, frankly discuss the relation between the abortion controversy and religion. *See generally, e.g.,* Brief for Agudath Israel of America as *Amicus Curiae,* Brief for Americans United for Separation of Church and State *et al.* as *Amici Curiae,* Brief for Catholics for a Free Choice *et al.* as *Amici Curiae,* Brief for Holy Orthodox Church as *Amicus Curiae,* Brief for Lutheran Church-Missouri Synod *et al.* as *Amici Curiae,* Brief for Missouri Catholic Conference as *Amicus Curiae. Cf.* Burke, Religion and Politics in the United States, in Movements and Issues in World Religions 243, 254-256 (C. Fu & G. Spiegler eds.1987).

[Footnote 3/17]

"Just as the right to speak and the right to refrain from speaking are complementary components of a broader concept of individual freedom of mind, so also the individual's freedom to choose his own creed is the counterpart of his right to refrain from accepting the creed established by the majority. At one time, it was thought that this right merely proscribed the preference of one Christian sect over another, but would not require equal respect for the conscience of the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism. But when the underlying principle has been examined in the crucible of litigation, the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all. This conclusion derives support not only from the interest in respecting the individual's freedom of conscience, but also from the conviction that religious beliefs worthy of respect are the product of free and voluntary choice by the faithful, and from recognition of the fact that the political interest in forestalling intolerance extends beyond intolerance among Christian sects -- or even intolerance among 'religions' -- to encompass intolerance of the disbeliever and the uncertain. As Justice Jackson eloquently stated in *West Virginia Board of Education v. Barnette,* 319 U. S. 624, 319 U. S. 642 (1943):"

" If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

"The State . . no less than the Congress of the United States, must respect that basic truth."

*Wallace v. Jaffree,* 472 U. S. 38, 472 U. S. 52-55 (1985) (footnotes omitted).

## Materials

### Oral Arguments

Oral Argument - April 26, 1989

## Search This Case

**Google Scholar**        **Google Books**        **Google Web**

**Google News**

## Columbus, Ohio Lawyers
Sponsored Listings

**John Reagan**

(614) 412-4994
**Columbus, OH**
Personal Injury, Products Liability, Medical Malpractice, Workers' Compensation, Nursing Home Abuse, Asbestos & Mesothelioma

PREMIUM



# Webster v. Doe, 486 U.S. 592 (1988)

Overview   Opinions   Materials

**Argued:**              **Decided:**
January 12, 1988         June 15, 1988

**Syllabus**

## U.S. Supreme Court

**Webster v. Doe, 486 U.S. 592 (1988)**

**Webster v. Doe**

**No. 86-1294**

**Argued January 12, 1988**

**Decided June 15, 1988**

**486 U.S. 592**

*Syllabus*

Section 102(c) of the National Security Act of 1947 (NSA) authorizes the Director of the Central Intelligence Agency (CIA), "in his discretion," to terminate the employment of any CIA employee "whenever he shall deem such termination necessary or advisable in the interests of the United States." After respondent, a covert electronics technician in the CIA's employ, voluntarily informed the agency that he was a homosexual, he was discharged by the Director (petitioner's predecessor) under § 102(c). Respondent filed suit against petitioner in Federal District Court for declaratory and injunctive relief, alleging violations of the Administrative Procedure Act (APA), of his rights to property, liberty, and privacy under the First, Fourth, Fifth, and Ninth Amendments, and of his rights to procedural due process and equal protection of the laws under the Fifth Amendment. After the court granted respondent's motion for partial summary judgment on his APA claim, declining to address his constitutional claims, the Court of Appeals vacated the judgment and remanded. The court agreed with the District Court that judicial review under the APA of petitioner's termination decisions made under § 102(c) of the NSA was not precluded by the provision of the APA, 5 U.S.C. § 701(a), which renders that Act inapplicable whenever "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." However, the court held that the District Court had erred in its ruling on the merits.

*Held:*

1. Title 5 U.S.C. § 701(a)(2) precludes judicial review under the APA of the CIA Director's termination decisions under § 102(c) of the NSA. Section 701(a)(2) applies where a statute is drawn in such broad terms that, in a given case, there is no law to apply, and the court would have no meaningful standard against which to judge the agency's exercise of discretion. In allowing termination whenever the Director "shall *deem* [it] necessary or advisable," and not simply when the dismissal *is* necessary or advisable, § 102(c) fairly exudes deference to the Director, and forecloses the application of any meaningful judicial standard of review for assessing a termination decision short of permitting cross-examination of the Director. That § 102(c)'s implementation was "committed to agency

Page 486 U. S. 593

discretion by law" is also strongly suggested by the overall structure of the NSA, which vests in the Director very broad authority to protect intelligence sources and methods from unauthorized disclosure. Section 102(c) is an integral part of that structure, because the CIA's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of CIA employees. Pp. 486 U. S. 599-601.

2. District Court review of respondent's constitutional claims is not precluded by § 102(c) of the NSA. Petitioner's view that all CIA employment termination decisions, even those based on policies normally repugnant to the Constitution, are given over to the Director's absolute discretion, is not supported by the required heightened showing of clear congressional intent. Although § 102(c) does commit termination decisions to the Director's discretion, 5 U.S.C. §§ 701(a)(1) and (a)(2) remove from judicial review only those determinations specifically identified by Congress or "committed to agency discretion by law." Nothing in § 102(c) demonstrates that Congress meant to preclude consideration of colorable constitutional claims arising out of the Director's actions pursuant to that section. Petitioner's contention that judicial review of constitutional claims will entail extensive "rummaging around" in the CIA's affairs to the detriment of national security is not persuasive, since claims attacking the CIA's employment policies under Title VII of the Civil Rights Act of 1964 are routinely entertained in federal court, and the District Court has the latitude to control any discovery process in order to balance respondent's need for access to proof against the CIA's extraordinary need for confidentiality. Petitioner's contention that Congress, in the interest of national security, may deny the courts authority to decide respondent's colorable constitutional claims arising out of his discharge and to order his reinstatement if the claims are upheld is also without merit, since Congress did not mean to impose such restrictions when it enacted § 102(c). Even without such prohibitory legislation, traditional equitable principles requiring the balancing of public and private interests control the grant of declaratory or injunctive relief, and, on remand, the District Court should thus address respondent's constitutional claims and the propriety of the equitable remedies sought. Pp. 486 U. S. 601-605.

254 U.S.App.D.C. 282, 796 F.2d 1508, affirmed in part, reversed in part, and remanded.

REHNQUIST, C.J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined, and in Parts I and II of which O'CONNOR, J., joined. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, *post*, p. 486 U. S. 605. SCALIA,

Page 486 U. S. 594

J., filed a dissenting opinion, *post*, p. 486 U. S. 606. KENNEDY, J., took no part in the consideration or decision of the case.

**Read More**

## Opinions

### Opinions & Dissents

Hear Opinion Announcement - June 15, 1988