

# U.S. Supreme Court

**Webster v. Doe, 486 U.S. 592 (1988)**
**Webster v. Doe**

**No. 86-1294**

**Argued January 12, 1988**

**Decided June 15, 1988**

**486 U.S. 592**

*CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR*

*THE DISTRICT OF COLUMBIA CIRCUIT*

*Syllabus*

Section 102(c) of the National Security Act of 1947 (NSA) authorizes the Director of the Central Intelligence Agency (CIA), "in his discretion," terminate the employment of any CIA employee "whenever he shall deem such termination necessary or advisable in the interests of the United States." After respondent, a covert electronics technician in the CIA's employ, voluntarily informed the agency that he was a homosexual, he was discharged by the Director (petitioner's predecessor) under § 102(c). Respondent filed suit against petitioner in Federal District Court for declaratory and injunctive relief, alleging violations of the Administrative Procedure Act (APA), of his rights to property, liberty, and privacy under the First, Fourth, Fifth, and Ninth Amendments, and of his rights to procedural due process and equal protection of the laws under the Fifth Amendment. After the court granted respondent's motion for partial summary judgment on his APA claim, declining to address his constitutional claims, the Court of Appeals vacated the judgment and remanded. The court agreed with the District Court that judicial review under the APA of petitioner's termination decisions made under § 102(c) of the NSA was not precluded by the provision of the APA, 5 U.S.C. § 701(a), which renders that Act inapplicable whenever "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." However, the court held that the District Court had erred in its ruling on the merits.

*Held:*

1. Title 5 U.S.C. § 701(a)(2) precludes judicial review under the APA of the CIA Director's termination decisions under § 102(c) of the NSA. Section 701(a)(2) applies where a statute is drawn in such broad terms that, in a given case, there is no law to apply, and the court would have no meaningful standard against which to judge the agency's exercise of discretion. In allowing termination whenever the Director "shall *deem* [it] necessary or advisable," and not simply when the dismissal *is* necessary or advisable, § 102(c) fairly exudes deference to the Director, and forecloses the application of any meaningful judicial standard of review for assessing a termination decision short of permitting cross-examination of the Director. That § 102(c)'s implementation was "committed to agency

Page 486 U. S. 593

discretion by law" is also strongly suggested by the overall structure of the NSA, which vests in the Director very broad authority to protect intelligence sources and methods from unauthorized disclosure. Section 102(c) is an integral part of that structure, because the CIA's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of CIA employees. Pp. 486 U. S. 599-601.

2. District Court review of respondent's constitutional claims is not precluded by § 102(c) of the NSA. Petitioner's view that all CIA employment termination decisions, even those based on policies normally repugnant to the Constitution, are given over to the Director's absolute discretion, is not supported by the required heightened showing of clear congressional intent. Although § 102(c) does commit termination decisions to the Director's discretion, 5 U.S.C. §§ 701(a)(1) and (a)(2) remove from judicial review only those determinations specifically identified by Congress or "committed to agency discretion by law." Nothing in § 102(c) demonstrates that Congress meant to preclude consideration of colorable constitutional claims arising out of the Director's actions

pursuant to that section. Petitioner's contention that judicial review of constitutional claims will entail extensive "rummaging around" in the CIA's affairs to the detriment of national security is not persuasive, since claims attacking the CIA's employment policies under Title VII of the Civil Rights Act of 1964 are routinely entertained in federal court, and the District Court has the latitude to control any discovery process in order to balance respondent's need for access to proof against the CIA's extraordinary need for confidentiality. Petitioner's contention that Congress, in the interest of national security, may deny the courts authority to decide respondent's colorable constitutional claims arising out of his discharge and to order his reinstatement if the claims are upheld is also without merit, since Congress did not mean to impose such restrictions when it enacted § 102(c). Even without such prohibitory legislation, traditional equitable principles requiring the balancing of public and private interests control the grant of declaratory or injunctive relief, and, on remand, the District Court should thus address respondent's constitutional claims and the propriety of the equitable remedies sought. Pp. 486 U. S. 601-605.

254 U.S.App.D.C. 282, 796 F.2d 1508, affirmed in part, reversed in part, and remanded.

REHNQUIST, C.J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined, and in Parts I and II of which O'CONNOR, J., joined. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, *post,* p. 486 U. S. 605. SCALIA,

Page 486 U. S. 594

J., filed a dissenting opinion, *post,* p. 486 U. S. 606. KENNEDY, J., took no part in the consideration or decision of the case.

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Section 102(c) of the National Security Act of 1947, 61 Stat. 498, *as amended,* provides that:

"[T]he Director of Central Intelligence may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States. . . ."

50 U.S.C. § 403(c). In this case we decide whether, and to what extent, the termination decisions of the Director under § 102(c) are judicially reviewable.

**I**

Respondent John Doe was first employed by the Central Intelligence Agency (CIA or Agency) in 1973 as a clerk typist. He received periodic fitness reports that consistently rated him as an excellent or outstanding employee. By 1977, respondent had been promoted to a position as a covert electronics technician.

Page 486 U. S. 595

In January, 1982, respondent voluntarily informed a CIA security officer that he was a homosexual. Almost immediately, the Agency placed respondent on paid administrative leave pending an investigation of his sexual orientation and conduct. On February 12 and again on February 17, respondent was extensively questioned by a polygraph officer concerning his homosexuality and possible security violations. Respondent denied having sexual relations with any foreign nationals, and maintained that he had not disclosed classified information to any of his sexual partners. After these interviews, the officer told respondent that the polygraph tests indicated that he had truthfully answered all questions. The polygraph officer then prepared a five-page summary of his interviews with respondent, to which respondent was allowed to attach a two-page addendum.

On April 14, 1982, a CIA security agent informed respondent that the Agency's Office of Security had determined that respondent's homosexuality posed a threat to security, but declined to explain the nature of the danger. Respondent was then asked to resign. When he refused to do so, the Office of Security recommended to the CIA Director (petitioner's predecessor) that respondent be dismissed. After reviewing respondent's records and the evaluations of his subordinates, the Director

"deemed it necessary and advisable in the interests of the United States to terminate [respondent's] employment with this Agency pursuant to section 102(c) of the National Security Act. . . . [Footnote 1] Respondent was also advised that, while the CIA would give him a positive recommendation in any future job search, if he applied for a job requiring a security clearance, the Agency would inform the prospective employer that it had concluded that

respondent's homosexuality presented a security threat."

Respondent then filed an action against petitioner in the United States District Court for the District of Columbia.

Page 486 U. S. 596

Respondent's amended complaint asserted a variety of statutory and constitutional claims against the Director. [Footnote 2] Respondent alleged that the Director's decision to terminate his employment violated the Administrative Procedure Act (APA), 5 U.S.C. § 706, because it was arbitrary and capricious, represented an abuse of discretion, and was reached without observing the procedures required by law and CIA regulations. [Footnote 3] He also complained that the Director's termination of his employment deprived him of constitutionally protected rights to property, liberty, and privacy in violation of the First, Fourth, Fifth, and Ninth Amendments. Finally, he asserted that his dismissal transgressed the procedural due process and equal protection of the laws guaranteed by the Fifth Amendment. Respondent requested a declaratory judgment that the Director had violated the APA and the Constitution, and asked the District Court for an injunction ordering petitioner to reinstate him to the position he held with the CIA prior to his dismissal. As an alternative remedy, he suggested that he be returned to paid administrative leave and that petitioner be ordered to reevaluate respondent's employment termination and provide a statement

Page 486 U. S. 597

of the reasons for any adverse final determination. Respondent sought no monetary damages in his amended complaint.

Petitioner moved to dismiss respondent's amended complaint on the ground that § 102(c) of the National Security Act (NSA) precludes judicial review of the Director's termination decisions under the provisions of the APA set forth in 5 U.S.C. §§ 701, 702, and 706 (1982 ed., Supp. IV). Section 702 provides judicial review to any

"person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."

The section further instructs that

"[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."

The scope of judicial review under § 702, however, is circumscribed by § 706, *see* n 3, *supra,* and its availability at all is predicated on satisfying the requirements of § 701, which provide:

"(a) This chapter applies, according to the provisions thereof, except to the extent that -- "

"(1) statutes preclude judicial review; or"

"(2) agency action is committed to agency discretion by law."

The District Court denied petitioner's motion to dismiss, and granted respondent's motion for partial summary judgment. The court determined that the APA provided judicial review of petitioner's termination decisions made under § 102(c) of the NSA, and found that respondent had been unlawfully discharged because the CIA had not followed the procedures described in its own regulations. The District Court declined, however, to address respondent's constitutional claims. Respondent was ordered reinstated to administrative

Page 486 U. S. 598

leave status, and the Agency was instructed to reconsider his case using procedures that would supply him with the reasons supporting any termination decision and provide him with an opportunity to respond.

A divided panel of the Court of Appeals for the District of Columbia Circuit vacated the District Court's judgment and remanded the case for further proceedings. The Court of Appeals first decided that judicial review under the APA of the Agency's decision to terminate respondent was not precluded by §§ 701(a)(1) or (a)(2). Turning to the merits, the Court of Appeals found that, while an agency must normally follow its own regulations, the CIA

regulations cited by respondent do not limit the Director's discretion in making termination decisions. Moreover, the regulations themselves state that, with respect to terminations pursuant to § 102(c), the Director need not follow standard discharge procedures, but may direct that an employee "be separated immediately and without regard to any suggested procedural steps." [Footnote 4] The majority thus concluded that the CIA regulations provide no independent source of procedural or substantive protection.

The Court of Appeals went on to hold that respondent must demonstrate that the Director's action was an arbitrary and capricious exercise of his power to discharge employees under § 102(c). [Footnote 5] Because the record below was unclear on certain points critical to respondent's claim for relief, the Court of Appeals remanded the case to District Court for a determination of the reason for the Director's termination of respondent. [Footnote 6] We granted certiorari to decide the question

Page 486 U. S. 599

whether the Director's decision to discharge a CIA employee under § 102(c) of the NSA is judicially reviewable under the APA.

## II

The APA's comprehensive provisions, set forth in 5 U.S.C. §§ 701-706 (1982 ed. and Supp. IV), allow any person "adversely affected or aggrieved" by agency action to obtain judicial review thereof, so long as the decision challenged represents a "final agency action for which there is no other adequate remedy in a court." Typically, a litigant will contest an action (or failure to act) by an agency on the ground that the agency has neglected to follow the statutory directives of Congress. Section 701(a), however, limits application of the entire APA to situations in which judicial review is not precluded by statute, *see* § 701(a)(1), and the agency action is not committed to agency discretion by law, *see* § 701(a)(2).

In *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U. S. 402 (1971), this Court explained the distinction between §§ 701(a)(1) and (a)(2). Subsection (a)(1) is concerned with whether Congress expressed an intent to prohibit judicial review; subsection (a)(2) applies "in those rare instances where *statutes are drawn in such broad terms that in a given case there is no law to apply.'" 401 U.S. at 401 U. S. 410 (citing S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)).*

We further explained what it means for an action to be "committed to agency discretion by law" in *Heckler v. Chaney,* 470 U. S. 821 (1985). *Heckler* required the Court to determine whether the Food and Drug Administration's decision not to undertake an enforcement proceeding against the use of certain drugs in administering the death penalty was subject to judicial review. We noted that, under § 701(a) (2), even when Congress has not affirmatively precluded judicial

Page 486 U. S. 600

oversight,

"review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."

470 U.S. at 470 U. S. 830. Since the statute conferring power on the Food and Drug Administration to prohibit the unlawful misbranding or misuse of drugs provided no substantive standards on which a court could base its review, we found that enforcement actions were committed to the complete discretion of the FDA to decide when and how they should be pursued.

Both *Overton Park* and *Heckler* emphasized that § 701 (a)(2) requires careful examination of the statute on which the claim of agency illegality is based (the Federal-Aid Highway Act of 1968 in *Overton Park* and the Federal Food, Drug, and Cosmetic Act in *Heckler*). In the present case, respondent's claims against the CIA arise from the Director's asserted violation of § 102(c) of the NSA. As an initial matter, it should be noted that § 102(c) allows termination of an Agency employee whenever the Director "shall *deem* such termination necessary or advisable in the interests of the United States" (emphasis added), not simply when the dismissal *is* necessary or advisable to those interests. This standard fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review. Short of permitting cross-examination of the Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests, we see no basis on which a reviewing court could properly assess an Agency termination decision. The

language of § 102(c) thus strongly suggests that its implementation was "committed to agency discretion by law."

So too does the overall structure of the NSA. Passed shortly after the close of the Second World War, the NSA created the CIA and gave its Director the responsibility "for protecting intelligence sources and methods from unauthorized disclosure." *See* 50 U.S.C. § 403(d)(3); S.Rep. No. 239, 80th Cong., 1st Sess., 2 (1947); H.R.Rep. No. 961,

Page 486 U. S. 601

80th Cong., 1st Sess., 3-4 (1947). Section 102(c) is an integral part of that statute, because the Agency's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of the Agency's employees. As we recognized in *Snepp v. United States,* 444 U. S. 507, 444 U. S. 510 (1980), employment with the CIA entails a high degree of trust that is perhaps unmatched in Government service.

This overriding need for ensuring integrity in the Agency led us to uphold the Director's use of § 102(d)(3) of the NSA to withhold the identities of protected intelligence sources in *CIA v. Sims,* 471 U. S. 159 (1985). In denying respondent's Freedom of Information Act requests in Sims to produce certain CIA records, we stated that

"[t]he plain meaning of the statutory language, as well as the legislative history of the National Security Act, . . . indicates that Congress vested in the Director of Central Intelligence very broad authority to protect all sources of intelligence information from disclosure."

*Id.* at 471 U. S. 168-169. Section 102(c), that portion of the NSA under consideration in the present case, is part and parcel of the entire Act, and likewise exhibits the Act's extraordinary deference to the Director in his decision to terminate individual employees.

We thus find that the language and structure of § 102(c) indicate that Congress meant to commit individual employee discharges to the Director's discretion, and that § 701(a)(2) accordingly precludes judicial review of these decisions under the APA. We reverse the Court of Appeals to the extent that it found such terminations reviewable by the courts.

### III

In addition to his claim that the Director failed to abide by the statutory dictates of § 102(c), respondent also alleged a number of constitutional violations in his amended complaint. Respondent charged that petitioner's termination of his employment deprived him of property and liberty interests under the Due Process Clause of the Fifth Amendment,

Page 486 U. S. 602

denied him equal protection of the laws, and unjustifiably burdened his right to privacy. Respondent asserts that he is entitled, under the APA, to judicial consideration of these claimed violations. [Footnote 7]

We share the confusion of the Court of Appeals as to the precise nature of respondent's constitutional claims. It is difficult, if not impossible, to ascertain from the amended complaint whether respondent contends that his termination, based on *his* homosexuality, is constitutionally impermissible, or whether he asserts that a more pervasive discrimination policy exists in the CIA's employment practices regarding *all* homosexuals. This ambiguity in the amended complaint is no doubt attributable in part to the inconsistent explanations respondent received from the Agency itself regarding his termination. Prior to his discharge, respondent had been told by two CIA security officers that his homosexual activities themselves violated CIA regulations. In contrast, the Deputy General Counsel of the CIA later informed respondent that homosexuality was merely a security concern that did not inevitably result in termination, but instead was evaluated on a case-by-case basis.

Page 486 U. S. 603

Petitioner maintains that, no matter what the nature of respondent's constitutional claim, judicial review is precluded by the language and intent of § 102(c). In petitioner's view, all Agency employment termination decisions, even those based on policies normally repugnant to the Constitution, are given over to the absolute discretion of the Director, and are hence unreviewable under the APA. We do not think § 102(c) may be read to exclude review of constitutional claims. We emphasized in *Johnson v. Robison,* 415 U. S. 361 (1974), that, where Congress intends to preclude judicial review of constitutional claims, its intent to do so must be clear. *Id.* at 415 U. S. 373-374. In *Weinberger v. Salfi,* 422 U. S. 749 (1975), we reaffirmed that view. We require this heightened

showing in part to avoid the "serious constitutional question" that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim. *See Bowen v. Michigan Academy of Family Physicians,* 476 U. S. 667, 476 U. S. 681, n. 12 (1986).

Our review of § 102(c) convinces us that it cannot bear the preclusive weight petitioner would have it support. As detailed above, the section does commit employment termination decisions to the Director's discretion, and precludes challenges to these decisions based upon the statutory language of § 102(c). A discharged employee thus cannot complain that his termination was not "necessary or advisable in the interests of the United States," since that assessment is the Director's alone. Subsections (a)(1) and (a)(2) of § 701, however, remove from judicial review only those determinations specifically identified by Congress or "committed to agency discretion by law." Nothing in § 102(c) persuades us that Congress meant to preclude consideration of colorable constitutional claims arising out of the actions of the Director pursuant to that section; we believe that a constitutional claim based on an individual discharge may be reviewed by

Page 486 U. S. 604

the District Court. [Footnote 8] We agree with the Court of Appeals that there must be further proceedings in the District Court on this issue.

Petitioner complains that judicial review even of constitutional claims will entail extensive "rummaging around" in the Agency's affairs to the detriment of national security. *See* Tr. of Oral Arg. 8-13. But petitioner acknowledges that Title VII claims attacking the hiring and promotion policies of the Agency are routinely entertained in federal court, *see* Reply Brief for Petitioner 13-14; Tr. of Oral Arg. 9, and the inquiry and discovery associated with those proceedings would seem to involve some of the same sort of rummaging. Furthermore, the District Court has the latitude to control any discovery process which may be instituted so as to balance respondent's need for access to proof which would support a colorable constitutional claim against the extraordinary needs of the CIA for confidentiality and the protection of its methods, sources, and mission. *See Kerr v. United States District Court,* 426 U. S. 394, 426 U. S. 405 (1976); *United States v. Reynolds,* 345 U. S. 1 (1953).

Petitioner also contends that, even if respondent has raised a colorable constitutional claim arising out of his discharge, Congress in the interest of national security may deny the courts the authority to decide the claim, and to order respondent's reinstatement if the claim is upheld. For the reasons previously stated, we do not think Congress meant to impose such restrictions when it enacted § 102(c) of the NSA. Even without such prohibitory legislation from Congress, of course, traditional equitable principles requiring the balancing of public and private interests control the grant of declaratory

Page 486 U. S. 605

or injunctive relief in the federal courts. *Weinberger v. Romero-Barcelo,* 456 U. S. 305 (1982); *Hecht Co. v. Bowles,* 321 U. S. 321, 321 U. S. 329-330 (1944). On remand, the District Court should thus address respondent's constitutional claims and the propriety of the equitable remedies sought.

The judgment of the Court of Appeals is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

[Footnote 1]

*See* May 11, 1982, Letter from Deputy General Counsel of CIA to respondent's counsel, App. 37.

[Footnote 2]

*See* Amended Complaint, *id.* at 5, 12-13.

[Footnote 3]

Title 5 U.S.C. § 706 provides in pertinent part:

"Scope of review"

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall -- "

"(1) compel agency action unlawfully withheld or unreasonably delayed; and"

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be -- "

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;"

"(B) contrary to constitutional right, power, privilege, or immunity;"

"(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;"

"(D) without observance of procedure required by law."

[Footnote 4]

*Doe v. Casey,* 254 U.S.App.D.C. 282, 293, and n. 41, 796 F.2d 1508, 1519, and n. 41 (1986) (citing CIA Regulation HR 20-27m).

[Footnote 5]

This "arbitrary and capricious" standard is derived from § 706(2)(A), *see* n 3, *supra.*

[Footnote 6]

The dissenting judge argued that Congress intended to preclude such review in creating § 102(c), and that the decision to discharge an employee was committed by that section to Agency discretion. He concluded that neither the statutory nor constitutional claims arising from a § 102(c) discharge are judicially reviewable under the APA.

[Footnote 7]

We understand that petitioner concedes that the Agency's failure to follow its own regulations can be challenged under the APA as a violation of § 102(c). *See* Reply Brief for Appellant in No. 85-5291 (CADC), p. 18 (*Doe v. Casey,* 254 U.S.App.D.C. 282, 796 F.2d 1508 (1986)); *see also Service v. Dulles,* 354 U. S. 363 (1957) (recognizing the right of federal courts to review an agency's actions to ensure that its own regulations have been followed); *Sampson v. Murray,* 415 U. S. 61, 415 U. S. 71 (1974) (stating that "federal courts do have authority to review the claim of a discharged governmental employee that the agency effectuating the discharge has not followed administrative regulations"). The Court of Appeals, however, found that the CIA's own regulations plainly protect the discretion granted the Director by § 102(c), and that the regulations "provid[e] no independent source of procedural or substantive protections." *Doe v. Casey, supra,* at 294, 796 F.2d at 1520. Thus, since petitioner prevailed on this ground below and does not seek further review of the question here, we do not reach that issue.

[Footnote 8]

Petitioner asserts, *see* Brief for Petitioner 27-28, n. 23, that respondent fails to present a colorable constitutional claim when he asserts that there is a general CIA policy against employing homosexuals. Petitioner relies on our decision in *Bowers v. Hardwick,* 478 U. S. 186 (1986), to support this view. This question was not presented in the petition for certiorari, and we decline to consider it at this stage of the litigation.

JUSTICE O'CONNOR, concurring in part and dissenting in part.

I agree that the Administrative Procedure Act (APA) does not authorize judicial review of the employment decisions referred to in § 102(c) of the National Security Act of 1947. Because § 102(c) does not provide a meaningful standard for judicial review, such decisions are clearly "committed to agency discretion by law" within the meaning of the provision of the APA set forth in 5 U.S.C. § 701(a)(2). I do not understand the Court to say that the exception in § 701(a)(2) is necessarily or fully defined by reference to statutes "drawn in such broad terms that in a given case there is no law to apply." *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U. S. 402, 401 U. S. 410 (1971), quoted *ante* at 599. Accordingly, I join Parts I and II of the Court's opinion.

I disagree, however, with the Court's conclusion that a constitutional claim challenging the validity of an

employment decision covered by § 102(c) may nonetheless be brought in a federal district court. Whatever may be the exact scope of Congress' power to close the lower federal courts to constitutional claims in other contexts, I have no doubt about its authority to do so here. The functions performed by the Central Intelligence Agency and the Director of Central Intelligence lie at the core of

"the very delicate, plenary and

Page 486 U. S. 606

exclusive power of the President as the sole organ of the federal government in the field of international relations."

*United States v. Curtiss-Wright Export Corp.,* 299 U. S. 304, 299 U. S. 320 (1936). The authority of the Director of Central Intelligence to control access to sensitive national security information by discharging employees deemed to be untrustworthy flows primarily from this constitutional power of the President, and Congress may surely provide that the inferior federal courts are not used to infringe on the President's constitutional authority. *See, e.g., Department of Navy v. Egan,* 484 U. S. 518, 484 U. S. 526-530 (1988); *Totten v. United States,* 92 U. S. 105 (1876). Section 102(c) plainly indicates that Congress has done exactly that, and the Court points to nothing in the structure, purpose, or legislative history of the National Security Act that would suggest a different conclusion. Accordingly, I respectfully dissent from the Court's decision to allow this lawsuit to go forward.

JUSTICE SCALIA, dissenting.

I agree with the Court's apparent holding in Part II of its opinion, *ante* at 486 U. S. 600 and 486 U. S. 601, that the Director's decision to terminate a CIA employee is "committed to agency discretion by law" within the meaning of 5 U.S.C. § 701(a)(2). But because I do not see how a decision can, either practically or legally, be both unreviewable and yet reviewable for constitutional defect, I regard Part 486 U. S. S. 599|>Part II. I therefore respectfully dissent from the judgment of the Court.

I

Before proceeding to address Part III of the Court's opinion, which I think to be in error, I must discuss one significant element of the analysis in Part II. Though I subscribe to most of that analysis, I disagree with the Court's description of what is required to come within subsection (a)(2) of § 701(a), which provides that judicial review is unavailable "to the extent that . . . agency action is committed to agency discretion

Page 486 U. S. 607

by law." * The Court's discussion, *ante* at 486 U. S. 599-600, suggests that the Court of Appeals below was correct in holding that this provision is triggered only when there is "no law to apply." *See Doe v. Casey,* 254 U.S.App.D.C. 282, 291-293, 796 F.2d. 1508, 1517-1519 (1986). *But see id.* at 305-307, 796 F.2d at 1531-1533 (Buckley, J., dissenting). Our precedents amply show that "commit[ment] to agency discretion by law" includes, but is not limited to, situations in which there is "no law to apply."

The Court relies for its "no law to apply" formulation upon our discussion in *Heckler v. Chaney,* 470 U. S. 821 (1985) -- which, however, did not apply that as the sole criterion of § 701(a)(2)'s applicability, but to the contrary discussed the subject action's "general unsuitability" for review, and adverted to "tradition, case law, and sound reasoning." 470 U.S. at 470 U. S. 831. Moreover, the only supporting authority for the "no law to apply" test cited in *Chaney* was our observation in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U. S. 402 (1971), that

"[t]he legislative history of the Administrative Procedure Act indicates that [§ 701(a)(2)] is applicable in those rare instances where 'statutes are drawn in such broad terms that, in a given case, there is no law to apply.' S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945),"

*id.* at 401 U. S. 410. Perhaps *Overton Park* discussed only the "no law to apply" factor because that was the only basis for non-reviewability

Page 486 U. S. 608

that was even arguably applicable. It surely could not have believed that factor to be exclusive, for that would contradict the very legislative history, both cited and quoted in the opinion, from which it had been derived, which read in full:

"The basic exception of matters committed to agency discretion would apply even if not stated at the outset [of the judicial review Chapter]. If, *for example,* statutes are drawn in such broad terms that, in a given case, there is no law to apply, courts of course have no statutory question to review."

S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945) (emphasis added).

The "no law to apply" test can account for the nonreviewability of certain issues, but falls far short of explaining the full scope of the areas from which the courts are excluded. For the fact is that there is no governmental decision that is not subject to a fair number of legal constraints precise enough to be susceptible of judicial application -- beginning with the fundamental constraint that the decision must be taken in order to further a public purpose, rather than a purely private interest; yet there are many governmental decisions that are not at all subject to judicial review. A United States Attorney's decision to prosecute, for example, will not be reviewed on the claim that it was prompted by personal animosity. Thus, "no law to apply" provides much less than the full answer to whether § 701(a)(2) applies.

The key to understanding the "committed to agency discretion *by law*" provision of § 701(a)(2) lies in contrasting it with the "*statutes* preclude judicial review" provision of § 701(a)(1). Why "statutes" for preclusion, but the much more general term "law" for commission to agency discretion? The answer is, as we implied in *Chaney,* that the latter was intended to refer to "the *common law' of judicial review of agency action," 470 U.S. at 832 -- a body of jurisprudence that had marked out, with more or less precision, certain issues and certain areas that were beyond the range of judicial review. That jurisprudence included principles*

*Page 486 U. S. 609*

*ranging from the "political question" doctrine, to sovereign immunity (including doctrines determining when a suit against an officer would be deemed to be a suit against the sovereign), to official immunity, to prudential limitations upon the courts' equitable powers, to what can be described no more precisely than a traditional respect for the functions of the other branches reflected in the statement in Marbury v. Madison, 1 Cranch 137, 170-171 (1803), that*

"[w]here the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct, would be rejected without hesitation."

*See, e.g., Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U. S. 103, 333 U. S. 110-114 (1948); *Switchmen v. National Mediation Board,* 320 U. S. 297, 320 U. S. 301-306 (1943); *United States v. George S. Bush & Co.,* 310 U. S. 371, 310 U. S. 379-380 (1940); *Reaves v. Ainsworth,* 219 U. S. 296, 219 U. S. 306 (1911); *Confiscation Cases,* 7 Wall. 454, 74 U. S. 457-459 (1869); *Martin v. Mott,* 12 Wheat.19, 25 U. S. 29-30 (1827). Only if all that "common law" were embraced within § 701 (a)(2) could it have been true that, as was generally understood, "[t]he intended result of [§ 701(a)] is to restate the existing law as to the area of reviewable agency action." Attorney General's Manual on the Administrative Procedure Act 94 (1947). Because that is the meaning of the provision, we have continued to take into account for purposes of determining reviewability, post-APA as before, not only the text and structure of the statute under which the agency acts, but such factors as whether the decision involves "a sensitive and inherently discretionary judgment call," *Department of Navy v. Egan,* 484 U. S. 518, 484 U. S. 527 (1988), whether it is the sort of decision that has traditionally been nonreviewable, *ICC v. Locomotive Engineers,* 482 U. S. 270, 482 U. S. 282 (1987); *Chaney, supra,* at 470 U. S. 832, and whether review would have "disruptive practical consequences," *see Southern R. Co. v. Seaboard Allied Milling Corp.,* 442 U. S. 444, 442 U. S. 457 (1979). This explains

Page 486 U. S. 610

the seeming contradiction between § 701(a)(2)'s disallowance of review to the extent that action is "committed to agency discretion," and § 706's injunction that a court shall set aside agency action that constitutes "an abuse of discretion." Since, in the former provision, "committed to agency discretion by law" means "of the sort that is traditionally unreviewable," it operates to keep certain categories of agency action out of the courts; but when agency action is appropriately in the courts, abuse of discretion is of course grounds for reversal.

All this law, shaped over the course of centuries and still developing in its application to new contexts, cannot possibly be contained within the phrase "no law to apply." It is not surprising, then, that although the Court

recites the test, it does not really apply it. Like other opinions relying upon it, this one essentially announces the test, declares victory, and moves on. It is not really true "*that a court would have no meaningful standard against which to judge the agency's exercise of discretion,*'" *ante* at 486 U. S. 600, *quoting Chaney, 470 U.S. at 470 U. S. 830. The standard set forth in § 102(c) of the National Security Act of 1947, 50 U.S.C. § 403(c), "necessary or advisable in the interests of the United States," at least excludes dismissal out of personal vindictiveness, or because the Director wants to give the job to his cousin. Why, on the Court's theory, is respondent not entitled to assert the presence of such excesses, under the "abuse of discretion" standard of § 706?*

If and when this Court does come to consider the reviewability of a dismissal such as the present one on the ground that it violated the agency's regulations -- a question the Court avoids today, *see ante* at 486 U. S. 602, n. 7 -- the difference between the "no law to apply" test and what I consider the correct test will be crucial. Perhaps a dismissal in violation of the regulations can be reviewed, but not simply because the regulations provide a standard that makes review possible. Thus, I agree with the Court's holding in Part II of its opinion

Page 486 U. S. 611

(though, as will soon appear, that holding seems to be undone by its holding in Part III), but on different reasoning.

**II**

Before taking the reader through the terrain of the Court's holding that respondent may assert constitutional claims in this suit, I would like to try to clear some of the underbrush, consisting primarily of the Court's ominous warning that

"[a] 'serious constitutional question' . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim."

*Ante* at 486 U. S. 603, *quoting from Bowen v. Michigan Academy of Family Physicians, 476* U. S. 667, 476 U. S. 681, n. 12 (1986).

The first response to the Court's grave doubt about the constitutionality of denying all judicial review to a "colorable constitutional claim" is that the denial of all judicial review is not at issue here, but merely the denial of review in United States district courts. As to that, the law is, and has long been, clear. Article III, § 2, of the Constitution extends the judicial power to "all Cases . . . arising under this Constitution." But Article III, § 1, provides that the judicial power shall be vested "in one supreme Court, *and in such inferior Courts as the Congress may from time to time ordain and establish*" (emphasis added). We long ago held that the power not to create any lower federal courts at all includes the power to invest them with less than all of the judicial power.

"The Constitution has defined the limits of the judicial power of the United States, but has not prescribed how much of it shall be exercised by the Circuit Court; consequently, the statute which does prescribe the limits of their jurisdiction, cannot be in conflict with the Constitution, unless it confers powers not enumerated therein."

*Sheldon v. Sill,* 8 How. 441, 49 U. S. 449 (1850). Thus, if there is any truth to the proposition that judicial cognizance of constitutional claims cannot be eliminated, it

Page 486 U. S. 612

is, at most, that they cannot be eliminated from state courts, and from this Court's appellate jurisdiction over cases from state courts (or eases from federal courts, should there be any) involving such claims. Narrowly viewed, therefore, there is no shadow of a constitutional doubt that we are free to hold that the present suit, whether based on constitutional grounds or not, will not lie.

It can fairly be argued, however, that our interpretation of § 701(a)(2) indirectly implicates the constitutional question whether state courts can be deprived of jurisdiction, because if they cannot, then interpreting § 701(a)(2) to exclude relief here would impute to Congress the peculiar intent to let state courts review Federal Government action that it is unwilling to let federal district courts review -- or, alternatively, the peculiar intent to let federal district courts review, upon removal from state courts pursuant to 28 U.S.C. § 1442(a)(1), claims that it is unwilling to let federal district courts review in original actions. I turn, then, to the substance of the Court's warning that judicial review of all "colorable constitutional claims" arising out of the respondent's dismissal may well be constitutionally required. What could possibly be the basis for this fear? Surely not some general principle

well be constitutionally required. What could possibly be the basis for this fear? Surely not some general principle that all constitutional violations must be remediable in the courts. The very text of the Constitution refutes that principle, since it provides that "[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members," Art. I, § 5, and that "for any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place," Art. I, § 6. Claims concerning constitutional violations committed in these contexts -- for example, the rather grave constitutional claim that an election has been stolen -- cannot be addressed to the courts. *See, e.g., Morgan v. United States,* 255 U.S.App.D.C. 231, 801 F.2d 445 (1986). Even apart from the strict text of the Constitution, we have found some constitutional claims to be beyond judicial review because they involve

Page 486 U. S. 613

"political questions." *See, e.g., Coleman v. Miller,* 307 U. S. 433, 307 U. S. 443-446 (1939); *Ohio ex rel. Bryant v. Akron Metropolitan Park District,* 281 U. S. 74, 281 U. S. 79-80 (1930). The doctrine of sovereign immunity -- not repealed by the Constitution, but to the contrary at least partly reaffirmed as to the States by the Eleventh Amendment -- is a monument to the principle that some constitutional claims can go unheard. No one would suggest that, if Congress had not passed the Tucker Act, 28 U.S.C. § 1491(a)(1), the courts would be able to order disbursements from the Treasury to pay for property taken under lawful authority (and subsequently destroyed) without just compensation. *See Schillinger v. United States,* 155 U. S. 163, 155 U. S. 166-169 (1894). And finally, the doctrine of equitable discretion, which permits a court to refuse relief, even where no relief at law is available, when that would unduly impair the public interest, does not stand aside simply because the basis for the relief is a constitutional claim. In sum, it is simply untenable that there must be a judicial remedy for every constitutional violation. Members of Congress and the supervising officers of the Executive Branch take the same oath to uphold the Constitution that we do, and sometimes they are left to perform that oath unreviewed, as we always are.

Perhaps, then, the Court means to appeal to a more limited principle that, although there may be areas where judicial review of a constitutional claim will be denied, the scope of those areas is fixed by the Constitution and judicial tradition, and cannot be affected by *Congress* through the enactment of a statute such as § 102(c). That would be a rather counterintuitive principle, especially since Congress has in reality been the principal determiner of the scope of review, for constitutional claims as well as all other claims, through its waiver of the preexisting doctrine of sovereign immunity. On the merits of the point, however: It seems to me clear that courts would not entertain, for example, an action for backpay by a dismissed Secretary of State claiming that the

Page 486 U. S. 614

reason he lost his Government job was that the President did not like his religious views -- surely a colorable violation of the First Amendment. I am confident we would hold that the President's choice of his Secretary of State is a "political question." But what about a similar suit by the Deputy Secretary of State? Or one of the Under Secretaries? Or an Assistant Secretary? Or the head of the European Desk? Is there really a constitutional line that falls at some immutable point between one and another of these offices at which the principle of unreviewability cuts in, and which cannot be altered by congressional prescription? I think not. I think Congress can prescribe, at least within broad limits, that, for certain jobs, the dismissal decision will be unreviewable -- that is, will be "committed to agency discretion by law."

Once it is acknowledged, as I think it must be, that (1) not all constitutional claims require a judicial remedy, and (2) that the identification of those that do not can, even if only within narrow limits, be determined by Congress, then it is clear that the "serious constitutional question" feared by the Court is an illusion. Indeed, it seems to me that, if one is in a mood to worry about serious constitutional questions, the one to worry about is not whether Congress can, by enacting § 102(c), give the President, through his Director of Central Intelligence, unreviewable discretion in firing the agents that he employs to gather military and foreign affairs intelligence, but rather whether Congress could constitutionally permit the courts to review all such decisions if it wanted to. We have acknowledged that the courts cannot intervene when there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker v. Carr,* 369 U. S. 186, 369 U. S. 217 (1962). We have recognized

"the insistence (evident from the number of Clauses devoted to the subject) with which the Constitution confers authority over the Army, Navy, and militia upon the political branches."

*United States v. Stanley,* 483 U. S. 669, 483 U. S. 682 (1987). We have also recognized

"the very delicate, plenary

Page 486 U. S. 615

and exclusive power of the President as the sole organ of the federal government in the field of international relations -- a power which does not require as a basis for its exercise an act of Congress."

*United States v. Curtiss-Wright Export Corp.,* 299 U. S. 304, 299 U. S. 320 (1936). And finally, we have acknowledged that

"[i]t is impossible for a government wisely to make critical decisions about foreign policy and national defense without the benefit of dependable foreign intelligence."

*Snepp v. United States,* 444 U. S. 507, 444 U. S. 512, n. 7 (1980) (per curiam). We have thus recognized that the

"authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information flows primarily from this constitutional investment of power in the President, *and exists quite apart from any explicit congressional grant.*"

*Department of Navy v. Egan,* 484 U.S. at 484 U. S. 527 (emphasis added).

I think it entirely beyond doubt that, if Congress intended, by the APA in 5 U.S.C. § 701(a)(2), to exclude judicial review of the President's decision (through the Director of Central Intelligence) to dismiss an officer of the Central Intelligence Agency, that disposition would be constitutionally permissible.

### III

I turn, then, to whether that executive action is, within the meaning of § 701(a)(2), "committed to agency discretion by law." My discussion of this point can be brief, because the answer is compellingly obvious. Section 102(c) of the National Security Act of 1947, 61 Stat. 498, states:

"*Notwithstanding . . . the provisions of any other law,* the Director of Central Intelligence, *may, in his discretion,* terminate the employment of any officer or employee of the Agency *whenever he shall deem* such termination necessary or advisable in the interests of the

Page 486 U. S. 616

United States. . . ."

50 U.S.C. § 403(c) (emphasis added). Further, as the Court declares, § 102(c) is an "integral part" of the National Security Act, which throughout exhibits "extraordinary deference to the Director." *Ante* at 486 U. S. 601. Given this statutory text, and given (as discussed above) that the area to which the text pertains is one of predominant executive authority and of traditional judicial abstention, it is difficult to conceive of a statutory scheme that more clearly reflects that "commit[ment] to agency discretion by law" to which § 701(a)(2) refers.

It is baffling to observe that the Court seems to agree with the foregoing assessment, holding that "the language and structure of § 102(c) indicate that Congress meant to commit individual employee discharges to the Director's discretion," *Ante* at 486 U. S. 601. Nevertheless, without explanation, the Court reaches the conclusion that "a constitutional claim based on an individual discharge may be reviewed by the District Court." *Ante* at 486 U. S. 603-604. It seems to me the Court is attempting the impossible feat of having its cake and eating it too. The opinion states that

"[a] discharged employee . . . cannot complain that his termination was not 'necessary or advisable in the interests of the United States,' *since that assessment is the Director's alone.*"

*Ante* at 486 U. S. 603 (emphasis added). But two sentences later, it says that

"[n]othing in § 102(c) persuades us that Congress meant to preclude consideration of colorable constitutional claims arising out of the actions of the Director pursuant to that section."

Which are we to believe? If the former, the case should be at an end. If the § 102(c) assessment is really "the Director's alone," the only conceivable basis for review of respondent's dismissal (which is what this case is about)

would be that the dismissal was not *really* the result of a § 102(c) assessment by the Director. But respondent has never contended that, nor could he. Not only was his counsel formally advised, by letter of May 11, 1982, that

"the Director has deemed it necessary and

Page 486 U. S. 617

advisable in the interests of the United States to terminate your client's employment with this Agency pursuant to section 102(c),"

App. 37, but the petitioner filed with the court an affidavit by the Director, dated September 17, 1982, stating that,

"[a]fter careful consideration of the matter, I determined that the termination of Mr. Doe's employment was necessary and advisable in the interests of the United States and, exercising my discretion under the authority granted by section 102(c), . . . I terminated Mr. Doe's employment."

*Id.* at 56. Even if the basis for the Director's assessment was the respondent's homosexuality, and even if the connection between that and the interests of the United States is an irrational, and hence an unconstitutional one, if that assessment is really "the Director's alone," there is nothing more to litigate about. I cannot imagine what the Court expects the "further proceedings in the District Court" which it commands, *ante* at 486 U. S. 604, to consist of, unless perhaps an academic seminar on the relationship of homosexuality to security risk. For even were the District Court persuaded that no such relationship exists, "that assessment is the Director's alone." Since the Court's disposition contradicts its fair assurances, I must assume that the § 102(c) judgment is no longer "the Director's alone," but rather only "the Director's alone except to the extent it is colorably claimed that his judgment is unconstitutional." I turn, then, to the question of where this exception comes from. As discussed at length earlier, the Constitution assuredly does not require it. Nor does the text of the statute. True, it only gives the Director absolute discretion to dismiss "[n]otwithstanding . . . the provisions of any other *law*" (emphasis added). But one would hardly have expected it to say "[n]otwithstanding the provisions of any other law or *of the Constitution.*" What the provision directly addresses is the authority to dismiss, not the authority of the courts to review the dismissal. And the Director does not have the authority to dismiss in violation of the Constitution, nor could Congress give it to him. The implication

Page 486 U. S. 618

of nonreviewability in this text, its manifestation that the action is meant to be "committed to agency discretion," is no weaker with regard to constitutional claims than nonconstitutional claims, unless one accepts the unacceptable proposition that the only basis for such committal is "no law to apply."

Perhaps, then, a constitutional right is by its nature so much more important to the claimant than a statutory right that a statute which plainly excludes the latter should not be read to exclude the former unless it says so. That principle has never been announced -- and with good reason, because its premise is not true. An individual's contention that the government has reneged upon a $100,000 debt owing under a contract is much more important to him -- both financially and, I suspect, in the sense of injustice that he feels -- than the same individual's claim that a particular federal licensing provision requiring a $100 license denies him equal protection of the laws, or that a particular state tax violates the Commerce Clause. A citizen would much rather have his statutory entitlement correctly acknowledged after a constitutionally inadequate hearing than have it incorrectly denied after a proceeding that fulfills all the requirements of the Due Process Clause. The *only* respect in which a constitutional claim is necessarily more significant than any other kind of claim is that, regardless of how trivial its real-life importance may be in the case at hand, it can be asserted against the action of the legislature itself, whereas a nonconstitutional claim (no matter how significant) cannot. That is an important distinction, and one relevant to the constitutional analysis that I conducted above. But it has no relevance to the question whether, as between executive violations of statute and executive violations of the Constitution -- both of which are equally unlawful, and neither of which can be said, *a priori*, to be more harmful or more unfair to the plaintiff -- one or the other category should be favored by a presumption against exclusion of judicial review.

Page 486 U. S. 619

Even if we were to assume, however, contrary to all reason, that every constitutional claim is *ipso facto* more worthy, and every statutory claim less worthy, of judicial review, there would be no basis for writing that preference into a statute that makes no distinction between the two. We have rejected such judicial rewriting of legislation even in the more appealing situation where particular applications of a statute are not merely less

legislation even in the more appealing situation where particular applications of a statute are not merely less desirable, but in fact raise "grave constitutional doubts." That, we have said, only permits us to adopt one rather than another permissible reading of the statute, but not, by altering its terms, "to ignore the legislative will in order to avoid constitutional adjudication." *Commodity Futures Trading Comm'n v. Schor,* 478 U. S. 833, 478 U. S. 841 (1986). There is no more textual basis for reading this statute as barring only nonconstitutional claims than there is to read it as barring only claims with a monetary worth of less than $1 million. Neither of the two decisions cited by the Court to sustain its power to read in a limitation for constitutional claims remotely supports that proposition. In *Johnson v. Robison,* 415 U. S. 361 (1974), we considered a statute precluding judicial review of "*the decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration.*'" *Id.* at 415 U. S. 367 (quoting 38 U.S.C. § 211(a)). *We concluded that this statute did not bar judicial review of a challenge to the constitutionality of the statute itself, since that was a challenge not to a decision of the Administrator, but to a decision of Congress. Our holding was based upon the text, and not upon some judicial power to read in a "constitutional claims" exception. And in Weinberger v. Salfi, 422 U. S. 749 (1975), we held that 42 U.S.C. § 405(h), a statute depriving district courts of federal question jurisdiction over "any claim arising under" Title II of the Social Security Act, did embrace even constitutional challenges, since its language was "quite different" from that at issue in Johnson, and*

"extend[ed] to any 'action' seeking 'to recover on any [Social Security] claim' --

Page 486 U. S. 620

irrespective of whether resort to judicial processes is necessitated by . . . allegedly unconstitutional statutory restrictions."

422 U.S. at 422 U. S. 762. In *Salfi,* to be sure, another statutory provision was available that would enable judicial review of the constitutional claim, but as just observed, that distinction does not justify drawing a line that has no basis in the statute. *Commodity Futures Trading Comm'n v. Schor, supra.*

The Court seeks to downplay the harm produced by today's decision by observing that

"petitioner acknowledges that Title VII claims attacking the hiring and promotion policies of the Agency are routinely entertained in federal court."

*Ante* at 486 U. S. 604, citing Reply Brief for Petitioner 13-14; Tr. of Oral Arg. 9. Assuming that those suits are statutorily authorized, I am willing to accept the Director's assertion that, while suits regarding hiring or promotion are tolerable, a suit regarding dismissal is not. Like the Court, I have no basis of knowledge on which I could deny that -- especially since it is obvious that, if the Director thinks that a particular hiring or promotion suit is genuinely contrary to the interests of the United States, he can simply make the hiring or grant the promotion, and then dismiss the prospective litigant under § 102(c).

The harm done by today's decision is that, contrary to what Congress knows is preferable, it brings a significant decisionmaking process of our intelligence services into a forum where it does not belong. Neither the Constitution, nor our laws, nor common sense gives an individual a right to come into court to litigate the reasons for his dismissal as an intelligence agent. It is of course not just *valid* constitutional claims that today's decision makes the basis for judicial review of the Director's action, but all *colorable* constitutional claims, whether meritorious or not. And in determining whether what is colorable is in fact meritorious, a court will necessarily have to review the entire decision. If the Director denies, for example, respondent's contention in the present

Page 486 U. S. 621

case that he was dismissed because he was a homosexual, how can a court possibly resolve the dispute without knowing what other good, intelligence-related reasons there might have been? I do not see how any "latitude to control any discovery process," *ante* at 604, could justify the refusal to permit such an inquiry, at least *in camera.* Presumably the court would be expected to evaluate whether the agent really did fail in this or that secret mission. The documents needed will make interesting reading for district judges (and perhaps others) throughout the country. Of course, the Agency can seek to protect itself, ultimately, by an authorized assertion of executive privilege, *United States v. Nixon,* 418 U. S. 683 (1974), but that is a power to be invoked only *in extremis,* and any scheme of judicial review of which it is a central feature is extreme. I would, in any event, not like to be the agent who has to explain to the intelligence services of other nations, with which we sometimes cooperate, that they need have no worry that the secret information they give us will be subjected to the notoriously broad discovery

powers of our courts, because, although we have to litigate the dismissal of our spies, we have available a protection of somewhat uncertain scope known as executive privilege, which the President can invoke if he is willing to take the political damage that it often entails.

Today's result, however, will have ramifications far beyond creation of the world's only secret intelligence agency that must litigate the dismissal of its agents. If constitutional claims can be raised in this highly sensitive context, it is hard to imagine where they cannot. The assumption that there are any executive decisions that cannot be hauled into the courts may no longer be valid. Also obsolete may be the assumption that we are capable of preserving a sensible common law of judicial review.

I respectfully dissent.

\* Technically, this provision merely precludes judicial review under the judicial review provisions of the Administrative Procedure Act (APA), that is, under Chapter 7 of Title 5 of the United States Code. However, at least with respect to all entities that come within the Chapter's definition of "agency," *see* 5 U.S.C. § 701(b), if review is not available under the APA, it is not available at all. Chapter 7 (originally enacted as § 10 of the APA) is an umbrella statute governing judicial review of all federal agency action. While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created, it becomes subject to the judicial review provisions of the APA unless *specifically* excluded, *see* 5 U.S.C. § 559. To my knowledge, no specific exclusion exists.

## Materials

### Oral Arguments

Oral Argument - January 12, 1988

## Search This Case

**Google Scholar**        **Google Books**        **Google Web**

**Google News**

# Columbus, Ohio Lawyers
Sponsored Listings

**John Reagan**

(614) 412-4994
**Columbus, OH**
Personal Injury, Products Liability, Medical Malpractice, Workers' Compensation, Nursing Home Abuse, Asbestos & Mesothelioma

PREMIUM

[Cite as *State v. Blake*, 2023-Ohio-2748.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

DARRELL E. BLAKE, JR.,

Defendant-Appellant.

---

### OPINION AND JUDGMENT ENTRY
### Case No. 22 CO 0020

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2019 CR 463

**BEFORE:**
Mark A. Hanni, Carol Ann Robb, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Vito J. Abruzzino*, Columbiana County Prosecutor, and *Atty. Shelley M. Pratt*, Assistant Prosecuting Attorney, Columbiana County Prosecutor's Office, 135 South Market Street, Lisbon, Ohio 44432, for Plaintiff-Appellee and

*Atty. Russell S. Bensing*, 600 IMG Building, 1360 East Ninth Street, Cleveland, Ohio 44114, for Defendant-Appellant.

Dated: August 8, 2023

– 2 –

**HANNI, J.**

———————————

{**¶1**}  Defendant-Appellant, Darrell E. Blake, Jr., appeals from a Columbiana County Common Pleas Court judgment convicting him of possession of cocaine, possession of heroin, possession of a fentanyl-related compound, and having a weapon under disability, following a jury trial and the resulting sentence.

{**¶2**}  On May 22, 2019, the Columbiana County Drug Task Force executed a search warrant at 410 14th Street in Wellsville.  Jarrell Sloan resided at the home and opened the door for the officers.  Appellant, who had spent the previous night at the house, was found naked in an upstairs bedroom with a woman.  Appellant asked the officers if he could put on his red sweatpants, which were sitting on the bed near him. Officers searched the pants before giving them to Appellant and found approximately $4,200 in the pocket.  Included in the cash found in Appellant's sweatpants was $40 from a controlled drug buy the previous day.  Officers also noticed a loaded Glock pistol on the floor next to the bed.  And they located a bag under the edge of the bed, covered with a towel, which contained three smaller baggies of 15.20 grams of cocaine, 14.38 grams of a heroin-fentanyl mixture, and 4.43 grams of a fentanyl-heroin mixture.  The drugs had a street value of approximately $7,100.  Officers also noticed various drug paraphernalia such as a digital scale and baggies.

{**¶3**}  On October 18, 2019, a Columbiana County Grand Jury indicted Appellant on one count of possession of cocaine, a third-degree felony in violation of R.C. 2925.11(A); one count of possession of heroin, a second-degree felony in violation of R.C. 2925.11(A); one count of possession of a fentanyl-related compound, a second-degree felony in violation of R.C. 2925.11(A); one count of having a weapon under disability, a third-degree felony in violation of R.C. 2923.13(A)(3); and one count of possession of drug paraphernalia, a fourth-degree misdemeanor in violation of R.C. 2925.14(C)(1).  The felony charges carried firearm specifications and forfeiture specifications.  Appellant entered a not guilty plea.

{**¶4**}  The matter proceeded to a jury trial on May 17, 2022.  The jury found Appellant guilty on all felony charges and not guilty on the misdemeanor charge.  It also

<u>Case No. 22 CO 0020</u>

– 3 –

found $4,186 and a Glock Model 22 pistol were subject to forfeiture. The court proceeded to sentencing.

{¶5} For possession of cocaine, the trial court sentenced Appellant to 24 months in prison and a mandatory $5,000 fine. For possession of heroin, the court sentenced him to an indefinite prison term of seven to ten-and-a-half years and a mandatory $7,500 fine. For possession of a fentanyl-related compound, the court sentenced Appellant to an indefinite term of seven to ten-and-a-half years and a mandatory $7,500 fine. For having a weapon under disability, the court sentenced him to 36 months. And on the firearm specification, the court sentenced Appellant to one year which was required to be served prior to and consecutively to the other prison terms. The court ordered Appellant to serve the sentences for possession of heroin and possession of a fentanyl-related compound concurrently with each other but consecutively to the other sentences. It ordered him to serve the sentences for possession of cocaine and having a weapon under disability consecutively to each other. Thus, Appellant's aggregate sentence is a minimum of 13 years and a maximum of 16 ½ years.

{¶6} Appellant filed a timely notice of appeal on June 9, 2022. He now raises four assignments of error.

{¶7} Appellant's first assignment of error states:

THE TRIAL COURT ERRED IN ENTERING A VERDICT OF CONVICTION WHICH WAS BASED UPON INSUFFICIENT EVIDENCE, IN DEROGATION OF DEFENDANT'S RIGHTS UNDER THE 5TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

{¶8} Appellant argues that his convictions were not based on sufficient evidence. He points out there was no testimony that he physically possessed the drugs. Appellant goes on to argue that Plaintiff-Appellee, the State of Ohio, did not prove constructive possession. He notes the evidence demonstrated he did not own the home where the drugs were found, he did not reside in the home where the drugs were found, and the drugs were not found in plain view in the room where he spent the night. Additionally, Appellant argues the controlled buys did not prove evidence of possession.

Case No. 22 CO 0020

– 4 –

**{¶9}** Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d 89 at 113. When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence. *State v. Thorn*, 7th Dist. Belmont No. 16 BE 0054, 2018-Ohio-1028, ¶ 34, citing *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991) (superseded by state constitutional amendment on other grounds).

**{¶10}** A sufficiency of the evidence challenge tests the burden of production while a manifest weight challenge tests the burden of persuasion. *Thompkins* at 390 (Cook, J., concurring). Therefore, when reviewing a sufficiency challenge, the court does not evaluate witness credibility. *State v. Yarbrough*, 95 Ohio St.3d 227, 243, 2002-Ohio-2126, 767 N.E.2d 216. Instead, the court looks at whether the evidence is sufficient if believed. *Id.* at ¶ 82.

**{¶11}** The jury convicted Appellant of possession of drugs in violation of R.C. 2925.11, which provides: "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." "Possession" is defined as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K).

**{¶12}** The jury also convicted Appellant of having a firearm while under disability, which prohibits a person under indictment for, or convicted of, a felony drug offense from knowingly acquiring, having, carrying, or using any firearm. R.C. 2923.13(A)(3).

**{¶13}** In the context of drug offenses, "possession" may be either actual possession or constructive possession. *State v. Carter*, 7th Dist. Jefferson No. 97-JE-24, 2000 WL 748140, *4 (May 30, 2000). "Constructive possession exists when an individual

Case No. 22 CO 0020

– 5 –

exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *State v. Wolery*, 46 Ohio St.2d 316, 329, 348 N.E.2d 351 (1976).

{¶14} We must now consider the evidence put forth by the State to determine if it was sufficient to sustain the jury's verdict.

{¶15} East Liverpool Police Officer Justin Watkins was a member of the Columbiana County Drug Task Force who executed the warrant leading to Appellant's arrest. Officer Watkins testified that when the search warrant was executed, officers found Appellant in what they labeled "Room 7," an upstairs bedroom. (Tr. 327). A woman named Reign Edwards was also in Room 7 with Appellant. (Tr. 328).

{¶16} Officer Watkins testified that drug paraphernalia, a scale, money, a gun, and suspected baggies of narcotics were all found in Room 7. (Tr. 332). More specifically, the officer stated that $4,197 was in found in the pair of red sweatpants that Appellant asked for. (Tr. 334). Of that money, $40 was pre-recorded drug task force funds that had been used in a previous controlled drug buy. (Tr. 334). As to the suspected narcotics, testing revealed the baggies contained cocaine, heroin, and fentanyl. (Tr. 341-342). And Officer Watkins testified that the gun was a loaded Glock Model 22 handgun. (Tr. 342). He further testified that Appellant was not permitted to possess a firearm because of a disability resulting from an indictment that was pending against him at the time. (Tr. 345; State Ex. 1).

{¶17} Officer Watkins next testified that while he was working on the inventory from the search, Appellant and Edwards were nearby him. (Tr. 349). He overheard Edwards ask Appellant why he brought her to a "trap." (Tr. 350). A "trap house" is a house where drugs are sold. (Tr. 324). Appellant apologized to Edwards and stated that he would never do it again. (Tr. 349).

{¶18} Erin Miller is a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation. She tested the suspected narcotics. Miller testified that the suspected narcotics contained cocaine, heroin, and fentanyl. (Tr. 389).

{¶19} Columbiana County Sheriff Brian McLaughlin was the director of the Columbiana County Drug Task Force (DTF) at the relevant time. Sheriff McLaughlin testified that in May 2019 the DTF made several controlled drug buys at 410 14th Street,

– 6 –

which is Jarrell Sloan's family house. (Tr. 423). The sheriff testified that the controlled buys used a confidential informant who made contact with Appellant to purchase drugs. (Tr. 423). He stated the investigation involved Sloan's house and involved both Sloan and Appellant. (Tr. 424). These controlled buys, the sheriff testified, led to the issuance of the search warrant for Sloan's house. (Tr. 424). The last controlled drug buy occurred the day before the DTF executed the search warrant. (Tr. 425).

{¶20} Sheriff McLaughlin testified that when the DTF arrived at Sloan's house to execute the warrant, Sloan opened the front door for them. (Tr. 427). He stated that Appellant and Edwards were found in an upstairs bedroom. (Tr. 429-430). Appellant was naked and Edwards was wrapped only in a towel. (Tr. 430). The sheriff stated that Appellant asked for his pants. (Tr. 430). There was a pair of red sweatpants on the bed, which Appellant said were his. (Tr. 430-431). The officers searched the pants before giving them to Appellant and found over $4,100 in the pocket. (Tr. 431, 452). The DTF removed the money from the pocket and gave Appellant his pants to wear. (Tr. 452). The sheriff testified the DTF also found narcotics, a gun, and drug paraphernalia in Room 7. (Tr. 434).

{¶21} The sheriff testified that when they entered Room 7, Appellant was located near the bottom right side of the bed, near the red sweatpants. (Tr. 448). A Glock pistol was located on the floor by the right side of the bed. (Tr. 448; State Ex. 10). The DTF also located some loose cash and baggies of marijuana on a television stand in Room 7. (Tr. 455-456; State Exs. 16, 17, 21).

{¶22} As to the cash found in Appellant's sweatpants, the sheriff testified that two of the twenty-dollar bills were bills that had been used in the controlled drug buy the day before. (Tr. 463). The sheriff was able to identify them by serial number. (Tr. 463).

{¶23} Next, Sheriff McLaughlin testified that underneath the right side of the bed, the officers located a towel. (Tr. 464; State Ex. 19). Underneath the towel, the officers found a single bag containing three smaller baggies of suspected narcotics, which were eventually identified as cocaine, heroin, and fentanyl. (Tr. 464-466; State Ex. 20).

{¶24} The sheriff further testified that people involved in the drug world are protective of their drugs and normally do not leave them unattended. (Tr. 469-470). As

– 7 –

to the value of the drugs recovered from Room 7, the sheriff estimated their total street value to be $7,100. (Tr. 470-471).

**{¶25}** Sheriff McLaughlin also testified that during the course of his investigation, there was no evidence that connected Edwards to any drug activity at 410 14th Street. (Tr. 472).

**{¶26}** "A defendant's mere presence in an area where drugs are located is insufficient to demonstrate that the defendant constructively possessed the drugs." *State v. Fry*, 4th Dist. Jackson No. 03CA26, 2004-Ohio-5747, ¶ 40. "'It must also be shown that the person was conscious of the presence of the object.'" *State v. Vaughn*, 7th Dist. Mahoning No. 20 MA 0106, 2022-Ohio-3615, ¶ 21, quoting *State v. Hankerson*, 70 Ohio St.2d 87, 91, 434 N.E.2d 1362 (1982). But a defendant's proximity to the drugs may constitute *some evidence* of constructive possession. *Id.* A defendant's conviction for drug possession can be based upon circumstantial evidence of possession. *State v. DeSarro*, 7th Dist. Columbiana No. 13 CO 39, 2015-Ohio-5470, ¶ 41. When drugs are readily usable and found in very close proximity to a defendant these facts may constitute circumstantial evidence and support a conclusion that the defendant had constructive possession of the drugs. *State v. Barker*, 7th Dist. Jefferson No. 05-JE-21, 2006-Ohio-1472, ¶ 78, quoting *State v. Kobi*, 122 Ohio App.3d 160, 174, 701 N.E.2d 420 (1997).

**{¶27}** In this case, Appellant was found in Room 7. The drugs and gun were also located in Room 7. Appellant was not alone in Room 7. Edwards was also found in the same room as the drugs and the gun. However, "two persons may constructively possess the same thing." *State v. Jackson*, 9th Dist. Summit Nos. 22378 and 22394, 2005-Ohio-5184, ¶ 19, citing *State v. Galindo*, 6th Dist. No. L-98-1242 (July 9, 1999). So the fact that there were two people near the contraband does not detract from Appellant possessing it.

**{¶28}** Another piece of circumstantial evidence tends to indicate that Appellant constructively possessed the drugs. A large amount of cash was found in his sweatpants. More significantly, $40 of that cash was from a controlled drug buy the day before. This evidence suggests that Appellant was conscious of the presence of the drugs.

**{¶29}** Several facts weigh in favor of Appellant's argument here such as Appellant did not own the home where the drugs were found, Appellant did not reside in the home

Case No. 22 CO 0020

– 8 –

where the drugs were found, and the drugs were not in plain view.  But Appellant clearly had access to the drugs.  They were found in close proximity to Appellant.  And Appellant was in possession of a large amount of cash, including cash from the previous day's controlled drug buy.  Thus, when viewing the evidence in a light most favorable to the prosecution as we are required to do in a sufficiency of the evidence challenge, sufficient evidence exists to support Appellant's convictions on the drug counts.

{¶30}  As to having a weapon under disability, the evidence was uncontroverted that Appellant was under a weapons disability due to a pending felony indictment.  And the firearm was found on the floor in plain view near Appellant and near the bed.  Viewing this evidence in favor of the State as we are required to do, there is sufficient evidence to prove that Appellant had constructive possession of the firearm while he was under a weapons disability.

{¶31}  Accordingly, Appellant's first assignment of error is without merit and is overruled.

{¶32}  Appellant's second assignment of error states:

THE TRIAL COURT COMMITTED PLAIN ERROR IN ADMITTING EVIDENCE OF DRUG TRANSACTIONS FOR WHICH DEFENDANT WAS NOT CHARGED, IN DEROGATION OF DEFENDANT'S RIGHTS UNDER THE 5TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

{¶33}  Here, Appellant argues the trial court erred in admitting evidence of prior drug transactions that he was not charged with.  First, Appellant argues this evidence was not necessary as background information as the State argued.  He asserts that it was irrelevant since he was charged with drug possession, not drug trafficking.  Second, Appellant argues the evidence was not admissible under Evid.R. 404(B) as the State claimed.  In its motion in limine, the State claimed it would offer evidence of the controlled drug buys for the purpose of proving opportunity, preparation, plan, or knowledge.  But Appellant contends none of these things were at issue in this case.  Additionally, Appellant asserts the evidence was more prejudicial than probative.

Case No. 22 CO 0020

– 9 –

{¶34} The State filed a motion in limine on this issue to which defense counsel filed a response in opposition. But during trial, defense counsel withdrew the objection to the introduction of the uncharged conduct. (Tr. 378-379).

{¶35} Appellant acknowledges his counsel did not raise an objection to this testimony during trial and, therefore, we are to apply a plain error review. Plain error should be invoked only to prevent a clear miscarriage of justice. *State v. Underwood*, 3 Ohio St.3d 12, 14, 444 N.E.2d 1332 (1983). Plain error is one in which but for the error, the outcome of the trial would have been different. *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

{¶36} Evidence of any other crime, wrong, or act is inadmissible to prove a person's character in order to show that the person acted in accordance with the character. Evid.R. 404(B)(1). However, this evidence may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Evid.R. 404(B)(2).

{¶37} The State solicited the following testimony from Sheriff McLaughlin regarding the controlled buys:

Q. Okay. And, just generally, what was your understanding of the investigation that was ongoing into the residence at 410 14th Street in Wellsville?

A. A couple of controlled buys were made, and Detective Watkins obtained a search warrant for the 410 14th Street.

Q. Did you have any other understanding of the investigation, about how it came to the attention of law enforcement, this residence, or anything like that?

A. I believe that went through a confidential informant, having contact with Darrell Blake to purchase the narcotics, and Jarrell Sloan actually bought those narcotics through us.

– 10 –

Q. Do you have an understanding, based on the investigation that was conducted and your knowledge and oversight of the investigation, who resided at 410 14th Street in Wellsville?

A. Jarrell Sloan.

Q. And did you understand who might have owned that residence?

A. It was a family house. I believe that, at the time - - I don't remember if it was his mother or his aunt, but I believe that they had just passed away, and he was still residing in the house.

Q. All right. And when you say "family house," you mean the Sloan family?

A. Yes.

Q. Okay. Thank you. I just wanted to clarify that, if that's okay.

A. No. That's okay.

Q. And the investigation itself did involve the arrangement of some controlled purchases from that residence?

A. Yes, it did.

Q. Okay. And your understanding of those controlled purchases were that both Mr. Blake and Mr. Sloan were involved in the drug activity at that residence?

A. Yes.

Q. And did that information lead to the request or presentation of a request for a search warrant to the court?

A. Yes.

Case No. 22 CO 0020

– 11 –

> Q. And, based upon the investigation and the probable cause developed through the investigation as to the potential existence of drugs at that residence, was a search warrant, in fact, issued?

> A. Yes, it was.

(Tr. 423-424). This was the extent of the State's evidence relating to the controlled buys.

{¶38} In *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20, the Ohio Supreme Court set out a three-step analysis for the admissibility of Evid.R. 404(B) evidence:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. See Evid.R 403.

{¶39} In applying the first step to this case, the evidence of the controlled buys was relevant to making a fact of consequence more probable than without the evidence. When the police found Appellant, he was naked in Room 7 where the drugs were located. Appellant asked police for his sweatpants and indicated that the red sweatpants on the bed were his. Before handing Appellant the sweatpants, the officers looked in the pockets where they found a large amount of cash. Included in the cash were two twenty-dollar bills from the previous day's controlled drug buy at the same house. Thus, the evidence of the controlled drug buys connected the cash in Appellant's pocket to the drugs. This evidence helped to establish that Appellant had constructive possession of the drugs found under the bed.

{¶40} In applying the second step, the evidence of the controlled buys was not presented to prove Appellant's character in order to show he acted in conformity therewith. Instead, the evidence went toward Appellant's knowledge of the drugs in Room

Case No. 22 CO 0020

– 12 –

7. It also demonstrated the absence of mistake in that, Appellant was not simply "in the wrong place at the wrong time."

{¶41} Finally, in applying the third step, the probative value of the controlled buys evidence was not substantially outweighed by the danger of unfair prejudice. The evidence of the controlled buys was prejudicial to Appellant, as is most all evidence presented by the State. But its probative value was not substantially outweighed by the danger of *unfair* prejudice. As noted above, evidence of the controlled buys was offered to show that Appellant knew of the drugs because money from a controlled drug buy was in his sweatpants' pocket. Because this was a case of constructive possession, the State had to demonstrate some link between Appellant and the drugs that were found under the bed. The fact that cash from the previous day's controlled drug buy at the same house was found in Appellant's pocket helped to establish that link.

{¶42} Based on the above, we cannot conclude the trial court committed plain error in allowing the evidence of the controlled drug buys.

{¶43} Accordingly, Appellant's second assignment of error is without merit and is overruled.

{¶44} Appellant's third assignment of error states:

THE DEFENDANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL, IN DEROGATION OF DEFENDANT'S RIGHTS UNDER THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

{¶45} In this assignment of error, Appellant contends his trial counsel was ineffective for failing to object to the evidence of the controlled drugs buys. Appellant acknowledges that his counsel did file a response in opposition to the State's motion in limine on the issue. But later, during trial, counsel withdrew the objection to the introduction of the evidence. (Tr. 378-379). Appellant argues the evidence should have been excluded, as he argued above, and its admission was prejudicial to him.

{¶46} To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v.*

Case No. 22 CO 0020

– 13 –

*Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Second, appellant must demonstrate that he was prejudiced by counsel's performance. *Id*. To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, at paragraph three of the syllabus.

{¶47} Appellant bears the burden of proof on the issue of counsel's ineffectiveness. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In Ohio, a licensed attorney is presumed competent. *Id*.

{¶48} The failure to raise an objection alone is not enough to sustain a claim of ineffective assistance of counsel. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 168.

{¶49} As discussed above in Appellant's second assignment of error, the evidence of the controlled drug buys was properly admitted pursuant to Evid.R. 404(B). Had Appellant's counsel objected to the evidence, the trial court would have likely overruled the objection. Thus, Appellant cannot demonstrate prejudice.

{¶50} Moreover, Appellant's counsel did initially object to the admission of the evidence in his opposition to the State's motion in limine. It was not until trial was underway, that counsel withdrew his objection. This indicates that trial counsel made a reasoned decision not to object to the evidence.

{¶51} Thus, Appellant has not established that his trial counsel was ineffective.

{¶52} Accordingly, Appellant's third assignment of error is without merit and is overruled.

{¶53} Appellant's fourth assignment of error states:

THE MODIFICATIONS TO SENTENCING FOR FIRST AND SECOND DEGREE FELONIES MADE BY THE REAGAN-TOKES ACT VIOLATE THE DEFENDANT'S RIGHT TO JURY TRIAL, AS PROTECTED BY THE FIFTH AND FOURTEENTH AMENDMENT[S] TO THE UNITED STATES CONSTITUTION, AND THE SEPARATION OF POWERS DOCTRINE EMBEDDED IN THE OHIO CONSTITUTION.

Case No. 22 CO 0020

– 14 –

**{¶54}** The trial court sentenced Appellant to an indefinite prison term of seven to ten-and-a-half years for possession of heroin and an indefinite term of seven to ten-and-a-half years for possession of a fentanyl-related compound, to be served concurrently with each other. Thus, on these offenses, Appellant will serve a minimum of seven years and the potential to serve an additional three-and-a-half years under the Reagan Tokes Law.[1]

**{¶55}** Appellant asserts here that the Reagan Tokes Law is unconstitutional because it violates a defendant's right to a jury trial and the separation of powers doctrine by giving the executive branch of the government the authority to increase a defendant's sentence.

**{¶56}** The Reagan Tokes Law, effective March 22, 2019, in general provides that first-degree and second-degree felonies not carrying a life sentence are subject to an indefinite sentencing scheme. Now, when imposing prison terms for offenders with first-degree or second-degree felony offenses, sentencing courts are to impose an indefinite sentence, meaning a stated minimum sentence as provided in R.C. 2929.14(A)(2)(a) and an accompanying maximum sentence as provided in R.C. 2929.144.

**{¶57}** Once an offender serves the required minimum term of incarceration, the Reagan Tokes Law provides that the offender is presumed to be released. R.C. 2967.271(B). But the DRC may rebut the presumption of release and maintain the offender in custody for a reasonable period of time, not to exceed the maximum term of incarceration imposed by the sentencing court. R.C. 2967.271(D). The DRC may overcome the presumption of release only if it conducts a hearing and finds that one or more of the following apply:

> (1)(a) During the offender's incarceration, the offender committed institutional rule infractions that involved compromising the security of a state correctional institution, compromising the safety of the staff of a state correctional institution or its inmates, or physical harm or the threat of physical harm to the staff of a state correctional institution or its inmates, or

---

[1] Appellant's sentences on the other charges are definite sentences and not affected by the Reagan-Tokes Law.

Case No. 22 CO 0020

– 15 –

committed a violation of law that was not prosecuted, and the infractions or violations demonstrate that the offender has not been rehabilitated, [and]

(b) The offender's behavior while incarcerated, including, but not limited to the infractions and violations specified in division (C)(1)(a) of this section demonstrate that the offender continues to pose a threat to society.

(2) Regardless of the security level in which the offender is classified at the time of the hearing, the offender has been placed by the department in extended restrictive housing at any time within the year preceding the date of the hearing.

(3) At the time of the hearing, the offender is classified by the department as a security level three, four, or five, or at a higher security level.

R.C. 2967.271(C)(1), (2), and (3).

{¶58} Just recently, on July 26, 2023, the Ohio Supreme Court addressed the constitutionality of the Regan Tokes Law. In *State v. Hacker*, Slip Opinion No. 2023-Ohio-2535, the appellants argued that the portion of the Regan Tokes Law that allows the DRC to maintain an offender's incarceration beyond the minimum prison term imposed by a trial court, violates the separation-of-powers doctrine, procedural due process, and the right to a jury trial. The Ohio Supreme Court rejected each of these claims and upheld the constitutionality of the Regan Tokes Law. *Id.* at ¶ 25, 28, 40.

{¶59} Accordingly, Appellant's fourth assignment of error is without merit and is overruled

{¶60} For the reasons stated above, the trial court's judgment is hereby affirmed.
Robb, J., concurs.
D'Apolito, P.J., concurs.

Case No. 22 CO 0020

[Cite as *State v. Blake*, 2023-Ohio-2748.]

———————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**NOTICE TO COUNSEL**

**This document constitutes a final judgment entry.**

JURY,PRO SE

## U.S. District Court
### Southern District of Ohio (Columbus)
### CIVIL DOCKET FOR CASE #: 2:24-cv-00267-SDM-EPD

Van Oliver v. State Of Ohio et al
Assigned to: Judge Sarah D. Morrison
Referred to: Magistrate Judge Elizabeth Preston Deavers
Demand: $1,700,000
Cause: 18:241 Conspiracy Against Citizen Rights

Date Filed: 01/22/2024
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Eddie Van Oliver, III**

represented by **Eddie Van Oliver, III**
2302 Middlehurst Dr.
Columbus, OH 43219
PRO SE

V.

**Defendant**

**State Of Ohio**

**Defendant**

**Lawerence Hairston**

**Defendant**

**Eddie Van Oliver, Jr.**

Email All Attorneys

| Date Filed | # | Docket Text |
|---|---|---|
| 01/22/2024 | 1 | COMPLAINT with JURY DEMAND against Lawerence Hairston, State Of Ohio, and Eddie Van Oliver, Jr. filed by Eddie Van Oliver, III (Attachments: # 1 Exhibit, # 2 Civil Cover Sheet, # 3 Envelope) (kk2) (Entered: 01/23/2024) |
| 01/22/2024 | 2 | REQUEST for Issuance of Summons by Plaintiff Eddie Van Oliver III (Attachments: # 1 USM-285 Marshal Forms, # 2 Envelope) (kk2) (Entered: 01/23/2024) |
| 01/23/2024 | 3 | NOTICE OF DEFICIENCY re 1 Complaint filed by Eddie Van Oliver, III: Requires a filing fee or motion for leave to proceed in forma pauperis. Electronic filers can pay the fee online. Please scroll down to the *event* called, **Pay Fees Via Pay.gov** to pay the required fee. Deficiency Deadline due by 2/22/2024. (Attachments: # 1 IFP Form) (kk2)(This document has been sent by regular mail to the party(ies) listed in the NEF that did not receive electronic notification) (Entered: 01/23/2024) |
| 02/28/2024 | 4 | ORDER: Plaintiff still has not paid the filing fee or moved for leave to proceed in forma pauperis. If Plaintiff intends to proceed with this action, he is DIRECTED to cure this deficiency by submitting the requisite filing fee, or by submitting an application to proceed in forma pauperis, to the Court by 3/13/2024. Plaintiff is ADVISED that failure to timely comply with this Order will result in a recommendation that this action be dismissed for failure to prosecute. Signed by Magistrate Judge Elizabeth Preston Deavers on 2/28/2024. (vb) (This document has been sent by regular mail to the party(ies) listed in the NEF that did not receive electronic notification). (Entered: 02/28/2024) |
| 02/28/2024 | | Set Deadline: Response-filing fee or IFP due by due by 3/13/2024. (vb) (Entered: 02/28/2024) |

 **CITY OF CLEVELAND**
Mayor Justin M. Bibb

🔍

🏠 / News / Cleveland Division of Police and Law Enforcement Agencies lead Investigation Resulting in Major Drug Seizure, One of Cuyahoga County's Largest

# Cleveland Division of Police and Law Enforcement Agencies lead Investigation Resulting in Major Drug Seizure, One of Cuyahoga County's Largest

**Thursday, May 16, 2024**

On Tuesday, May 14, 2024, the Cartel Gang Narcotics & Laundering Task Force (CGNL) a multi-agency task force led by the Cleveland Division of Police and Federal Bureau of Investigation, conducted an operation involving multiple search and arrest warrants being served simultaneously in Cleveland's Second District, Third District, Fifth District, Highland Heights and Westlake, OH.

This six-month investigation led to this seizure of approximately 65 kilograms (143 pounds) of suspected fentanyl pills and powder, 3 pistols, 2 rifles, a pill manufacturing press machine and additional evidence related to narcotics trafficking were seized. Two subjects, ages 40 and 43 were apprehended on federal arrest warrants. Final evidence totals are pending laboratory analysis, but investigators


**CITY OF CLEVELAND**
Mayor Justin M. Bibb

amount of 9.5 million dollars. The

CGNL Task Force worked in partnership with the U.S. Attorney's Office for the Northern District of Ohio, the Cuyahoga County Prosecutors Office and partner agencies from the Cleveland Organized Crime Drug Enforcement Task Force (OCDETF)- Strike Force throughout this investigation. This search and arrest warrant operation was made possible with the assistance and partnership of the Cleveland Police SWAT Unit, the FBI SWAT Team, The Southwest Enforcement Bureau (SEB) SWAT Team, the Cleveland Police NICE Unit, US Marshals Northern Ohio Violent Fugitive Task Force and ATF Violent Gun Crime Task Force.

The Cartel Gang Narcotics & Laundering Task Force (CGNL) is a long-standing multiagency major crimes task force composed of over 38 investigators and analysts from multiple federal, state and local agencies. The CGNL Task Force is led in partnership by the Cleveland Division of Police and the Federal Bureau of Investigation.

CGNL is composed of investigators, analysts and assisting personnel from the following agencies: Cleveland Division of Police, FBI, ATF, U.S. Attorney's Office for the Northern District of Ohio, Organized Crime Drug Enforcement Task Forces (OCDETF), Cuyahoga County Prosecutor's Office, Cuyahoga County Sheriff's Office, U.S. Coast Guard, Ohio HIDTA, Ohio State Highway Patrol, Ohio BCI, Ohio Adult Parole Authority, U.S. Border Patrol, Ottawa County Drug Task Force, Brooklyn; Bedford; GCRTA, North Royalton and Shaker Heights Police Departments.

## Read More

 **CITY OF CLEVELAND**
Mayor Justin M. Bibb





Aging

## Senior Day 2025

May 21, 2025



## Mayor Bibb Calls for Commitment to Structurally Balanced Budget: Opposes Risky Budget Amendments from City Council

 **CITY OF CLEVELAND**
Mayor Justin M. Bibb





## City Responds After CPC Ignores Confidentiality Best Practices by Releasing Sensitive HR Information

Feb 19, 2025

City of Cleveland

601 Lakeside Ave, Room 227
Cleveland, Ohio 44114

216.664.2000

MayorBibb@clevelandohio.gov



**CITY OF CLEVELAND**
Mayor Justin M. Bibb

Monday - Friday
9 AM to 4:30 PM

## Newsletter Sign Up

**Email Address** *

**First Name** *

**Last Name** *

Subscribe

Cleveland City Council →

TV20 Watch Now →



**CITY OF CLEVELAND**
Mayor Justin M. Bibb

   

Privacy Policy

Sitemap

Copyright © 2024. All Rights Reserved.





**PRESS RELEASE**

# Eighteen Cleveland Gang Members and Associates Indicted on Federal Charges for RICO Conspiracy, Murder, Kidnapping, Assault, Firearms Violations, and Drug Trafficking

Wednesday, December 4, 2024

**For Immediate Release**

Office of Public Affairs

A federal district court in the Northern District of Ohio today unsealed a second superseding indictment against 18 members and associates of a violent street gang known as the Fully Blooded Felons, who have been charged with various federal crimes, including racketeering (RICO) conspiracy, murder in aid of racketeering, kidnapping in aid of racketeering, assault in aid of racketeering, firearms violations, and drug trafficking offenses.

The investigation that led to the second superseding indictment took place over the last two years. Agents apprehended individuals in a series of coordinated arrests. They seized cocaine, methamphetamine, over 400 grams of fentanyl, and 15 illegally possessed firearms throughout the investigation.

"The superseding indictment alleges that these 18 defendants were leaders, members, or associates of the Fully Blooded Felons, a violent gang that — for more than a decade — made money and controlled territory in Northern Ohio through murder, arson, robbery, drug

trafficking, and firearms possession," said Principal Deputy Assistant Attorney General Nicole M. Argentieri, head of the Justice Department's Criminal Division. "Violence and other gang activities make communities less safe for all of their residents. Addressing violent crime — including through the arrests announced today — is one of the Criminal Division's highest priorities. I am proud of the outstanding work done by our Violent Crime and Racketeering Section, in partnership with our federal, state, and local partners, to make our communities safer places to live by targeting the most violent offenders on our streets."

"As the indictment alleges, the Fully Blooded Felons styled themselves after a Mafia crime family, terrorizing Cleveland's streets and operating an open-air illegal drug market in the Cedar Central neighborhood for years. I commend the valiant efforts of our brave law enforcement partners who have worked diligently to win back our streets and protect our community by taking down these bad actors," said U.S. Attorney Rebecca Lutzko for the Northern District of Ohio. "The USAO will aggressively continue to pursue — through RICO prosecutions and other federal charges — violent criminals who seek to secure territory, power, and money by ruthlessly harming others, peddling poisons, and creating an atmosphere of fear. Members of FBF or other violent gangs in this district who have yet to be caught should think twice before continuing to engage in such illegal and destructive behavior."

"For several years, according to the indictment, these individuals committed a homicide, armed robberies, and unlawfully imported and distributed fentanyl and other dangerous opioids throughout the community," said Special Agent in Charge Greg Nelsen of the FBI Cleveland Field Office. "The Fully Blooded Felons, a subset of the Heartless Felons criminal network, has been identified as Cleveland's most significant gang threat and their reign of terror is over thanks to the collaborative efforts of FBI and the Safe Streets Gang Task Force. We will not waver in our mission to investigate, disrupt, and dismantle gangs not only in the larger cities across America, but also right here in northern Ohio."

As alleged in the second superseding indictment, the Fully Blooded Felons have been in existence in Ohio since approximately 2012, operating primarily out of the east side of Cleveland, as well as Akron, Youngstown, and elsewhere. They are also allegedly active in the Ohio prison system.

According to the facts alleged in the indictment, the Fully Blooded Felons' structure includes a "Commission," which is a group of members tasked with maintaining the structure and organization of the enterprise through physical discipline and by determining which illicit means the organization would use to make money.

As alleged in the indictment, the Fully Blooded Felons had rules that members were required to abide by. The rules were disseminated to members online, by text message, and in face-to-face communications. Members were required to abide by "omerta," or the code of silence. Members were also required to memorize and recite at meetings the "Fully Five," a set of rules that

included following all orders issued by the Commission, pledges of loyalty to fellow members, and being respectful to Capos, a position held by senior gang members. If a member did not know the "Fully Five," they were punished. Members were also expected to know and abide by the "Fully Commandments," a similar set of rules.

Fully Blooded Felon members allegedly utilized different two separate stash-houses at a local apartment complex. According to court documents, during the execution of two search warrants, law enforcement recovered over 300 grams of fentanyl, cocaine, and methamphetamine, as well as seven firearms.

Members and associates of the Fully Blooded Felons allegedly came together for the common purposes of making money through robberies and drug trafficking, preserving and promoting Fully Blooded Felon territory, and promoting and enhancing the Fully Blooded Felon enterprise and its members and associates' activities.

According to the indictment, on Sept. 12, 2023, three Fully Blooded Felon members — Raven Mullins, Henry Burchett, and James Clemons — and another individual shot and killed a victim on the west side of Cleveland. After killing the victim, the defendants allegedly fled the scene in a stolen Honda Pilot, which Fully Blooded Felon members later burned.

The second superseding indictment alleges a years-long pattern of racketeering and violence including a murder, kidnapping, assaults, and drug trafficking.

The defendants and their charges are:

- **Raven Mullins**, 35, also known as Dunny and Dun, of Cleveland, is charged with RICO conspiracy, murder in aid of racketeering, kidnapping in aid of racketeering, assault in aid of racketeering, conspiracy to distribute controlled substances, numerous counts of possession with the intent to distribute controlled substances, possession of a firearm in furtherance of a drug trafficking crime, being a felon in possession of a firearm, and use of a communications facility to facilitate a felony drug offense.

- **Henry Burchett**, 29, also known as Noodles, Noo, and Omerta, of Cleveland, is charged with RICO conspiracy, murder in aid of racketeering, kidnapping in aid of racketeering, assault in aid of racketeering, conspiracy to distribute controlled substances, numerous counts of possession with the intent to distribute controlled substances, possession of a firearm in furtherance of a drug trafficking crime, felon in possession of a firearm, and use of a communications facility to facilitate a felony drug offense.

- **Elijah Johnson**, 37, also known as Loon, of Youngstown, is charged with conspiracy to distribute controlled substances, interstate travel in aid of racketeering, and use of a communications facility to facilitate a felony drug offense.

- **Demarcus Elliott**, 37, also known as Moo and Fast Lane, of Cleveland, is charged with RICO conspiracy, conspiracy to distribute controlled substances, and use of a communications facility to facilitate a felony drug offense.

- **Dontez Hammond**, 35, also known as Donny and Tez, of Cleveland, is charged with RICO conspiracy, conspiracy to distribute controlled substances, and illegal receipt of a firearm and ammunition by a person under indictment.

- **Jeffrey Lee**, 24, also known as Fatty, of Cleveland, is charged with RICO conspiracy, conspiracy to distribute controlled substances, numerous counts of possession with the intent to distribute controlled substances, possession of a firearm in furtherance of a drug trafficking crime, and use of a communications facility to facilitate a felony drug offense.

- **Jerrell Jones-Ferrell**, 25, also known as Ruga, of Cleveland, is charged with conspiracy to distribute controlled substances, felon in possession of a firearm, and use of a communications facility to facilitate a felony drug offense.

- **Devonte Johnson**, 32, also known as D Nut and Nut, of Euclid, Ohio, is charged with conspiracy to distribute controlled substances and felon in possession of a firearm.

- **Jerome Williams**, 29, also known as Jay, and JT, of Cleveland, is charged with RICO conspiracy, conspiracy to distribute controlled substances, and use of a communications facility to facilitate a felony drug offense.

- **Christopher Horton**, 41, also known as Cam and Killa, of Cleveland, is charged with RICO conspiracy, conspiracy to distribute controlled substances, possession with the intent to distribute controlled substances, and use of a communications facility to facilitate a felony drug offense.

- **Deeundra Perkins**, 33, also known as Drizzy, of Garfield Heights, Ohio, is charged with conspiracy to distribute controlled substances.

- **Deon Blackwell**, 38, also known as White Boy, of Cleveland, is charged with conspiracy to distribute controlled substances and use of a communications facility to facilitate a felony drug offense.

- **James Clemons**, 32, also known as Flock, Pope, and Fully Pope Flock, of Cleveland, is charged with RICO conspiracy and murder in aid of racketeering.

- **Alex Darden**, 23, also known as Lil' Pee Wee, of Cleveland, is charged with RICO conspiracy and conspiracy to distribute controlled substances.

- **Esmond Williams**, 35, also known as Relle, of Cleveland, is charged with RICO conspiracy and conspiracy to distribute controlled substances.

- **Adrionna Null**, 27, also known as Ali, of Cleveland, is charged with kidnapping in aid of racketeering and assault in aid of racketeering.

- **Myeasha West**, 31, also known as Action, of Lorain, Ohio, is charged with kidnapping in aid of racketeering and assault in aid of racketeering.

- **Kyla Sharie Tyler**, 27, also known as Yayeo, of Cleveland, is charged with kidnapping in aid of racketeering and assault in aid of racketeering.

The FBI is investigating the case, with assistance from the Cleveland Division of Police, U.S. Marshals Service, Drug Enforcement Administration, and Bureau of Alcohol, Tobacco, Firearms,

and Explosives.

Trial Attorneys Brian W. Lynch and Alyssa Levey-Weinstein of the Criminal Division's Violent Crime and Racketeering Section and Assistant U.S. Attorneys Paul Hanna and Robert F. Corts for the Northern District of Ohio are prosecuting the case.

*An indictment is merely an allegation. All defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.*

*Updated December 4, 2024*

**Topics**

| DRUG TRAFFICKING | FIREARMS OFFENSES | VIOLENT CRIME |

**Components**

Criminal Division | Criminal - Violent Crime and Racketeering Section | USAO - Ohio, Northern

Press Release Number: 24-1514

# Related Content

**PRESS RELEASE**

## New Jersey Man Convicted for Conspiring to Traffic Fentanyl-Related Substances and Launder Money

A federal jury in Newark convicted a New Jersey man on Jan. 27 for conspiring to traffic fentanyl-related substances and launder money.

January 29, 2025

**PRESS RELEASE**

## Five Members of the Hoover Criminal Gang Sentenced for Racketeering and Firearms Crimes

A leader in the Hoover Criminal Gang was sentenced to 15 years in prison today for ordering fellow gang members to murder a suspected rival gang member.

January 16, 2025

**PRESS RELEASE**

## Seven Hartford Gang Members Charged with Murder and Racketeering Offenses

A grand jury in Hartford, Connecticut, returned a 15-count indictment on Jan. 8 charging seven alleged members of a violent Hartford gang with participating in a years-long interstate Racketeer Influenced...

January 15, 2025

✉ **Office of Public Affairs**
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530

☎ Office of Public Affairs Direct Line
202-514-2007

Department of Justice Main Switchboard
202-514-2000

An official website of the United States government
Here's how you know

FULL TEXT LINKS

Sage Journals

Case Reports     J Child Neurol. 2003 Nov;18(11):805-8. doi: 10.1177/08830738030180111501.

# Hydrogen peroxide neurotoxicity in childhood: case report with unique magnetic resonance imaging features

George Cannon [1], E Martin Caravati, Francis M Filloux

Affiliations
PMID: 14696912   DOI: 10.1177/08830738030180111501

## Abstract

Concentrated hydrogen peroxide (H2O2) intoxication is relatively rare in children. Serious irreversible neurotoxicity generally results. The case of an 11-year-old boy who inadvertently drank a concentrated (35%) H2O2 solution is described. He exhibited signs of an acute encephalopathy with cortical visual impairment. Extensive cerebrocortical diffusion restriction with apparent gyral edema was evident at 3 days following ingestion, particularly in the parieto-occipital regions bilaterally. Spontaneous neurologic improvement quickly followed, and nearly full clinical resolution was evident 1 month later. The pattern of imaging abnormalities closely resembles that of reversible posterior leukoencephalopathy. Concentrated H2O2 neurotoxicity in children can exhibit unique patterns (a reversible posterior leukoencephalopathy) and a better than expected outcome.

PubMed Disclaimer

# Related information

MedGen

PubChem Compound (MeSH Keyword)

## LinkOut – more resources

**Full Text Sources**

Atypon

Ovid Technologies, Inc.

**Medical**

MedlinePlus Health Information

*Hydrogen Peroxide*

# Hydrogen Peroxide (H₂O₂)
## CAS 7722-84-1; UN 2984 (8%-20%), UN 2014 (20%-52%), UN 2015 (>52%)

Synonyms include dihydrogen dioxide, hydrogen dioxide, hydroperoxide, and peroxide.

> **Persons exposed only to hydrogen peroxide gas do not pose risks of secondary contamination to personnel outside the Hot Zone. However, persons whose clothing or skin is contaminated with concentrated hydrogen peroxide solution can secondarily contaminate personnel by direct contact or through off-gassing vapor.**
>
> **Hydrogen peroxide is a clear, colorless, noncombustible liquid. It is a powerful oxidizing agent; when it comes in contact with organic material, spontaneous combustion can occur. Odor does not provide a warning of hazardous concentrations.**

**Description**

Pure hydrogen peroxide is a crystalline solid below 12 °F and a colorless liquid with a bitter taste above 12 °F. It is almost always used as an aqueous solution, which is available in dilute form (3% to 10%) for household use and in concentrated form (greater than 30%) for industrial use. Hydrogen peroxide is unstable, decomposing readily to oxygen and water with release of heat. Commercial peroxide products contain a stabilizer (usually acetanilide) to slow the rate of spontaneous decomposition.

Hydrogen peroxide is nonflammable, but it is a powerful oxidizing agent that can cause spontaneous combustion when it comes in contact with organic material.

**Routes of Exposure**

*Inhalation*

Inhalation of vapors, mists, or aerosols from concentrated solutions of hydrogen peroxide can cause significant morbidity. Because it is nearly odorless and nonirritating except at high concentrations, persons may not be aware of its presence. No odor threshold was located for hydrogen peroxide (the OSHA PEL is 1 ppm). **Detection of odor does not provide adequate warning of hazardous concentrations**. Hydrogen peroxide vapor is heavier than air and may cause asphyxiation in enclosed, poorly ventilated, or low-lying areas.

Children exposed to the same levels of hydrogen peroxide vapor as adults may receive larger doses because they have greater lung surface area:body weight ratios and increased minute volumes:weight ratios. In addition, they may be exposed to higher levels than adults in the same location because of their

*Hydrogen Peroxide*

short stature and the higher levels of hydrogen peroxide vapor found nearer to the ground. Children may be more vulnerable to corrosive agents than adults because of the smaller diameter of their airways.

*Skin/Eye Contact*

Hydrogen peroxide is poorly absorbed through intact skin. When used for household disinfectant purposes (3% to 5%), it is mildly irritating to the skin and mucous membranes. At a concentration of 10%, which is found in some hair-bleaching solutions, it is strongly irritating and may be corrosive.

Children are more vulnerable to toxicants affecting the skin because of their relatively larger surface area:body weight ratio.

*Ingestion*

If ingested, solutions of hydrogen peroxide up to concentrations of 9% are generally nontoxic; however, even a 3% solution is mildly irritating to mucosal tissue and may cause vomiting and diarrhea. Ingestion of industrial-strength solutions ( 10%) causes systemic toxicity and has been associated with fatalities.

**Sources/Uses**

In industry, hydrogen peroxide is used as a bleach for textiles and paper, as a component of rocket fuels, and as a reagent for producing foam rubber and organic chemicals. In the home, dilute hydrogen peroxide solutions are used as disinfectants, deodorants, and hair-bleaching agents.

**Standards and Guidelines**

OSHA PEL (permissible exposure limit): 1 ppm (averaged over an 8-hour workshift)

NIOSH IDLH (immediately dangerous to life or health) = 75 ppm

AIHA ERPG-2 (emergency response planning guideline) (maximum airborne concentration below which it is believed that nearly all individuals could be exposed for up to 1 hour without experiencing or developing irreversible or other serious health effects or symptoms which could impair an individual's ability to take protective action) = 50 ppm

**Physical Properties**

*Description*: Colorless liquid at room temperature; used commonly in aqueous solution.

*Warning properties*: Odor is inadequate as index of exposure

*Molecular weight*: 34.0 daltons

*Boiling point* (760 mm Hg): 286 °F (141 °C)

*Hydrogen Peroxide*

*Freezing point*: 12 °F (-11.1 °C)

*Specific gravity*: 1.39 at 68 °F (20 °C) (water = 1)

*Vapor pressure*: 5 mm Hg at 86 °F (30 °C)

*Gas density*: 1.2 (air = 1) (heavier than air)

*Water solubility*: Miscible with water

*Flammability*: Nonflammable, but a powerful oxidizer and may ignite any organic matter with which it comes in contact

**Incompatibilities**    Hydrogen peroxide reacts with oxidizable materials, iron, copper, brass, bronze, chromium, zinc, lead, manganese, and silver. Contact with organic materials may result in spontaneous combustion.

*Hydrogen Peroxide*

*Hydrogen Peroxide*

## Health Effects

> Hydrogen peroxide is corrosive to skin, eyes, and mucous membranes at high concentrations (>10%); lower concentrations may cause irritation.
>
> Other effects occur from inhalation or ingestion and may include gas embolism, gastric irritation, gastric distension and emesis, an accumulation of fluid in the lungs, unconsciousness, and respiratory arrest.
>
> Symptoms become more severe as the concentration of hydrogen peroxide increases.

**Acute Exposure**

The systemic effects of hydrogen peroxide result from its interaction with catalase in the tissues with the liberation of oxygen and water as it decomposes. One milliliter of 3% hydrogen peroxide liberates 10 mL of oxygen. When the amount of oxygen evolved exceeds the maximum blood solubility, venous embolism occurs. Intravascular oxygen embolism may also occur. Ingestion of dilute solutions (3–10%) produces mild gastrointestinal irritation, gastric distension and emesis, and on rare occasions, gastrointestinal erosions or embolism. Ingestion of 10–20% solutions produces similar symptoms, but exposed tissues may also be burned. Ingestion of 20–40% produces the symptoms described for lower concentrations, but may also induce rapid loss of consciousness followed by respiratory arrest.

Children do not always respond to chemicals in the same way that adults do. Different protocols for managing their care may be needed.

*Respiratory*

Vapors, mists, or aerosols of hydrogen peroxide can cause upper airway irritation, inflammation of the nose, hoarseness, shortness of breath, and a sensation of burning or tightness in the chest. Exposure to high concentrations can result in severe mucosal congestion of the trachea and bronchi and delayed accumulation of fluid in the lungs.

Children may be more vulnerable to corrosive agents than adults because of the relatively smaller diameter of their airways.

Children may be more vulnerable because of relatively increased minute ventilation per kg and failure to evacuate an area promptly when exposed.

*CNS*

Inhalation or ingestion of high concentrations of hydrogen peroxide may result in seizures, cerebral infarction, or cerebral

*Hydrogen Peroxide*

embolism. The ensuing damage to the CNS may cause permanent neurological deficits or death.

*Dermal*

Prolonged exposure to concentrated vapor or to dilute solutions can cause irritation and temporary bleaching of skin and hair. Contact with concentrated solutions can cause severe skin burns with blisters.

Because of their relatively larger surface area:body weight ratio, children are more vulnerable to toxicants affecting the skin.

*Ocular*

Exposure to concentrated vapor, mist, or aerosol can cause stinging pain and tearing. Solutions that are 5% or greater can cause injury to the eye surface if splashed in the eye (sometimes with delayed effects).

*Gastrointestinal*

Ingestion of household solutions (3%) usually causes mild mucosal irritation and vomiting. Gastric distention due to liberation of oxygen in the stomach may occur, but hollow-organ rupture is uncommon when dilute solutions are ingested.

Ingestion of concentrated solutions ( 10%) can cause extreme irritation, inflammation, and burns of the alimentary tract can occur, and hollow-organ distention and rupture is a significant danger. Hydrogen peroxide enemas have caused colonic rupture, intestinal gangrene with gas bubbles, and acute ulcerative colitis.

*Potential Sequelae*

Survivors of severe inhalation injury may sustain permanent lung damage. Severe eye exposures may result in ulceration of the eye and blindness. Permanent neurological deficits have also been reported.

**Chronic Exposure**

Because hydrogen peroxide is rapidly decomposed in the body, it is unlikely to cause chronic toxicity. However, repeated exposures to hydrogen peroxide vapor may cause chronic irritation of the respiratory tract and partial or complete lung collapse. Repeated contact with vapor or solution may result in bleaching of skin and hair.

Chronic exposure may be more serious for children because of their potential longer latency period.

*Carcinogenicity*

The International Agency for Research on Cancer (IARC) has determined that hydrogen peroxide is not classifiable as to its carcinogenicity to humans.

*Hydrogen Peroxide*

*Developmental and*
*Reproductive Effects*

Hydrogen peroxide is not included in *Reproductive and Developmental Toxicants,* a 1991 report published by the U.S. General Accounting Office (GAO) that lists 30 chemicals of concern because of widely acknowledged reproductive and developmental consequences. No reports were located on the developmental or reproductive effects of hydrogen peroxide in humans.

*Hydrogen Peroxide*

*Hydrogen Peroxide*

## Prehospital Management

---

- **Victims exposed only to hydrogen peroxide vapor do not pose substantial risks of secondary contamination to personnel outside the Hot Zone. Victims whose clothing or skin is contaminated with concentrated hydrogen peroxide solution can secondarily contaminate personnel by direct contact or through off-gassing vapor.**

- **Hydrogen peroxide is corrosive to skin, eyes, and mucous membranes at high concentrations (>10%); lower concentrations may cause irritation. Symptoms become more severe as the concentration of hydrogen peroxide increases.**

- **Other effects occur from inhalation or ingestion and may include gas embolism, gastric irritation, gastric distension, gastric rupture and emesis, an accumulation of fluid in the lungs, unconsciousness, and respiratory arrest.**

- **There is no antidote for hydrogen peroxide. Treatment consists of support of respiratory and cardiovascular functions.**

---

**Hot Zone**

Rescuers should be trained and appropriately attired before entering the Hot Zone. If the proper equipment is not available, or if rescuers have not been trained in its use, assistance should be obtained from a local or regional HAZMAT team or other properly equipped response organization.

*Rescuer Protection*

Hydrogen peroxide vapor is a severe respiratory tract irritant. Hydrogen peroxide solutions are corrosive at high concentrations (>10%); lower concentrations may cause irritation.

*Respiratory Protection*: Positive-pressure, self-contained breathing apparatus (SCBA) is recommended in response situations that involve exposure to potentially unsafe levels of hydrogen peroxide.

*Skin Protection*: Chemical-protective clothing is recommended for concentrations greater than 10% because hydrogen peroxide can cause skin irritation and burns.

*ABC Reminders*

Quickly access for a patent airway, ensure adequate respiration and pulse. If trauma is suspected, maintain cervical immobilization manually and apply a cervical collar and a backboard when feasible.

*Victim Removal*

If victims can walk, lead them out of the Hot Zone to the Decontamination Zone. Victims who are unable to walk may be

---

*Hydrogen Peroxide*

removed on backboards or gurneys; if these are not available, carefully carry or drag victims to safety.

Consider appropriate management of chemically contaminated children, such as measures to reduce separation anxiety if a child is separated from a parent or other adult.

**Decontamination Zone**

Patients exposed only to hydrogen peroxide vapor who have no skin or eye irritation may be transferred immediately to the Support Zone. Other patients will require decontamination as described below.

*Rescuer Protection*

If exposure levels are determined to be safe, decontamination may be conducted by personnel wearing a lower level of protection than that worn in the Hot Zone (described above).

*ABC Reminders*

Quickly access for a patent airway, ensure adequate respiration and pulse. Stabilize the cervical spine with a collar and a backboard if trauma is suspected. Administer supplemental oxygen as required. Assist ventilation with a bag-valve-mask device if necessary.

*Basic Decontamination*

Victims who are able may assist with their own decontamination. Remove contaminated clothing while flushing exposed areas. Double-bag contaminated clothing and personal belongings.

Flush liquid-exposed skin and hair with plain water for at least 5 minutes. Wash exposed area extremely thoroughly with soap and water.Use caution to avoid hypothermia when decontaminating children or the elderly. Use blankets or warmers when appropriate.

Flush exposed or irritated eyes with copious amounts of plain water or saline for at least 15 minutes. Remove contact lenses if easily removable without additional trauma to the eye. If a corrosive material is suspected or if pain or injury is evident, continue irrigation while transferring the victim to the Support Zone.

In cases of ingestion, **do not induce emesis.** Victims who are conscious and able to swallow should be given 4 to 8 ounces of milk or water. If the victim is symptomatic, delay decontamination until other emergency measures have been instituted. Activated charcoal has not been shown to absorb hydrogen peroxide and will interfere with endoscopy which will be necessary to assess tissue damage.

*Hydrogen Peroxide*

Consider appropriate management of chemically contaminated children at the exposure site. Provide reassurance to the child during decontamination, especially if separation from a parent occurs.

*Transfer to Support Zone*    As soon as basic decontamination is complete, move the victim to the Support Zone.

**Support Zone**    Be certain that victims have been decontaminated properly (see *Decontamination Zone* above). Victims who have undergone decontamination or who have been exposed only to vapor pose no serious risks of secondary contamination. In such cases, Support Zone personnel require no specialized protective gear.

*ABC Reminders*    Quickly access for a patent airway. If trauma is suspected, maintain cervical immobilization manually and apply a cervical collar and a backboard when feasible. Ensure adequate respiration and pulse. Administer supplemental oxygen as required and establish intravenous access if necessary. Place on a cardiac monitor.

*Additional Decontamination*    Continue irrigating exposed skin and eyes, as appropriate.

In cases of ingestion, **do not induce emesis.** Victims who are conscious and able to swallow should be given 4 to 8 ounces of milk or water. If the victim is symptomatic, delay decontamination until other emergency measures have been instituted. Activated charcoal has not been shown to absorb hydrogen peroxide and will interfere with endoscopy which will be necessary to assess tissue damage.

*Advanced Treatment*    In cases of respiratory compromise secure airway and respiration via endotracheal intubation. If not possible, perform cricothyroidotomy if equipped and trained to do so.

Treat patients who have bronchospasm with aerosolized bronchodilators. The use of bronchial sensitizing agents in situations of multiple chemical exposures may pose additional risks. Consider the health of the myocardium before choosing which type of bronchodilator should be administered. Cardiac sensitizing agents may be appropriate; however, the use of cardiac sensitizing agents after exposure to certain chemicals may pose enhanced risk of cardiac arrhythmias (especially in the elderly). Hydrogen peroxide poisoning is not known to pose additional risk during the use of bronchial or cardiac sensitizing agents.

*Hydrogen Peroxide*

Consider racemic epinephrine aerosol for children who develop stridor. Dose 0.25–0.75 mL of 2.25% racemic epinephrine solution in 2.5 cc water, repeat every 20 minutes as needed, cautioning for myocardial variability.

Patients who are comatose, hypotensive, or are having seizures or cardiac arrhythmias should be treated according to advanced life support (ALS) protocols.

*Transport to Medical Facility*

Only decontaminated patients or patients not requiring decontamination should be transported to a medical facility. "Body bags" are not recommended.

Report to the base station and the receiving medical facility the condition of the patient, treatment given, and estimated time of arrival at the medical facility.

If a chemical has been ingested, prepare the ambulance in case the victim vomits toxic material. Have ready several towels and open plastic bags to quickly clean up and isolate vomitus.

**Multi-Casualty Wage**

Consult with the base station physician or the regional poison control center for advice regarding triage of multiple victims.

Patients who have obvious injury, such as severe wheezing, dyspnea, or skin or eye burns, should be transported immediately to a medical facility for evaluation. Patients who have ingested hydrogen peroxide solutions (except minor ingestions of household strength solutions (3% to 5%) should also be transported for medical evaluation.

Persons who have no eye, skin, or throat irritation or who have mild or transient symptoms are unlikely to develop severe complications. They may be discharged at the scene after their names, addresses, and telephone numbers are recorded. Those discharged should be advised to seek medical care promptly if symptoms of toxicity develop (see *Patient Information Sheet* below).

*Hydrogen Peroxide*

## Emergency Department Management

Hospital personnel can be secondarily contaminated by direct contact or from vapor off-gassing from heavily soaked clothing or from the vomitus of victims who have ingested hydrogen peroxide. Patients do not pose contamination risks after contaminated clothing is removed and the skin is thoroughly washed.

Hydrogen peroxide is corrosive to skin, eyes, and mucous membranes at high concentrations (>10%); lower concentrations may cause irritation. Symptoms become more severe as the concentration of hydrogen peroxide increases.

Other effects occur from inhalation or ingestion and may include gas embolism, gastric irritation, gastric distension, gastric rupture and emesis, an accumulation of fluid in the lungs, unconsciousness, and respiratory arrest.

There is no antidote for hydrogen peroxide poisoning. Treatment consists of support of respiratory and cardiovascular functions.

**Decontamination Area**

Previously decontaminated patients and patients exposed only to hydrogen peroxide vapor who have no skin or eye irritation may be transferred immediately to the Critical Care Area. Other patients will require decontamination as described below.

Be aware that use of protective equipment by the provider may cause fear in children, resulting in decreased compliance with further management efforts.

Because of their relatively larger surface area:body weight ratio, children are more vulnerable to toxicants affecting the skin. Also, emergency room personnel should examine children's mouths because of the frequency of hand-to-mouth activity among children.

*ABC Reminders*

Evaluate and support airway, breathing, and circulation. Children may be more vulnerable to corrosive agents than adults because of the smaller diameter of their airways. In cases of respiratory compromise secure airway and respiration via endotracheal intubation. If not possible, surgically create an airway.

Treat patients who have bronchospasm with aerosolized bronchodilators. The use of bronchial sensitizing agents in situations of multiple chemical exposures may pose additional risks. Consider the health of the myocardium before choosing which type of bronchodilator should be administered. Cardiac sensitizing agents may be appropriate; however, the use of

*Hydrogen Peroxide*

cardiac sensitizing agents after exposure to certain chemicals may pose enhanced risk of cardiac arrhythmias (especially in the elderly). Hydrogen peroxide poisoning is not known to pose additional risk during the use of bronchial or cardiac sensitizing agents.

Consider racemic epinephrine aerosol for children who develop stridor. Dose 0.25–0.75 mL of 2.25% racemic epinephrine solution in 2.5 cc water, repeat every 20 minutes as needed, cautioning for myocardial variability.

Patients who are comatose, hypotensive, or have seizures or ventricular arrhythmias should be treated in the conventional manner.

*Basic Decontamination*

Patients who are able may assist with their own decontamination.

Because concentrated hydrogen peroxide can cause burns, ED staff should don chemical resistant jumpsuits (e.g., of Tyvek or Saranax) or butyl rubber aprons, rubber gloves, and eye protection if the patient's clothing or skin is wet with hydrogen peroxide. After the patient has been decontaminated, no special protective clothing or equipment is required for ED personnel.

Quickly remove contaminated clothing while flushing the exposed skin with water (preferably under a shower). Double-bag the contaminated clothing and personal belongings. Wash skin thoroughly with soap and water.Use caution to avoid hypothermia when decontaminating children or the elderly. Use blankets or warmers when appropriate.

Irrigate exposed or irritated eyes with copious amounts of plain water or saline for at least 15 minutes. Remove contact lenses if easily removable without additional trauma to the eye. If a corrosive material is present or if pain or injury is evident, continue irrigation while transporting the patient to the Critical Care Area.

In cases of ingestion, **do not induce emesis.** Victims who are conscious and able to swallow should be given 4 to 8 ounces of milk or water if this has not been done already. If the victim is symptomatic, delay decontamination until other emergency measures have been instituted. Activated charcoal has not been shown to absorb hydrogen peroxide and will interfere with endoscopy which will be necessary to assess tissue damage.

*Hydrogen Peroxide*

| | |
|---|---|
| **Critical Care Area** | Be certain that appropriate decontamination has been carried out (see *Decontamination Area* above). |
| *ABC Reminders* | Evaluate and support airway, breathing, and circulation as in *ABC Reminders* above. Children may be more vulnerable to corrosive agents than adults because of the relatively smaller diameter of their airways. Establish intravenous access in seriously ill patients if this has not been done previously. Continuously monitor cardiac rhythm. |
| | Patients who are comatose, hypotensive, or have seizures or cardiac arrhythmias should be treated in the conventional manner. |
| *Inhalation Exposure* | Treat patients who have bronchospasm with aerosolized bronchodilators. The use of bronchial sensitizing agents in situations of multiple chemical exposures may pose additional risks. Consider the health of the myocardium before choosing which type of bronchodilator should be administered. Cardiac sensitizing agents may be appropriate; however, the use of cardiac sensitizing agents after exposure to certain chemicals may pose enhanced risk of cardiac arrhythmias (especially in the elderly). Hydrogen peroxide poisoning is not known to pose additional risk during the use of bronchial or cardiac sensitizing agents. |
| | Consider racemic epinephrine aerosol for children who develop stridor. Dose 0.25–0.75 mL of 2.25% racemic epinephrine solution in 2.5 cc water, repeat every 20 minutes as needed, cautioning for myocardial variability. |
| *Skin Exposure* | If concentrated hydrogen peroxide solution was in contact with the skin, chemical burns may result; treat as thermal burns. |
| | Because of their relatively larger surface area:body weight ratio, children are more vulnerable to toxicants affecting the skin. |
| *Eye Exposure* | Continue irrigation for at least 15 minutes. Test visual acuity. Examine the eyes for corneal damage and treat appropriately. Immediately consult an ophthalmologist for patients who have corneal injuries. |
| *Ingestion Exposure* | **Do not induce emesis.** Victims who are conscious and able to swallow should be given 4 to 8 ounces of milk or water if this has not been done already. If the victim is symptomatic, delay decontamination until other emergency measures have been instituted. Activated charcoal has not been shown to absorb |

*Hydrogen Peroxide*

hydrogen peroxide and will interfere with endoscopy which will be necessary to assess tissue damage.

Consider endoscopy to evaluate the extent of gastrointestinal tract injury. Extreme throat swelling may require endotracheal intubation or cricothyroidotomy. Gastric lavage is useful in certain circumstances to remove caustic material and prepare for endoscopic examination. Consider gastric lavage with a small nasogastric tube if: (1) a large dose has been ingested; (2) the patient's condition is evaluated within 30 minutes; (3) the patient has oral lesions or persistent esophageal discomfort; and (4) the lavage can be administered within 1 hour of ingestion. Care must be taken when placing the gastric tube because blind gastric-tube placement may further injure the chemically damaged esophagus or stomach.

Because children do not ingest large amounts of corrosive materials, and because of the risk of perforation from NG intubation, lavage is discouraged in children unless performed under endoscopic guidance.

Toxic vomitus or gastric washings should be isolated (e.g., by attaching the lavage tube to isolated wall suction or another closed container).

Large ingestions may produce gastritis from hydrogen peroxide decomposition, which releases large volumes of oxygen and causes gastric distention. Gently place a small nasogastric tube to relieve distention or to perform lavage on an obtunded patient. Most ingestions of dilute hydrogen peroxide are benign, and mild irritation is self-limited.

*Antidotes and Other Treatments*

There is no antidote for hydrogen peroxide poisoning. Enhanced elimination methods are neither necessary nor effective. Hyperbaric oxygen has been used in severe embolization cases, but there are no controlled studies of the efficacy of this treatment. Careful aspiration of air through a central venous line may be attempted for patients in extremis.

*Laboratory Tests*

The diagnosis of acute hydrogen peroxide toxicity is primarily clinical based on eye and skin irritation or burns, white foam from the mouth, and gastric irritation. Routine laboratory studies for all exposed patients include CRC, glucose, and electrolyte determinations. For patients exposed through inhalation, useful studies include chest radiography, pulse oximetry (or ABG measurements), spirometry, and peak flow measurements. A radiograph of the abdomen and chest is advised if there are

*Hydrogen Peroxide*

symptoms, or if a high concentration is ingested to detect intravascular oxygen embolization. Ingestion of hydrogen peroxide can be assessed by adding 1 drop of 15% titanium chloride to an acidified mixture of equal parts of gastric contents and ethyl ether. A yellow to deep orange coloration of the aqueous layer indicates the formation of $H_2TiO_4$ which is an indication of ingested peroxide.

**Disposition and Follow-up**

Consider hospitalizing symptomatic patients who have histories of substantial inhalation exposure and patients who have ingested a concentrated solution of hydrogen peroxide.

*Delayed Effects*

Patients who have complaints of chest pain, chest tightness, or cough should be observed for 24 to 72 hours and reexamined periodically to detect delayed-onset pulmonary edema or respiratory failure.

*Patient Release*

Patients who remain asymptomatic for 4 to 6 hours may be discharged with instructions to seek medical care promptly if symptoms develop (see the *Hydrogen Peroxide—Patient Information Sheet* below).

*Follow-up*

Obtain the name of the patient's primary care physician so that the hospital can send a copy of the ED visit to the patient's doctor.

Patients who have corneal injuries or severe skin burns should be reexamined within 24 hours.

**Reporting**

If a work-related incident has occurred, you may be legally required to file a report; contact your state or local health department.

Other persons may still be at risk in the setting where this incident occurred. If the incident occurred in the workplace, discussing it with company personnel may prevent future incidents. If a public health risk exists, notify your state or local health department or other responsible public agency. When appropriate, inform patients that they may request an evaluation of their workplace from OSHA or NIOSH. See Appendices III and IV for a list of agencies that may be of assistance.

*Hydrogen Peroxide*

# Hydrogen Peroxide
## Patient Information Sheet

This handout provides information and follow-up instructions for persons who have been exposed to hydrogen peroxide.

### What is hydrogen peroxide?
Hydrogen peroxide is used widely in industry to bleach cloth and paper and to manufacture other chemicals. It is also an ingredient of some rocket fuels. Hydrogen peroxide is found in dilute form (3% to 10%) in the home and in concentrated form (30% or greater) in industry. In the home, 3% solutions of hydrogen peroxide are used as disinfectants for cuts and scrapes, and slightly more concentrated solutions (10%) are used in hair bleaches. Dilute solutions have almost no odor, but stronger solutions have a sharp odor. Hydrogen peroxide is not flammable, but concentrated solutions may cause combustion of organic materials.

### What immediate health effects can result from hydrogen peroxide exposure?
Depending on the concentration, breathing hydrogen peroxide vapor can cause eye and throat irritation, coughing, and breathing difficulty. Serious eye or skin burns and bleaching of the hair may result from contact with hydrogen peroxide solutions. Drinking a concentrated hydrogen peroxide solution can cause vomiting and severe burns of the throat and stomach. Generally, the more serious the exposure, the more severe the symptoms.

### Can hydrogen peroxide poisoning be treated?
There is no proven antidote for hydrogen peroxide poisoning, but its effects can be treated, and most persons get well. Persons who have experienced serious symptoms may need to be hospitalized.

### Are any future health effects likely to occur?
A single small exposure from which a person recovers quickly is not likely to cause delayed or long-term effects. After a severe exposure, a person may not notice any symptoms for up to 24 hours, but may develop lung damage.

### What tests can be done if a person has been exposed?
There are no specific blood and urine tests that can show whether a person has been exposed to hydrogen peroxide. However, blood tests and a chest x-ray may be used to evaluate lung injury. Testing is not needed in every case.

### Where can more information about hydrogen peroxide be obtained?
More information about hydrogen peroxide can be obtained from your regional poison control center; your state, county, or local health department; the Agency for Toxic Substances and Disease Registry (ATSDR); your doctor; or a clinic in your area that specializes in occupational and environmental health. If the exposure happened at work, you may wish to discuss it with your employer, the Occupational Safety and Health, Administration (OSHA), or the National Institute for Occupational Safety and Health (NIOSH). Ask the person who gave you this form for help in locating these telephone numbers.

*Hydrogen Peroxide*

## Follow-up Instructions

Keep this page and take it with you to your next appointment. Follow *only* the instructions checked below.

[ ] Call your doctor or the Emergency Department if you develop any unusual signs or symptoms within the next 24 hours, especially:

- coughing, difficulty breathing or shortness of breath
- wheezing, chest pain or tightness
- increased redness or pain or a pus-like discharge from injured skin, eyes, or other wound
- stomach pain or vomiting

[ ] No follow-up appointment is necessary unless you develop any of the symptoms listed above.

[ ] Call for an appointment with Dr. _____ in the practice of _____.
When you call for your appointment, please say that you were treated in the Emergency Department at _____ Hospital by _____ and were advised to be seen again in _____ days.

[ ] Return to the Emergency Department/ _____ Clinic on (date) _____ at ___
_____ AM/PM for a follow-up examination.

[ ] Do not perform vigorous physical activities for 1 to 2 days.

[ ] You may resume everyday activities including driving and operating machinery.

[ ] Do not return to work for _____ days.

[ ] You may return to work on a limited basis. See instructions below.

[ ] Avoid exposure to cigarette smoke for 72 hours; smoke may worsen the condition of your lungs.

[ ] Avoid drinking alcoholic beverages for at least 24 hours; alcohol may worsen injury to your stomach or have other effects.

[ ] Avoid taking the following medications: _____

[ ] You may continue taking the following medication(s) that your doctor(s) prescribed for you: ___
_____
_____

[ ] Other instructions: _____
_____
_____

- Provide the Emergency Department with the name and the number of your primary care physician so that the ED can send him or her a record of your emergency department visit.

- You or your physician can get more information on the chemical by contacting: _____
_____ or _____, or by checking out the following Internet Web sites: _____; _____.

Signature of patient _____ Date _____

Signature of physician _____ Date _____

## Cleveland Regional Profile

| Indicator[1] | Ohio | Cleveland Region | OSAM Drug Consumers |
|---|---|---|---|
| Total Population, 2010 | 11,536,504 | 2,287,265 | 46 |
| Gender (Female), 2010 | | 51.8% | 43.8% |
| Whites, 2010 | 81.1% | 82.7% | 52.2% |
| African Americans, 2010 | | 16.0% | 37.0% |
| Hispanic or Latino Origin, 2010 | 3.1% | | 4.3% |
| High school graduates, 2009-2010 | | 82.8% | 71.1%[2] |
| Median household income, 2010 | $45,151 | $49,864 | $19,001 - $30,000[3] |
| Persons below poverty, 2010 | 15.8% | | 38.5%[4] |

Ohio and Cleveland statistics are derived from the U.S. Census Bureau.[1]
Graduation status was unable to be determined for one respondent due to missing data.[2]
Respondents reported income by selecting a category that best represented their household's approximate income for 2011. Income status was unable to be determined for six respondents due to missing data.[3]
Poverty status was unable to be determined for seven respondents due to missing or insufficient income data.[4]



Drug Consumer Characteristics* (N=46)

*Not all participants filled out forms; therefore numbers may not add to 46.
**Club drugs refers to Ecstasy, Ketamine and LSD.
***Some respondents reported multiple drugs of use during the past six months.

## Data Sources

This regional report was based upon qualitative data collected via focus group interviews. Participants were active and recovering drug users recruited from alcohol and other drug treatment programs in Cuyahoga, Geauga and Lake counties. Data triangulation was achieved through comparison of participant data to qualitative data collected from regional professionals (treatment providers and law enforcement) via individual and focus group interviews, as well as to data surveyed from the Cuyahoga Regional Forensic Science Lab, the Cuyahoga County Medical Examiner's Office and the Bureau of Criminal Investigation (BCI) Richfield Office, which serves the Akron, Cleveland and Youngstown areas. All secondary data are summary data of cases processed from January through June 2011. Note: OSAM participants were asked to report on drug use/knowledge pertaining to the past six months (from time of interview through prior six months); thus, current secondary data correspond to the current reporting period of participants. In addition to these data sources, Ohio media outlets were queried for information regarding regional drug abuse for July through December 2011.

## Powdered Cocaine
### Historical Summary

In the previous reporting period, powdered cocaine was highly available in the region. Participants most often reported the drug's availability as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). However, to obtain powdered cocaine, especially powdered cocaine of good quality, participants reported that one would need connections. Law enforcement most often reported the drug's availability as '8.' Participants agreed that user demand for powdered cocaine was driven by the desire to obtain powdered cocaine to make into crack cocaine, allowing users to improve the quality of their crack cocaine. Most participants rated the quality of powdered cocaine as '5' on a scale of '0' (poor quality, "garbage") to '10' (high quality). The BCI Richfield Crime Lab continued to cite the following substances as commonly used to cut (adulterate) powdered cocaine: caffeine, diltiazem (medication used to treat heart conditions/high blood pressure), lidocaine and procaine (local anesthetics). Participants reported that a gram of powdered cocaine sold for between $40-120, depending on the quality. The most common way to use powdered cocaine remained snorting. No participant indicated powdered cocaine as a primary drug of choice. Participants described typical users of powdered cocaine as young, old, of all incomes and races. There were some generalities made about powdered cocaine use: Younger users were said to be more inclined to "speedball" (inject a combination of heroin and cocaine) and more inclined to use powdered cocaine with marijuana; older users (those older than 50 years of age) and wealthier users were said to prefer snorting powdered cocaine more so than smoking or intravenous injection.

### Current Trends

Powdered cocaine remains highly available in the region. Participants most often reported the drug's current availability as '8' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was '10.' Participants continued to report that obtaining powdered cocaine requires a phone call or a drive. A participant reported, *"I think it [powdered cocaine] is easy to get. It's a phone call. In Cleveland you could probably just walk around, but it's mainly phone calls, and you can get it within an hour."* Another participant stated, *"[Powdered cocaine] it's harder to get if you don't drive."* Other users agreed that dealers retain powdered cocaine, and while obtaining it is not difficult, it often requires a relationship with a dealer to secure the drug: *"[Powdered cocaine] it's more expensive because you can blow it up [turn it into crack cocaine]. Dealers hang on to it to double their money; I don't know if it would be easy for a newcomer to get it [powdered cocaine]."* Law enforcement most often reported the drug's current availability as '8;' the previous most common score was also '8.' A law enforcement officer said, *"[Powdered cocaine] it's there, but it's still more expensive. It's there for the high-end user."* A treatment provider contrasted the availability of powdered cocaine to that of crack cocaine, reporting, *"For IV [intravenous] drug users, speedballing [concurrent use of cocaine and heroin] went from being powder[ed] cocaine and heroin in the needle to heroin in the needle and smoking crack. It's easier to get crack [cocaine] than powder."*

Collaborating data also indicated that powdered cocaine is readily available in the region. The Cuyahoga County Medical Examiner's Office reported that 12 percent of all deaths it investigated during the past six months were drug-related (had an illegal substance present or legal drug above the therapeutic range); in the last reporting period, 11.5 percent of all deaths were drug-related. Furthermore, the Coroner reported cocaine as present in 26.8 percent of all drug-related deaths (this is a decrease from 35.7 percent from the previous six-month reporting period. Note: Coroner's data is aggregate data of powdered cocaine and crack cocaine and does not differentiate between these two forms of cocaine). In addition to the coroner's data, media outlets throughout the state reported on significant arrests during this reporting period involving cocaine trafficking in the region. In October, *The Plain Dealer* reported that the Ohio State Highway Patrol arrested two individuals from Michigan during a traffic stop on the Ohio Turnpike in Amherst Township (Lorain County) for possession of two pounds of cocaine, valued between

$26,000-34,000. The pair also possessed a pound of heroin valued at $70,000 and 181 Xanax® pills valued at nearly $1,000 (**www.cleveland.com**, Oct. 5, 2011). In December, *The Morning Journal* reported that the Ohio State Highway Patrol arrested two men from New York during a traffic stop on the Ohio Turnpike in Elyria (Lorain County) for possession of a pound and a half of cocaine, valued at $70,000 (**www. morningjournal.com**, Dec. 6, 2011).

The majority of participants, treatment providers and law enforcement officers reported that the availability of powdered cocaine has remained the same during the past six months. A few participants reported that availability of powdered cocaine has decreased, citing the displacement of the drug by heroin, its "less trendy" status and law enforcement activities. Participants stated, *"I think powder is less available because heroin is taking over. If you want the powder dealers, you better come early because after 9 p.m. they're through. Then, it's who you know; In the 1980s powder was the thing. Powder is to the side today."* The Cuyahoga Regional Forensic Science Lab reported that the number of powdered cocaine cases it processes has increased during the past six months.

Participants most often rated the current quality of powdered cocaine as '8' on a scale of '0' (poor quality, "garbage") to '10' (high quality); the previous most common score was '5.' However, participants supplied a range of quality scores because the quality of powdered cocaine was said to be inconsistent and varied widely. Factors that were said to influence quality included law enforcement activity and proximity to dealer sources. A participant explained, *"After a big bust in Cleveland, the next day all the coke [cocaine] tasted like soap."* Another participant reported, *"Around me [powdered cocaine] it's stomped on [adulterated], but if I go to 185th [Street] in Cleveland, [powdered cocaine quality] it's better."* Participants reported that powdered cocaine in the region is cut with baby laxative, baking soda, bath salts, inositol, novocaine, MiraLAX®, Orajel®, Tylenol® and vitamin B-12. When asked about bath salts in powdered cocaine, users noted that this is not "advertised," per se, by dealers as an additional feature. Participants reported that the overall quality of powdered cocaine has remained the same during the past six months. The Cuyahoga Regional Forensic Science Lab did not examine the constituent parts of powdered cocaine; however, the BCI Richfield Crime Lab cited the following substances as commonly used to cut powdered cocaine: caffeine, benzocaine (local anesthetic), diltiazem (medication used to treat heart conditions/high blood pressure) and levamisole (livestock dewormer).

Current street jargon includes many names for powdered cocaine. The most commonly cited names remain "blow" and "white girl." Participants listed the following as other common street names: "birds (for kilos)," "booger sugar," "chicken little," "Christina Aguilera," "Coca-Cola," "coke," "fish scales," "Lindsay Lohan," "powder," "scrape," "snow," "soft," "Tony Montana," "ya-yo" and "yip." Current street prices for powdered cocaine were consistent among participants with experience buying powdered cocaine, and prices tended to be higher in rural areas on the eastern and western reaches of the region. Participants reported that a gram of powdered cocaine sells for between $50-120, depending on the quality; 1/8 ounce, or "eight ball," sells for between $80-180; an ounce sells for approximately $1,100-1,200; a kilo sells for between $2,500-5,000. Participants reported that the most common way to use powdered cocaine remains snorting. Out of 10 powdered cocaine users, participants reported that on average approximately seven would snort and the remaining three would either intravenously inject or smoke. It is important to note that when users discussed the popularity of smoking powdered cocaine, almost all of them meant that the powder would be "rocked up" to create crack cocaine, and not the freebase smoking method.

A profile of a typical powdered cocaine user did not emerge from the data. Among younger participants (those 25 years of age and younger), powdered cocaine was said to be more often used to intensify the effects of other drugs than to be abused by itself. No participant indicated powdered cocaine as a primary drug of choice. However, a treatment provider described the use of powdered cocaine among certain groups, saying: *"Mid-20 year olds, upper-middle class White females, somewhat educated [tend to use powdered cocaine] … males in the upper-middle class, too. People in school use it [powdered cocaine] when they take tests. I've seen students getting into it for studying purposes. It's secondary to the Adderall® and Ritalin®. But, they can't get the Ritalin®, so they use powder."*

Reportedly, powdered cocaine is used in combination with alcohol, Ecstasy, heroin, marijuana, prescription opioids, sedative-hypnotics and tobacco. Common practices among younger users (those 25 years of age and younger) include lacing marijuana with powdered cocaine (aka, "primo" or "doobie"), or lacing cigarettes with powdered cocaine (aka, "coke smoke" or "snow-cap"). Mixing cocaine with heroin, either together or in sequence, called "speedball," is also reportedly common among younger users, as well as with some older users. Heroin, marijuana, sedative-hypnotics and other "downers" are used to "come down" from a cocaine high; and cocaine is used to "come up" to allow users to be able to keep using these drugs. A participant reported, *"Drinking [alcohol] and snorting [powdered cocaine] goes together."* Participants were aware of the dangers of mixing drugs. A participant reported, *"I almost overdosed doing Ecstasy and coke."* In addition to these use combinations, a trend emerged

during discussions with younger users about powdered cocaine use that involved using the drug to prolong sexual activity.

### Crack Cocaine
#### Historical Summary

In the previous reporting period, crack cocaine was highly available in the region. Participants most often reported the drug's availability as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Law enforcement also rated the availability of crack cocaine as high, reporting availability as '9,' and explained that the urgency to respond to crack cocaine had been eclipsed by the emergence of drugs like heroin and prescription opioids. The BCI Richfield Crime Lab reported that the number of crack cocaine cases it processes had remained the same during the previous six months. The most common participant quality score for crack cocaine was '5' on a scale of '0' (poor quality, "garbage") to '10' (high quality). Participants reported that crack cocaine was most often cut with other substances. The BCI Richfield Crime Lab continued to cite the following substances as commonly used to cut crack cocaine: caffeine, diltiazem (medication used to treat heart conditions/high blood pressure), lidocaine and procaine (local anesthetics). Participants reported that crack cocaine continued to sell in $10, $20 and $50 units. Larger quantities of crack cocaine were also available: 1/8 ounce sold for between $100-220, and an ounce sold for between $800-900. By far, the most common route of administration for this form of cocaine was smoking. Participants tended to agree that crack cocaine users varied in age and race; they were unable to identify a "typical" crack cocaine user.

#### Current Trends

Crack cocaine remains highly available in the region. Participants most often reported the drug's current availability as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was also '10.' Like marijuana and oftentimes heroin, crack cocaine is reportedly available from unknown dealers, as well as from established connections. Several participants echoed these sentiments: *"I had to call sometimes [to locate crack cocaine], but sometimes they [dealers] walk up to you on the street; I'm a White girl in the hood … they [dealers] know what I'm looking for."* Participants noted particular availability near convenience stores and gas stations: *"At the corner gas station there are dope boys that say, 'Take my number' [and call to purchase crack cocaine]; If you can't find a dealer, you can go to this convenience store and buy it [crack cocaine] over the counter. It's loose to just put right in the stem. They sell baggies for 10 cents if you want it to*

*go."* Crack cocaine is available in rural areas far to the west or east of Cleveland, but requires known connections to obtain. A participant reported, *"I had no idea it [crack cocaine] was so popular [until I came to Cleveland]. I thought it was an '80s thing. Where I'm from, it's rural … [Availability of crack cocaine] it's '0' on that [current availability] scale."* A law enforcement official made a similar observation: *"People that live in urban areas have easier access [to crack cocaine]. They just have to go out their door. People who live in the suburbs have to drive to get it."* Law enforcement and treatment providers reported the drug's current availability as '8,' and said availability varied depending on where one lived in the region. An officer reported, *"Door-to-door service [delivery of crack cocaine] is only in certain areas. Dealers might have specialty items, but they will have crack [cocaine]. It's there."* Another officer said, *"[Crack cocaine] it's still available, and our officers are bringing in males and females all the time … it's there if you want it."* A treatment provider explained, *"[Crack cocaine] it's still out there. I always have a couple clients in my [treatment] group [who are crack cocaine dependent]. Ten years ago it was more prevalent, but there are still people getting it."*

Participants, law enforcement and treatment providers most often agreed that the availability of crack cocaine has remained the same during the past six months. A participant explained, *"As long as you have coke, and somebody that knows how to cook it up, [into crack cocaine] it's always going to be there."* However, three participants in the City of Cleveland noted a decrease in the availability of 'door service' for crack cocaine. One participant stated, *"[Crack cocaine] it's not as available as it used to be. They [dope boys] don't run up to the car now. You gotta know the [dope boy's] number now or have somebody take you to them. This is because of cops cracking down."* A second participant echoed, *"Police are doing their jobs. They've wiped it out [car door service where I live]. The police don't want it [crack cocaine sales] here."* While law enforcement and treatment providers reported that the availability of crack cocaine has remained highly available during the past six months, both groups continued to mention drugs like heroin and prescription opioids beginning to eclipse the popularity of crack cocaine. A law enforcement officer said, *"I don't think [crack cocaine] it's as popular as it used to be."* Likewise, participants noted crack cocaine's decline as dealers begin to favor heroin: *"Dealers are switching [from crack cocaine sales] because there's more money in heroin."* A participant observed, *"[Crack cocaine] it's not the drug of choice anymore. Everyone's switching to heroin."* The Cuyahoga Regional Forensic Science Lab reported that the number of crack cocaine cases it processes has decreased during the past six months.

Most participants rated the quality of crack cocaine as '7' on a scale of '0' (poor quality, "garbage") to '10' (high quality); the previous most common score was '5.' Most participants

agreed that the quality of crack cocaine varies depending on the dealer and time of day. A participant explained, *"For the first batch, dealers would put more baking soda in it [crack cocaine]. If you had a good relationship, they'd give you the better stuff from the second batch. If I got [my dealer] more clientele, he would hook me up."* Other participants stated, *"[Crack cocaine] quality always fluctuates, even from the same dealer; If you don't know somebody, [crack cocaine quality] it'll be bad. It's getting worse. Out of 10 people you might buy from, maybe one has good crack."* Some participants noted the difference between crack cocaine obtained in the City of Cleveland compared to crack cocaine obtained on the far east or west sides of the city. One participant said, *"In Painesville [Lake County], [crack cocaine quality] it's a '3' on your quality scale ... in Cleveland, it's '7.'"* Participants reported that crack cocaine is cut with many other substances. A participant stated, *"People in my family say that now [crack cocaine] it's mixed up with so much garbage [that] they're wasting their money. The others [people at this treatment facility] say they weren't even getting high any more from it."* Reportedly, crack cocaine is cut with aspirin, baby laxative, baking soda, Kool-Aid®, heroin, MiraLAX®, Percocet®, Tylenol® and Vicodin®. A treatment provider reported, *"I've heard it [crack cocaine] being cut with bath salts and MiraLAX®. Clients tell me that it's not as strong as it was. I've heard more about MiraLAX®, especially now that it's over-the-counter. It used to be prescription only."* Participants also noted that crack cocaine is mixed with substances to increase its potency. A user stated that some dealers, *"Cut it [crack cocaine] with something, and then they say it's fire [very potent]. It depends — sometimes they use heroin or Percocet®. Those are cheaper than coke."* Occasionally, these additives are advertised to crack cocaine consumers as an added feature. Participants reported that the quality of crack cocaine has remained the same during the past six months. The Cuyahoga Regional Forensic Science Lab did not examine the constituent parts of crack cocaine; however, the BCI Richfield Crime Lab continues to cite the following substances as commonly used to cut crack cocaine: caffeine and diltiazem (medication used to treat heart conditions/high blood pressure).

Current street jargon includes many names for crack cocaine. The most commonly cited names remain "hard" and "work." Participants listed the following as other common street names: "A/C (air conditioning)," "action," "bricks" (for a large quantity), "Charlie," "chunk," "dope," "O2" and "rock." Current street prices for crack cocaine were consistent among participants with experience buying the drug. Participants reported that crack cocaine, when sold anonymously in $10, $20 and $50 units, varies in size from peanut- to chocolate chip-sized pieces. These transactions are quick, and the drug is seldom measured by users. A participant explained, *"They [dealers] don't always weigh it [crack cocaine], and you* can't really argue it."* A law enforcement officer explained, *"If users are buying it [crack cocaine] off the street, they don't have a scale. If they go inside a house, the seller will at least have a scale. If you are familiar with it, you can look at it and start to negotiate."* When weighed, users reported better pricing: a .4 gram rock (aka "twomp") sells for $20; 1/8 ounce sells for between $100-$200. Like powdered cocaine, crack cocaine prices are reportedly higher in the far east or west side areas of Cleveland. While there were a few reported ways of administering crack cocaine, the most common route of administration continues to be smoking. Out of 10 crack cocaine users, participants reported that approximately eight would smoke, and the other two would intravenously inject or snort the drug. Injecting crack cocaine was perceived to be on the rise among 18-25 year-old users. A younger participant reported, *"People are shooting it [injecting crack cocaine] more now. They used to just smoke it."* Another participant stated how needle use is related to a user's previous experience: *"People get addicted to the needle. So they shoot other things like crack."*

A typical user profile did not emerge from the data. Law enforcement and treatment providers described typical users of crack cocaine as being of every race and socio-economic class. A law enforcement officer said, *"It's poor people to people with money [that use crack cocaine]. We're getting it through the full spectrum."* However, the perception among community professionals was that while crack cocaine is easy to obtain, crack cocaine is not a popular drug among younger users. A treatment provider reported, *"I haven't had anyone under 30 [years of age] who uses it [crack cocaine]. It's not their drug of choice or even in the top three. They might have tried it though."* A law enforcement officer said, *"Crack goes throughout the spectrum, but I wouldn't say it's a common drug for teenagers. They're still into gateway drugs like marijuana or hallucinogens. The age that kicks in when we start making arrests is in their mid-20s up into the 50s."* The officer also noted a difference between users and traffickers of crack cocaine, saying, *"The crack sellers are early 20s. They're not users yet; they're selling it. When you get into the 30s, then they start using it."*

Reportedly, crack cocaine is used in combination with alcohol, heroin, marijuana (aka "primo"), prescription opioids, sedative-hypnotics and tobacco. Two users noted a preference for Valium® taken with crack cocaine, *"to balance the high,"* or taken, *"after to come down."* Participants also noted "speedballing" (mixing crack cocaine with heroin). A treatment provider observed, *"Heroin with crack, it's huge right now,"* A participant reported, *"I would do heroin, then crack to come down."* While some participants indicated that the speedball combination is injected simultaneously, others noted that the drugs are also taken in sequence (aka "elevator"). Younger participants noted that it is common to obtain crack cocaine in exchange for sex.

## Heroin

### Historical Summary

In the previous reporting period, heroin was highly available in the region. Participants most often reported the drug's availability as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Law enforcement and treatment providers most often reported the drug's availability as '8.' When asked to identify the most urgent or emergent drug trends, all professionals indicated that heroin were a concern. While many types of heroin were available in the region, participants continued to report the availability of brown powdered heroin as most available. Reportedly, black tar and white powdered heroin could also be obtained, but required closer connections to obtain and were dependent on the user's location. Those who felt heroin had become more available during the previous six months reasoned that increasing availability was due to increased demand among younger users, prescription opiate abuse and pressure from dealers who desired to switch their clients from crack cocaine to more-profitable heroin. The BCI Richfield Crime Lab reported that the number of powdered heroin cases it processes had increased during the previous six months. Most participants generally rated the quality of heroin as '4' on a scale of '0' (poor quality, "garbage") to '10' (high quality). The BCI Richfield Crime Lab cited lidocaine and procaine (local anesthetics) as commonly used to cut powdered heroin. Participants reported that brown powdered heroin was available in different quantities, with the most common unit being small "bags," containing one "hit" (1/10 gram), which sold for $10. Participants also reported buying heroin in "bundles" (10-12 small packs), which sold for between $80-120. Participants reported that the most common way to use heroin remained intravenous injection. Many users continued to note the pill progression to heroin, reportedly an extremely popular trend among those aged 16-30 years: users begin with prescription opioids, move to snorting heroin, then progress to injecting heroin.

### Current Trends

Heroin remains highly available in the region. Participants most often reported overall current availability of heroin as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was also '10.' While many types of heroin are currently available in the region, participants continued to report the availability of brown powdered heroin as the most available type within the City of Cleveland as well as in both the east and west side areas, most often rating its current availability as '10.' Participants who had knowledge

of white powdered heroin's availability most often rated its availability as also '10;' however, not all users supplied availability scores for this type of heroin. The current availability of black tar heroin was most often reported as '5.' Almost all participants continued to report heroin as easy or very easy to get. A user summarized trends throughout the region, saying, "[Heroin] it's out there. It [availability] varies. I've never seen tar [black tar heroin], but I've seen dark chunks [of brown powdered heroin]. If you're White and you drive down certain areas, people think you're looking for it … better quality stuff would be in chunk form, and it's not as good if it's powder, because I guess they [dealers] cut it. Some people that used to sell coke have heroin now. Dealers know people get sick without it [heroin], so they are trying to get users on it." Participants reported some variations in availability and quality between the east and west sides of Cleveland. Participants agreed that while heroin is plentiful on the west side, participants would often travel to the east side to obtain better-quality heroin. A participant reported, "If you want the better stuff [heroin], you have to go out to Euclid. If you want garbage and to just not be sick, stick around the west side." Despite local differences, brown and white powdered forms of the drug are easily obtained, and are perceived to be used at epidemic levels. A participant stated, "In my area [heroin] it's readily available. As soon as you cross into Cuyahoga County, someone's going to walk up to you. I'd be waiting for my dope boy and get approached by three others. It's everywhere." Black tar heroin was not reported to be as available as the other forms of the drug.

Community professionals most often reported the drug's current availability as '10;' the previous most common score was '8.' With regard to availability of the different varieties, law enforcement and treatment providers concurred with data supplied by drug consumers, stating, "It's mostly brown and white [powdered heroin] we see; Brown powder we [law enforcement] buy more than any other kind. You can get tar [black tar heroin] once in a while." A treatment provider noted, "My clients share with me that [obtaining heroin] it's a matter of home delivery, like the pizza man. It's not too much of a challenge. It's not a big hassle." However, when describing clients 25 years of age and younger, treatment providers noted that heroin could be somewhat more difficult to obtain for this age group: "With an adolescent population, they don't have the connections that some of my older clients do, and some of them don't have cars to drive to get it [heroin]; I've had a lot adolescent heroin addicts. A lot of them drive out to the east side to get it [heroin], so it's a bit more difficult to get

*than other drugs like marijuana. They know where they can get it around here, and friends at school that have it, but for a lot of it they have to drive to the east side to meet a connection out there."* When asked to identify the most urgent or emergent drug trends, law enforcement continued to cite heroin trafficking as a primary concern: *"It [heroin] moves from city to town, town to city … about 85 percent of our [law enforcement] work involves heroin now."* Law enforcement officials described large quantity buys that involved bundles as well as multiple bags/bindles, capsules, powder and sleeves (aka "fingers," a long balloon which contains seven to 10 grams of heroin): *"Capsules or sleeves up to half a kilo [of heroin] are inserted into the bodies of mules [drug smugglers] from other countries. They arrive here and meet the dealer. There's a lot of that happening."* Collaborating data also indicated that heroin is readily available in the region. The Cuyahoga County Medical Examiner's Office reported that 12 percent of all deaths it investigated during the past six months were drug-related (had an illegal substance present or legal drug above the therapeutic range); in the last reporting period, 11.5 percent of all deaths were drug-related. Furthermore, the Coroner reported heroin as present in 34.2 percent of all drug-related deaths (this is a decrease from 37.1 percent from the previous six-month reporting period).

The majority of participants and community professionals reported that the availability of heroin has increased during the past six months. No one felt heroin's availability has decreased. Participants reinforced two trends identified in previous reports: increased competition among dealers to secure steady heroin users and increased demand for heroin. A participant stated, *"Dealers are readily available to serve you. I've seen the dudes and heard about kids as young as eight or nine years old to get into it [heroin sales]."* Other participants remarked, *"Dealers that used to sell just crack now sell both [crack cocaine and heroin]; [Heroin] it's extremely popular; I have been approached by cocaine sellers who have both [cocaine and heroin]; I used to have to go to Cleveland to get it [heroin]; now it's here. It's a phone call. The crack dealers have realized they can make more money if they carry both."* Also, many dealers reportedly have modified their inventory and techniques to attract and retain heroin users. A participant reported on being approached at a store to buy heroin: *"The last time the guy tried to give me some heroin for free … a little bag."* Others observed, *"There are more dope boys [heroin dealers] every single day."* The Cuyahoga Regional Forensic Science Lab reported that the number of heroin cases it processes has increased during the past six months.

Most participants generally rated the quality of heroin as '7' on a scale of '0' (poor quality, "garbage") to '10' (high quality); the previous most common score was '4.' Participants reported that heroin in the region is cut with

cocaine, fentanyl, Flexeril®, lidocaine and procaine (local anesthetics), methadone, OxyContin® and other prescription opioids, Tylenol PM®, vitamin B-12 and Xanax®. A participant explained that in a very fine powdered form, heroin, *"is probably garbage. You have to cut it [heroin], but not change the color too much."* A participant described heroin's consistency as *"… like a brown rock crushed up or in chunks."* Another participant described heroin as loose, brown powder to be tannish in color, sometimes gray.
A participant explained that heroin can be cut with *"anything that dissolves in water."* Several participants supplied details on the common perception that heroin is cut with fentanyl, with one stating, *"When I was in Toledo, they called heroin, 'fentanyl,' even though it was heroin."* Another participant stated, *"I didn't like the white stuff [white powdered heroin] … a lot of people cut it with fentanyl. It's usually not that great because it has fentanyl in it. Gray and brown were less cut [adulterated], more reliable."* A law enforcement officer said, *"About four or five years ago we heard about how fentanyl explodes if you use a NIK [narcotic identification kit] test. Even now if we come across an amount of heroin, we send it to the lab because of the risk of fentanyl being in it."* Most participants agreed with the sentiment that powdered heroin contains many other ingredients. One participant said, *"They [dealers] aren't going to tell you what's in there [heroin]. You don't always know."* When discussing purity, a participant noted, *"There are definitely purity wars. Whoever's got the better stuff [heroin] that's where I'm going."* Despite this perception, law enforcement stated that laboratory analysis has shown an increase in purity. A law enforcement official said, *"Heroin is 70-80 percent [pure] now, compared with the 40-50 percent from a few years ago."* The Cuyahoga Regional Forensic Science Lab did not examine the constituent parts of heroin; however, the BCI Richfield Crime Lab cited caffeine and diphenhydramine (antihistamine) as commonly used to cut powdered heroin.

Current street jargon includes many names for heroin. The most commonly cited names remain "boy" and "dog food." Other names used in the region include: "dope," "H," "heron," "Ronald," "smack" and "tar." It should be noted that among younger users, "dope" refers to a specific drug (usually heroin or crack cocaine), while among older users, dope can be any type of abused substance. A participant stated, *"I've never heard anybody but cops call marijuana, 'dope.' Older people use 'dope' for everything."* Participants reported that brown powdered heroin is available in different quantities. Bags or bindles (1/10 gram) sell for between $10-15, with higher prices reported on the west side due to higher demand. A law enforcement official from the west side stated, *"[Heroin] it's $15 per bindle out here. It used to be $10 per bindle, but that's due to more demand."* Participants also reported buying

heroin in "bundles" (10-12 small bags of heroin). Bundles sell for between $75-120; 1/2 gram sells for between $60-80; a gram sells for between $140-150; 1/4 ounce sells for between $700-1,000. Reportedly, brown powdered heroin is most commonly sold in bags, bundles, and increasingly, loose by weight, indicating a possible shift away from balloons, double hits and capsules. A participant described how heroin is sold, explaining, *"When I got it [heroin] in quantity, I would get chunks. Little wax bags are for powder. If you get larger quantity, you probably get chunk. Like a gram chunk."* Another participant said, *"You get $20 per chunk right in your hand or folded in paper. That's kind of a newer thing. [Weighed] bags don't let them [dealers] make extra money like loose [heroin] does."* Participants reported that the most common way to use heroin remains intravenous injection. Out of 10 heroin users participants reported that approximately eight would inject, the other two would either snort or smoke the drug. Users who are new to heroin are more likely to snort before progressing to injection.

Participants and law enforcement identified pharmacies as the main source for clean injection needles. Participants reported that injection needles are relatively inexpensive and can be obtained by saying they are for diabetes management. Users noted that many pharmacies are beginning to "crack down" on needle sales by insisting that buyers fill a prescription for insulin or other medication. A participant reported, *"You can get needles anywhere, but you have to lie and say you're a diabetic. Some [pharmacies] will look it up, and then you're screwed."* Other sources listed by participants included treatment centers, veterinary supply stores, nurses, tattoo shops and needle exchange programs. There was little awareness of needle exchange programs among participants. Dealers do not supply needles to users in the region. Needles are often shared. A law enforcement officer commented on the long term ramifications of shared needle use: *"[Users] they're sharing needles and sharing themselves. Now you've got a whole disease dimension of drug use that will develop over the years. We haven't even begun to see this problem unfold."* When users share needles, many reported that they occasionally attempt to sterilize them through bleaching. Other times the sterilization attempt is not made. A participant reported, *"I saw sharing needles often. They [users] would not care, or they would bleach it out. Even strangers would share."* All participants agreed that intravenous drug users are well aware of the risks of sharing needles, but that sharing occurs when users are desperate or because they have stopped caring about contracting diseases. A participant explained, *"I saw sharing cottons and dirty water. I didn't see a difference in behavior [between younger and older users]. Mostly it [needle sharing] had to do with how long they've been using. New users are more likely to get clean needles."*

A profile for a typical heroin user did not emerge from the data. Participants noted that heroin is popular with those of all ages, races and socio-economic status. A participant commented, *"I think [heroin] it's big with all ages. It's all people doing pills [prescription opioids] who run out of pills. They get heron to supplement because it's cheaper. Instead of paying $80 for an oxy [OxyContin®] they can spend $20 and get some heron."* While participants did not cite a particular type of user in terms of age, race, or income, they noted that race is a factor when suburban Whites travel to predominantly Black neighborhoods: the assumption is that Whites are seeking drugs, particularly heroin. A participant reported, *"Everyone assumes I'm a heroin user because I have dark hair and tattoos. I stopped at the store and everyone was trying to sell me heroin. I had to check to make sure I didn't have a sticker on my forehead. The dope boy didn't ask the Black lady I was with. All the men I saw there would see me, a White girl, and try to sell me heroin."* Law enforcement and treatment providers also reported that heroin use is, *"across the board; a cross-trend drug."* A law enforcement officer said, *"[Heroin use] it's higher income and lower income. The youngest [heroin user] we see is about 15-16 years old. We've seen them aged 60 and 70 years old."* However, law enforcement and treatment providers noted increases of heroin use among two groups: younger, White, suburban dwellers (15-25 years of age) and older people (older than 35 years of age) of all races. An officer reported, *"I see two different types of [heroin] users: the older people who have been using [drugs] for a long time and graduated up to heroin. Then also, the young people who just went right into heroin. They're young teens, 19, 18 [years of age]. A lot of them are suburban."* As documented in previous reports, both participants and law enforcement noted the abuse progression from prescription opioids to heroin. A participant observed, *"People got busted for pills, then everyone switched to heroin."* Another participant observed that the reformulation of OxyContin® OC to a non-crushable form prompted an increase in heroin abuse, saying, *"A lot of the pill dealers turned into heroin dealers because nobody wants a pill you can't snort."*

Reportedly, heroin is used in combination with alcohol and sedative-hypnotics to intensify the effects of heroin, crack cocaine to "come up", and marijuana and powdered cocaine to prolong the effects of heroin. A participant also stated that a dealer, *"would sometimes sell a 50 percent cocaine/50 percent heroin mix. He [dealer] started doing that after recommendations from users who wanted that."* Another user observed: *"Putting heroin in your blunt [marijuana cigar] is also a 'primo'. When they hand you a primo, you gotta ask what's in it."*

## Prescription Opioids
### Historical Summary

In the previous reporting period, prescription opioids were highly available in the region. Participants most often reported availability of these drugs as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Participants and community professionals identified OxyContin® OP, Percocet® and Vicodin® as the most available prescription opioids in terms of widespread use. OxyContin® OC (the discontinued crushable form) continued to become more difficult to obtain. Opana® and methadone were cited as up-and-coming opioids of abuse that were gaining in popularity. Reportedly, many different types of prescription opioids were sold on the region's streets. In addition to obtaining prescription opioids from dealers who buy prescriptions and from friends, participants also reported that their primary resource for getting prescription opioids remained from doctors at pain clinics and emergency rooms. Many participants knew of specific physicians who wrote prescriptions for cash. While there were a few reported ways of consuming prescription opioids, and variations in methods of use were noted among types of prescription opioids, generally, the most common route of administration continued to be oral ingestion, either chewing or swallowing. Participants and community professionals described users of prescription opioids as from every socio-economic status, income level, all ages and all races, while citing two types of new users: people who had suffered a physical injury and then developed a dependency, and people younger than 25 years of age.

### Current Trends

Prescription opioids remain highly available in the region. Participants most often reported the current availability of these drugs as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was also '10'. Participants identified Vicodin®, Percocet®, OxyContin® OP, and Opana® as the most abused prescription opioids in the region. OxyContin® OC (the discontinued crushable form) has continued to become increasingly difficult to obtain. A participant explained, *"It's not as easy to get them [prescription opioids] as it used to be for certain pills like OC's [OxyContin® OC] and Opana® they're so expensive. Vic's [Vicodin®] and perc's [Percocet®] you can get."* Another participant reported, *"[Prescription opioids] they're pretty highly available. Everyone has a family member with a prescription. My aunt has a stock of pain pills. You don't even have to go out on the street to get them because it's in the household."* Law enforcement and treatment providers agreed that these drugs are the most popular prescription opioids in terms of widespread use. A treatment provider noted, *"It was oxy's [OxyContin®] for a long time [that was most widely used], but now it's Opana®. Every client I've seen in the last few months has been using Opana®."* However, community professionals supplied lower availability scores than participants did for prescription opioids. While users reported the availability of prescription opioids as '10', or "very easy to get," community professionals most often reported the current availability of prescription opioids as follows: Vicodin® as '8', Percocet® as '7', OyxContin® OP as '6' and Opana® as '3'. A law enforcement officer described the vast amount of prescription opioids that are available: *"We [law enforcement] do a medicine cabinet drug take-back twice a year to set up sites across the county [Lorain County] to have people bring in narcotics. This year we got 1,378 pounds [of prescription medications] from just 900 people. We have a population of 300,000, so you need to think about what's still out there."*

Other drugs that were reported to be popular included fentanyl, methadone, and Ultram®, with methadone reported as gaining in popularity. A law enforcement officer explained, *"A lot of insurance plans won't pay for OxyContin® OP, so they [doctors] write [prescriptions] for methadone."* Treatment providers said it is common to obtain fentanyl patches from nursing homes. One treatment provider observed, *"I see methadone prescribed for pain — which is insane! And, the fentanyl is big. People at the end of life pass away, and then people get it."* Several other treatment providers noted the rising popularity of fentanyl among heroin users and military personnel. One treatment provider stated, *"In the military community, fentanyl is used a whole lot more. They have a sucker form of the drug that's used for injured vets. In the military it's a whole lot easier to get and I haven't seen it in the civilian channels as much."* Collaborating data also indicated that prescription opioids are readily available in the region. The Cuyahoga County Medical Examiner's Office reported that 12 percent of all deaths it investigated during the past six months were drug-related (had an illegal substance present or legal drug above the therapeutic range); in the last reporting period, 11.5 percent of all deaths were drug-related. Furthermore, the Coroner reported prescription opioids as present in 40.9 percent of all drug-related deaths (this is an increase from 35.0 percent from the previous six-month reporting period). Both law enforcement and treatment providers mentioned seeing increases in overdoses involving prescription opioids.

While participants and community professionals most often reported that the availability of prescription opioids has remained the same during the past six months (extremely available, except for OxyContin® OC), several respondents reported that availability has increased. A law enforcement officer stated, *"It's worse every day. We used to get one or two calls per week [regarding prescription opioids]. Now it's every day."* The Cuyahoga Regional Forensic Science Lab reported that the number of prescription opioid cases it processes has

generally remained the same or has decreased during the past six months; noted exceptions were increases in cases of codeine, oxycodone hydrochloride (OxyContin®) and morphine.

Reportedly, many different types of prescription opioids are currently sold on the region's streets. Participants reported the following prescription opioids as available to street-level users (Note: When reported, current street names and prices are indicated in parentheses): fentanyl (sells for $1 per milligram), methadone 10 mg (aka "dones;" sells for between $2-12), Norco® (sells for between $1.50-3 per pill), Opana® (aka "panda bears;" sells for between $1-2 per milligram), oxycodone (aka "smurfs;" sells for between $.50-1 per milligram), OxyContin® OC (*old* formulation, aka "oxy's" and "oceans;" sells for $2 per milligram), OxyContin® OP (*new* formulation, aka "OP's;" sells for between $.40-.90 per milligram), Percocet® (aka "perc's" and "school buses;" 5 mg, aka "nickels;" sells for between $5-7; 10 mg, aka "dimes;" sells for between $8-9), Roxicet® 30 mg (sells for between $18-25), Ultram® and Vicodin® (aka "V's" and "vikes;" 5 mg sells for between $4-5; 7.5 mg sells for between $5-7; 10 mg sells for between $7-10). Many participants observed that pricing for these pills has gone up recently. A participant reported, *"When all the doctors got busted, the prices [of prescription opioids] went way up."* While there were a few reported ways of consuming prescription opioids, the most common route of administration is snorting. Out of 10 prescription opioid abusers, participants reported that approximately six would snort, two would inject and two would take the drugs by mouth. Exceptions were noted based on medication formulation (liquid, pill, wafer) and the nature of the drug's effect on the body. A participant explained: *"If I had an Opana® or oxy [OxyContin®], I would snort it. If it had acetaminophen in it, I would pop [swallow] it."* Participants also continued to note difficulty manipulating the new OxyContin® OP formulation. A participant stated, *"I've seen people make a special wood structure to hold them [OxyContin® OP] to scrape them [of their protective coating], then snort them."*

In addition to obtaining prescription opioids on the street from dealers, participants continued to list the following other sources for prescription opioids: friends, family, doctors, pain clinics and emergency rooms. Many participants reported having dealer connections in medical careers. A participant said, *"I got them [prescription opioids] from the hospital. I know a girl who was writing her own prescription for them."* Law enforcement agreed that illegal sales through nurses and doctors accounted for the largest volume of diverted opioids. A law enforcement official said, *"We try to focus on the doctors and nurses who are doing the real damage …"* Another officer reported, *"We had more than 800*

*people since June of 2011 coming back to this area with scripts [prescriptions for opioids] written all from one clinic."* However, treatment providers reported mixed success with monitoring programs. A treatment provider noted, *"They [users] get them [prescription opioids] from the doctor. You can't 'doctor shop' that much anymore, but I haven't heard of users having to go to the street to get them."* Another provider said, *"I'm also seeing the pain management specialists are starting to wean the clients off. They're making the clients go without [prescription opioids], and I really see doctors are being more selective. They don't want to be sued. But with modern technology they can see what's been filled, and they can spot abuse better."* A focus group composed of law enforcement officers noted that nearly all of their prescription opioid arrests resulted from good collaboration with area pharmacies. One officer said, *"Mostly, we get someone that stole a script or made a counterfeit. We [law enforcement] get a call from the pharmacist, and when they [users] return to pick up their drugs, we arrest them … it's the pharmacy that says, 'You need to get up here.'"*

Participants, law enforcement and treatment providers described typical users of prescription opioids as from every socio-economic status, age and race. A law enforcement officer stated, *"It's regular factory workers, a few professionals, homeless people, lawyers [abusing prescription opioids] … aged 16-86 [years of age]."* However, participants and treatment professionals shared identical observations about two larger user groups; they described how there is abuse by older (those older than 40 years of age), and employed individuals who abuse/sell opioids as a result of injury or for additional income. Participants reported, *"They [older users] are using pills to supplement their money; Fifty percent of the people who get pain pills don't use them. They sell them."* A treatment provider stated, *"[Prescription opioids] they're more available among the older community. They don't present to doctors as junkies, so they leave with more pills."* Another user group that emerged during interviews is that of younger users (those 15 years of age, and up to 25 years of age) who abuse their relatives' prescribed opioids or obtain them from friends. A treatment provider described this group as, *"White, middle-class, young,"* and another described this group as, *"Fifteen-to 25 year-olds who get into their grandparents' medicine cabinets, primarily Caucasian … and it's getting younger."* A participant said, *"[Prescription opioid users] they're younger White kids in school. No money, but they'll buy what they can get."* A treatment provider reported, *"There are kids at school who just have bags of pills."* Community professionals noted that prescription opioids also appeal to both of these groups because use can be concealed. Participants and community professionals also observed that drug runners tend to be younger. A participant recalled, *"I met a drug runner that was 11 or 12 [years old]."* A law enforcement officer also noted the

difference between users and younger traffickers, explaining, *"The users are a range, but the trafficker is a younger person in their 20s."* Finally, a treatment provider noted prescription opioid abuse among military service personnel, saying, *"I used to work for the Army, and there are a lot of injuries. They get pain meds sooner, and they stay on it longer than your average civilian would …"*

Reportedly, when used in combination with other drugs, prescription opioids are most often used in combination with alcohol, marijuana, powdered cocaine, sedative-hypnotics and tobacco. Combining other drugs with prescription opioids is common, as the effects of prescription opioids are said to be enhanced by other drugs. A participant reported, *"I would do Xanax® or any benzo's [benzodiazepines] after opiates. It intensifies the nod. You black out."*

**Suboxone®**
**Historical Summary**

In the previous reporting period, Suboxone® was highly available in the region. Participants most often reported availability of Suboxone® as '9' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Law enforcement most often reported the drug's availability as '8'. The BCI Richfield Crime Lab reported that the number of Suboxone® cases it processed had increased during the previous six months. Participants reported that Suboxone® 2 mg sold for between $7-10; Suboxone® 8 mg sold for between $5-25; two Suboxone® strips sold for $25. Out of 10 Suboxone® users, participants reported that, on average, 5.5 users would take Suboxone® orally as directed, 3.5 would snort and one would intravenously inject. Suboxone® continued to be primarily acquired from doctors, friends and dealers. Few participants in each session had in-depth knowledge about Suboxone®, but among those who did, they cited the drug as widely available from heroin users and/or from heroin dealers. Participants described typical users of Suboxone® as heroin users who used the drug to avoid withdrawal symptoms when heroin could not be obtained. Reportedly, Suboxone® was used in combination with crack and powdered cocaine, marijuana and sedative-hypnotics.

**Current Trends**

Suboxone® is moderately available in the region. Participants most often reported the availability of Suboxone® as '7' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was '9'. Participants reported the drug to be available by prescription, through treatment centers and from friends who use heroin. A participant stated, *"Anybody that does*

*opiates or is in treatment, or just got out of treatment has them [Suboxone®]."* Some participants had never heard of abuse of the drug: *"I only heard of it [Suboxone®] in treatment; I didn't know it [Suboxone®] was abused."* Law enforcement did not report data on illicit use of Suboxone®, but a treatment provider reported the current availability of the drug as '10'. Participants reported that the availability of Suboxone® has remained the same during the past six months. The Cuyahoga Regional Forensic Science Lab reported that the number of Suboxone® cases it processes has remained the same during the past six months.

The only street name reported for Suboxone® was "subs." Participants indicated that Suboxone® 2 mg sells for between $8-10 (pills or strips); Suboxone® 8 mg sells for between $10-20 (pills or strips); Subutex® 8 mg sells for between $15-20. On pricing, a participant noted, *"You'll pay more [for Suboxone®] if you're desperate."* Out of 10 Suboxone® users, participants reported that, on average, approximately 8 would take Suboxone® sublingually (dissolving it under the tongue) as indicated, one would snort and one would intravenously inject. Intravenous use of this drug is considered by those with experience to be less-desirable than other methods, with one participant stating, *"You do not want to shoot them [Suboxone®]. It's instant dope sick."* Participants reported that the pill form of the drug is more preferred because, as a participant noted, they can be snorted, whereas, *"[Suboxone®] strips you have to eat. That's why they're so cheap. Nobody wants them."*

Suboxone® continues to be primarily acquired from doctors, friends and occasionally dealers who take them in trade for other drugs. A participant reported, *"People would sell half of their [Suboxone®] prescription and keep half."* The strategy in this case is to reserve Suboxone® for times when heroin cannot be obtained. Participants reported, *"I would only get Suboxone® if I knew that I wouldn't be able to find anything else in the next couple days; I would get my [Suboxone®] script and then keep about five, and then sell the other 25 to get heroin. I only kept those for the days I couldn't get heroin. I chose not to get Suboxone® this time [in treatment] to get clean because it doesn't work for me."* Participants continued to describe typical users of Suboxone® as heroin users who are trying to avoid withdrawal symptoms when heroin cannot be obtained, and those who use it as part of a physician-prescribed treatment program. A participant said, *"People were just using it [Suboxone®] to keep from getting sick. It's not a go-to choice drug."* A treatment provider agreed, reporting that the typical Suboxone® user is, *"the person who can't get their drug of choice."*

Reportedly, Suboxone® is used in combination with alcohol, marijuana and sedative-hypnotics. A participant reported, *"I would do a Xanax® with it [Suboxone®] to try to get high."*

Although, due to its "drug of last resort" nature, and its opiate-blocking effects, a participant noted that people who abuse Suboxone are often *"too sick to do anything else with it."*

### Sedative-Hypnotics
#### Historical Summary

In the previous reporting period, sedative-hypnotics (benzodiazepines, barbiturates and muscle relaxants) were highly available in the region. Participants most often reported the availability of these drugs as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Participants listed the most common sedative-hypnotics in terms of widespread use as Ativan®, Klonopin®, Soma®, Valium® and Xanax®. Law enforcement and treatment providers said this drug class was a constant enforcement challenge. The BCI Richfield Crime Lab reported that the number of sedative-hypnotic cases it processes had remained the same during the previous six months. While sedative-hypnotics were obtained on the street from dealers, participants continued to report obtaining them primarily from doctors, friends and family members, as well as from Internet pharmacies. The most common routes of administration were swallowing and snorting. Reportedly, intravenous injection of sedative-hypnotics was rare except for Xanax®, which heroin users were said to inject. Participants could not describe a typical user of sedative-hypnotics; participants and community professionals said these drugs were widely used by all groups of people.

#### Current Trends



Sedative-hypnotics (benzodiazepines, barbiturates and muscle relaxants) remain highly available in the region. Participants most often reported the current availability of these drugs as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was also '10'. More specifically, participants most often reported the availability of Ambien® as '5', Ativan® as '10', Klonopin® as '10', Soma® as '8', Valium® as '10' and Xanax® as '8'. Participants identified Valium® and Xanax® as the most popular sedative-hypnotics in terms of widespread use. Klonopin® was identified as a drug increasing in popularity. Law enforcement and treatment providers included sedative-hypnotics as a target of their diversion program because of their use by younger people and opioid abusers; they noted Soma®, Valium® and Xanax® to be particularly popular, assigning them availability scores of '7', '8' and '8' respectively. A treatment provider reported, *"Klonopin® and Xanax® are the biggest ones [most popular*

*sedative-hypnotics]."* A law enforcement officer explained that these drugs are widely available: *"Quite a few kids use this [sedative-hypnotics] … and anyone who says they're 'anxious'."* Collaborating data also indicated that sedative-hypnotics are highly available in the region. The Cuyahoga County Medical Examiner's Office reported that 12 percent of all deaths it investigated during the past six months were drug-related (had an illegal substance present or legal drug above the therapeutic range); in the last reporting period, 11.5 percent of all deaths were drug-related. Furthermore, the Coroner reported sedative-hypnotics as present in 27.5 percent of all drug-related deaths (this is a decrease from 30.8 percent from the previous six-month reporting period).

Most participants reported that the availability of sedative-hypnotics has increased during the past six months, and no participant or community professional felt that these drugs had become less available. A participant observed, *"[Sedative-hypnotics] they're more available. The doctors know what they're doing. They got pill mills. And everyone's got a 'disorder' now."* The Cuyahoga County Regional Forensic Science Lab reported that the number of sedative-hypnotic cases it processes has remained the same during the past six months, with the exception of an increase in cases related to Klonopin®.

Reportedly, many different types of sedative-hypnotics (aka "benzo's" and "downers") are currently sold on the region's streets. Participants reported the following sedative-hypnotics as available to street-level users (Note: When reported, current street names and prices are indicated in parentheses): Ambien® (sells for $2 per pill), Ativan® (sells for between $1-5 per pill), Klonopin® (aka "pins," sells for between $1-3 per pill), Soma® (sells for between $1-2 per pill), Valium® (5mg sells for between $1-4; 10 mg sells for between $6-10), Xanax® (aka "footballs" and "xani's;" 0.25 mg-1 mg sells for between $1-3; 2 mg, aka "bars" and "xanibars;" sells for between $3-5). While there were a few reported ways of consuming sedative-hypnotics, the most common routes of administration remain swallowing and snorting. Out of 10 sedative-hypnotic users, participants reported that six would swallow the pills, two would snort, one would smoke (with marijuana, aka "primo") and one would intravenously inject.

In addition to obtaining sedative-hypnotics on the street from dealers, participants continued to list the following primary sources for sedative-hypnotics: doctors, friends and family members. In addition, participants described some apparent homeless individuals selling or exchanging sedative-hypnotics for cigarettes. A participant explained getting his drugs from homeless people: *"You can get them [sedative-hypnotics] from 'bums' [homeless people] on the street … For real. It seems like 90 percent of the bums on the street are veterans who get this stuff."* Another participant said, *"You*

*find people walking down the street and they say, 'If you give me some cigarettes, I'll give you a xanibar.'"* It should be noted that participants indicated specifically that street-level "dope boys" do not typically carry this class of drug.

A profile of a typical user of sedative-hypnotics did not emerge from the data. Participants compared and contrasted younger versus older users, stating, *"I don't know too many older people who would abuse benzo's [benzodiazepines]; I know older people that sell their benzo's."* A treatment provider reported, *"Older people are getting them [sedative-hypnotics], but they're sitting in the medicine cabinet, and they take one every three months, and then the kids get them."* Law enforcement noted, *"A typical [sedative-hypnotic] user can look like you or me; anybody who can get a script; People who abuse heroin or opiates [abuse sedative-hypnotics]."* Reportedly, when used in combination with other drugs, sedative-hypnotics are most often used with alcohol, heroin, marijuana, and they are often taken after the use of prescription opioids to intensify or extend the high produced by the opioids. A participant stated, *"I abused [sedative-hypnotics] when I had something to mix them with."*

## Marijuana
### Historical Summary

In the previous reporting period, marijuana was highly available in the region. Participants most often reported the drug's availability as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Law enforcement and treatment providers also unanimously reported the drug's availability as '10.' The BCI Richfield Crime Lab reported that the number of marijuana cases it processes had remained the same during the past six months. According to participants, the quality of regular-grade and high-grade marijuana was most often '10' on a scale of '0' (poor quality, "garbage") to '10' (high quality). Many participants discussed the improvement in quality of marijuana over time. Participants reported that for regular-grade marijuana, a "blunt" (cigar) sold for between $3-5, and an ounce sold for between $80-150. High-grade marijuana continued to sell for significantly more: 1/8 ounce sold for between $50-60, and an ounce sold for between $320-380. The most common route of administration for marijuana continued to be smoking. A minority of participants mentioned oral ingestion of marijuana, specifically in brownies, butter, oils and creams. Notably, several participants mentioned the use of vaporizers. Participants were not able to establish a profile for the typical user of marijuana; they explained that marijuana use was so common that it was not limited to one type of user, age group or race.

### Current Trends

Marijuana remains highly available in the region. Participants most often reported the drug's current availability as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was also '10.' Marijuana is the most easily-obtained illegal drug in the region. Nearly every participant supplied a current availability score of '10.' Participants stated: *"Weed's [marijuana] everywhere; [Marijuana's current availability] it's a '20' on your [availability] scale."* Law enforcement officers and treatment providers agreed, and reported availability at '10' on the same scale. These community professionals reported, *"[Marijuana availability] it's off the charts. It's more available than crack; Marijuana is the common denominator. It seems to go with everything. [Treatment] clients always say their drug of choice and marijuana."* Media outlets across the state reported on significant arrests during this reporting period involving marijuana trafficking in the region. In November, the Ohio State Highway Patrol stopped a man in Lorain County for a routine traffic violation and confiscated 10 pounds of British Columbia marijuana, worth an estimated $50,000 (**www.nbc4i.com**, Nov. 3, 2011).

Participants and law enforcement reported that the availability of regular-grade marijuana has remained the same during the past six months, with some variability due to harvest times and drug seizures. A law enforcement officer reported, *"Reg [regular-grade marijuana] is about the same [in availability]. Sometimes you hear the market is dried up because of seizures or harvests. Lately [availability of regular-grade marijuana] it's a tad bit less."* Participants reported that the availability of high-grade marijuana has been dramatically increasing. A participant stated, *"High-grade [marijuana] is more available. It's getting better, and 'mids' [regular-grade marijuana] is not okay anymore."* Another participant said, *"It used to be lower-grade [marijuana] was all over, but in the last year, there's been so much high-grade the reggie [regular-grade marijuana] is scarce."* Several users spoke to the general preference for high-grade marijuana, with one stating, *"If you smoke 'loud' [high-grade marijuana], you're not going to smoke 'reg' anymore."* Another participant added, *"Dealers don't have to have a team meeting anymore to find you good stuff [high-grade marijuana]."* The Cuyahoga County Regional Forensic Science Lab reported that the number of marijuana cases it processes has increased during the past six months.

Most participants rated the quality of regular-grade marijuana as '8' and the quality of high-grade marijuana as '10' on a scale of '0' (poor quality, "garbage") to '10' (high

quality); the previous most common score was '10' for both grades of marijuana. Several participants explained that the quality of marijuana depends on whether the user buys "regular weed" or hydroponically grown (high-grade) marijuana. A few users felt the appearance of more high-grade marijuana in the region coincides with more states legalizing the drug for medical use, as explained by a participant: *"Since the medical marijuana thing, I've seen some really hairy, really crystally [very desirable] bud [marijuana]. I've been told that's medical [aka 'government weed']."* Quality scores were interpreted as a type of 'customer satisfaction' metric to describe how closely the marijuana advertised by dealers met the user's expectations. Many participants commented how quality changes are affecting availability: *"Nobody wants reg. I haven't seen anybody selling reg. My dealers usually sell 'dro' [hydroponically grown marijuana]; I think it's harder to find mids now, because nobody wants it."*

Current street jargon includes countless names for marijuana, with variants of "kush" and "purple haze" most commonly mentioned. Consumers listed the following as common street names for marijuana: "dirt," "kind bud," "reg," "reggie," "skunk" and "swag" for low- and mid-grade marijuana; "Afghani Kush," "AK-47," "Alaskan thunder f***," "blueberry yum-yum," "bubble kush," "chronic," "diesel," "dro," "fire," "Fruity Pebble dank," "lemon G," "Orange Crush," "purp," "schwag," "sour diesel," "strawberry cough" and "train wreck" for high-grade or hydroponically grown marijuana. Continuing with previously reported trends, fruit-flavored marijuana is popular, and branding with creative names helps to popularize certain strains. The price of marijuana depends on the quality desired. Participants reported regular-grade marijuana is the cheapest form: a blunt or two joints sell for $5; 1/8 ounce sells for $20; 1/4 ounce sells for $40; 1/2 ounce sells for between $45-55; an ounce sells for between $100-120; a pound sells for between $900-1,000. High-grade or hydroponically grown marijuana continues to sell for significantly more: a blunt or two joints sell for between $10-20; 1/8 ounce sells for between $60-65; 1/4 ounce sells for $125; an ounce sells for between $350-400; a pound sells for $2,400-2,600. While there were several reported ways of consuming marijuana, the most common route of administration remains smoking. Participants reported that 98 percent of marijuana is smoked, and only two percent is ingested in foods like brownies, waffles, pancakes or butters. A participant commented, *"Only hippie dudes will eat it [marijuana]."* Participants shared other observations about preferences: *"Older people smoke joints. Younger users smoke blunts and bongs [water pipes]; There are only blunts in the city. In the country, it's all bowls [pipes]. There are more cops in the city, and you can't throw your bowl out if you get caught."* Several participants continued to mention the use of vaporizers, which are devices that heat marijuana to precise temperatures and boil off marijuana compound's

vapor for inhalation, whereby the user receives a higher dose of THC (Tetrahydrocannabinol). A participant familiar with vaporizers explained that White users are more likely to use vaporizers than Black users.

A profile for a typical marijuana user did not emerge from the data, as participants most often continued to describe typical users of marijuana as *"everyone."* A treatment provider stated, *"The 55-year-old, blue-collar worker and the 17-year-old, and every age and race in between are who's using it [marijuana]."* A participant observed, *"Come to my church, and my pastor can sell you some 'reggie.'"* Treatment providers and law enforcement officers agreed that because penalties are so low for marijuana possession, many users *"don't consider it to even be a drug,"* as one commented. Law enforcement added, *"Other than alcohol, [marijuana] it's the number-one gateway drug. Kids 12-13 years old smoke weed."* Reportedly, marijuana is used in combination with almost every other drug, including: alcohol, crack and powdered cocaine (used to "come down"), Ecstasy (crushed and added to a blunt), hallucinogens (blunts dipped in liquid lysergic acid diethylamide ( LSD) and phencyclidine (PCP), aka "woo" and "wet"), heroin and prescription opioids. Reportedly, younger users are generally more likely to crush prescription opioids for use with marijuana. A participant reported, *"We would sprinkle pills [prescription opioids] on top [of marijuana while rolling a joint] and call it a 'spicy joint.'"*

**Methamphetamine**
*Historical Summary*

In the previous reporting period, methamphetamine was highly available in the region. Few participants had knowledge of methamphetamine outside of Cuyahoga and Geauga counties, but those with experience most often reported the drug's availability as '8' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Since few participants had personal knowledge of the drug, the availability ranking was usually qualified by participants to mean that the drug was highly available to a limited number of users who were connected with a tight-knit network of methamphetamine dealers and users. Law enforcement and treatment providers most often reported the drug's availability as '4.' They agreed with the participant view of availability; they thought that methamphetamine was highly available, but only to a select few. The BCI Richfield Crime Lab reported that the number of crystal and powdered methamphetamine cases it processes had increased during the previous six months. Reportedly, the most common route of administration for powder methamphetamine was snorting. Law enforcement and treatment providers thought typical users of methamphetamine to be White, economically disadvantaged and likely living in rural areas.

### Current Trends



Methamphetamine remains highly available in the region. Participants with experience buying methamphetamine most often reported the drug's current availability as '9' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was '8.' As was the case in the previous reporting period, participants who assigned an availability ranking usually qualified their scores to mean that methamphetamine is highly available to a limited number of users who are connected with a tight-knit network of dealers and users. Law enforcement most often reported the current availability of methamphetamine as '2;' the previous most common score was '4.' Participants reported that the drug is not widely available in the city of Cleveland, due to the higher population density that prohibits the operation of meth [methamphetamine] labs. One participant stated, *"[Methamphetamine] it's one of the things you don't hear about in Cleveland; you can't get that in the city."* A law enforcement officer working in the City of Cleveland remarked, *"You keep hearing about the meth wave that's supposed to be coming in. [Methamphetamine] it's on the outskirts of Geauga County, Lake County and some places in Cuyahoga County, but we haven't seen it."* However, participants indicated methamphetamine can be obtained through personal connections with methamphetamine dealers and users. In two separate focus groups, participants noted that when the drug is available in Cleveland, it is reportedly coming from areas east of the city, particularly Lake and Ashtabula counties. A couple of participants said they would engage directly with methamphetamine "cooks" to obtain the drug: *"If I didn't have a lot of money, I would have gotten a box of Sudafed® to trade [for methamphetamine]; A lot of meth guys only get pills [pseudoephedrine] to trade for meth."* Media outlets across the state reported on significant arrests during this reporting period involving methamphetamine in the region. In October, *The Morning Journal* reported that Lorain County Sheriff's deputies found chemicals and equipment to manufacture methamphetamine after a car was pulled over for fictitious license plates (**www. morningjournal.com**, Oct. 27, 2011).

Participants most often reported that the availability of methamphetamine has increased during the past six months. A participant explained, *"There are more houses [methamphetamine labs] in Madison and Perry [Lake County], and it's moving this way [toward Cleveland]."* A participant commented, *"It's gotten easier to get [methamphetamine] within the past year. It's getting more popular."* Another participant mentioned a recent experience, *"I don't really have to know anybody. I was approached the first time I ever saw it [methamphetamine]."* Lorain County law enforcement also noted an increase in methamphetamine activity: *"In the last two weeks we've had three [methamphetamine] lab busts. That is three more than we've had in the last two years."* The Cuyahoga County Regional Forensic Science Lab reported that the number of crystal and powdered methamphetamine cases it processes has decreased during the past six months.

Only two participants were able to rate the quality of methamphetamine, supplying quality scores of '5' and '6' on a scale of '0' (poor quality, "garbage") to '10' (high quality); previously, the quality score of methamphetamine was '7.' Participants reported that methamphetamine is primarily available in a home-cooked, powdered form. Crystal methamphetamine, perceived to have a higher purity, is reportedly an exotic variant of the drug that would be imported from the western part of the country. A participant explained, *"The stuff [methamphetamine] from Madison, Ashtabula and Perry wasn't as fine as the stuff I had in Arizona. They're making it here … what they make here is a white powder."* A law enforcement officer's observations aligned with participants': *"We had a group from Mexico that was trying to establish a super [methamphetamine] lab here. The purity rate was 98.3% compared to the [home-cooked] powder stuff. If they had gotten established, it would have taken off."*

Current street jargon includes many names for methamphetamine. The most commonly cited names were "crank" and "crystal." Participants listed the following as other common street names: "bulb," "gear," "home cooked," "ice," "monster," "red dope," "speed" and "tweak." Several participants had experience buying the drug, and they reported that a gram sells for between $40-120; 1/16 ounce sells for $70; 1/8 ounce sells for between $140-150. A participant explained that like other drugs, methamphetamine pricing depends on quality, and that the purer, crystal form of the drug costs more. Reportedly, the most common routes of administration for powdered methamphetamine are snorting and smoking. Out of 10 methamphetamine users, five would snort the drug, four would smoke and one would intravenously inject.

A profile for a typical methamphetamine user did not emerge from the data, but participants supplied their perceptions about those who use the drug. Some participants thought of methamphetamine as a rural drug. One participant said, *"[Methamphetamine] it's more of a country thing … out where I live, we have a lot of labs in the trailer parks."* Others participants thought methamphetamine also common in suburban users as well as rural users, and many participants believed the drug not to be typically used by city dwellers. One participant said, *"Nobody that walked through those doors [at this facility in Cleveland] uses meth."* A treatment provider felt the drug is, *"very popular among*

gay males in Lakewood [Cuyahoga County, west of Cleveland]." Reportedly, methamphetamine is used in combination with depressant drugs like alcohol, heroin and sedative-hypnotics, which are used to "come down" from the effects of methamphetamine.

### Ecstasy
#### Historical Summary

In the previous reporting period, Ecstasy (methylenedioxymethamphetamine: MDMA, or other derivatives containing BZP, MDA, and/or TFMPP) was highly available in the region. Participants most often reported the drug's availability as '9' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Both participants and law enforcement agreed that the drug was most commonly available in dance clubs and nightclubs. The BCI Richfield Crime Lab reported that the number of Ecstasy cases it processes had decreased during the previous six months. Participants reported that a "double stack" (moderate dose) Ecstasy tablet sold for between $10-15, and a "triple stack" (high dose) sold for between $15-20. The BCI Richfield Crime Lab cited methcathinone analogs (psychoactive stimulants) and other clandestine uncontrolled substances (bath salts) as cutting agents for Ecstasy. Participants described typical users of Ecstasy as young people in their early to mid-20s.

#### Current Trends

Ecstasy (methylenedioxymethamphetamine: MDMA, or other derivatives containing BZP, MDA, and/or TFMPP) remains highly available in the region. Participants most often reported the drug's current availability as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was '9.' Law enforcement and treatment providers did not rate the current availability of Ecstasy. Media outlets throughout the state reported on a significant arrest during this reporting period involving Ecstasy in the region. In November, the Ohio State Highway Patrol confiscated 200 Ecstasy pills, along with two grams of heroin in Lorain County during a routine traffic stop (**www.nbc4i.com**, Nov. 3, 2011). Participants reported that the availability of Ecstasy has remained the same during the past six months; however, a few participants felt that the purest form of Ecstasy (aka "Molly") has been becoming more available as knowledge about the drug grows. A participant commented, *"Once you take a hit [of Molly] you're going to be back [for more] in 10 minutes."* The Cuyahoga County Regional Forensic Science Lab reported that the number of pure Ecstasy cases it processes has decreased while the number of piperazine cases (synthetic substances similar to Ecstasy) has increased during the past six months.

Participants most often rated the current quality of Ecstasy as '10' on a scale of '0' (poor quality, "garbage") to '10' (high quality), even though several participants felt that quality has been decreasing. Participants reported, *"I stopped doing it [Ecstasy] because it was garbage; I would not touch it [Ecstasy] again. I don't know what's in it now."* Participants did not believe that it is possible to assess ingredients or quality before taking the drug: *"You don't know [what's in Ecstasy] unless you have a close drug dealer; Some [Ecstasy] have meth effects, some have downer effects."*

Current street jargon includes only a few names for Ecstasy. The most commonly cited names were "X" and "Molly." Participants said Molly is sold as a yellowish loose powder, and that Ecstasy is sold as small colored tablets that feature popular images or logos: Transformers, Playboy® bunnies, Flintstones™, dolphins or hummingbirds. Participants explained the differences among tablets: *"You just choose [Ecstasy] based on how you want to feel [and] based on what it looks like; You can get a testing kit at a head shop or look up the [Ecstasy] stamp online; If it [Ecstasy] had crystals in it, it would get you messed up."* A participant commented, *"The stamp tells you how [Ecstasy] it's supposed to make you feel, but they're all the same."* Participants reported that a single Ecstasy tablet (low dose) generally sells for between $2-10; a double stack sells for between $5-10; a triple stack sells for between $8-12. When purchased in large quantities, the price is reportedly $0.70 per tablet. Molly is the most expensive form of Ecstasy and is often pre-bagged as "rails" (approx. 1/10 gram): 1/10 gram sells for between $10-12; a gram sells for between $100-150. While there are few reported ways of administering Ecstasy, the most common route of administration is by mouth. Out of 10 Ecstasy users, participants reported that approximately nine would eat Ecstasy and one would snort it. Participants also mentioned other less common methods; some said users "parachute" (wrap a crushed tablet in tissue and swallow it), while others said users insert the tablet anally or dissolve it in warm water and take it like a shot of alcohol.

According to participants, these drugs are most often obtained from friends and dealers via phone call or at night clubs. Several users also described the comeback of raves featuring Ecstasy. A participant reported, *"In the past three months, I've heard about four or five raves in Kent and Cleveland with music glow sticks and everything. It was in the paper even."* A law enforcement officer noted, *"[Our service area] doesn't really have any clubs so that's one of the reasons we don't have a lot of Ecstasy."* A profile for a typical Ecstasy user did not emerge from the data, but the drug was said to be popular in both rural and urban areas. Participants and law enforcement perceived that the drug is more popular with younger users, 18-25 years old. A law enforcement officer stated, *"[Ecstasy] it's more of younger person's drug."* Reportedly, Ecstasy is used

in combination with alcohol and other depressant drugs, tobacco and VIAGRA®. Users reported the need to follow Ecstasy with a counteracting drug if it contained a stimulant or a sedative. A participant explained, *"You take downers when [Ecstasy] is mixed with coke or meth."*

**Prescription Stimulants**
***Historical Summary***

In the previous reporting period, prescription stimulants were highly available in the region. Participants rated the availability of these drugs as '8' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). The BCI Richfield Crime Lab reported that the number of prescription stimulant cases it processes had remained the same during the past six months. Participants reported infrequently buying these drugs, so only one price was mentioned for prescription stimulants: Adderall® 30 mg sold for $5. Reportedly, these drugs were obtained from friends and drug dealers, and were favored by young people. Participants stated that pills were most often crushed and snorted or dissolved and then intravenously injected.

***Current Trends***

Prescription stimulants remain highly available in the region. While few participants had knowledge of these drugs, those with experience rated the current availability of prescription stimulants as '9' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was '8.' Participants reported Adderall®, Concerta® and Vyvanse® as most popular in terms of widespread use and generally readily available. A participant reported, *"I was shooting it [prescription stimulants] for a while. It was a phone call away. It's out there."* Another participant reported, *"I know people that had been purchasing it [prescription stimulants] for school. My son is on it, and someone asked me for it."* Ritalin® is reportedly difficult to obtain due to a national shortage of the drug. Treatment providers most commonly supplied an availability score of '9.' Law enforcement did not supply data on prescription stimulants. A treatment provider stated, *"[Prescription stimulants] it's a friend-to-friend drug. It's big by Case [Western Reserve University] and John Carroll [University]. You can't even get it at any pharmacy. There is a shortage on any immediate-release pills."* The Cuyahoga Regional Forensic Science Lab reported that the number of prescription stimulant cases it processes has increased during the past six months.

Participants remarked on the high level of abuse among high school- and college-aged people. One participant said, *"[Students] use them [prescription stimulants] to study and focus."* A treatment provider reported, *"I don't see clients who say [prescription stimulants] it's their drug of choice, or that*

*they need Adderall® to survive. Instead, I see a lot of drinking [alcohol] with it, a lot of using it for studying … just abuse, but not necessarily dependence."* A couple of participants noted that these drugs are more popular with mothers of children with prescriptions and with younger females. A participant reported, *"Vyvanse® and Adderall® are really big with girls. It makes them feel like they're on coke."* Treatment providers reinforced the connection between school and stimulants: *"I know [prescription stimulants] it's in all the school systems. I have clients that say their kids are all on this stuff. They're not taking the prescriptions, but it seems like everyone else is."*

No slang terms or common street names were reported for prescription stimulants. Reportedly, prescription stimulants sell for between $2-5 per pill. According to participants, these drugs continue to be obtained from friends and drug dealers. While there were a few reported ways of administering prescription stimulants, the most common route of administration remains snorting. Out of 10 prescription stimulant users, participants reported that approximately eight would snort and two would orally ingest them. Reportedly, prescription stimulants are used in combination with alcohol, marijuana and prescription opioids.

**Bath Salts**
***Historical Summary***

In the previous reporting period, bath salts (synthetic compounds containing methylone, mephedrone or MDPV) were highly available in the region. Participants reported the availability of these drugs as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Law enforcement and treatment providers also most often reported availability as '10.' Participants and community professionals said the high availability was due to bath salts' legal status, often being sold in head shops. Bath salts sold for approximately $40 per 500 mg. The most common route of administration for this drug was smoking and snorting. A profile for a typical bath salts user did not emerge from the data; participants and community professionals only agreed that users of bath salts were younger than typical users of other drugs.

***Current Trends***

Bath salts (synthetic compounds containing methylone, mephedrone or MDPV) remain highly available in the region. Participants reported the current availability of these drugs as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Despite recent legislation that has banned the sale of these synthetic chemicals, packaged products remain widely available from the same convenience stores that previously sold bath salts. Participants frequently made comments like, *"Head*

shops follow the rules, but [other] stores will continue to sell it [bath salts]; [Bath salts] it's still sold in stores. They might say they don't sell it, but it's behind the counter." Participants also reported obtaining the drug online and in bulk from certain dealers. A participant reported, "My friend was buying it [bath salts] online in larger quantities. It comes in one big chunk … then he would break it down and put it in bags." Law enforcement officers and treatment providers reported the current availability of these drugs as '9.' A law enforcement enforcement official reported, "[Bath salts] it's still out there. They have a different way of marketing, but it's there." A treatment provider said, "My clients said it [bath salts] was really available, and you can still get them at the corner store." A law enforcement officer noted that a nearby hospital had 40 bath salts-related emergency cases in one month. A treatment provider reported, "In the last two months, I have had three clients that have been hospitalized for bath salts. One was in the ICU [Intensive Care Unit] twice and is finally in treatment for it. The other had psychotic features for weeks afterward." Both participants and law enforcement reported that the availability of bath salts has remained the same during the past six months. The Cuyahoga Regional Forensic Science Lab reported that the number of bath salts cases it processes has increased during the past six months.

No slang terms or common street names were reported for bath salts. Bath salts sell for between $15-25 per 1/2 gram; a gram sells for between $20-40. Participants did not report a spike in prices after the drug was made illegal in October 2011. A law enforcement officer stated, "[Bath salts] it's being packaged and brought in here. The law has helped, but it's still being imported." Law enforcement officers felt that if the importation of bath salts is disrupted, the price will likely rise. The drug is most typically smoked or snorted, although intravenous injection and oral ingestion were also reported in a minority of cases. Law enforcement and treatment providers reported that bath salts are typically used by younger users. A treatment provider said, "Last week I was explaining what it [bath salts] was to some of my clients, and the older clients over about 25 years old, didn't know what it was. The younger ones were explaining what it was." Another treatment provider shared a similar experience, remarking, "I had one [older] client who used it [bath salts] accidentally. The guy in the store told him it was fake cocaine, and it was legal. He ended up in the psych unit for three days. My clients talk about it being heard in the news, but they don't admit to using it … but the younger clients know who's using it and what stores have it." Treatment providers described users to be more likely younger than 30 years of age, White and suburban. A law enforcement officer described typical use similarly: "It's a younger group using it [bath salts]. I haven't seen 30s [those in their 30s] or older [using bath salts]. It's mostly teens and 20s [who use bath salts]." Bath salts were not reported to be used in combination with other drugs.

## Other Drugs
### Historical Summary

In the previous reporting period, participants and professionals listed the following other drugs as present in the region, but these drugs were not mentioned by the majority of people interviewed: Ketamine (aka "special K"), GHB (gamma-hydroxybutyrate), hallucinogens [DMT (dimethyltryptamine), LSD (lysergic acid diethylamide) and psilocybin mushrooms], PCP (phencyclidine) and synthetic marijuana ("K2" and "Spice"). Ketamine was rarely available in the region. Participants most often reported the drug's availability as '0' or '2' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). GHB was moderately available in the region. Participants on the east side of Cleveland most often reported its availability as '6;' DMT was reportedly also available on the west side of the region. Law enforcement most often reported the drug's availability as '1.' Due to two arrests in the prior three months for DMT possession, law enforcement thought the drug's availability was trending upward. Reportedly, the drug cost $50 per gram, and it was sold as a powder. The most common method of administration was snorting. LSD was highly available in the region according to the few participants with experience purchasing the drug. Participants most often reported LSD's availability as '8.' Only three participants were able to rate the quality of LSD, and they gave scores ranging from '7' to '9' on a scale of '0' (poor quality, "garbage") to '10' (high quality). Participants disagreed as to whether LSD quality had remained the same, increased or decreased during the previous six months. Participants did not provide pricing information, but they said that LSD was available in microdots (small tablets) and sugar cubes. Psilocybin mushrooms were relatively rare in the region, and participants most often reported the drug's availability as '3.' Only four participants were able to rate the quality of psilocybin mushrooms, and they gave quality scores ranging from '7' to '9.' Street prices for psilocybin mushrooms were consistent among participants with experience buying the drug: 1/8 ounce sold for $40. Oral ingestion was the most commonly reported route of administration. PCP was highly available in the region. Participants most often reported availability as '10.' As with the previous reporting period, most participants reported obtaining PCP from an area called "Water World" on Cleveland's east side. Most participants generally rated the quality of PCP as '10.' PCP was commonly sold on a per dip basis or as ready-to-smoke tobacco or marijuana. Rarely, the drug was sold as a crystalline powder. Pricing was consistent with the previous reporting period: one dip of a cigarette sold for between $10-20. Synthetic marijuana was highly available in the region. Participants frequently mentioned rising popularity of the drug due to the belief that synthetic

marijuana delivered a marijuana-like high but could not be detected by urine drug screens. Like marijuana, the most popular route of administration for this drug was smoking.

### Current Trends

Participants and professionals listed a variety of other drugs as being present in the region, but these drugs were not mentioned by a majority of the people interviewed. DMT (dimethyltryptamine), a naturally occurring psychedelic compound, is highly available in the region. Participants most often reported its availability as '9' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Some participants thought DMT to be an emerging drug in the region. A participant stated, *"I've been hearing a lot about it [DMT] coming up."* The drug is obtained from drug dealers and other users, as one participant explained, *"It [DMT] comes from people that know how to make it. They use it."* A participant described two variants of the drug: a natural compound and a compound made with synthetic chemicals. According to participants, the natural version is a white powder derived from, *"plants and natural ingredients,"* which was reported to be the, *"healthier way"* to create DMT. The other method utilizes household chemicals such as paint thinner; this form of DMT is a yellow-tinted powder that has a slight odor. A participant noted that the white or "natural" form is gaining in popularity and that the quality is improving as the knowledge of the drug-manufacturing process improves. Participants with knowledge of the "natural" form of the drug most often rated its quality as '8' on a scale of '0' (poor quality, "garbage") to '10' (high quality); quality of the synthetic form of the drug was most often rated '7'. No street names were mentioned for DMT. Participants reported that 1/10 gram of DMT sells for $10, and a gram sells for $150. Reportedly, the "natural" form of DMT sells for twice as much as the synthetic varieties. Participants reported that the most common routes of administration are smoking or snorting. Occasional use by mouth was also mentioned. The drug was said to be popular with, *"Kids who like to use hallucinogens. [DMT] it's up and coming,"* and with *"show kids,"* meaning younger people who attend concerts. Another participant talked about the wide variety of users: *"Sixteen to twenty-five year olds are the people who use it [DMT]."* A participant reported that marijuana and LSD are used in combination with DMT because they, *"enhance the effect"* of the drug.

PCP (phencyclidine) remains highly available in certain areas of Cleveland. Participants most often reported current availability as '8' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was '10.' As with the previous reporting period, most participants reported obtaining PCP (aka "wet" or "woo") from an area called "water world" on Cleveland's east side. Liquid PCP is still commonly sold on

a per dip basis or as ready-to-smoke tobacco or marijuana. The crystalline powder form was not reported. The Cuyahoga Regional Forensic Science Lab reported that the number of PCP cases it processes has increased during the past six months. On a scale of '0' (poor quality, "garbage") to '10' (high quality) two participants supplied PCP quality scores of '7' and '8'. A participant explained, *"It's only liquid [PCP] that's sold. It's embalming fluid, but they say now it's not like it used to be. [Dealers] they're cutting it with other stuff and it's not as good."* A law enforcement officer noted, *"We hear a lot about it [PCP] from suspects who mix it or they say they were high on it, but we don't actually encounter it."* Pricing is consistent with the previous reporting period: one dip of a cigarette sells for between $15-20. Law enforcement reported the drug to be most popular among users in their 30s-50s. PCP is most commonly used with alcohol, marijuana and tobacco.

Synthetic marijuana ("K2" and "Spice") remains highly available in the region. Unlike previous reporting periods, many participants had heard of synthetic marijuana. Participants continued to attribute the popularity of synthetic marijuana to the continued belief that the drug delivers a marijuana-like high but cannot be detected in urine drug screens. Despite recent legislation that has made synthetic marijuana illegal, participants most often reported current availability of the drug as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); previously, participants said synthetic marijuana was highly available, but did not assign an availability score. A participant explained, *"People were stocking up before they [synthetic marijuana] got illegal."* Reportedly, synthetic marijuana is still widely available from head shops, convenience stores and independently owned gas stations. A participant reported, *"I just went into a store that had it [synthetic marijuana] last week."* Another participant added that users must develop a relationship with the store owners before purchasing the product: *"They gotta know your face, and you have to know what to ask for."* Treatment providers most often reported the current availability of synthetic marijuana as '9'; however, many thought that the drug is not as popular as before the ban went into effect in October 2011. A treatment provider said, *"[Synthetic marijuana] it's illegal, and clients could be tested for it. They [clients] think, 'I can't use it [synthetic marijuana] now because I could be caught with it.' That was the attraction … it was a cheap, legal high. We are testing for it on toxicity screens, and parole officers test for it, so it's causing the clients to forget about it."* The Cuyahoga Regional Forensic Science Lab reported that the number of synthetic marijuana cases it processes has increased during the past six months. A crime lab professional reported, *"Synthetic cannabinoids, although listed [prohibited by law] are an epidemic situation in Cuyahoga County."* Participants with knowledge of the drug rated its quality as '9' on a scale of '0' (poor quality, "garbage")

to '10' (high quality). Reportedly, the most available brands of synthetic marijuana are "Mr. Nice Guy" and "Black Magic." Participants reported that a gram of synthetic marijuana sells for between $1.50-3. Like marijuana, the most popular route of administration for this drug remains smoking. Treatment providers cited the drug's popularity with all races and socio-economic groups, but that it is most favored by younger users (between 25-30 years).

Seroquel® (quetiapine), an antipsychotic medicine, was reported to be widely available and occasionally abused by the 18-25 year-old participants interviewed. Participants reported obtaining the drug from friends and doctors. One participant said, *"Everybody in the world is bipolar, so they get it [Seroquel®]."* Another participant explained, *"You can't get it from a dealer. You don't even buy Seroquel®. People give it away. It's like a cigarette. You trade it."* Reportedly, abuse of this drug produces a detached, "floaty" feeling and reduced or eliminated anxiety. Participants most often reported the availability of Seroquel® as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Seroquel® 10 mg and 100 mg sell for between $7-$20 per pill. The most common route of administration is oral ingestion. Several participants also mentioned dissolving the pills in liquid (orange juice or sports drinks). Reportedly, the drug is used in combination with alcohol, marijuana and prescription stimulants.

### Conclusion

Bath salts, crack cocaine, Ecstasy, heroin, marijuana, methamphetamine, PCP (phencyclidine), powdered cocaine, prescription opioids, prescription stimulants, sedative-hypnotics and synthetic marijuana remain highly available in the Cleveland region; also highly available for the first time is DMT (dimethyltryptamine), a psychedelic compound with natural and synthetic versions. Some participants thought DMT to be an emerging drug in the region; the drug is popular among younger users (16-25 years of age). Increases in availability exist for heroin and marijuana, and data indicate likely increases in availability for methamphetamine and sedative-hypnotics. While prescription opioids generally remain highly available, participants and community professionals noted that methadone is gaining in popularity. Both law enforcement and treatment providers reported that methadone is increasingly prescribed for pain. The majority of participants and community professionals reported that the availability of heroin has increased during the past six months; no respondent felt heroin's availability has decreased. Participants reinforced two trends identified in previous reports: increased competition among dealers to secure steady heroin users and increased demand for heroin.

Despite local differences, brown and white powdered forms of the drug are easily obtained, and are perceived to be used at epidemic levels. When asked to identify the most urgent or emerging drug trends, law enforcement continued to cite heroin trafficking as a primary concern. Marijuana is the most easily obtained illegal drug in the region. Participants reported that the availability of high-grade marijuana has been dramatically increasing. The Cuyahoga County Regional Forensic Science Lab reported that the number of marijuana cases it processes has increased during the past six months. While methamphetamine appears not to be available in the city of Cleveland for street purchase, the drug remains highly available to a limited number of users who are connected with a tight-knit network of dealers and users. Participants most often reported that the availability of methamphetamine has increased during the past six months; Lorain County law enforcement also noted an increase in methamphetamine activity. Most participants reported that the availability of sedative-hypnotics has increased during the past six months. Klonopin® was identified as a drug increasing in popularity; The Cuyahoga County Regional Forensic Science Lab reported an increase in cases related to Klonopin®. Despite recent legislation that has banned the sale of certain synthetic chemicals, bath salts and synthetic marijuana remain widely available from the same retail outlets (head shops, convenience stores and gas stations) that sold the products previously. A participant reported, *"[Bath salts] it's still sold in stores. They might say they don't sell it, but it's behind the counter; People were stocking up before they [synthetic marijuana] got illegal."*