




Ohio Substance Abuse Monitoring Network

# Drug Abuse Trends in the Cleveland Region




**Regional Epidemiologist:**
**Jamie Cammilletti**, MPH

### Data Sources for the Cleveland Region

This regional report was based upon qualitative data collected via focus group interviews. Participants were active and recovering drug users recruited from alcohol and other drug treatment programs in Cuyahoga, Lake, Lorain, Medina and Wayne counties. Data triangulation was achieved through comparison of participant data to qualitative data collected from regional community professionals (treatment providers and law enforcement) via focus group interviews, as well as to data surveyed from Cuyahoga County Medical Examiner's Office, Cuyahoga County Crime Lab, Lake County Crime Lab, Ohio Bureau of Criminal Investigation (BCI) and Ohio Department of Public Safety (ODPS), which logs drug task force seizures from across Ohio. All secondary data are summary data of cases processed from January to June 2018. In addition to these data sources, Ohio media outlets were queried for information regarding regional drug abuse for July through December 2018.

*Note:* OSAM participants were asked to report on drug use/knowledge pertaining to the past six months prior to the interview; thus, current secondary data correspond to the reporting period of participants.

**OSAM Staff:**

**R. Thomas Sherba**, PhD, MPH, LPCC
OSAM Principal Investigator

**Sarah Balser**, MPH, MSW, LSW, CHES
OSAM Coordinator

**Jessica Linley**, PhD, MSW, LSW
OSAM Quantitative Data Analyst

# Regional Profile

| Indicator[1] | Ohio | Cleveland Region | OSAM Drug Consumers |
|---|---|---|---|
| Total Population, 2017 | 11,689,442 | 2,272,467 | 47 |
| Gender (female), 2017 | 51.0% | 51.6% | 31.9% |
| Whites, 2017 | 82.2% | 76.7% | 72.3%[2] |
| African Americans, 2017 | 12.9% | 18.7% | 19.1%[2] |
| Hispanic or Latino Origin, 2017 | 3.8% | 5.4% | 6.4%[3] |
| High School Graduation Rate, 2013-17 | 89.8% | 89.1% | 77.3%[4] |
| Median Household Income, 2013-17 | $52,407 | $59,400 | $16,000 to $20,999[5] |
| Persons Below Poverty Level, 2013-17 | 14.0% | 14.5% | 46.8%[6] |

[1] Ohio and Cleveland region statistics were derived from the most recent US Census; OSAM drug consumers were participants for this reporting period: June 2018 - January 2019.
[2] Race was unable to be determined for 1 participant due to missing and/or invalid data.
[3] Hispanic or Latino Origin was unable to be determined for 1 participant due to missing and/or invalid data.
[4] Education level was unable to be determined for 3 participants due to missing and/or invalid data.
[5] Participants reported income by selecting a category that best represented their household's approximate income for the previous year. Income was unable to be determined for 4 participants due to missing and/or invalid data.
[6] Poverty status was unable to be determined for 4 participants due to missing and/or invalid data.




*Not all participants filled out forms completely; therefore, numbers may not equal 47.
**Some respondents reported multiple drugs of use during the past six months.
***Other drugs included: lysergic acid diethylamide (LSD) and Neurontin® (gabapentin).

## Historical Summary

In the previous reporting period (January – June 2018), crack cocaine, fentanyl, heroin, marijuana, methamphetamine and Neurontin® (gabapentin) remained highly available in the Cleveland region. Changes in availability during the reporting period included: increased availability for methamphetamine and powdered cocaine; decreased availability for prescription opioids; and possible decreased availability for Suboxone® (buprenorphine).

While heroin and fentanyl remained highly available, respondents indicated that fentanyl was easier to obtain than heroin. Moreover, the consensus was that heroin not adulterated with fentanyl had become difficult to obtain. Participants and community professionals continued to report powdered heroin as the most available type of heroin in the region; and they noted that white powdered heroin was typically cut with fentanyl or was fentanyl sold in place of heroin. Participants discussed that the overall quality of heroin was poor; hence, fentanyl was added to heroin to boost its potency. Participants and community professionals also reported the presence of heroin cut with carfentanil (synthetic opioid significantly more potent than fentanyl).

Participants reported that the availability of fentanyl had increased during the reporting period, attributing the increase to greater demand for the drug, while noting that fentanyl was considerably cheaper than heroin; and thus, extremely appealing to dealers who could sell it as heroin at heroin prices. Participants explained that fentanyl was shorter acting than heroin, meaning the high it produced did not last as long, so users needed more of the drug to maintain a high and to avoid experiencing withdrawal symptoms.

Corroborating data indicated that fentanyl was highly available in the region. Cuyahoga County Medical Examiner's Office reported that 53.8% of the 316 drug overdose deaths it processed during the reporting period involved fentanyl/fentanyl analogues; 29.7% of these deaths involved carfentanil. In addition, all participating crimes labs reported that the incidence of carfentanil cases they processed from this region had increased during the reporting period. Law enforcement warned that fentanyl was used to adulterate many drugs, not just heroin. One law enforcement officer stated, *"They're putting this fentanyl in cocaine, they're putting it in heroin … everything has fentanyl."* A few participants discussed that some drug dealers pressed counterfeit pills with fentanyl and sold them as prescription opioids.

The availability of illicit stimulant drugs, particularly that of methamphetamine, had increased during the reporting period. Crystal methamphetamine continued to be the more available form of methamphetamine in the region. Law enforcement discussed that the drug was brought into the region from other states and Mexico, sometimes shipped via U.S. postal services. They also discussed that there was an increase in the number of dealers selling the drug and a trend in dealers selling methamphetamine as other drugs such as "molly" (powdered MDMA).

All respondent groups noted heroin users were transitioning to methamphetamine and cocaine use out of fear of fentanyl overdose and due to medication-assisted treatment (MAT) with Vivitrol®, which, while blocking opiate use, allowed for stimulant use. Treatment providers commented that a high proportion of users entering treatment had methamphetamine in their recent use history. One provider said, *"It's very rare to see a new client coming in that doesn't test positive for meth."* Treatment providers also noted that methamphetamine was particularly difficult for clients to stop using.

Lastly, corroborating data indicated that illicit stimulant drugs were highly available in the region. Cuyahoga County Medical Examiner's Office reported that 47.5% of the 316 drug overdose deaths it processed during the reporting period involved cocaine. In addition, Lake County and Cuyahoga County crime labs reported that the incidence of methamphetamine cases they process had increased during the reporting period. Participants and community professionals most often described typical methamphetamine users as white people, aged 20-30s and heroin users.

## Current Trends

### Powdered Cocaine

Powdered cocaine remains moderately to highly available in the region. Participants most often reported the drug's current availability as '10' on a scale of '0' (not available,

impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was also '10.' One participant stated, *"Any area I go to, it's really accessible."*

Treatment providers most often reported the current availability of powdered cocaine as '9,' while law enforcement most often reported it as '6;' the previous most common scores were '8' for treatment providers and '6-7' and '8-9' for law enforcement. Treatment providers commented: *"If someone wants it, they can get it; It's the main ingredient in 'crack' (crack cocaine), you can find* [crack] *anywhere; I'll go out to the bars and there's people selling* [powdered cocaine] *at the bars."* However, one provider remarked, *"It's easier for somebody to scrape up $20 for crack than $100 for a gram* [of powdered cocaine]*."* A law enforcement commented, *"It's fairly available, but it doesn't seem to be as available as crack cocaine or heroin or even pills."*

Corroborating data indicated that powdered cocaine is available in the Cleveland region. Cuyahoga County Medical Examiner's Office reported that 42.1% of the 259 drug-related deaths it recorded this reporting period involved cocaine (powdered and/or crack cocaine). In addition, the Ohio Department of Public Safety (ODPS) reported seizing 38.5 kilograms (85.0 lbs.) of powdered cocaine from this region during the past six months.

Media outlets reported on law enforcement seizures and arrests in the region this reporting period. Cleveland Police, responding to reports of an unresponsive body in a downtown hotel room, found a man dead from an apparent drug overdose; officers recovered three baggies of cocaine from the hotel room (www.cleveland.com, July 17, 2018). North Ridgeville Police (Lorain County), responding to a call from a gas station clerk about an impaired driver, caught up with and stopped a vehicle along State Route 57, seizing a small amount of cocaine; officers arrested the driver of the car for traffic violations, possession of a controlled substance, drug paraphernalia, failure to comply with the arresting officer's orders and OVI (operating a vehicle under the influence of alcohol and/or other drugs) (www.cleveland.com, July 29, 2018).

Participants and community professionals reported that the availability of powdered cocaine has remained the same during the past six months. A law enforcement commented, *"Availability doesn't seem to have changed … it's prevalent, but it's not the most prominent drug."*

Ohio Bureau of Criminal Investigation (BCI) and Lake County crime labs reported that the incidence of cocaine cases they process from this region has decreased during the past six months, while Cuyahoga County Crime Lab reported that the incidence of cocaine cases it processes has increased. The labs do not differentiate between powdered and crack cocaine.

| Powdered Cocaine | Reported Availability Change during the Past 6 Months | |
|---|---|---|
| | Participants | No change |
| | Law enforcement | No change |
| | Treatment providers | No change |

Participants most often rated the current overall quality of powdered cocaine as '6' on a scale of '0' (poor quality, "garbage") to '10' (high quality); the previous most common score was '8.' Participants observed: *"I know one guy with the best stuff, and I know one guy with the worst stuff.… You don't know what you're getting; By the time it gets in the hands of the users, it's been 'cut' (adulterated) so many times, it doesn't have a high purity at all."*

Participants discussed adulterants (aka "cuts") that affect the quality of powdered cocaine and they reported the top cutting agent for the drug as fentanyl. Other adulterants mentioned included: Miami Ice® (powder found at head shops and sold as carpet deodorizer) and NoDoz® (caffeine supplement). Participants reported: *"A lot of times they like to cut it with pills called NoDoz®, it's kind of like a speed pill, but you can definitely tell the difference between an actual 'coke' (powdered cocaine) high compared to coke that's cut with NoDoz®; Miami Ice®, it gives you the same numbness feeling as if it was real cocaine."* Overall, participants reported that the quality of powdered cocaine remained the same during the past six months.

| Powdered Cocaine | Cutting Agents Reported by Crime Lab |
|---|---|
| | atropine (prescription heart medication) |
| | caffeine |
| | levamisole (livestock dewormer) |
| | local anesthetic (benzocaine, lidocaine and procaine) |
| | phenacetin (banned analgesic) |
| | triacetin (triglyceride) |

Reports of current prices for powdered cocaine were variable among participants with experience buying the drug. Reportedly, the most common quantity of purchase is a gram. Overall, participants reported that the price of powdered cocaine has remained the same during the past six months. However, a participant added, "[Price] *just depends on who you go to.*"

| Powdered Cocaine | Current Street Prices for Powdered Cocaine | |
|---|---|---|
| | A gram | $50-100 |
| | 1/16 ounce (aka "teener") | $100-150 |
| | 1/8 ounce (aka "eight ball") | $150-250 |

The most common route of administration for powdered cocaine remains snorting. Participants estimated that out of 10 powdered cocaine users, eight would snort and two would intravenously inject (aka "shoot") the drug. One participant remarked, *"Most people snort it."*

Participants described typical powdered cocaine users as white-collar professionals and young adults between 18 and 25 years of age who are experimenting. Participants remarked: *"If you're buying coke, you got a little money; You got prestige and a suit; It's very social now."* Community professionals described typical powdered cocaine users as of middle to higher socio-economic status and white people. They commented: *"People who snort powdered cocaine are more sophisticated and have a better stature financially than* [people who use] *other street narcotics; People that have an income that could maintain that kind of habit."*

## Crack Cocaine

Crack cocaine is highly available in the region. Participants most often reported the drug's current availability as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was also '10.' Participants stated: *"There's a mass amount of it around, usually at all times; It's so easy to get; You just turn and walk down the street and you're gonna have someone beep the horn* [offering a free sample of crack cocaine], *'Come here, you wanna test this?'"*

Treatment providers most often reported the current availability of crack cocaine as '10,' while law enforcement most often reported it as '8;' the previous most common score was '5' for treatment providers and law enforcement. Treatment Providers remarked: *"In Cuyahoga County you have to run away from the crack dealer. If you drive through certain parts of Cleveland* [and] *you get lost, and you're white, they will come up to your car thinking you're only there to buy* [crack cocaine]*; I work with clients who tell me it's easy to get ...."* One law enforcement officer noted, *"Crack cocaine is making a comeback. It's being used by heroin users as an upper as a way to come back from the down (depressant effect of heroin use)."*

Corroborating data indicated that crack cocaine is available in the Cleveland region. Cuyahoga County Medical Examiner's Office reported that 42.1% of the 259 drug-related deaths it recorded this reporting period involved cocaine (crack and/or powdered cocaine). In addition, ODPS reported seizing 324.4 grams (0.7 lbs.) of crack cocaine from this region during the past six months.

Media outlets reported on law enforcement seizures and arrests in the region this reporting period. Berea Police (Cuyahoga County) conducted a traffic stop for expired license plates and discovered the driver had outstanding warrants; officers searched the vehicle and seized 16 hypodermic needles, a crack cocaine pipe and a marijuana pipe, leading police to arrest the driver for possession of drug paraphernalia and driving with expired plates and a suspended license (www.cleveland.com, July 19, 2018). A detective with Cleveland Police observed suspicious activity in a parking lot that led to a traffic stop after the driver noticed a marked police car approach and attempted to drive away; the detective arrested the driver for drug possession after police found suspected crack

cocaine in the car's center console and a glass pipe (www.cleveland.com, July 25, 2018). Ashland Police (Ashland County) responded to a call of suspected drug activity and stopped a suspicious vehicle, arresting a man and woman for possession of cocaine and trafficking in drugs; the teenage son of the woman who was in the car at the time of their arrest was placed in custody of Children Services, and additional drug trafficking evidence was seized from the woman's apartment in Ashland www.mansfieldnewsjournal.com,( Aug. 2, 2018). Elyria Police (Lorain County) conducted a traffic stop and found the woman driving to be in possession of a small baggie with white powder that the woman claimed was sugar she planned to sell as crack cocaine, while the passenger was found in possession of a 1/10 gram "rock" (piece of crack cocaine) that tested positive for cocaine; the driver and the passenger arrested and charged with counterfeit controlled substance and possession of cocaine and drug paraphernalia, respectively (www.newes5cleveland.com, Aug. 8, 2018). Westlake Police (Cuyahoga County) responded to a report of a car theft at a motel and noticed suspected crack cocaine and drug paraphernalia in the caller's room when speaking with him about the car theft; officers arrested the man for possession of cocaine and drug paraphernalia (www.cleveland.com, Sept. 28, 2018).

Participants and treatment providers reported that the availability of crack cocaine has remained the same during the past six months, while law enforcement reported that it has increased. One law enforcement officer observed, *"More and more people we are* [drug] *testing ... test positive for cocaine...."* BCI and Lake County crime labs reported that the incidence of cocaine cases they process from this region has decreased during the past six months, while Cuyahoga County Crime Lab reported that the incidence of cocaine cases it processes has increased. The labs do not differentiate between crack and powdered cocaine.

| Crack Cocaine | Reported Availability Change during the Past 6 Months | |
|---|---|---|
| | Participants | No change |
| | Law enforcement | Increase |
| | Treatment providers | No change |

Participants most often rated the current overall quality of crack cocaine as '7' on a scale of '0' (poor quality, "garbage") to '10' (high quality); the previous most common score was also '7.' Participants discussed: "[Quality is] *hit or miss depending on how they cook it. Consistently it's been alright; Depends who you're getting it from."* Participants reported that crack cocaine in the region is adulterated (aka "cut") with baking soda, fentanyl and methamphetamine. One participant stated, "[Crack] *is being mixed with fentanyl, making it stronger and more addictive. That's good for the 'dope boy' (drug dealer), but not for the users."* Overall, participants reported that the quality of crack cocaine has remained the same during the past six months.

**Crack Cocaine — Cutting Agents Reported by Crime Lab**

- atropine (prescription heart medication)
- caffeine
- levamisole (livestock dewormer)
- local anesthetic (benzocaine, lidocaine and procaine)
- phenacetin (banned analgesic)
- triacetin (triglyceride)

Current prices for crack cocaine were reported by participants with experience buying the drug. Reportedly, the most common quantity of purchase is 1/10-2/10 gram (aka "rock"). Participants shared: *"Crack really doesn't get sold by weight too much. They carry it by the bag and break off* [pieces to sell]; *It's not about unit of measure as it is size and amount of 'stones' (rocks of crack cocaine) that you get; Generally, the rule of thumb is a rock is $20."* Overall, participants reported that the price of crack cocaine has remained the same during the past six months.

| Crack Cocaine | Current Street Prices for Crack Cocaine | |
|---|---|---|
| | 1/10 gram-2/10 gram (aka "rock") | $10-20 |
| | A gram | $60-80 |
| | 1/16 ounce (aka "teener") | $100-150 |
| | 1/8 ounce (aka "eight ball") | $200-220 |

The most common route of administration for crack cocaine remains smoking. Participants estimated that out of 10 crack cocaine users, nine would smoke and one would intravenously inject (aka "shoot") the drug. Participants explained: *"If they got crack, they're going to smoke it; They use vinegar as a neutralizer for crack. They break down the crack ... turn it into a liquid form and start shooting ...."*

Participants described typical crack cocaine users as people aged 40 years and older and of low socio-economic status. Participants remarked: *"It's so darn cheap and it's so readily available; Usually the older crowd, 40s and up."* Community professionals described typical crack cocaine users also as of low socio-economic status but noted use more often among African-American people. One treatment provider added, *"In talking to clients who prefer* [crack] *cocaine, 40s and 50s, it was very popular in the eighties and these individuals started their drug use then, they liked the effects of* [crack] *cocaine and continued to use it."* Law enforcement reported: "[Crack cocaine users are] *a little more down and out, lower economic class; Mostly African-American."*

## Heroin

Heroin remains highly available in the region. Participants most often reported the current availability of the drug as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was also '10.' A participant remarked, *"You can literally pull up in (travel to) big cities (Cleveland) and people come up, 'You working for that boy?' (looking for heroin?)."*

Treatment providers most often reported the current availability of heroin as '10,' while law enforcement most often reported it as '9;' the previous most common scores were '7' and '9-10' for treatment providers and '8' for law enforcement. One treatment provider remarked, "[Heroin is] *available, that's what they're going for."* One law enforcement officer noted, *"There are dealers that actually drive around and seek people out* [to sell heroin to]. *They see people that they think are either becoming 'dope sick' (experiencing withdrawal) or look like they're addicts, and basically, they're just asking them if they're looking to buy drugs ... readily available."*

Corroborating data indicated that heroin is available in the Cleveland region. The Cuyahoga County Medical Examiner's Office reported that 40.3% of the 259 drug-related deaths it recorded this reporting period involved heroin; of these heroin-related deaths, 93.8% also involved fentanyl. In addition, ODPS reported seizing 670.8 grams (1.5 lbs.) of heroin from this region during the past six months.

Media outlets reported on law enforcement seizures and arrests in the region this reporting period. Westlake Police (Cuyahoga County) responded to a call of suspicious activity and found the man in question to be unsteady, sweating and slurring his speech while he attempted to misinform officers; officers arrested the man for felony drug possession and misidentification after officers searched his vehicle that was left running with the doors open and hypodermic needles in plain view with suspected heroin, as well as methamphetamine and pills (www.patch.com, July 28, 2018). Cleveland Police arrested a man for aggravated vehicular homicide after he overdosed behind the wheel and crashed into a woman riding a scooter in downtown Cleveland that led to her death (www.cleveland.com, Aug. 20, 2018). Westlake Police responded to a call about unwanted house guests and drug usage; officers found two women in possession of heroin and needles and arrested them along with the resident who called for drug use and permitting drug use, respectively (www.patch.com, Sept. 25, 2018).

While many types of heroin are currently available in the region, participants and community professionals continued to report powdered heroin as most available. However, a participant noted, *"Heroin and fentanyl are one in the same anymore."* One law enforcement officer observed, *"We're not seeing black tar or brown powder* [heroin], *we're seeing a lot of gray powder, purplish tinted, and pink powder."* Another officer stated, *"We don't see black tar heroin here. In the ten years I've been in law enforcement, I think I've seen it once ... most of our* [heroin cases] *are off-white powder heroin."* Regarding black tar heroin, a participant commented, *"I've seen* [black tar heroin], *but not often.... I saw black tar heroin a few weeks ago, 'Mexican mud' they call it. It's very hard to come by...."*

Participants and community professionals reported that the availability of heroin has remained the same during the past six months. Cuyahoga County Crime Lab

reported that the incidence of heroin cases it processes from this region has increased during the past six months, while BCI and Lake County crime labs reported that the incidence of heroin cases they process has decreased or remained the same. The labs reported processing beige, blue, brown, gray, purple, tan and white powdered heroin as well as black tar heroin.

| Heroin | Reported Availability Change during the Past 6 Months | |
|---|---|---|
| | Participants | No change |
| | Law enforcement | No change |
| | Treatment providers | No change |

Participants most often rated the current overall quality of heroin as '10' on a scale of '0' (poor quality, "garbage") to '10' (high quality); the previous most common scores were '1-2' and '10.' However, quality ratings were dependent on personal preference towards fentanyl. Participants shared: "[More fentanyl] *makes* [heroin] *way better; The chance of getting good quality heroin is very slim. That's why overdoses happen because people get junk … then when they do get a good one, their bodies aren't used to it; The quality of heroin … we don't know* [what it is]."

Participants discussed adulterants (aka "cuts") that affect the quality of the drug and reported that the top cutting agent for heroin remains fentanyl. A participant remarked, *"It's not heroin, it's fentanyl."* A treatment provider remarked, *"I don't think users actually know what it is. They just buy it and do it and don't care."*

Additional cuts mentioned included: aspirin, baby formula, baby laxatives, carfentanil, cosmetics, prescription opioids (Percocet®), powdered sugar, salt, sedative-hypnotics (Xanax®), sugar, trazodone (prescribed sedative and antidepressant) and Tylenol®. Participants discussed: "*You don't know* [what you get with heroin] *until you end up hittin' (using) it. And, some people don't take the time to do like a warm up (tester of heroin) to see how it's gonna affect them…. When you don't use responsibly, or you're careless about it … that's why you're seeing* [overdose] *happen so much; I pissed dirty (screened positive on a drug screen) for trazodone, barbiturates, Xanax®… they put all types of cut with that stuff."* Overall, participants reported that the quality of heroin has remained the same during the past six months.

| Heroin | Cutting Agents Reported by Crime Lab |
|---|---|
| | acetaminophen |
| | caffeine |
| | cocaine |
| | diphenhydramine (antihistamine) |
| | fentanyl |
| | inositol (dietary supplement) |
| | lidocaine (local anesthetic) |
| | mannitol (diuretic) |
| | methamphetamine |
| | papaverine (vasodilator) |
| | quinine (antimalarial) |
| | sorbitol (artificial sweetener) |
| | tramadol |
| | xylazine (animal sedative) |

Reports of current prices for heroin were variable among participants with experience purchasing the drug. Reportedly, the most common quantities of purchase are 1/2 gram and a gram. Overall, participants indicated that the price of heroin has remained the same during the past six months; however, one participant observed, "[Price has decreased for heroin because] *not as many people are buying it because they're switching over to meth*."

| Heroin | Current Street Prices for Heroin | |
|---|---|---|
| | **Powdered:** | |
| | 1/10 gram (aka "point") | $10-20 |
| | 1/2 gram | $40-60 |
| | A gram | $80-150 |

The most common route of administration for heroin remains intravenous injection (aka "shooting"). Participants estimated that out of 10 heroin users, nine would shoot and one would snort the drug. Participants discussed: "[Certain drug houses] *they call 'shooting galleries.' It's a dollar to get in and a dollar to use the syringes. So, if you go there, everybody's shooting…. At a shooting gallery everyone's coming to shoot. At a bar, you go in the bathroom and snort. At parties, they say we got the heroin over there, the cocaine over there, go get what y'all want and most of them are going to snort it because they have this*

*persona they have to live up to. I don't shoot 'dope' (heroin), I snort dope; When you first start off doing heroin, you're going to snort it or smoke it.* [Route of administration] *depends what stage* [of use/addiction] *you're in; Ten people would shoot it, and all use the same needle."*

Participants most often described typical heroin users as white people in their 20s and 30s. Participants observed: *"I've been all over the place shootin' dope ... I don't see a lot of African-American men shooting* [heroin].... *I don't see them shooting as prevalently as white males and white females. They'd rather smoke crack; I just got released from the institution and I've seen more guys, 20-year-old, white drug addicts. I said, 'How you become a drug addict at 18* [years of age]?*' 'My mom. My mom's drugs, her Percocet®, her Vicodin®;' There's more whites doing it than blacks; 18- to 80-year olds ... but primarily people in their 20s and 30s."*

Community professionals could not provide a profile of a typical heroin user. Treatment providers commented: "[Heroin use is] *across the board, the next door neighbor, someone under the bridge (homeless people), high school kids; Everyone's a risk, especially if you've been hospitalized."* Law enforcement officers added: *"All economic realms, suburbs, rich and poor neighborhoods, white, male or female, a lot of times they're younger; Young people with average age of 18-30* [years] *being most common."*

## Fentanyl

Fentanyl remains highly available in the region. Participants most often reported the current availability of the drug as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was also '10.' Participants discussed: *"Fentanyl is* [to heroin] *what crack is to cocaine, very cheap, very available; Heroin and fentanyl are one in the same anymore; The demand is up for heroin with fentanyl because it's cheaper and easier to get; The high* [with fentanyl] *is shorter lasting, so you need to keep doing more, that's why the demand is up; I have no idea how to differentiate* [between heroin and fentanyl]. *It's all so mixed."*

Treatment providers most often reported the current availability of fentanyl as '10,' while law enforcement most often reported it as '6-7;' the previous most common scores were '6-7.' Treatment providers remarked: *"It's more available than heroin at this point; Drug dealers are passing it off as heroin and you don't know what you got till it's already in you."* Law enforcement noted: *"Most of the people don't even know they're using it ... I've not had anyone say they're seeking fentanyl, or if they are, they're certainly not verbalizing it; We're actually coming across pills that are passed off as Percocet® ... but turns out to be pressed fentanyl... people end up overdosing from that, thinking they're taking Percocet®, or oxycodone, and it turns out to be fentanyl."*

Corroborating data indicated that fentanyl is available in the Cleveland region. Cuyahoga County Medical Examiner's Office reported that 68.7% of the 259 drug-related deaths it recorded this reporting period involved fentanyl/fentanyl analogues; 9.3% of these deaths involved carfentanil. In addition, ODPS reported seizing 1,085.3 grams (2.4 lbs.) of fentanyl from this region during the past six months.

Media outlets reported on law enforcement seizures and arrests in the region this reporting period. Elyria Police (Lorain County) and U.S. Drug Enforcement Administration (DEA) investigated the circumstances surrounding a man who was arrested for allegedly attempting to swallow 40 packages of fentanyl, totaling 400 grams, that were smuggled into the country; officers seized the fentanyl packages from a motel in Elyria (www.cleveland.com, July 17, 2018). A man was indicted in U.S. District Court in Cleveland following the conclusion of a joint Elyria Police and FBI investigation that led his arrest on charges of possession with intent to distribute narcotics and being a felon in possession of a firearm; officers seized 1.46 grams of fentanyl and 22 grams of crack cocaine from the man at the time of his arrest (www.patch.com, July 25-26, 2018). A South Euclid (Cuyahoga County) man was arrested in possession of 14 grams of heroin/fentanyl, 31 grams of heroin, 64 alprazolam (Xanax®) pills and firearms; the man allegedly sold fentanyl and heroin several times over the month prior and was charged with distribution, possession with intent to distribute drugs and two felony charges related to firearms (www.patch.com, July 26, 2018). The U.S. District Court in Pittsburgh, Pennsylvania heard a guilty plea from a Euclid (Cuyahoga County) resident to charges related to the distribution of fentanyl, following a five-month investigation involving federal agents and U.S. Postal inspectors that included the seizure of 10 grams of fentanyl (www.triblive.com, Aug. 13, 2018). Lake County Crime Lab reported a fifty percent increase during the

Case: 2:25-cv-00748-SDM-EPD Doc #: 1-10 Filed: 07/07/25 Page: 10 of 71 PAGEID #: 750



past six months in cases involving fake oxycodone pills containing fentanyl or carfentanil (www.news5cleveland.com, Sept. 11, 2018). Narcotics agents and several law enforcement agencies in Lorain County concluded a week-long investigation with the recovery of 118 grams of fentanyl and the arrest of one man for aggravated drug trafficking and trafficking in heroin (www.clevealnd.com, October 16, 2018). A man was caught on security footage performing a hand-to-hand transaction outside a casino in downtown Cleveland and later arrested for distribution of fentanyl, cocaine and heroin; a baggie of a mixture of cocaine, heroin and fentanyl was found inside the hotel room of the fatally overdosed buyer of the drugs (www.news5cleveland.com, Oct. 24, 2018). Eight deputies of the Cuyahoga County Sheriff's Office serving an arrest warrant were taken to the hospital due to possible fentanyl exposure; one suspect was arrested (www.fox8.com, Nov. 7, 2018).

Participants and community professionals reported that the availability of fentanyl has remained the same during the past six months. BCI and Cuyahoga County crime labs reported that the incidence of fentanyl/fentanyl analogue cases they process from this region has increased during the past six months, while Lake County Crime Lab reported that the incidence of its cases has decreased. All three crime labs reported that the incidence of carfentanil cases they process from this region has decreased during the past six months.

| Fentanyl | Reported Availability Change during the Past 6 Months | |
|---|---|---|
| | Participants | No change |
| | Law enforcement | No change |
| | Treatment providers | No change |

Participants most often rated the current overall quality of fentanyl as '8' on a scale of '0' (poor quality, "garbage") to '10' (high quality); the previous most common score was '10.' Participants discussed adulterants (aka "cuts") that affect the quality of the drug and reported that the top cutting agent for fentanyl is heroin. Additional cuts mentioned included: cocaine, methamphetamine and sugar. Participants explained: *"They have to 'step on' (adulterate) it or everybody would be dying, so they have cut* [fentanyl]; [Fentanyl is being used] *with a low grade of heroin. You gotta understand that. You get some garbage heroin and you put some fentanyl with it, now you got the best stuff in town 'cause guess what,* [the user is] *gonna OD (overdose), and everyone's going to say, 'Where'd he get it from?;' What's really messed up is if somebody dies off of their fentanyl ... more people ... will come to that dealer because they know that their* [dope] *isn't fake."* Overall, participants reported that the quality of fentanyl has remained the same during the past six months.

Reports of current prices for fentanyl were consistent among participants with experience purchasing the drug. Reportedly, the most common quantity of purchase is a 2/10 gram for $20. In addition, participants discussed fentanyl sold in capsules. One participant reported, *"They put* [fentanyl] *in capsules and sell it by the capsule.* [My dealer] *used to buy this stack of energy pills from like Circle K®, dump all the stuff out of* [the capsules] *and fill fentanyl into them. That way they were a cool color. You could know who you bought them from off of which capsule they had."* Overall, participants indicated that the price of fentanyl has remained the same during the past six months.

The most common route of administration for fentanyl remains intravenous injection (aka "shooting"). Participants estimated that out of 10 fentanyl users, eight would shoot and two would snort the drug. Participants and community professionals described typical fentanyl users as heroin users, white people in their 20s and 30s. A treatment provider explained, *"It's the same as heroin users, young, white, male and female.* [Fentanyl use is] *looked down upon with the black community in Cuyahoga County, but they'll deal it."* A law enforcement officer added, *"It's predominantly Caucasian ... for us it's predominantly Caucasian because it's the racial makeup of the county* [Medina County] *... and men are overdosing* [due to fentanyl] *at a rate of three to one to women steadily."*

## Prescription Opioids



Prescription opioids are moderately to highly available for illicit use in the region. Participants most often reported the current street availability of these drugs as '8' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous

most common score was '6.' Treatment providers most often reported the current street availability of prescription opioids as '3,' while law enforcement most often reported it as '5;' the previous most common scores were '5' and '6,' respectively.

Corroborating data indicated that prescription opioids are available for illicit use in the Cleveland region. Cuyahoga County Medical Examiner's Office reported that 13.9% of the 259 drug-related deaths it recorded this reporting period involved prescription opioids. In addition, media outlets reported on law enforcement seizures and arrests in the region this reporting period. During a traffic stop, Solon Police (Cuyahoga County) searched a vehicle and recovered a small amount of marijuana and hydrocodone pills; officers arrested a man for felony drug abuse and driving without a license (www.patch.com, Oct. 12, 2018). Ohio State Highway Patrol (OSHP) conducted a traffic stop for speeding along Interstate 71 and seized 1,899 grams of oxycodone pills and marijuana from the stopped vehicle; two men were arrested for aggravated trafficking in drugs (www.norwalkreflector.com, Dec. 17, 2018).

Participants and community professionals identified Norco®, tramadol and Vicodin® as the most popular prescription opioids in terms of widespread illicit use. Participants stated: *"Norco® would be one of the easier ones to find; I've seen Vicodin®, Norco® and tramadol, but everything else is very rare nowadays; The doctors are cutting the 'perks' (limiting Percocet®). … If you get some Percocet® from the doctor, they're monitoring it."* A treatment provider remarked, *"If you go to the dentist, they'll offer Norco® before they even offer Motrin®."*

Participants and community professionals reported that the general availability of prescription opioids has decreased during the past six months. A participant commented, *"You can't get a whole month's 'script' (prescription) anymore … people can't sell them like they used to. …* [Doctors] *do more pill counts (prescription monitoring)."* A treatment provider observed, *"More doctors are taking advantage of the OARRS (Ohio Automated Rx Reporting System) report and prescriptions are being monitored more."* Law enforcement concluded: *"I believe people can't get the pills (opioids) or they cost more and that's why they're doing heroin; Cases involving prescription opioids have decreased tremendously over the past year; They're not nearly as easy to come by. Pharmacies are much more vigilant checking for fake scripts. Doctors aren't prescribing as much."* Cuyahoga County Crime Lab reported that the incidence of hydrocodone (Vicodin®), oxycodone (OxyContin®, Percocet®) and tramadol (Ultram®) cases it processes has increased during the past six months; Lake County Crime Lab reported increased incidence of tramadol cases. BCI crime labs reported that its incidence of cases for the aforementioned drugs has decreased or remained the same during the past six months. All crime labs reported processing very few cases of hydromorphone (Dilaudid®), methadone and oxymorphone (Opana®) during the past six months.

| Prescription Opioids | Reported Availability Change during the Past 6 Months | |
|---|---|---|
| | Participants | Decrease |
| | Law enforcement | Decrease |
| | Treatment providers | Decrease |

Reports of current street prices for prescription opioids were consistent among participants with experience buying the drugs. Reportedly, the majority of prescription opioids sell for $1 per milligram. Participants commented: *"I've seen people pay $1.50 to $2* [per milligram] *for Vicodin® because they were withdrawing so bad … but generally it's $1 per milligram for Vicodin®; Percocet® are $1 per milligram; When they're harder to get, the price jacks up. …"* Overall, participants indicated that the street price of prescription opioids has remained the same during the past six months.

| Prescription Opioids | Current Street Prices for Prescription Opioids | |
|---|---|---|
| | Pharmaceutical fentanyl | $20 for 25 mcg patch |
| | Opana® | $35 for 10 mg<br>$50 for 15 mg |
| | OxyContin® OP | $1 per milligram |
| | Percocet® | $6-10 for 5 mg<br>$14-15 for 10 mg |
| | Vicodin® | $3 for 5 mg<br>$5 for 7.5 mg<br>$8-15 for 10 mg |

Participants reported obtaining prescription opioids for illicit use from people with prescriptions for them. Participants explained: *"A lot of people imagine that you get painkillers from big burly drug dealers, but I got them from little old ladies ... little old ladies that had cancer and couldn't pay their rent; I went to my friends* [to obtain prescription opioids] *... my one friend, his mom had kidney cancer and he would just steal them from her.... She'd sleep so long that she wouldn't know that she didn't take a dose; My mom ... she's selling* [her prescribed Percocet®] *... making at least $1,200 on one prescription."* In addition, participants discussed that some dealers will sell counterfeit prescription opioids: "[Drug dealers are] *pressin'* [prescription opioids] *with fentanyl; Some people have stampers (pill presses) and they sell fake pills."*

The most common route of administration for illicit use of prescription opioids remains snorting. Participants estimated that out of 10 illicit prescription opioid users, eight would snort and two would intravenously inject (aka "shoot") the drugs. A profile of a typical illicit prescription opioid user did not emerge from the data. A participant shared, *"It could be anyone."* Treatment providers confirmed: *"Users are across the board; Same as heroin, everyone's a risk."* While law enforcement added: *"Anybody, anywhere from construction workers, doctors, kids stealing them from medicine cabinets; I don't think there is one* [typical illicit user], *I really don't."*

## Suboxone®



Suboxone® (buprenorphine) remains moderately to highly available for illicit use in the region. Participants most often reported the current street availability of Suboxone® as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common scores were '5-7' for the sublingual filmstrip form and '10' for the pill form. A participant stated, *"It's really possible to get because there are so many people* [prescribed Suboxone®] *... they sell them like crazy."*

Treatment providers and law enforcement most often reported the current street availability of Suboxone® as '6;' the previous most common scores were '7-8' and '5,' respectively. Treatment providers remarked: *"I've watched clients get their scripts and people are waiting for them outside; It's as easy to get as heroin because people get on Suboxone® and they use it for currency ... they trade it for heroin and use it to get through withdrawal periods."* Law enforcement noted: *"It's pretty common to find* [Suboxone®] *on arrests or search warrants related to heroin; Suboxone® has stayed on pace with the opiate epidemic for quite a while now."*

Participants and treatment providers reported that the street availability of Suboxone® has increased during the past six months. A participant commented, *"People are getting in* [legal] *trouble and in order to get out of trouble, you could* [agree to] *be on a Suboxone® program, but they don't really want to get better, so they just take the Suboxone®, pass the drug tests, and sell the rest of them."* Law enforcement most often reported that street availability of Suboxone® has remained the same during the past six months. BCI and Lake County crime labs reported that the incidence of Suboxone® cases they process from this region has remained the same during the past six months, while Cuyahoga County Crime Lab reported that the incidence of Suboxone® cases it processes has increased.

| Suboxone® | Reported Availability Change during the Past 6 Months | |
|---|---|---|
| | Participants | Increase |
| | Law enforcement | No change |
| | Treatment providers | Increase |

Reports of current street prices for Suboxone® were consistent among participants with experience buying the drug. Reportedly, Suboxone® 8 mg most often sells for $16-20. Overall, participants indicated that the street price of Suboxone® has remained the same during the past six months. Participants reported obtaining Suboxone® on the street from drug dealers and from other users.

The most common route of administration for illicit use of Suboxone® remains oral consumption and snorting. Participants estimated that out of ten illicit Suboxone® users, nine would orally consume and one would snort the drug. A participant stated, *"Most people put it under their tongue and use it as a crutch to not get sick (experience withdrawal) from the heroin."* Participants did not identify typical illicit Suboxone® users. However, community professionals described typical illicit users as similar to illicit opioid users: white people in their 20s and 30s.

## Sedative-Hypnotics

Sedative-hypnotics (benzodiazepines, barbiturates and muscle relaxants) are moderately to highly available for illicit use in the region. Participants most often reported the current street availability of these drugs as '8' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was '7.' Treatment providers most often reported the current street availability of sedative-hypnotics as '8;' while law enforcement most often reported it as '4;' the previous most common scores were '7' and '5,' respectively. One law enforcement officer noted, *"A lot of times you'll see it mixed with your opiate users."*

Corroborating data indicated that sedative-hypnotics are available for illicit use in the Cleveland region. Cuyahoga County Medical Examiner's Office reported that 16.6% of the 259 drug-related deaths it recorded this reporting period involved one or more benzodiazepine and/or sedative-hypnotic. In addition, media outlets reported on law enforcement seizures and arrests in the region this reporting period. Elyria Police Special Response Team and Lorain Police SWAT (Lorain County) conducted two searches of Lorain residences and seized 136 oxycodone pills, 158 Xanax® pills, 130 grams of cocaine, 12 grams of heroin/fentanyl, 134 grams of marijuana, several firearms and cash; officers arrested a father and son on several counts of drug possession, drug trafficking and receiving stolen property (www.fox8.com, Sept. 4, 2018).

Participants and community professionals identified Klonopin® and Xanax® as the most available sedative-hypnotics in terms of widespread illicit use. Law enforcement commented: *"Xanax® is the one that we see the most often on the street; Xanax® and Klonopin® are the most prevalent. Very seldom do we see anything other than those two."*

Participants reported that the street availability of sedative-hypnotics has decreased during the past six months. Participants commented: *"They're getting harder to get;* [Availability has decreased] *because of the crackdown on prescription drugs in general; Probation department is on key about stuff like this and the Sheriffs are well-trained about things nowadays, and I think the state troopers have increased* [their presence] *around here, too. In Lorain County especially, the drugs have just slowed down."*

Community professionals reported that the availability of sedative-hypnotics has remained the same during the past six months. Cuyahoga County Crime Lab reported that the incidence of alprazolam (Xanax®), clonazepam (Klonopin®), diazepam (Valium®) and lorazepam (Ativan®) cases it processes has increased in the past six months, while the incidence of carisoprodol (Soma®) and zolpidem (Ambien®) cases it processes has decreased or remained the same. In addition, the lab reported having processed 10 cases of "designer benzos" (synthetic drugs that produce similar effects as benzodiazepines) during the past six months. BCI and Lake County crime labs reported that the incidence of sedative-hypnotics cases they process from the region has decreased or remained the same during the past six months. The two labs reported processing very few cases of carisoprodol (Soma®) and zolpidem (Ambien®) for this region during the past six months.

| Sedative-Hypnotics | Reported Availability Change during the Past 6 Months | |
|---|---|---|
| | Participants | Decrease |
| | Law enforcement | No change |
| | Treatment providers | No change |

Reports of current street prices for sedative-hypnotics were consistent among participants with experience buying the drugs. Overall, participants reported that the price of sedative-hypnotics has remained the same during the past six months.

| Sedative-Hypnotics | Current Street Prices for Sedative-Hypnotics | |
|---|---|---|
| | Ativan® | $2 for 1 mg<br>$4 for 2 mg |
| | Klonopin® | $0.50-1 for 1 mg |
| | Valium® | $2 for 2 mg |
| | Xanax® | $2 for 1 mg<br>$5-10 for 2 mg (aka "xanie bar")<br>$6 for 3 mg |

Participants reported obtaining sedative-hypnotics for illicit use from drug dealers. In addition, participants discussed that some dealers sell counterfeit sedative-hypnotic pills. A participant mentioned, *"Xanax® are the top dog for 'benzos' (benzodiazepines), so pill pressers are putting those on production for sure, mixed with fentanyl. The same effects happen, drowsiness, calm and relaxing. People don't know they're not getting benzos...."*

The most common routes of administration for illicit use of sedative-hypnotics are oral consumption and snorting. Participants estimated that out of 10 illicit sedative-hypnotic users, five would orally consume and five would snort the drugs. Participants and community professionals described typical illicit sedative-hypnotics users as female, aged young adult to middle age. Law enforcement shared: *"With Xanax® it seems like females are more apt to possess that; Some middle-aged women are abusers of this stuff. For some reason they seem to get prescribed these easier* [than men do] *for anxiety or depression."*

## Marijuana

Marijuana remains highly available in the region. Participants and community professionals most often reported the current availability of the drug as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common scores were also '10.' Participants commented: *"It's legal basically; Everyone does it."* One treatment provider stated, "[Clients are] *more lax (relaxed) about it and find it easier to talk about it now."* Law enforcement remarked: *"A lot of areas it's basically becoming decriminalized; If we get someone who doesn't test positive for marijuana, we almost question the test ....'"*

Participants and community professionals also discussed current availability of high-grade marijuana extracts and concentrates, often appearing as oil and waxy forms of the drug (aka "dabs"). Participants most often reported the current availability of marijuana extracts and concentrates as '10;' the previous most common score was '9-10.' A participant noted, "[Dabs are] *more appealing and accessible."* Community professionals did not report on the current availability of marijuana extracts and concentrates; however, the previous most common scores were '4' for treatment providers and '7-8' for law enforcement.

Corroborating data indicated that marijuana is available in the Cleveland region. ODPS reported seizing 594.3 kilograms (1,310.3 lbs.) of marijuana from this region during the past six months. In addition, media outlets reported on law enforcement seizures and arrests in the region this reporting period. While conducting a traffic stop along U.S. Route 422, Solon Police (Cuyahoga County) were led on a short foot chase by the passenger of the stopped vehicle; the passenger was apprehended and arrested with 24.5 grams of marijuana and a digital scale, and officers also discovered a loaded handgun under the passenger's seat of the car (www.patch.com, July 23, 2018). North Ridgeville Police (Lorain County) arrested a man for possession of marijuana paraphernalia and for improperly handling a firearm in a motor vehicle; officers responded to a call from a fast food restaurant employee regarding the man passed out in his van in restaurant's parking lot for over an hour (www.cleveland. com, July 29, 2018). Westlake Police (Cuyahoga County) conducted a traffic stop along Interstate 90 and were notified by a passenger of the stopped car of a loaded firearm in the car, prompting a search and seizure of an undisclosed amount of marijuana and drug paraphernalia; officers arrested the driver and two passengers of the vehicle for felony drug trafficking and carrying a concealed weapon (www.patch.com, July 31, 2018). Berea Police (Cuyahoga County) arrested two young women after finding 20 bags of marijuana and a scale in their vehicle during a traffic stop (www.cleveland.com, Aug. 12, 2018). OSHP and local law enforcement agencies coordinated in the seizure of 80 marijuana plants from three residences in Wooster (Wayne County); two people were charged with possession and cultivation of marijuana (www.fox8.com, Aug. 24, 2018). Several local law enforcement agencies including U.S. Marshals and DEA agents coordinated in the arrests of 11 people alleged to have been involved in shipping over 2,000 pounds of marijuana from Southern California to Northeast Ohio (www.news5cleveland.com, Sept. 5, 2018). A sergeant of the Cuyahoga County Sheriff's Office fatally shot a man who had been attacking motorists on the side of Interstate 90 and charged officers repeatedly after being subdued with a stun-gun; toxicology reports indicated that the man, an admitted drug dealer, had THC (tetrahydrocannabinol, the psychoactive component of marijuana) in his system (www.cleveland.com, Sept. 30, 2018). Solon Police conducted a traffic stop for tinted windows and discovered that the driver's license was suspended and the man had three active arrest warrants; officers seized 36 individually wrapped bags of marijuana

in a backpack and charged the man with drug trafficking (www.patch.com, Oct. 18, 2018). Solon Police observed the vehicle of a convicted drug trafficker in a parking garage and arrested the man for drug possession after the man attempted to flee the scene, leaving his vehicle running with 48 grams of marijuana and a scale inside the vehicle (www.patch.com, Oct. 18, 2018). A grand jury in Lorain County indicted a woman on drug-related charges and child endangering after it became known that she allegedly smoked marijuana with her juvenile son and his friends (www.chroniclet.com, Oct. 26, 2018). North Ridgeville Police were notified by administrators of a local high school of a female student in possession of vape pens and THC oils that the girl allegedly was selling to other students; the girl was arrested for drug trafficking and possession of marijuana (www.cleveland.com, Oct. 30, 2018). OSHP conducting a traffic stop on the Ohio Turnpike near Olmsted Falls (Cuyahoga County) seized 510 pounds of marijuana wrapped and packaged in boxes from a rented truck; one woman was arrested for drug possession and trafficking in marijuana (www.abc6onyourside.com, Nov. 9 2018). Brecksville Police (Cuyahoga County) made an inquiry of a parked car on the shoulder along Interstate 77 and noticed the odor of marijuana from the driver and passenger who said they had run out of gas; officers found marijuana residue and a digital scale in the vehicle and cited the passenger for possession of drug paraphernalia and drug abuse (www.cleveland.com, Nov. 21, 2018). Lorain County Drug Task Force intercepted four packages containing a total of 539 one-gram THC vape cartridges as part of an ongoing investigation (www.fox8.com, Nov. 21, 2018).

Participants and community professionals reported that the availability of marijuana has remained the same during the past six months. A treatment provider observed, *"Marijuana has always been prevalent, and I think that's because the stigma associated with marijuana has declined tremendously over the years."* Participants indicated that the availability of marijuana extracts and concentrates has increased during the past six months. One participant explained that the increased availability of dabs is due to the increased demand for more potent forms of marijuana. This participant said, *"Most good 'bud' (marijuana) is between 14 and 16 percent THC, and your dabs are 88 percent to 98 percent THC, so you take one hit and you're 'ripped' (high)."* Another participant added, "[Concentrates and extracts are] *new and have a higher potency, so you nedd less."*

Community professionals did not report on availability change of marijuana extracts and concentrates during the past six months. However, a law enforcement officer shared, *"The big thing in the last six months that we've seen is that a lot of people are switching from smoking marijuana … to getting THC oil and vape pens … they prefer* [oils] *because* [its high] *lasts longer, so it's cheaper in the long run for them, and it's more of a cleaner (smokeless) … concentrated high…."*

BCI crime labs reported that the incidence of cannabis (including edible cannabis) and concentrated THC (oils, dabs) cases they process from this region has remained the same during the past six months. Cuyahoga County Crime Lab reported that the incidence of cannabis (including edible cannabis) cases it processes has increased during the past six months, while Lake County Crime Lab reported decreased cannabis incidence. Cuyahoga County Crime Lab reported that the incidence of concentrated THC cases it processes has decreased during the past six months, while Lake County Crime Lab reported increased incidence of concentrated THC cases.

| Marijuana | Reported Availability Change during the Past 6 Months | |
|---|---|---|
| | Participants | Increase |
| | Law enforcement | No change |
| | Treatment providers | No change |

Participant most often rated the current overall quality of marijuana as '10' on a scale of '0' (poor quality, "garbage") to '10' (high quality); the previous most common score was '8.' Participants stated: *"There's mostly high quality … it's hard to find low quality; Haven't seen low-grade weed in years."* Overall, participants indicated that the quality of marijuana has remained the same during the past six months.

Reports of current prices for marijuana were provided by participants with experience buying the drug. Reportedly, the most common quantity of purchase is 1/4 ounce; the most common quantity of purchase for marijuana extracts and concentrates is a gram. Overall, participants reported that the price of marijuana has remained the same during the past six months.

| Marijuana | Current Street Prices for Marijuana | |
|---|---|---|
| | **High grade:** | |
| | A blunt (cigar) or a gram | $5-10 |
| | 1/8 ounce | $25 |
| | 1/4 ounce | $50-100 |
| | An ounce | $180-250 |
| | **Extracts and concentrates:** | |
| | 1/2 gram | $15-25 |
| | A gram | $30-50 |

While there were a few reported ways of consuming marijuana, generally the most common route of administration remains smoking. Participants estimated that out of 10 marijuana users, eight would smoke and two would orally consume the drug. For marijuana extracts and concentrates, participants estimated that out of 10 users, seven would smoke and three would orally consume. Participants noted: "*Smoking and eating; The new generation of kids are scared of bad effects of things … so they're switching over to vaporizers and they're not smoking weed, they're eating it, like that's healthier. They're justifying in their head that it's okay to do it that way; Edibles are very popular.*"

A profile for a typical marijuana user did not emerge from the data. Participants shared: "*Marijuana doesn't discriminate; Doesn't everybody smoke weed?*" A law enforcement officer concluded, "*Could be anyone … grandparents, parents, people with prescriptions* [for medicinal marijuana]."

## Methamphetamine



Methamphetamine remains highly available in the region. Participants most often reported the current availability of the drug as '10' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was '9.' Participants stated: "*It's everywhere; Everybody in my neighborhood does it…. If I wanted to do it, all I'd have to do is walk down the street* [to obtain metamphetamine]."

Treatment providers most often reported the current availability of methamphetamine as '4,' while law enforcement most often reported it as '6;' the previous most common scores were '8-9' and '6-7,' respectively. One treatment provider remarked, "*Based on the people that come in (enter treatment) … I see it on their urine (positive drug screens for methamphetamine). I would say it's pretty easy to get.*"

Corroborating data indicated that methamphetamine is available in the Cleveland region. Cuyahoga County Medical Examiner's Office reported that 5.0% of the 259 drug-related deaths it recorded this reporting period involved methamphetamine. In addition, ODPS reported seizing 9.1 kilograms (20.1 lbs.) of methamphetamine from this region during the past six months. Media outlets reported on law enforcement seizures and arrests in the region this reporting period. OSHP in Painesville (Lake County) conducted a search of the vehicle after stopping it for a traffic violation and seeing drug paraphernalia in plain view; officers seized 161 grams of methamphetamine and the arrested the car's driver for drug trafficking and possession of a controlled substance (www.cleveland19.com, July 20, 2018). North Olmsted Police (Cuyahoga County) arrested a man after questioning him near a bus stop and discovering that he had two active warrants for drug-related charges; the man was also found with suspected crystal methamphetamine and unidentified pills on his person (www.cleveland.com, Aug. 25, 2018). Detectives with a regional drug task force conducted a welfare check at a residence in Ashland (Ashland County) and arrested a man and a woman for child endangerment after finding 14 grams of methamphetamine, a pipe and other drug paraphernalia; the 8 month-old daughter of the woman was placed into child protective services with a high level of methamphetamine in her system (www.wmfd.com, Sept. 10, 2018). During a traffic stop in Hinkley (Medina County), police arrested a juvenile for possession of methhamphetamine and marijuana (www.cleveland.com, Oct. 1, 2018). OSHP conducting a traffic stop for speeding along U.S. Route 6, searched the stopped vehicle after detecting the odor of marijuana; officers seized 58 grams of methamphetamine, a firearm and arrested a man for trafficking in and possession of methamphetamine (www.chroniclet.com, Oct. 15, 2018). North Olmsted

Police, responding to a possible domestic dispute in a hotel room, took two men with outstanding arrest warrants into custody; the first man was found in the room along with suspected crystal methamphetamine, syringes and glass pipes; the second man later returned to the room with a backpack containing a syringe loaded with methamphetamine, two small bags of methamphetamine and other drug paraphernalia (www.cleveland.com, Oct. 29, 2018).

Participants reported that methamphetamine is available in crystal and powdered forms in the region. However, they continued to identify crystal methamphetamine as more prevalent. Participants commented: *"Sometimes you see powdered meth, but not normally; 'Shake-and-bake' (powdered methamphetamine) is nasty."* One law enforcement officer observed, *"It seems like the users don't even want* [shake-and-bake], *even though they do use it … crystal is the most popular methamphetamine out there right now."*

The powdered form of methamphetamine is typically referred to as "shake-and-bake," which means users produce the drug in a single-sealed container, such as a two-liter soda bottle. By using common household chemicals along with ammonium nitrate (found in cold packs) and pseudoephedrine (found in some allergy medications), people who make methamphetamine can produce the drug in approximately 30 minutes in nearly any location. One participant noted of shake-and-bake, *"You can make it in your backyard, you don't have to wait for the cartel to smuggle it into the country."* A law enforcement officer observed, *"We're not seeing the one-pot, self-made, homemade type of methamphetamine (shake-and-bake). We're not seeing that at all anymore."*

Participants and community professionals reported that the availability of methamphetamine has increased during the past six months. Participants discussed: *"Meth is so popular right now … it's cheaper … it's better than 'coke' (powdered cocaine); People are changing addictions … meth is running rampant; It's the new party drug. I introduced meth to my mom to try to get her off heroin. That was the worst mistake I could make because now she 'speed balls' (uses heroin and methamphetamine together or one after the other); It's way more available since painkillers are so hard to get and a lot of people died from fentanyl, so everyone's moving to meth; More people want it, so more people have it."*

One treatment provider shared, *"It started out in very rural populations … it took it's time to get more urban, but I think it's starting to infiltrate more and more. I see it trending up."* Law enforcement commented: *"We're seeing methamphetamine more than anything right now, and it's crystal methamphetamine, probably shipped up from Mexico; In the last six months, patrol officers are coming across it more than they used to … it seems to be more popular."*

BCI, Cuyahoga County and Lake County crime labs reported that the incidence of methamphetamine cases they process from this region has increased during the past six months. The labs reported processing brown and white powdered methamphetamine, a white solid substance, and clear, blue, pink and white crystalline methamphetamine during the past six months.

| Methamphetamine | **Reported Availability Change during the Past 6 Months** | |
|---|---|---|
| | Participants | Increase |
| | Law enforcement | Increase |
| | Treatment providers | Increase |

Participants most often rated the current overall quality of methamphetamine as '7' on a scale of '0' (poor quality, "garbage") to '10' (high quality); the previous most common score was '5' for powdered methamphetamine and '9' for crystal methamphetamine. Participants discussed adulterants (aka "cuts") that affect the quality of the drug and reported the following cutting agents for methamphetamine: amphetamines (Adderall®), bath salts (synthetic cathinones) and fentanyl.

Participants shared: *"They're now starting to mix* [methamphetamine] *with fentanyl to make people come back (to get users addicted to opiates); Adderall®. They* [drug] *tested me, and* [the results] *came up* [positive] *with amphetamines and methamphetamines, so it's cut with Adderall® for sure."* Overall, participants reported that the quality of methamphetamine has decreased during the past six months. A participant remarked, *"The quality of* [crystal methamphetamine] *has gone down. It's being cut with fentanyl."*

| Methamphetamine | Cutting Agents Reported by Crime Lab |
|---|---|
| | dimethyl sulfone (DMSO; dietary supplement) |
| | magnesium sulfate (Epsom salts) |

Reports of current prices for methamphetamine were consistent among participants with experience buying the drug. Reportedly, the most common amount of purchase is a gram. Participants remarked: *"A non-regular user could purchase as little as 1/10 gram and be high for 24 hours easily, so I guess it could go down that small; When I sell it, I sell it in quarter grams for $50 … a half gram is like $60. It goes down real quick … I buy my grams for $20, but I flip it; If you're getting shards, that's going to be a higher price no matter what. If it's straight rock, you're going to pay more than that."* Overall, participants reported that the price of methamphetamine has remained the same during the past six months.

| Methamphetamine | Current Prices for Methamphetamine | |
|---|---|---|
| | **Crystal:** | |
| | 1/4 gram | $30-40 |
| | 1/2 gram | $60 |
| | A gram | $50-80 |
| | An ounce | $400 |

The most common route of administration for methamphetamine remains smoking. Participants estimated that out of 10 methamphetamine users, four would smoke, three would intravenously inject (aka "shoot") and three would snort the drug. Participants shared: *"'Hot rail' … you know what a crack pipe looks like, like a glass straw, you superheat the end of the glass, snort it, and then exhale. You're snorting it and smoking it; Hot rails is what's up. You burn* [the pipe] *with a torch and you sniff it … that burns the shit out of my nose; I think when people start using they definitely snort, but more people I've seen shoot than anything else…."*

Participants described typical methamphetamine users as of low socio-economic status, unemployed, white people, aged 20s and 30s. A participant commented, *"The people that I've seen affected most is younger people in their 20s and 30s, and I've seen a lot of women affected, like* [exotic] *dancers and stuff."* Participants also discussed heroin users switching to methamphetamine. They said: *"A lot of people are using crystal meth to get off of heroin … there's no physical comedown from meth … you can't die from meth; It takes the 'dope sickness' (withdrawal symptoms) away…."* Community professionals described typical methamphetamine users as of low socio-economic status, white people and age in their 20s. Law enforcement observed: *"Lower socio-economic status, pretty popular in biker community, motorcycle gang, and younger people; Lower income, white, younger late teens and early 20s, and low education."*

## Prescription Stimulants

Prescription stimulants remain moderately to highly available for illicit use in the region. Participants most often reported the current street availability of these drugs as '5' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common score was '10.' One participant stated, *"Adderall® is the most common, and I would probably give it a '5.'"*

Treatment providers most often reported the current street availability of prescription stimulants as '9,' while law enforcement most often reported it as '5;' the previous most common scores were '6' and '5,' respectively. A treatment provider remarked, *"I know a lot of people are coming in* [to see a doctor], *asking for Adderall® right off the bat."* Law enforcement noted: *"We're sporadically seeing* [prescription stimulants]; *People take it if they need to be extra focused in school or something … our folks (arrestees) don't seem to be seeking it."*

Media outlets reported on law enforcement seizures and arrests in the region this reporting period. Lyndhurst Police (Cuyahoga County) investigated an automobile accident during which one of the drivers was found to be in possession of Adderall®, oxycodone, marijuana and a digital scale (www.cleveland.com, Oct. 31, 2018).

Participants identified Adderall® and Ritalin® as the most available prescription stimulants in terms of widespread illicit use. Community professionals identified Adderall® as most available. Participants and treatment providers

reported that the availability of prescription stimulants has decreased during the past six months, while law enforcement reported it has remained the same. A participant remarked, *"They're getting harder to get."* A treatment provider observed, *"A little less available, to me it seemed like doctors would give out prescription stimulants more freely ... they're not prescribing as freely anymore."*

Lake County and Cuyahoga County crime labs reported that the incidence of amphetamine (Adderall®) cases they process has increased during the past six months; Cuyahoga County Crime Lab also reported that the incidence of methylphenidate (Ritalin®) cases it processes has remained the same. BCI crime labs did not report having processed any cases of amphetamine (Adderall®) or methylphenidate (Ritalin®) for this region during the past six months, and very few cases of lisdexamfetamine (Vyvanse®).

| Prescription Stimulants | Reported Availability Change during the Past 6 Months | |
|---|---|---|
| | Participants | Decrease |
| | Law enforcement | No change |
| | Treatment providers | Decrease |

Current street prices for prescription stimulants were provided by participants with experience buying these drugs. Reportedly, Adderall® 20 mg most often sells for $6. Participants did not comment on whether the price of prescription stimulants has changed during the past six months.

The most common route of administration for illicit use of prescription stimulants is snorting. Participants estimated that out of 10 illicit prescription stimulant users, five would snort, three would orally consume and two would intravenously inject (aka "shoot") the drugs. One law enforcement officer mentioned, *"A lot of people are crushing them up and snorting them. You don't see it too often, but some people are injecting it because they're so addicted to using a needle."*

Participants described typical illicit prescription stimulants users as teenagers or people in their 20s and attending school or are employed. One participant commented, "[Typical users are] *younger, teens and 20s, and career people who are required to stay focused. It's not a dirty drug like heroin or 'coke' (powdered cocaine)."* Community professionals described typical illicit prescription stimulant users as white people in their 20s.

## Ecstasy

Ecstasy (methylenedioxymethamphetamine: MDMA, or other derivatives containing BZP, MDA, and/or TFMPP) ) remains moderately available in the region. Participants most often reported the current availability of the pressed tablet form of ecstasy and of "molly" (powdered MDMA) as '6' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common scores were '3' and '6,' respectively. Participants stated: *"Molly. That's all the 'dope boys' (drug dealers) want to do ... there's still 'X' (ecstasy) around; It's everywhere on the East side* [of Cleveland]."

Treatment providers most often reported the current availability of ecstasy as '5' and of molly as '7;' the previous most common scores were '6-8' and '8,' respectively. Law enforcement most often reported the current availability of ecstasy and molly as '3;' the previous most common scores were '3' and '0-2,' respectively. A treatment provider remarked, *"The way I've been hearing about it, if my clients wanted to get* [ecstasy], *they would probably need to make a few phone calls or take an hour trip ... Molly is more available than ecstasy."* Law enforcement noted: *"Once in a while ... we don't see much of it anymore; We see more molly. We don't see pills (ecstasy tablets) very often at all anymore."*

Participants reported that the availability of ecstasy and molly has decreased during the past six months. Participants commented: *"You gotta travel to go get this stuff; Hard to get* [molly] *and harder to make now; Most people are seeking uppers to mix with their opiates* [and not MDMA]." Community professionals reported that the availability of ecstasy and molly has remained the same during the past six months. BCI crime labs reported that the incidence of MDMA (ecstasy/molly) cases they process from this region has slightly increased during the past six months, although it remains low. Cuyahoga County Crime Lab reported that the incidence of ecstasy/molly cases it processes has remained the same during the past six months.

**Ecstasy/Molly**

| Reported Availability Change during the Past 6 Months | |
|---|---|
| Participants | Decrease |
| Law enforcement | No change |
| Treatment providers | No change |

Participants discussed the current quality of ecstasy and molly and rated the overall quality of ecstasy as '5' and of molly as '7' on a scale of '0' (poor quality, "garbage") to '10' (high quality); the previous most common scores were '3' and '7,' respectively. Reportedly, molly is often cut with other substances including methamphetamine and fentanyl. Participants added: *"The stuff that people sell ends up not being molly, so people are afraid to take it; It's being substituted with meth; It's either cut with meth or 'fetty' (fentanyl) ... you either get the 'upper molly' (molly cut with meth) or the 'downer molly' (molly cut with fentanyl)."* Overall, participants reported that the quality of ecstasy and molly has remained the same during the past six months.

Reports of current prices for ecstasy and molly were consistent among participants with experience buying the drugs. Reportedly, the most common amount of purchase for molly is 1/2 gram. Overall, participants indicated that the prices of ecstasy and molly have remained the same during the past six months.

**Ecstasy/Molly**

| Current Prices for Ecstasy/Molly | |
|---|---|
| **Ecstasy:** | |
| Low dose (aka "single stack") | $5-10 |
| Medium dose (aka "double stack") | $20 |
| High dose (aka "triple stack") | $30 |
| **Molly:** | |
| 1/2 gram | $50 |
| A gram | $80-100 |

Participants indicated that ecstasy and molly are obtained through drug dealers. The most common route of administration for ecstasy is oral consumption. Participants estimated that out of 10 ecstasy users, eight would orally consume, one would intravenously inject (aka "shoot") and one would snort the drug. The most common route of administration for molly is snorting. Participants estimated that out of 10 molly users, six would snort and four would orally consume the drug. Participants described typical ecstasy and molly users as aged late teens through 20s and of middle to high socio-economic status. Community professionals described typical ecstasy and molly users also as people in their late teens and 20s, as well as people who go to dance/night clubs.

## Other Drugs in the Cleveland Region

Participants and community professionals listed a variety of other drugs as being present in the region, but these drugs were not mentioned by the majority of people interviewed: hallucinogens (lysergic acid diethylamide [LSD] and psilocybin mushrooms), Neurontin® (gabapentin) and synthetic marijuana (synthetic cannabinoids). In addition, BCI crime labs reported that the incidence of synthetic cathinone ("bath salts") cases they process from this region has decreased during the past six months, while Cuyahoga County Crime Lab reported that the incidence of bath salts cases it processes has increased. Both crime labs reported that the incidence of U-47700 (synthetic opioid) cases they process from this region has decreased during the past six months.

### *Hallucinogens*

Hallucinogens are available in the region. Participants most often reported the current availability of hallucinogens as '7' for psilocybin mushrooms and '7' for LSD on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common scores were '6' for psilocybin mushrooms and '6' and '10' for LSD. Participants stated: *"Yeah, it's definitely around; Someone gave my husband* [a psilocybin mushroom] *at the bar the other night."* Only one law enforcement officer reported on the current availability of hallucinogens. The officer reported the current availability of LSD as a '3' on a scale of '0' (poor quality, "garbage") to '10' (high quality); the previous most common score was '2.' Treatment providers did not comment on availability of hallucinogens.

Media outlets reported on law enforcement seizures and arrests in the region this reporting period. Cuyahoga County officials initiated an investigation at the county jail after an inmate died of a suspected drug overdose; the man was in jail for possession of cocaine, but hours later exhibited symptoms of being under the influence of drugs, vomiting and complaining of stomach pains; he vomited a balloon full of suspected ecstasy, marijuana, cocaine and liquid PCP (phencyclidine) (www.cleveland.com, July 12, 2018).

Participants reported that the availability of both psilocybin mushrooms and LSD has remained the same during the past six months. Law enforcement reported that availability of LSD has increased. One officer remarked, "*We don't see it all the time, but it has definitely increased.*" Cuyahoga County Crime Lab reported that the incidence of LSD, psilocybin mushrooms and PCP cases it processes has increased during the past six months. BCI crime labs reported that the incidence of LSD cases they process from this region has increased during the past six months, although still very few cases, while the incidence of psilocybin mushroom and PCP cases they process has remained the same during, very few cases.

| Hallucinogens | Reported Availability Change during the Past 6 Months | |
|---|---|---|
| | Participants | No change |
| | Law enforcement | Increase |
| | Treatment providers | No comment |

Participants discussed the current quality of LSD and rated its overall quality as '8-9' on a scale of '0' (poor quality, "garbage") to '10' (high quality); the previous most common score was not reported. Overall, participants reported that the quality of LSD has increased during the past six months. A participant commented, "[LSD] *has gotten a lot stronger.*"

Current prices for hallucinogens were reported by participants with experience buying the drugs. Overall, participants indicated that prices have remained the same during the past six months.

| Hallucinogens | Current Prices for Hallucinogens | |
|---|---|---|
| | **Psilocybin mushrooms:** | |
| | 1/2 gram | $10 |
| | A gram | $15-20 |
| | 1/8 ounce | $30 |
| | **LSD:** | |
| | A liquid drop or single dose (aka "hit") | $5-20 |

Participants reported obtaining hallucinogens at "hippie" (music and arts) festivals, raves (dance parties) and at music concerts. Participants did not report on the most common routes of administration for psilocybin mushrooms or LSD; however, one participant reported, "*LSD goes by drops, so you can put it on a sugar cube or put it on your tongue.*" Participants described typical hallucinogen users as people aged late teens through 20s, as well as "hippies" in their 40s and 50s. Law enforcement described typical users as people in their early 20s. One law enforcement officer remarked, "*We're seeing* [LSD] *more prevalent, again* [among people] *in their lower 20s.*"

### *Neurontin®*



Neurontin® (gabapentin, an anticonvulsant and nerve pain medication) remains available for illicit use in the region. However, participants did not report on the current street availability of Neurontin®; the previous most common street availability score was '8' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get). Treatment providers reported the current street availability of Neurontin® as '7,' while the law enforcement reported it as '5;' the previous most common scores were '9' and '2,' respectively.

A treatment provider stated, "*What I've heard about* [Neurontin®] *is they get it prescribed pretty easily.... You have to take 4,000 to 8,000 mg at a time* [to achieve a high] *... it comes in 300 mg capsules, 600 mg tablets and 800 mg tablets, so you've got to pop (consume) 20 at a time to get high. When their labs (drug screen results) come back, I'll notice if they take it to get high or not* [by the level of the

drug found]. *Gabapentin … is monitored by OARRS (Ohio Automated Rx Reporting System, Ohio's prescription monitoring program)."*

Community professionals reported that the street availability of Neurontin® has increased during the past six months. Law enforcement noted: *"We're seeing a lot of gabapentin lately in the last six months; Definitely increased …."* Community professionals described typical illicit Neurontin® users as white people in their 20s.

| Neurontin® | Reported Availability Change during the Past 6 Months | |
|---|---|---|
| | Participants | No comment |
| | Law enforcement | Increase |
| | Treatment providers | Increase |

### *Synthetic Marijuana*

Synthetic marijuana (synthetic cannabinoids) remains available in the region. However, participants did not report current availability of the drug. Treatment providers most often reported the current availability of synthetic marijuana as '8-9,' while law enforcement most often reported it as '5' on a scale of '0' (not available, impossible to get) to '10' (highly available, extremely easy to get); the previous most common scores were '9' and '4-5,' respectively. Treatment providers shared: "[Synthetic marijuana] *is not hard to get right now; If you go down to the* [inner city], *you can still get it at the corner store."* One law enforcement officer stated, *"We don't see synthetic marijuana that much anymore."*

Community professionals most often reported that the availability of synthetic marijuana has remained the same during the past six months. BCI crime labs reported that the incidence of synthetic cannabinoids cases they process from this region has decreased during the past six months, while Cuyahoga County Crime Lab reported that the incidence of synthetic cannabinoids cases it processes has increased.Community professionals described typical synthetic marijuana users as people in their teens and 20s.

| Synthetic Marijuana | Reported Availability Change during the Past 6 Months | |
|---|---|---|
| | Participants | No comment |
| | Law enforcement | No change |
| | Treatment providers | No change |

## Conclusion

Fentanyl, heroin, marijuana and methamphetamine remain highly available in the Cleveland region; also highly available in the region is crack cocaine. Changes in availability during the past six months include: increased availability for methamphetamine; likely increased availability for Neurontin® (gabapentin) and Suboxone® (buprenorphine); and decreased availability for prescription opioids.

Respondents reported that the high availability of heroin and fentanyl has remained the same during the past six months. Participants and law enforcement observed drug dealers pushing heroin in urban areas similar to how crack cocaine has been pushed. Participants reported that in Cleveland all one has to do to obtain heroin is drive into certain areas where drug dealers approach cars and solicit for customers. One participant remarked, *"People come up (approach you)* [and ask], *'You working for that boy?' (looking for heroin?)."* Law enforcement also noted that heroin dealers drive around and look for customers. One officer commented, *"They see people that they think are either becoming 'dope sick' (experiencing withdrawal) or look like they're addicts, and basically, they're just asking them if they're looking to buy drugs…."*

While several respondents indicated that they thought fentanyl to be more available than heroin, there was consensus that the two drugs have become synonymous. Participants expressed: *"It's all so mixed; Heroin and fentanyl are one in the same anymore."* Participants continued to report that the top cutting agent for heroin remains fentanyl; several participants reported heroin as the top cutting agent for fentanyl.

In addition to heroin-fentanyl mixtures, fentanyl continues to be combined with other drugs such as cocaine and methamphetamine. Law enforcement also reported that fentanyl is pressed into pill form to resemble prescription opioids. The use of fentanyl continues to result in fatal consequences. Cuyahoga County Medical Examiner's Office reported that 68.7% of the 259 drug-related deaths it recorded this reporting period involved fentanyl/fentanyl analogues; 9.3% of these deaths involved carfentanil (synthetic opioid more potent than fentanyl).

Participants and community professionals reported that the availability of crystal methamphetamine has increased during the past six months. Respondents attributed increased availability to a shift in use from opiates to stimulant drugs due to fear of fatal overdose with fentanyl. Participants commented: "*A lot of people died from fentanyl, so everyone's moving to 'meth' (methamphetamine); People are changing addictions … meth is running rampant; More people want it, so more people have it.*" Participants also discussed that methamphetamine is preferred over cocaine because it is cheaper, more potent and easier to obtain.

According to all reporting regional crime labs (BCI, Cuyahoga County and Lake County crime labs), the incidence of methamphetamine cases for the Cleveland region has increased during the past six months. The labs reported processing brown and white powdered methamphetamine, a white solid substance, and clear, blue, pink and white crystalline methamphetamine during the past six months.

Lastly, participants indicated that the availability of marijuana extracts and concentrates (oils, "dabs") has increased during the past six months. One participant explained that increased availability of dabs is due to increased demand for more potent forms of marijuana. In addition, community professionals reported that the availability of Neurontin® for illicit use has increased during the past six months. A law enforcement officer remarked, "*Definitely increased.*" Community professionals described typical illicit Neurontin® users as white people in their 20s.

121022

U.S. Department of Justice
Office of Justice Programs
Bureau of Justice Statistics



# Drugs and Crime Facts, 1989

Drug use and criminal offenders 4
Trends in offender drug use 7
Drug law enforcement 8
sentencing
tors 9
son by drug offenders 12
correctional populations 13
out drugs 15
neral population 17
21
ion call
ll-free

121022

# Drugs & Crime Data

Data Center & Clearinghouse for Drugs & Crime



## Illicit drugs— Cultivation to consequences

**The worldwide drug business**

- Cultivation & production
  - Foreign
  - Domestic
- Distribution
  - Export
  - Transshipment
  - Import into U.S.
- Finance
  - Money laundering
  - Profits

**The fight against drugs**

- Enforcement
  - Border interdiction
  - Investigation
  - Seizure & forfeiture
  - Prosecution
- Consumption reduction
  - Prevention
  - Education
  - Treatment

**Consequences of drug use**

- Abuse
  - Addiction
  - Overdose
  - Death
- Crime
  - While on drugs
  - For drug money
  - Trafficking
- Impact on justice system
- Social disruption

The Data Center & Clearinghouse for Drugs & Crime is funded by the Bureau of Justice Assistance and directed by the Bureau of Justice Statistics of the U.S. Department of Justice.

**Major heroin smuggling routes into the United States**

DEA Quarterly Intelligence Trends

## One free phone call can give you access to a growing data base on drugs & crime

*The new Data Center & Clearinghouse for Drugs & Crime is managed by the Bureau of Justice Statistics. To serve you, the center will—*

- **Respond** to your requests for drugs and crime data.
- **Let you know** about new drugs and crime data reports.
- **Send you** reports on drugs and crime.
- **Conduct** special bibliographic searches for you on specific drugs and crime topics.
- **Refer you** to data on epidemiology, prevention, and treatment of substance abuse at the National Clearinghouse for Alcohol and Drug Information of the Alcohol, Drug Abuse, and Mental Health Administration.
- **Publish** special reports on subjects such as assets forfeiture and seizure, economic costs of drug-related crime, drugs and violence, drug laws of the 50 States, drug abuse and corrections, and innovative law enforcement reactions to drugs and crime.
- **Prepare** a comprehensive, concise report that will bring together a rich array of data to trace and quantify the full flow of illicit drugs from cultivation to consequences.

**Major cocaine smuggling routes into the United States**



DEA Quarterly Intelligence Trends

*Call now* and speak to a specialist in drugs & crime statistics:

**1-800-666-3332**

*Or write* to the Data Center & Clearinghouse for Drugs & Crime
1600 Research Boulevard
Rockville, MD 20850

Case: 2:25-cv-00748-SDM-EPD Doc #: 1-10 Filed: 07/07/25 Page: 27 of 71 PAGEID #: 767

U.S. Department of Justice
Office of Justice Programs
Bureau of Justice Statistics



# Drugs and Crime Facts, 1989

Drug use and criminal offenders 4
Trends in offender drug use 7
Drug law enforcement 8
Prosecution and sentencing of drug law violators 9
Time served in prison by drug offenders 12
Drug offenders in correctional populations 13
Public opinion about drugs 15
Drug use in the general population 17
Source notes 19
BJS mailing lists 21

NCJRS
FEB 27 1990
ACQUISITIONS

For more information call or write:

Drugs & Crime Data Center & Clearinghouse
1600 Research Boulevard
Rockville, MD 20850
**1-800-666-3332**

# BJS reports on . . .

## Drugs

Many BJS programs produce data on drug law enforcement, drug offenders, and drugs and crime. For example —

- the National Crime Survey (NCS) asks victims of personal crimes if they believed the offenders had been using drugs
- court processing studies compare sentences given to drug offenders with those given to other offenders
- reports on State prisoners, jail inmates, and incarcerated youth include data on their histories of drug use and drug offenses
- the annual BJS *Compendium of Federal justice statistics* contains detailed data on drug law violators in the Federal justice system
- the annual BJS *Sourcebook of criminal justice statistics* presents data on drug use in the general population and on public opinion toward drugs and enforcement of drug laws.

During fiscal 1989 BJS published five Special Reports and two Bulletins with information on drug use and crime and drug law enforcement:

- *The redesigned National Crime Survey: Selected new data* (BJS Special Report, January 1989) presented for the first time data on victims' perceptions about the offenders' drug use.

- *Felony sentences in State courts, 1986* (BJS Bulletin, February 1989) presented the first national data on State court handling of drug traffickers and other felony offenders.

- Two reports from the new BJS survey of Law Enforcement Management and Administrative Statistics (LEMAS) — *Profile of State and local law enforcement agencies, 1987* (BJS Bulletin, March 1989) and *Police departments in large cities, 1987* (BJS Special Report, August 1989) — discussed the types of drug-related programs operated by police agencies.

- *Recidivism of prisoners released in 1983* (BJS Special Report, April 1989) described the postincarceration criminal histories of drug law offenders and other felons in 11 States.

- *Federal criminal cases, 1980-87: Federal offenses and offenders* (BJS Special Report, July 1989) compared the prosecution, disposition, and sentencing of drug law violators in Federal courts with other Federal offenders.

- *Criminal cases in five States, 1983-86* (BJS Special Report, September 1989) presented Offender-Based Transaction Statistics (OBTS) data on criminal justice processing of felony offenders, including drug offenders, in five States.

In fiscal 1988, with funding from the Bureau of Justice Assistance, BJS established the Drugs & Crime Data Center & Clearinghouse to provide policymakers, criminal justice practitioners, researchers, and the general public with ready access to understandable information on drug law violations and drug-related law enforcement. The clearinghouse is a central source of data from diverse Federal, State, and local agencies as well as the private sector.

The Drugs & Crime Data Center & Clearinghouse responds to policymakers' urgent need for the most current data on —

- illegal drugs
- drug law violations
- drug-related crime
- drug-using offenders in the criminal justice system
- the impact of drugs on criminal justice administration.

The Data Center & Clearinghouse serves the drugs-and-crime information needs of —

- Federal, State, and local policymakers
- criminal justice and public health practitioners
- researchers and universities
- private corporations
- the media
- the public

with special attention to the needs of State and local government agencies, especially those seeking data to meet the statistical requirements of the Anti-Drug Abuse Grant Program of the Bureau of Justice Assistance (BJA).

The clearinghouse component —

- disseminates BJS and other Department of Justice publications relating to drugs and crime
- distributes data summaries and reading lists on specific drugs-and-crime topics
- maintains a data base of some 1,300 annotated bibliographies of statistical and research reports, books, and journal articles on drugs and crime
- searches the bibliographic data base to fill requests for data on specific topics
- advises requesters on data availability and usefulness and on other data sources that may meet their needs
- provides statistics and bibliographic citations by mail or telephone
- maintains a reading room where visitors can use the clearinghouse collection of close to 2,000 documents on drugs and crime
- coordinates with Federal, State, and local agencies in identifying other data resources and makes referrals.

The data center component —

- prepares a comprehensive national report on drugs and crime compiling drug data from various sources into one easy-to-understand volume to be used as a national resource document
- analyzes existing drug data and prepares special reports
- evaluates existing drug data for statistical quality and usefulness, suggests improvements, and identifies drug data gaps
- prepares special computer tabulations that are not available elsewhere
- prepares annotated bibliographies of new drugs-and-crime reports to be added to the data base the clearinghouse uses to respond to requests.

During fiscal 1989 the Data Center & Clearinghouse —

- published *Drugs and crime facts, 1988* (September 1989), which presents existing BJS data on the subject from diverse BJS reports
- handled about 3,000 requests for information

- expanded the bibliographic data base to about 1,300 documents and library holdings to about 2,000 items
- distributed about 8,000 drugs-and-crime documents, 80% of which were BJS publications
- attended nine national conferences and provided support to six others
- developed a new brochure for distribution
- began work on a comprehensive State directory of drugs-and-crime resources
- provided assistance to BJA grant recipients at regional cluster meetings
- assembled drugs-and-crime documents from 49 States and territories as a result of letters sent requesting State drug strategies as well as other State-specific documents
- provided technical assistance to the Office of National Drug Control Policy
- developed working relationships with and made arrangements for distributing documents among other drug-related clearinghouses, including the National Clearinghouse for Alcohol and Drug Information (treatment and prevention), the National AIDS Information Clearinghouse, and the Drug Information and Strategy Clearinghouse (drugs in public housing)
- mailed personalized letters announcing the clearinghouse to all governors, State attorneys general, State criminal justice planning and statistical agencies, criminal justice editors, and public interest groups
- continued research and writing for the *Report to the Nation on drugs and crime* and several special reports on drugs and crime.

The Data Center & Clearinghouse began operations on October 1, 1987. The toll-free line, 800-666-3332, became operational in January 1988. The data center is located at the Research Triangle Institute (RTI) in Research Triangle Park, N.C. The clearinghouse is located at Aspen Systems Corporation in Rockville, Md.

Case: 2:25-cv-00748-SDM-EPD Doc #: 1-10 Filed: 07/07/25 Page: 31 of 71 PAGEID #: 771



### Drug use and criminal offenders

Victims reported that they believed their assailants were under the influence of drugs or alcohol in about 36% of violent crime incidents. Victims of rape and assault were more likely than robbery victims to report that the offenders had used drugs or alcohol. In 43% of violent crimes the victims reported that they did not know if the offender was under the influence of drugs or alcohol. Victims of robbery were more likely than other victims to report that they did not know if the offenders had used drugs or alcohol.

**Characteristics of violent offenders under the influence of drugs or alcohol, as reported by victims**

| Offender characteristics[a] | Percent of violent crime incidents where victim perceived the offender to be: | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Not under the influence | Under the influence | | | | Not sure which substance | Not known if under the influence |
| | Total | | Total | Alcohol only | Drugs only | Both | | |
| **Sex** | | | | | | | | |
| Male | 100% | 19% | 38% | 23% | 6% | 6% | 2% | 43% |
| Female | 100 | 34 | 27 | 17 | 6 | 3 | 1[b] | 39 |
| Both sexes | 100 | 17 | 47 | 23 | 13 | 11 | —[b] | 37 |
| **Race** | | | | | | | | |
| White | 100% | 23% | 42% | 28% | 5% | 7% | 2% | 35% |
| Black | 100 | 18 | 27 | 12 | 9 | 4 | 2 | 55 |
| Other | 100 | 18 | 39 | 20 | 8[b] | 6[b] | 4[b] | 43 |
| **Age** | | | | | | | | |
| 20 or younger | 100% | 29% | 23% | 14% | 5% | 3% | 1%[b] | 48 % |
| 21 or older | 100 | 18 | 45 | 28 | 8 | 8 | 2 | 37 |
| Mixed ages | 100 | 11 | 44 | 27 | 4[b] | 12 | 2[b] | 44 |
| **Relationship to victim** | | | | | | | | |
| Nonstranger | 100% | 31% | 40% | 24% | 6% | 8% | 1% | 28% |
| Stranger | 100 | 13 | 35 | 22 | 7 | 5 | 2 | 52 |

Note: Percents may not total 100% because of rounding. For incidents with more than one offender, data show incidents in which at least one offender was under the influence. Crimes committed by mixed racial groups are not presented.
— Less than .5%.
[a]Describes single and multiple offenders.
[b]Estimate is based on 10 or fewer sample cases; see source.

Data from BJS surveys show the extent of drug and alcohol use by State prisoners, jail inmates, and youth in long-term, State-operated juvenile facilities at the time of the offense for which they were incarcerated and at other times in their lives. These incarcerated adults and youth report high levels of drug use:

- 75% of jail inmates, 79.6% of State prisoners, and 82.7% of youth in long-term public juvenile facilities had used drugs at some point in their lives.
- A third of State prisoners, a quarter of convicted jail inmates, and two-fifths of the incarcerated youth said they had been under the influence of an illegal drug at the time of their offense.

Most State prison inmates (54%) in 1986 reported that they were under the influence of drugs or alcohol or both at the time they committed the offense for which they were currently sentenced: 17% were under the influence of drugs only, and 18% were under the influence of drugs and alcohol. More than half (52%) of the State prisoners said they had taken illegal drugs during the month before committing the crime, and 43% said they had used drugs on a daily basis in that month.

Three-fourths of all jail inmates in 1983 reported using illegal drugs at some time in their lives:

- 72% used marijuana.
- 38% used cocaine.
- 32% used amphetamines.
- 27% used barbiturates.
- Methaqualone, LSD, and heroin each had been used by more than a fifth of the inmates.

**Violent offenders under the influence of drugs or alcohol, as perceived by victims**

| | Percent of violent crime incidents where victim perceived the offender to be: | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Not under the influence | Under the influence | | | | | |
| Type of crime | Total | | Total | Alcohol only | Drugs only | Both | Not sure which substance | Not known if under the influence |
| Crimes of violence | 100% | 20% | 36% | 22% | 6% | 6% | 2% | 43% |
| Rape | 100 | 15 | 46 | 23 | 13* | 5* | 5* | 39 |
| Robbery | 100 | 12 | 27 | 10 | 10 | 5 | 1* | 61 |
| Aggravated assault | 100 | 16 | 42 | 25 | 7 | 7 | 2 | 42 |
| Simple assault | 100 | 26 | 36 | 25 | 4 | 6 | 2 | 38 |

Note: Percents may not total 100% because of rounding. For incidents with more than one offender, data show incidents in which at least one offender was under the influence.
*Estimate is based on 10 or fewer sample cases; see source.

Nearly 83% of youth in long-term, State-operated juvenile facilities in 1987 reported use of an illegal drug in the past, and 63% had used an illegal drug on a regular basis. The most commonly mentioned drugs were marijuana, cocaine, and amphetamines. Almost 40% of the incarcerated youth said they were under the influence of drugs at the time of their offense.

Among State prisoners —
- drug offenders and burglars were the most likely to have been under the influence of drugs at the time of their offense
- 19% had used a major drug (heroin, cocaine, PCP, or LSD) daily in the month before the offense for which they were imprisoned, and 70% of these (13% of all inmates) were convicted of a crime for gain (including robbery, burglary, drug trafficking, and larceny)
- half of those sentenced for robbery, burglary, larceny, or a drug offense were daily drug users, and about 40% were under the influence of an illegal drug when they committed the crime — a higher proportion than for inmates convicted of other crimes
- male inmates were somewhat more likely than female inmates to use drugs — the proportion of inmates who used heroin was somewhat greater among women than men.

The convicted jail inmates most likely to have used drugs just prior to the offense were drug offenders and property offenders.

In 1986, 28% of prison inmates reported past drug dependency. The drugs most often mentioned were heroin (14%), cocaine (10%), and marijuana or hashish (9%).

In 1986, 30% of prison inmates reported that they had participated in a drug treatment program at some time —12% more than once. About half the inmates who had participated in a program had received their most recent treatment while incarcerated.

Sources: *The redesigned National Crime Survey: Selected new data. Profile of State prison inmates, 1986. Drug use and crime: State prison inmate survey, 1986. Jail inmates 1983. Survey of youth in custody, 1987.*

**Trends in offender drug use**

Between 1974 and 1986 the proportion of State prisoners —

- under the influence of an illegal drug at the time of the offense for which they were incarcerated grew from 25% to 35%
- under the influence of cocaine at the time of the offense grew from 1% to 10.7%
- under the influence of heroin fell from 16.2% to 7%.

In 1979, 42.7% of the 288,086 State prisoners either had been convicted of a drug crime or were daily users of illegal drugs in the month preceding the offense for which they were imprisoned. In 1986, 46.8% of the 500,725 State prisoners were actively involved with illegal drugs either as users or by conviction for a drug crime.

More than half the State prisoners who had ever used a major drug (heroin, methadone, cocaine, PCP, or LSD) reported that they had not done so until after their first arrest. Nearly three-fifths of those who had used a major drug regularly said such use began after their first arrest — 51% not until more than a year after.

For the typical State prisoner who used drugs —

- first use of any drug occurred at age 15
- first use of a major drug occurred at age 17
- first regular use of a major drug began at age 18.

First use and first regular use of major drugs began an average of 2 years earlier among white than among black inmates.

Among drug-using youth in long-term, State-operated juvenile facilities, 19% said they first used drugs before age 10; almost 40% reported their first use was before age 12.

Sources: *Drug use and crime: State prison inmate survey, 1986. Prisoners in 1988. Survey of youth in custody, 1987.*

**Drug law enforcement**

Federal, State, and local agencies share responsibility for enforcing the Nation's drug laws. Most drug arrests (estimated at more than 1 million in 1988) are made by State and local authorities , but 21,188 drug suspects were arrested by the Drug Enforcement Administration (DEA) and the FBI during the Federal fiscal year ending September 30, 1986. Federal agents took part in joint Federal/State efforts leading to the arrest of suspects by State or local officials.

**Estimated number of adult arrests for drug violations reported by State and local police, 1980-88**

| Year | Sale/manufacture | Possession |
|---|---|---|
| 1980 | 102,714 | 368,451 |
| 1981 | 93,143 | 374,913 |
| 1982 | 119,309 | 465,541 |
| 1983 | 128,948 | 454,526 |
| 1984 | 137,218 | 486,501 |
| 1985 | 170,307 | 548,290 |
| 1986 | 186,414 | 556,273 |
| 1987 | 219,176 | 630,345 |
| 1988 | 287,858 | 762,718 |
| Percent change, 1980-88 | 180.3% | 107.0% |

As reported in the 1988 BJS *Sourcebook of criminal justice statistics* —

- the Federal Government seized 4,175 clandestine drug laboratories between 1975 and 1988
- in 1988, 810 labs were seized; 667 of them were used to manufacture methamphetamines
- in 1988 DEA's program for eradicating domestic marijuana resulted in the destruction of 107 million plants in 38,531 plots, 6,062 arrests, and 2,034 weapons seized
- in 1988 DEA confiscated 125,000 pounds of cocaine, almost 2,000 pounds of heroin, 73 pounds of opium, and 1.2 million pounds of marijuana
- in 1987 the U.S. Customs Service seized 1.7 million pounds of marijuana, 87,900 pounds of cocaine, and close to 4 million dosage units of drugs such as LSD and barbiturates
- in 1988 the U.S. Coast Guard confiscated 356,000 pounds of marijuana and more than 9,000 pounds of cocaine
- in 1988 the U.S. Postal Service made 425 arrests for mailing narcotics
- in 1987 State and Federal courts authorized wiretaps in 379 narcotics cases.

Drug seizure data from different Federal agencies cannot be tadded together because in many instances more than one agency participated in the operations.

Law enforcement agencies perform many drug-related functions in addition to seizing illegal drugs and arresting drug law violators:

- In 1987, almost half (47%) of State police agencies had primary responsibility for laboratory testing of drugs, but only the largest municipal and county agencies tended to have such responsibility.
- 78% of municipal police departments serving populations of 250,000 or more had special units for drug education in the schools, and 50% of those serving populations of 1 million or more had some type of drug-screening program.

Only the largest law enforcement agencies tended to have primary responsibility for laboratory testing of drugs in 1987:

**Law enforcement agencies with primary responsibility for laboratory testing of drugs, by population served and type of agency, 1987**

| Population served | Type of agency | |
|---|---|---|
| | Local police | Sheriff |
| All sizes | 4.3% | 7.4% |
| 1 million or more | 76.9 | 35.3 |
| 500,000-999,999 | 48.2 | 20.1 |
| 250,000-499,999 | 45.3 | 15.2 |
| 100,000-249,999 | 16.9 | 14.2 |
| 50,000-99,999 | 17.1 | 10.4 |
| 25,000-49,999 | 9.6 | 5.2 |
| 10,000-24,999 | 4.2 | 4.6 |
| Less than 10,000 | 2.9 | 5.6 |

Sources: *Drug law violators, 1980-86: Federal offenses and offenders. Prisoners in 1988.* The Drug Enforcement Administration, the U.S. Coast Guard, the U.S. Customs Service, the Federal Bureau of Investigation, the U.S. Postal Service, and the Administrative Office of the U.S. Courts; all as reported in the BJS *Sourcebook of criminal justice statistics, 1988. Profile of State and local law enforcement agencies, 1987. Police departments in large cities, 1987.*

**Prosecution and sentencing of drug law violators**

Of all persons or organizations referred to U.S. prosecutors during the Federal fiscal year ending September 30, 1987, 24.9% were suspected of drug law violations, up from 13.8% in 1980. During the previous fiscal year, among the suspected drug offenders —

- 87% were alleged to have distributed or illegally manufactured drugs
- 9% were suspected of importing drugs
- 4% were suspected of simple possession.

In 1987, 78% of suspects in drug cases were prosecuted, up from 73% in 1980. This was a higher rate than for any other crime category.

The number of suspects prosecuted for drug offenses increased from 7,003 in 1980 to 17,729 in 1987 — an increase of 153%.

The number of persons convicted of violating Federal drug laws rose to 13,423 in 1987 from 5,135 in 1980. This 161% increase exceeded the 49% growth in U.S. court convictions for all Federal offenses during the same years and accounted for over 50% of the total increase in Federal convictions.

The number of defendants convicted of drug possession offenses increased from 498 in 1980 to 2,193 in 1987 — a 340.4% increase.

Drug offenses accounted for 17% of all defendants convicted in 1980 and 30% of all defendants convicted in 1987. Drug trafficking offenses accounted for 25.2% of all defendants convicted in 1987. The conviction rate for drug defendants increased from 74% in 1980 to 85% in 1987.

The percent of convicted Federal offenders charged with drug violations who were sentenced to prison rose from 72% in 1980 to 76% in 1987.

The average prison sentence for persons charged with Federal drug violations was longer than for all other offenses except violent crimes and racketeering.

**Average sentence length for persons sentenced to Federal prisons for drug and non-drug offenses, 1987**

| | |
|---|---|
| All offenses | 55.2 mos. |
| **Drug offenses** | **67.8** |
| **Trafficking** | **69.1** |
| **Possession** | **48.1** |
| Violent offenses | 126.2 |
| Fraudulent property offenses | 31.1 |
| General property offenses | 36.5 |
| Regulatory offenses | 42.1 |
| Public-order offenses | 32.2 |

The percent of all defendants sentenced to prison who were convicted of drug offenses grew steadily from 26.7% in 1980 to 43.2% in 1987 at an average rate of 15.7%.

Federal sentences for drug offenses are longer than in the past. The average Federal prison sentence for drug offenses rose from almost 4 years in 1980 to more than 5.5 years in 1987 — a rise of 44%, a higher percentage increase in average sentence length than for all offenses combined (25%).

The first national BJS study of felony court sentencing in 1986 found that 64% of the persons convicted of drug trafficking were sentenced to some kind of incarceration — 27% to jail and 37% to prison. In the 75 largest counties, 75% of those convicted of drug trafficking were sentenced to incarceration (40% to jail and 35% to prison). This may reflect the small amounts of illegal drugs (sometimes only ounces) needed to allow a defendant to be charged with "possession with intent to sell" rather than possession only. This could mean that relatively minor cases are pulling down the percentage sentenced to incarceration.

In the United States in 1986 there were 185,423 adults arrested for drug trafficking, 76,437 felony trafficking convictions, and 48,651 drug traffickers incarcerated (including 28,151 sent to prison).

**Percent of convicted felons sentenced to incarceration in the United States, 1986**

| | Percent incarcerated | |
|---|---|---|
| | Total | In a State prison |
| Murder | 95% | 92% |
| Rape | 88 | 75 |
| Robbery | 87 | 76 |
| Aggravated assault | 71 | 45 |
| Burglary | 74 | 53 |
| Larceny | 64 | 40 |
| Drug trafficking | 64 | 37 |

**Average maximum prison sentence length imposed and estimated time to be served in prisons for persons sentenced for felonies in the United States, 1986**

| Most serious conviction offense | Average maximum sentence length | Estimated time to be served |
|---|---|---|
| Murder | 221 mos. | 86 mos. |
| Rape | 151 | 66 |
| Robbery | 139 | 57 |
| Aggravated assault | 97 | 41 |
| Burglary | 75 | 31 |
| Larceny | 46 | 20 |
| Drug trafficking | 69 | 22 |

In 1986, of adults arrested for felony drug offenses in five States —

- 79% were prosecuted
- 57% were convicted
- 45% were sentenced to incarceration — 10% for more than 1 year.

**Disposition of felony arrests in five States, 1983-86**

| Arrested for: | Percent of persons arrested who were: Prosecuted | Convicted | Sentenced to incarceration: Total | Prison |
|---|---|---|---|---|
| All offenses | | | | |
| 1983 | 83 | 62 | 37 | 10 |
| 1986 | 83 | 62 | 41 | 11 |
| Violent offenses | | | | |
| 1983 | 82 | 56 | 36 | 15 |
| 1986 | 81 | 53 | 35 | 14 |
| Property offenses | | | | |
| 1983 | 86 | 67 | 43 | 10 |
| 1986 | 86 | 67 | 47 | 11 |
| Drug offenses | | | | |
| 1983 | 74 | 50 | 33 | 7 |
| 1986 | 79 | 57 | 45 | 10 |

**Disposition of felony arrests in the United States, 1986**

| Arrest offense | For 100 arrests: Convicted | Incarcerated: Total | Prison |
|---|---|---|---|
| Murder* | 56 | 54 | 52 |
| Robbery | 38 | 33 | 29 |
| Aggravated assault | 13 | 9 | 6 |
| Burglary | 36 | 26 | 19 |
| Drug trafficking | 41 | 26 | 15 |

*Includes nonnegligent manslaughter.

Sources: *Federal criminal cases, 1980-87. Felony sentences in State courts, 1986. Criminal cases in five States, 1983-86. Drug law violators, 1980-86: Federal offenses and offenders.*

**Time served in prison by drug offenders**

Typically, *only part of the sentence handed* down by the court is actually served in prison.

**Median time served by persons released from State prisons in 1984**

| | Time served in jail and prison | Percent of sentence in confinement |
|---|---|---|
| All | 17 mos. | 45.4% |
| Violent | 28 | 50.5 |
| Property | 15 | 44.0 |
| Drug | 14 | 38.8 |
| Possession | 12 | 39.2 |
| Trafficking | 16 | 38.7 |
| Other | 13 | 38.7 |
| Public-order | 9 | 39.5 |
| Other | 15 | 50.6 |

**Average time served by Federal prisoners***

| Offense | Average time served | Percent of sentence served |
|---|---|---|
| All | 43.3 mos. | 59.1% |
| Robbery | 72.9 | 49.0 |
| Drug | 38.5 | 58.6 |
| Weapons | 31.5 | 69.4 |
| Monetary crime** | 26.5 | 63.8 |

*Federal prison inmates who were sentenced to more than 1 year in prison, who had their first parole hearing during the year prior to June 30, 1980, and who were released or scheduled for release as of January 1, 1987.
**Monetary crime includes counterfeiting, forgery, fraud, mail theft, embezzlement, interstate transportation of stolen securities, and receiving stolen property with intent to sell; it excludes burglary and robbery.

The 38.5-month average time served by Federal drug offenders was about 59% of their court-ordered maximum sentences. Offenders who received sentences of between —

- 1 and 5 years served an average of 2 years 1 month (70% of their sentences)
- 15 and 20 years served an average of 7 years 4 months (39% of their sentences).

Federal parole guidelines governing release of drug offenders were changed in 1987. Under the amended guidelines, drug offenders will be required to serve longer portions of their sentences. Many States have made similar changes that are expected to increase the amount of time served by drug law violators in State prisons.

Sources: *Time served in prison and on parole, 1984. Drug law violators, 1980-86: Federal offenses and offenders. Sentencing and time served: Federal offenses and offenders.*

### Drug offenders in correctional populations

Drug law violators make up a growing share of Federal prison admissions:
- 22% of all admissions in fiscal 1980
- 34% in fiscal 1986.

Between 1979 and 1986 the percent of inmates in prison for —
- any drug law offense rose from 6.4% to 8.6%
- drug possession rose from 1.6% to 2.9%
- drug trafficking rose from 4.4% to 5.4%.

In 1986 persons sentenced for drug trafficking made up 26.1% of State prison inmates with no known prior sentence to probation or incarceration. This was a larger proportion than for any other offense.

**Offense composition of long-term, State-operated juvenile facilities (1987) and State adult prisons (1986)**

| Current offense | Percent of youth in long-term, State-operated juvenile institutions: Under age 18 | Age 18 and older | Percent of inmates in State prisons |
|---|---|---|---|
| Violent | 39.3% | 52.3% | 54.6% |
| Property | 45.6 | 29.0 | 31.0 |
| Drug | 5.6 | 11.3 | 8.6 |
| Public-order | 7.2 | 6.8 | 5.2 |
| Other* | 2.4 | .6 | .7 |

*Includes juvenile status offenses for youth in State institutions.

As reported in the BJS *Sourcebook of criminal justice statistics, 1988*, the proportion of juveniles in public facilities for drug offenses was higher than in private facilities:

| Detained or committed for: | All | Type of facility: Public | Private |
|---|---|---|---|
| Crimes against persons | 20% | 25% | 6% |
| Crimes against property | 37 | 44 | 17 |
| Drug-related offenses | 6 | 7 | 3 |
| Alcohol and public-order offenses | 4 | 6 | 2 |
| Probation/parole violation | 5 | 8 | 1 |
| Other delinquent acts | 5 | 5 | 5 |
| Nondelinquent reasons | 23 | 6 | 66 |

Note: Percents may not total 100% because of rounding.

The proportion of drug offenders in local jails was about the same in 1978 and 1983:

| Current offense | Percent of all inmates: 1978 | 1983 |
|---|---|---|
| Any drug offense | 9% | 10% |
| Trafficking | 4 | 4 |
| Possession/use | 4 | 5 |
| Other drug | 1 | 1 |

In 1983, among drug offenders in local jails —
- 64% had been convicted and were awaiting sentencing, awaiting transfer to a State or Federal prison, or serving the sentence in jail
- 36% were on trial, awaiting trial, or not yet arraigned.

Of prisoners released in 1983 from 11 States, 50.4% of those incarcerated for drug law violations were rearrested within 3 years, compared to 68% of property offenders, 59.6% of violent offenders, and 54.6% of public-order offenders. Of all prisoners released that year, 9.5% had a drug law violation as the most serious offense for which they had been incarcerated.

Drug offenses accounted for 14% of new charges against all those rearrested.

Of those drug law violators released from prison in 1983, 24.8% were rearrested within 3 years for a drug law violation.

**Percent of drug law violators released from prison in 1983 who within 3 years were —**

| | Re-arrested | Re-convicted | Re-incarcerated |
|---|---|---|---|
| Drug offenses | 50.4% | 35.3% | 30.3% |
| Possession | 62.8 | 40.2 | 36.7 |
| Trafficking | 51.5 | 34.5 | 29.4 |

Sources: *Drug law violators, 1980-86: Federal offenses and offenders. Profile of State prison inmates, 1986. Survey of youth in custody, 1987. Jail inmates 1983. Recidivism of prisoners released in 1983.* Office of Juvenile Justice and Delinquency Prevention, as reported in the BJS *Sourcebook of criminal justice statistics, 1988.*

### Public opinion about drugs

As reported in the BJS *Sourcebook of criminal justice statistics*, the number of Gallup Poll respondents describing drug abuse as the most important problem facing our country today has grown steadily during the past several years:

| Date of poll | Drug abuse most serious problem |
|---|---|
| January 1985 | 2% |
| May 1985 | 6 |
| July 1986 | 8 |
| April 1987 | 11 |
| September 1988 | 11 |
| May 1989 | 27 |

Gallup Poll respondents most often mentioned use of drugs as one of the biggest problems with which the schools in their communities had to deal. Giving that response in 1988 were —

- 30% of public-school parents
- 29% of non-public-school parents
- 34% of those with no children in school
- 32% of all surveyed.

In a 1987 Gallup Poll, 54% of youth 13-17 years old said drug abuse was one of "the biggest problems facing people" their age. That response was given much more often than others such as alcohol abuse (12%), teenage pregnancy (11%), peer pressure (10%), AIDS (5%), and problems with parents (2%).

In 1988, 38% of Gallup Poll respondents said they favored the death penalty for convicted drug dealers who had not been convicted of murder.

When asked about spending for various social problems, 71% of the respondents to a 1988 National Opinion Research Center (NORC) Poll said this country is spending too little to deal with drug addiction.

NORC has asked adults (age 18 and older) about legalization of marijuana since 1973. During that time those who say marijuana should be made legal —

- peaked at 30% in 1978
- fell to 17% in 1988.

College freshmen have been surveyed since 1968. In 1988, 19.3% of those surveyed agreed strongly or somewhat that marijuana should be legalized, down from a high of 52.9% in 1977. The 1988 response is similar to the 19.4% recorded in 1968, which increased gradually until the 1977 peak.

High school seniors have been surveyed each year since 1975. In —

- 1987, 15.4% felt using marijuana should be entirely legal, down from 34% feeling that way in 1977
- 1988, 78.6% reported worrying often or sometimes about drug abuse, up from 65.8% in 1977.

**1988 high school seniors reporting they could obtain drugs fairly easily or very easily**

| Drug | Percent |
|---|---|
| Marijuana | 85.0% |
| Amphetamines | 63.9 |
| Cocaine powder | 50.3 |
| Crack | 42.1 |
| Tranquilizers | 49.1 |
| Barbiturates | 47.8 |
| LSD | 33.3 |
| Heroin | 28.0 |

The seniors were asked, "How harmful is the use of drugs?" The percents of those who answered by saying people are taking a "great risk" of harming themselves in regularly using the following were—

- marijuana/hashish, 77%, up from a low of 35% in 1978
- cocaine, 89.2%, up from a low of 68% in 1977 and 1978
- heroin, 88.8%, virtually stable since 1977
- LSD, 84.2%, up from 79.1% in 1977.

In 1988 Gallup Poll respondents were asked which strategies would do the most to "halt the drug epidemic in the U.S.":

- 47% said "educating young people and other non-users about the dangers of drug abuse"
- 35% said "making it harder for illegal drugs to get into the country"
- 6% said "helping drug users obtain treatment to overcome their dependency"
- 13% volunteered "all" of the above
- 1% volunteered "none."

In 1988 a Gallup Poll asked what respondents felt would be the effect of legalizing drugs:

| Effect of legalization | Increase | Decrease | Stay about the same |
|---|---|---|---|
| Increase or decrease: | | | |
| Drug use in public schools | 65% | 13% | 19% |
| The number of addicts | 61 | 8 | 28 |
| The number of drug overdoses | 60 | 12 | 24 |
| Drug-related crime | 49 | 27 | 20 |

Sources: *The Gallup report*; National Opinion Research Center data made available through the Roper Public Opinion Research Center; Alexander W. Astin et al., *The American freshman: Twenty year trends*; Lloyd D. Johnston, Jerald G. Bachman, and Patrick M. O'Malley, *Monitoring the future 1975-1988*; Lloyd D. Johnston, Patrick M. O'Malley, and Jerald G. Bachman, *Drug use, drinking, and smoking: National survey results from high school, college, and young adult populations 1975-1988*; all as reported in the BJS *Sourcebook of criminal justice statistics, 1988*.

## Drug use in the general population

As reported in the 1988 BJS *Sourcebook of criminal justice statistics* —

- 47.2% of 1988 high school seniors reported having ever used marijuana/hashish
- 12.1% reported having ever used cocaine
- 1.1% reported having ever used heroin.

**Reported illegal drug use of high school seniors, 1988**

| Drug | Used within the last: 12 months* | 30 days |
|---|---|---|
| Marijuana | 33.1% | 18.0% |
| Inhalants | 7.1 | 3.0 |
| Hallucinogens | 5.8 | 2.3 |
| Cocaine | 7.9 | 3.4 |
| Heroin | .5 | .2 |
| Other opiates | 4.6 | 1.6 |
| Sedatives | 3.7 | 1.4 |
| Tranquilizers | 4.8 | 1.5 |
| Stimulants | 10.9 | 4.6 |

*Including the last 30 days.

Reported marijuana use by high school seniors within the previous 12 months fell to 33% in 1988, the lowest level since the survey began in 1975; similarly, the 18% reporting such use within the last 30 days was also the lowest in the period.

Self-reports of drug use among high school seniors underrepresent drug use among youth of that age group because high school dropouts and truants are not included, and these groups are expected to have more involvement with drugs than those who stay in school.

**Cocaine use among high school seniors during the late 1970's and early 1980's may have peaked in 1985**

| Year | Used cocaine within the last: 12 months* | 30 days |
|---|---|---|
| 1975 | 5.6% | 1.9% |
| 1976 | 6.0 | 2.0 |
| 1977 | 7.2 | 2.9 |
| 1978 | 9.0 | 3.9 |
| 1979 | 12.0 | 5.7 |
| 1980 | 12.3 | 5.2 |
| 1981 | 12.4 | 5.8 |
| 1982 | 11.5 | 5.0 |
| 1983 | 11.4 | 4.9 |
| 1984 | 11.6 | 5.8 |
| 1985 | 13.1 | 6.7 |
| 1986 | 12.7 | 6.2 |
| 1987 | 10.3 | 4.3 |
| 1988 | 7.9 | 3.4 |

*Including the last 30 days.

**Reported recency of marijuana and cocaine use among college students, 1980-87**

| | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|---|
| Marijuana | | | | | | | | |
| Daily within last month | 7.2% | 5.6% | 4.2% | 3.8% | 3.6% | 3.1% | 2.1% | 2.3% |
| Last month | 34.0 | 33.2 | 26.8 | 26.2 | 23.0 | 23.6 | 22.3 | 20.3 |
| Last year | 51.2 | 51.3 | 44.7 | 45.2 | 40.7 | 41.7 | 40.9 | 37.0 |
| Cocaine | | | | | | | | |
| Daily within last month | .2 | 0 | .3 | .1 | .4 | .1 | .1 | .1 |
| Last month | 6.9 | 7.3 | 7.9 | 6.4 | 7.6 | 6.9 | 7.0 | 4.6 |
| Last year | 16.9 | 15.9 | 17.2 | 17.2 | 16.4 | 17.3 | 17.1 | 13.7 |

As reported in the 1988 BJS *Sourcebook of criminal justice statistics*, data from the 1985 *National Household Survey on Drug Abuse* show that marijuana and cocaine use are related to age:

| Drug | Age of respondent | | |
|---|---|---|---|
| | 18-25 | 26-34 | 35+ |
| Marijuana | | | |
| Last month | 21.8% | 16.9% | 2.2% |
| Last year | 36.9 | 25.1 | 2.3 |
| Lifetime | 60.3 | 58.5 | 15.9 |
| Cocaine | | | |
| Last month | 7.6% | 6.1% | .5% |
| Last year | 16.3 | 12.6 | 1.2 |
| Lifetime | 25.2 | 24.1 | 4.2 |

Sources: Lloyd D. Johnston, Patrick M. O'Malley, and Jerald G. Bachman, *Drug use, drinking, and smoking: National survey results from high school, college, and young adult populations 1975-1988*; National Institute on Drug Abuse, *National household survey on drug abuse: Main findings, 1985*; both as reported in the BJS *Sourcebook of criminal justice statistics, 1988*.

# Source notes

Single copies of any report with an NCJ number can be obtained free from the Drugs & Crime Data Center & Clearinghouse, 1600 Research Boulevard, Rockville, MD 20850; toll-free **800-666-3332** (local number 301-251-5500).


***Criminal cases in five States, 1983-86*** (BJS Special Report), September 1989, NCJ-118798

***Drugs & Crime Data Center & Clearinghouse*** (brochure), November 1989, BC-000125

***Drug law violators, 1980-86: Federal offenses and offenders*** (BJS Special Report), June 1988, NCJ-111763

***Drug use and crime: State prison inmate survey, 1986*** (BJS Special Report), July 1988, NCJ-111940

***Drugs and crime facts, 1988***, September 1989, NCJ-118312

***Federal criminal cases, 1980-87: Federal offenses and offenders*** (BJS Special Report), July 1989, NCJ-18311

***Felony sentences in State courts, 1986*** (BJS Bulletin), February 1989, NCJ-115210

***Jail inmates 1933*** (BJS Bulletin), November 1985, NCJ-99175

***Police departments in large cities, 1987*** (BJS Special Report), August 1989, NCJ-119220

***Profile of State and local law enforcement agencies, 1987*** (BJS Bulletin), March 1989, NCJ-113949

***Profile of State prison inmates, 1986*** (BJS Special Report), January 1988, NCJ-109926

***Prisoners in 1988*** (BJS Bulletin), April 1989, NCJ-116315

***Recidivism of prisoners released in 1983*** (BJS Special Report), April 1989, NCJ-116261

***Sentencing and time served: Federal offenses and offenders*** (BJS Special Report), June 1987, NCJ-101043

***Sourcebook of criminal justice statistics, 1988***, August 1989, NCJ-118318

***Survey of youth in custody, 1987*** (BJS Special Report), September 1988, NCJ-113365

***The redesigned National Crime Survey: Selected new data*** (BJS Special Report), January 1989, NCJ-114746

***Time served in prison and on parole, 1984*** (BJS Special Report), December 1987, NCJ-108544

# Now you can receive BJS press releases and other current data from the NCJRS Electronic Bulletin Board!

The Electronic Bulletin Board provides quick and easy access to new information—use your personal computer and modem, set at 8–N–1 (rates 300 to 2400 baud), and call 301–738–8895, 24 hours a day.

Once online, you will be able to review current news and announcements from BJS and its Justice Statistics Clearinghouse, including new publication listings and conference calendars.

For more information about the Bulletin Board, call 1–800–732–3277.

BJS menu options
1. BJS press releases
2. Latest BJS findings
3. Justice Statistics Clearing-house information
4. BJS conference activity
5. News from the Drugs & Crime Data Center & Clearinghouse
6. National Archive of Criminal Justice Data
7. News from State Statistical Analysis Centers



## Bureau of Justice Statistics reports

(revised December 1989)

Call toll-free 800-732-3277 (local 301-251-5500) to order BJS reports, to be added to one of the BJS mailing lists, or to speak to a reference specialist in statistics at the Justice Statistics Clearinghouse, National Criminal Justice Reference Service, Box 6000, Rockville, MD 20850.

**BJS maintains the following mailing lists:**

- Law Enforcement reports (new)
- Drugs and crime data (new)
- Justice spending & employment
- White-collar crime (new)
- National Crime Survey (annual)
- Corrections (annual)
- Juvenile corrections (annual)
- Courts (annual)
- Privacy and security of criminal history information and information policy
- Federal statistics (annual)
- BJS bulletins and special reports (approximately twice a month)
- Sourcebook of Criminal Justice Statistics (annual)

Single copies of reports are free; use NCJ number to order. Postage and handling are charged for bulk orders of single reports. For single copies of multiple titles, up to 10 titles are free; 11-40 titles $10; more than 40, $20; libraries call for special rates.

Public-use tapes of BJS data sets and other criminal justice data are available from the National Archive of Criminal Justice Data (formerly CJAIN), P.O. Box 1248, Ann Arbor, MI 48106 (toll-free 1-800-999-0960).

### National Crime Survey

**Criminal victimization in the U.S.:**
- 1987 (final report), NCJ-115524, 6/89
- 1986 (final report), NCJ-111456, 9/88

*BJS special reports:*
- **Hispanic victims**, NCJ-120507, 12/89
- **The redesigned National Crime Survey: Selected new data**, NCJ-114746, 1/89
- **Motor vehicle theft**, NCJ-109978, 3/88
- **Elderly victims**, NCJ-107676, 11/87
- **Violent crime trends**, NCJ-107217, 11/87
- **Robbery victims**, NCJ-104638, 4/87
- **Violent crime by strangers and nonstrangers**, NCJ-103702, 1/87
- **Preventing domestic violence against women**, NCJ-102037, 8/86
- **Crime prevention measures**, NCJ-100438, 3/86
- **The use of weapons in committing crimes**, NCJ-99643, 1/86
- **Reporting crimes to the police**, NCJ-99432, 12/85
- **Locating city, suburban, and rural crime**, NCJ-99535, 12/85
- **The risk of violent crime**, NCJ-97119, 5/85
- **The economic cost of crime to victims**, NCJ-93450, 4/84
- **Family violence**, NCJ-93449, 4/84

*BJS bulletins*
- **Criminal victimization 1988**, NCJ-119845, 10/89
- **Households touched by crime, 1988**, NCJ-117434, 6/89
- **Criminal victimization 1987**, NCJ-113587, 10/88
- **The crime of rape**, NCJ-96777, 3/85
- **Household burglary**, NCJ-96021, 1/85
- **Measuring crime**, NCJ-75710, 2/81

*BJS technical reports*
- **New directions for the NCS**, NCJ-115571, 3/89
- **Series crimes: Report of a field test**, NCJ-104615, 4/87
- **Lifetime likelihood of victimization**, NCJ-104274, 3/87
- **Response to screening questions in the NCS**, NCJ-97624, 7/85

**Preliminary data from the National Crime Survey, 1988** (press release), 4/89
**Redesign of the National Crime Survey**, NCJ-111457, 3/89
**The seasonality of crime victimization**, NCJ-111033, 6/88
**Crime and older Americans information package**, NCJ-104569, $10, 5/87
**Teenage victims**, NCJ-103138, 12/86
**Victimization and fear of crime: World perspectives**, NCJ-93872, 1/85, $9.15
**The National Crime Survey: Working papers**, vol. I: Current and historical perspectives, NCJ-75374, 8/82; vol. II: Methodological studies, NCJ-90307, 12/84, $9.50

### Corrections

*BJS bulletins and special reports:*
- **Prison rule violators**, NCJ-120344, 12/89
- **Capital punishment 1988**, NCJ-118313, 7/89
- **Prisoners in 1988**, NCJ-116315, 4/89
- **Recidivism of prisoners released in 1983**, NCJ-116261, 4/89
- **Drug use and crime: State prison inmate survey, 1986**, NCJ-111940, 7/88
- **Time served in prison and on parole 1984**, NCJ-108544, 1/88
- **Profile of State prison inmates, 1986**, NCJ-109926, 1/88
- **Imprisonment in four countries**, NCJ-103967, 2/87
- **Population density in State prisons**, NCJ-103204, 12/86
- **State and Federal prisoners, 1925-85**, 102494, 11/86
- **Prison admissions and releases, 1983**, NCJ-100582, 3/86
- **The prevalence of imprisonment**, NCJ-93657, 7/85
- **Examining recidivism**, NCJ-96501, 2/85

**Correctional populations in the U.S.:**
- 1987, NCJ-118762, 12/89
- 1986, NCJ-111611, 2/89
- 1985, NCJ-103957, 2/88

**Historical statistics on prisoners in State and Federal institutions, yearend 1925-86**, NCJ-111098, 6/88
**1984 census of State adult correctional facilities**, NCJ-105585, 7/87
**Historical corrections statistics in the U.S., 1850-1984**, NCJ-102529, 4/87

*Census of jails and survey of jail inmates*
*BJS bulletins and special reports*
- **Jail inmates, 1987**, NCJ-114319, 12/88
- **Drunk driving**, NCJ-109945, 2/88
- **Jail inmates, 1986**, NCJ-107123, 10/87
- **The 1983 jail census**, NCJ-95536, 11/84

**Census of local jails, 1983: Data for individual jails**, vols. I-IV, Northeast, Midwest, South, West, NCJ-112796-9; vol. V, Selected findings, methodology, summary tables, NCJ-112795, 11/88
**Our crowded jails: A national plight**, NCJ-111846, 8/88

### Parole and probation

*BJS bulletins*
- **Probation and parole:**
  - 1988, NCJ-119970, 11/89
  - 1987, NCJ-113948, 11/88
  - 1986, NCJ-108012, 12/87
- **Setting prison terms**, NCJ-76218, 8/83

*BJS special reports*
- **Time served in prison and on parole, 1984**, NCJ-108544, 1/88
- **Recidivism of young parolees**, NCJ-104916, 5/87

### Children in custody

- **Census of public and private juvenile detention, correctional, and shelter facilities, 1975-85**, NCJ-114065, 6/89
- **Survey of youth in custody, 1987** (special report), NCJ-113365, 9/88
- **Public juvenile facilities, 1985** (bulletin), NCJ-102457, 10/86

### Law enforcement management

*BJS special reports*
- **Police departments in large cities, 1987**, NCJ-119220, 8/89
- **Profile of State and local law enforcement agencies**, NCJ-113949, 3/89

### Expenditure and employment

*BJS bulletins*
- **Justice expenditure and employment:**
  - 1985, NCJ-104460, 3/87
  - 1983, NCJ-101776, 7/86

**Anti-drug abuse formula grants: Variable pass-through data, fiscal 1990** (BJS technical report), NCJ-120070, 12/89
**Justice expenditure and employment:**
- 1985 (full report), NCJ-106356, 8/89
- Extracts, 1982 and 1983, NCJ-106629, 8/88
- Extracts, 1980 and 1981, NCJ-96007, 6/85
- 1971-79, NCJ-92596, 11/84

### Courts

*BJS bulletins*
- **Felony sentences in State courts**, NCJ-115210, 2/89
- **Criminal defense for the poor, 1986**, NCJ-112919, 9/88
- **State felony courts and felony laws**, NCJ-106273, 8/87
- **The growth of appeals: 1973-83 trends**, NCJ-96381, 2/85
- **Case filings in State courts 1983**, NCJ-95111, 10/84

*BJS special reports*
- **Felony case-processing time**, NCJ-101985, 8/86
- **Felony sentencing in 18 local jurisdictions**, NCJ-97681, 6/85
- **The prevalence of guilty pleas**, NCJ-96018, 12/84
- **Sentencing practices in 13 States**, NCJ-95399, 10/84

**Sentencing outcomes in 28 felony courts**, NCJ-105743, 8/87
**National criminal defense systems study**, NCJ-94702, 10/86

**The prosecution of felony arrests:**
- 1986, NCJ-113248, 6/89
- 1982, NCJ-106990, 5/88
- 1981, NCJ-101380, 9/86, $7.60

**Felony laws of the 50 States and the District of Columbia, 1986**, NCJ-105066, 2/88, $14.70
**State court model statistical dictionary**, Supplement, NCJ-98326, 9/85; 1st edition, NCJ-62320, 9/80

### Privacy and security

**Compendium of State privacy and security legislation:**
- 1987 overview, NCJ-111097, 9/88
- 1987 full report (1,497 pages, microfiche $2, hard copy $145), NCJ-113021, 9/88

**Criminal justice information policy:**
- **Strategies for improving data quality**, NCJ-115339, 5/89
- **Public access to criminal history record information**, NCJ-111458, 11/88
- **Juvenile records and recordkeeping systems**, NCJ-112815, 11/88
- **Automated fingerprint identification systems: Technology and policy issues**, NCJ-104342, 4/87
- **Criminal justice "hot" files**, NCJ-101850, 12/86
- **Crime control and criminal records** (BJS special report), NCJ-99176, 10/85
- **State criminal records repositories** (BJS technical report), NCJ-99017, 10/85
- **Data quality of criminal history records**, NCJ-98079, 10/85
- **Victim/witness legislation: An overview**, NCJ-94365, 12/84
- **Proceedings of BJS/SEARCH conference:**
  - **Open vs. confidential records**, NCJ-113560, 11/88
  - **Data quality policies and procedures**, NCJ-101849, 12/86

### Computer crime

*BJS special reports:*
- **Electronic fund transfer fraud**, NCJ-96666, 3/85
- **Electronic fund transfer and crime**, NCJ-92650, 2/84

**Electronic fund transfer systems fraud**, NCJ-100461, 4/86
**Electronic fund transfer systems and crime**, NCJ-83736, 9/82
**Expert witness manual**, NCJ-77927, 9/81, $11.50

### Federal justice statistics

**Compendium of Federal justice statistics 1984**, NCJ-112816, 9/89
**The Federal civil justice system** (BJS bulletin), NCJ-104769, 7/87
**Employer perceptions of workplace crime**, NCJ-101851, 7/87, $6

### Federal offenses and offenders

*BJS special reports:*
- **Federal criminal cases, 1980-87**, NCJ-118311, 7/89
- **Drug law violators, 1980-86**, NCJ-111763, 6/88
- **Pretrial release and detention: The Bail Reform Act of 1984**, NCJ-109929, 2/88
- **White-collar crime**, NCJ-106876, 9/87
- **Pretrial release and misconduct**, NCJ-96132, 1/85

*BJS bulletins*
- **Bank robbery**, NCJ-94463, 8/84
- **Federal drug law violators**, NCJ-92692, 2/84

### General

*BJS bulletins and special reports:*
- **Criminal cases in five states, 1983-86**, NCJ-118798, 9/89
- **International crime rates**, NCJ-110776, 5/88
- **Tracking offenders, 1984**, NCJ-109686, 1/88
- **BJS telephone contacts '87**, NCJ-102909, 12/86
- **Tracking offenders: White-collar crime**, NCJ-102867, 11/86
- **Police employment and expenditure**, NCJ-100117, 2/86

**Sourcebook of criminal justice statistics, 1988**, NCJ-118318, 9/89

**BJS data report, 1988**, NCJ-116262, 5/89
**BJS annual report, fiscal 1988**, NCJ-115749, 4/89

**Sourcebook of criminal justice statistics, 1987**, NCJ-111612, 9/88
**Report to the Nation on crime and justice:**
- **Second edition**, NCJ-105506, 6/88
- **Technical appendix**, NCJ-112011, 8/88

**Drugs & crime data:**
- **Drugs & crime data center & clearinghouse brochure**, BC-000125, 11/89
- **Drugs and crime facts, 1988**, NCJ-118312, 9/89
- **Rolodex card**, 800-666-3332, 8/88

**Criminal justice microcomputer guide and software catalog**, NCJ-112178, 8/88
**Proceedings of the third workshop on law and justice statistics**, NCJ-112230, 7/88
**Publications of BJS, 1971-84**, 10/86:
- **Topical bibliography**, TB030012, $17.50
- **Microfiche library**, PR030012, $203.00

**National survey of crime severity**, NCJ-96017, 10/85
**Criminal victimization of District of Columbia residents and Capitol Hill employees, 1982-83**, NCJ-97982;

**See order form on last page**

Please put me on the mailing list for—

- ☐ **Law enforcement reports**—national data on State and local police and sheriffs' departments: operations, equipment, personnel, salaries, spending, policies, programs
- ☐ **Federal statistics**—data describing Federal case processing, from investigation through prosecution, adjudication, and corrections
- ☐ **Drugs and crime data**—sentencing and time served by drug offenders, drug use at time of crime by jail inmates and State prisoners, and other quality data on drugs, crime, and law enforcement
- ☐ **Justice expenditure and employment reports**—annual spending and staffing by Federal/State/local governments and by function (police, courts, etc.)
- ☐ **White-collar crime**—data on the processing of Federal white-collar crime cases
- ☐ **Privacy and security of criminal history information and information policy**—new legislation; maintaining and releasing intelligence and investigative records; data quality issues
- ☐ **Juvenile corrections reports**—juveniles in custody in public and private detention and correctional facilities
- ☐ **BJS bulletins and special reports**—timely reports of the most current justice data
- ☐ **Prosecution and adjudication in State courts**—case processing from prosecution through court disposition, State felony laws, felony sentencing, criminal defense
- ☐ **Corrections reports**—results of sample surveys and censuses of jails, prisons, parole, probation, and other corrections data
- ☐ **National Crime Survey reports**—the only regular national survey of crime victims
- ☐ **Sourcebook of Criminal Justice Statistics** (annual)—broad-based data from 150+ sources (400+ tables, 100+ figures, subject index, annotated bibliography, addresses of sources)
- ☐ Send me a form to sign up for **NCJ Reports** (free 6 times a year), which abstracts both private and government criminal justice publications and lists upcoming conferences and training sessions in the field.

To be added to any BJS **mailing list**, please copy or cut out this page, fill in, fold, stamp, and mail to the Justice Statistics Clearinghouse/NCJRS.

You will receive an annual renewal card. If you do not return it, we must drop you from the mailing list.

To order copies of **recent BJS reports**, check here ☐ and circle items you want to receive on other side of this sheet.

Name:

Title:

Organization:

Street or box:

City, State, Zip:

Daytime phone number: ( )

Criminal justice interest:

Put your organization and title here if you used home address above:

FOLD, SEAL WITH TAPE AND STAMP

U.S. Department of Justice
Office of Justice Programs
Bureau of Justice Statistics
Washington, D.C. 20531

Place 1st-class stamp here

Justice Statistics Clearinghouse/NCJRS
U.S. Department of Justice
Box 6000
Rockville, MD 20850

# Drugs & Crime Data

Data Center & Clearinghouse for Drugs & Crime



## Illicit drugs— Cultivation to consequences

**The worldwide drug business**

- Cultivation & production
  - Foreign
  - Domestic
- Distribution
  - Export
  - Transshipment
  - Import into U.S.
- Finance
  - Money laundering
  - Profits

**The fight against drugs**

- Enforcement
  - Border interdiction
  - Investigation
  - Seizure & forfeiture
  - Prosecution
- Consumption reduction
  - Prevention
  - Education
  - Treatment

**Consequences of drug use**

- Abuse
  - Addiction
  - Overdose
  - Death
- Crime
  - While on drugs
  - For drug money
  - Trafficking
- Impact on justice system
- Social disruption

The Data Center & Clearinghouse for Drugs & Crime is funded by the Bureau of Justice Assistance and directed by the Bureau of Justice Statistics of the U.S. Department of Justice.

**Major heroin smuggling routes into the United States**



## One free phone call can give you access to a growing data base on drugs & crime

The new Data Center & Clearinghouse for Drugs & Crime is managed by the Bureau of Justice Statistics. To serve you, the center will—

- **Respond** to your requests for drugs and crime data.
- **Let you know** about new drugs and crime data reports.
- **Send** you reports on drugs and crime.
- **Conduct** special bibliographic searches for you on specific drugs and crime topics.
- **Refer** you to data on epidemiology, prevention, and treatment of substance abuse at the National Clearinghouse for Alcohol and Drug Information of the Alcohol, Drug Abuse, and Mental Health Administration.
- **Publish** special reports on subjects such as assets forfeiture and seizure, economic costs of drug-related crime, drugs and violence, drug laws of the 50 States, drug abuse and corrections, and innovative law enforcement reactions to drugs and crime.
- **Prepare** a comprehensive, concise report that will bring together a rich array of data to trace and quantify the full flow of illicit drugs from cultivation to consequences.

**Major cocaine smuggling routes into the United States**



***Call now*** and speak to a specialist in drugs & crime statistics:

**1-800-666-3332**

***Or write*** to the Data Center & Clearinghouse for Drugs & Crime
1600 Research Boulevard
Rockville, MD 20850

## *COVID-19 Stats*



### COVID-19 Incidence,* by Age Group† — United States, March 1–November 14, 2020§




**Abbreviation:** COVID-19 = coronavirus disease 2019.
* Incidence = cases per 100,000 calculated using 2019 U.S. Census population.
† Age data for COVID-19 cases are based on case report forms submitted by state and territorial jurisdictions for confirmed and probable cases. Reporting for some jurisdictions is incomplete. Age is missing for 1% of case reports.
§ Data are provisional and subject to change.

During late March–late May, COVID-19 incidence was highest among adults aged ≥80 years, with a peak in incidence in the week beginning April 12. In June, incidence increased in all age groups, with the most rapid rate of increase and highest overall incidence among young adults aged 18–24 years; the rate in this group continues to be the highest among all age groups. Incidence steadily increased among children and adolescents (aged 0–17 years). The incidence in high school–aged persons (aged 14–17 years) was markedly higher than that in younger children by early July, then decreased before increasing in September. During late September–early October, weekly incidence decreased among young adults aged 18–24 years only, then continued to steadily increase among all age groups through November 14.

**Source:** CDC COVID-19 case-level report forms, March 1–November 14, 2020.

**Reported by:** Lindsey M. Duca, PhD, eocevent331@cdc.gov; Likang Xu, MD; Sandy F. Price; Catherine A. McLean, MD.

Español | Other Languages

Morbidity and Mortality Weekly Report (MMWR)

Morbidity and Mortality Weekly Report (*MMWR*)

Morbidity and Mortality Weekly Report (MMWR) Home



# COVID-19 Surveillance After Expiration of the Public Health Emergency Declaration — United States, May 11, 2023

*Weekly* / May 12, 2023 / 72(19);523–528

*On May 5, 2023, this report was posted online as an* MMWR *Early Release.*

Benjamin J. Silk, PhD[1]; Heather M. Scobie, PhD[1]; William M. Duck, MPH[1,2]; Tess Palmer, MPH[3]; Farida B. Ahmad, MPH[4]; Alison M. Binder, MS[5]; Jodi A. Cisewski, MPH[4]; Seth Kroop, MPA[5]; Karl Soetebier, MAPW[2]; Meeyoung Park, MPH[6]; Aaron Kite-Powell, MS[2]; Andrea Cool, MPH[5,7]; Erin Connelly, MPAff[1]; Stephanie Dietz, PhD[2]; Amy E. Kirby, PhD[8]; Kathleen Hartnett, PhD[2]; Jocelyn Johnston, MHS[3]; Diba Khan, PhD[1]; Shannon Stokley, DrPH[9]; Clinton R. Paden, PhD[1]; Michael Sheppard, MS[2]; Paul Sutton, PhD[4]; Hilda Razzaghi, PhD[9]; Robert N. Anderson, PhD[4]; Natalie Thornburg, PhD[1]; Sarah Meyer, MD[9]; Caryn Womack[1]; Aliki P. Weakland, MPH, MSW[1]; Meredith McMorrow, MD[1]; Lanson R. Broeker, MBA[1,3]; Amber Winn, MPH[1]; Aron J. Hall, DVM[1]; Brendan Jackson, MD[1]; Barbara E. Mahon, MD[1]; Matthew D. Ritchey, DPT[2] (VIEW AUTHOR AFFILIATIONS)

View suggested citation

## Summary

**What is already known about this topic?**

Authorizations to collect certain public health data expire at the end of the U.S. public health emergency declaration on May 11, 2023.

**What is added by this report?**

Changes to the national COVID-19 monitoring strategy and COVID Data Tracker capitalize on marked improvements in multiple surveillance systems. Weekly COVID-19 hospital admission levels and the percentage of all COVID-19–associated deaths will be primary surveillance indicators. Emergency department visits and percentage of positive SARS-CoV-2 laboratory test results will help detect early changes in trends. Genomic surveillance will continue to help identify and monitor SARS-CoV-2 variants.

**What are the implications for public health practice?**

COVID-19 is an ongoing public health problem that will be monitored with sustainable data sources to guide prevention efforts.

### Article Metrics

Altmetric:

1317

- News (147)
- Blogs (3)
- Policy documents (2)
- X (269)
- Facebook (2)
- Reddit (1)
- Mendeley (25)

Citations: 18

Views: 6,336

*Views equals page views plus PDF downloads*

Related Materials

Article PDF

Full Issue PDF




View Larger

On January 31, 2020, the U.S. Department of Health and Human Services (HHS) declared, under Section 319 of the Public Health Service Act, a U.S. public health emergency because of the emergence of a novel virus, SARS-CoV-2.* After 13 renewals, the public health emergency will expire on May 11, 2023. Authorizations to collect certain public health data will expire on that date as well. Monitoring the impact of COVID-19 and the effectiveness of prevention and control strategies remains a public health priority, and a number of surveillance indicators have been identified to facilitate ongoing monitoring. After expiration of the public health emergency, COVID-19–associated hospital admission levels will be the primary indicator of COVID-19 trends to help guide community and personal decisions related to risk and prevention behaviors; the percentage of COVID-19–associated deaths among all reported deaths, based on provisional death certificate data, will be the primary indicator used to monitor COVID-19 mortality. Emergency department (ED) visits with a COVID-19 diagnosis and the percentage of positive SARS-CoV-2 test results, derived from an established sentinel network, will help detect early changes in trends. National genomic surveillance will continue to be used to estimate SARS-CoV-2 variant proportions; wastewater surveillance and traveler-based genomic surveillance will also continue to be used to monitor SARS-CoV-2 variants. Disease severity and hospitalization-related outcomes are monitored via sentinel surveillance and large health care databases. Monitoring of COVID-19 vaccination coverage, vaccine effectiveness (VE), and vaccine safety will also continue. Integrated strategies for surveillance of COVID-19 and other respiratory viruses can further guide prevention efforts. COVID-19–associated hospitalizations and deaths are largely preventable through receipt of updated vaccines and timely administration of therapeutics (*1–4*).

Although COVID-19 no longer poses the societal emergency that it did when it first emerged in late 2019, COVID-19 remains an ongoing public health challenge. By April 26, 2023, more than 104 million U.S. COVID-19 cases, 6 million related hospitalizations, and 1.1 million COVID-19–associated deaths were reported to CDC and summarized on CDC's COVID Data Tracker.[†] COVID-19 was the third leading cause of death during 2020 and 2021[§] and the fourth leading cause during 2022 (*5*). To mitigate the consequences of the pandemic, approximately 675 million COVID-19 vaccine doses were administered, including 55 million updated (bivalent) booster doses. Based on seroprevalence data, infection- and vaccine-induced population immunity in the United States was 95% by December 2021 (*6*). As a result, rates of COVID-19–associated hospitalizations and deaths have declined substantially since March 2022 (*7*). This report describes changes to the national COVID-19 surveillance strategy, data sources, and indicators that will be made after the public health emergency declaration expires; these indicators will be displayed as weekly or otherwise scheduled updates to CDC's COVID Data Tracker.

Top

## Continued Surveillance After May 11, 2023

Most COVID-19 surveillance data sources will continue to be available after the public health emergency declaration ends on May 11; the reporting cadence of some will change, and three will be discontinued (Table 1). Since December 15, 2022, daily reporting to CDC's National Healthcare Safety Network (NHSN) of aggregate counts of patients with laboratory-confirmed

COVID-19 admitted to acute care and critical access U.S. hospitals has been required. After the public health emergency ends on May 11, 2023, a switch to a weekly cadence of national reporting will affect data processing and introduce reporting lag. NHSN data on COVID-19 hospital admissions per 100,000 population will be the primary surveillance indicator to help guide community and individual decisions related to risk and prevention behaviors. These data have similar suitability for tracking local COVID-19 activity as do COVID-19 Community Levels (CCLs) (*8*) and will be updated weekly on COVID Data Tracker at the county,[¶] state, regional, and national levels.

Considerable gains in the timeliness of National Vital Statistics System (NVSS) death certificate data processing were accomplished during the pandemic (*9*). Provisional death certificate data from NVSS, including decedents for whom COVID-19 is listed as an underlying or a contributing cause of death, will be the primary data source for monitoring COVID-19 mortality. Among several mortality-based metrics, the percentage of COVID-19–associated deaths among all reported deaths in NVSS will be a new weekly surveillance indicator on COVID Data Tracker that is comparable with a corresponding influenza mortality surveillance indicator (Table 2).** Because the lag in mortality reporting is similar for COVID-19 deaths and deaths overall, this indicator is not biased by incomplete reporting in previous weeks and allows for timely tracking of mortality trends (*8*).

The National Syndromic Surveillance Program (NSSP) has expanded substantially during the COVID-19 pandemic, with data from 6,300 facilities in all 50 states, the District of Columbia, and Guam. NSSP includes 75% of all U.S. ED visits (Table 1); coverage is currently limited in Minnesota and Oklahoma, and discharge diagnosis completeness is currently limited in Missouri. Using NSSP discharge diagnosis data, the weekly percentage of patients who receive a diagnosis of COVID-19 among all ED visits is an indicator that can identify trends earlier than hospital admission rates can (*8*).

Monitoring national and regional trends in the percentage of positive SARS-CoV-2 nucleic acid amplification test (NAAT) results will be based on surveillance data from the National Respiratory and Enteric Virus Surveillance System (NREVSS). This system is an established sentinel network of approximately 450 clinical, public health, and commercial laboratories that voluntarily submit weekly data on numbers of positive test results and total tests performed. As another early indicator, the percentage of positive SARS-CoV-2 test results from NREVSS is a suitable alternative to that obtained through COVID-19 electronic laboratory reporting (CELR), which will not be possible after May 11, because reporting of negative rest results will not be required (*8*). Because SARS-CoV-2 testing volumes and the geographic representation of NREVSS laboratories are heterogeneous (with one to 31 participating laboratories per state), region-level rather than state-level data will be displayed.

Genomic surveillance to estimate SARS-CoV-2 variant proportions at the national and regional levels will continue with a biweekly cadence and revised analytic methods for weighting based on the probability of selecting positive laboratory specimens for sequencing (*10*). As fewer specimens and sequences become available, a system that is scaled sufficiently to allow for regional estimates will be established in collaboration with the network of public health laboratories that have participated in the National SARS-CoV-2 Strain Surveillance program.[††] The National Wastewater Surveillance System (NWSS) and Traveler-based Genomic Surveillance (TGS) Program are additional sources of surveillance data for monitoring early trends in SARS-CoV-2 infections and variant proportions (NWSS) and for early detection of new variants in travelers entering the United States (TGS) that will continue to be available with daily or weekly updates.[§§]

In addition to NHSN, sentinel surveillance and large health care databases will continue to monitor disease severity and hospitalization-related outcomes. The Coronavirus Disease 2019–Associated Hospitalization Surveillance Network (COVID-NET)[¶¶] uses active, population-based surveillance to estimate rates of laboratory-confirmed COVID-19–associated hospital admissions and also collects detailed clinical information, including underlying conditions, to better understand trends and risk for severe disease. COVID-NET currently comprises 98 counties in 13 states. In addition, three large databases of electronic health care records (BD Insights Research Database [BD], the National Patient-Centered Clinical Research Network [PCORnet], and Premier Healthcare Database's Special COVID-19 Release [Premier])*** will support monitoring of COVID-19 severity among hospitalized patients (i.e., percentages of patients in intensive care units [ICUs], those receiving invasive mechanical ventilation, and deaths).

Monitoring vaccination coverage, safety,[†††] and VE are ongoing priorities because COVID-19–associated hospitalizations and deaths can be prevented through receipt of updated COVID-19 vaccines (*1–3*). Data use agreements established at the start of the pandemic with states, territories, and selected cities to facilitate receipt of comprehensive vaccine administration data from immunization information systems will terminate at the end of the public health emergency declaration. However, most jurisdictions have signed data use agreement extensions and will continue to submit COVID-19 vaccination data. Although future data might not be as complete because reporting requirements vary by state, the National Immunization Survey Child and Adult COVID Modules will continue to provide data on COVID-19 vaccination coverage and intent at the national and state levels via COVID Data Tracker and COVIDVaxView.[§§§] VE platforms will continue to provide robust assessment of the real-world

performance of vaccines (e.g., Investigating Respiratory Viruses in the Acutely Ill [IVY] and VISION Networks) (*1*,*2*). However, strategies for evaluating VE will need to incorporate alternative sources of vaccination data (e.g., patient/provider interviews or claims data) if immunization information systems are not sufficiently complete.

To continue facilitating access to national COVID-19 surveillance data, a first-phase, redesigned COVID Data Tracker website will launch on May 11, 2023. These data will continue providing an evidence base of information to guide prioritization of public health action. Numerous surveillance data sources and corresponding metrics and geographic levels will be updated weekly on COVID Data Tracker, with visualizations of trends and maps (Table 2). County-level hospitalization data will continue to include metrics on COVID-19–associated admissions and inpatient and ICU bed occupancy. Metrics for COVID-19–associated deaths (state-level), ED visits for COVID-19 (state-level), and percentage of positive SARS-CoV-2 test results (HHS region-level) will also be displayed. Metric levels will be anchored to levels of hospital admission rates used in the CCLs (*8*). The COVID Data Tracker will also continue to display SARS-CoV-2 variant proportion estimates and wastewater and traveler-based genomic surveillance data, as well as vaccination data and health care data on disease severity. In addition, availability of priority data will continue after May 11, 2023, for health equity, pediatric and special populations (e.g., vaccination coverage among persons who are pregnant and those with disabilities), health care settings (e.g., nursing home residents), and seroprevalence. SARS-CoV-2 infections remain nationally notifiable, and line-level COVID-19 case surveillance data will continue to be available, including public use data at https://data.cdc.gov.

Top

## Data Collection That Will Be Discontinued After May 11, 2023

After the expiration of the public health emergency on May 11, 2023, authorizations to collect certain types of public health data expire (Table 1). The COVID Data Tracker includes a page for accessing archived data.[¶¶] HHS can no longer require reporting of negative SARS-CoV-2 testing results via CELR reporting. This change removes the ability to monitor the national percentage of positive SARS-CoV-2 test results using the CELR data source. CELR data served as a useful early indicator of SARS-COV-2 transmission during the pandemic. However, since a peak of approximately 17.4 million NAATs performed weekly in January 2022, coinciding with the SARS-CoV-2 Omicron variant surge, the reported weekly volume of NAATs performed declined to less than 1 million by April 26, 2023. This decline is related in part to increased use of antigen tests as well as at-home testing.**** The CELR data have become more variable in quality or altogether unavailable in many jurisdictions over time. CDC's COVID-19 Community Transmission Levels, which were derived, in part, from CELR data, also will be discontinued.

National reporting of aggregate weekly counts of COVID-19 cases and associated deaths, which CDC compiles using automated data extraction from jurisdictional websites and dashboards and direct submissions, will also be discontinued with the expiration of the public health emergency. This transition is consistent with many state and local health authorities' decisions to discontinue public reporting of these data. Aggregate counts of COVID-19 cases have been useful for monitoring changing trends in incidence but have become less representative of actual rates of SARS-CoV-2 infections or levels of transmission over time, related to decreased laboratory testing, increased home testing, changes in reporting practices, and asymptomatic infections. Early in the pandemic, aggregate reporting from health departments provided more up-to-date counts of total deaths than did NVSS, but the timeliness of NVSS is now comparable with that of the aggregate counts (*8*,*9*). As part of the shift from reporting of aggregate death count data to use of NVSS data, date of death will be used rather than report date.

CCLs are based on a composite metric that includes COVID-19 hospital admission rates, inpatient bed utilization among patients with COVID-19, and case rates derived from aggregate reporting of case counts by jurisdictions. Because aggregate weekly case counts will end, CCLs also will end on May 11, 2023. Hospital admissions levels from NHSN closely align with CCLs (*8*) and will replace the CCL metric. Monthly reporting of case, hospitalization, and mortality rates by vaccination status will end with the expiration of the public health emergency.

Top

## Discussion

Beginning in 2020, the historic response to the COVID-19 pandemic necessitated rapid improvements in processing, reporting, and visualizing of timely and granular public health surveillance data on an unprecedented scale. In 2023, as part of the transition of COVID-19 from emergency to routine public health program activities, CDC has established the Coronavirus and Other Respiratory Viruses Division,[††††] which is committed to working with state, tribal, local, territorial, federal, and other partners on the prevention of COVID-19 within a sustainable and integrated surveillance strategy that monitors other circulating respiratory viruses and prevention measures, including vaccination, to provide timely and comprehensive situational awareness. In the past year, CDC has developed several public dashboards displaying data on hospitalizations or ED visits for diagnosed or laboratory-confirmed COVID-19, influenza, and respiratory syncytial virus.[§§§§]

Monitoring the impact of COVID-19 and the effectiveness of prevention and control strategies continues to be a public health priority during the transition from the emergency phase of the COVID-19 response to routine public health practice. Approximately 1,000 COVID-19–associated weekly deaths were reported in early April 2023; COVID-19–associated deaths are largely preventable through receipt of updated COVID-19 vaccine and timely administration of therapeutics¶¶¶¶ (*1–4*).

Top

## Acknowledgments

Lincoln Bollschweiler, Brett Burdick, Peter Colella, Cindy Friedman, Jonathan Hamer, Fiona Havers, Nesha Jairam, Iris Jiang, Jayshreema Khoosal, Saeed Muhammad, Bryan Nuckols, Kinsey Okoa, Harold Pryor, Cassandra Smith, Alexander Stubbs, Chris Taylor, Ernest Weems, Brian Wood, Fred Zagotti; Partnerships and Evaluation Branch, Office of Public Health Data, Surveillance, and Technology, CDC; Healthcare Data Advisory Unit, Data, Analytics, and Visualization Task Force, CDC COVID-19 Emergency Response Team.

Top

Corresponding author: Benjamin Silk, bsilk@cdc.gov.

Top

---

[1]Coronavirus and Other Respiratory Viruses Division, National Center for Immunization and Respiratory Diseases, CDC; [2]Office of Public Health Data, Surveillance, and Technology, CDC; [3]Office of Innovation and Analytics, Agency for Toxic Substances and Disease Registry, Atlanta, Georgia; [4]Division of Vital Statistics, National Center for Health Statistics, CDC; [5]Division of Healthcare Quality and Promotion, National Center for Emerging and Zoonotic Diseases, CDC; [6]Division of Emergency Operations, Center for Preparedness and Response, CDC; [7]Booz Allen Hamilton, McLean, Virginia; [8]Division of Foodborne, Waterborne, and Environmental Diseases, National Center for Emerging and Zoonotic Diseases, CDC; [9]Immunization Services Division, National Center for Immunization and Respiratory Diseases, CDC.

Top

All authors have completed and submitted the International Committee of Medical Journal Editors form for disclosure of potential conflicts of interest. No potential conflicts of interest were disclosed.

Top

* https://aspr.hhs.gov/legal/PHE/

† https://covid.cdc.gov/covid-data-tracker

§ https://www.cdc.gov/nchs/products/databriefs/db427.htm; https://www.cdc.gov/nchs/products/databriefs/db456.htm

¶ County-level hospital data, including new hospital admissions levels, are derived using calculations performed at the Health Service Area (HSA) level. An HSA is defined by CDC's National Center for Health Statistics as a geographic area containing at least one county that is self-contained with respect to the population's provision of routine hospital care. Every county in the United States is assigned to an HSA, and each HSA must contain at least one hospital. Data presented represent admissions and bed use among hospitals within the selected HSA.

** https://www.cdc.gov/flu/weekly/index.htm#NCHSMortality

†† https://www.aphl.org/aboutAPHL/publications/Documents/ID-Influenza-Right-Size-Roadmap-Edition2.pdf ; https://www.aphl.org/programs/preparedness/Crisis-Management/COVID-19-Response/Pages/Sequence-Based-Surveillance-Submission.aspx

§§ State, tribal, local, and territorial health departments participating in the NWSS submit testing data to CDC. CDC standardizes, interprets, and presents these data. How often sites collect wastewater samples and how frequently data are reported to CDC varies by health department. NWSS data for SARS-CoV-2 trends are updated daily, and data for SARS-CoV-2 variants are updated weekly (https://www.cdc.gov/nwss/index.html). The Traveler-Based Genomic Surveillance Program tracks SARS-CoV-2 variants by collecting samples from international air travelers arriving from more than 30 countries at seven major U.S. airports. These samples are then sent to a laboratory network for PCR testing; all positive samples undergo genomic sequencing. https://wwwnc.cdc.gov/travel/page/travel-genomic-surveillance

¶¶ https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covid-net/purpose-methods.html

*** Data on disease severity among hospitalized COVID-19 patients are obtained from three large health care data sources that contain information from subsets of U.S. hospitals: BD, PCORnet, and Premier. Although none of these sources is

national in scope, viewing trends across these three data sources adds to the overall understanding of COVID-19 disease severity. https://covid.cdc.gov/covid-data-tracker/index.html#hospitalizations-severity

††† https://www.cdc.gov/vaccinesafety/index.html

§§§ https://covid.cdc.gov/covid-data-tracker/#vaccine-confidence; https://www.cdc.gov/vaccines/imz-managers/coverage/covidvaxview/interactive.html

¶¶¶ https://covid.cdc.gov/covid-data-tracker/#archived

**** https://data.cdc.gov/Public-Health-Surveillance/U-S-COVID-19-Self-Test-Data/275g-9x8h

†††† https://www.federalregister.gov/documents/2023/02/13/2023-02930/establishment-of-the-coronavirus-and-other-respiratory-viruses-division

§§§§ https://www.cdc.gov/ncird/surveillance/respiratory-illnesses/index.html; https://www.cdc.gov/surveillance/resp-net/dashboard.html

¶¶¶¶ https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

Top

## References

1. Tenforde MW, Weber ZA, Natarajan K, et al. Early estimates of bivalent mRNA vaccine effectiveness in preventing COVID-19–associated emergency department or urgent care encounters and hospitalizations among immunocompetent adults—VISION Network, nine states, September–November 2022. MMWR Morb Mortal Wkly Rep 2022;71:1616–24. https://doi.org/10.15585/mmwr.mm715152e1 PMID:36580430
2. Surie D, DeCuir J, Zhu Y, et al.; IVY Network. Early estimates of bivalent mRNA vaccine effectiveness in preventing COVID-19–associated hospitalization among immunocompetent adults aged ≥65 years—IVY Network, 18 states, September 8–November 30, 2022. MMWR Morb Mortal Wkly Rep 2022;71:1625–30. https://doi.org/10.15585/mmwr.mm715152e2 PMID:36580424
3. Johnson AG, Linde L, Ali AR, et al. COVID-19 incidence and mortality among unvaccinated and vaccinated persons aged ≥12 years by receipt of bivalent booster doses and time since vaccination—24 U.S. jurisdictions, October 3, 2021–December 24, 2022. MMWR Morb Mortal Wkly Rep 2023;72:145–52. https://doi.org/10.15585/mmwr.mm7206a3 PMID:36757865
4. Shah MM, Joyce B, Plumb ID, et al. Paxlovid associated with decreased hospitalization rate among adults with COVID-19—United States, April–September 2022. MMWR Morb Mortal Wkly Rep 2022;71:1531–7. https://doi.org/10.15585/mmwr.mm7148e2 PMID:36454693
5. Ahmad FB, Cisewski JA, Xu J, Anderson RN. Provisional mortality data—United States, 2022. MMWR Morb Mortal Wkly Rep 2023;72:488–92. https://doi.org/https://www.cdc.gov/mmwr/volumes/72/wr/mm7218a3.htm?s_cid=mm7218a3_w
6. Jones JM, Opsomer JD, Stone M, et al. Updated US infection- and vaccine-induced SARS-CoV-2 seroprevalence estimates based on blood donations, July 2020–December 2021. JAMA 2022;328:298–301. https://doi.org/10.1001/jama.2022.9745 PMID:35696249
7. CDC. COVID-19 data review: update on COVID-19–related mortality. Atlanta, GA: US Department of Health and Human Services, CDC; 2023. Accessed April 14, 2023. https://www.cdc.gov/coronavirus/2019-ncov/science/data-review/index.html
8. Scobie HM, Panaggio M, Gallagher ME, Duck WM, Graff P, Silk B. Evaluation of current and future COVID-19 surveillance systems—United States, May 2023. MMWR Morb Mortal Wkly Rep 2023;72. https://www.cdc.gov/mmwr/volumes/72/wr/mm7219e2.htm?s_cid=mm7219e2_w https://doi.org/
9. Ahmad FB, Anderson RN, Knight K, Rossen LM, Sutton PD. Advancements in the National Vital Statistics System to meet the real-time data needs of a pandemic. Am J Public Health 2021;111:2133–40. https://doi.org/10.2105/AJPH.2021.306519 PMID:34878853
10. Lambrou AS, Shirk P, Steele MK, et al.; Strain Surveillance and Emerging Variants Bioinformatic Working Group; Strain Surveillance and Emerging Variants NS3 Working Group. Genomic surveillance for SARS-CoV-2 variants: predominance of the Delta (B.1.617.2) and Omicron (B.1.1.529) variants—United States, June 2021–January 2022. MMWR Morb Mortal Wkly

Rep 2022;71:206–11. https://doi.org/10.15585/mmwr.mm7106a4 PMID:35143464

Top

TABLE 1. Changes to national reporting of COVID-19 surveillance data sources and accessibility after the expiration of the public health emergency declaration — United States, May 11, 2023

Return

| Surveillance data source | Changes to COVID Data Tracker | Accessibility* |
|---|---|---|
| National Healthcare Safety Network† | Continued availability with weekly updates | COVID Data Tracker |
| National Vital Statistics System§ | New availability with weekly updates | COVID Data Tracker |
| National Syndromic Surveillance Program¶ | Continued availability with weekly updates | COVID Data Tracker |
| National Respiratory and Enteric Viruses Surveillance System** | New availability with weekly updates | COVID Data Tracker |
| National SARS-CoV-2 Strain Surveillance†† | Continued availability with biweekly updates | COVID Data Tracker |
| National Wastewater Surveillance System§§ | Continued availability with daily or weekly updates | COVID Data Tracker |
| Traveler-based Genomic Surveillance program¶¶ | Continued availability with weekly updates | COVID Data Tracker |
| COVID-NET (sentinel surveillance for COVID-19–associated hospitalizations)*** | Continued availability with weekly updates | COVID Data Tracker |
| Large health care databases††† | Continued availability with monthly or quarterly updates | COVID Data Tracker |
| COVID-19 vaccination administration§§§ | Continued availability with monthly updates | COVID Data Tracker |
| National Immunization Survey¶¶¶ | Continued availability with weekly or monthly updates | COVID Data Tracker and COVIDVaxView |
| Line-level COVID-19 case reporting**** | Continued availability with weekly updates | COVID Data Tracker and https://data.cdc.gov |
| CELR†††† | Discontinued on May 11, 2023 | Archived on https://healthdata.gov |
| ACDC reporting§§§§ | Discontinued on May 11, 2023 | Archived on https://data.cdc.gov |
| Community transmission level and COVID-19 community level metrics | Discontinued on May 11, 2023 | Archived on https://data.cdc.gov |

**Abbreviations:** ACDC = aggregate cases and death counts; CELR = COVID-19 electronic laboratory reporting; COVID-NET = Coronavirus Disease 2019-Associated Hospitalization Surveillance Network.
* https://covid.cdc.gov/covid-data-tracker; https://www.cdc.gov/vaccines/imz-managers/coverage/covidvaxview/index.html; https://data.cdc.gov; https://healthdata.gov

† https://www.hhs.gov/sites/default/files/covid-19-faqs-hospitals-hospital-laboratory-acute-care-facility-data-reporting.pdf

§ https://www.cdc.gov/nchs/nvss/index.htm
¶ https://www.cdc.gov/nssp/index.html
** https://www.cdc.gov/surveillance/nrevss/index.html
†† https://covid.cdc.gov/covid-data-tracker/#variant-proportions
§§ https://www.cdc.gov/nwss/index.html
¶¶ https://wwwnc.cdc.gov/travel/page/travel-genomic-surveillance
*** https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covid-net/purpose-methods.html
††† https://covid.cdc.gov/covid-data-tracker/index.html#hospitalizations-severity
§§§ https://www.cdc.gov/vaccines/covid-19/reporting/index.html; https://www.cdc.gov/coronavirus/2019-ncov/vaccines/reporting-vaccinations.html
¶¶¶ https://www.cdc.gov/vaccines/imz-managers/nis/index.html
**** https://cdn.ymaws.com/www.cste.org/resource/resmgr/ps/ps2022/22-ID-01_COVID19.pdf
†††† https://www.cdc.gov/coronavirus/2019-ncov/lab/reporting-lab-data.html
§§§§ ACDC data are compiled using automated data extraction from state and jurisdictional websites and dashboards and direct submissions from jurisdictions. ACDC data shifted from daily to weekly cadence in October 2022, with some jurisdictions continuing to report daily totals and others reporting only weekly totals.

Top

TABLE 2. Data sources, metrics, and geographic levels for continued COVID-19 surveillance after the expiration of the public health emergency declaration — United States, May 11, 2023 Return

| Surveillance data source | Metrics | Geographic level |
|---|---|---|
| National Healthcare Safety Network* | Count of COVID-19–associated hospital admissions | County, state, regional per HHS regions, and national |
| | Rate of COVID-19–associated hospital admissions per 100,000 population | |
| | % Change in COVID-19–associated hospital admissions from previous wk | |
| | % of inpatient beds occupied by COVID-19 patients | |
| | Absolute change in % of inpatient beds occupied by COVID-19 patients from previous wk | |
| | % of ICU beds occupied by COVID-19 patients | |
| | Absolute change in % of ICU beds occupied by COVID-19 inpatients from previous wk | |
| National Vital Statistics System† | % of all COVID-19–associated deaths | State, regional per HHS regions, and national |
| | Count of COVID-19–associated deaths | |
| | Rate of COVID-19–associated deaths per 100,000 population (crude and age-adjusted) | |

| | | |
|---|---|---|
| National Syndromic Surveillance Program§ | % of ED visits with COVID-19 discharge diagnoses | Select states, regional per HHS regions, and national |
| | % Change in % of ED visits with COVID-19 from previous wk | |
| National Respiratory and Enteric Viruses Surveillance System¶ | SARS-CoV-2 NAAT % positivity | Regional per HHS regions and national |
| | % Change in SARS-CoV-2 NAAT % positivity from previous wk | |
| National SARS-CoV-2 Strain Surveillance** | Weighted and nowcast estimates of variant proportions | Regional per HHS regions and national |
| National Wastewater Surveillance System†† | Current virus levels in wastewater by site | Select counties, states, regional per HHS regions, and national |
| | % Change in the last 15 days | |
| | % of wastewater samples with detectable virus | |
| | Predominant variants by site | |
| | Relative abundance of variants by site | |
| Traveler-based Genomic Surveillance program§§ | % Test positivity (pooled) | National |
| | Variant proportions among positive pools | |
| COVID-NET (sentinel surveillance for COVID-19–associated hospitalizations)¶¶ | Rate of COVID-19–associated hospital admissions | Select states and counties (sentinel network) |
| | COVID-19–associated hospital admissions rates, by age group, sex, and race and ethnicity | |
| | % of COVID-19–associated hospitalizations by underlying medical conditions | |
| | % of COVID-19–associated hospitalizations resulting in ICU, IMV, or death | |
| Large health care databases*** | % of hospitalized COVID-19 patients who were admitted to an ICU | Select participating health care organizations |
| | % of hospitalized COVID-19 patients who received IMV | |
| | % of hospitalized COVID-19 patients who died | |
| COVID-19 vaccinations††† | % Up-to-date status | 57 of 64 jurisdictions (as of April 25, 2023) |
| National Immunization Survey§§§ | % Vaccinated and intent for vaccination | National (adults and children); |

| | | |
|---|---|---|
| | Vaccination status and intent by demographic characteristics and behavioral indicators | state (adults) |

**Abbreviations:** COVID-NET = Coronavirus Disease 2019-Associated Hospitalization Surveillance Network; ED = emergency department; HHS = U.S. Department of Health and Human Services; ICU = intensive care unit; IMV = invasive mechanical ventilation; NAAT = nucleic acid amplification test.

* https://www.hhs.gov/sites/default/files/covid-19-faqs-hospitals-hospital-laboratory-acute-care-facility-data-reporting.pdf .

† https://www.cdc.gov/nchs/nvss/index.htm

§ https://www.cdc.gov/nssp/index.html

¶ https://www.cdc.gov/surveillance/nrevss/index.html

** https://covid.cdc.gov/covid-data-tracker/#variant-proportions

†† https://www.cdc.gov/nwss/index.html

§§ https://wwwnc.cdc.gov/travel/page/travel-genomic-surveillance.

¶¶ https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covid-net/purpose-methods.html

*** https://covid.cdc.gov/covid-data-tracker/index.html#hospitalizations-severity

††† https://www.cdc.gov/vaccines/covid-19/reporting/index.html; https://www.cdc.gov/coronavirus/2019-ncov/vaccines/reporting-vaccinations.html; https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html

§§§ https://www.cdc.gov/vaccines/imz-managers/nis/index.html

Top

**Suggested citation for this article:** Silk BJ, Scobie HM, Duck WM, et al. COVID-19 Surveillance After Expiration of the Public Health Emergency Declaration — United States, May 11, 2023. MMWR Morb Mortal Wkly Rep 2023;72:523–528. DOI: http://dx.doi.org/10.15585/mmwr.mm7219e1 .

*MMWR* and *Morbidity and Mortality Weekly Report* are service marks of the U.S. Department of Health and Human Services.

Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.

References to non-CDC sites on the Internet are provided as a service to *MMWR* readers and do not constitute or imply endorsement of these organizations or their programs by CDC or the U.S. Department of Health and Human Services. CDC is not responsible for the content of pages found at these sites. URL addresses listed in *MMWR* were current as of the date of publication.

All HTML versions of *MMWR* articles are generated from final proofs through an automated process. This conversion might result in character translation or format errors in the HTML version. Users are referred to the electronic PDF version (https://www.cdc.gov/mmwr) and/or the original *MMWR* paper copy for printable versions of official text, figures, and tables.

Questions or messages regarding errors in formatting should be addressed to mmwrq@cdc.gov.
Last Reviewed: May 11, 2023



# Hood v. Webster

WILLIAM J. HOOD, Respondent, v. HOWARD A. WEBSTER et al., Appellants

**Court of Appeals of the State of New York**

271 N.Y. 57, 2 N.E.2d 43

Opinion

Argued March 12, 1936

Decided April 21, 1936

Appeal from the Supreme Court, Appellate Division, Fourth Department.

Carrollton A. Roberts for appellants.

William MacFarlane for respondent.

LOUGHRAN, J.

Florence F. Hood owned a parcel of farm land in the town of Phelps, Ontario county. This property had been devised to her by her husband, whose will said that, should she predecease him, he wanted his estate to go to his brother, the plaintiff here. In 1913 Mrs. Hood executed a deed of the farm to the plaintiff and delivered it to his attorney as an escrow to take effect on her death. The Appellate Division has confirmed a finding of the Equity Term that this delivery was subject to no other condition. A majority of this court has come to the conclusion that the contrary of the fact so found may not be declared as matter of law on this record.

Having all along occupied the property, Mrs. Hood in 1928 granted it to the defendants (her brother and a nephew) by a deed then recorded. She died in 1933. The prior deed held

as an escrow was thereupon delivered over to the plaintiff who had it recorded. In this action to annul the subsequent deed to the defendants, it has been held that on the foregoing facts the plaintiff was entitled to prevail.

On this appeal by the defendants, the parties concede that the case made by the findings depends for its solution upon the force and effect of section 291 of the Real Property Law (Cons. Laws, ch. 50). It is thereby provided that every conveyance of real property not recorded "is void as against any subsequent purchaser in good faith and for a valuable consideration, from the same vendor, his heirs or devisees, of the same real property or any portion thereof, whose conveyance is first duly recorded."

Did the single circumstance that the subsequent deed to the defendants was first on record establish, in the absence of evidence to the contrary, the matters thus essential to avoid the prior deed to the plaintiff?

We think this question of burden of proof as fixed by the recording act is not for us an open one. The defendants were bound to make out by a fair preponderance of evidence the affirmative assertion of their status as purchasers in good faith and for a valuable consideration. ( Westbrook v. Gleason, 79 N.Y. 23; Ten Eyck v. Witbeck, 135 N.Y. 40; Lehrenkrauss v. Bonnell, 199 N.Y. 240, 243.)

Brown v. Volkening ( 64 N.Y. 76) and Constant v. University of Rochester ( 111 N.Y. 604; 133 N.Y. 640), as read by us, are not authorities to the contrary. In those cases the court did say that the party who claimed under an unrecorded conveyance was required to prove that the subsequent record purchaser took with notice. But here, as elsewhere, it must be kept in mind that the phrase "burden of proof" may stand in one connection "for the never changing burden of establishing the proposition in issue," and in another "for the constantly changing burden of producing evidence." (Thayer, Preliminary Treatise on Evidence, pp. 353-389.) In the Brown and Constant cases the controlling factor was that substantial value had been paid for the subsequent conveyance. That fact was more than evidence of consideration. It was further the basis for the auxiliary inference that there was also good faith in the transaction, and what was said respecting the burden of proof had reference to the duty of adducing evidence to repel that inference. For the same reason, the burden of proof (in the same sense) is upon the holder of an unrecorded conveyance when a subsequent deed first recorded acknowledges receipt by the grantor of a consideration sufficient to satisfy the statute. ( Wood v. Chapin, 13 N.Y. 509, 518; Page v. Waring, 76 N.Y. 463, 469; Lacustrine Fertilizer Co. v. Lake Guano Fertilizer Co., 82 N.Y. 476, 483; Ward v. Isbill, 73 Hun, 550.)

We have a different case here. Under their defense of purchase for value without notice the defendants offered no evidence of actual consideration given. The subsequent deed to them expressed their payment of "One Dollar and other good and valuable consideration." This recital was not enough to put them into the position of purchasers for a valuable consideration in the sense of the statute. ( Ten Eyck v. Witbeck; Lehrenkrauss v. Bonnell, supra.) The duty of maintaining the affirmative of the issue, and in a primary sense the burden of proof, was cast upon the defendants by the recording act. They failed to discharge that burden.

The judgment should be affirmed, with costs.

CRANE, Ch. J. (dissenting).

I cannot agree with Brother LOUGHRAN'S view of the law nor with his conclusion on the evidence in this case.

The Real Property Law, section 291, provides: "A conveyance of real property, within the state, on being duly acknowledged by the person executing the same, * * * may be recorded in the office of the clerk of the county where such real property is situated, * * *. Every such conveyance not so recorded is void as against any subsequent purchaser in good faith and for a valuable consideration, from the same vendor, his heirs or devisees, of the same real property or any portion thereof, whose conveyance is first duly recorded."

It is conceded that the holder of a prior unrecorded deed has the burden of proving the lack of good faith in the holder of a subsequent recorded deed. The burden is upon him to prove notice or such circumstances as would give notice to a reasonable man. ( Brown v. Volkening, 64 N.Y. 76; Constant v. University of Rochester, 133 N.Y. 640; Kirchhoff v. Gerli, 171 App. Div. 160. ) I can see no reason for complicating this rule by shifting the burden of proof when it comes to valuable consideration. It is just as easy to prove lack of consideration in this day when parties may be witnesses and examined before trial as it is to prove notice or bad faith. We should not impair the force and efficacy of the recording statutes upon which it has become a habit and custom to rely in the transfer of real property. A deed or mortgage on record is good as against prior unrecorded deeds or incumbrances until notice or bad faith or a lack of consideration is proven. The burden of proof should rest with the person who asserts the invalidity. Such was the view expressed in Gratz v. Land River Improvement Co. (82 Fed. Rep. 381, 385; writ dismissed, 173 U.S. 705 [Circuit Court of Appeals, Seventh Circuit]). It was there stated: "It is further objected that the deed from Herbert to Mitchell, being prior in point of time, although subsequent in point of record, was effectual to pass the title of the premises, and was valid against the

whole world, except bona fide purchasers for value, without notice, and that the burden of proof with respect to the bona fides of the deeds subsequent in date, but prior of record, is cast upon those claiming under them. This presents a question not altogether without difficulty, and in respect to which the authorities are not wholly at agreement. Jackson v. M'Chesney, 7 Cow. 360; Wood v. Chapin, 13 N.Y. 509; Shotwell v. Harrison, 22 Mich. 410; Hoyt v. Jones, 31 Wis. 389, 404; Lampe v. Kennedy, 56 Wis. 249; 14 N.W. 43; Cutler v. James, 64 Wis. 173, 179; 24 N.W. 874; Prickett v. Muck, 74 Wis. 199, 206; 42 N.W. 256. In the state of New York it is ruled that under the recording act the junior purchaser, whose deed is first recorded, is presumptively a bona fide purchaser for a valuable consideration, without notice, and that the burden of proof to the contrary rests upon the senior purchaser, whose deed has not been recorded."

Naturally this burden of proof readily shifts and where fraud is shown or circumstances which cast suspicion upon the transactions the defendant — subsequent vendee — may be called upon to show or prove his good faith and the consideration. Such were the cases of Ochenkowski v. Dunaj ( 232 App. Div. 441); Flickinger v. Glass ( 222 N.Y. 404), and Seymour v. McKinstry ( 106 N.Y. 230), upon which the Flickinger case was decided.

I go still further, however, and hold that the plaintiff is not entitled to recover on the evidence. Florence F. Hood was a widow of about fifty-five years of age, living alone on a small farm, which is the subject of this action. The plaintiff, William J. Hood, is her brother-in-law. She married his brother. The defendant Almon B. Farwell is her brother, and the defendant Howard A. Webster her nephew. Mrs. Hood was left by her husband with this farm and no money with the exception of a mortgage of $1,200 upon property in Nebraska. She was desirous and anxious to get enough money to live on the farm and the plaintiff proposed to give it to her during her natural life in exchange for the farm. She was brought in January of 1913 to the office of the plaintiff's lawyer, at which time she executed a deed of the farm to the plaintiff and also an agreement, which was part and parcel of one transaction, wherein the plaintiff agreed to pay her $200 a year as long as she lived. The deed was not given to the plaintiff; it was given to the lawyer to hold in escrow for no other purpose that can be imagined except to insure the plaintiff's paying the $200 a year and keeping his agreement. The delivery of the deed in escrow and the promise of the plaintiff were all one and the same transaction, and the payment of the money by the plaintiff was clearly a condition precedent to be fulfilled before he was entitled to the deed. Florence Hood lived for twenty years thereafter and died on the 29th day of January, 1933. The plaintiff broke all his promises and agreements. He never paid her a dollar, so far as this record shows. He owed her at the time of her death $4,000, not counting simple interest,

and the courts below, dealing in equity, have turned over to him the farm, without requiring the plaintiff to do equity and pay to the estate the money he owes.

The agreement drawn by the plaintiff's lawyer went so far as to require Florence Hood, during all the years that she lived, to work the farm and to pay out of its produce all the taxes and upkeep, and this she did. Florence Hood repudiated the plaintiff, no doubt because of his failure to pay her any money or to keep his agreement, and in 1928 executed and delivered a deed of the farm to Howard A. Webster, her nephew, who had come to live with her and help her on the farm. This deed has been recorded and is the one which the plaintiff seeks to set aside and which the courts below have set aside in the face of the plaintiff's default. In this I think the courts were clearly in error as there is no evidence to justify the conclusion that the farm was to be given or the deed to it turned over to the plaintiff without any consideration or regard whatever to his obligations, acts or responsibilities. Even the $1,200 mortgage on the Nebraska property was given to the plaintiff in 1913 on the understanding and agreement that he was to support and care for his sister-in-law by paying $200 a year. This apparently he still keeps or has disposed of.

The plaintiff's lawyer became a witness and testified as to the transaction in his office when the deed and agreement were drawn up: "She also stated in substance, I can't give her exact words, `that she was not well off, financially,' and `that she wanted to be certain of some income during her life; that certain loans had been made by her, and her husband, to members of her own family, which had not turned out well, and that she felt that she could rely upon William J. Hood.' * * * During the conversation, as I say, Mrs. Hood said `that she wanted to be assured of some income during her life,' and it was stated that she had a mortgage on some property in Nebraska for $1,200, which she was going to turn over to William J. Hood, and that she was also going to agree to pay to William J. Hood at any time which he might demand it, an additional sum of $500, and that William J. Hood was going to pay her $200 per year during her lifetime * * *."

Martha T. Hood, the wife of the plaintiff, became a witness for him and testified that Mrs. Hood said the following: "Why, she didn't know what she was going to do if she used her money. She would soon be out of money, and her agreement with Mr. Will Hood was that she would be assured of an income each year which would reduce her worries a great deal."

With this attitude and fear of poverty Mrs. Hood on January 22, 1913, executed a deed of the farm to William J. Hood, which was not delivered to him or given to him, but was put by his lawyer in the lawyer's safe and kept in escrow for no other purpose or reason that I can see except to bind and hold William to the fulfilment of his agreement executed at the same time. The instrument is dated January 22d, and William J. Hood of Rochester

becomes party of the first part, and Florence Hood of the town of Phelps, Ontario county, party of the second part. It recites that "Whereas" a deed of even date has been delivered in escrow to be delivered to William J. Hood upon the death of Florence J. Hood, that "Now, therefore, for and in consideration of the making and delivery in escrow of said deed, and of the covenants and agreements herein expressed, the said party of the first part in consideration thereof and a further sum to be agreed upon by the parties hereto, not to exceed however the sum of Five Hundred Dollars ($500.00) in addition to the property above transferred, to be paid to him by the said party of the second part, does hereby agree that he will pay or cause to be paid to the said party of the second part during the term of her natural life the sum of Two Hundred Dollars ($200.00) per year or more at his option, to be paid quarterly, the said sum to be paid in addition to any income derived by said party of the second part from the use of said farm. * * *

"It is mutually agreed that the party of the second part shall pay all taxes, necessary repairs and operating expenses of said farm out of the income therefrom."

When we consider that this elderly widow had nothing but a farm which had to be worked, and was in fear and dread of financial distress, there is only one possible conclusion, in my judgment, to be drawn from the execution of these instruments. Florence Hood was to give the farm to William Hood at her death in consideration for his paying to her $200 a year for her to live on; and that it was never her intention or any part of the transaction that he should have the farm for nothing or in default of his obligation. The courts below have given him the farm for nothing, so far as this record shows, instead of to the nephew who helped his aunt work the farm in order to meet taxes, upkeep and a living.

The record is none too full, so that the conclusions which I have drawn are based entirely upon the evidence or lack of evidence which appeared on the trial. As a matter of law, therefore, on this evidence, the plaintiff failed to make out a case entitling him to equitable relief and the removal of the defendants' deed from the record.

The judgment should be reversed and the complaint dismissed, with costs in all courts.

LEHMAN, O'BRIEN, CROUCH and FINCH, JJ., concur with LOUGHRAN, J.; CRANE, Ch. J., dissents in opinion in which HUBBS, J., concurs on the second ground stated.

Judgment affirmed.

Some case metadata and case summaries were written with the help of AI, which can produce inaccuracies. You should read the full case before relying on it for legal research purposes.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

**U.S. Department of Justice**
Office of Justice Programs
Bureau of Justice Statistics

Joseph M. Bessette
Acting Director

Single copies of any report cited here or any other BJS publication can be ordered from the Drugs & Crime Data Center & Clearinghouse at 1600 Research Blvd., Rockville, MD 20850, toll-free 1-800-666-3332. Please order using NCJ numbers listed in the source notes, page 19. Postage and handling are charged for bulk orders.

Public-use tapes for BJS data sets and other criminal justice data are available from the National Archive of Criminal Justice Data, P.O. Box 1248, Ann Arbor, MI 48106 (313-763-5010).

The Assistant Attorney General, Office of Justice Programs, coordinates the activities of the following program offices and bureaus: Bureau of Justice Statistics, National Institute of Justice, Bureau of Justice Assistance, Office of Juvenile Justice and Delinquency Prevention, and Office for Victims of Crime.

NCJ-121022
January1990

121022

**U.S. Department of Justice**
**National Institute of Justice**

This document has been reproduced exactly as received from the person or organization originating it. Points of view or opinions stated in this document are those of the authors and do not necessarily represent the official position or policies of the National Institute of Justice.

Permission to reproduce this copyrighted material has been granted by
Public Domain/OJP/BJS
U.S. Department of Justice
to the National Criminal Justice Reference Service (NCJRS).

Further reproduction outside of the NCJRS system requires permission of the copyright owner.

Case: 2:25-cv-00748-SDM-EPD Doc #: 1-10 Filed: 07/07/25 Page: 70 of 71 PAGEID #: 810



| Seconds | 0.8 | 2 | 3 | 4 | 5 | 6 | 9 | 120 |
|---|---|---|---|---|---|---|---|---|
| Wet virus | 517 | 170 | 53 | 13 | 13 | 2 | ND | NT |
| Wet virus control | 2150 | 2100 | 2167 | 2267 | 1450 | 1700 | 1550 | NT |
| Percent reduction | 75.9 | 91.9 | 97.6 | 99.4 | 99.1 | 99.9 | >99.9 | N/A |
| Dry virus | 85 | 39 | 8 | 1 | ND | ND | ND | ND |
| Dry virus control | 513 | 523 | 503 | 563 | 613 | 550 | 563 | 420 |
| Percent reduction | 83.4 | 92.5 | 98.4 | 99.8 | >99.9 | >99.9 | >99.9 | >99.9 |

**Table 1.** Reduction in viral titer (PFU/ml) at different irradiation times. *PFU/ml* plaque-forming units per milliliter, *ND* not detected, *NT* not tested, *N/A* not applicable.




**Figure 1.** Reduction in infectivity of SARS-CoV-2 after exposure to UV-C irradiation. The virus was exposed to UV-C as dried droplets (**A**) or wet droplets (**B**). Each set of data (dry samples and wet samples) shows a decrease of the remaining infectivity as a function of time, normalized to 1. Blue lines indicate single exponential decay functions while red lines indicate double exponential decay functions.

occurred from 0.8 s of exposure, while SARS-CoV-2 virus infectivity was reduced to below detectable levels in as few as 9 s for dried virus (Table 1; Fig. 1A) and 4 s for wet virus (Table 1; Fig. 1B).

Virus inactivation by UV light is expected to be an exponential process[9]. Therefore, to estimate the decay time, we used linear regression methods with single and double exponential decay functions (Fig. 1). The single exponential decay function has the form $y = e^{-t/\tau}$, while the double exponential function has the form $y = (1-f)e^{-t/\tau_1} + fe^{-t/\tau_2}$. $\tau$, $\tau_1$ and $\tau_2$ are the decay times of the linear regressions. In case of double exponential decay, $f$ is the fraction of the viruses that survive the first decay. For the analysis, data points were normalized so that the initial condition $t=0$ corresponds to 100% infectivity with no irradiance.

In the linear regression of dried droplets, the reduced $\chi^2$ for double exponential decay (0.36) was lower than the one corresponding to single exponential decay (0.52). The $R^2$ for double exponential was higher than the $R^2$ of the single exponential. Hence, we used the double exponential decay to estimate the decay times, obtaining $\tau_1 = 0.48 \pm 0.09$s, and $\tau_2 = 1.60 \pm 1.17$s.

In case of wet droplets, we observed the opposite: the $\chi^2$ for the double exponential (1.0) was higher than the one corresponding to the single exponential (0.8). The $R^2$ for the double exponential and the single exponential was the same (0.9). We therefore used the single exponential decay as a best fit of the data to estimate the decay time, translating into an average decay time of $\tau = 1.0 \pm 0.1$s. Within one standard deviation, the decay times of wet and dried droplets are congruent. This is most likely due to the limited resolution of the measurements. In addition, this indicates that given the observation limits, UV-C absorption by media constituents did not significantly affect virus inactivation at a wavelength of 254 nm.

It should be noted that the experiments for this study were performed under specific and controlled conditions. Factors such as humidity, textured surfaces and the presence of dust and other particles may reduce the effectiveness of UV-C and influence the dose required to achieve complete viral inactivation[6]. It is also important to consider the composition of respiratory droplets when evaluating the effectiveness of 254 nm UV-C irradiation. Droplets are likely to be in solvent with a variety of other biological fluids such as respiratory mucus (phlegm) which may include viral glycoproteins, and UV-C absorption of these fluids and particles may result in a reduction in viral inactivation efficiencies. The results obtained in this study should therefore be interpreted as the minimum dose of radiation required to achieve viral inactivation.

PC-G-17.3 (Rev. 1-2010)

PROBATE COURT OF FRANKLIN COUNTY, OHIO
JEFFREY D. MACKEY, JUDGE

IN THE MATTER OF GUARDIANSHIP OF Eddie Van Oliver III aka Eddie Oliver III

CASE NO. 633904

# NOTICE TO PROSPECTIVE WARD OF APPLICATION AND HEARING

To: Eddie Van Oliver III aka Eddie Oliver III

An application has been filed by Tracy Hairston asking to be appointed as your guardian. If the court finds that you are incompetent and in need of a guardian, the court may appoint the applicant, a different applicant, or an independent attorney as your guardian.

If the guardianship is granted, the guardian will be able to make decisions for you concerning your personal life and/or your estate. (Estate means money and property.)

A hearing on the application for guardianship will be held on November 26 20 24 at 3:30 PM. in the Probate Court of Franklin County, 22nd Floor, 373 South High Street, Columbus, Ohio 43215. At that hearing the applicant must prove by clear and convincing evidence that, because of mental impairment, you are unable to handle your own affairs.

You have the right to be present at the hearing, to contest the application, and to be represented by an attorney of your choice. For more information on your rights, see the back of this Notice.